No. 2016-1054

# United States Court of Appeals for the Federal Circuit

BLUE SPIKE, LLC,

*Plaintiff-Appellant,*

v.

GOOGLE INC.,

*Defendant-Appellee.*

Appeal from the United States District Court for the
Northern District of California in Case No. 4:14-cv-01650-YGR,
Judge Yvonne Gonzalez Rogers.

## BRIEF OF APPELLEE GOOGLE INC.

NICHOLAS H. LEE
nicholas.lee@aporter.com
ARNOLD & PORTER LLP
777 S. Figueroa Street
44th Floor
Los Angeles, California 90017
Telephone:      (213) 243-4000
Facsimile:      (213) 243-4199

MICHAEL A. BERTA
*Counsel of Record*
michael.berta@aporter.com
ARNOLD & PORTER LLP
Three Embarcadero Center
10th Floor
San Francisco, California 94111
Telephone:      (415) 471-3100
Facsimile:      (415) 471-3400

*Counsel for Appellee Google Inc.*

March 28, 2016

No. 2016-1054

---

**IN THE UNITED STATE COURT OF APPEALS
FOR THE FEDERAL CIRCUIT**

---

BLUE SPIKE, LLC,

*Plaintiff-Appellant*,

v.

GOOGLE INC.,

*Defendant-Appellee.*

---

Appeal from the United States District Court for the
Northern District of California in Case No. 4:14-cv-01650-YGR,
Judge Yvonne Gonzalez Rogers.

---

**CERTIFICATE OF INTEREST**

---

Counsel for Appellee Google Inc. certifies the following:

1.   The full name of every party or amicus represented by me is:

   Google Inc.

2.   The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

   Google Inc.

3.   All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

   Alphabet Inc., a publicly held company (NASDAQ: GOOG, GOOGL), has more than 10% ownership of Google Inc.  No publicly held company owns 10% or more of Alphabet Inc.'s stock.

4.   The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

Michael A. Berta
Arnold & Porter LLP
3 Embarcadero Center, 10th Floor
San Francisco, CA 94111

Nicholas H. Lee
Wallace Wu
Arnold & Porter LLP
777 S. Figueroa Street, 44th Floor
Los Angeles, CA 90017

Lance Lee
Young, Pickett & Lee
4122 Texas Boulevard
Texarkana, TX 75504

DATED:  March 28, 2016                    */s/ Michael A. Berta*
                                          Michael A. Berta

# TABLE OF CONTENTS

ABBREVIATIONS .................................................................................1

COUNTER-STATEMENT OF RELATED CASES..................................3

JURISDICTIONAL STATEMENT ........................................................4

COUNTER-STATEMENT OF THE ISSUES .........................................5

COUNTER-STATEMENT OF THE CASE ...........................................6

I.      Introduction...............................................................................6

II.     The Patents And Asserted Claims ...........................................8

        A.      The Patents Perform Basic Signal Comparisons Using Generic
                Computer Components......................................................8

        B.      The Patents Describe An Aspirational "Abstract" To Mimic
                Everyday Human Activity................................................11

III.    The Proceedings Below ...........................................................15

        A.      Blue Spike's Assertion Of The Patents..............................15

        B.      Google's Motion For Judgment On The Pleadings ............17

SUMMARY OF ARGUMENT .............................................................20

ARGUMENT .....................................................................................22

I.      Standard Of Review.................................................................22

II.     The District Court Correctly Held That The Asserted Claims Are
        Invalid Under § 101 ................................................................22

        A.      The Asserted Claims Are Directed To An Abstract Idea...................23

                1.      The District Court Correctly Applied Part One Of The
                        *Alice/Mayo* Framework.............................................23

2.      Blue Spike Mischaracterizes The Asserted Claims By
        Arguing That The Idea Of The Patents Is "Using An
        Abstract" To Compare ............................................................27

3.      Blue Spike's Other Arguments Do Not Save The Asserted
        Claims ..................................................................................31

        a)      Nothing In The Asserted Claims Requires More
                Than What Humans Would Do .....................................31

        b)      Unclaimed, Speculative Benefits Are Not Relevant ......33

        c)      The Prior Art Is Not Relevant To Whether The
                Asserted Claims Are Directed To An Abstract Idea ......35

B.      The Asserted Claims Do Not Include An Inventive Concept.............36

        1.      Implementing Human Behavior On Generic Computer
                Components Is Not An Inventive Concept ...............................36

        2.      The Remaining Claim Limitations Do Not Provide An
                Inventive Concept To Limit The Abstract Idea ......................40

                a)      Limitations Directed To Generating The "Abstract"
                        Lack An Inventive Concept ...........................................40

                b)      Limitations Directed To Comparing And Matching
                        Lack An Inventive Concept ...........................................44

                c)      Limitations Directed To Routine, Conventional
                        Activity On Generic Computer Components Lack
                        An Inventive Concept ....................................................47

        3.      The Asserted Claims Are Preemptive.......................................49

        4.      The Asserted Claims Do Not Satisfy The Machine Or
                Transformation Test.................................................................52

III.    Blue Spike's Remaining Arguments Do Not Bear On The § 101
        Analysis, Have No Merit And/Or Were Not Raised Below .........................54

iv

A. The District Court Did Not Err In Deciding Patent Eligibility In The Context Of A Rule 12(c) Motion, And Did Not Enter Judgment Prematurely ......................................................................54

B. Google And The District Court Did Not Inject Other Invalidity Considerations Into The § 101 Analysis ...............................................55

C. The Invalidity Of These Asserted Claims Is Not Affected By The Texas Court's Finding Of A "Prose Algorithm" ................................57

D. Blue Spike's Reliance On Purported Novelty, The USPTO's Issuance Of The Patents And The Statutory Presumption of Validity Is Misplaced ........................................................................59

CONCLUSION .......................................................................................60

# TABLE OF AUTHORITIES

## Cases

*Alice Corp. Pty. Ltd. v. CLS Bank Int'l*,
    134 S. Ct. 2347 (2014).......................................................... passim

*Amgen v. Sandoz Inc.*,
    794 F.3d 1347 (Fed. Cir. 2015) ...................................................22

*Augme Techs., Inc. v. Yahoo! Inc.*,
    755 F.3d 1326 (Fed. Cir. 2014) ...................................................58

*Bancorp Services LLC v. Sun Life Assurance Co. Canada (U.S.)*,
    687 F.3d 1266 (2012) .......................................................... passim

*Bilski v. Kappos*,
    561 U.S. 593 (2010)....................................................... 20, 53, 55

*buySAFE, Inc. v. Google, Inc.*,
    765 F.3d 1350 (Fed. Cir. 2014) ......................................... 47, 54

*Content Extraction and Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n*,
    776 F.3d 1343 (Fed. Cir. 2014) .......................................... passim

*Cybersource Corp. v. Retail Decisions, Inc.*,
    654 F.3d 1366 (Fed. Cir. 2011) ...................................................50

*DDR Holdings, LLC v. Hotels.com, L.P.*,
    773 F.3d 1245 (Fed. Cir. 2014) ...................................................30

*Dealertrack, Inc. v. Huber*,
    674 F.3d 1315 (Fed. Cir. 2012) ................................. 24, 38, 47, 50

*Digitech Image Techs., LLC v. Electronics for Imaging, Inc.*,
    758 F.3d 1344 (Fed. Cir. 2014) ................................ 33, 43, 48, 56

*ePlus, Inc. v. Lawson Software, Inc.*,
    700 F.3d 509 (Fed. Cir. 2012) .....................................................58

*Ergo Licensing, LLC v. CareFusion 303, Inc.*,
    673 F.3d 1361 (Fed. Cir. 2012) ....................................................................58

*Gottschalk v. Benson*,
    409 U.S. 63 (1972).........................................................................................6

*Intellectual Ventures I LLC v. Capital One Bank (USA)*,
    792 F.3d 1363 (Fed. Cir. 2015) ............................................................ 24, 37

*Internet Patents Corp. v. Active Network, Inc.*,
    790 F.3d 1343 (Fed. Cir. 2015) ........................................................... passim

*J&J Sports Prods., Inc. v. Kim Hung Ho*,
    Case No. 5:11-cv-1163, 2012 WL 1910041 (N.D. Cal. May 24, 2012) .......58

*Mayo Collaborative Servs. v. Prometheus Labs., Inc.*,
    132 S. Ct. 1289 (2012).......................................................................... passim

*OIP Technologies, Inc. v. Amazon.com, Inc.*,
    788 F.3d 1359 (Fed. Cir. 2015) ..................................................... 22, 47, 54

*Open Text S.A. v. Box, Inc.*,
    78 F.Supp.3d 1043 (N.D. Cal. 2015).............................................................24

*Parker v. Flook*,
    437 U.S. 584 (1978)................................................................. 23, 28, 35

*Planet Bingo, LLC v. VKGS LLC*,
    576 F. App'x 1005 (Fed. Cir. 2014)...................................................... passim

*Research Corp. Technologies, Inc. v. Microsoft Corp.*,
    627 F.3d 859 (Fed. Cir. 2010) ....................................................................32

*Ultramercial, Inc. v. Hulu, LLC*,
    772 F.3d 709 (Fed. Cir. 2014) ....................................................... 24, 46, 53

*Vehicle Intelligence and Safety LLC v. Mercedes-Benz USA, LLC*,
    Case No. 2015-1411, 2015 WL 9461707 (Fed. Cir. Dec. 28, 2015). ... passim

**Statutes**

35 U.S.C. § 101 ................................................................................. passim

35 U.S.C. § 102 ...................................................................................... 55

35 U.S.C. § 103 ......................................................................................55

35 U.S.C. § 112 ................................................................................. 55, 56

# ABBREVIATIONS

| | |
|---|---|
| '472 patent | U.S. Patent No. 7,346,472 |
| '700 patent | U.S. Patent No. 7,600,700 |
| '494 patent | U.S. Patent No. 7,949,494 |
| '175 patent | U.S. Patent No. 8,214,175 |
| '728 patent | U.S. Patent No. 8,712,728 |
| Appx___ | Page in Appendix |
| Appx___(x:yy-zz) | Page in Appendix citing patent at column x, lines yy-zz |
| Appx___:yy-zz | Page in Appendix citing transcript at lines yy-zz |
| "abstract" | An "abstract" as recited in the specification of the Patents and Asserted Claims |
| Asserted Claims | Collectively, the patent claims at issue in this appeal: claims 1, 2, 3, 4, 8 and 11 of the '472 patent; claims 1, 10, 11, 12, 18, 21, 27, 40 and 51 of the '700 patent; claims 11, 15, 17 and 29 of the '494 patent; claims 1, 8, 11, 12, 16 and 17 of the '175 patent; and claims 1, 4, 5, 16, 25, 26 and 30 of the '728 patent |
| Blue Spike | Plaintiff-Appellant Blue Spike, LLC |
| Br. ___ | Opening Brief of Blue Spike, filed January 6, 2016 |
| District Court | United States District Court for the Northern District of California in the case appealed from |
| Google | Defendant-Appellee Google Inc. |
| Order | September 8, 2015 Order Granting the Motion for Judgment on the Pleadings (Appx0001-0018) |
| Patents | Collectively, the five U.S. Patents identified above |

| Texas court | United States District Court for the Eastern District of Texas in the cases concerning one or more of the Patents |
| --- | --- |
| USPTO | United States Patent & Trademark Office |
| **NOTE:** | Emphasis to quotations has been added unless noted. |

## COUNTER-STATEMENT OF RELATED CASES

There has been no other appeal in or from the same civil action in this or any other appellate court. Google disagrees with the Statement of Related Cases provided by Blue Spike in the following respects.

Two cases in the Northern District of California, *Blue Spike, LLC v. Gracenote Inc. et al.*, Case No. 4:15-cv-01494 (N.D. Cal.) and *Blue Spike, LLC v. Facebook, Inc.*, Case No. 4:15-cv-04185 (N.D. Cal.), have been related to the *Google* action and are stayed pending resolution of this appeal.

Of the three actions identified by Blue Spike in the Eastern District of Texas, only one is stayed: *Blue Spike, LLC v. Miranda Tech., Inc. et al.*, Case No. 6:14-cv-00598 (E.D. Tex.) (stayed pending resolution of this appeal); *Blue Spike, LLC v. Audible Magic Corp. et al.*, Case No. 6:15-cv-00584 (E.D. Tex.) (not stayed); *Blue Spike, LLC v. WiOffer, LLC et al.*, Case No. 6:15-cv-00585 (E.D. Tex.) (not stayed).

These cases may be directly affected by this Court's decision.

# JURISDICTIONAL STATEMENT

Google agrees with the jurisdictional statement of Blue Spike.

## COUNTER-STATEMENT OF THE ISSUES

Whether the District Court correctly held that the Asserted Claims are patent-ineligible under 35 U.S.C. § 101 because they (i) are directed to an abstract idea and (ii) do not contain any inventive concept.

## COUNTER-STATEMENT OF THE CASE

## I.    INTRODUCTION

It is fundamental to our patent laws that '[a]n idea of itself is not patentable.'" *Gottschalk v. Benson*, 409 U.S. 63, 67 (1972) (quoting *Rubber-Tip Pencil Co. v. Howard*, 87 U.S. (20 Wall.) 498, 507 (1874)). This rule has no less force and application in today's digital age; taking a bare idea and moving it to a computer environment does not make it patentable. *See, e.g.*, *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 134 S. Ct. 2347 (2014) ("*Alice*").

Here, the Asserted Claims seek to monopolize the idea of comparing works, such as songs or images or videos, by using the features of those works that humans would perceive and use to differentiate between them, such as subject matter or melody. The Asserted Claims say, in essence, 'do this, but on a computer'; they recite using an "abstract" of the content that is intended to digitally mimic how humans perform the same comparisons in the real world.

Given that this "abstract" is the alleged "key" to the invention (Br. at 6), one would expect the Patents to disclose technical details necessary to generate this "abstract" and use it for comparisons. They do not. The specification and Asserted Claims refer to the "abstract" in aspirational terms only – identifying *what it should do* (*e.g.*, an abstract should retain what is "humanly-perceptible" so that it "successfully mimics human perception") but *not how* to do it. Essentially,

the Patents seek to claim for themselves any and all ways to perform the same comparison humans would do, but on a computer.  In short, the "abstract" itself is nothing more than an abstract idea under *Alice* and under this Court's precedent.

This simply is not a case where a patent-ineligibility finding for these Asserted Claims threatens ***every*** patent – like those for self-driving cars – or increases the risk that ***all*** patents will be construed at such a high level of generality that they, too, will be found to be abstract ideas and invalidated. (*Contra* Br. at 2-3, 12, 31, 56.)  After considering the briefing and giving Blue Spike every opportunity to answer "a very open-ended question" and explain what the Patents do (Appx2755:13-Appx2759:10), the District Court determined that the concept of the Asserted Claims is directed to an abstract idea, and the specification does not identify "the specifics of implementation – it includes no source code, detailed algorithms or formulas, or the like."  (Appx0004.)  The other claim limitations "merely discuss using routine computer components and methods" for an otherwise abstract concept.  (Appx0010.)  These Patents claim nothing more than a naked idea, executed on conventional computer components, and are invalid under § 101.

## II.    THE PATENTS AND ASSERTED CLAIMS

### A.    The Patents Perform Basic Signal Comparisons Using Generic Computer Components

Blue Spike asserts five Patents against Google, each entitled "Method and Device for Monitoring and Analyzing Signals." (Appx0023.[1]) These Patents purport to cover methods and apparatus for the same process that humans have been performing since the dawn of time – comparing two or more works based on the content of those works – but implemented using generic computer components. (Appx0027(1:56-59), Appx0028(4:42-43, 4:56-59).) Blue Spike contends that the "key" to the computerized comparisons is the claimed "abstract" (Br. at 6; Appx0335 ¶ 11), which is admittedly based solely on human-observable characteristics of the content itself. (Appx0338-39 ¶ 21; *see* Counter-Statement of the Case, Section II.B, *infra*.)

The Abstract and Summary of the Invention of the Patents recite (i) a reference signal, (ii) creating and storing an "abstract" for the reference signal, (iii) receiving a query signal, (iv) creating an "abstract" for the query signal, and (v) comparing the "abstract" of the query signal to the stored "abstract(s)" of the reference signal(s) to determine if they match. (Appx0023(Abstract), Appx00027-

---

[1] Unless noted, Google cites to the '472 patent specification, the earliest of the Patents. (Appx0023.) The others are continuations and share the same specification. (Appx0038, Appx0052, Appx0069, Appx0084.)

8(2:64-3:47).)  Claim 1 of the '472 patent, which the District Court found to be representative for purposes of § 101 (Appx0002), recites the same:[2]

> A method for monitoring and analyzing at least one signal comprising:
>
> receiving at least one reference signal to be monitored;
>
> creating an abstract of said at least one reference signal wherein the step of creating an abstract of said at least one reference signal comprises:
>
>> inputting the reference signal to a processor;
>>
>> creating an abstract of the reference signal using perceptual qualities of the reference signal such that the abstract retains a perceptual relationship to the reference signal from which it is derived;
>
> storing the abstract of said at least one reference signal in a reference database; receiving at least one query signal to be analyzed;
>
> creating an abstract of said at least one query signal wherein the step of creating an abstract of said at least one query signal comprises:
>
>> inputting the at least one query signal to the processor;
>>
>> creating an abstract of the at least one query signal using perceptual qualities of the at least one query signal such that the abstract retains a perceptual relationship to the at least one query signal from which it is derived; and

_____

[2] In the proceedings below, Google submitted that the independent claims are not meaningfully distinguishable from one another for purposes of § 101.  (Appx2195-97 & notes (providing citations to the limitations of other independent claims that correspond to those of '472 claim 1).)  Blue Spike never identified any material differences in response, but contended at the hearing that "specific limitations" for a handful of Asserted Claims should be considered for part two of the *Alice/Mayo* framework.  (Appx2746:3-8; Appx2277-78 & n.2, Appx2289.)  Google addresses these alleged differences below, but submits that '472 claim 1 is representative for at least part one of the test.

comparing the abstract of said at least one query signal to the abstract of said at least one reference signal to determine if the abstract of said at least one query signal matches the abstract of said at feast [sic] one reference signal.

(Appx0034(claim 1).)  Method claim 1 recites nothing more than the ***generic idea*** of comparing one signal to another signal for virtually any purpose or application, and the ***aspirational idea*** of creating some unspecified type of "abstract" by an unidentified mechanism that uses any humanly-observable "perceptual qualities" of the signal.  It says to do all of this using only generic computer components. The independent system claims fare no better, reciting additional generic computer components (*e.g.*, processor, input, receiver, database, comparing device, counter) to practice the same idea of comparing.  (*See, e.g.*, Appx0049(claim 1).)

The dependent claims are directed generally to creating the "abstract" (Appx0034('472 claim 2); Appx0049('700 claim 21); Appx0066('494 claims 15, 17); Appx0083('175 claim 16); Appx0099('728 claims 5, 26)); creating a second "abstract" for the signal (Appx0099('728 claim 4)); further processing the "abstract" using techniques in the prior art (Appx0049('700 claims 10, 11)); "comparing" and "matching" (Appx0034('472 claim 4); Appx0083('175 claim 12); Appx0099('728 claim 16)); embedding information into the signal itself (Appx0049('700 claim 12)); or other activity that is common in computer environments such as authorizing or distributing (Appx0049('700 claims 27, 51)).

None of these limitations adds anything inventive. (*See* Argument, Section II.B.2, *infra*.)

## B. The Patents Describe An Aspirational "Abstract" To Mimic Everyday Human Activity

The District Court held, and Blue Spike admits, that the Patents attempt "to model the processes of the highly effective ability of humans to identify and recognize a signal" (Appx0008; Br. at 9; Appx0028(4:32-41)) by creating an "abstract" for the signal. The specification explains, in theory, that the "abstract" should capture qualities of the signal's content that humans perceive and utilize to differentiate one work from another:

- Signal should be compressed "to its essence" but "preserve some underlying 'aesthetic quality'" (Appx0030(7:3-7));

- "Abstract" should "retain what is 'humanly-perceptible'" so that it "successfully mimics human perception" (*id.*(7:34-40));

- "Abstract" should identify perceptual differences to distinguish between different artists' recordings of the same song (*id.*(7:14-20); *id.*(8:24-27) (also has "obvious application" to visual works like images, trademarks, photos and video));

- Database should be recalibrated if it fails to recognize different versions of a song, *e.g.*, an artist's performances that are similar but not identical (Appx0032(11:13-23));

- Invention should capture "humanly-perceptible observation" and "experience based criteria," *e.g.*, to differentiate between a "complete song" and "short 3 second segment" used for commercials (*id.*(11:31-45));

- Invention should recognize and distinguish "perceptual differences" such as those that "exist between a song and its reproduction from a CD, an AM radio, and an Internet broadcast" if listeners would recognize a difference (Appx0033(13:13-22)); and

- Invention must "preserve those perceptual qualities that permit a human to recognize the original visual image" (*id.*(14:58-61)).

(*See also* Appx1495 ¶ 23 ("signal abstracting" is based "solely on the perceptual characteristics of the material itself").)

The specification states that because the "abstract" retains humanly-perceptible qualities of the original signal, comparing one "abstract" to another will replicate activities "performed by actual persons." (Appx0033(13:54-14:2).) In one embodiment, the invention is explained by analogy to finding paintings of sunsets or sunrises. (Appx0033-34(14:56-15:11).) A person could look at a painting, observe its subject (*e.g.*, sunsets) and characteristics (*e.g.*, color, position of the sun, artistic technique) and then use this information to locate similar paintings in physical archives or digital repositories. Or, another approach "might involve a textual search [of] a database wherein the [paintings] have been described in writing." (*Id.*) The specification explains that the invention contemplates (without explaining exactly how) scanning an image "involving the sun," compressing the data to "those perceptual characteristics related to the sun" and finding matches in a database. (*Id.*) Similarly, the specification states that the invention could be used to identify songs or the number of times they are played on

a radio station or Internet streaming site. (Appx0033(13:31-38, 13:54-14:2).) The specification does not provide any specific mechanism by which to accomplish this goal; instead, it generically refers to the concepts of "compression" and "data-reduction" and analogizes the invention to the human task it is supposed to mimic: "traditional analysis is performed by actual persons who use play lists …" or by simply listening to the radio or Internet stream. (*Id*. ("through manual (*i.e.*, by persons) monitoring").)

Apart from these aspirational goals of what the "abstract" should do and how it might be used, the specification contains no technical detail or instruction of how to go about creating such an "abstract." There is no drawing, no figure, no schematic and no algorithm. (*See* Appx00023 *et seq*.) The specification describes the "abstract" only in terms of its hoped-for function, as illustrated by the following passage:

> The ability to **massively compress a signal to its essence** – which is not strictly equivalent to "lossy" or "lossless" compression schemes or perceptual coding techniques, but designed to **preserve some underlying "aesthetic quality"** of the signal – represents a useful means for signal analysis in a wide variety of applications. The signal analysis, however, **must maintain the ability to distinguish the perceptual quality of the signals being compared**.

(Appx0030(7:3-11).) The specification suggests that existing technology may be relevant to achieving these stated goals, but never quite explains exactly how the "abstract" is created. (Appx0028(4:8-22), Appx0029(7:3-7) (prior art compression

schemes are not "strictly equivalent" to invention); Appx0030(7:40-43) (existing

compressive techniques may have "some relevance … [but] additional data

reduction or massive compression is anticipated" and dependent on application);

Appx0031(10:50-55) (after "abstract" is created, additional hash, signature or

cryptographic technique may be used); *see also* Br. at 21, 33 (Blue Spike contends

that the Patents teach tangible improvements over the prior art, but only points to

statements in the specification that make the assertion as its support for the

assertion).)

Fundamentally, the specification's description of an "abstract" (*i.e.*, a

reduced version of the signal that retains humanly-perceptible qualities of the

underlying signal) is nothing more than a broad, open-ended theoretical concept,

waiting for future innovation and for someone else to figure out how to implement

it.[3]

---

[3] Blue Spike attempts to capitalize upon these conceptual recitations of the "abstract" by interpreting the Patents broadly to cover and preempt virtually every conceivable application for which "comparing" one thing to another might be useful (*e.g.*, piracy, biometric identification, security, authorization systems, market/consumer intelligence).  Blue Spike has asserted these Patents against defendants whose businesses concern wide-ranging content (*e.g.*, songs, videos, photos, TV shows, video games, human fingerprints, optics, facial features) and platforms (*e.g.*, radio, television, Internet, mobile devices, smartphones, tablets). (Appx1494 ¶ 22; Appx1495-96 ¶¶ 24-26.)

## III.    THE PROCEEDINGS BELOW

### A.    Blue Spike's Assertion Of The Patents

Blue Spike began a litigation campaign against Google and others in the Eastern District of Texas in August 2012, just days after it obtained ownership of the Patents from a related entity, Blue Spike Inc.  (Appx0117 at Dkt. 1; Appx2130 ¶ 4; Appx2136.)  It filed a complaint against Google on August 22, 2012 in Case No. 6:12-cv-00558, asserting that Google infringed the '472, '700, '494 and '175 patents.  (Appx0106.)  The court consolidated the *Google* action with more than eighty-five other cases into Case No. 6:12-cv-00499 (Appx0118-19, Appx0162-63), and Blue Spike later filed more cases in the same district.  Several remain pending in Texas and California, but as of May 2015, Blue Spike had voluntarily dismissed or settled at least eighty.  (Counter-Statement of Related Cases, *supra*; Appx2130 ¶ 2.)

The Texas court severed the *Google* action from the others on March 13, 2014 when it granted Google's motion to transfer venue.  (Appx0174, Appx0235.)  This case transferred to the Northern District of California on April 10, 2014 (Appx0108), well prior to claim construction or summary judgment in Texas.  (Br. at 4-5.)  Google took no part in those proceedings.

Following transfer of the *Google* action and several others to California, the District Court related the cases (Appx0109), then held a scheduling conference on

July 28, 2014.  (Appx0110.)  At the hearing, counsel for Google and Adobe

informed the Court of their clients' assertions that the Patents were invalid under

§ 101 and indicated that early disposition may be appropriate.  (Appx0608, 0609,

0623, 0626.)

On September 15, 2014, Blue Spike amended its complaint to assert the '728

patent along with the four patents identified in its original complaint.  (Appx1488.)

Google filed its answer and counterclaims on October 2, 2014 and Blue Spike

answered the counterclaims on October 20, 2014.  (Appx0111.)  Between October

2014 and February 2015, the parties exchanged contentions and claim charts

required under the Patent Local Rules and began conferring on claim construction.

Discussions and filings related to claim construction were delayed on several

occasions at Blue Spike's request as it negotiated settlements with other defendants

in the related California cases (*see, e.g.*, Appx2802-10, Appx2811-23, Appx 2824-

39) and awaited decisions from the Texas court on several motions to transfer

venue.  (Br. at 4.)

Ultimately, Blue Spike asserted thirty-two claims (*see* Abbreviations, *supra*)

against Google.  Google and Blue Spike filed a Joint Claim Construction Statement

in early August 2015.  (Appx2635.)  They agreed to adopt constructions from the

Texas court for certain claim terms, including those implicated in the present

appeal:  "abstract," "perceptible characteristic" and "perceptual characteristics."

(Appx2636; *see also* Appx2750:12-Appx2751:6 (stipulating to constructions for purposes of the § 101 motion).)

## B.    Google's Motion For Judgment On The Pleadings

On May 12, 2015, Google moved for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c) that the Asserted Claims were invalid under 35 U.S.C. § 101.  (Appx2103-2127.)  Blue Spike opposed the motion on June 9, 2015 and Google filed its reply brief on June 16, 2015.  (Appx0113 at entry 63, 64.)  The District Court heard argument on June 30, 2015 (Appx2739), granted the motion on September 9, 2015 (Appx0001), and entered judgment in Google's favor on October 1, 2015.[4] (Appx0021.)

In its opinion, the District Court noted, "[a]t a high level, the patents contemplate determining whether one piece of content – *e.g.*, a picture, a song, or a video – matches another, or the extent to which they are similar."  (Appx0002.)  It further noted, "the specification does not teach the specifics of implementation – it includes no source code, detailed algorithms or formulas, or the like."  (Appx0004.)  The District Court then discussed and applied the legal framework

---

[4] In the proceedings below, Blue Spike agreed that it did not comply with its disclosure obligations for '728 claim 30.  (Appx2130 ¶¶ 6-9; Appx2784.)  Regardless, the District Court ordered the parties to show cause as to why claim 30 should not be invalidated on the same grounds as the other claims.  (Appx0019.)  Blue Spike did not oppose, and the District Court invalidated claim 30.  (Appx0020.)  Based on that order, Google includes claim 30 as an Asserted Claim.

for patent eligibility, looking not only at the two-step test outlined in *Alice* and

*Mayo Collaborative Servs. v. Prometheus Labs., Inc.,* 132 S. Ct. 1289 (2012)

("*Mayo*"), but also recent cases from this Court.  (Appx0005-0008.)

Under part one of the *Alice/Mayo* framework, the District Court concluded

that the Asserted Claims "are generally directed to the abstract concept of

comparing one thing to another."  (Appx0008.)  More specifically, the District

Court stated that "[t]he patents seek to model on a computer a human's highly

effective ability to identify and recognize a signal" (*id*. (internal quotation marks

omitted)), and rejected Blue Spike's contention that the Patents require

comparisons that humans cannot make.  (*Id*.)  The District Court relied on the

specification, the plain language of the Asserted Claims and the constructions

urged by Blue Spike:[5]

| Abstract | a data-reduced representation of a signal that retains a ***perceptual*** relationship with the signal and differentiates the data-reduced representation from other data-reduced representations |
|---|---|
| perceptual quality | quality ***perceived by a person*** |
| recognizable characteristic | quality visually or aurally ***perceived by a person*** |

---

[5] Blue Spike's repeated assertions that the District Court failed to consider claim construction are incorrect.  (Br. at 2, 13, 24, 28-29.)  In its analysis, the District Court expressly cited to and relied upon the prior constructions urged by Blue Spike.  (Appx1996, Appx2230-31 (Texas claim constructions); Appx0003-4, Appx0008-9, Appx0017 n.7 (discussing same).)

(Appx0008-9.)  The District Court concluded that this evidence confirmed that the Asserted Claims are directed to mimicking human-observable aspects of signals on a computer.  (*Id*.)

The District Court then turned to part two of the *Alice/Mayo* framework and concluded that the Asserted Claims contained no inventive concept.  It found that the Asserted Claims merely discuss using routine computer components and methods to perform comparisons (Appx0010-11) and "preempt a wide range of comparisons that humans can and, indeed, have, undertaken from time immemorial."  (Appx0011.)

Finally, although it confirmed that its two-step analysis of representative claim 1 "applie[d] with equal force to all claims at issue" (Appx0011), the District Court looked at each of the other Asserted Claims in turn.  It concluded that the recitation of generic computer components or routine processes did not save the Asserted Claims from invalidity.  (Appx0011-18.)

## SUMMARY OF ARGUMENT

Patent eligibility under 35 U.S.C. § 101 is a threshold issue, serving to ensure that "basic tools of scientific and technological work" and "building blocks of human ingenuity" remain "free to all men and [are] reserved exclusively to none." *Bilski v. Kappos*, 561 U.S. 593, 602 (2010); *Alice*, 134 S. Ct. at 2354; *Mayo,* 132 S. Ct. at 1293 (citations omitted). The Asserted Claims in this case run afoul of this important safeguard. They seek to claim the same real-world comparisons that humans make every day when identifying, comparing and locating content (*e.g.*, songs, images, videos, text) and preempt every possible use or application of these straight-forward comparisons on a computer. That the Asserted Claims purport to move this process to a computerized environment by reciting the use of an "abstract" to perform the comparisons is of no moment. The claim language, specification, and relevant claim constructions confirm that the "abstract" is merely a conceptual substitute for human behavior in that it is any result generated using inherent, perceptual qualities perceived by humans (*e.g.*, color, subject matter, melody). As the District Court correctly found under part one of the *Alice/Mayo* framework, the Asserted Claims are directed to an abstract idea.

Where the Asserted Claims are directed to an abstract idea, the other limitations of the Asserted Claims fail to convey an inventive concept to confer

patentability under part two of the *Alice/Mayo* framework.  They are generally directed to (i) claiming the generation of any "abstract" that mimics human perception; (ii) comparing or matching "abstracts" or determining how they are related, which is an activity that humans routinely perform; or (iii) routine, conventional activity using generic computer components, which this Court has repeatedly rejected as "inventive" in its pre- and post-*Alice* cases.  Despite Blue Spike's assertions to the contrary, the Asserted Claims require nothing more than what humans can do (*e.g.*, they do not claim increased speed, efficiency or accuracy), they are preemptive, and they do not satisfy the machine-or-transformation test.  And as the District Court correctly found under part two of the *Alice/Mayo* framework, there is no other limitation in the Asserted Claims that conveys an inventive concept or that is limiting enough to confer patent eligibility.

The District Court's judgment should be affirmed.

# ARGUMENT

## I.    STANDARD OF REVIEW

In reviewing judgment on the pleadings, this Court applies the procedural law of the regional circuit, which in this case is *de novo*. *Amgen, Inc. v. Sandoz Inc.*, 794 F.3d 1347, 1354 (Fed. Cir. 2015) (citing *Peterson v. California*, 604 F.3d 1166, 1169 (9th Cir. 2010)). Patent eligibility under 35 U.S.C. § 101 is a question of law that this Court also reviews *de novo*. *OIP Techs., Inc. v. Amazon.com, Inc.*, 788 F.3d 1359, 1362 (Fed. Cir. 2015).

## II.    THE DISTRICT COURT CORRECTLY HELD THAT THE ASSERTED CLAIMS ARE INVALID UNDER § 101

Section 101 of the Patent Act defines patent-eligible subject matter as "any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof." 35 U.S.C. § 101. The Supreme Court has "long held that this provision contains an important implicit exception: Laws of nature, natural phenomena, and ***abstract ideas are not patentable***." *Alice*, 134 S. Ct. at 2354 (citation omitted). Under the now-familiar two-part test described in *Alice* and *Mayo*, courts must first determine whether the claims are directed to a patent-ineligible concept. If so, courts must next conduct "a search for an inventive concept" by considering the elements of the claims individually and as an ordered combination to determine if they "transform the nature of the claim" from an abstract idea into a patent-eligible application. *Id*. at 2355 (quotation

marks and citation omitted); *Mayo,* 132 S. Ct. at 1294, 1297.  The Asserted Claims are not patent-eligible under this test.

## A.    The Asserted Claims Are Directed To An Abstract Idea

The Supreme Court has instructed that, at part one, courts should consider the claims as a whole, looking to "their face" to decide what "concept" they are drawn to.  *Alice*, 134 S. Ct. at 2356.  Here, as found by the District Court, the real-world, everyday process of identifying and comparing works using their inherent, perceptual qualities is an abstract idea.  *Parker v. Flook*, 437 U.S. 584, 586, 589 (1978) (citation omitted) ("abstract intellectual concepts are not patentable, as they are the basic tools of scientific and technological work," and finding allegedly inventive algorithm was not patentable).  Blue Spike takes issue with what it calls "over-generalization" by the District Court (Br. at 18-30), but this Court's precedent makes clear that the District Court's analysis and conclusions regarding the idea of the Asserted Claims is correct.

## 1.    The District Court Correctly Applied Part One Of The *Alice/Mayo* Framework

The District Court began its analysis by looking to the claim language to determine the concept to which the Asserted Claims were drawn (*i.e.*, their "character" or "gist"), then confirmed its understanding against the specification and Texas claim constructions urged by Blue Spike.  (Appx0002-4, Appx0008-10;

*see also* Appx2755-2759.)  This is the exact approach used by this Court.[6]  *See*

*Internet Patents Corp. v. Active Network, Inc.*, 790 F.3d 1343, 1346, 1348 (Fed.

Cir. 2015) (ascertaining basic character of claims and describing *Mayo* as having

"distilled this ineligible concept from the claims as a whole"); *Intellectual Ventures*

*I LLC v. Capital One Bank (USA)*, 792 F.3d 1363, 1369 (Fed. Cir. 2015) (for step

one, "it is often useful to determine the breadth of the claims"); *Ultramercial, Inc.*

*v. Hulu, LLC*, 772 F.3d 709, 714 (Fed. Cir. 2014) (agreeing with lower court that

the abstract idea "at the heart of" an eleven-step claim was using "[an]

advertisement as an exchange or currency") (citation omitted); *Dealertrack, Inc. v.*

*Huber*, 674 F.3d 1315, 1333-34 (Fed. Cir. 2012) (distilling claim limitations down

to their "simplest form").

As discussed above, the Asserted Claims generally recite receiving a

reference and query signal; creating an "abstract" for each using some undisclosed

mechanism, but using inherent qualities that humans would perceive; and

comparing the signals using the "abstracts."  (Appx0034(claim 1); Appx0027-28;

---

[6] Blue Spike critiques California decisions that use phrases such as "gist of the claims" in their part one analysis.  (Br. at 24, 26-28.)  Even a cursory look at these cases establishes that they understand and are utilizing the correct framework as applied by the Supreme Court and this Court.  *See Open Text S.A. v. Box, Inc.*, 78 F.Supp.3d 1043, 1046-47 (N.D. Cal. 2015) (citing relevant portions of *Bilski*, *Alice*, *buySAFE* and *Ultramercial*).  Similarly here, the District Court correctly describes the holdings of seven different Federal Circuit cases in its application of the *Alice/Mayo* framework.  (Appx0006-8.)

Appx0002 (describing claims).)  The concept to which these Asserted Claims are drawn is "comparing one thing to another," just as the District Court held.  That this comparing uses humanly-perceptible qualities and is a substitute for human comparison is understood from the claim language, specification and claim constructions.  (Appx0010 (summarizing prior discussion, and stating "as noted, the patents are directed to an abstract idea – the idea of comparing one thing to another"); *see also* Appx0002 (at a high level, the patents contemplate determining if pictures, songs, or videos match).)

Recent cases from this Court confirm that the District Court correctly identified the idea of the Asserted Claims, and that it is abstract.  For example, in *Internet Patents*, this Court began its own claim analysis "by ascertaining the basic character of the subject matter" to determine "whether their character as a whole is directed to excluded subject matter."  790 F.3d at 1346, 1348.  Those claims concerned the use of a conventional web browser's Back and Forward navigation buttons without losing data ("maintaining the state").  *Id*. at 1344.  Despite arguments that "maintaining the state" was the innovative, most important aspect of the invention and "a tangible and useful improvement" over the art (just as Blue Spike argues here for "abstract"), this Court affirmed that the "character of the claimed invention is an abstract idea:  the idea of retaining information in the navigation of online forms."  *Id*. at 1345, 1348.  This Court did not import the ***way***

the invention allegedly retained information or "maintained the state" as part of the idea, *id*. (noting that mechanism for "maintaining the state" is not described), even though it is apparent that there must have been a computerized mechanism to "maintain the state."

This Court applied the same approach in *Vehicle Intelligence*. Those claims recited screening equipment operators for impairment, selectively testing the operators, and controlling equipment if impairment was detected. Despite arguments that the claimed "expert system modules," which performed the "screening [and] controlling," were inventive and allegedly improved over the prior art, this Court determined that the claims were drawn to the abstract idea of "testing for any impairment." *Vehicle Intelligence and Safety LLC v. Mercedes-Benz USA, LLC*, Case No. 2015-1411, 2015 WL 9461707, at *1-3 (Fed. Cir. Dec. 28, 2015). The Court did not import the mechanism for performing the idea into the idea itself, and, in fact, noted that "critically absent from the entire patent" are any details as to how "expert system modules" work. *Id*. at *3.

This case is no different. The Asserted Claims and specification assert ownership of the bare-bones idea of an "abstract," setting forth only its aspirational function of mimicking on a computer the way that humans compare content by using humanly-perceptible qualities of the content. That falls squarely into the realm of ideas that this Court has found to be abstract.

### 2. Blue Spike Mischaracterizes The Asserted Claims By Arguing That The Idea Of The Patents Is "Using An Abstract" To Compare

Blue Spike argues that, because the District Court did not recite the idea of using an "abstract" to compare two things as part of its statement of the idea of the patents, the District Court committed error. (Br. at 18-30.) Blue Spike is incorrect. Blue Spike's argument is based upon three fundamentally flawed notions that build upon one another. *First*, that the idea to be articulated in part one of the *Alice/Mayo* framework must recite the "particular contributions" of the purported invention that implement or accomplish the idea of the Patents. (Br. at 3, 13, 17; *id*. at 13, 24, 25 (arguing that the idea must include the means employed and not just the task the claims cover); *id*. at 25 ("the question [is] whether that abstracting approach is patentable subject matter").) *Second*, that the idea of the Asserted Claims is not comparing one signal to another (Appx0010), but is comparing one signal to another ***using an "abstract*.**" (Br. at 12-13; *see also id*. at 7, 23, 24-25, 25 (generally discussing using an "abstract" to compare signals).) *Third*, that because the idea is using the "abstract" and the "abstract" is digital, the Asserted Claims allegedly are rooted in computer technology and the idea of the Patents thus cannot be abstract. (*Id*. at 12, 24.) None of these arguments is correct, and none save the Asserted Claims from ineligibility under § 101.

*First*, Blue Spike's notion that the idea of a patent claim must restate every element that it contends is "inventive" (here, the "abstract" (Appx1491 ¶ 12)) is counter to this Court's precedent. For example, in *Vehicle Intelligence*, this Court determined that the idea was "testing for any impairment" ***not*** "testing for any impairment using expert system modules" even though the claimed "expert system modules" were the allegedly inventive limitation.[7] *Vehicle Intelligence*, 2015 WL 9461707 at *2; *see also Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n*, 776 F.3d 1343, 1344, 1348 (Fed. Cir. 2014) (considering ***how*** the patents "recogniz[ed] certain data" in second part of test); *Parker*, 437 U.S. at 593 (holding untenable respondent's position "that if a process application implements a principle in some specific fashion, it automatically falls within the patentable subject matter of § 101 and the substantive patentability … can then be determined by the conditions of §§ 102 and 103").

---

[7] That the District Court may have shorthanded the abstract idea as "comparing one thing to another" (Appx0010) is not indicative of any error. The District Court necessarily considered the claimed "abstract" in step one – just as this Court considered the allegedly inventive "expert system modules" in *Vehicle Intelligence* – in determining the claims' concept, and in its analysis expressly addressed Blue Spike's arguments as to the nature of the "abstract" (*e.g.*, rejecting Blue Spike's claim that the "abstract" surpasses what the human mind can do because claim language itself is not so limited). (Appx0010-11.) Blue Spike over-simplifies and recasts the Order to "comparing one thing to another" in the hopes of inciting this Court's skepticism because none of its other arguments save the Asserted Claims.

*Second*, even if Blue Spike was correct that the idea of the Asserted Claims is to compare signal content "using an abstract," the ultimate conclusion of patent-ineligibility under part one of the *Alice/Mayo* framework is the same.  The District Court found that the Asserted Claims are directed to a process "long undertaken within the human mind."  (Appx0008.)  It looked to the claim language, specification and the Texas court's claim constructions advanced by Blue Spike, which all confirm that the "abstract" is a concept intended to reflect "human-observable aspects of signals."  (Appx0010-11.)  Thus, the idea of "comparing signals using an abstract" that Blue Spike urges here is still an abstract idea.  The idea of comparing signals using human-observable characteristics of the signals is simply a longer way of saying:  use an aspect of the content that humans would perceive and utilize to compare the content.  This is nothing more than a restatement of the very abstract idea that the District Court found.

*Third*, importing the concept of a digital "abstract" into the idea for purposes of part one of the *Alice/Mayo* framework makes no difference.  It does not transform ***these*** Asserted Claims into claims that necessarily are rooted in computer technology.  If Blue Spike had its way, anytime a patentee injected the concept of something "digital" into its claims through either argument or clever draftsmanship, it would automatically make the claims commensurate with those in *DDR Holdings*.  (*See* Br. at 23.)  Those claims, however, on their face were

directed to an issue that would only arise on the internet, *i.e.*, on-click Internet redirection to an automatically generated hybrid webpage that combined the look and feel of a host-site layout with product information from a third-party merchant. *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1249, 1257 (Fed. Cir. 2014) (claims reciting, for example, a host web page, link and Internet communication).

The Asserted Claims here stand in stark contrast. As expressly confirmed in the specification, ***these*** Patents are directed to comparing actual works – songs on the radio, pictures of the sun – in the way humans would. (*See* Counter-Statement of the Case, Section II.B, *supra*.) Doing so digitally, rather than with analog eyeballs or ears, does not bring these Asserted Claims within the ambit of *DDR Holdings*. Rather, Blue Spike's argument is like that in *Bancorp* and "boils down to the contention that because its claims are limited to being performed on a computer, they cannot claim only an abstract idea." This Court has found that argument "untenable." *See Bancorp Servs. L.L.C. v. Sun Life Assurance Co. of Canada (U.S.)*, 687 F.3d 1266, 1277 (2012) (rejecting argument because it "boils down to the contention that because its claims are limited to being performed on a computer, they cannot claim only an abstract idea"); *see also Alice*, 134 S. Ct. at 2358-59 (requiring that an abstract idea be done on a computer does not confer patent eligibility).

### 3.    Blue Spike's Other Arguments Do Not Save The Asserted Claims

#### a)    Nothing In The Asserted Claims Requires More Than What Humans Would Do

Blue Spike also argues that the Asserted Claims are not directed to replicating an ordinary human process on a computer like some of the patents discussed in this Court's recent cases.  (Br. at 30-33.)  As discussed above, however, the idea of an "abstract" is the idea of replicating human perceptions in a computer environment.  So, Blue Spike is wrong.  And, absent from Blue Spike's attempt to distinguish these Patents from other cases that "simply replicat[e] ordinary human processes" (*id.* at 31-32) is any reference to the Patents or Asserted Claims, or any discussion of the substantive patent claim analysis of the prior cases.  Instead, Blue Spike just declares that these Patents are on a par with innovations like a self-driving car or the telephone.  (*Id.* at 31-32 & 32 n.15.)  With no substance, Blue Spike's arguments can be rejected.

Similarly, Blue Spike's assertion that there is no "evidence that humans perform comparisons by reducing signals to data-reduced representations" (*id.* at 33) is belied by the Patents themselves.  Indeed, one of the two "embodiments" of the Patent is little more than an analogy between the purported invention and the human activity of looking at different pictures and comparing them by aspects of the pictures like the presence of a setting sun.  (Appx0033-34(14:65-15:8).)  Where

the Patents themselves resort to explaining the invention by analogy to human activities, Blue Spike's assertion that these Patents are not directed to replicating human activities is simply not true.

The District Court was also not "led astray" by the human aspects of the "abstract." (*Contra* Br. at 32.) It considered Blue Spike and its expert's attempts to distinguish comparisons that the claimed "abstract" could perform from those that humans are capable of performing, but concluded that "on their face the patents do not purport to recognize aspects of the compared work that only a computer – but not a human – could reasonably detect." (Appx0008.) This determination was consistent with this Court's decisions. *See Bancorp*, 687 F.3d at 1278 ("To salvage an otherwise patent-ineligible process, a computer must be integral to the claimed invention, facilitating the process in a way that a person making calculations or computations could not."); *Content Extraction*, 776 F.3d at 1347 (finding claims invalid under § 101 and rejecting argument that humans could not process and recognize streams of bits output by a conventional computer, *e.g.*, scanner) (citing *Alice*, 134 S. Ct. at 2358).

Had the Asserted Claims done something other than generically recite the use of humanly-perceptual qualities to do comparisons, and had the patentee truly invented and claimed an actual process by which to generate an "abstract … using perceptual qualities," this case may have been different. *Compare Research Corp.*

-32-

*Techs., Inc. v. Microsoft Corp.*, 627 F.3d 859, 869 (Fed. Cir. 2010) (claimed

methods relating to digital image half-toning that "incorporate algorithms and

formulas that control the masks and halftoning" are patent-eligible) *with Digitech*

*Image Technologies, LLC v. Electronics for Imaging, Inc.*, 758 F.3d 1344, 1350-51

(Fed. Cir. 2014) ("a process for generating a device profile" that requires

"generating [ ] data" relating to "color information content of the image" and

"spatial information content of the image" is patent-ineligible).  But, no matter

how much Blue Spike wishes differently, the Asserted Claims require no more

than what human do, and are patent-ineligible.

### b)    Unclaimed, Speculative Benefits Are Not Relevant

Scattered throughout Blue Spike's part one analysis are assertions that the

"abstract" provides improvements or benefits over "human-based" comparisons

and identification.  For example, Blue Spike contends that the "abstract" might be

faster and more accurate than human-based comparison[8] (Br. at 9); might be used

in a variety of applications such as piracy detection, security measures, or police

work (*id*. at 2, 9); or might facilitate various computer-related processes, such as

---

[8] Except for one ('471 claim 11, discussed below), the claims that Blue Spike cites
to illustrate "other improvements over human-based comparisons" are not asserted
against Google and are not at issue on appeal.  (Br. at 9-10.)

permitting some unspecified "complex signal comparison" or reducing signal-comparison costs and volume.[9]  (Br. at 6-7, 22-23.)

This argument also fails.  Whether or not a comparison – if done on a computer – might be faster or more efficient than if done by a person is nothing more than saying that computers can be faster than humans in some contexts. Even if there was some potential increased efficiency or benefit, this Court has not found that to be sufficient to confer patent-eligibility.  *Bancorp*, 687 F.3d at 1279 (finding that no "technical advance is evident in the present invention" but merely employ computers to "perform[] more efficiently what could otherwise be accomplished manually").

And here, where the claimed "abstract" of these Patents is described in aspirational terms only, the specification and the Asserted Claims are devoid of any teaching or limitation that would require or provide that implementing the claimed "abstract" on a computer actually provides any particular benefit or improvement over human activity.  Indeed, the Asserted Claims point in the opposite direction, purporting to cover all ranges of comparisons at any level of complexity by expressly requiring only the minimal amount of comparison to fall

---

[9] To the extent Blue Spike points to any particular Asserted Claim for a purported "application" or "useful operation" (Br. at 5-7), Google addresses them below at Section II.B.2.  Blue Spike also points to un-asserted claims in its brief, including '472 claims 9 and 12, '494 claim 1 and '175 claim 5 (Br. at 6, 9-10), which are not relevant to this appeal.

within the claimed scope: "at least one" reference signal to "at least one" query signal, which the specification recognizes can be performed by a human. *See Planet Bingo, LLC v. VKGS LLC*, 576 F. App'x 1005, 1008 (Fed. Cir. 2014) (claims fall far short of capturing an invention that handles "thousands, if not millions" of transactions).

### c)     The Prior Art Is Not Relevant To Whether The Asserted Claims Are Directed To An Abstract Idea

Blue Spike argues at length that the Asserted Claims are not an abstract idea because using an "abstract" to compare signal content allegedly solves a problem in the prior art and provides an alternative to watermarking technology. (Br. at 2, 3, 7-8, 11-12, 17, 19-20, 21, 25, 29, 33.) Blue Spike's conclusion does not follow from its premise – identifying an idea and determining whether it is abstract is not dictated by the content of the prior art. Blue Spike's argument is merely an argument against the *Alice* test. But, *Alice* is the law, and Blue Spike's argument has been rejected by this Court multiple times, particularly in cases like this one where the patent lacks detail as to how the purported invention works. *See, e.g.*, *Vehicle Intelligence*, 2015 WL 9461707, at *3 (rejecting argument that "using expert system module" to make decisions or effectuate control improved over prior art); *Parker*, 437 U.S. at 594-95 (claims were patent-ineligible even though assumed to disclose a "better" or "improved" method over the prior art). Whether

-35-

or not there is prior art to these Asserted Claims does not dictate whether or not they are directed to an abstract idea, as they are here.

### B.    The Asserted Claims Do Not Include An Inventive Concept

Under part two of the *Alice/Mayo* framework, the District Court correctly determined that there are no limitations of the Asserted Claims, considered individually or collectively, that contain an inventive step sufficient to transform the abstract idea of comparing content using human-perceptible aspects of that content into patent-eligible subject matter.

### 1.    Implementing Human Behavior On Generic Computer Components Is Not An Inventive Concept

As the District Court determined, the Asserted Claims "merely discuss using routine computer components and methods (*e.g.,* general purpose computers, compression, and databases)" to make comparisons that humans can accomplish. (Appx0010; Appx0034(claim 1).) Blue Spike challenges this conclusion, arguing that the idea of an "abstract" is inventive because the Patents: (1) permit faster and more accurate auditing of signals; and (2) utilize a computer in a non-routine manner to perform complex calculations on digital signals.[10] (Br. at 36-39.) Blue Spike is incorrect.

---

[10] The only substantive citations Blue Spike provides are to a passage indicating that the invention might be used for voice-activated security (which is not in any of the Asserted Claims) and to '494 claims 6 and 20 related to security control (which

Footnote continued on next page

With respect to Blue Spike's first argument, it is well established that simply adding a computer to an abstract idea, even to increase speed or efficiency, does not transform the abstract idea into patent-eligible subject matter. *Planet Bingo,* 576 F. App'x at 1007-1008 (citations omitted) (if patent's recitation of computer amounts to mere instruction to implement an abstract idea on a computer, that addition cannot impart patent eligibility); *Intellectual Ventures,* 792 F.3d at 1370 ("[O]ur precedent is clear that merely adding computer functionality to increase the speed or efficiency of the process does not confer patent eligibility on an otherwise abstract idea."); *Vehicle Intelligence,* 2015 WL 9461707, at *3-5 (rejecting argument that implementing an abstract idea using conventional and readily-available computer components to produce "faster, more accurate and reliable results" provide an inventive concept to confer patentability, especially given the absence of any relevant implementation details in the specification or claim requirement). Here, the Asserted Claims do not require any particular level of speed or performance – indeed, they purport to cover any comparison at all, even the most basic instance where ***two*** signals be compared, *i.e.*, one reference signal to one query signal based on an "abstract" that can be formed in any way one desires and with whatever content one wishes, as long as it is at least human-perceptible.

---

Footnote continued from previous page
are not asserted). (Br. at 36-39; *see also id.* at 9-10 (citing un-asserted '472 claims 9 and 12, and '494 claim 1).) These citations have no relevance to this appeal.

The District Court recognized that the Asserted Claims do not require any level of complexity, pointing out that "[t]he mere fact that the claims may cover a computer implementation that surpasses in scope or complexity what a human mind is capable of accomplishing is irrelevant where the claims are not limited to such complex activities, but also encompass more basic human approaches." (Appx0010-11.)  This is exactly the analysis that is supposed to happen in part two of the *Alice/Mayo* framework – not asking what is possible while still within the scope of the Asserted Claims, but to ask whether any limitations of the Asserted Claims take them from the theoretical abstract to a concrete inventive concept.

With respect to Blue Spike's second argument, as the District Court also noted, the Asserted Claims, on their face, do not require any specialized equipment, but instead solely rely upon generic computer components (*e.g.*, processors, receivers, databases, comparing devices, devices configured to determine matches, and/or non-transitory memory) to perform conventional computer operations (*e.g.*, receiving, inputting, creating, generating, storing, counting, comparing, recording, and distributing).  (Appx0010; *see also, e.g.*, Appx0034-35 ('472 claims 1, 8, 11); Appx0049-50 ('700 claims 1, 18, 40); Appx0066-67 ('494 claims 11, 29); Appx0082-83 ('175 claims 1, 8, 11, 17); Appx0099 ('728 claims 1, 25).)  Routine operations performed on generic computer components do not adequately limit an abstract idea.  *See Planet Bingo*,

576 F. App'x at 1007-1008 (computer components "long in use" could implement the computer-aided methods and systems); *Content Extraction*, 776 F.3d at 1347-48 (data collection, scanning, recognizing and storing information insufficient for patentability); *Dealertrack*, 674 F.3d at 1333 ("the claims are silent as to how a computer aids the method, the extent to which a computer aids the method, or the significance of a computer to the performance of the method").

Moreover, the Supreme Court and this Court have made clear that using computers to perform calculations and computations, especially for a process that seeks to model human recognition and ability, does not render a claim patentable. *Alice*, 132 S. Ct. at 2355-56; *Bancorp*, 687 F.3d at 1278 (use of computer in otherwise patent-ineligible process for "its most basic function – making calculations or computations – fails to circumvent the prohibition against patenting abstract ideas and mental processes"); *Content Extraction*, 776 F.3d at 1347 (for a computer in a computer-implemented invention to be deemed meaningful "it must involve more than performance of 'well-understood, routine, [and] convention activities previously known to the industry'").  Blue Spike's characterizations of the Patents to "utilize a computer for complex calculations on a digital signal" and make comparisons through what admittedly relies upon human perceptibility (*i.e.*, the "abstract") (Br. at 39, 33) do nothing to disturb the District Court's finding that the Patents fail to provide an inventive step.

### 2. The Remaining Claim Limitations Do Not Provide An Inventive Concept To Limit The Abstract Idea

Beyond the recitation of generic computer components, routine computer functionality, and the claimed "abstract" that make up the sum total of representative claim 1, the remaining limitations of the Asserted Claims rely on routine computer functionality, well-known techniques, mathematical computations, human capacity and/or are minor variations over the representative claim. Considered even as an ordered combination, these limitations do not add anything that is not already present when considered separately. *See Mayo*, 132 S. Ct. at 1298. None of these confer patentability.

### a) Limitations Directed To Generating The "Abstract" Lack An Inventive Concept

In representative claim 1 of the '472 patent, the data-reduced "abstract" of the signal mimics human perception because, by definition, it is generated using and retains qualities that are perceived by a person. The "abstract"-generating limitations of the other Asserted Claims add nothing more, and even Blue Spike refrains from arguing that these limitations add any inventive concept:

- Reciting use of "selectable criteria" (Appx0035 ('472 claim 11)) or "selected criteria" (Appx0099 ('728 claim 5));

- Reciting use of "signal characteristic parameters" or "perceptual characteristics" or "cognitive features" or "perceptible characteristics" that differentiate between versions of the signal (Appx0049 ('700 claims 1, 18, 21, 40); Appx0066-67 ('494 claims 11, 29); Appx0082 ('175 claim 8));

- Reciting use of "characteristics" of each signal in a group of "audibly/perceptibly similar signals" (Appx0100 ('728 claim 30, and un-asserted claim 29 from which it depends)); and

- Reciting that the "abstract" is "similar to" or a "self-similar representation of" the signal (Appx0066 ('494 claim 15); Appx0082-83 ('175 claims 1, 8, 11, 17); Appx0099 ('728 claims 1, 4, 25)).

These are all different ways of saying that the "abstract" is based on and

representative of some humanly-recognizable quality of the content.[11]  (*See, e.g.*,

Appx2303 ("perceptible" as construed by Texas court means "perceived by a

person"); Appx0028(3:63-4:2) ("abstract" should model a person's ability to

differentiate between songs that have "the same lyrics and music, but which are

sung by different artists"); Appx0033(13:7-12) (selectable criteria are based on

human-defined differences:  "[t]o the extent that the creator or consumer of the

signal can define a difference in any of the four criteria above, means can be

derived (and programmed for selectability) to recognize and distinguish these

differences."); Appx0030(7:36-48) (the only mention of "self-similar" in the

specification pertains to prior art hashing or compression techniques, but then

clarifies that an "abstract" is something else because it must "retain what is

humanly perceptible," be "realistic," and "mimic human perception"); Appx0033-

34(14:65-15:11) (analogizing an "abstract" to human analysis of identifying and

---

[11] Claims 3 and 8 of the '472 patent require "creating an abstract" with no further limitations, and in that respect, are even broader and more abstract than representative claim 1.

comparing sunset paintings by selecting "perceptual characteristics" relating to the sun as the criteria).)  As confirmed by the patent specification, these limitations are merely restatements of the abstract idea of comparing based on what a human would perceive, and do not limit the abstract idea sufficiently to state a patentable, inventive concept.  (*See* Argument, Sections II.A.1, II.B.1, *supra*.)

The other limitations likewise add nothing inventive.  Several claims reiterate that the "abstract" be "reduced in size" or "data reduced" – just as the Texas court's claim construction and specification already require.  (*See* Appx1996; Appx0082-83('175 claims 1, 8, 11, 17); Appx0099('728 claims 1, 4, 25); Appx0030(7:36-40).)  In generating the data-reduced "abstract," '175 claim 16 refers to an unspecified "algorithm," '175 claim 17 uses a "psycho-acoustic" or "psycho-visual" model, and '728 claim 26 applies a "spectral transform" to the signal.  (Appx0083('175 claims 16, 17); Appx0099('728 claim 26).)  But, the Patents confirm that these limitations are not sufficiently limiting either.

With respect to claim 16 of the '175 patent, the specification fails to provide any algorithm to generate the "abstract" and, as noted by the District Court, claim 16 is not limited to any particular algorithm, thus providing no concrete limitation on the abstract idea sufficient to confer patentability (Appx0016).  *See Vehicle Intelligence*, 2015 WL 9461707, at *3 (claims were patent-ineligible where the specification was devoid of any details on how the claimed system works).  As also

noted by the District Court, the psycho-acoustic or psycho-visual models recited in claim 17 are confirmed by the specification to be existing data manipulation tools that mimic human perception.  (Appx0016.)  Thus, these limitations simply restate the abstract idea itself in the context of using existing algorithms to manipulate the data, and do not provide a limiting inventive concept.  *Content Extraction*, 776 F.3d at 1349 ("all of the additional limitations in the claims … recite well-known, routine, and conventional functions of scanners and computers.  Thus, while these claims may have a narrower scope than the representative claims, no claim contains an 'inventive concept' that transforms the corresponding claim into a patent-eligible application of the otherwise ineligible abstract idea.").

The same is true for '728 claim 26, which claims using a "spectral transform" in the creation of the "abstract."  Again, the specification confirms that a "spectral transform" is nothing more than a mathematical manipulation of data that "should maintain, for certain applications, some cognitive or perceptual relationship with the original analog waveform."  (Appx0032(11:28-31).)  But, this is nothing other than a restatement of the abstract idea of the Patents, *i.e.*, use a mathematical equation to achieve the goal of the abstract idea.  This too is not a limitation that provides an inventive concept.  *See Digitech*, 758 F.3d at 1351 ("Without additional limitations, a process that employs mathematical algorithms

to manipulate existing information to generate additional information is not patent eligible.").

Finally, two dependent claims require that the "abstracts" be generated using only a portion of the underlying signal (rather than the entire signal as in the independent claims from which they depend). In '472 claim 2, both the reference signal "abstract" and query signal "abstract" are based upon a portion of the reference and query signals, respectively. Claim 17 of the '494 patent is similar, except that it addresses only the reference signal "abstract." For the same reasons as already discussed for an "abstract" based on a whole signal, using some undefined "portion" of a signal is not an inventive concept or meaningful limitation on the abstract idea of creating and using an "abstract."

The District Court also analyzed these limitations, and correctly concluded that they do not include any inventive concepts. (*See, e.g.*, Appx0012-18.)

> **b)      Limitations Directed To Comparing And Matching Lack An Inventive Concept**

Just like representative claim 1, nearly every other Asserted Claim requires comparing the reference and query signal "abstracts" to determine if they match or are related.[12] The majority of Asserted Claims require nothing beyond this basic

---

[12] The exceptions are claims 1, 8 and 17 of the '175 patent. They are even more generic than the other Asserted Claims in that they recite an "abstract" but no compare step. (Appx0082-83.)

comparison. They recite no purpose, practical use or application, a fact that Blue Spike has exploited in more than one hundred separate lawsuits covering a vast array of technology fields and applications. (*See* n.3, *supra*.) The handful of Asserted Claims that do require that something happen as a result of the match recite only routine computerized processes that do not confer patent-eligibility.

Limitations that require comparing "abstracts" to determine if they match (Appx0034-35('472 claim 3, 8, 11); Appx0049('700 claims 1, 18); Appx0067('494 claim 29); Appx0099('728 claims 1, 4, 25)) or to generate a "compare result" (Appx0083('175 claims 11, 12)) are no different than the comparing and matching limitations of representative claim 1 of the '472 patent. These types of routine computerized comparisons are not an inventive concept. *See Planet Bingo*, 576 F. App'x. at 1008-09 (finding patent's recitation of computer components, such as "a program …. enabling" the steps of storing and comparing, referred to purely "'conventional activity'") (citations omitted); *Content Extraction*, 776 F.3d at 1345, 1348-49 (determining that digital data recognition was routine computer functionality).

Certain Asserted Claims compare "abstracts" to determine whether they are related (Appx0050('700 claim 40); Appx0066('494 claim 11)), and others require an index of relatedness after a match is determined (Appx0035('472 claim 11); Appx0049('700 claim 27)). The quality of relatedness is not directly addressed in

the specification, but is conceptually referred to in discussions regarding "perceptual differences" in songs or the common theme of the sun in different paintings. (Appx0033-34(13:16-22, 14:65-15:11).) This concept – determining how things are related based on human-perceptible characteristics – is no different than what humans (even children) do, for example, by looking at two paintings to determine how they are similar and how they are different. Claiming "relatedness" – particularly with no parameters for what level of "relatedness" would result in a match – does not save the claim under § 101. *See Alice*, 134 S. Ct. at 2355-56 (determining that generically applying a computer to an otherwise abstract idea fails to confer patentability); *Bancorp*, 687 F.3d at 1278 (noting that basic digital computation on a conventional computer to perform mental processes is not patentable).

For the few Asserted Claims that require additional activity as a result of any match, these activities are nothing more than routine processes like counting matches, recording match occurrences or generating a report to identify matches (Appx0034('472 claims 3, 4, 8); Appx0099('728 claim 16)); authorizing transmission of the signal (Appx0049('700 claim 18, 27)); or distributing the signal (Appx0050('700 claim 51)). These functions have been recognized as examples of "routine, conventional activity" that do not confer patentability. *See Ultramercial*, 772 F.3d at 715-16 (citations omitted) (steps such as updating an

activity log are "conventional steps, specified at a high level of generality" that do not supply an inventive concept); *OIP Technologies*, 788 F.3d at 1363 (citations omitted) ("sending" digital data is well-understood, routine, conventional activity); *buySAFE, Inc. v. Google, Inc.*, 765 F.3d 1350, 1355 (Fed. Cir. 2014) ("That a computer receives and sends the information over a network–with no further specification–is not even arguably inventive.").

> **c) Limitations Directed To Routine, Conventional Activity On Generic Computer Components Lack An Inventive Concept**

Blue Spike does not contend that there is anything special or inventive about any of the generic computer components recited in the Asserted Claims, *e.g.*, a processor, database used to store "abstracts," non-transitory memory, comparing device, receiver or electronic system.  This Court has confirmed that recitation of such components do not provide an inventive concept to an abstract idea, particularly where no special structure or use is indicated.  *Dealertrack*, 674 F.3d at 1333; *Planet Bingo*, 576 F. App'x at 1008.

The embedder recited in '700 claim 12 is similarly generic.  As described in the specification, it was used in the prior art to embed "additive signals" like digital watermarks into the signal.  (Appx0028(4:42-66) (traditional methods to identify and monitor signals rely on "a separate and additional signal" that is concatenated or embedded into the original signal); Appx0033(13:60-14:2) (identifier embedded

into or affixed to signal is a traditional monitoring technique); Appx0029(5:40-6:17) (watermarking).)  Adding known techniques and components to an otherwise abstract idea does not confer patent-eligibility.  *See, e.g.*, *Content Extraction*, 776 F.3d at 1345, 1348 (claim requiring "recognizing portions of said hard copy documents corresponding to a first data field" that uses existing technology to recognize and store data is not inventive); *Alice*, 132 S. Ct. at 2357 (finding that techniques "well known in the art" are insufficient to transform an abstract idea into patentability).

Other dependent claims in the '700 patent also recite prior art techniques. After an "abstract" is generated, there is an additional step of applying a cryptographic protocol to the "abstract" ('700 claim 10) where the protocol is a hash or digital signature ('700 claim 11), and then storing the hashed or digitally signed "abstract" ('700 claim 11).  (Appx0049.)  None of these limitations limit the scope of the claimed "abstract" but instead add an admittedly known processing step only after the "abstract" is created.  (*See, e.g.*, Appx0046(10:39-48); *see also* Appx2030 (construing "hash" as a "mathematical transform").)  Adding conventional computing functions to an abstract idea is not an inventive step.  *See Digitech Image*, 758 F.3d at 1451 (process that employs "mathematical algorithms" to manipulate data is not patent eligible); *Alice*, 134 S. Ct. at 2357-58

(mathematical principle that could be carried out in existing computers long in use is not patent eligible).

### 3.    The Asserted Claims Are Preemptive

Blue Spike's anti-preemption arguments focus on unclaimed, aspirational aspects of the "abstract," rather than the actual claim language.  For example, Blue Spike asserts that ***something*** about the Asserted Claims themselves "transform the abstract idea of comparing one thing to another [into an idea of] developing a specific system for automating comparison across digital platforms in order to facilitate further improvements over the art."  (Br. at 40.)  There are at least two significant problems with this argument.  *First*, according to Blue Spike, the inventive concept is ***using*** the very construct (*i.e.*, the claimed "abstract") that it says is the idea of the Patents under part one of the *Mayo/Alice* framework.  In other words, if the claimed "abstract" is the idea of the Patents – which Blue Spike says it is – then the Patents intrinsically claim the ineligible concept itself.  *See Alice*, 134 S. Ct. at 2355 (citation omitted) (the second step of the test is to ensure that the asserted claims are "significantly more than a patent upon the [abstract idea] itself.").

*Second*, Blue Spike's own interpretation of the claimed "abstract" makes clear that the abstract idea in the Asserted Claims is not meaningfully limited.  As mentioned above, Blue Spike urged Google and the District Court to adopt the

earlier constructions entered in Texas (*see* Appx0003-04), which confirm that the claimed "abstract" is simply a portion of the original work that retains a human-perceptible relationship to the original.  (Appx1996; Appx2030-32; Appx2636.) By definition, this is the equivalent of human processing, which proves that "abstract"-based comparisons are not meaningfully limited in its application and scope. *See CyberSource Corp. v. Retail Decisions, Inc.*, 654 F.3d 1366, 1372 (Fed. Cir. 2011) (finding claims unpatentable because they are of such a broad scope that they extend to methods that "can be performed in the human mind"); *Content Extraction*, 776 F.3d at 1347 (noting that the concepts of "data collection, recognition, and storage is indisputably well-known" and are functions that "humans have always performed"); *Dealertrack*, 674 F.3d at 1333-34 (explaining that "computer aided" mental process claims was unlimited in scope and preempted the abstract concept).

The sweeping breadth of the claimed "abstract" is further confirmed by the specification, which highlights the goal of modeling and mirroring human-observable signal recognition for performing claimed comparisons.  (*See, e.g.*, Appx0028(4:32-36) (recognizing that "it is usually costly and time consuming to model the processes of the highly effective ability of humans to identify and recognize signals"); Appx0033-34(14:58-15:11) (invention models and preserves "perceptual qualities that permit a human to recognize the original visual image");

*id.* (describing how invention might be used to locate images of the sun by analogy to what a person would do); Appx0033(15:12-15) (one application might be "identification of photographs of potential suspects which identity matches a sketch of a police artist").)

As broad as the Patents read, Blue Spike dismisses preemption issues by asserting that the Asserted Claims would not preempt what is in the prior art. (Br. at 40 (using an "abstract" is "just one method" for comparing signals; others like watermarking or additive signals are in the prior art and can be utilized).) This self-serving declaration of an axiomatic patent law principle cannot save Blue Spike. This Court has made clear that the "mere existence of a non-preempted use of an abstract idea does not prove that a claim is drawn to patent-eligible subject matter." To hold otherwise would allow a patentee to avoid a § 101 challenge by "identify[ing] a single prior art reference in the specification and state that its invention improves upon that reference." *See Vehicle Intelligence*, 2015 WL 9461707, at *3.

Blue Spike additionally argues that the Patents do not preempt because they do not cover "direct comparison, analyzing two binary files composed of 1s and 0s side-by-side on a bit-by-bit basis." (Br. at 40-41.) Said differently, Blue Spike is essentially arguing that everything other than an entire-work-to-entire-work comparison *is* covered by the Asserted Claims. This argument does not help Blue

Spike; instead, it proves the point.  By Blue Spike's own argument, any process that takes any human-perceptible part of a work and makes a comparison on that basis (using any prior art or yet-to-be-conceived mechanism), is within the scope of the alleged invention.  This is preemption of the abstract idea.  *See Internet Patents*, 790 F.3d at 1349 (finding claims invalid under § 101 and noting that computer aided mental process and abstract ideas linked to general purpose computer preempted all practical uses of the abstract concept).

### 4.   The Asserted Claims Do Not Satisfy The Machine Or Transformation Test

Regarding the machine-or-transformation test, the District Court did not "ignore" Blue Spike's arguments (*contra* Br. at 42-44), but asked at the hearing what relevance the machine-or-transformation test had to its § 101 analysis.  The entirety of Blue Spike's response was to suggest that the test was "an indicator" or "factor" to consider, and to direct the District Court's attention to its opposition brief.  (Appx2781:3-13.)  That brief dedicated ***one paragraph*** to discussing – in the most cursory fashion possible – how the Asserted Claims purportedly satisfied the "transformation" portion of the test (*i.e.*, by claiming "a method for creating signal abstracts, which are manipulations of the data signal" to a data-reduced form).  (Appx2994.)  Blue Spike repeats this argument on appeal and again misses the mark.  (Br. at 43.)  The mere transformation of data does not satisfy the

machine-or-transformation test.[13] *Cf. Bilski*, 561 U.S. at 602; *Alice*, 134 S. Ct. at 2357-58 (noting, for example, that mathematical transforms carried out in computers long in use is not patentable).

With respect to whether these claims involve a "machine," Blue Spike, for the first time on appeal, apparently asserts that the presence of a computer satisfies the machine test. Again, Blue Spike is wrong. The Asserted Claims recite nothing more than generic computer components (*see* Counter-Statement of the Case, Section II.A, *supra*; Appx0011), which cannot save them from invalidity under this Court's precedent. *Ultramercial*, 772 F.3d at 716-7 (claims that "are not tied to any particular novel machine or apparatus, only a general purpose computer" do not satisfy "machine" prong); *Vehicle Intelligence*, 2015 WL 9461707, at *4 ("Merely stating that the methods at issue are performed on already existing

---

[13] Blue Spike newly contends on appeal that the "abstract" is "non-invertible." (Br. at 7.) Blue Spike is apparently arguing against the construction of "abstract" that it urged to the Court below. On that basis, its new argument can be rejected. Regardless, Blue Spike is wrong. As support, Blue Spike cites a passage of the '175 patent that corresponds to Appx0033(14:3-8), which does ***not*** discuss the "abstract." It describes creating a second database (storing data-reduced audio signals) from a first database (storing audio signals) where the data-reduced versions of the signals in the second database are "not likely to reflect the human perceptual quality of the signal" and thus, are "not *likely* to be played back and recognized as the original signal." (Emphasis added.) As discussed above, an "abstract" by definition must retain human perceptual qualities of the underlying signal (Argument, Section II.A, *supra*; Counter-Statement of the Case, Section II.B, *supra*.) and neither this section of the specification or any language in any of the Asserted Claims ***requires*** that any abstract be "non-invertible."

vehicle equipment, without more, does not save the disputed claims from

abstraction.").

### III.   BLUE SPIKE'S REMAINING ARGUMENTS DO NOT BEAR ON THE § 101 ANALYSIS, HAVE NO MERIT AND/OR WERE NOT RAISED BELOW

#### A.   The District Court Did Not Err In Deciding Patent Eligibility In The Context Of A Rule 12(c) Motion, And Did Not Enter Judgment Prematurely

Patent eligibility under § 101 is a threshold issue.  *Bilski*, 561 U.S. at 602.

Where claims are plainly directed to an abstract idea, this Court has "repeatedly

sanctioned a district court's decision to dispose of them on the pleadings."  *See*

*OIP Technologies*, 788 F3d. at 1364-65 (J. Mayer, concurring) (rejecting argument

that discovery and claim construction are necessary); *see also Content Extraction*,

776 F.3d at 1349 (rejecting argument that lower court erred by declaring claims

patent-ineligible at the pleading stage without claim construction or expert

discovery); *buySAFE*, 765 F.3d 1350 (affirming judgment on the pleadings).  Here,

there is no merit to Blue Spike's complaint that the District Court should have

construed claim terms and considered expert opinion before ruling on Google's

motion.  (Br. at 2, 13, 15, 24, 28-30, 29 n.13.)  Even though the District Court

would have been well within its authority had it not done so, the District Court

analyzed the Texas court's claim constructions urged by Blue Spike and

considered the expert declaration submitted by Blue Spike.  (Appx0003-4,

Appx0008-9.)  To the extent Blue Spike contends that the District Court

misunderstood the Patents, it also gave Blue Spike every opportunity to explain

them.  (Appx0601-0609 (scheduling conference); Appx2270 (brief); Appx2739 (§

101 hearing); Appx0019 (order to show cause).)  On this record and for these

Patents, the District Court did not err in entering judgment on the pleadings.

### B.    Google And The District Court Did Not Inject Other Invalidity Considerations Into The § 101 Analysis

It is true that, whether or not the Asserted Claims are patent-eligible, they

still would be invalid if they did not satisfy the other statutory requirements for

patentability, including §§ 102, 103 and 112.  *Bilski*, 561 U.S. at 602; 35 U.S.C. §

101.  But, the question of what the Patents cover is as central to the § 101 analysis

as it is to other statutory requirements for patentability.  Here, Blue Spike argues

that the District Court was reversibly confused by enablement issues under § 112

when the District Court found these Patents invalid under § 101, pointing to the

District Court's occasional use of words like "teach" or "enable" at the hearing or

in its Order (along with a footnote in Google's motion reserving its rights to move

later on § 112 issues, *see* Appx2114).  (Br. at 3-4, 10-11, 14-15, 17, 20 n.5, 53-54.)

While the Patents are critically deficient under § 112, neither Google nor the

District Court imported those deficiencies into or conflated them with the § 101

discussion.[14]  The question of what the Patents teach, and thus what they may

cover, are critical questions with respect to certain aspects of a § 101 analysis,

including the scope of preemption and whether there is an inventive concept

sufficient to limit a claimed abstract idea.  Here, the District Court was correct in

noting that these Patents do not actually teach any way to construct an "abstract,"

but instead merely claim the idea of using an "abstract."  This is a § 112 problem.

But, it is also relevant to the § 101 analysis.  The District Court's questions and

analysis focused on whether there is, indeed, any limit anywhere in the Asserted

Claims or specifications as to what an "abstract" could be or how it could be

generated, other than the abstract idea of being based on human perception.  In this

analysis, the District Court, Google, and Blue Spike all referred to and evaluated

the Asserted Claims in light of the specification, which is consistent with how this

Court analyzes § 101 issues.  *Internet Patents Corp.*, 790 F.3d at 1348 (discussing

specification's lack of disclosure as part of the patentability determination);

*Vehicle Intelligence,* 2015 WL 9461707, at *3 ("neither the claims at issue nor the

specification provide any details as to how this [claimed] system works or how it

produces faster, more accurate and reliable results"); *see also Digitech Image*, 758

---

[14] Google was not "ultimately forced to disavow its § 112 argument." (*Contra* Br.
at 14.)  Google's motion was limited to a single question, patentability under
§ 101.  Its briefing and argument focused solely on that issue.  Blue Spike cites
nothing that would suggest otherwise.

F.3d at 1350 (system claims directed to describing mathematical transformations for digital image processing were not patent-eligible where they did not "require any physical embodiment").  The fact that the Asserted Claims may not, for instance, be enabled does not undercut the conclusion, as confirmed by the District Court, that the Asserted Claims also do not place any patentable limits on the abstract idea of an "abstract."

## C. The Invalidity Of These Asserted Claims Is Not Affected By The Texas Court's Finding Of A "Prose Algorithm"

Blue Spike asserts that the District Court's statement that the specification includes no "source code, detailed algorithms or formulas, or the like" (Appx0004) is contradicted by a Texas court decision that apparently found a "prose" algorithm in the specification.  (Br. at 10, 20 n.4, 22, 29 n.13; Appx2034.)  In context, the Texas court was not considering the question of patent eligibility under § 101, but instead addressed arguments as to whether certain phrases met the requirements of § 112 ¶¶ 2, 6.  (Appx2045, Appx2048.)

Blue Spike's assertion of a conflict is overstated, at best.  The District Court, in its analysis of the claimed "abstract," noted that "the specification does not teach the specifics of implementation—it includes no source code, detailed algorithms or formulas, or the like."  (Appx0004.)  As framed by Blue Spike, the Texas court's supposedly contradictory finding of a "prose algorithm" was related to "five elements: (1) a reference database, (2) an object locator, (3) a feature selector, (4) a

comparing device, and (5) a recorder." (Br. at 10 (citing '175 Patent 8:3-9:40).)

Whether or not the specification's discussion of these elements is a "prose"

algorithm, it certainly is not a detailed algorithm teaching the specifics of *how* to

create the claimed "abstract" that is alleged to be "key" to the Asserted Claims.[15]

There is thus no substantive tension between the District Court's observation and

the Texas Court's finding.

Even if Blue Spike's assertion of a conflict was true, Blue Spike offers no

authority for the proposition that one court's decision regarding one element of a

claim in light of § 112 has any bearing on another court's detailed analysis under

§ 101. *See, e.g.*, *J&J Sports Prods., Inc. v. Kim Hung Ho*, Case No. 5:11-cv-1163,

2012 WL 1910041, at *4 (N.D. Cal. May 24, 2012). Regardless, the District Court

cannot be criticized for its finding that the specification contained no algorithm

(*contra* Br. at 29 n.13) when Blue Spike never raised its "prose" algorithm

---

[15] *See Augme Techs., Inc. v. Yahoo! Inc.*, 755 F.3d 1326, 1337-38 (Fed. Cir. 2014) (affirming indefiniteness ruling where specification merely restated the recited function to "assemble a second code module" but did not include any algorithm for *how* the second code module was actually assembled); *ePlus, Inc. v. Lawson Software, Inc.*, 700 F.3d 509, 520-21 (Fed. Cir. 2012) (rejecting argument that specification included prose algorithm, noting that the "problem here is not the adequacy of the substance or form of the disclosure, but the absence of any disclosure at all"); *Ergo Licensing, LLC v. CareFusion 303, Inc.*, 673 F.3d 1361, 1365 (Fed. Cir. 2012) ("Even described 'in prose,' an algorithm is still 'a step-by-step procedure for accomplishing a given result.'") (citation omitted).

argument below.[16]  (*See* Appx2278, Appx2283, Appx2758-59.)  At the hearing, Blue Spike admitted that the Asserted Claims do not include any algorithms and, in response to the District Court's request that it identify ***where*** the Patents teach the "complex mathematical algorithms" that it alleged were in the specification, Blue Spike identified only two passages.  (Appx2758:1-Appx2759:9.)  The first pertains to prior art psycho-acoustic and psycho-visual compression (Appx0030-31 (7:65-9:39)) and the second pertains to prior art lossless and lossy compression and other data reduction techniques (Appx00028 (4:8-18).)  The District Court ***did*** consider each argument that Blue Spike actually made below, but rejected them because it held that the approaches identified by Blue Spike "fall[] squarely within the prior art and/or the abstract concept."  (Appx0016) (considering these arguments in connection with the Asserted Claims that actually recite these limitations).)

**D.    Blue Spike's Reliance On Purported Novelty, The USPTO's Issuance Of The Patents And The Statutory Presumption of Validity Is Misplaced**

Blue Spike's last assertion – that the USPTO's issuance of the Patents and "the general statutory presumption of patent validity" should trump the § 101 eligibility requirement – also has no merit.  (Br. at 5-6, 8, 18-19, 19 n.2, 22.)  If

---

[16] Blue Spike cites the '175 patent at column 8:3-9:40 as evidence of "a 5-step prose algorithm."  (Br. at 10; Appx0078-79.)  This citation corresponds to column 7:65-9:39 of the '472 patent (Appx0030-31), and is not one of the two passages identified by Blue Spike at the hearing on Google's motion.  (Appx2758-59 (identifying column 7:46-60 and column 4:24-32 (sic, 4:8-18).)

this were so, there would be no *Bilski*, no *Mayo*, no *Alice* and no role for the Court on this issue. *See Alice*, 134 S. Ct. at 2359 (finding claims patent-ineligible as they relied upon prior art and prior knowledge insofar as the claims recited "'well-understood, routine, conventional activit[ies]' previously known to the industry.") (citing *Mayo*, 132 S. Ct. at 1294); *Internet Patent*, 790 F.3d at 1348 (finding the specification described a claimed element as "conventional," well-known, and a product of prior art applications rending it patent-ineligible).

## CONCLUSION

For the foregoing reasons, Google respectfully requests that the Court affirm the Order of the District Court granting judgment on the pleadings and finding that the Asserted Claims are invalid under 35 U.S.C. § 101.

Dated: March 28, 2016

Respectfully submitted,

/s/ Michael A. Berta
Michael A. Berta
ARNOLD & PORTER LLP
Three Embarcadero Center, 7th Floor
San Francisco, CA 94111
Phone: (415) 471-3100
Fax: (415) 471-3400
michael.berta@aporter.com

Nicholas H. Lee
ARNOLD & PORTER LLP
777 S. Figueroa Street, 44th Floor
Los Angeles, CA 90017
Phone: (213) 243-4000

Fax: (213) 243-4199
nicholas.lee@aporter.com

*Attorneys for Appellee Google Inc.*

No. 2016-1054

_____

## IN THE UNITED STATE COURT OF APPEALS
## FOR THE FEDERAL CIRCUIT

_____

BLUE SPIKE, LLC,

*Plaintiff-Appellant*,

v.

GOOGLE INC.,

*Defendant-Appellee.*

_____

Appeal from the United States District Court for the
Northern District of California in Case No. 4:14-cv-01650-YGR,
Judge Yvonne Gonzalez Rogers.

_____

## PROOF OF SERVICE

_____

I certify that I served a copy of the foregoing brief on counsel of record this

28th day of March, 2016 via Electronic Means (by E-mail and/or CM/ECF):

>       Randall T. Garteiser
>       rgarteiser@ghiplaw.com
>       Christopher A. Honea
>       chonea@ghiplaw.com
>       bluespike@ghiplaw.com

DATED:  March 28, 2016                    */s/ Michael A. Berta*_____
                                          Michael A. Berta

No. 2016-1054

IN THE UNITED STATE COURT OF APPEALS
FOR THE FEDERAL CIRCUIT

BLUE SPIKE, LLC,
*Plaintiff-Appellant*,

v.

GOOGLE INC.,
*Defendant-Appellee.*

Appeal from the United States District Court for the
Northern District of California in Case No. 4:14-cv-01650-YGR,
Judge Yvonne Gonzalez Rogers.

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limitation of Federal Rule of

Appellate Procedure 32(a)(7)(B).  The brief contains 13,194 words, excluding the

parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii)

DATED:  March 28, 2016            */s/ Michael A. Berta*
                                  Michael A. Berta