# United States Court of Appeals For the Federal Circuit

———————

BLUE SPIKE, LLC

*Plaintiff-Appellant,*

v.

GOOGLE INC.

*Defendant-Appellee,*

Appeal from The United States District Court
For The Northern District of California
In Case No. 14-CV-1650, Judge Yvonne Gonzalez Rogers

## JOINT APPENDIX

| | |
|---|---|
| Randall T. Garteiser | Nicholas H. Lee |
| Christopher A. Honea | ARNOLD & PORTER LLP |
| Kirk J. Anderson | 777 S. Figueroa Street, 44th Floor |
| GARTEISER HONEA, P.C. | Los Angeles, California 90017 |
| 44 North San Pedro Rd | (213) 243-4000 |
| San Rafael, California 94903 | |
| (415) 785-3762 | Michael A. Berta |
| | *Counsel of Record* |
| Ernest Young | ARNOLD & PORTER LLP |
| *Of Counsel* | Three Embarcadero Center, 10th Floor |
| Apex, North Carolina 27502 | San Francisco, California 94111 |
| (919) 360-7718 | (415) 471-3100 |
| | |
| *Attorneys for Plaintiff-Appellant* | *Counsel for Defendant-Appellee* |
| *Blue Spike, LLC* | *Google Inc.* |

United States Court of Appeals
for the Federal Circuit
Blue Spike LLC v. Google Inc.
[16-1054]

## JOINT APPENDIX TABLE OF CONTENTS

## VOLUME ONE

|  | Page |
|---|---|
| Order Granting Google's Motion for Justice on the Pleadings, **dated 09/08/15** | Appx0001–0018 |
| Order to Show Cause, **dated 09/08/15** | Appx0019 |
| Order on Remaining Patent Claim, **dated 09/08/15** | Appx0020 |
| Judgment Invalidating Asserted Patents, **dated 10/01/15** | Appx0021–0022 |
| "472 Patent" – US 7,346,472 | Appx0023–0037 |
| "700 Patent" – US 7,660,700 | Appx0038–0051 |
| "494 Patent" – US 7,949,494 | Appx0052–0068 |
| "175 Patent" – US 8,214,175 | Appx0069–0083 |
| "728 Patent" – US 8,712,728 | Appx0084–0101 |
| Docket Sheet from CAND 4:14-cv-01650 | Appx0102–0116 |
| Docket Sheet from TXED 6:12-cv-00499 | Appx0117–0292 |

# VOLUME TWO

Blue Spike's Original Complaint for Patent Infringement against Google, **dated 08/22/12**     Appx0293–0312

Blue Spike's First Amended Complaint against Google, **dated 02/13/14**     Appx0332–0353

Defendant Google's Answer to Original Complaint for Patent Infringement, **dated 11/15/12**     Appx0401–0413

Order Transferring Case to the Northern District of California, **dated 03/13/14**     Appx0414–0423

Transcript from July 28, 2014 Case Management Conference, **dated 08/13/14**     Appx0596–0642

Blue Spike's Amended Complaint Against Google, **dated 09/15/14**     Appx1488–1509

Memorandum Opinion and Order regarding Claim Construction, **dated 10/16/14**     Appx1965–2033

Report and Recommendation Denying Motion for Summary Judgment of Invalidity Based on Indefiniteness, **dated 10/16/14**     Appx2034–2052

Google's Motion for Judgment on the Pleadings, **dated 05/12/15**     Appx2103–2127

Declaration of Nicholas Lee in Support of Motion for Judgment on the Pleadings, **dated 05/12/15** — Appx2129–2132

  Exhibit 2: Patent Assignment Details from USPTO.gov — Appx2137

  Exhibit 6: "175 Patent" — Appx2188–2203

  Exhibit 8: Excerpts from July 28, 2014 Case Management Conference — Appx2223–2231

Blue Spike's Opposition to Google's Motion for Judgment on the Pleadings, **dated 06/09/15** — Appx2270–2295

  Exhibit 1: Memorandum Opinion and Order — Appx2338–2407

  Declaration of Yannis Papakonstantinou, Ph.D., in support of Blue Spike's Opposition to Google's Motion — Appx2302–2308

Google's Reply Brief in Support of Motion for Judgment on the Pleadings, **dated 06/16/15** — Appx2479–2499

Joint Claim Construction and Prehearing Statement, **dated 08/03/15** — Appx2635–2643

Transcript of Hearing for Motion for Judgment on the Pleadings, **dated 06/30/15** — Appx2739–2794

Docket Sheet from CAND 4:13-cv-01105-YGR, *AOptix Technologies v. Blue Spike, LLC* — Appx2802–2810

Docket Sheet from CAND 4:14-cv-01649-YGR, *Blue Spike, LLC v. SoundHound, Inc.* — Appx2811–2823

Docket Sheet from CAND 4:14-cv-01648-YGR, *Blue Spike, LLC v. Zeitera, LLC et al.* — Appx2824–2839

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF TEXAS**

**TYLER DIVISION**

| | | |
|---|---|---|
| **BLUE SPIKE, LLC,** | § | |
| *Plaintiff*, | § | **Civil Action No. 6:12-CV-558** |
| | § | |
| **v.** | § | |
| | § | **JURY TRIAL DEMANDED** |
| **GOOGLE INC.,** | § | |
| *Defendant*. | § | |

<u>**ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT**</u>

Plaintiff Blue Spike, LLC files this complaint against Defendant Google Inc. and alleges infringement of U.S. Patent Nos. 7,346,472 (the '472 Patent), 7,660,700 (the '700 Patent), 7,949,494 (the '494 Patent), and 8,214,175 (the '175 Patent, and together with the '472, '700, and '494 Patents, the Patents-in-Suit) as follows:

**NATURE OF THE SUIT**

1.      This is a claim for patent infringement arising under the patent laws of the United States, Title 35 of the United States Code.

**PARTIES**

2.      Plaintiff Blue Spike, LLC is a Texas limited liability company and has its headquarters and principal place of business at 1820 Shiloh Road, Suite 1201-C, Tyler, Texas 75703. Blue Spike, LLC is the assignee of the Patents-in-Suit from Blue Spike, Inc. (a Florida corporation), which was the assignee of the Patents-in-Suit from Scott Moskowitz and Michael Berry. Blue Spike, LLC and Blue Spike, Inc. are collectively referred to as "Blue Spike." Blue Spike CEO Scott Moskowitz is an inventor on more than 66 U.S. Patents related to managing, monitoring, and monetizing digital content and informational assets. Blue Spike has practiced and has

1

continued business plans to practice Moskowitz's patented inventions. Many of Blue Spike's patents are foundational to today's robust markets for content, which grew into their present form only after using Blue Spike's technology to catalogue, manage, monitor, and monetize that content.

3.      On information and belief, Google Inc. ("Google" or "Defendant") is a Delaware corporation having its principal place of business at 600 Amphitheatre Parkway, Mountain View, California 94043. Google Inc. is registered to do business in Texas and has appointed Corporation Service Company d/b/a CSC Lawyers Incorporating Service Company, 211 E. 7th Street, Suite 620, Austin, Texas 78701-3218, as its agent for service of process. Defendant does business in the State of Texas and in the Eastern District of Texas.

## JURISDICTION AND VENUE

4.      This lawsuit is a civil action for patent infringement arising under the patent laws of the United States, 35 U.S.C. §101 *et seq.* The Court has subject-matter jurisdiction pursuant to 28 U.S.C. §§1331, 1332, 1338(a), and 1367.

5.      The Court has personal jurisdiction over Defendant for at least five reasons: (1) Defendant has designated an agent for service of process in the State of Texas; (2) Defendant has committed acts of patent infringement and contributed to and induced acts of patent infringement by others in this District and elsewhere in Texas; (3) Defendant regularly does business or solicits business in the District and in Texas; (4) Defendant engages in other persistent courses of conduct and derives substantial revenue from products and/or services provided to individuals in the District and in Texas; and (5) Defendant has purposefully established substantial, systematic, and continuous contacts with the District and should

reasonably expect to be haled into court here. Thus, the Court's exercise of jurisdiction over Defendant will not offend traditional notions of fair play and substantial justice.

6.      Venue is proper in this judicial district under 28 U.S.C. §§1391(b)–(c) and 1400(b) because Defendant does business in the State of Texas, Defendant has committed acts of infringement in Texas and in the District, a substantial part of the events or omissions giving rise to Blue Spike's claims happened in the District, and Defendant is subject to personal jurisdiction in the District.

## FACTUAL BACKGROUND

### A.      Moskowitz's History

7.      The owners of art, music, films, and other creations who want to sell and license their work in digital form over the Internet need an efficient way to manage, monitor, and monetize it. Blue Spike founder Scott Moskowitz pioneered—and continues to invent—technology that makes such management possible, and which has parlayed with equal importance into other industries.

8.      Moskowitz, who earned two degrees *cum laude* from the Wharton School of Finance and Commerce at the University of Pennsylvania, is an inventor of more than 66 U.S. Patents, including each of the Patents-in-Suit.

9.      In 1992, Moskowitz entered the entertainment industry by doing agency work in Japan for a large U.S. wholesaler of music-related products.

10.     In 1993, Moskowitz filed his first U.S. digital-content-management patent application. That year, he also founded the software start-up The Dice Company, which would become widely recognized as a leader in digital watermarking. Since that first patent, Moskowitz has

continued to create patented inventions in the field of information management and security at a prodigious pace. His goal from the outset has been to commercialize his patented inventions.

11.     Moskowitz founded Blue Spike, Inc. in November 1997. Just over two years later, he filed his first patent application related to signal recognition technology, which issued as the '472 Patent. In describing this pioneering technology, Moskowitz coined the term "signal abstracting," which enhanced the ability to catalogue, archive, identify, authorize, transact, and monitor the use and/or application of signals, such as images (for example, photographs, paintings, and scanned fingerprints), audio (for example, songs, jingles, commercials, movies soundtracks, and their versions), video (for example, videos, television shows, commercials, and movies), and multimedia works. This revolutionary technology greatly improves the efficiency and speed of monitoring, analyzing, and identifying signals as perceived, as well as enabling the optimal compression of the signals and their associated signal abstracts for memory accommodation.

12.     Moskowitz's status as a pioneer in this new field between cryptography and signal analysis is evident from the United States Patent and Trademark Office's categorization of his patent applications. The USPTO was initially puzzled about how to classify his early inventions, as the then-existing patent categories in cryptography and signal analysis were, by themselves, inadequate. The USPTO therefore created a new classification for his groundbreaking inventions: classification 713, subclass 176, called "Authentication by digital signature representation or digital watermark."

13.     The National Security Agency (NSA) even took interest in his work after he filed one of his early patent applications. The NSA made the application classified under a "secrecy order" while it investigated his pioneering innovations and their impact on national security.

14. As an industry trailblazer, Moskowitz has been an active author and public figure on digital-watermarking and signal-recognition technologies since their emergence. A 1995 *New York Times* article—titled "TECHNOLOGY: DIGITAL COMMERCE; 2 plans for watermarks, which can bind proof of authorship to electronic works"—recognized Moskowitz's The Dice Company as one of two leading software start-ups in this newly created field. *Forbes* also interviewed Moskowitz as an expert for "Cops Versus Robbers in Cyberspace," a September 9, 1996 article about the emergence of digital watermarking and rights-management technology. He has also testified before the Library of Congress regarding the Digital Millennium Copyright Act.

15. He has spoken to the RSA Data Security Conference, the International Financial Cryptography Association, Digital Distribution of the Music Industry, and many other organizations about the business opportunities that digital watermarking creates. Moskowitz also authored *So This Is Convergence?*, the first book of its kind about secure digital-content management. This book has been downloaded over a million times online and has sold thousands of copies in Japan, where Shogakukan published it under the name *Denshi Skashi*, literally "electronic watermark." Moskowitz was asked to author the introduction to *Multimedia Security Technologies for Digital Rights Management*, a 2006 book explaining digital-rights management. Moskowitz authored a paper for the 2002 International Symposium on Information Technology, titled "What is Acceptable Quality in the Application of Digital Watermarking: Trade-offs of Security, Robustness and Quality." He also wrote an invited 2003 article titled "Bandwidth as Currency" for the *IEEE Journal*, among other publications.

16. Moskowitz is a senior member of the Institute of Electrical and Electronics Engineers (IEEE), a member of the Association for Computing Machinery, and the International Society for

Optics and Photonics (SPIE). As a senior member of the IEEE, Moskowitz has peer-reviewed numerous conference papers and has submitted his own publications.

17.     Moskowitz has been at the forefront of industry-based tests—such as the MUSE Embedded Signaling Tests, Secure Digital Music Initiative ("SDMI"), and various tests by performance-rights organizations including ASCAP and BMI, as well as Japan's Nomura Research Institute.

18.     Moskowitz has negotiated projects to incorporate his technologies with leaders in a gamut of industries. For example, Moskowitz worked with EMI, Warner Brothers, and Universal Music Group on music-release tracking systems; with AIG on insurance and financial services; with IBM on watermarking its software and managing movie scripts; and with Juniper Networks on measuring and provisioning the bandwidth used on its routers. Blue Spike is also registered with the Federal Government's Central Contractor Registry (managed under the System for Award Management, "SAM") and participated in the Department of Defense Small Business Innovative Research (SBIR) program.

19.     Moskowitz and his companies have always practiced or had business plans to practice his patented inventions. He has worked extensively to ensure that his technology's powerful and patented Giovanni® suite of media security technologies can be licensed to all. Before the industry understood where digital management of content was heading, Moskowitz believed that copyright management was an invaluable element for dramatically expanding the business of music, emphasizing that security must not be shrouded in secrecy and that his patented techniques were the strongest to do so.

20.     Moskowitz and Blue Spike continued to produce new versions of its popular digital-watermarking tools. Under Moskowitz's control, Blue Spike also developed its unique

Scrambling technologies, which continue to gain currency. Moskowitz and Blue Spike rolled out its "end-to-end" solution for music security. Music encoded with Blue Spike's watermark had both security and CD-quality sound, even when integrated with text, image, and video content. To this day, Moskowitz and Blue Spike are working with artists to help them manage and secure their valuable artistic contributions from its office in Tyler, Texas.

**B.      Patents-in-Suit**

21.      As content becomes increasingly profitable and prevalent in the U.S. and around the globe, pirates will continue to proliferate and use increasingly sophisticated technologies to steal and illegally copy others' work, especially those works that are digitally formatted or stored. The Patents-in-Suit comprise, in part, what Moskowitz has coined "signal abstracting," which encompasses techniques, among others, also known as "signal fingerprinting," "acoustic fingerprinting," or "robust hash functions." These are among the most effective techniques available for combating piracy, which are completely undetectable to the thief, yet still enable content owners to easily search through large amounts of data to identify unauthorized copies of their works.

22.      Broadly speaking, "signal abstracting" identifies digital information and material—including video, audio, graphics, multimedia, and text—based solely on the perceptual characteristics of the material itself.  If desired, however, the abstract need not be static, and other information or heuristics can be used to augment the perceptual characteristics, resulting in a more robust abstract. In contrast, other technologies (such as digital watermarking) embed additional information or messages into the original source material to enable traceability of the subsequently watermarked content, much like an audit trail or the serial number on a dollar bill. When a pirate attempts to remove embedded information or messages, ideally the quality of the

content may be degraded, making the tampered copies unusable or of such poor quality that they have little commercial value. Signal abstracting avoids watermarking's vulnerabilities by leaving the source signal unchanged and catalogues the signal's identifying features or perceptual characteristics in a database.

23.    Content owners can also then monitor and analyze distribution channels, such as the Internet, radio broadcasts, television broadcasts, and other media sources, to determine whether any content from those sources has the same abstract as their catalogued works. Unauthorized versions of copies of content may then be successfully identified. With the unauthorized copies identified, the content owner can then restrict access, compel payment for authorized use, and develop better intelligence about content markets and those consumers with a willingness to pay. In some cases, new versions of the content can be observed and analyzed, creating more robust abstracts or new abstracts entirely, informing owners and content aggregators about new channels or new opportunities for consumption of their content.

24.    Similarly, content recognition applications running on mobile devices, smartphones, and tablets can use abstracts to identify content for users who would like to know what it is they are listening to (such as applications that just identify content) or would like to know more about that content  (such as applications that are now popularly known as "second screen applications," which allow a television audience to identify and interact with the content they are consuming, whether it be, for example, TV shows, movies, music, or video games). Once identified by an abstract, songwriters, for example, can be given lyrics, or budding video producers can be provided related versions or background on a video identified. Thus, value add in markets can be adjusted to meet the specific needs and consumption patterns of users.

25.     This idea of "signal abstracting" applies equally to biometric identification and today's security systems, such as fingerprint, facial, and optic systems that analyze, catalogue, monitor, and identify a person's biometric features. Once an image is created from the features of these biometric identifiers, signal abstracting can be used to optimally compress the signal and its associated abstract, resulting in less memory usage and increased accuracy and speed of signal analysis and identification. Further, signal abstracts of the biometric information can be secured independently; this means that authentication and verification of the identifying abstract do not compromise the original information. This separation of the abstracts from the original source material enables more secure environments, such as those dealing with the security of a person's biometrics. Thus, fingerprint scanners are made more secure, as are systems requiring physical scans of a person's body. The recent evolution to smaller and cheaper processors and memory storage has led to the proliferation of these biometric-identification systems, which rely on the inventions of the Patents-in-Suit to be implemented.

26.     The four Patents-in-Suit are prime examples of Moskowitz's pioneering contributions to signal recognition technology.

## C.     The Accused Products and Services

27.     Defendant designs and develops software, applications, websites, systems, and technology so users can find, store, share, manage, and monetize content. Defendant makes, uses, offers for sale and/or imports into the U.S. products, systems and/or services including, but not limited to, its YouTube, Content ID, Video Identification ("Video ID"), Google Play, and Google Music software, applications, websites, systems, and technology ("Accused Products"), which infringe one or more claims of the Patents-in-Suit. Defendant is extremely successful,

with predictions that it could generate more than $3.6 billion in 2012 from the Accused Products alone.

28.     Defendant has not sought or obtained a license for any of Blue Spike's patented technologies.

29.     Yet Defendant is using methods, devices, and systems taught by Blue Spike's Patents-in-Suit.

30.     Ironically, although Defendant does not have permission to use Blue Spike's Patents-in-Suit, it is using those very same technologies to prevent and track piracy committed by others. Furthermore, without the use of Blue Spike's patented technology, Defendant faces lawsuits seeking billions of dollars from content owners claiming copyright infringement alleging that Defendant has done too little to prevent the uploading of copyrighted content.

## COUNT 1:
## INFRINGEMENT OF U.S. PATENT NO. 8,214,175

31.     Blue Spike incorporates by reference the allegations in paragraphs 1 through 30 of this complaint.

32.     Blue Spike, LLC is assignee of the '175 Patent, titled "Method and Device for Monitoring and Analyzing Signals," and has ownership of all substantial rights in the '175 Patent, including the rights to grant sublicenses, to exclude others from using it, and to sue and obtain damages and other relief for past and future acts of patent infringement.

33.     The '175 Patent is valid, is enforceable, and was duly and legally issued on July 3, 2012. A true and correct copy of the '175 Patent is attached as Exhibit A.

34.     Without a license or permission from Blue Spike, Defendant has infringed and continues to infringe on one or more claims of the '175 Patent—directly, contributorily, or by inducement—by importing, making, using, offering for sale, or selling products and devices that

embody the patented invention, including, without limitation, one or more of the Accused Products, in violation of 35 U.S.C. §271.

35. Defendant has been and now is indirectly infringing by way of inducing infringement by others and/or contributing to the infringement by others of the '175 Patent in the State of Texas, in this judicial district, and elsewhere in the United States, by, among other things, making, using, importing, offering for sale, and/or selling, without license or authority, products for use in systems that fall within the scope of one or more claims of the '175 Patent. Such products include, without limitation, one or more of the Accused Products. Such products have no substantial non-infringing uses and are for use in systems that infringe the '175 Patent. By making, using, importing offering for sale, and/or selling such products, Defendant injured Blue Spike and is thus liable to Blue Spike for infringement of the '175 Patent under 35 U.S.C. § 271. Those whom Defendant induces to infringe and/or to whose infringement Defendant contributes are the end users of the Accused Products. Defendant had knowledge of the '175 Patent at least as early as the service of this complaint and is thus liable for infringement of one or more claims of the '175 Patent by actively inducing infringement and/or is liable as contributory infringer of one or more claims of the '175 Patent under 35 U.S.C. §271.

36. Defendant's acts of infringement of the '175 Patent have caused damage to Blue Spike, and Blue Spike is entitled to recover from Defendant the damages sustained as a result of Defendant's wrongful acts in an amount subject to proof at trial pursuant to 35 U.S.C. §271. Defendant's infringement of Blue Spike's exclusive rights under the '175 Patent will continue to damage Blue Spike, causing it irreparable harm, for which there is no adequate remedy at law, warranting an injunction from the Court.

37.     On information and belief, Defendant has continued to infringe the '175 Patent since receiving notice of their infringement, at least by way of their receiving notice of this lawsuit. On information and belief, such continued infringement has been objectively reckless including because Defendant has (1) acted despite an objectively high likelihood that its actions constituted infringement of a valid patent and (2) knew or should have known of that objectively high risk. Accordingly, Blue Spike seeks a willfulness finding against Defendant relative to its infringement of the '175 Patent entitling Blue Spike to increased damages under 35 U.S.C. §284 as well as attorneys' fees and costs under 35 U.S.C. §285.

38.     On information and belief, Defendant has at least had constructive notice of the '175 Patent by operation of law.

**COUNT 2:**
**INFRINGEMENT OF U.S. PATENT NO. 7,949,494**

39.     Blue Spike incorporates by reference the allegations in paragraphs 1 through 38 of this complaint.

40.     Blue Spike, LLC is assignee of the '494 Patent, titled "Method and Device for Monitoring and Analyzing Signals," and has ownership of all substantial rights in the '494 Patent, including the rights to grant sublicenses, to exclude others from using it, and to sue and obtain damages and other relief for past and future acts of patent infringement.

41.     The '494 Patent is valid, is enforceable, and was duly and legally issued on May 24, 2011. A true and correct copy of the '494 Patent is attached as Exhibit B.

42.     Without a license or permission from Blue Spike, Defendant has infringed and continues to infringe on one or more claims of the '494 Patent—directly, contributorily, or by inducement—by importing, making, using, offering for sale, or selling products and devices that

embody the patented invention, including, without limitation, one or more of the Accused Products, in violation of 35 U.S.C. §271.

43.     Defendant has been and now is indirectly infringing by way of inducing infringement by others and/or contributing to the infringement by others of the '494 Patent in the State of Texas, in this judicial district, and elsewhere in the United States, by, among other things, making, using, importing, offering for sale, and/or selling, without license or authority, products for use in systems that fall within the scope of one or more claims of the '494 Patent. Such products include, without limitation, one or more of the Accused Products. Such products have no substantial non-infringing uses and are for use in systems that infringe the '494 Patent. By making, using, importing offering for sale, and/or selling such products, Defendant injured Blue Spike and is thus liable to Blue Spike for infringement of the '494 Patent under 35 U.S.C. §271. Those whom Defendant induces to infringe and/or to whose infringement Defendant contributes are the end users of the Accused Products. Defendant had knowledge of the '494 Patent at least as early as the service of this complaint and is thus liable for infringement of one or more claims of the '494 Patent by actively inducing infringement and/or is liable as contributory infringer of one or more claims of the '494 Patent under 35 U.S.C. § 271.

44.     Defendant's acts of infringement of the '494 Patent have caused damage to Blue Spike, and Blue Spike is entitled to recover from Defendant the damages sustained as a result of Defendant's wrongful acts in an amount subject to proof at trial pursuant to 35 U.S.C. §271. Defendant's infringement of Blue Spike's exclusive rights under the '494 Patent will continue to damage Blue Spike, causing it irreparable harm, for which there is no adequate remedy at law, warranting an injunction from the Court.

45. On information and belief, Defendant has continued to infringe the '494 Patent since receiving notice of their infringement, at least by way of their receiving notice of this lawsuit. On information and belief, such continued infringement has been objectively reckless including because Defendant has (1) acted despite an objectively high likelihood that its actions constituted infringement of a valid patent and (2) knew or should have known of that objectively high risk. Accordingly, Blue Spike seeks a willfulness finding against Defendant relative to its infringement of the '494 Patent entitling Blue Spike to increased damages under 35 U.S.C. §284 as well as attorneys' fees and costs under 35 U.S.C. §285.

46. On information and belief, Defendant has at least had constructive notice of the '494 Patent by operation of law.

**COUNT 3:**
**INFRINGEMENT OF U.S. PATENT NO. 7,660,700**

47. Blue Spike incorporates by reference the allegations in paragraphs 1 through 46 of this complaint.

48. Blue Spike, LLC is assignee of the '700 Patent, titled "Method and Device for Monitoring and Analyzing Signals," and has ownership of all substantial rights in the '700 Patent, including the rights to grant sublicenses, to exclude others from using it, and to sue and obtain damages and other relief for past and future acts of patent infringement.

49. The '700 Patent is valid, is enforceable, and was duly and legally issued on February 9, 2010. A true and correct copy of the '700 Patent is attached as Exhibit C.

50. Without a license or permission from Blue Spike, Defendant has infringed and continues to infringe on one or more claims of the '700 Patent—directly, contributorily, or by inducement—by importing, making, using, offering for sale, or selling products and devices that

14
Appx0306

embody the patented invention, including, without limitation, one or more of the Accused Products, in violation of 35 U.S.C. §271.

51.    Defendant has been and now is indirectly infringing by way of inducing infringement by others and/or contributing to the infringement by others of the '700 Patent in the State of Texas, in this judicial district, and elsewhere in the United States, by, among other things, making, using, importing, offering for sale, and/or selling, without license or authority, products for use in systems that fall within the scope of one or more claims of the '700 Patent. Such products include, without limitation, one or more of the Accused Products. Such products have no substantial non-infringing uses and are for use in systems that infringe the '700 Patent. By making, using, importing offering for sale, and/or selling such products, Defendant injured Blue Spike and is thus liable to Blue Spike for infringement of the '700 Patent under 35 U.S.C. §271. Those whom Defendant induces to infringe and/or to whose infringement Defendant contributes are the end users of the Accused Products. Defendant had knowledge of the '700 Patent at least as early as the service of this complaint and is thus liable for infringement of one or more claims of the '700 Patent by actively inducing infringement and/or is liable as contributory infringer of one or more claims of the '700 Patent under 35 U.S.C. §271.

52.    Defendant's acts of infringement of the '700 Patent have caused damage to Blue Spike, and Blue Spike is entitled to recover from Defendant the damages sustained as a result of Defendant's wrongful acts in an amount subject to proof at trial pursuant to 35 U.S.C. §271. Defendant's infringement of Blue Spike's exclusive rights under the '700 Patent will continue to damage Blue Spike, causing it irreparable harm, for which there is no adequate remedy at law, warranting an injunction from the Court.

53. On information and belief, Defendant has continued to infringe the '700 Patent since receiving notice of their infringement, at least by way of their receiving notice of this lawsuit. On information and belief, such continued infringement has been objectively reckless including because Defendant has (1) acted despite an objectively high likelihood that its actions constituted infringement of a valid patent and (2) knew or should have known of that objectively high risk. Accordingly, Blue Spike seeks a willfulness finding against Defendant relative to its infringement of the '700 Patent entitling Blue Spike to increased damages under 35 U.S.C. §284 as well as attorneys' fees and costs under 35 U.S.C. §285.

54. On information and belief, Defendant has at least had constructive notice of the '700 Patent by operation of law.

## COUNT 4:
## INFRINGEMENT OF U.S. PATENT NO. 7,346,472

55. Blue Spike incorporates by reference the allegations in paragraphs 1 through 54 of this complaint.

56. Blue Spike, LLC is assignee of the '472 Patent, titled "Method and Device for Monitoring and Analyzing Signals," and has ownership of all substantial rights in the '472 Patent, including the rights to grant sublicenses, to exclude others from using it, and to sue and obtain damages and other relief for past and future acts of patent infringement.

57. The '472 Patent is valid, is enforceable, and was duly and legally issued on March 18, 2008. A true and correct copy of the '472 Patent is attached as Exhibit D.

58. Without a license or permission from Blue Spike, Defendant has infringed and continues to infringe on one or more claims of the '472 Patent—directly, contributorily, or by inducement—by importing, making, using, offering for sale, or selling products and devices that

embody the patented invention, including, without limitation, one or more of the Accused Products, in violation of 35 U.S.C. §271.

59.     Defendant has been and now is indirectly infringing by way of inducing infringement by others and/or contributing to the infringement by others of the '472 Patent in the State of Texas, in this judicial district, and elsewhere in the United States, by, among other things, making, using, importing, offering for sale, and/or selling, without license or authority, products for use in systems that fall within the scope of one or more claims of the '472 Patent. Such products include, without limitation, one or more of the Accused Products. Such products have no substantial non-infringing uses and are for use in systems that infringe the '472 Patent. By making, using, importing offering for sale, and/or selling such products, Defendant injured Blue Spike and is thus liable to Blue Spike for infringement of the '472 Patent under 35 U.S.C. §271. Those whom Defendant induces to infringe and/or whose infringement to which Defendant contributes are the end users of the Accused Products. Defendant had knowledge of the '472 Patent at least as early as the service of this complaint and is thus liable for infringement of one or more claims of the '472 Patent by actively inducing infringement and/or is liable as contributory infringer of one or more claims of the '472 Patent under 35 U.S.C. § 271.

60.     Defendant's acts of infringement of the '472 Patent have caused damage to Blue Spike, and Blue Spike is entitled to recover from Defendant the damages sustained as a result of Defendant's wrongful acts in an amount subject to proof at trial pursuant to 35 U.S.C. §271. Defendant's infringement of Blue Spike's exclusive rights under the '472 Patent will continue to damage Blue Spike, causing it irreparable harm, for which there is no adequate remedy at law, warranting an injunction from the Court.

61.     On information and belief, Defendant has continued to infringe the '472 Patent since receiving notice of their infringement, at least by way of their receiving notice of this lawsuit. On information and belief, such continued infringement has been objectively reckless including because Defendant has (1) acted despite an objectively high likelihood that its actions constituted infringement of a valid patent and (2) knew or should have known of that objectively high risk. Accordingly, Blue Spike seeks a willfulness finding against Defendant relative to its infringement of the '472 Patent entitling Blue Spike to increased damages under 35 U.S.C. §284 as well as attorneys' fees and costs under 35 U.S.C. §285.

62.     On information and belief, Defendant has at least had constructive notice of the '472 Patent by operation of law.

### REQUEST FOR RELIEF

Blue Spike incorporates each of the allegations in paragraphs 1 through 62 above and respectfully asks the Court to:

(a)     enter a judgment that Defendant has directly infringed, contributorily infringed, and/or induced infringement of one or more claims of each of the Patents-in-Suit;

(b)     enter a judgment awarding Blue Spike all damages adequate to compensate it for Defendant's infringement of, direct or contributory, or inducement to infringe, the Patents-in-Suit, including all pre-judgment and post-judgment interest at the maximum rate permitted by law;

(c)     enter a judgment awarding treble damages pursuant to 35 U.S.C. §284 for Defendant's willful infringement of one or more of the Patents-in-Suit;

(d)     issue a preliminary injunction and thereafter a permanent injunction enjoining and restraining Defendant, its directors, officers, agents, servants, employees, and those acting in

privity or in concert with them, and their subsidiaries, divisions, successors, and assigns, from further acts of infringement, contributory infringement, or inducement of infringement of the Patents-in-Suit;

(c)      enter a judgment requiring Defendant to pay the costs of this action, including all disbursements, and attorneys' fees as provided by 35 U.S.C. §285, together with prejudgment interest; and

(d)      award Blue Spike all other relief that the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Blue Spike demands a jury trial on all issues that may be determined by a jury.

Respectfully submitted,

Eric M. Albritton
Texas State Bar No. 00790215
ema@emafirm.com
Stephen E. Edwards
Texas State Bar No. 00784008
see@emafirm.com
Michael A. Benefield
Texas State Bar No. 24073408
mab@emafirm.com
ALBRITTON LAW FIRM
P.O. Box 2649
Longview, Texas 75606
Telephone:  (903) 757-8449
Facsimile:  (903) 758-7397

Randall T. Garteiser
Texas Bar No. 24038912
randall.garteiser@sftrialattorneys.com
Christopher A. Honea
Texas Bar No. 24059967
chris.honea@sftrialattorneys.com
Christopher S. Johns
Texas Bar No. 24044849
chris.johns@sftrialattorneys.com

Appx0311

**GARTEISER HONEA, P.C.**
44 North San Pedro Road
San Rafael, California 94903
Telephone:  (415) 785-3762
Facsimile:  (415) 785-3805

*Counsel for Blue Spike, LLC*

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

| | | |
|---|---|---|
| **BLUE SPIKE, LLC,** | § | |
| *Plaintiff,* | § | **Civil Action No. 12-CV-499-MHS** |
| | § | |
| **v.** | § | **LEAD CASE** |
| | § | |
| **TEXAS INSTRUMENTS, INC.,** *et al.,* | § | **JURY TRIAL DEMANDED** |
| | § | |
| *Defendants.* | § | |
| | § | |

## FIRST AMENDED COMPLAINT FOR PATENT INFRINGEMENT AGAINST GOOGLE INC.

Plaintiff Blue Spike, LLC files this complaint against Defendant Google Inc. and alleges infringement of U.S. Patent Nos. 7,346,472 (the '472 Patent), 7,660,700 (the '700 Patent), 7,949,494 (the '494 Patent), and 8,214,175 (the '175 Patent, and together with the '472, '700, and '494 Patents, the Patents-in-Suit) as follows:

### NATURE OF THE SUIT

1.     This is a claim for patent infringement arising under the patent laws of the United States, Title 35 of the United States Code.

### PARTIES

2.     Plaintiff Blue Spike, LLC is a Texas limited liability company and has its headquarters and principal place of business at 1820 Shiloh Road, Suite 1201-C, Tyler, Texas 75703. Blue Spike, LLC is the assignee of the Patents-in-Suit from Blue Spike, Inc. (a Florida corporation), which was the assignee of the Patents-in-Suit from Scott Moskowitz and Michael Berry. Blue Spike, LLC and Blue Spike, Inc. are collectively referred to as "Blue Spike." Blue Spike CEO Scott Moskowitz is an inventor on more than 66 U.S. Patents related to managing, monitoring, and monetizing digital content and

informational assets. Blue Spike has practiced and has continued business plans to practice Moskowitz's patented inventions. Many of Blue Spike's patents are foundational to today's robust markets for content, which grew into their present form only after using Blue Spike's technology to catalogue, manage, monitor, and monetize that content.

3.     On information and belief, Google Inc. ("Google" or "Defendant") is a Delaware corporation having its principal place of business at 600 Amphitheatre Parkway, Mountain View, CA 94043. Defendant can be served with process through its registered agent, The Corporation Trust Company, located at 1209 Orange Street, Wilmington, Delaware 19801. Defendant does business in the State of Texas and in the Eastern District of Texas.

## JURISDICTION AND VENUE

4.     This lawsuit is a civil action for patent infringement arising under the patent laws of the United States, 35 U.S.C. §101 *et seq.* The Court has subject-matter jurisdiction pursuant to 28 U.S.C. §§1331, 1332, 1338(a), and 1367.

5.     The Court has personal jurisdiction over Defendant for at least four reasons: (1) Defendant has committed acts of patent infringement and/or contributed to or induced acts of patent infringement by others in this District and elsewhere in Texas; (2) Defendant regularly does business or solicits business in the District and in Texas; (3) Defendant engages in other persistent courses of conduct and derives substantial revenue from products and/or services provided to individuals in the District and in Texas; and (4) Defendant has purposefully established substantial, systematic, and continuous contacts with the District and should reasonably expect to be haled into court

here. Thus, the Court's exercise of jurisdiction over Defendant will not offend traditional notions of fair play and substantial justice.

6.      Venue is proper in this judicial district under 28 U.S.C. §§1391(b)–(c) and 1400(b) because Defendant does business in the State of Texas, Defendant has committed acts of infringement in Texas and in the District, a substantial part of the events or omissions giving rise to Blue Spike's claims happened in the District, and Defendant is subject to personal jurisdiction in the District.

## FACTUAL BACKGROUND

### A.      Moskowitz's History

7.      The owners of art, music, films, and other creations who want to sell and license their work in digital form over the Internet need an efficient way to manage, monitor, and monetize it. Blue Spike founder Scott Moskowitz pioneered—and continues to invent—technology that makes such management possible, and which has parlayed with equal importance into other industries.

8.      Moskowitz, who earned two degrees *cum laude* from the Wharton School of Finance and Commerce at the University of Pennsylvania, is an inventor of more than 66 U.S. Patents, including each of the Patents-in-Suit.

9.      In 1992, Moskowitz entered the entertainment industry by doing agency work in Japan for a large U.S. wholesaler of music-related products.

10.      In 1993, Moskowitz filed his first U.S. digital-content-management patent application. That year, he also founded the software start-up The Dice Company, which would become widely recognized as a leader in digital watermarking. Since that first patent, Moskowitz has continued to create patented inventions in the field of information

management and security at a prodigious pace. His goal from the outset has been to commercialize his patented inventions.

11.     Moskowitz founded Blue Spike, Inc. in November 1997. Just over two years later, he filed his first patent application related to signal recognition technology, which issued as the '472 Patent. In describing this pioneering technology, Moskowitz coined the term "signal abstracting," which enhanced the ability to catalogue, archive, identify, authorize, transact, and monitor the use and/or application of signals, such as images (for example, photographs, paintings, and scanned fingerprints), audio (for example, songs, jingles, commercials, movies soundtracks, and their versions), video (for example, videos, television shows, commercials, and movies), and multimedia works. This revolutionary technology greatly improves the efficiency and speed of monitoring, analyzing, and identifying signals as perceived, as well as enabling the optimal compression of the signals and their associated signal abstracts for memory accommodation.

12.     Moskowitz's status as a pioneer in this new field between cryptography and signal analysis is evident from the United States Patent and Trademark Office's categorization of his patent applications. The USPTO was initially puzzled about how to classify his early inventions, as the then-existing patent categories in cryptography and signal analysis were, by themselves, inadequate. The USPTO therefore created a new classification for his groundbreaking inventions: classification 713, subclass 176, called "Authentication by digital signature representation or digital watermark."

13.     The National Security Agency (NSA) even took interest in his work after he filed one of his early patent applications. The NSA made the application classified under a

"secrecy order" while it investigated his pioneering innovations and their impact on national security.

14.     As an industry trailblazer, Moskowitz has been an active author and public figure on digital-watermarking and signal-recognition technologies since their emergence. A 1995 *New York Times* article—titled "TECHNOLOGY: DIGITAL COMMERCE; 2 plans for watermarks, which can bind proof of authorship to electronic works"— recognized Moskowitz's The Dice Company as one of two leading software start-ups in this newly created field. *Forbes* also interviewed Moskowitz as an expert for "Cops Versus Robbers in Cyberspace," a September 9, 1996 article about the emergence of digital watermarking and rights-management technology. He has also testified before the Library of Congress regarding the Digital Millennium Copyright Act.

15.     He has spoken to the RSA Data Security Conference, the International Financial Cryptography Association, Digital Distribution of the Music Industry, and many other organizations about the business opportunities that digital watermarking creates. Moskowitz also authored *So This Is Convergence?*, the first book of its kind about secure digital-content management. This book has been downloaded over a million times online and has sold thousands of copies in Japan, where Shogakukan published it under the name *Denshi Skashi*, literally "electronic watermark." Moskowitz was asked to author the introduction to *Multimedia Security Technologies for Digital Rights Management*, a 2006 book explaining digital-rights management. Moskowitz authored a paper for the 2002 International Symposium on Information Technology, titled "What is Acceptable Quality in the Application of Digital Watermarking: Trade-offs of Security, Robustness and

Quality." He also wrote an invited 2003 article titled "Bandwidth as Currency" for the *IEEE Journal*, among other publications.

16.     Moskowitz is a senior member of the Institute of Electrical and Electronics Engineers (IEEE), a member of the Association for Computing Machinery, and the International Society for Optics and Photonics (SPIE). As a senior member of the IEEE, Moskowitz has peer-reviewed numerous conference papers and has submitted his own publications.

17.     Moskowitz has been at the forefront of industry-based tests—such as the MUSE Embedded Signaling Tests, Secure Digital Music Initiative ("SDMI"), and various tests by performance-rights organizations including ASCAP and BMI, as well as Japan's Nomura Research Institute.

18.     Moskowitz has negotiated projects to incorporate his technologies with leaders in a gamut of industries. For example, Moskowitz worked with EMI, Warner Brothers, and Universal Music Group on music-release tracking systems; with AIG on insurance and financial services; with IBM on watermarking its software and managing movie scripts; and with Juniper Networks on measuring and provisioning the bandwidth used on its routers. Blue Spike is also registered with the Federal Government's Central Contractor Registry (managed under the System for Award Management, "SAM") and participated in the Department of Defense Small Business Innovative Research (SBIR) program.

19.     Moskowitz and his companies have always practiced or had business plans to practice his patented inventions. He has worked extensively to ensure that his technology's powerful and patented Giovanni® suite of media security technologies can be licensed to all. Before the industry understood where digital management of content

6

was heading, Moskowitz believed that copyright management was an invaluable element for dramatically expanding the business of music, emphasizing that security must not be shrouded in secrecy and that his patented techniques were the strongest to do so.

20.     Moskowitz and Blue Spike continued to produce new versions of its popular digital-watermarking tools. Under Moskowitz's control, Blue Spike also developed its unique Scrambling technologies, which continue to gain currency. Moskowitz and Blue Spike rolled out its "end-to-end" solution for music security. Music encoded with Blue Spike's watermark had both security and CD-quality sound, even when integrated with text, image, and video content. To this day, Moskowitz and Blue Spike are working with artists to help them manage and secure their valuable artistic contributions from its office in Tyler, Texas.

**B.     Patents-in-Suit**

21.     As content becomes increasingly profitable and prevalent in the U.S. and around the globe, pirates will continue to proliferate and use increasingly sophisticated technologies to steal and illegally copy others' work, especially those works that are digitally formatted or stored. The Patents-in-Suit comprise, in part, what Moskowitz has coined "signal abstracting," which encompasses techniques, among others, also known as "signal fingerprinting," "acoustic fingerprinting," or "robust hash functions." These are among the most effective techniques available for combating piracy, which are completely undetectable to the thief, yet still enable content owners to easily search through large amounts of data to identify unauthorized copies of their works.

22.     Broadly speaking, "signal abstracting" identifies digital information and material—including video, audio, graphics, multimedia, and text—based solely on the

perceptual characteristics of the material itself.  If desired, however, the abstract need not be static, and other information or heuristics can be used to augment the perceptual characteristics, resulting in a more robust abstract. In contrast, other technologies (such as digital watermarking) embed additional information or messages into the original source material to enable traceability of the subsequently watermarked content, much like an audit trail or the serial number on a dollar bill. When a pirate attempts to remove embedded information or messages, ideally the quality of the content may be degraded, making the tampered copies unusable or of such poor quality that they have little commercial value. Signal abstracting avoids watermarking's vulnerabilities by leaving the source signal unchanged and catalogues the signal's identifying features or perceptual characteristics in a database.

23.    Content owners can also then monitor and analyze distribution channels, such as the Internet, radio broadcasts, television broadcasts, and other media sources, to determine whether any content from those sources has the same abstract as their catalogued works. Unauthorized versions of copies of content may then be successfully identified. With the unauthorized copies identified, the content owner can then restrict access, compel payment for authorized use, and develop better intelligence about content markets and those consumers with a willingness to pay. In some cases, new versions of the content can be observed and analyzed, creating more robust abstracts or new abstracts entirely, informing owners and content aggregators about new channels or new opportunities for consumption of their content.

24.    Similarly, content recognition applications running on mobile devices, smartphones, and tablets can use abstracts to identify content for users who would like to

know what it is they are listening to (such as applications that just identify content) or would like to know more about that content  (such as applications that are now popularly known as "second screen applications," which allow a television audience to identify and interact with the content they are consuming, whether it be, for example, TV shows, movies, music, or video games). Once identified by an abstract, songwriters, for example, can be given lyrics, or budding video producers can be provided related versions or background on a video identified. Thus, value add in markets can be adjusted to meet the specific needs and consumption patterns of users.

25.     This idea of "signal abstracting" applies equally to biometric identification and today's security systems, such as fingerprint, facial, and optic systems that analyze, catalogue, monitor, and identify a person's biometric features. Once an image is created from the features of these biometric identifiers, signal abstracting can be used to optimally compress the signal and its associated abstract, resulting in less memory usage and increased accuracy and speed of signal analysis and identification. Further, signal abstracts of the biometric information can be secured independently; this means that authentication and verification of the identifying abstract do not compromise the original information. This separation of the abstracts from the original source material enables more secure environments, such as those dealing with the security of a person's biometrics. Thus, fingerprint scanners are made more secure, as are systems requiring physical scans of a person's body. The recent evolution to smaller and cheaper processors and memory storage has led to the proliferation of these biometric-identification systems, which rely on the inventions of the Patents-in-Suit to be implemented.

26.    The four Patents-in-Suit are prime examples of Moskowitz's pioneering contributions to signal recognition technology.

**C.    The Accused Products and Services**

27.    Defendant designs and develops software, applications, systems, and technology so users can identify and engage media and content.  Defendant makes, uses, offers for sale and/or imports into the U.S. products, systems and/or services including, but not limited to, its YouTube and Google Music software, applications, systems, services, and technology, Google Music "scan and match" (*see* Exhibit 1 and 2), Google Knowledge Graph (*see* Exhibit 3), Sound Search for Google Play (*see* Exhibit 4), Google Glass with Sound Search (*see* Exhibit 5), Google Find my Face (*see* Exhibit 6), and Content ID (*see* Exhibit 7) ("Accused Products") which infringe one or more claims of the Patents-in-Suit. Defendant is extremely successful with its Accused Products based on millions of users of the Accused Products.

28.    Defendant has not sought or obtained a license for any of Blue Spike's patented technologies.

29.    Yet Defendant is using methods, devices, and systems taught by Blue Spike's Patents-in-Suit.

**COUNT 1:
INFRINGEMENT OF U.S. PATENT NO. 8,214,175**

30.    Blue Spike incorporates by reference the allegations in paragraphs 1 through 29 of this complaint.

31.    Blue Spike, LLC is assignee of the '175 Patent, titled "Method and Device for Monitoring and Analyzing Signals," and has ownership of all substantial rights in the

'175 Patent, including the rights to grant sublicenses, to exclude others from using it, and to sue and obtain damages and other relief for past and future acts of patent infringement.

32.     The '175 Patent is valid, is enforceable, and was duly and legally issued on July 3, 2012.

33.     Without a license or permission from Blue Spike, Defendant has infringed and continues to infringe on one or more claims of the '175 Patent—directly, contributorily, or by inducement—by importing, making, using, offering for sale, or selling products and devices that embody the patented invention, including, without limitation, one or more of the Accused Products, in violation of 35 U.S.C. §271.

34.     Defendant has been and now is indirectly infringing by way of inducing infringement by others and/or contributing to the infringement by others of the '175 Patent in the State of Texas, in this judicial district, and elsewhere in the United States, by, among other things, making, using, importing, offering for sale, and/or selling, without license or authority, products for use in systems that fall within the scope of one or more claims of the '175 Patent. Such products include, without limitation, one or more of the Accused Products. Such products have no substantial non-infringing uses and are for use in systems that infringe the '175 Patent. By making, using, importing offering for sale, and/or selling such products, Defendant injured Blue Spike and is thus liable to Blue Spike for infringement of the '175 Patent under 35 U.S.C. § 271. Those whom Defendant induces to infringe and/or to whose infringement Defendant contributes are the end users of the Accused Products. Defendant had knowledge of the '175 Patent at least as early as the service of this complaint and is thus liable for infringement of one or more claims of

the '175 Patent by actively inducing infringement and/or is liable as contributory infringer of one or more claims of the '175 Patent under 35 U.S.C. §271.

35.     Defendant's acts of infringement of the '175 Patent have caused damage to Blue Spike, and Blue Spike is entitled to recover from Defendant the damages sustained as a result of Defendant's wrongful acts in an amount subject to proof at trial pursuant to 35 U.S.C. §271. Defendant's infringement of Blue Spike's exclusive rights under the '175 Patent will continue to damage Blue Spike, causing it irreparable harm, for which there is no adequate remedy at law, warranting an injunction from the Court.

36.     On information and belief, the infringement of the Patents-in-Suit by Defendant has been willful and continues to be willful. Defendant had knowledge of the Patents-in-Suit, including but not limited to at least one or more of the following:

> a.     The Patents-in-Suit are prominent, pioneering patents in the field of monitoring and analyzing signals. This is evidenced, in part, by the extent to which each of these patents has been forward-cited as prior art in connection with the examination of subsequently-issued U.S. patents. The Patents-in-Suit have been forward-cited in at least 50 U.S.-issued patents, including patents originally assigned to such prominent companies as Microsoft Corp., Harmonix Music Systems, Inc., Digimarc Corp., Agilent Technologies, Inc., Nvidia Corp., and Avaya Inc.

> b.     Through the filing and known attempted service of the original Complaint in this lawsuit in August 2012.

37.     On information and belief, Defendant has at least had constructive notice of the '175 Patent by operation of law.

## COUNT 2:
## INFRINGEMENT OF U.S. PATENT NO. 7,949,494

38.     Blue Spike incorporates by reference the allegations in paragraphs 1 through 37 of

this complaint.

39.     Blue Spike, LLC is assignee of the '494 Patent, titled "Method and Device for

Monitoring and Analyzing Signals," and has ownership of all substantial rights in the

'494 Patent, including the rights to grant sublicenses, to exclude others from using it, and

to sue and obtain damages and other relief for past and future acts of patent infringement.

40.     The '494 Patent is valid, is enforceable, and was duly and legally issued on May

24, 2011.

41.     Without a license or permission from Blue Spike, Defendant has infringed and

continues to infringe on one or more claims of the '494 Patent—directly, contributorily,

or by inducement—by importing, making, using, offering for sale, or selling products and

devices that embody the patented invention, including, without limitation, one or more of

the Accused Products, in violation of 35 U.S.C. §271.

42.     Defendant has been and now is indirectly infringing by way of inducing

infringement by others and/or contributing to the infringement by others of the '494

Patent in the State of Texas, in this judicial district, and elsewhere in the United States,

by, among other things, making, using, importing, offering for sale, and/or selling,

without license or authority, products for use in systems that fall within the scope of one

or more claims of the '494 Patent. Such products include, without limitation, one or more

of the Accused Products. Such products have no substantial non-infringing uses and are

for use in systems that infringe the '494 Patent. By making, using, importing offering for

sale, and/or selling such products, Defendant injured Blue Spike and is thus liable to Blue

Spike for infringement of the '494 Patent under 35 U.S.C. §271. Those whom Defendant induces to infringe and/or to whose infringement Defendant contributes are the end users of the Accused Products. Defendant had knowledge of the '494 Patent at least as early as the service of this complaint and is thus liable for infringement of one or more claims of the '494 Patent by actively inducing infringement and/or is liable as contributory infringer of one or more claims of the '494 Patent under 35 U.S.C. § 271.

43.     Defendant's acts of infringement of the '494 Patent have caused damage to Blue Spike, and Blue Spike is entitled to recover from Defendant the damages sustained as a result of Defendant's wrongful acts in an amount subject to proof at trial pursuant to 35 U.S.C. §271. Defendant's infringement of Blue Spike's exclusive rights under the '494 Patent will continue to damage Blue Spike, causing it irreparable harm, for which there is no adequate remedy at law, warranting an injunction from the Court.

44.     On information and belief, the infringement of the Patents-in-Suit by Defendant has been willful and continues to be willful. Defendant had knowledge of the Patents-in-Suit, including but not limited to at least one or more of the following:

    a.      The Patents-in-Suit are prominent, pioneering patents in the field of monitoring and analyzing signals. This is evidenced, in part, by the extent to which each of these patents has been forward-cited as prior art in connection with the examination of subsequently-issued U.S. patents. The Patents-in-Suit have been forward-cited in at least 50 U.S.-issued patents, including patents originally assigned to such prominent companies as Microsoft Corp., Harmonix Music Systems, Inc., Digimarc Corp., Agilent Technologies, Inc., Nvidia Corp., and Avaya Inc.

b.   Through the filing and known attempted service of the original Complaint in this lawsuit in August 2012.

45.   On information and belief, Defendant has at least had constructive notice of the '494 Patent by operation of law.

**COUNT 3:**
**INFRINGEMENT OF U.S. PATENT NO. 7,660,700**

46.   Blue Spike incorporates by reference the allegations in paragraphs 1 through 45 of this complaint.

47.   Blue Spike, LLC is assignee of the '700 Patent, titled "Method and Device for Monitoring and Analyzing Signals," and has ownership of all substantial rights in the '700 Patent, including the rights to grant sublicenses, to exclude others from using it, and to sue and obtain damages and other relief for past and future acts of patent infringement.

48.   The '700 Patent is valid, is enforceable, and was duly and legally issued on February 9, 2010.

49.   Without a license or permission from Blue Spike, Defendant has infringed and continues to infringe on one or more claims of the '700 Patent—directly, contributorily, or by inducement—by importing, making, using, offering for sale, or selling products and devices that embody the patented invention, including, without limitation, one or more of the Accused Products, in violation of 35 U.S.C. §271.

50.   Defendant has been and now is indirectly infringing by way of inducing infringement by others and/or contributing to the infringement by others of the '700 Patent in the State of Texas, in this judicial district, and elsewhere in the United States, by, among other things, making, using, importing, offering for sale, and/or selling, without license or authority, products for use in systems that fall within the scope of one

or more claims of the '700 Patent. Such products include, without limitation, one or more of the Accused Products. Such products have no substantial non-infringing uses and are for use in systems that infringe the '700 Patent. By making, using, importing offering for sale, and/or selling such products, Defendant injured Blue Spike and is thus liable to Blue Spike for infringement of the '700 Patent under 35 U.S.C. §271. Those whom Defendant induces to infringe and/or to whose infringement Defendant contributes are the end users of the Accused Products. Defendant had knowledge of the '700 Patent at least as early as the service of this complaint and is thus liable for infringement of one or more claims of the '700 Patent by actively inducing infringement and/or is liable as contributory infringer of one or more claims of the '700 Patent under 35 U.S.C. §271.

51.   Defendant's acts of infringement of the '700 Patent have caused damage to Blue Spike, and Blue Spike is entitled to recover from Defendant the damages sustained as a result of Defendant's wrongful acts in an amount subject to proof at trial pursuant to 35 U.S.C. §271. Defendant's infringement of Blue Spike's exclusive rights under the '700 Patent will continue to damage Blue Spike, causing it irreparable harm, for which there is no adequate remedy at law, warranting an injunction from the Court.

52.   On information and belief, the infringement of the Patents-in-Suit by Defendant has been willful and continues to be willful. Defendant had knowledge of the Patents-in-Suit, including but not limited to at least one or more of the following:

a.   The Patents-in-Suit are prominent, pioneering patents in the field of monitoring and analyzing signals. This is evidenced, in part, by the extent to which each of these patents has been forward-cited as prior art in connection with the examination of subsequently-issued U.S. patents. The Patents-in-Suit have

been forward-cited in at least 50 U.S.-issued patents, including patents originally assigned to such prominent companies as Microsoft Corp., Harmonix Music Systems, Inc., Digimarc Corp., Agilent Technologies, Inc., Nvidia Corp., and Avaya Inc.

      b.      Through the filing and known attempted service of the original Complaint in this lawsuit in August 2012.

53.      On information and belief, Defendant has at least had constructive notice of the '700 Patent by operation of law.

### COUNT 4:
### INFRINGEMENT OF U.S. PATENT NO. 7,346,472

54.      Blue Spike incorporates by reference the allegations in paragraphs 1 through 53 of this complaint.

55.      Blue Spike, LLC is assignee of the '472 Patent, titled "Method and Device for Monitoring and Analyzing Signals," and has ownership of all substantial rights in the '472 Patent, including the rights to grant sublicenses, to exclude others from using it, and to sue and obtain damages and other relief for past and future acts of patent infringement.

56.      The '472 Patent is valid, is enforceable, and was duly and legally issued on March 18, 2008.

57.      Without a license or permission from Blue Spike, Defendant has infringed and continues to infringe on one or more claims of the '472 Patent—directly, contributorily, or by inducement—by importing, making, using, offering for sale, or selling products and devices that embody the patented invention, including, without limitation, one or more of the Accused Products, in violation of 35 U.S.C. §271.

58.     Defendant has been and now is indirectly infringing by way of inducing infringement by others and/or contributing to the infringement by others of the '472 Patent in the State of Texas, in this judicial district, and elsewhere in the United States, by, among other things, making, using, importing, offering for sale, and/or selling, without license or authority, products for use in systems that fall within the scope of one or more claims of the '472 Patent. Such products include, without limitation, one or more of the Accused Products. Such products have no substantial non-infringing uses and are for use in systems that infringe the '472 Patent. By making, using, importing offering for sale, and/or selling such products, Defendant injured Blue Spike and is thus liable to Blue Spike for infringement of the '472 Patent under 35 U.S.C. §271. Those whom Defendant induces to infringe and/or whose infringement to which Defendant contributes are the end users of the Accused Products. Defendant had knowledge of the '472 Patent at least as early as the service of this complaint and is thus liable for infringement of one or more claims of the '472 Patent by actively inducing infringement and/or is liable as contributory infringer of one or more claims of the '472 Patent under 35 U.S.C. § 271.

59.     Defendant's acts of infringement of the '472 Patent have caused damage to Blue Spike, and Blue Spike is entitled to recover from Defendant the damages sustained as a result of Defendant's wrongful acts in an amount subject to proof at trial pursuant to 35 U.S.C. §271. Defendant's infringement of Blue Spike's exclusive rights under the '472 Patent will continue to damage Blue Spike, causing it irreparable harm, for which there is no adequate remedy at law, warranting an injunction from the Court.

60. On information and belief, the infringement of the Patents-in-Suit by Defendant has been willful and continues to be willful. Defendant had knowledge of the Patents-in-Suit, including but not limited to at least one or more of the following:

a. The Patents-in-Suit are prominent, pioneering patents in the field of monitoring and analyzing signals. This is evidenced, in part, by the extent to which each of these patents has been forward-cited as prior art in connection with the examination of subsequently-issued U.S. patents. The Patents-in-Suit have been forward-cited in at least 50 U.S.-issued patents, including patents originally assigned to such prominent companies as Microsoft Corp., Harmonix Music Systems, Inc., Digimarc Corp., Agilent Technologies, Inc., Nvidia Corp., and Avaya Inc.

b. Through the filing and known attempted service of the original Complaint in this lawsuit in August 2012.

61. On information and belief, Defendant has at least had constructive notice of the '472 Patent by operation of law.

### REQUEST FOR RELIEF

Blue Spike incorporates each of the allegations in paragraphs 1 through 61 above and respectfully asks the Court to:

(a) enter a judgment that Defendant has directly infringed, contributorily infringed, and/or induced infringement of one or more claims of each of the Patents-in-Suit;

(b) enter a judgment awarding Blue Spike all damages adequate to compensate it for Defendant's infringement of, direct or contributory, or inducement to infringe, the

Patents-in-Suit, including all pre-judgment and post-judgment interest at the maximum rate permitted by law;

(c)     enter a judgment awarding treble damages pursuant to 35 U.S.C. §284 for Defendant's willful infringement of one or more of the Patents-in-Suit;

(d)     issue a preliminary injunction and thereafter a permanent injunction enjoining and restraining Defendant, its directors, officers, agents, servants, employees, and those acting in privity or in concert with them, and their subsidiaries, divisions, successors, and assigns, from further acts of infringement, contributory infringement, or inducement of infringement of the Patents-in-Suit;

(c)     enter a judgment requiring Defendant to pay the costs of this action, including all disbursements, and attorneys' fees as provided by 35 U.S.C. §285, together with prejudgment interest; and

(d)     award Blue Spike all other relief that the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Blue Spike demands a jury trial on all issues that may be determined by a jury.

Respectfully submitted,

/s/ Randall T. Garteiser
Randall T. Garteiser
  Texas Bar No. 24038912
  rgarteiser@ghiplaw.com
Christopher A. Honea
  Texas Bar No. 24059967
  chonea@ghiplaw.com
Christopher S. Johns
  Texas Bar No. 24044849
  cjohns@ghiplaw.com

**GARTEISER HONEA, P.C.**
218 N. College Ave.
Tyler, Texas 75702
Telephone:  (903) 705-0828
Facsimile:  (903) 526-5477

Kirk J. Anderson
  California Bar No. 289043
Peter S. Brasher
  California Bar No. 283992
**GARTEISER HONEA, P.C.**
44 North San Pedro Road
San Rafael, California 94903
Telephone:  (415) 785-3762
Facsimile:  (415) 785-3805

***Counsel for Blue Spike, LLC***

**CERTIFICATE OF SERVICE**

The undersigned certifies that the foregoing document was filed electronically in compliance with Local Rule CV-5(a). As such, this document was served on all counsel who are deemed to have consented to electronic service. Local Rule CV-5(a)(3)(A). Pursuant to Federal Rule of Civil Procedure 5(d) and Local Rule CV-5(d) and (e), all other counsel of record not deemed to have consented to electronic service were served with a true and correct copy of the foregoing by email.

/s/ Randall T. Garteiser
Randall T. Garteiser

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION**

|  |  |  |
|---|---|---|
| BLUE SPIKE, LLC, | § | |
| | § | Civil Action No. 6:12-CV-558 |
| Plaintiff, | § | |
| | § | **JURY TRIAL DEMANDED** |
| v. | § | |
| | § | |
| GOOGLE INC., | § | |
| | § | |
| Defendant. | § | |
| | § | |

**DEFENDANT GOOGLE INC.'S ANSWER TO
ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT**

Defendant Google Inc. ("Google") answers the Original Complaint for Patent

Infringement of Plaintiff Blue Spike, LLC ("Blue Spike") as follows:

**NATURE OF THE SUIT**

1.      Google admits that Blue Spike alleges a claim for patent infringement arising

under the patent laws of the United States, Title 35 of the United States Code.

**PARTIES**

2.      Google admits that on the face of the patents attached to Blue Spike's Original

Complaint, Blue Spike, Inc. is identified as the assignee of United States Patent Nos. 7,346,472,

7,660,700, 7,949, 494, and 8,214,175 (collectively, the "Patents-in-Suit").  Google is without

knowledge or information sufficient to form a belief as to the truth of the remaining allegations

of paragraph 2 and therefore denies them.

3.      Google admits that it is a Delaware corporation with its principal place of

business at 1600 Amphitheatre Parkway, Mountain View, California 94043.  Google admits that

it is registered to do business in Texas, that it has appointed Corporation Service Company as its

agent for service of process, and that it has transacted business in the Eastern District of Texas.
Google denies any remaining allegations in paragraph 3.

## JURISDICTION AND VENUE

4.      The allegations in paragraph 4 are legal conclusions to which no answer is
required.  To the extent that any answer is required, Google admits that this action invokes the
United States patent laws, and that this Court has subject matter jurisdiction over patent law
claims.  Google denies any remaining allegations in paragraph 4.

5.      The allegations in paragraph 5 are legal conclusions to which no answer is
required.  To the extent that any answer is required, Google does not contest that there is
personal jurisdiction in Texas solely for the purpose of this action.  Google denies that it has
committed any acts of infringement within the Eastern District of Texas, or any other District in
Texas.  Google denies any remaining allegations in paragraph 5.

6.      Google admits that it has transacted business in the State of Texas.  Google denies
that venue is legally proper in the Eastern District of Texas for purposes of this action, and
further denies that venue is appropriate or convenient in the Eastern District of Texas.  Google
denies the remaining allegations in paragraph 6, and specifically denies that it has committed any
acts of infringement within the Eastern District of Texas, or any other District in Texas.

## FACTUAL BACKGROUND

**A.      Moskowitz's History**

7.      Google is without knowledge or information sufficient to form a belief as to the
truth of the allegations of paragraph 7, and therefore denies them.

8.      Google is without knowledge or information sufficient to form a belief as to the
truth of the allegations of paragraph 8, and therefore denies them.

9.      Google is without knowledge or information sufficient to form a belief as to the
truth of the allegations of paragraph 9, and therefore denies them.

10.      Google is without knowledge or information sufficient to form a belief as to the
truth of the allegations of paragraph 10, and therefore denies them.

11.     Google is without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 11, and therefore denies them.

12.     Google is without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 12, and therefore denies them.

13.     Google is without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 13, and therefore denies them.

14.     Google is without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 14, and therefore denies them.

15.     Google is without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 15, and therefore denies them.

16.     Google is without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 16, and therefore denies them.

17.     Google is without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 17, and therefore denies them.

18.     Google is without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 18, and therefore denies them.

19.     Google is without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 19, and therefore denies them.

20.     Google is without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 20, and therefore denies them.

**B.**     **Patents-In-Suit**

21.     Google lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 21, and accordingly denies the same.

22.     Google lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 22, and accordingly denies the same.

23.     Google lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 23, and accordingly denies the same.

24.     Google lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 24, and accordingly denies the same.

25.     Google lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 25, and accordingly denies the same.

26.     Google lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 26, and accordingly denies the same.

## C.     The Accused Products and Services

27.     Google admits that it designs and develops software, applications, websites, systems, and technology.  Google denies any remaining allegations in paragraph 27, and specifically denies that it has committed any acts of infringement.

28.     Google admits that it has not sought or obtained a license to the Patents-in-Suit.

29.     Google denies the allegations contained in paragraph 29.

30.     Google denies the allegations contained in paragraph 30.

## COUNT 1: INFRINGEMENT OF U.S. PATENT NO. 8,214,175

31.     Google incorporates by reference its responses to paragraphs 1-30 above, as if fully set forth herein.

32.     Google admits that, according to the face of the patent, United States Patent No. 8,214,175 ("the '175 Patent") is entitled "Method and Device for Monitoring and Analyzing Signals."  Google is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of paragraph 32, and therefore denies them.

33.     Google admits that what appears to be a copy of the '175 Patent is attached as an exhibit to Blue Spike's Original Complaint, and that, on its face, the '175 Patent was issued on July 3, 2012.  Google denies that the '175 Patent is valid.  Google is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of paragraph 33, and therefore denies them.

34.     Google denies the allegations in paragraph 34, and specifically denies that it has committed any acts of infringement.

35.     Google denies the allegations in paragraph 35, and specifically denies that it has committed any acts of infringement.

36.     Google denies the allegations in paragraph 36.

37.     Google denies the allegations in paragraph 37.

38.     Google denies the allegations in paragraph 38.

**COUNT 2: INFRINGEMENT OF U.S. PATENT NO. 7,949,494**

39.     Google incorporates by reference its responses to paragraphs 1-38 above, as if fully set forth herein.

40.     Google admits that, according to the face of the patent, United States Patent No. 7,949,494 ("the '494 Patent") is entitled "Method and Device for Monitoring and Analyzing Signals."  Google is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of paragraph 40, and therefore denies them.

41.     Google admits that what appears to be a copy of the '494 Patent is attached as an exhibit to Blue Spike's Original Complaint, and that, on its face, the '494 Patent was issued on May 24, 2011.  Google denies that the '494 Patent is valid.  Google is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of paragraph 41, and therefore denies them.

42.     Google denies the allegations in paragraph 42, and specifically denies that it has committed any acts of infringement.

43.     Google denies the allegations in paragraph 43, and specifically denies that it has committed any acts of infringement.

44.     Google denies the allegations in paragraph 44.

45.     Google denies the allegations in paragraph 45.

46.     Google denies the allegations in paragraph 46.

**COUNT 3: INFRINGEMENT OF U.S. PATENT NO. 7,660,700**

47.     Google incorporates by reference its responses to paragraphs 1-46 above, as if fully set forth herein.

48.     Google admits that, according to the face of the patent, United States Patent No. 7,660,700 ("the '700 Patent") is entitled "Method and Device for Monitoring and Analyzing Signals."  Google is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of paragraph 48, and therefore denies them.

49.     Google admits that what appears to be a copy of the '700 Patent is attached as an exhibit to Blue Spike's Original Complaint, and that, on its face, the '700 Patent was issued on February 9, 2010.  Google denies that the '700 Patent is valid.  Google is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of paragraph 49, and therefore denies them.

50.     Google denies the allegations in paragraph 50, and specifically denies that it has committed any acts of infringement.

51.     Google denies the allegations in paragraph 51, and specifically denies that it has committed any acts of infringement.

52.     Google denies the allegations in paragraph 52.

53.     Google denies the allegations in paragraph 53.

54.     Google denies the allegations in paragraph 54.

**COUNT 4: INFRINGEMENT OF U.S. PATENT NO. 7,346,472**

55.     Google incorporates by reference its responses to paragraphs 1-54 above, as if fully set forth herein.

56.     Google admits that, according to the face of the patent, United States Patent No. 7,346,472 ("the '472 Patent") is entitled "Method and Device for Monitoring and Analyzing Signals."  Google is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of paragraph 56, and therefore denies them.

57.     Google admits that what appears to be a copy of the '472 Patent is attached as an exhibit to Blue Spike's Original Complaint, and that, on its face, the '472 Patent was issued on March 18, 2008.  Google denies that the '472 Patent is valid.  Google is without knowledge or

information sufficient to form a belief as to the truth of the remaining allegations of

paragraph 57, and therefore denies them.

58.     Google denies the allegations in paragraph 58, and specifically denies that it has

committed any acts of infringement.

59.     Google denies the allegations in paragraph 59, and specifically denies that it has

committed any acts of infringement.

60.     Google denies the allegations in paragraph 60.

61.     Google denies the allegations in paragraph 61.

62.     Google denies the allegations in paragraph 62.

## RESPONSE TO PRAYER FOR RELIEF

These paragraphs set forth the statement of relief requested by Blue Spike to which no

response is required.  Google denies that Blue Spike is entitled to any of the requested relief and

denies any allegations.

## AFFIRMATIVE DEFENSES

Subject to the responses above, Google alleges and asserts the following defenses in

response to the allegations, undertaking the burden of proof only as to those defenses deemed

affirmative defenses by law, regardless of how such defenses are denominated herein.  Google's

investigation of its defenses is continuing, and Google reserves all rights to allege additional

defenses that may now exist or become known through the course of discovery or further

investigation in this case.

1.     Venue is neither proper nor convenient in this District.

2.     Blue Spike lacks good title to one or more of the Patents-in-Suit and/or lacks

standing to sue on same.

3.     Google does not infringe and has not infringed (not directly, indirectly,

contributorily, by inducement, under the doctrine of equivalents, nor in any other manner) any

valid claim of the '175 Patent, the '494 Patent, the '700 Patent and/or the '472 Patent.

4.     The claims of the Patents-in-Suit are invalid under 35 U.S.C. § 101 for incorrect inventorship.

5.     The claims of the Patents-in-Suit are invalid because the claims fail to satisfy the conditions for patentability set forth in 35 U.S.C. §§ 101, 102, 103 and/or 112.

6.     Blue Spike's claims for relief are barred in whole or in part by laches, waiver, acquiescence, and estoppel.

7.     Blue Spike's claim for damages, if any, against Google for alleged infringement of the Patents-in-Suit are limited by 35 U.S.C. §§ 286, 287 and/or 288.

## COUNTERCLAIMS

As and for its counterclaims against Blue Spike, Google respectfully states as follows:

## PARTIES

1.     Counterclaim-Plaintiff Google is a corporation organized and existing under the laws of the State of Delaware with its principal place of business at 1600 Amphitheatre Parkway, Mountain View, California 94043.

2.     Upon information and belief, Counterclaim-Defendant Blue Spike, LLC is a limited liability company organized and existing under the laws of the State of Texas.

## JURISDICTION AND VENUE

3.     In these Counterclaims, Google seeks a judicial declaration as to non-infringement and invalidity of the '175 Patent, the '494 Patent, the '700 Patent, and the '472 Patent.  This Court has jurisdiction over the subject matter of these Counterclaims under, without limitation, 28 U.S.C. §§ 1331, 1338(a), 1367, 2201, and 2202.

4.     By filing its Original Complaint, Blue Spike has consented to personal jurisdiction in the Eastern District of Texas.

5.     By filing its Original Complaint, Blue Spike has consented to venue in the Eastern District of Texas.  Google makes this allegation without prejudice to and specifically reserving and not waiving its contention that Blue Spike's claim of venue in this district is not proper under 28 U.S.C. §§ 1391 and 1404.

Appx0408

## COUNT ONE - DECLARATORY JUDGMENT OF
## NON-INFRINGEMENT OF THE '175 PATENT

6.      Google restates and reincorporates by reference its allegations in paragraphs 1-5 of its Counterclaims.

7.      An actual case or controversy exists between Google and Blue Spike as to whether the '175 Patent is infringed by Google.

8.      A judicial declaration is necessary and appropriate so that Google may ascertain its rights regarding the '175 Patent.

9.      Google has not infringed and does not infringe, directly or indirectly, any valid claim of the '175 Patent.

## COUNT TWO - DECLARATORY JUDGMENT OF
## INVALIDITY OF THE '175 PATENT

10.     Google restates and reincorporates by reference its allegations in paragraphs 1-9 of its Counterclaims.

11.     An actual case or controversy exists between Google and Blue Spike as to whether the '175 Patent is invalid.

12.     A judicial declaration is necessary and appropriate so that Google may ascertain whether the '175 Patent is invalid.

13.     The '175 Patent is invalid because it fails to satisfy the conditions for patentability set forth in 35 U.S.C. §§ 101, 102, 103, and/or 112.

## COUNT THREE - DECLARATORY JUDGMENT OF
## NON-INFRINGEMENT OF THE '494 PATENT

14.     Google restates and reincorporates by reference its allegations in paragraphs 1-13 of its Counterclaims.

15.     An actual case or controversy exists between Google and Blue Spike as to whether the '494 Patent is infringed by Google.

16.     A judicial declaration is necessary and appropriate so that Google may ascertain its rights regarding the '494 Patent.

17.     Google has not infringed and does not infringe, directly or indirectly, any valid claim of the '494 Patent.

## COUNT FOUR - DECLARATORY JUDGMENT OF INVALIDITY OF THE '494 PATENT

18.     Google restates and reincorporates by reference its allegations in paragraphs 1-17 of its Counterclaims.

19.     An actual case or controversy exists between Google and Blue Spike as to whether the '494 Patent is invalid.

20.     A judicial declaration is necessary and appropriate so that Google may ascertain whether the '494 Patent is invalid.

21.     The '494 Patent is invalid because it fails to satisfy the conditions for patentability set forth in 35 U.S.C. §§ 101, 102, 103, and/or 112.

## COUNT FIVE - DECLARATORY JUDGMENT OF NON-INFRINGEMENT OF THE '700 PATENT

22.     Google restates and reincorporates by reference its allegations in paragraphs 1-21 of its Counterclaims.

23.     An actual case or controversy exists between Google and Blue Spike as to whether the '700 Patent is infringed by Google.

24.     A judicial declaration is necessary and appropriate so that Google may ascertain its rights regarding the '700 Patent.

25.     Google has not infringed and does not infringe, directly or indirectly, any valid claim of the '700 Patent.

## COUNT SIX - DECLARATORY JUDGMENT OF INVALIDITY OF THE '700 PATENT

26.     Google restates and reincorporates by reference its allegations in paragraphs 1-25 of its Counterclaims.

27.     An actual case or controversy exists between Google and Blue Spike as to whether the '700 Patent is invalid.

28.     A judicial declaration is necessary and appropriate so that Google may ascertain whether the '700 Patent is invalid.

29.     The '700 Patent is invalid because it fails to satisfy the conditions for patentability set forth in 35 U.S.C. §§ 101, 102, 103, and/or 112.

## COUNT SEVEN - DECLARATORY JUDGMENT OF NON-INFRINGEMENT OF THE '472 PATENT

30.     Google restates and reincorporates by reference its allegations in paragraphs 1-29 of its Counterclaims.

31.     An actual case or controversy exists between Google and Blue Spike as to whether the '472 Patent is infringed by Google.

32.     A judicial declaration is necessary and appropriate so that Google may ascertain its rights regarding the '472 Patent.

33.     Google has not infringed and does not infringe, directly or indirectly, any valid claim of the '472 Patent.

## COUNT EIGHT - DECLARATORY JUDGMENT OF INVALIDITY OF THE '472 PATENT

34.     Google restates and reincorporates by reference its allegations in paragraphs 1-33 of its Counterclaims.

35.     An actual case or controversy exists between Google and Blue Spike as to whether the '472 Patent is invalid.

36.     A judicial declaration is necessary and appropriate so that Google may ascertain whether the '472 Patent is invalid.

37.     The '472 Patent is invalid because it fails to satisfy the conditions for patentability set forth in 35 U.S.C. §§ 101, 102, 103, and/or 112.

## EXCEPTIONAL CASE

38.     On information and belief, this is an exceptional case entitling Google to an award of its attorneys' fees incurred in connection with defending and prosecuting this action pursuant to 35 U.S.C. § 285, as a result of, *inter alia*, Blue Spike's assertion of the Patents-in-Suit against

Google with knowledge that Google does not infringe any valid claim of the Patents-in-Suit and/or that the Patents-in-Suit are invalid

## **PRAYER FOR RELIEF**

WHEREFORE, Google prays for judgment as follows:

a.       A judgment dismissing Blue Spike's Original Complaint against Google with prejudice;

b.       A declaration that Google has not infringed, contributed to the infringement of, or induced others to infringe, either directly or indirectly, any valid claim of the Patents-in-Suit;

c.       A declaration that the Patents-in-Suit are invalid;

d.       A declaration that this case is exceptional and an award to Google of its reasonable costs and expenses of litigation, including attorneys' fees and expert witness fees;

e.       Such other and further relief as this Court may deem just and proper.

## **DEMAND FOR JURY TRIAL**

In accordance with Federal Rule of Civil Procedure 38(b), Google demands a trial by jury on all issues so triable.

Dated:  November 15, 2012                              Respectfully submitted,

                                        */s/ Lance Lee*
                                        Lance Lee
                                        Attorney at Law
                                        5511 Plaza Drive
                                        Texarkana, TX 75503
                                        Email: wlancelee@aol.com
                                        Tel: 903-223-0276/Fax: 903-223-0210

Michael Berta
michael.berta@aporter.com
Patrick J. Conti
patrick.conti@aporter.com
**Arnold & Porter LLP**
Three Embarcadero Center, 7th Floor
San Francisco, CA 94111
Tel.: 415-471-3100/Fax: 415-471-3400

Wallace Wu
wallace.wu@aporter.com
Nicholas H. Lee
nicholas.lee@aporter.com
**Arnold & Porter LLP**
777 S. Figueroa Street, 44th Floor
Los Angeles, CA  90017
Tel.: 213-243-4000/Fax: 213-243-4199

ATTORNEYS FOR DEFENDANT
GOOGLE INC.

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on November 15, 2012, a true and correct copy of

the foregoing was served to the parties counsel of record via electronic mail pursuant to Local

Rule CV-5(d).

*/s/ Lance Lee*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## TYLER DIVISION

| | | |
|---|---|---|
| BLUE SPIKE, LLC | § | |
| | § | |
| v. | § | Case No. 6:12-cv-499 |
| | § | |
| TEXAS INSTRUMENTS, INC. | § | |

| | | |
|---|---|---|
| BLUE SPIKE, LLC | § | |
| | § | |
| v. | § | Case No. 6:12-cv-558 |
| | § | |
| GOOGLE INC. | § | |

## ORDER TRANSFERRING TO NORTHERN DISTRICT OF CALIFORNIA

Now before the Court is Defendant Google Inc.'s motion to transfer for the convenience of the parties (Doc. No. 678). Having considered the parties' briefing and the applicable law, the Court finds that the Northern District of California is a clearly more convenient venue and transfers this case to the Northern District of California.

## I.     BACKGROUND

This action involves dozens of cases against unrelated Defendants for infringement of four patents: U.S. Patent Nos. 7,346,472 (the '472 Patent), 7,660,700 (the '700 Patent), 7,949,494 (the '494 Patent), and 8,214,175 (the '175 Patent). The four related patents in suit describe a method and device for monitoring and analyzing signals. The inventor describes the patented technology as "signal abstracting" prevalent in the field of digital security, such as "digital fingerprinting." Plaintiff accuses Defendant's video and music identification software as infringing each of the patents in suit.

The Court consolidated the cases into the above styled action. The consolidation was for pretrial purposes, including claim construction and discovery, but the Court affirmatively noted that the consolidation would not bear on any venue challenges. After the consolidation, Defendant moved to transfer the case to the Northern District of California for the convenience of the parties.

## II.      MOTION TO TRANSFER FOR THE CONVENIENCE OF THE PARTIES

Defendant moves the Court to transfer this case to the Northern District of California for the convenience of the parties. Defendant bases its argument largely on the fact that its headquarters—and thus its witnesses and evidence—are in Mountain View, California.

Plaintiff responds that Defendant asks the Court to ignore the effect of the requested transfer on Plaintiff. Plaintiff emphasizes two additional facts in support of its position: (1) the pendency of dozens of related cases in this district, and (2) the presence of Plaintiff Blue Spike as well as Blue Spike CEO and Inventor Scott Moskowitz in the Eastern District of Texas.

### a.  Legal Standard

"[A] district court may transfer any civil action to any other district or division where it might have been brought" for the convenience of parties and witnesses and in the interest of justice. 28 U.S.C. § 1404(a). Thus, the first inquiry when analyzing a transfer under section 1404(a) is "whether the judicial district to which transfer is sought would have been a district in which the claim could have been filed." *In re Volkswagen AG*, 371 F.3d 201, 203 (5th Cir. 2004) (per curiam) (hereinafter *In re Volkswagen I*).

Once that threshold inquiry is met, the district court must then consider the convenience of parties and witnesses as well as the interests of particular venues in hearing the case. *See Humble Oil & Ref. Co. v. Bell Marine Serv., Inc.*, 321 F.2d 53, 56 (5th Cir. 1963); *In re Nintendo*

*Co., Ltd.*, 589 F.3d 1194, 1197–98 (Fed. Cir. 2009); *In re TS Tech USA Corp.*, 551 F.3d 1315, 1319 (Fed. Cir. 2008). The party seeking the transfer must show good cause, which means that the moving party must demonstrate that the proposed transferee venue is "clearly more convenient than the venue chosen by the plaintiff[.]" *In re Volkswagen of Am., Inc.*, 545 F.3d 304, 315 (5th Cir. 2008) (en banc) (hereinafter *In re Volkswagen II*). A convenience determination consists of balancing the convenience and inconvenience resulting from plaintiff's choice of venue in comparison with those of the proposed venue. This balancing includes examining several private and public interest factors, none of which has dispositive weight. *Id.*

The private interest factors are: (1) the relative ease of access to sources of proof; (2) the availability of compulsory process to secure the attendance of witnesses; (3) the cost of attendance for willing witnesses; and (4) all other practical problems that make trial of a case easy, expeditious, and inexpensive. *In re Volkswagen I*, 371 F.3d at 203; *In re Nintendo*, 589 F.3d at 1198; *In re TS Tech*, 551 F.3d at 1319. The public interest factors are: (1) the administrative difficulties flowing from court congestion; (2) the local interest in having localized interests decided at home; (3) the familiarity of the forum with the law that will govern the case; and (4) the avoidance of unnecessary problems of conflict of laws or in the application of foreign law. *In re Volkswagen I*, 371 F.3d at 203; *In re Nintendo*, 589 F.3d at 1198; *In re TS Tech*, 551 F.3d at 1319.

The plaintiff's choice of venue is not a factor in this analysis. *In re Volkswagen II*, 545 F.3d at 314–15 & n.10. Rather, the weight of the plaintiff's choice of venue is reflected in the defendant's burden of proving that the proposed venue is "clearly more convenient" than the transferor venue. *In re Volkswagen II*, 545 F.3d at 315; *In re Nintendo*, 589 F.3d at 1200; *In re TS Tech*, 551 F.3d at 1320. Furthermore, though the private and public factors apply to most

transfer cases, "they are not necessarily exhaustive or exclusive," and no single factor is dispositive. *In re Volkswagen II*, 545 F.3d at 315.

### b.  The Northern District of California

Defendant must first establish that this action could have been brought in the Northern District of California. 28 U.S.C. § 1404(a). Defendant argues—and Plaintiff does not dispute— that Google is headquartered in Mountain View, California, and this Court agrees, that under these facts, venue is proper in the Northern District of California a pursuant to 28 U.S.C. § 1391.

### c.  Private Interest Factors

#### i.  *The Relative Ease of Access to Sources of Proof*

The first of the private interest factors to be considered is the relative ease of access to sources of proof. Despite technological advances that undoubtedly lighten the relative inconvenience of transporting large amounts of documents and hard copies across the country, this factor must still be considered in the transfer analysis. *In re Volkswagen II*, 545 F.3d at 316 ("That access to some sources of proof presents a lesser inconvenience now than it might have absent recent developments does not render this factor superfluous."). Courts analyze this factor in light of the distance that documents, or other evidence, must be transported from their existing location to the trial venue. *See id.*; *Adaptix, Inc. v. HTC Corp.*, 937 F. Supp. 2d 867, 873 (E.D. Tex. 2013). This factor will turn upon which party, usually the accused infringer, will most probably have the greater volume of documents relevant to the litigation and their presumed location in relation to the proposed and transferor venues. *See, e.g.*, *In re Nintendo*, 589 F.3d at 1199; *In re Genentech, Inc.*, 566 F.3d 1338, 1345 (Fed. Cir. 2009). But documents that have

been moved to a particular venue in anticipation of a venue dispute should not be considered. *In re Hoffman-La Roche Inc.*, 587 F.3d 1333, 1336–37 (Fed. Cir. 2009).

Defendant represents that its relevant documents are in its offices in the Northern District of California. Plaintiff counters that its documents and servers are located in Texas.[1] On balance, the location of Defendant's sources of proof far outweighs the presence of Plaintiff's documents and servers in Texas. *See In re Nintendo*, 589 F.3d at 1199. Accordingly, this factor favors transfer.

### ii.   *The Availability of Compulsory Process to Secure the Attendance of Witnesses*

This factor will weigh more heavily in favor of transfer when more third-party witnesses reside within the proposed venue. *See In re Volkswagen II*, 545 F.3d at 316; *In re Amazon.com Inc.*, 478 F. App'x 669, 670 (Fed. Cir. 2012). The factor weighs the heaviest in favor of transfer when a proposed venue is said to have "absolute subpoena power." *In re Hoffmann-La Roche Inc.*, 587 F.3d at 1338. "Absolute subpoena power" is subpoena power to compel attendance at both depositions and trial. *Id.*

Defendant points to nine licensees and 24 prior art witnesses that are located in the Northern District of California. Plaintiff identifies no third-party witnesses that this Court would have absolute subpoena power over. Accordingly, this factor favors transfer.

### iii.   *The Cost of Attendance for Willing Witnesses*

This factor is analyzed by giving broad "consideration [to] the parties and witnesses in all claims and controversies properly joined in a proceeding." *In re Volkswagen I*, 371 F.3d at 204. All potential material and relevant witnesses must be taken into account for the transfer analysis,

---

[1]   Defendant argues that Plaintiff's documents were moved to this district in anticipation of litigation and should be disregarded by the Court. The Court finds this factor favors transfer even if Plaintiff's documents are considered, and thus does not address Defendant's argument.

irrespective of their centrality to the issues raised in a case or their likelihood of being called to testify at trial. *See In re Genentech*, 566 F.3d at 1343 ("Requiring a defendant to show that the potential witness has more than relevant and material information at this point in the litigation or risk facing denial of transfer on that basis is unnecessary.").

The Fifth Circuit has adopted a "100-mile rule" to assist with analysis of this factor. *See In re Volkswagen I*, 371 F.3d at 204–05. "When the distance between an existing venue for trial of a matter and a proposed venue under § 1404(a) is more than 100 miles, the factor of inconvenience to witnesses increases in direct relationship to the additional distance to be traveled." *Id.* When applying the 100-mile rule, the threshold question is whether the transferor and proposed venues are more than 100 miles apart. *See In re Volkswagen II*, 545 F.3d at 317; *In re TS Tech*, 551 F.3d at 1320. If so, then a court determines the respective distances between the residences (or workplaces) of all the identified material and relevant witnesses and the transferor and proposed venues. *See In re Volkswagen II*, 545 F.3d at 317; *In re TS Tech*, 551 F.3d at 1320. The 100-mile rule generally favors transfer (with differing degrees) if the proposed venue is a shorter average distance from witnesses than the transferor venue. *See In re Volkswagen II*, 545 F.3d at 317; *In re TS Tech*, 551 F.3d at 1320.

But "the '100-mile rule' should not be rigidly applied." *In re Genentech*, 566 F.3d at 1344. When a particular witness "will be required to travel a significant distance no matter where they testify," that witness is discounted for purposes of the 100-mile rule analysis. *Id.* (discounting European witnesses and documents transported from Washington, D.C. in the convenience analysis when reviewing a denial of transfer from Texas to California).

As to this factor, Defendant identifies numerous party and non-party witness that reside in the Northern District of California. Plaintiff counters that its CEO and inventor of the technology at issue lives in this district.

The Courts weighs most heavily the convenience of non-party witnesses. *U.S. Ethernet Innovations, LLC v. Acer, Inc.*, No. 6:09-cv-448-JDL, 2010 WL 2771842, at *9 (E.D. Tex. July 13, 2013). Defendant identifies 33 potential non-party witnesses located in the transferee district. The only witness specifically identified in this district is Plaintiff's CEO Scott Moskowitz. But co-inventor Michael W. Berry, a resident of Seattle, Washington, is located closer to the transferee district. Plaintiff encourages the Court to give special consideration to Moskowitz's travel limitations imposed by his serious health condition: chronic inguinal neuropathy. Plaintiff has not provided any health documentation to support his claim that he is medically unable to travel long distances. Accordingly, the Court will not give undue consideration to Moskowitz's health condition.

Having considered all of the facts discussed above, the Court finds that this factor weighs in in favor of transfer.

### iv.   *Other Practical Problems*

Practical problems include those that are rationally based on judicial economy. Particularly, the existence of duplicative suits involving the same or similar issues may create practical difficulties that will weigh heavily in favor or against transfer. *See In re Volkswagen of Am., Inc.*, 566 F.3d 1349, 1351 (Fed. Cir. 2009) (hereinafter *In re Volkswagen III*).

Importantly, "[m]otions to transfer venue are to be decided based on 'the situation which existed when suit was instituted.'" *In re EMC Corp.*, 501 F. App'x 973, 976 (Fed. Cir. 2013) (quoting *Hoffman v. Blaski*, 363 U.S. 335, 343 (1960)). "While considerations of judicial

economy arising *after* the filing of a suit do not weigh against transfer, a district court may properly consider any judicial economy benefits which would have been apparent at the time the suit was filed." *Id.* "[A] district court's experience with a patent in prior litigation and the co-pendency of cases involving the same patent are permissible considerations in ruling on a motion to transfer venue." *Id.*

Both parties point to the high volume of related litigation in this district as supporting its position under this factor. Defendant argues that Plaintiff's decision to serially file dozens of cases in this District should not allow Plaintiff to establish venue. Plaintiff counters that the volume of related litigation compels the Court to deny transfer in order to jointly consider common issues such as claim construction. The Court finds both positions have merit.

As the Court has previously acknowledged, certain stages of the related litigation, such as claim construction and certain discovery matters, could be more efficiently managed through consolidated measures. *See In re EMC*, 677 F.3d 1351, 1360 (Fed. Cir. 2012). But the Court also acknowledges that in this instance, the excessively high volume of Defendants (much higher than in most patent litigation), with little overlap in the accused products, creates case management issues not normally encountered by the Court. Although the Court is confident that these issues can be effectively and efficiently managed, the presence of the additional case management burden cannot be ignored.

However, in view of the number of common or related issues among the related cases, the Court views the balance of this factor to weight slightly against transfer.

### d.  **Public Interest Factors**

The parties only address two of the public interest factors: administrative difficulties due to relative court congestion and the local interest in the dispute. These factors are addressed below. The remaining two public interest factors are considered neutral.

#### i.  *Administrative Difficulties Flowing from Court Congestion*

Defendant argues that relative court congestion favors transfer because the Eastern District of Texas has fewer judges and a longer median time-to-trial as compared to the Northern District of California. The Court finds that merely comparing the number of judges and median time to trials to be too speculative to determine any administrative difficulties from relative court congestion. Therefore, it finds this factor neutral.

#### ii.  *Local Interests*

The Fifth Circuit has explained that "[j]ury duty is a burden that ought not to be imposed upon the people of a community which has no relation to the litigation." *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508–09 (1947); *In re Volkswagen I*, 371 F.3d at 206. This factor analyzes the "factual connection" that a case has with both the proposed and transferor venues. *See id.* Generally, local interests that "could apply virtually to any judicial district or division in the United States" are disregarded in favor of particularized local interests. *In re Volkswagen II*, 545 F.3d at 318 (in a products liability suit, disregarding local interest of citizens who used the widely sold product within the transferor venue); *In re TS Tech*, 551 F.3d at 1321. Thus, when products are sold throughout the United States, citizens of a venue do not have a particularized interest in deciding the dispute simply based on product sales within the venue. *In re Nintendo*, 589 F.3d at 1198.

Defendant insists that the Northern District of California has a particular interest in this litigation since Defendant is headquartered there. The Court finds that both districts have a localized interest in the dispute. Accordingly, this factor is neutral.

### e. **Balance of Factors**

Three favor transfer and another weighs slightly against transfer. The one factor that slightly weighs against transfer does so only because Plaintiff serially filed dozens of cases in this district and, therefore, is of limited importance. *Cf. GeoTag v. Starbucks Corp.*, 2:10-cv-572, 2013 WL 890484, at *6 (E.D. Tex. Jan. 14, 2013). All of the public interest factors are neutral. Having considered each of these relevant factors, the Court finds that the Northern District of California is a clearly more convenient forum.

### III. **CONCLUSION**

For the reasons discussed more fully above, the Court GRANTS Defendant Google Inc.'s motion to transfer venue (Doc. No. 678). Accordingly, Plaintiff's claims against Google Inc. are SEVERED from the lead case back into the original cause number, 6:12-cv-558, and the clerk of the court is directed to TRANSFER the severed action to the Northern District of California for further consideration.

**It is SO ORDERED.**

**SIGNED this 13th day of March, 2014.**

MICHAEL H. SCHNEIDER
UNITED STATES DISTRICT JUDGE

Appx0423

PAGES 1 – 46

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| AOPTIX TECHNOLOGIES, | ) | |
| | ) | |
| PLAINTIFF, | ) | NO. C-13-1105 YGR |
| | ) | (RELATED CASE) |
| VS. | ) | |
| | ) | MONDAY, JULY 28, 2014 |
| BLUE SPIKE, LLC, | ) | |
| | ) | OAKLAND, CALIFORNIA |
| | ) | |
| DEFENDANT. | ) | INITIAL CASE MANAGEMENT |
| ———————————— | ) | CONFERENCE |
| | ) | |
| BLUE SPIKE, LLC, | ) | |
| | ) | |
| PLAINTIFF, | ) | NO. C-14-1647 YGR |
| | ) | (RELATED CASE) |
| VS. | ) | |
| | ) | |
| ADOBE SYSTEMS, INC., | ) | |
| | ) | |
| DEFENDANT. | ) | |
| ———————————— | ) | |

CAPTION CONTINUED ON NEXT PAGE


BEFORE THE HONORABLE YVONNE GONZALEZ ROGERS, JUDGE


**REPORTER'S TRANSCRIPT OF PROCEEDINGS**


(APPEARANCES ON NEXT PAGE)

REPORTED BY:            DIANE E. SKILLMAN, CSR 4909, RPR, FCRR
                       OFFICIAL COURT REPORTER


TRANSCRIPT PRODUCED BY COMPUTER-AIDED TRANSCRIPTION

```
1    BLUE SPIKE, LLC,              )
                                   )
2             PLAINTIFF,           )   NO. C-14-1648 YGR
                                   )      (RELATED CASE)
3       VS.                        )
                                   )
4    ZEITERA, LLC, AOPTIX          )
     TECHNOLOGIES, AND             )
5    WATCHWITH, INC.,              )
                                   )
6             DEFENDANTS.          )
     _____)
7    BLUE SPIKE, LLC,              )
                                   )
8             PLAINTIFF,           )   NO. C-14-1649 YGR
                                   )      (RELATED CASE)
9       VS.                        )
                                   )
10   SOUNDHOUND, INC. AND AOPTIX   )
     TECHNOLOGIES,                 )
11                                 )
              DEFENDANTS.          )
12   _____)
                                   )
13   BLUE SPIKE, LLC               )
                                   )
14            PLAINTIFF,           )   NO. C-14-1650 YGR
                                   )      (RELATED CASE)
15      VS.                        )
                                   )
16   GOOGLE, INC.,                 )
                                   )
17            DEFENDANT.           )
     _____)
18

19   **APPEARANCES:**

20   **FOR AOPTIX**          FENWICK & WEST, LLP
     **C-13-1105**           555 CALIFORNIA STREET, 12TH FLOOR
21   **C-14-1648**           SAN FRANCISCO, CALIFORNIA 94104
     **C-14-1649:**     BY:  TERESA M. CORBIN, ESQUIRE
22                           BRYAN A. KOHM, ESQUIRE

23   **FOR BLUE SPIKE**      GARTEISER HONEA
     **C-13-1105,**          44 N. SAN PEDRO
24   **C-14-1647 THROUGH**   SAN RAFAEL, CALIFORNIA 94903
     **C-14-1650**      BY:  RANDALL GARTEISER, ESQUIRE

25
```

```
1                         (APPEARANCES CONTINUED)

2


3    FOR ADOBE SYSTEMS        FARELLA BRAUN + MARTEL, LLP
     C-14-1647:               235 MONTGOMERY STREET
4                             SAN FRANCISCO, CALIFORNIA 94104
                        BY:  JEFFREY M. FISHER, ESQUIRE
5                             EUGENE Y. MAR, ESQUIRE

6


7    FOR SOUNDHOUND           FENWICK & WEST, LLP
     & ZEITERA,               555 CALIFORNIA STREET, 12TH FLOOR
8    C-14-1648               SAN FRANCISCO, CALIFORNIA 94104
     C-14-1649:          BY:  TERESA M. CORBIN, ESQUIRE
9                             BRYAN A. KOHM, ESQUIRE

10


11   FOR WATCHWITH            ORRICK, HERRINGTON & SUTCLIFFE
     C-14-1648:               1000 MARSH ROAD
12                            MENLO PARK, CALIFORNIA 94025
                        BY:  GABRIEL M. RAMSEY, ESQUIRE
13


14


15   FOR GOOGLE               ARNOLD & PORTER
     C-14-1650:               777 SOUTH FIGUEROA STREET, 44TH FLOOR
16                            LOS ANGELES, CALIFORNIA 90017
                        BY:  NICHOLAS H. LEE, ESQUIRE
17


18                            ARNOLD & PORTER, LLP
                              THREE EMBARCADERO CENTER, 10TH FLOOR
19                            SAN FRANCISCO, CALIFORNIA 94111
                        BY:  MICHAEL A. BERTA, ESQUIRE
20


21


22


23


24


25
```

```
1    MONDAY, JULY 28, 2014                          2:08 P.M.

2                    P R O C E E D I N G S

3         THE COURT:  OKAY.  THE BLUE SPIKE CASES.  ALL OF YOU,

4    COME ON UP.

5       BLUE SPIKE BY THE JURY BOX, PLAINTIFF SIDE.  WE'LL START

6    CALLING THE CASES FOR PURPOSES OF THE RECORD.

7         THE CLERK:  CALLING CIVIL AOPTIX CASE, CIVIL 13-1105

8    AOPTIX TECH VERSUS BLUE SPIKE.

9       SHOULD THEY STATE AFTER EACH ONE?

10        THE COURT:  JUST CALL THEM ALL.

11        THE CLERK:  RELATED CIVIL ACTION 14-1647 BLUE SPIKE

12   VERSUS ADOBE SYSTEMS, RELATED CIVIL ACTION 14-1648 BLUE SPIKE

13   VERSUS ZEITERA, RELATED CIVIL ACTION 14-1649 BLUE SPIKE VERSUS

14   SOUNDHOUND, INC., AND RELATED CIVIL ACTION 14-1650 BLUE SPIKE

15   VERSUS GOOGLE.

16        THE COURT:  OKAY.  SO I WOULD LIKE APPEARANCES MADE

17   IN THE FOLLOWING ORDER.

18      COUNSEL, FOR BLUE SPIKE.

19        MR. GARTEISER:  YOUR HONOR, RANDALL GARTEISER ON

20   BEHALF OF BLUE SPIKE.

21        THE COURT:  ALL RIGHT.  GOOD AFTERNOON.

22      NEXT FOR AOPTIX.

23        MS. CORBIN:  GOOD AFTERNOON, YOUR HONOR.  TERESA

24   CORBIN AND BRYAN KOHM FOR DJ PLAINTIFF AOPTIX.

25        THE COURT:  YOU ARE BRYAN KOHM?
```

1          **MR. KOHM:**  YES, YOUR HONOR.

2          **THE COURT:**  MR. FISHER FOR ADOBE SYSTEMS.

3          **MR. FISHER:**  GOOD AFTERNOON, YOUR HONOR.  JEFF FISHER

4    OF FARELLA BRAUN + MARTEL ALONG WITH MY COLLEAGUE EUGENE MAR

5    FOR ADOBE.

6          **THE COURT:**  OKAY.  GOOD AFTERNOON.

7       AND THEN, MS. CORBIN, ARE YOU REPRESENTING ZEITERA, LLC AS

8    WELL?

9          **MS. CORBIN:**  YES, YOUR HONOR.

10         **THE COURT:**  AND SOUNDHOUND, INC.?

11         **MS. CORBIN:**  YES.

12         **THE COURT:**  OKAY.  WATCHWITH, INC.?

13         **MR. RAMSEY:**  GABRIEL RAMSEY WITH ORRICK, HERRINGTON &

14   SUTCLIFFE FOR WATCHWITH, INC.

15         **THE COURT:**  AND FOR GOOGLE?

16         **MR. BERTA:**  YOUR HONOR, MIKE BERTA.  AND WITH ME IS

17   NICK LEE OF ARNOLD & PORTER.

18         **THE CLERK:**  COULD YOU --

19         **MR. BERTA:**  I CAN.  I WILL.

20      YOUR HONOR, MIKE BERTA, NICK LEE OF ARNOLD & PORTER FOR

21   GOOGLE, INC.

22         **THE CLERK:**  DO YOU HAVE A CARD?

23         **MR. BERTA:**  I DON'T HAVE A CARD.

24         **THE CLERK:**  OKAY.

25         **THE COURT:**  OKAY.  LOT TO DO TODAY.

1    LET ME HAVE PLAINTIFF'S ATTORNEY UP HERE, OR AT LEAST I

2   WILL REFER TO YOU AS PLAINTIFF'S ATTORNEY, BLUE SPIKE, AND ONE

3   LAWYER FOR EACH OF THE DEFENDANTS.  THAT'S YOUR MIC.

4    THEN STARTING AOPTIX HERE IN THE MIDDLE, WITH COUNSEL FOR

5   ADOBE, AND THEN WE CAN GET ORRICK AND ARNOLD & PORTER AT THE

6   END.

7    JUST GIVE ME A MINUTE.  I WAS EXPECTING MR. CHATTERJEE.

8                    (PAUSE IN THE PROCEEDINGS.)

9    OKAY.

10   SO, HOW DO I SAY YOUR NAME AGAIN?

11            **MR. GARTEISER:**  GARTEISER.

12            **THE COURT:**  GARTEISER?

13            **MR. GARTEISER:**  YES, MA'AM -- YES, YOUR HONOR.

14            **THE COURT:**  ALL RIGHT, MR. GARTEISER, TELL ME ABOUT

15   THE TECHNOLOGY.

16            **MR. GARTEISER:**  THE TECHNOLOGY IN THIS CASE IS

17   ACTUALLY VERY PIONEERING.  WHAT IT DOES IS IT RECOGNIZES A

18   FACE OR A SOUND, AND IT THEN CREATES WHAT'S CALLED AN ABSTRACT

19   IN THE PATENT.

20    IN FACT, WE ACTUALLY HAVE TUTORIALS THAT WE PREPARED IN

21   ANOTHER CASE THAT WE WOULD BE MORE THAN HAPPY TO LODGE WITH

22   THE COURT TO -- I MENTION IT IN THE CMC STATEMENT AS WELL.

23    BUT IN A NUTSHELL, IF YOU ARE FAMILIAR WITH SHAZAM OR HOW

24   GOOGLE'S YOUTUBE WORK TO STOP PIRACY, THAT'S THE SAME WAY THIS

25   TECHNOLOGY WORKS.  SO SOUNDHOUND IN THIS CASE HAS GOT AN

```
 1    APPLICATION SIMILAR --

 2            THE COURT:  DON'T TELL ME ABOUT THEIR APPLICATIONS.

 3    TELL ME ABOUT WHAT YOUR CLIENT INVENTED.

 4            MR. GARTEISER:  SURE.

 5        SO WHAT HE INVENTED WAS A NOVEL WAY TO TRACK

 6    IDENTIFICATION OF SOMETHING THAT YOU WANT TO PROTECT ONLINE.

 7    AND THE BEAUTY -- THE INVENTION ASPECT NOVELTY OF IT INVOLVES

 8    THAT YOU CAN'T RECREATE THE ORIGINAL FROM WHAT THIS ABSTRACT

 9    IS.  SO, IF YOU'RE WARNER BROTHERS --

10            THE COURT:  I'M GOING TO INTERRUPT YOU FOR A MOMENT.

11        THE CMC STATEMENT -- WE ARE DEALING WITH FOUR PATENTS; IS

12    THAT RIGHT?

13            MR. GARTEISER:  YOUR HONOR, THERE'S ALSO A FIFTH ONE

14    THAT ISSUED RECENTLY.

15            THE COURT:  GIVE ME THE SHORT NAMES FOR THE PATENTS.

16    WHAT ARE THE NUMBERS?

17            MR. GARTEISER:  SURE.  ONE MOMENT.

18                    (PAUSE IN THE PROCEEDINGS.)

19            THE COURT:  DOES ANYBODY HAVE THEM?

20            MS. CORBIN:  YES, YOUR HONOR, I DO.

21            MR. BERTA:  '175.

22            THE COURT:  '175.

23            MR. BERTA:  '494.

24            THE COURT:  '494.

25            MR. BERTA:  '700.
```

```
 1              THE COURT:  '700.

 2              MR. BERTA:  AND '472.

 3              THE COURT:  '472.

 4         ALL RIGHT.  THE '175 PATENT, WHAT IS THE KIND OF PATENT

 5    ARE WE DEALING WITH?

 6              MR. GARTEISER:  WE'RE DEALING WITH A PATENT THAT

 7    HANDLES --

 8              THE COURT:  IS IT A METHOD'S PATENT?  WHAT KIND OF

 9    PATENT --

10              MR. GARTEISER:  THERE'S NO MEANS-PLUS-FUNCTION, IT'S

11    METHOD AND APPARATUS.  AND THAT'S TRUE FOR ALL FIVE.

12              THE COURT:  ARE THE PATENTS ATTACHED TO THE

13    COMPLAINT?

14              MR. GARTEISER:  NOT IN THIS CASE, YOUR HONOR, BUT WE

15    CAN TRANSFER -- WE CAN LODGE THE FIVE WITH THE COURT.

16              THE COURT:  OKAY.  PLEASE LODGE THEM.

17         ALL RIGHT.  SO HE'S CREATED A METHOD FOR DOING THIS; IS

18    THAT WHAT YOU ARE SAYING TO ME?

19              MR. GARTEISER:  THAT'S CORRECT.  FROM THAT, YOU CAN

20    ACTUALLY BUILD A SYSTEM TO DO IT AS WELL.

21              THE COURT:  WHAT IS HIS BACKGROUND?

22              MR. GARTEISER:  HIS BACKGROUND -- AND THERE'S TWO

23    INVENTORS HERE.  ONE IS SCOTT MOSKOWITZ, SO I WILL START WITH

24    HIM.  HE IS THE CEO OF BLUE SPIKE, INCORPORATED WHICH

25    TRANSFERRED THESE PATENTS TO BLUE SPIKE, LLC.
```

1        THE OTHER INVENTOR IS MIKE BARRY WHO LATER ENDED UP

2   WORKING FOR ADOBE SYSTEMS WHO IS ALSO INVOLVED IN THIS

3   LITIGATION --

4            **THE COURT:**  HE IS NOT SUED INDIVIDUALLY, THOUGH?

5            **MR. GARTEISER:**  NO, NOT AT ALL.  AND WE DON'T HAVE

6   ANY -- IT'S JUST RUN-OF-THE-MILL PATENT CASE WITH ADOBE.

7   THERE'S NOTHING EXCITING ABOUT IT.

8            **THE COURT:**  SO WHAT IS MR. MOSKOWITZ'S BACKGROUND?

9            **MR. GARTEISER:**  HE HOLDS TWO DEGREES FROM WHARTON,

10  AND HE STUDIED ALSO AT --

11           **THE COURT:**  WHARTON IS A MBA -- THAT IS A BUSINESS --

12           **MR. GARTEISER:**  IT'S A BUSINESS SCHOOL.

13           **THE COURT:**  DOESN'T HE HAVE A TECHNICAL BACKGROUND?

14           **MR. GARTEISER:**  HE DOESN'T.  IT'S KIND OF LIKE THE

15  GUY THAT WE'VE HAD -- THAT WE HIRED, HAS AN ENGLISH DEGREE,

16  BUT HE KNOWS COMPUTERS.  SO WHEN HE WANTED TO GO BACK TO UVA,

17  HE STUDIED ENGLISH AND THEN WENT TO LAW SCHOOL.

18           **THE COURT:**  HE'S TEACHING ENGINEERS HOW TO DO

19  SOMETHING?

20           **MR. GARTEISER:**  HE'S TEACHING HIMSELF -- HE TAUGHT

21  HIMSELF HOW TO DO THESE THINGS AND HAD MIKE BARRY HELP HIM

22  WITH THE IMPLEMENTATION SIDE AS WELL.

23           **THE COURT:**  SO WHAT IS MIKE BARRY'S BACKGROUND?

24           **MR. GARTEISER:**  HE'S A COMPUTER PROGRAMMER.

25           **THE COURT:**  SO WHEN I LOOK AT THESE PATENTS, WHAT'S

1    IT GOING TO EXPLAIN TO ME HOW TO DO?

2              **MR. GARTEISER:**  IT'S GOING TO EXPLAIN HOW TO KEEP

3    TRACK OF SOMETHING THAT'S IMPORTANT, SOMETHING OF VALUE.

4        SO ORIGINALLY, THE WHOLE PREMISE BACK IN SEPTEMBER 2000

5    WAS, WELL, IT'S HARD FOR LIKE WARNER BROTHERS TO STOP PIRACY

6    OF MOVIES ONLINE, HOW DO WE DO THAT?  WE DON'T WANT TO GIVE

7    THE WHOLE MOVIE TO SOMEONE TO --

8              **THE COURT:**  GREAT IDEA.  HOW DO YOU DO IT?

9              **MR. GARTEISER:**  YOU LOOK AT THE SIGNAL WAVE, AND THEN

10   YOU CAN TAKE FROM THAT THE PORTION OF IT THAT YOU THEN ASSIGN

11   TO AN ABSTRACT, WHAT WE CALL ABSTRACT, AND THEN YOU CAN

12   COMPARE THAT LATER.

13             **THE COURT:**  HOW DOES HE DO THAT?  HOW DOES HE EXPLAIN

14   OR TEACH SOMEONE TO DO THAT?

15             **MR. GARTEISER:**  HOW DOES HE EXPLAIN OR TEACH HOW TO

16   DO THAT?

17             **THE COURT:**  RIGHT.

18             **MR. GARTEISER:**  THERE'S DIFFERENT METHODS THAT ARE

19   DISPLAYED -- CONTAINED.  LET ME SEE IF I CAN GIVE YOU ONE

20   EXAMPLE.

21       YOU TAKE YOUR REFERENCE SIGNAL AND YOU COMPARE IT TO

22   ANOTHER SIGNAL THAT YOU HAVE IN THIS DATABASE.  SO IF

23   YOU'RE -- IN THIS EXAMPLE I MADE UP WITH WARNER BROTHERS, THEY

24   HAVE A MOVIE, THEY WANT TO TRACK IT, SO THEY GIVE THAT

25   ABSTRACT, NOT THE WHOLE MOVIE, TO AN AGENCY THAT POST VIDEOS

1    AND AUDIOS ONLINE, AND THEN THEY USE THAT ABSTRACT TO FIND A

2    MATCH OR A SIMILAR VERSION.

3        IT'S LIKE A COMPARATOR MACHINE.  JUST BECAUSE YOU DON'T

4    GET AN EXACT MATCH, YOU CAN COMPARE AND YOU CAN SEE THAT THIS

5    IS MOST LIKELY A VERSION OF THIS.  SO IT'S KIND OF A LITTLE

6    BIT OF A DECISION TREE THAT GOES THROUGH THE PROCESS.

7            **THE COURT:**  SO HE'S PATENTED A DECISION TREE?

8            **MR. GARTEISER:**  NO, YOUR HONOR.  HE DID NOT PATENT A

9    DECISION TREE, BUT I WAS TRYING TO DISTILL IT DOWN A LITTLE

10   BIT.

11           **THE COURT:**  WHAT'S THE FIFTH PATENT?  YOU SAID THERE

12   IS A NEW PATENT OUT THERE.

13           **MR. GARTEISER:**  YES.  THE FIFTH PATENT IS, AGAIN, THE

14   '728 PATENT.  AND IN THAT SITUATION THERE, THE TECHNOLOGY

15   NEVER WAS -- HAD TO REQUIRE A DATABASE.  YOU CAN DO THESE

16   COMPARISONS IN REAL TIME, BUT THOSE INITIAL FOUR PATENTS I

17   MENTIONED, DIDN'T MENTION NOT USING A DATABASE, BUT THE FIFTH

18   PATENT DOES.

19       AND THE FIFTH PATENT HAS NOT BEEN ASSERTED AGAINST ALL OF

20   THE DEFENDANTS.  IT IS ONLY AOPTIX I BELIEVE AT THIS POINT.

21           **THE COURT:**  ANYBODY ELSE HAVE ANY THOUGHTS ON THE

22   TECHNOLOGY OR ON THE -- WHAT THE PATENTS ARE ATTEMPTING TO

23   TEACH?

24       I WILL START WITH YOU, MS. CORBIN.

25           **MS. CORBIN:**  WELL, YOUR HONOR, I THINK IT'S -- I CAN

1    DEFER ALSO TO GABE RAMSEY, BUT OUR BELIEF IS THAT THE PATENT

2    REALLY DOESN'T TEACH ANYTHING.  IT DESCRIBES VERY HIGH -- AT A

3    VERY, VERY HIGH LEVEL THIS SIGNAL MATCHING.  AND, YOU KNOW,

4    THAT YOU ARE GOING TO CREATE AN ABSTRACT BASED ON PERCEPTUAL

5    QUALITIES, ANOTHER TERM THAT IS NOT DEFINED IN THE PATENT.  SO

6    THERE ARE MANY TERMS THAT ARE USED THAT ARE NOT DEFINED.

7        IT'S CLEAR THAT YOU DO SOME KIND OF SIGNAL SEARCH.  THE

8    PATENT TALKS ABOUT BEING ABLE TO USE THE SIGNAL MATCHING FOR

9    ANY NUMBER OF APPLICATIONS.  FOR EXAMPLE, MUSIC, SONG

10   RECOGNITION AS WELL AS BIOMETRICS, FINGERPRINTING, FACIAL

11   RECOGNITION, AND THE LIKE, BUT THE DESCRIPTION IN THE PATENT

12   IS A VERY EXTREMELY HIGH LEVEL.

13            **THE COURT:**  MR. FISHER?

14            **MR. FISHER:**  I DON'T HAVE MUCH TO ADD FROM THAT OTHER

15   THAN THERE AREN'T FIGURES IN THERE EITHER.  IT'S VERY

16   DIFFICULT FOR US TO KNOW WHAT THESE PATENTS ARE ABOUT.  AND

17   THAT TIES TO THE PROBLEMS WITH THE INFRINGEMENT CONTENTIONS

18   THAT WE HAD THAT DATE BACK TO THE BRIEF PERIOD OF TIME WE WERE

19   ALL IN TEXAS, BUT IT REMAINS AS A CONCERN THAT WE HAVE IN THIS

20   COURT GOING FORWARD.

21            **THE COURT:**  MR. RAMSEY.

22            **MR. RAMSEY:**  I WILL ECHO SOME OF THE POINTS THAT WERE

23   JUST MADE AND ALSO ADD THE FACT THERE'S SOME DISCLOSURE IN THE

24   PATENT, BUT IT'S ONLY SIGNAL PROCESSING CONCEPTS AT THE

25   HIGHEST LEVEL, THAT THAT -- AND THIS IS THE ONLY DIRECTION

1    THAT ONE READING THE PATENT WOULD HAVE TO ACTUALLY CREATE AN

2    INVENTION, AND THERE'S NO CODE DISCLOSED, BUT IN GENERAL BROAD

3    STROKES.  THE CLAIMS TALK ABOUT THE PROCESS OF CREATING A

4    REPRESENTATION OF A SIGNAL OF SOME -- SOME TYPE THAT IS CALLED

5    AN ABSTRACT.  IT'S CREATED -- THE THING IS CREATED FOR AN

6    UNKNOWN SIGNAL AND THEY'RE COMPARED AT SOME POINT TO IDENTIFY,

7    BUT BEYOND THAT, THAT'S THE -- THE MOST SPECIFICITY THERE IS

8    IN THE PATENT.

9            **THE COURT:**  MR. BERTA?

10           **MR. BERTA:**  YOUR HONOR, THE ONLY THING I WOULD ADD

11   IS -- AND I DON'T KNOW IF THIS IS THE TIME IN WHICH THAT'S

12   APPROPRIATE -- THIS IS WHY WE RAISED WITH RESPECT TO THE

13   SCHEDULE THAT FOR THIS CASE IN PARTICULAR, I THINK THE

14   PROBLEM'S ARTICULATING WHAT THE INVENTION TEACHES ARE WHY WE

15   THINK THERE'S A 112 OR 101 EARLY MOTION RELATED TO CLAIM

16   CONSTRUCTION THAT WE THINK MIGHT BE HELPFUL HERE BECAUSE I,

17   FOR ONE, IF YOU GO THROUGH THIS PATENT -- THESE PATENTS,

18   THEY'RE A LITTLE BIT LIKE --

19           **THE COURT:**  IT'S A LITTLE WHAT?

20           **MR. BERTA:**  THEY'RE LIKE BIT LIKE A PATENT ON A SPACE

21   SHIP WHERE IT TALKS ABOUT IF YOU DID THIS THING, ALL THE

22   DIFFERENT WAYS IN WHICH IT WOULD BE COOL TO APPLY THIS

23   TECHNOLOGY IN A BUNCH OF DIFFERENT AREAS, BUT THEY DON'T

24   ACTUALLY SAY HOW TO DO THE THING THAT THEY SAY IS COOL.

25       SO THAT -- IN THAT -- AND THAT IS, YOU KNOW, HE MENTIONED

```
1    GOOGLE AND YOUTUBE.  WE DO DO A WAY IN WHICH TO DETECT

2    COPYRIGHTING.  AND WE DO SOME OF THE THINGS THAT THEY SAY IN

3    THIS PATENT APPLICATION ARE SO COOL IF ONE COULD COMPARE TWO

4    THINGS AND DETERMINE WHETHER THEY ARE OR ARE NOT IDENTICAL.

5    BUT THEY DON'T EVER SAY WHAT IT IS.  IT IS A WHARTON

6    DISCUSSION OF HOW TO DO THIS THING.  AND IT JUST SAYS IF YOU

7    CAN WRITE COMPUTER CODE TO MAKE A COMPARISON, THERE'S MANY

8    WAYS TO USE IT, BUT THEY DON'T TELL YOU HOW TO DO IT.

9         AND THAT'S AN INDEFINITENESS PROBLEM OR A 101 PROBLEM WITH

10   ALL THESE PATENTS IN COMMON, YOUR HONOR.

11             MR. GARTEISER:  YOUR HONOR, MAKE MAY I COMMENT?

12             THE COURT:  YOU MAY.

13             MR. GARTEISER:  WELL, I DISAGREE THERE'S A 101 OR

14   112 --

15             THE COURT:  I'M SURE YOU DO.

16             MR. GARTEISER:  THIS IS A PIONEERING INVENTION, AND

17   IT DOES ACTUALLY DISCLOSE HOW TO DO IT.

18        I APOLOGIZE, MY COLLEAGUE IS AN ELECTRICAL ENGINEER, AND

19   HE ISN'T HERE TO JOIN ME TODAY TO DO A BETTER JOB OF

20   EXPLAINING THIS TECHNOLOGY.  HONESTLY, I APOLOGIZE FOR MY POOR

21   JOB.

22             THE COURT:  I TRY TO LOOK AT THE PATENTS BEFORE I

23   HAVE YOU COME IN, AND I DIDN'T HAVE AN OPPORTUNITY TO DO THAT

24   IN THIS CASE, SO THAT'S WHY I WAS ASKING THE QUESTIONS.

25        ALL RIGHT.
```

1            **MR. GARTEISER:**  YOUR HONOR, WOULD IT HELP IF WE

2  LODGED OUR TUTORIAL?

3            **THE COURT:**  NO.  I THOUGHT -- WE WILL TALK ABOUT THE

4  TUTORIAL IN A MINUTE.

5            **MR. GARTEISER:**  OKAY.

6            **THE COURT:**  SO, I HAVE RELATED THESE CASES FOR

7  DISCOVERY PURPOSES.  I AM GOING RELATE -- I AM GOING TO REFER

8  ALL OF THESE CASES TO JUDGE CORLEY IN TERMS OF ANY DISPUTES

9  WITH RESPECT TO DISCOVERY IN THE FIRST INSTANCE BECAUSE I WANT

10  TO MAKE SURE THAT WE ARE PUSHING THIS AS FAST AS WE CAN.

11  SHE'S ONE OF OUR BEST JUDGES ON THESE ISSUES.

12      I DO THINK THAT THE NORTHERN DISTRICT'S RULES ARE

13  DISTINCTLY DIFFERENT THAN THE EASTERN DISTRICT OF TEXAS.  YOU

14  MUST COMPLY WITH OUR RULES.  PERIOD.  IF THAT MEANS THAT YOU

15  HAVE TO REDO THE INFRINGEMENT CONTENTIONS, THEN SO BE IT.  BUT

16  YOU UNDERSTAND MR. GARTEISER -- DID I SAY THAT RIGHT?

17            **MR. GARTEISER:**  YES.

18            **THE COURT:**  -- THAT YOU'RE FOLLOWING OUR RULES, NOT

19  TEXAS' RULES.

20            **MR. GARTEISER:**  I UNDERSTAND, YOUR HONOR.

21            **THE COURT:**  SO, AS I -- MY NOTES HERE INDICATE, THEY

22  ARE NOT DUE, THE REVISED CONTENTIONS ARE NOT DUE UNTIL

23  OCTOBER 25TH; IS THAT RIGHT?  IS THAT BY AGREEMENT?

24            **MR. FISHER:**  YOUR HONOR, I THINK WE -- WE WERE AT THE

25  DATE, AND THEN I THINK AS WE GOT CLOSER TO FILING, THE

1    PLAINTIFF AGREED TO MOVE IT BACK TO SEPTEMBER 26TH, WHICH IS

2    WHAT WE PUT IN THE PROPOSED SCHEDULE.

3         **MR. GARTEISER:**  SEPTEMBER 26TH INSTEAD OF OCTOBER

4    25TH?

5         **MS. CORBIN:**  YES.

6         **MR. GARTEISER:**  I MENTIONED OCTOBER 25TH EARLIER IN

7    THE DOCUMENT.  THAT'S WHY --

8         **THE COURT:**  THAT'S WHY I HAVE IT IN MY NOTES.  I

9    DIDN'T PICK IT OUT OF THE SKY.

10        **MR. FISHER:**  WE HAVE -- AFTER RE-READING THE

11   STATEMENT THIS MORNING, IT DOES APPEAR IN THE BLUE SPIKE

12   PORTION THE OCTOBER DATE, BUT AS WE GOT CLOSER TO FILING THE

13   SCHEDULE, THAT IS WHY WE PUT IN THE SEPTEMBER DATE AS LONG AS

14   THEY ARE OKAY WITH IT.

15        **THE COURT:**  ALL RIGHT.  SO I'M LOOKING AT YOUR

16   PROPOSED SCHEDULE.  YOU AGREE ON THE DISCLOSURE.  SO THAT'S

17   ORDERED.

18      THE DEADLINE TO AMEND, YOU AGREED.  THAT'S ORDERED.

19      WITH RESPECT TO THE DISCLOSURES OF ASSERTED CLAIMS AND

20   YOUR INFRINGEMENT CONTENTIONS....

21        **MR. GARTEISER:**  YOUR HONOR, THAT'S SOMETHING THAT WE

22   DON'T NECESSARILY NEED TO DO AT THAT STAGE.  WE WERE TRYING TO

23   COMPROMISE WITH THE DEFENDANTS.

24      THE PROBLEM IS SOME OF THE DEPENDENT CLAIMS FOCUS MORE ON

25   ISSUES OF AMP-TYPE APPLICATION AS OPPOSED TO A BIOMETRIC

1    APPLICATION.

2            **THE COURT:**  I DON'T KNOW ENOUGH ABOUT YOUR TECHNOLOGY

3    YET TO UNDERSTAND WHAT YOU JUST SAID.  SO TRY AGAIN.

4            **MR. GARTEISER:**  SURE.

5        SOME DEPENDENT CLAIMS -- SO THERE'S INDEPENDENT CLAIMS AND

6    DEPENDENT CLAIMS.  AND WHY I'M BRINGING THIS UP IS PREVIOUSLY

7    WE HAD MENTIONED THAT WE'RE OKAY WITH TRYING TO LIMIT OVER 112

8    CLAIMS THAT THE INVENTOR WAS ISSUED FROM THE PTO TO A LOWER

9    NUMBER, BUT WE -- IT'S NOT ALWAYS APPLES TO APPLES.

10       SO, FOR EXAMPLE, SOME OF THE DEPENDENT CLAIMS THAT ARE

11   ASSERTED WOULD BE DIFFERENT FOR EACH OF THE DEFENDANTS,

12   ALTHOUGH THERE WILL BE SOME LARGER CLAIMS THAT WOULD RELATE TO

13   ALL OF THE DEFENDANTS.

14           **THE COURT:**  SO WHAT'S YOUR POINT?

15           **MR. GARTEISER:**  WE DON'T WANT TO LIMIT IT TO 64 IF WE

16   DON'T HAVE TO AT THAT STAGE.  BUT WE DON'T REALLY THINK THAT

17   WE ARE GOING TO GO OVER THAT NUMBER ANYWAY.

18           **THE COURT:**  WELL, I'VE GOT HERE THAT THE

19   DEFENDANTS -- I HAVE A NUMBER OF 32.  WHERE DOES THAT NUMBER

20   COME FROM, JUST THE DEFENDANTS?

21           **MS. CORBIN:**  YES, YOUR HONOR.

22           **MR. FISHER:**  THE PLAINTIFF HAD INDICATED 64, WHICH IS

23   ON THE LEFT-HAND COLUMN OF THE SCHEDULE, AND WE WERE

24   SUGGESTING THAT 64 IS TOO MANY AT THIS STAGE, AND WE WOULD

25   REQUEST THAT IT BE LIMITED TO 32 AT THAT STAGE.

1      **THE COURT:**  LET ME ASK THIS:  DO -- IS THERE ANY --

2   HAVE THE DEFENDANTS CONFERRED IN TERMS OF HOW MUCH -- IS THERE

3   ANY SENSE OF HOW MUCH OVERLAP THERE IS AND HOW MUCH THERE'S

4   NOT?

5      I MEAN IT'S -- 64 -- I COULD SAY 64, IF I DIVIDE THAT BY

6   THE FOUR, YOU KNOW, THAT'S 16, 16 PER DEFENDANT.

7      **MR. FISHER:**  RIGHT.

8      **THE COURT:**  AND IT'S NOT -- IT'S EVEN LESS THAN THAT

9   BECAUSE MS. CORBIN REPRESENTS MULTIPLES.  SO I HAVE THREE,

10  SIX -- IT'S ABOUT LESS THAN -- IT'S ABOUT TEN PER.

11     **MR. FISHER:**  SO I CAN TELL YOU FROM TEXAS WHAT HAD

12  HAPPENED WHERE WE GOT CONTENTIONS AS TO GOOGLE AND ADOBE, AT

13  LEAST, THERE WAS COMPLETE OVERLAP AND IT WAS ALL 114 CLAIMS --

14     **THE COURT:**  SO THERE WAS COMPLETE OVERLAP BETWEEN

15  GOOGLE AND WHOM?

16     **MR. BERTA:**  ADOBE.

17     **MR. FISHER:**  OF THE FOUR PATENTS THAT WERE ASSERTED

18  AGAINST US BOTH IN TEXAS, IT WAS 114 CLAIMS, EVERY ONE OF THE

19  CLAIMS IN THOSE FOUR PATENTS.

20     WE DON'T KNOW IF THAT WILL HAPPEN HERE.

21     **MR. GARTEISER:**  YOUR HONOR, THAT WON'T HAPPEN AGAIN.

22     **THE COURT:**  WHY NOT?

23     **MR. GARTEISER:**  BECAUSE THAT WAS MORE OF A KITCHEN

24  SINK APPROACH, AND WE HAVE SINCE NARROWED OUR INFRINGEMENT

25  CONTENTIONS DOWN.

1       IN SOME OF THE CASES THERE'S OBVIOUSLY A LOT OF SOFTWARE

2   AND PROPRIETARY INFORMATION REQUIRED TO PROVE THE CASE

3   EVENTUALLY.  SO WE DO HAVE THIS ISSUE WHERE IF YOU DON'T -- IF

4   YOU REALLY WANT REALLY GOOD PATENT INFRINGEMENT CONTENTIONS,

5   PLEASE HELP US SEE THE SOURCE CODE, AND THAT'S WHAT WE HAVE

6   BEEN DOING.

7           **THE COURT:**  YOU WANT THE GEM SO THAT YOU COULD SAY

8   WHAT THE PROBLEM IS?

9           **MR. GARTEISER:**  PARDON?

10          **THE COURT:**  YOU WANT THEIR SOURCE CODE SO YOU CAN

11  TELL THEM WHAT THE PROBLEM IS.

12          **MR. GARTEISER:**  NO, YOUR HONOR.  WE WANT THE SOURCE

13  CODE TO SEE IF THERE'S AN ISSUE AT ALL AND WHETHER WE SPEND A

14  LOT OF LITIGATION MONEY.  WE ARE NOT ASKING ANYONE TO PULL

15  EMAILS AT THIS STAGE.  WE JUST WANT TO SEE IF WHAT WE THINK

16  THEY DO, BASED ON INFORMATION AND BELIEF, AND WHAT THEY TELL

17  CUSTOMERS, THEN THAT'S WHAT WE WANT TO DO.  OTHERWISE, WE ARE

18  NOT SURE EVEN HOW YOU WOULD GET AROUND THAT ISSUE.

19      WE WILL SERVE OUR INFRINGEMENT CONTENTIONS.  THIS IS MORE

20  WHEN THEY COME BACK AND TRY TO STRIKE THEM, OR MOVE TO COMPEL.

21  I'M JUST BRINGING IT UP AS AN ISSUE.

22          **THE COURT:**  OKAY.  OTHER CASES WERE IN TEXAS.  HOW

23  FAR DID THEY GO AND WHAT'S THE OVERLAP LOOK LIKE?

24          **MS. CORBIN:**  THE -- IN THE TEXAS COURT, YOUR HONOR,

25  THEY HAVE THE CLAIMS CONSTRUCTION BRIEFING IS STARTING

```
 1    AUGUST 22ND, THE CLAIM CONSTRUCTION HEARING IS SET FOR
 2    OCTOBER 1ST.  SO THE JOINT CLAIM CONSTRUCTION STATEMENT WENT
 3    IN A WEEK OR TWO AGO.
 4              MR. RAMSEY:  TWO WEEKS AGO.
 5              MS. CORBIN:  TWO WEEKS AGO.
 6              THE COURT:  BUT THOSE AREN'T ANY OF THESE DEFENDANTS.
 7              MS. CORBIN:  NO.  WE ALL STARTED IN TEXAS, BUT WE --
 8              THE COURT:  RIGHT.  IS THERE ANY -- IS IT MR. RAMSEY?
 9              MR. RAMSEY:  MR. RAMSEY.
10        IF I MAY JUST NOTE THAT I REPRESENT A MAJOR SUPPLIER OF
11    CONTENT RECOGNITION TECHNOLOGY CALLED AUDIBLE MAGIC IN TEXAS.
12    AND ONE OF THE -- THE CUSTOMER DEFENDANT THAT I REPRESENT IN
13    THIS CASE, AUDIBLE MAGIC IS ONE OF THEIR SUPPLIERS.  SO THAT
14    SUPPLIER CASE IS GOING TO PROCEED, YOU KNOW, TO ITS CONCLUSION
15    LONG BEFORE THIS CASE, AND WE HAVE ASKED TO STAY, WATCHWITH'S
16    CASE --
17              THE COURT:  THAT'S A SEPARATE ISSUE.  I DON'T WANT TO
18    DEAL WITH THAT RIGHT NOW, MR. RAMSEY.
19        THE QUESTION I'M TRYING TO UNDERSTAND IS HOW MUCH
20    INFORMATION DO YOU HAVE FROM THE TEXAS CASE THAT IS GOING TO
21    INFORM THE DECISION HERE ABOUT WHETHER OR NOT I CAN REASONABLY
22    LIMIT CLAIMS.
23              MS. CORBIN:  WELL, YOUR HONOR, I CAN JUST SAY THAT IN
24    THAT CASE, BY CLAIM CONSTRUCTION, THE PLAINTIFF HAD TO LIMIT
25    TO TEN CLAIMS PER PATENT AND NO MORE THAN 32 IN TOTAL.  SO
```

```
1    CLAIMS CONSTRUCTION IS STARTING NEXT MONTH, AND BY THEN THEY

2    HAVE TO NARROW DOWN TO THAT POINT.

3         MR. GARTEISER:  YOUR HONOR, THERE'S ANOTHER CASE IN

4    THE COURT OF FEDERAL CLAIMS, AND IN THAT CASE, THE GOVERNMENT

5    TRIED TO LIMIT THE SAME NUMBER TO 32 AND THE COURT FOUND THERE

6    THAT THAT WOULD BE IMPROPER AT THAT STAGE OF THE LITIGATION

7    WHEN THE PLAINTIFF HADN'T HAD A CHANCE TO EVEN DEVELOP ITS

8    CASE AS TO ARBITRARY (SIC) LIMIT IT TO 32.  AND 32 WAS PICKED

9    DUE TO THE SIZE OF THE CASE AND THE NUMBER OF DEFENDANTS

10   INVOLVED.

11        THE COURT:  WELL, IT CERTAINLY WILL FOCUS YOU ON

12   WHAT'S MOST ESSENTIAL.

13        MR. GARTEISER:  YOUR HONOR, IT'S AT THE PREJUDICE TO

14   THE INVENTOR IN OUR COMPANY.  THIS GOES BACK TO THAT --

15   OVERALL, YOUR HONOR, I DON'T THINK 32 WILL BE OKAY.  BUT IF

16   IT'S 32 IN TOTAL AND IT HAS TO INCLUDE THEM ALL, IT GETS A

17   LITTLE MORE DIFFICULT FOR US TO DO THAT.

18        THE COURT:  WELL --

19        MR. GARTEISER:  BUT WE DO THINK WE CAN -- WE ARE

20   TRYING TO BE REASONABLE AND TRY TO LIMIT IT DOWN TO 64.

21   THAT'S WHERE I CAME UP WITH THAT NUMBER ON THE LEFT-HAND SIDE.

22      ULTIMATELY, YOUR HONOR, WE ARE OKAY WITH LIMITING, FURTHER

23   NARROWING, IT'S JUST MORE OF THE TIMING OF WHEN THAT NARROWING

24   OCCURS IS THE ISSUE THAT THE PLAINTIFF HAS.

25        THE COURT:  WELL, YOU'RE ONLY -- LOOK, MY RULE IN
```

1    PATENT CASES IS THAT I ONLY CONSTRUE TEN TERMS.  AND I ONLY DO

2    THAT BECAUSE THESE PATENT CASES TAKE CONSIDERABLE RESOURCES.

3    THIS IS A PUBLIC INSTITUTION AND I HAVE MANY CASES.  AND IT IS

4    NOT FAIR TO ALL OF THE OTHER CASES TO GIVE ANY ONE CASE MORE

5    ATTENTION THAN IS REASONABLY NECESSARY.  AND I DEEM TEN, AS DO

6    THE REST OF MY COLLEAGUES IN THIS DISTRICT, TO BE REASONABLE.

7    THAT'S ALL YOU'RE GOING TO GET, AT LEAST IN THE FIRST

8    INSTANCE.

9        IF I NEED TO CONSTRUE OTHER TERMS IN THE CONTEXT OF

10   SUMMARY JUDGMENT OR IN THE CONTEXT OF A TRIAL, WHICH IS THE

11   ONLY POINT, RIGHT, WE ARE CONSTRUING TERMS FOR PURPOSES OF

12   ULTIMATELY AT TRIAL.

13            **MR. GARTEISER:**  CORRECT.

14            **THE COURT:**  THEN THAT'S WHEN I'LL DO IT, BUT YOU ARE

15   NOT GOING TO GET MORE THAN THAT.  SO, FOCUSING EARLY IS

16   IMPORTANT.

17       ANY OTHER INFORMATION ABOUT THE TEXAS LITIGATION AND ITS

18   OVERLAP HERE?

19       SO I HAVE COMPLETE OVERLAP BETWEEN ADOBE AND GOOGLE.  ANY

20   OTHER OVERLAPS?

21            **MS. CORBIN:**  THERE WAS SUBSTANTIAL OVERLAP WHEN WE

22   WERE IN TEXAS AND WE GOT INFRINGEMENT CONTENTIONS.  AT THE

23   POINT THEY HAVE NARROWED DOWN TO, I THINK SOME OF THE

24   BIOMETRIC COMPANIES, AOPTIX WOULD BE ONE OF THOSE, HAS

25   SLIGHTLY DIFFERENT -- THERE ARE SOME THAT DON'T MATCH, BUT THE

```
1    MAJORITY OF THE CLAIMS ARE OVERLAPPING AGAINST ALL OF THE
2    DEFENDANTS.
3            THE COURT:  DEFINE BIOMETRIC FOR ME --
4        MS. CORBIN:  THEY DO FACIAL RECOGNITION OR IRIS
5    RECOGNITION, FINGERPRINT IDENTIFICATION.
6            THE COURT:  AND ZEITERA?
7        MS. CORBIN:  ZEITERA IS IN THE SPACE WHERE YOU HAVE A
8    SECOND SCREEN, LIKE ON THE TELEVISION.
9        MR. GARTEISER:  IT RECOGNIZES WHAT'S BEING PLAYED ON
10   TV AND THEN YOU CAN TARGET ADVERTISEMENTS FOR SOMEONE WHO IS
11   WATCHING THAT SHOW.  IF YOU LIKE THIS SHOW, MAYBE YOU WANT TO
12   BUY THESE DIAPERS BECAUSE THE SHOW TALKS ABOUT A CHILD IN
13   DIAPERS.
14       MS. CORBIN:  SOUNDHOUND IS IN SOUND RECOGNITION, THE
15   MUSIC SEARCH SPACE.  I THINK THE CLAIMS AGAINST ZEITERA AND
16   SOUNDHOUND WERE LARGELY OVERLAPPING.
17      MR. RAMSEY:  AND MY POINT, YOUR HONOR, ABOUT
18   WATCHWITH WAS SIMPLY THAT AS A CUSTOMER, THE CLAIMS AGAINST IT
19   OVERLAP WITH ZEITERA AND AUDIBLE MAGIC, WHICH IS BACK IN
20   TEXAS.
21       MR. GARTEISER:  YOUR HONOR, IF IT HELPS, WE'RE
22   WILLING TO MAYBE JUST HAVE LIKE -- LIMIT IT DOWN TO 50 AND
23   THEN MAYBE FIVE INDIVIDUAL DEPENDENT CLAIMS OR FIVE CLAIMS
24   THAT ARE ABOVE AND BEYOND THAT.  WE ARE NOT TRYING TO BE
25   UNREASONABLE HERE AT ALL.
```

1    AGAIN, IT'S JUST THE TIMING OF IT.  IF WE NEED TO GET DOWN

2    TO A CERTAIN NUMBER BEFORE CLAIM CONSTRUCTION IN THIS

3    LITIGATION, WE DON'T MIND DOING THAT.  IT'S JUST I MENTIONED

4    CERTAIN ASPECTS OF IT TO YOU.

5         **THE COURT:**  I DON'T SEE THE KIND OF DELINEATION FROM

6    THE TEXAS -- AND, AGAIN, I DON'T HAVE THE PATENTS IN FRONT OF

7    ME.  EACH SIDE IS REQUESTING A TOTAL NUMBER; NO MORE THAN 32

8    ON THE DEFENDANTS' SIDE, 64 ON THE PLAINTIFF'S SIDE.

9    I DON'T SEE ANY RECOMMENDATION IN TERMS OF PER PATENT,

10   THAT KIND OF -- THE WAY THEY DID IT IN TEXAS.  IS THERE ANY

11   THOUGHT ON THAT FRONT?  YES, MR. BERTA.

12        **MR. BERTA:**  YOUR HONOR, MAYBE I AM MISSPEAKING, BUT I

13   THINK IN THE 32, IT WAS PER DEFENDANT.  SO THAT PROBABLY HELPS

14   THE DEFENDANTS, BUT PERHAPS LESS HELPS THE COURT BECAUSE THEY

15   COULD DO 32 AGAINST GOOGLE, FOR EXAMPLE, AND A DIFFERENT 32

16   AGAINST ADOBE, WHICH DOESN'T CUT DOWN ON THE TOTAL NUMBER OF

17   CLAIMS THAT THE COURT WOULD HAVE TO DEAL WITH.

18        SO, IF THE COURT WAS THINKING THAT THERE COULD BE A TOTAL

19   ABSOLUTE LIMIT OF CLAIMS AT ISSUE AND THEN A SEPARATE LIMIT

20   WITH RESPECT TO EACH DEFENDANT, I THINK THAT THAT MAKES SENSE

21   BECAUSE THAT PROVIDES ACTUALLY EFFICIENCY FOR THE COURT AS

22   WELL OR GUARANTEES EFFICIENCY TO THE COURT AS WELL.

23        SO IF IT'S SOMETHING LIKE 64 CLAIMS IN TOTAL THAT CAN

24   POSSIBLY BE ASSERTED, AND THEN IT'S NO MORE THAN SOMETHING

25   LIKE 32 OR SOMETHING FOR EACH DEFENDANT, THAT WOULD GUARANTEE

1    CAPS FOR EVERYBODY AND EFFICIENCY FOR EVERYBODY, AND MAYBE NOT

2    BE UNFAIR.

3         LIKE I SAID, WE'RE ONLY SPEAKING FOR GOOGLE, AND I DON'T

4    KNOW WHAT ANYONE ELSE'S REACTION WOULD BE.

5         **MR. GARTEISER:**   I THINK IT'S A NICE APPROACH AND I

6    LIKE IT.  SO, WE ARE NOT QUITE SURE WHAT THAT TOTAL IS, AND

7    THAT'S ONE OF THE PROBLEMS WE HAD IN THE EASTERN DISTRICT OF

8    TEXAS CASE.  WE, AS A PLAINTIFF, INTERPRETED THE JUDGE'S ORDER

9    TO LIMIT IT TO 32 FOR DEFENDANTS, AND IT WASN'T.  SO WE ONLY

10   ASSERTED 32 OVERALL.  IN FACT, SOMETIMES IT WAS MORE LIKE 31

11   FOR ONE GROUP AND THEN 31 FOR A DIFFERENT GROUP BASED ON THE

12   TECHNOLOGY AT ISSUE.

13        SO, WE WOULD LIKE TO MAYBE HAVE SOME SORT OF OVERALL CAP,

14   BUT THEN GIVE US THE FLEXIBILITY TO ASSERT CERTAIN DEPENDENT

15   CLAIMS WITH RESPECT TO -- SAY IT'S A FACIAL RECOGNITION

16   SCANNER OR SOMETHING LIKE THAT, IT MIGHT BE IN SOME DEPENDENT

17   CLAIM AGAINST A PARTICULAR DEFENDANT.

18        **THE COURT:**   MR. BERTA, GIVE ME YOUR RECOMMENDATION

19   AGAIN.

20        **MR. BERTA:**   A TOTAL OF 64 CLAIMS AT ISSUE IN THE

21   CASE.  PERIOD, ACROSS ALL PLAINTIFFS AND DEFENDANTS, BUT THAT

22   FOR ANY ONE DEFENDANT, NO MORE THAN 32 CLAIMS, WHETHER

23   DEPENDENT OR INDEPENDENT CAN BE ASSERTED AGAINST THAT

24   DEFENDANT OR PLAINTIFF IN THE CASE OF AOPTIX.

25        **THE COURT:**   MS. CORBIN?

1          **MS. CORBIN:**  YES, THAT'S AGREEABLE TO US, YOUR HONOR.

2          **THE COURT:**  MR. FISHER?

3          **MR. FISHER:**  I STILL THINK IT'S TOO MANY, BUT WE WILL

4     LIVE WITH IT, YOUR HONOR.

5          **MR. RAMSEY:**  IT'S AGREEABLE WITH WATCHWITH.

6          **THE COURT:**  ALL RIGHT.  SO ORDERED.  TOTAL OF 64, NO

7     MORE THAN 32 PER DEFENDANT.

8       OKAY.  SO YOU GET THEM SEPTEMBER 26TH.

9       DEADLINE TO MEET AND CONFER THEN IS NOVEMBER 14TH.

10       INVALIDITY CONTENTIONS JANUARY 26TH.

11       EVERYBODY -- IT SEEMS EVERYBODY IS AGREEING ON THE

12     SCHEDULE FOR AT LEAST THE NEXT SET.  SO SIMULTANEOUS EXCHANGE

13     OF PROPOSED TERMS AND CLAIM ELEMENTS --

14          **MR. GARTEISER:**  YOUR HONOR, ON THAT WE HAD AN ISSUE,

15     IF I MAY BE HEARD.

16          **THE COURT:**  YOU CAN, ALTHOUGH THE CHART HERE SAYS

17     IT'S IDENTICAL.

18          **MR. GARTEISER:**  YES, YOUR HONOR.

19       WELL, WE WERE -- WE WANTED TO FOLLOW THE LOCAL RULES ON

20     THAT, AND IT CAME TO MY ATTENTION AFTER THIS THAT

21     SIMULTANEOUS -- OR DURING THIS PROCESS, ACTUALLY, THAT IT'S

22     NOT SIMULTANEOUS NORMALLY.

23       NORMALLY THE PLAINTIFF WOULD GO FIRST AND THEN THE

24     DEFENDANTS WOULD FILE AN OPPOSITION, AND THEN THE PLAINTIFF

25     WOULD FILE A REPLY.

1    AND THE WHOLE EARLY BRIEFING ON THE INDEFINITENESS IS NOT

2  NORMALLY PART OF THE PROCEDURE EITHER --

3         **THE COURT:**  HOLD ON.  WE HAVEN'T GOTTEN TO THAT YET.

4         **MR. GARTEISER:**  OKAY.

5         **THE COURT:**  I AM ON SIMULTANEOUS EXCHANGE -- I DON'T

6  HAVE THE RULE IN FRONT OF ME.  IT SAYS THIS IS PURSUANT TO

7  PATENT LOCAL RULE 4-1, IS IT NOT?

8         **MR. FISHER:**  THAT'S CORRECT, YOUR HONOR.

9         **MR. GARTEISER:**  I GOT AHEAD OF MYSELF.

10        **THE COURT:**  ALL RIGHT.

11    SO, THAT'S ORDERED 14 DAYS AFTER SERVICE OF THE INVALIDITY

12  CONTENTIONS.

13    COMPLETION OF CLAIM CONSTRUCTION DISCOVERY.  THAT'S THE

14  PER THE RULE, SO THAT'S ORDERED.

15    SIMULTANEOUS EXCHANGE OF PRELIMINARY CLAIM CONSTRUCTION

16  PER THE RULE.  OKAY.

17    JOINT CLAIM CONSTRUCTION PREHEARING STATEMENTS, FINE, PER

18  THE RULE.

19    SO WHAT DOES THAT BRING US TO?  WHERE ARE WE, ASSUMING

20  THAT THE INVALIDITY CONTENTIONS ARE SERVED ON THE 26TH, YOU

21  GET TWO WEEKS, 30 DAYS, SO WE ARE AT ABOUT JUNE 1ST; IS THAT

22  RIGHT?

23        **MR. FISHER:**  SOUNDS RIGHT.  OKAY.

24        **THE COURT:**  OKAY.  IS THIS THE POINT YOU WANTED TO

25  DISCUSS?

1          **MR. GARTEISER:**  IT IS, YOUR HONOR.

2          **THE COURT:**  WHY WOULD I DO THIS, MR. FISHER?

3          **MR. FISHER:**  WELL, THERE'S TWO THINGS.  ONE IS --

4          **THE COURT:**  LET'S PUT THE MIC IN FRONT OF YOU.

5          **MR. FISHER:**  SURE.

6      SO MR. BERTA MAY BE BETTER AT STATING THIS THAN I AM, BUT

7  THE GENERAL GIST, AS WE RAISED EARLIER, IS WE THINK THERE'S

8  SOME FUNDAMENTAL ISSUES WITH THE PATENTS THAT WE WANTED TO

9  BRING TO THE COURT'S ATTENTION AT THE EARLIEST REASONABLE

10 POINT, WHICH SEEM TO BE IN CONJUNCTION WITH CLAIMS

11 CONSTRUCTION WHERE WE MIGHT RAISE WITH THE COURT ISSUES UNDER

12 SECTION 101 OR ISSUES OF INDEFINITENESS UNDER SECTION 112.

13     OUR THOUGHT WAS THAT IF IT WOULD BE AGREEABLE TO THE

14 COURT, THAT WE CAN BRIEF THESE ISSUES AT THE SAME TIME WITH

15 CLAIM CONSTRUCTION SO THAT THE COURT COULD DEAL WITH THEM

16 WHILE CONSTRUING THE CLAIMS OF THE TERMS WHICH SEEM TO MAKE

17 SENSE TO US.

18         **MR. GARTEISER:**  YOUR HONOR, AND OUR POSITION IS

19 THAT'S A SEPARATE DECISION OF THE COURT THAN THE SIMULTANEOUS

20 FILING OF CLAIM CONSTRUCTION BRIEFING, AND THEN SOMETIME LATER

21 SIMULTANEOUS EXCHANGE OF OPPOSITION BRIEFING.  SO --

22         **THE COURT:**  I CONSIDER THESE TO BE TWO SEPARATE

23 ISSUES, FRANKLY.  I MEAN, IF I LET YOU HAVE AN EARLY SUMMARY

24 JUDGMENT, THEN, YOU KNOW, THAT REALLY IS A SEPARATE ISSUE FROM

25 CLAIM CONSTRUCTION.

1        WELL, LET'S TALK JUST ABOUT THE CLAIM CONSTRUCTION.

2        THIS IS NOT IN THE LOCAL RULES, BUT YOU HAVE TO FOLLOW IT.

3    I REQUIRE THAT PARTIES EXCHANGE IN ADVANCE, AND IT'S IN MY

4    STANDING ORDER WITH RESPECT TO PATENT LITIGATION, I REQUIRE

5    THAT YOU EXCHANGE IN ADVANCE A STATEMENT OF THE IMPORT OF THE

6    MEANING THAT YOU ARE ASSERTING IN YOUR CLAIMS CONSTRUCTION.

7        AND I WAS ENCOURAGED TO DO THIS BY JUDGE O'MALLEY FROM THE

8    FEDERAL CIRCUIT, ONE OF OUR FEW TRIAL JUDGES UP THERE, AND BY

9    PROFESSOR LEMLEY OF STANFORD.  AND THE POINT OF THIS IS, IT'S

10   KIND OF A HYBRID, WE ARE NOT QUITE AT THE SUMMARY JUDGMENT

11   STAGE, BUT THERE ARE THOSE ON THIS BENCH WHO BELIEVE IN THE

12   PURITY OF CLAIM CONSTRUCTION, AND THAT'S ALL THEY DO AND THEY

13   DO IT IN A VACUUM, AND THAT'S HOW THEY DO IT.  AND THEIR VIEW

14   IS I'M NOT GOING TO DO ANY MORE EXTRA WORK THAN I HAVE TO.

15   USUALLY ONCE I CONSTRUE THEM, THE CASES RESOLVE AND GO AWAY.

16       THERE ARE OTHERS ON THE BENCH WHO REFUSE TO DO CLAIMS

17   CONSTRUCTION IN ANY CONTEXT OTHER THAN SUMMARY JUDGMENT.  AND

18   IN THAT CIRCUMSTANCE THE THEORY IS THAT THEY CANNOT CONSTRUE

19   IT WITHOUT UNDERSTANDING THE CONTEXT AND THE MEANING.

20       TO CONSTRUE CLAIMS SOLELY IN THE CONTEXT OF SUMMARY

21   JUDGMENT TENDS TO COST LITIGANTS A LOT MORE MONEY, SO I FOLLOW

22   THE HYBRID APPROACH, WHICH IS EFFECTIVELY TO REQUIRE THAT YOU

23   NOT PLAY GAMES, NOT HIDE THE BALL, AND EXPLAIN TO THE OTHER

24   SIDE WHY YOU WERE CONSTRUING A TERM IN A PARTICULAR WAY.

25   BECAUSE SOMETIMES WHAT HAPPENS IS ONCE THE OTHER SIDE HEARS

1    WHY YOU WANT TO CONSTRUE IT IN THAT PARTICULAR WAY, THE ISSUE

2    SOMETIMES GOES AWAY.  AND IT IS HELPFUL IN TERMS OF AN

3    EXCHANGE OF INFORMATION.  THAT'S WHY I DO THAT ON THE CLAIM

4    CONSTRUCTION SIDE.

5        THAT BEING SAID, I HAD A CASE LAST YEAR WHERE I RECEIVED

6    ALL THE CLAIM CONSTRUCTION BRIEFS, AND IT WAS CLEAR, ONCE I

7    RECEIVED THEM, THAT IT WAS POINTLESS FOR ME TO CONSTRUE THE

8    TERMS AND I REALLY NEEDED TO HAVE A SUMMARY JUDGMENT BECAUSE

9    OF THE VARIETY OF ISSUES THAT WERE HAPPENING IN THAT CASE.  SO

10   I HAD ALL THE BRIEFING ON WHAT THEY BELIEVED THEIR -- HOW

11   THEIR TERMS SHOULD BE CONSTRUED, BUT THEN I REQUIRED THEM TO

12   JUST BRIEF THE SUMMARY JUDGMENT, AND I HAD THE DUAL SETS OF

13   MOTIONS.  BUT IT WASN'T UNTIL I HAD REALLY GOTTEN INTO THE

14   NITTY-GRITTY OF THE CASE, HAD THE VARIOUS TERMS, WENT THROUGH

15   THE TUTORIAL, HEARD THE ARGUMENT THAT I HAD ENOUGH INFORMATION

16   IN FRONT OF ME TO WARRANT SUGGESTING TO THE PARTIES OR

17   AGREEING THAT AN EARLY SUMMARY JUDGMENT WAS APPROPRIATE.

18       SO, I THINK THAT THERE ARE CERTAINLY CASES, AND I HAVE TO

19   SAY, MR. GARTEISER, CERTAINLY IN THE CONTEXT OF METHOD PATENTS

20   WHERE EARLY SUMMARY JUDGMENTS ARE APPROPRIATE TO TRY AND

21   FIGURE OUT WHETHER THERE IS ANYTHING THERE THERE.  BUT I'M NOT

22   SAYING THAT, I DON'T KNOW ANYTHING OTHER --

23            MR. GARTEISER:  IT WON'T BE CASE DISPOSITIVE EITHER,

24   YOUR HONOR, BECAUSE THERE'S GOING TO BE MORE THAN METHOD

25   CLAIMS ASSERTED.  THIS IS NOT LIKE A REM CASE WHERE SUDDENLY

```
1    THE SERVER IS OFFSHORE SO THERE'S NO INFRINGEMENT.

2         THERE'S NOT A CLEAN ISSUE FOR EARLY SUMMARY JUDGMENT IN

3    OUR OPINION, AND IN THE TEXAS CASE, THE ONLY EARLY SUMMARY

4    JUDGMENT MOTION IS FOR IF YOU HAVE A LICENSING DEFENSE, SO

5    IT'S A LOT CLEANER, LET'S SAY.

6              MR. RAMSEY:   THERE IS A PROVISION IN THE SCHEDULE

7    THERE FOR AN INDEFINITENESS MOTION FOR SUMMARY JUDGMENT THREE

8    WEEKS FROM NOW ALONG WITH CLAIM CONSTRUCTION.

9              MR. GARTEISER:   THAT IS TRUE.

10             MR. BERTA:   YOUR HONOR, CAN I SPEAK BRIEFLY?

11             THE COURT:   YES.

12             MR. BERTA:   THE ONLY -- WE WERE SORT OF DRIVING THIS

13   TO PUT THIS IN.  AND WE'VE READ YOUR STANDING ORDER AND YOUR

14   LOCAL RULES, AND WE UNDERSTAND EXACTLY WHAT YOU WANT FROM US.

15        WE ONLY PUT THIS IN HERE FOR PART AS HAVING A DISCUSSION

16   ON THIS ISSUE BECAUSE I -- HOW CAN YOU -- EVERYONE PROBABLY

17   COMES IN AND SAYS THEY HAVE A SILVER BULLET CASE DISPOSITIVE

18   ISSUE, AND YOU CAN'T POSSIBLY KNOW AT THIS POINT.

19        I JUST WANTED TO RAISE IT BECAUSE WE DON'T WANT YOU TO BE

20   SURPRISED IN OUR -- BECAUSE I THINK OUR CLAIM CONSTRUCTION

21   BRIEFING IN THIS CASE IS GOING TO BE PRETTY COMPLICATED BY A

22   LOT OF 112 AND 101 ISSUES THAT DON'T SHOW UP IN OTHER CASES

23   LIKE THIS WHERE THERE'S JUST A CLEAN CLAIM CONSTRUCTION.

24        SO WE THINK THIS COULD BE THE LIKE THE PRIOR CASE YOU WERE

25   REFERENCING AND WE JUST WANT A DECISION -- A POINT AT WHICH
```

```
1    YOU COULD -- THIS COURT COULD BE ABLE TO ENGAGE ON THAT ISSUE

2    AND MAKE IT'S OWN DETERMINATION AS TO WHETHER THIS WAS ONE OF

3    THOSE CASES OR NOT, AND NOT JUST HAVE IT COME OUT OF NOWHERE

4    DURING CLAIM CONSTRUCTION.

5            MR. GARTEISER:  AND, YOUR HONOR, IF IT ENDS UP

6    THERE'S FACTUAL ISSUES UNDERLYING THE LEGAL ISSUES AND A

7    MOTION UNDER 101 OR 112 IS DENIED BY THE COURT, WE WOULD LIKE

8    TO BE ABLE TO INSTRUCT THE JURY THAT THIS ISSUE WAS RAISED AND

9    THEY SHOULD BE PRECLUDED FROM BRINGING IT UP AGAIN.

10           THE COURT:  AND YOU THINK I'M GOING TO GIVE YOU A

11   DECISION ON THAT TODAY NOT KNOWING ANYTHING?

12           MR. GARTEISER:  I'M JUST SAYING, YOUR HONOR, IS IT

13   GOING TO BE CROSS-MOTIONS?  SO CROSS-MOTIONS FOR VALIDITY --

14           THE COURT:  SOMETIMES THEY ARE AND SOMETIMES THEY

15   AREN'T.

16           MR. GARTEISER:  I THINK THAT'S WHAT WE WOULD TEE IT

17   UP AS.

18           THE COURT:  I THINK WE ARE GETTING AHEAD OF

19   OURSELVES.

20       IN TERMS OF THE BRIEFING, JUST USE THE LOCAL RULES RIGHT

21   NOW FOR PURPOSES OF BRIEFING ON THE CLAIM CONSTRUCTION.  BUT

22   WE WILL BE MEETING AGAIN BEFORE THAT TIME, AND I CAN FIGURE

23   OUT ONCE I HAVE SOME MORE INFORMATION, ONCE THE LANDSCAPE HERE

24   IS A LITTLE BIT MORE SETTLED, WHETHER OR NOT AN EARLIER

25   SUMMARY JUDGMENT MIGHT BE APPROPRIATE.
```

1      AND I'M NOT SAYING THAT IT ISN'T, I'M JUST SAYING THAT I

2   DON'T HAVE A LOT OF INFORMATION RIGHT NOW.

3           MR. GARTEISER:  YOUR HONOR, ALONG THOSE LINES, WOULD

4   IT BE APPROPRIATE FOR US TO FILE ALSO THE CROSS-MOTIONS?

5           THE COURT:  SOMETIMES, BUT UNDERSTAND, YOU GET ONE

6   SUMMARY JUDGMENT MOTION.  SO, YOU TAKE IT, YOU TAKE YOUR SHOT

7   OR YOU DON'T.

8           MR. GARTEISER:  I AM GLAD YOU CLARIFIED IT.  EACH

9   DEFENDANT ONLY GETS ONE OR EACH PARTY, HOW DOES IT WORK?

10          THE COURT:  UNLESS I GIVE YOU LEAVE OTHERWISE.

11          MR. GARTEISER:  OKAY.

12          THE COURT:  AND SOMETIMES IF I -- YOU KNOW, SOMETIMES

13  I DO.  THAT IS, WHERE I SEE A VERY, VERY NARROW ISSUE, I WILL

14  LET SOMEONE BRING AN EARLY ONE WITHOUT WAIVING THEIR RIGHT TO

15  BRING A GENERAL ONE LATER.  BUT THE GENERAL RULE IN THIS

16  DISTRICT IS YOU GET ONE SUMMARY JUDGMENT, AND THAT'S IT.

17          MR. GARTEISER:  WE APPRECIATE THE EXTRA TIME TO VET

18  THAT ISSUE, YOUR HONOR, BECAUSE IT INVOLVES A LOT OF EXPERT

19  TESTIMONY AS WELL ON WHETHER ONE OF ORDINARY SKILL IN THE ART

20  WOULD BE ABLE TO MAKE SENSE OF --

21          THE COURT:  WHO IS SOMEONE OF ORDINARY SKILL IN THE

22  ART, AN MBA?

23          MR. GARTEISER:  YOUR HONOR, WE WOULD PROBABLY HAVE --

24  WE WOULD PROBABLY HAVE DISCUSSIONS ABOUT THIS THAT LAST A LONG

25  TIME.

1          **THE COURT:**  WELL, IT PROBABLY WILL BE SHORT BECAUSE

2    YOU WON'T AGREE.

3          **MR. GARTEISER:**  PARDON?

4          **THE COURT:**  I SAID, THEY PROBABLY WILL BE SHORT

5    BECAUSE YOU WON'T AGREE.

6          **MR. GARTEISER:**  WELL, ULTIMATELY WE NEED TO COME TO

7    SOME RESOLUTION ON THAT.  MAYBE WE CAN PUT THAT AS AN ACTION

8    ITEM THAT WE HAVE TO GIVE TO YOU BY NEXT MEETING.

9          **THE COURT:**  OKAY.  WHEN CAN YOU GET YOUR OPENING

10   BRIEF ON FILE?  DO I HAVE SOMETHING -- ANYBODY HAVE THE LOCAL

11   RULE HANDY?

12         **MR. GARTEISER:**  AUGUST 1ST, YOUR HONOR, WOULD BE THE

13   DATE WE RECOMMENDED.

14         **THE COURT:**  THAT'S 60 DAYS.  I THINK THE PATENT RULES

15   IS WHAT, 45 DAYS?

16         **MR. GARTEISER:**  WE CAN COMPLY WITH THE 45 DAYS.

17         **THE COURT:**  LET ME ALSO PUT YOU ALL ON NOTICE NOW,

18   LOOKING AT WHERE WE ARE, I FIND OUT -- I HAVE A

19   MULTI-DEFENDANT VICAR, RICO, DOUBLE DEATH PENALTY CASE GOING

20   TO TRIAL IN SEPTEMBER OF NEXT YEAR.

21      IF ATTORNEY GENERAL HOLDER DOES NOT SIGN THE DEATH

22   WARRANTS, IT WILL CHANGE THE LANDSCAPE OF THAT CASE.  I SHOULD

23   FIND OUT IN SEPTEMBER.

24      IF I'M GOING TO TRIAL IN THAT CASE IN SEPTEMBER OF NEXT

25   YEAR, WHICH IS THE SCHEDULED TRIAL DATE, IT'S GOING TO TAKE ME

1    THREE TO FOUR MONTHS TO TRY THAT CASE.  I AM TOLD BY MY

2    COLLEAGUE IN HAWAII WHO JUST FINISHED ONE THAT IT TOOK HIM SIX

3    WEEKS TO PICK HIS JURY.

4        YOU CAN EXPECT THAT OTHER THINGS WILL BE PUT TO THE SIDE.

5    SO I'M JUST LETTING YOU KNOW RIGHT NOW.  WE WILL PUT THE

6    SCHEDULE TOGETHER, BUT THAT WILL TAKE PRIORITY UNDER ALL

7    CIRCUMSTANCES.  OKAY?

8        SO, IF WE'VE GOT JUNE 1ST FOR THE DATE THAT THE PREHEARING

9    STATEMENTS ARE DUE, JULY 17TH FOR OPENING BRIEFS.  UNDER OUR

10   RULES WE GENERALLY DO 14 DAYS FOR RESPONSIVE.  YOU CAN HAVE

11   MORE, IF YOU NEED.

12           **MS. CORBIN:**  TWENTY-ONE IF WE COULD, YOUR HONOR.

13           **THE COURT:**  OKAY.

14           **MR. GARTEISER:**  PLAINTIFF IS AGREEABLE TO THAT.

15           **THE COURT:**  THAT WOULD BE AUGUST 7TH.  FOR RESPONSIVE

16   REPLY, WE GENERALLY WOULD GET SEVEN, YOU WANT THE EXTRA WEEK?

17           **MR. GARTEISER:**  YES, PLEASE.

18           **THE COURT:**  AUGUST 21ST.

19       AND THEN AFTER ALL THE BRIEFING IS DONE, TYPICALLY THAT'S

20   WHEN WE WOULD DO THE TUTORIAL AND THEREAFTER THE CLAIMS

21   CONSTRUCTION HEARING.

22       I'M BEGINNING TO WONDER IN SOME OF THESE CASES, AND IT WAS

23   SUGGESTED BY THE PLAINTIFF HERE THAT I HAVE TUTORIALS EARLIER

24   JUST TO BEGIN TO UNDERSTAND THE TECHNOLOGY THAT ALL OF YOU ARE

25   WORKING WITH FOR MONTHS AND MONTHS IN ADVANCE.

1    I DID CONTACT JUDGE CORLEY TO MAKE SURE SHE WAS AVAILABLE

2    TO ASSIST IN THIS CASE, AND SHE IS.  SO I'M NOT EXACTLY SURE

3    WHETHER I NEED IT EARLY, BUT IF YOU'RE THINKING YOU WANT TO DO

4    SOMETHING LIKE BRIEF, YOU KNOW, BRING AN EARLY SUMMARY

5    JUDGMENT, IT SEEMS TO ME I'M GOING TO NEED THE CONTEXT.  I'M

6    GOING TO NEED TO KNOW SOMETHING.

7    SO IT MAY BE WORTHWHILE TO HAVE YOU IN IN BETWEEN WHEN THE

8    STATEMENT IS DUE, PERHAPS, AND WHEN THE BRIEFS ARE DUE TO GET

9    A TUTORIAL, PERHAPS TO HAVE YOU TEE UP FOR ME EARLY WHICH ARE

10   THE TEN TERMS THAT ARE GOING TO BE CONSTRUED IN THESE VARIOUS

11   PATENTS SO THAT I CAN BEGIN TO GET MY HEAD AROUND WHAT ALL

12   THESE ISSUES ARE.  IT IS JUST A SUGGESTION GIVEN THE CONFINES

13   OF THIS CASE.

14   **MR. GARTEISER:**  YOUR HONOR, IF I MAY.  SOMETIMES IF

15   THE TUTORIAL INVOLVES LIKE DISPUTED TERMS --

16   **THE COURT:**  NOT IN MY COURTROOM.

17   **MR. GARTEISER:**  I WANTED TO CLARIFY THAT.  OKAY.

18   **THE COURT:**  IT REALLY IS A TUTORIAL.  I'M JUST TRYING

19   TO UNDERSTAND.  AND USUALLY I BEGIN TO START WITH THE DEFENSE

20   BECAUSE THE DEFENSE TENDS TO SAY THIS IS THE WHOLE HISTORY,

21   AND THIS IS WHAT EVERYBODY IS DOING, THESE ARE ALL THE ISSUES,

22   AND THAT'S HOW THEY USUALLY BEGIN THEIR PRESENTATIONS.

23   THE PLAINTIFF THEN USUALLY SAYS, YOU KNOW, THIS IS THE

24   VERY SPECIFIC ISSUE THAT WE, YOU KNOW, THAT WE SOLVED OR

25   HERE'S WHAT WE DID, WHATEVER.

```
 1        IN TERMS OF THE WAY MY BRAIN THINKS, I NEED TO UNDERSTAND

 2   THE BIG PICTURE BEFORE I CAN UNDERSTAND THE -- I NEED TO

 3   UNDERSTAND THE FOREST BEFORE I CAN UNDERSTAND THE TREES.  SO I

 4   TEND TO START WITH THE DEFENDANTS.  I GO BACK AND FORTH, BUT I

 5   THINK IN THIS CASE THAT PROBABLY WOULD BE THE RIGHT APPROACH.

 6   IT'S NOT GOOD OR BAD, IT'S JUST THE WAY I THINK.

 7        THERE WILL NOT BE A COURT REPORTER FOR THOSE TUTORIALS.  I

 8   DO NOT BECAUSE I FOUND THAT SOMETIMES PEOPLE GO BACK AND MAKE

 9   REFERENCE TO THOSE TRANSCRIPTS AND IT'S NOT APPROPRIATE, SO

10   THEY ARE OFF THE RECORD AND THEY ARE INTENDED TO BE OFF THE

11   RECORD.  OKAY?

12        SO, THOUGHTS ON DOING A TUTORIAL IN BETWEEN THOSE TWO TIME

13   PERIODS AND THEN BEING ABLE TO HAVE SOME MORE INFORMED

14   DISCUSSIONS?

15        MS. CORBIN:  FOR MY DEFENDANTS, YOUR HONOR, I THINK

16   IT WOULD BE VERY USEFUL.

17        MR. FISHER:  WHATEVER IS THE COURT'S PREFERENCE, WE

18   THINK THAT'S FINE.

19        MR. RAMSEY:  IT IS FINE WITH WATCHWITH.

20        MR. BERTA:  WE WOULD APPRECIATE THE OPPORTUNITY.  I

21   THINK THAT WOULD BE APRIL OR MAY?  IS THAT WHERE WE'RE

22   LOOKING?

23        THE COURT:  WELL, YOUR JOINT CLAIM CONSTRUCTION AND

24   PREHEARING STATEMENT IS DUE JUNE 1ST.  SO I WAS THINKING

25   BETWEEN JUNE 1ST AND WHEN YOUR BRIEFS ARE DUE.
```

1              MR. FISHER:  IT MAKES SENSE.

2              MR. GARTEISER:  IT JUST DEPENDS, YOUR HONOR.  I'M NOT

3     QUITE SURE IF YOU WANTED A TUTORIAL FROM THE PLAINTIFF, WE

4     SURELY WOULD LIKE TO PROVIDE ONE.

5              THE COURT:  NO.  ABSOLUTELY.

6              MR. GARTEISER:  OKAY.

7              THE COURT:  SO I GET ONE FROM EACH SIDE.  I DON'T

8     WANT TO HEAR -- WELL, IT DEPENDS.  IF YOU HAVE GOOD EXPERTS,

9     I'M HAPPY TO HEAR FROM THE EXPERTS.  SOMETIMES I ALWAYS THINK

10    IT'S A GOOD TEST FOR THE LAWYERS TO SEE HOW GOOD THEY CAN

11    EXPLAIN THINGS, SO I FREQUENTLY HEAR FROM EXPERTS FOR THE

12    TUTORIALS.

13             MR. BERTA:  YOUR HONOR?

14             THE COURT:  SIR.

15             MR. BERTA:  ON THE SCHEDULE, THE DATES AREN'T

16    ADDITIVE IN SOME PORTIONS.

17       SO I HEARD THE JUNE 1 DATE, AND I WASN'T NECESSARILY SURE.

18    THE JOINT CLAIM CONSTRUCTION AND PREHEARING STATEMENT, IF IT'S

19    60 DAYS AFTER THE INVALIDITY CONTENTIONS, WOULD BE END OF

20    MARCH.

21             THE COURT:  RIGHT.

22             MR. BERTA:  AND THEN WE HAVE ANOTHER SET OF TIME FOR

23    CLAIM CONSTRUCTION DISCOVERY AFTER THAT, SO WE WILL STILL BE

24    DOING THINGS PRIOR TO BRIEFING, BUT THERE'S SOME AMOUNT OF

25    SPACE BETWEEN BRIEFING AND THE JOINT CLAIM CONSTRUCTION

```
 1    STATEMENT.

 2              MR. GARTEISER:  FROM OUR EXPERIENCE, YOUR HONOR, IN

 3    ED TEXAS --

 4              THE COURT:  HOLD ON.  LET ME FIGURE OUT THESE

 5    NUMBERS.  LET ME GO BACK.  INVALIDITY CONTENTIONS ARE

 6    JANUARY 26TH.  SIMULTANEOUS EXCHANGE THEN ARE DUE

 7    FEBRUARY 9TH.

 8              MR. BERTA:  THE NEXT GUY'S OUT OF ORDER.

 9              THE COURT:  YES, IT IS.

10         THEN THE NEXT ONE IS SIMULTANEOUS EXCHANGE OF PRELIMINARY

11    CLAIM CONSTRUCTION MARCH 2ND.

12         I WAS OFF.  THANK YOU.

13         SO, YOUR PREHEARING STATEMENT IS ACTUALLY DUE LIKE

14    APRIL 1ST, NOT JUNE 1ST, RIGHT?

15              MR. BERTA:  ROUGHLY, YES, YOUR HONOR.  RIGHT,

16    FEBRUARY IS LITTLE.  YES, YOUR HONOR.

17              THE COURT:  OKAY.  SO I WAS OFF.  THANK YOU.

18         SO IF YOUR PREHEARING STATEMENT IS DUE APRIL 1ST, THEN YOU

19    WANT TO HAVE YOUR BRIEFS IN MUCH SOONER.  NOT IN JULY.

20              MR. BERTA:  THERE'S --

21              THE COURT:  THEN YOU WOULD HAVE THEM IN MID-MAY.

22              MR. BERTA:  THERE'S 30 DAYS OF DISCOVERY FOLLOWING

23    THE STATEMENT, WHICH WOULD TAKE US TO THE END OF APRIL OR SO,

24    AND THEN SOME AMOUNT OF TIME THEREAFTER FOR THE BRIEFING

25    BEGINNING IN MAY.
```

```
1            THE COURT:  OKAY.  SO WHEN DO YOU WANT YOUR OPENING
2    BRIEFS?
3            MR. BERTA:  IS THE END OF MAY ACCEPTABLE TO THE
4    COURT?  WELL, EXCEPT FOR MEMORIAL DAY, AROUND THE END, MAYBE
5    RIGHT BEFORE MEMORIAL DAY?
6            THE COURT:  DOES THAT WORK?
7            MR. GARTEISER:  YES, YOUR HONOR.
8            THE COURT:  LET'S GET YOU BACK THEN ON TUESDAYS.  SO
9    WE WILL DO IT AFTER MAY.  JUNE 2ND FOR OPENING BRIEFS, AND
10   THEN WE SAID THREE WEEKS WOULD BE JUNE 23RD, AND TWO WEEKS,
11   JULY 7TH.
12           MR. GARTEISER:  AND, YOUR HONOR, JUST TO BE CLEAR
13   WHEN YOU SAY "OPENING BRIEFS", IT'S REALLY GOING TO BE ONE
14   BRIEF FROM THE PLAINTIFF.
15           THE COURT:  CORRECT.
16           MR. GARTEISER:  FOR ALL FIVE OR FOUR PATENTS.
17           THE COURT:  CORRECT.
18           MR. GARTEISER:  OKAY.
19           THE COURT:  OKAY.  SO THEN BETWEEN APRIL 1ST AND
20   JUNE 2ND IS WHEN WE WILL DO A TUTORIAL.
21       HOW ABOUT FRIDAY, MAY 1ST?  AND THAT WOULD BE AT TEN A.M.
22   DOES THAT WORK?
23           MS. CORBIN:  YES, YOUR HONOR.
24           THE COURT:  SO PUT IT ON FOR TUTORIAL AND STATUS
25   CONFERENCE.  AT THAT POINT YOU CAN -- WE CAN HAVE A DISCUSSION
```

1    ABOUT SUMMARY JUDGMENTS AND HOW THINGS WILL PLAY OUT IN TERMS

2    OF CLAIM CONSTRUCTION.  OKAY?  THAT'S ACTUALLY MUCH BETTER

3    BECAUSE THAT GETS IT TEED UP A COUPLE OF MONTHS EARLIER THAN

4    THE TRIAL, SO IT WORKS BETTER.

5        OKAY.  LET'S SEE.  THERE IS A MOTION TO STAY.

6            **MR. GARTEISER:**  YOUR HONOR, WE HAVEN'T HAD A CHANCE

7    TO FILE AN OPPOSITION TO THAT, BUT IF THE COURT WANTS TO RULE

8    FROM THE BENCH, IF I COULD HAVE TWO MINUTES OF ARGUMENT WE CAN

9    RESOLVE IT, OR THE JUDGE CAN MAKE A DECISION EITHER FOR IT OR

10   AGAINST IT.

11           **THE COURT:**  WELL, I READ WHAT YOU PUT IN YOUR PAPERS.

12   I MEAN, I READ WHAT YOU PUT IN THE STATUS CONFERENCE

13   STATEMENT.  I TAKE IT YOU ARE OPPOSING THE MOTION?

14           **MR. GARTEISER:**  THAT'S CORRECT, YOUR HONOR.  WE JUST

15   THINK THAT THE BEHAVIOR OF THAT PARTICULAR DEFENDANT IS HIDE

16   THE BALL.  IF WE HAD KNOWN THEY WERE AN AUDIBLE MAGIC

17   CUSTOMER --

18           **THE COURT:**  SHOULD I SEND IT BACK TO THE EASTERN

19   DISTRICT?

20           **MR. RAMSEY:**  WE PREFER TO STAY IN THE NORTHERN

21   DISTRICT OF CALIFORNIA.  THE SEQUENCE OF EVENTS -- WE FILED A

22   MOTION ON FRIDAY.  I'M SURE THE COURT HAS NOT HAD A CHANCE TO

23   LOOK AT IT.

24           **THE COURT:**  I HAVEN'T LOOKED AT IT.  I HEARD IT WAS

25   FILED.

1          **MR. RAMSEY:**  VERY BRIEFLY, THE HIGH LEVEL SITUATION

2     IS THIS.  IN THE ZEITERA COMPLAINT, WATCHWITH WAS ACCUSED AS A

3     ZEITERA CUSTOMER.  IT'S A SINGLE SET OF DEFENDANTS NOW

4     TRANSFERRED TO THIS COURT.

5          FEBRUARY THE 26TH OF THIS YEAR, I BELIEVE IT WAS

6     FEBRUARY 26TH, BLUE SPIKE SERVED ITS INFRINGEMENT CONTENTIONS

7     IN TEXAS AGAINST WATCHWITH.

8          FOR THE VERY FIRST TIME, NOW IT ASSERTS ZEITERA AS A

9     SUPPLY OF WATCHWITH AND ALSO AUDIBLE MAGIC, MY CLIENTS IN

10    TEXAS.  SO NOW THE ACCUSATIONS IN THE INFRINGEMENT CONTENTIONS

11    GO BEYOND THE COMPLAINT.

12         WATCHWITH HAD ALREADY FILED A MOTION TO TRANSFER TO THIS

13    COURT TO FOLLOW ZEITERA AND FILED SUCH A MOTION.  TEXAS RULED

14    ON THE TRANSFER BEFORE THERE WAS ANY -- EVER ANY, YOU KNOW,

15    ANY SORT OF CONVERSATION ABOUT THE FACT THAT NOW AUDIBLE

16    MAGIC -- AUDIBLE MAGIC IS ACCUSED AS A SUPPLIER OF WATCHWITH

17    IN TEXAS.

18         I THINK IT DOESN'T MATTER AT THE END OF THE DAY.  EITHER

19    WATCHWITH IS GOING TO BE HERE WITH ONE SUPPLIER OR IN TEXAS

20    WITH ONE SUPPLIER, BUT THERE'S ALWAYS GOING TO BE ONE SUPPLIER

21    IN ONE VENUE OR ANOTHER.

22         THE FACT IS THAT WATCHWITH SIMPLY -- IT'S A SOFTWARE

23    PACKAGE BOTH FROM MS. CORBIN'S CUSTOMER, JUST IN THE CONTEXT

24    OF TESTING, OR FROM AUDIBLE MAGIC, MY OTHER CLIENT, AND USES

25    IT IN SOME WAY.  THEY HAVE NO IDEA WHAT'S IN THAT BOX.  SO

```
1    IT'S EXACTLY THE KIND OF CASE I THINK WE CAN STAY.

2            THE COURT:  SO HAVE YOU -- THE ACTION THAT IS PENDING

3    IN TEXAS, HAVE YOU FILED -- HAVE YOU AMENDED THE COMPLAINT OR

4    SOMEHOW ADDED THAT WATCHWITH AS A DEFENDANT THERE?

5            MR. GARTEISER:  WELL, YOUR HONOR, AFTER THE TRANSFER,

6    I BELIEVE THAT WE -- WE KIND OF -- WE WEREN'T ABLE TO DO THAT

7    ANYMORE.  ARE YOU TALKING ABOUT AUDIBLE MAGIC, DID WE AMEND TO

8    INCLUDE WATCHWITH?

9            THE COURT:  NOW THAT THEY'VE DISCLOSED THEY ARE A

10   CUSTOMER OF AUDIBLE.

11           MR. GARTEISER:  WE DID NOT AMEND THAT COMPLAINT.  THE

12   DEADLINE -- I BECAME AWARE OF THAT IN OUR MEET AND CONFER

13   PROCESS.  I WILL GIVE MY COLLEAGUES OR FELLOW MEMBERS OF THE

14   BAR HERE CREDIT FOR.  I THOUGHT WE HAD A PRETTY GOOD MEET AND

15   CONFER PROCESS.  THAT'S WHEN IT CAME OUT.

16       ZEITERA JUST HAD A -- WATCHWITH WAS JUST KIND OF USING

17   ZEITERA ON A TRIAL RUN, STILL USES THE PATENTED TECHNOLOGY,

18   BUT THIS WHOLE TIME IT APPEARS THEY HAVE BEEN A CUSTOMER OF

19   AUDIBLE MAGIC, SO WE HAVEN'T HAD A CHANCE TO AMEND BECAUSE THE

20   CASE GOT TRANSFERRED.

21       OH.  AND WATCHWITH IS HERE NOW, SO WE DIDN'T -- ONCE

22   WATCHWITH WAS TRANSFERRED, WE DIDN'T THINK IT WAS APPROPRIATE

23   TO AMEND THE COMPLAINT OVER THERE JUST FOR ONE DEFENDANT.  AND

24   IT WOULD BE CONFUSING AND CREATE A LOT OF MOTION PRACTICE

25   FOR -- WE DIDN'T SEE AS NECESSARY.
```

1      **MR. RAMSEY:**  IF I MAY RESPOND, YOUR HONOR?

2      WATCHWITH IS A SAN FRANCISCO COMPANY.  IT'S BASED IN SAN

3   FRANCISCO, SO THIS IS THE RIGHT VENUE.

4      ZEITERA IS GOING TO, I'M SURE, FULLY LITIGATE ITS

5   TECHNOLOGY IN THIS CASE.  I KNOW THAT AUDIBLE MAGIC IS

6   LITIGATING FULLY ITS TECHNOLOGY IN TEXAS, INCLUDING PRODUCING

7   THE VERSIONS OF, FOR EXAMPLE, THE SOFTWARE DEVELOPMENT KIT

8   THAT WATCHWITH USES IN TEXAS.  THAT'S GOING TO BE LITIGATED AS

9   PART OF THE AUDIBLE MAGIC CASE.

10     WE JUST SERVED INTERROGATORIES IDENTIFYING, FOR EXAMPLE,

11   THE WATCHWITH SDK AS PART OF THAT CASE.  SO AUDIBLE MAGIC IS

12   LITIGATING THAT ON BEHALF OF ALL OF ITS CUSTOMER.  SO -- AND I

13   PRESUME THE SAME IS TRUE IN THIS COURT WITH ZEITERA LITIGATING

14   AND DEFENDING ITS OWN TECHNOLOGY.

15     **MR. GARTEISER:**  YOUR HONOR, IF I CAN ADD ONE POINT TO

16   THAT.

17     POST AIA, IT'S A LITTLE CONFUSING TO DO PATENT LITIGATION.

18   AND HAD WE SUED A COUPLE DEFENDANTS HERE AND A COUPLE

19   SOMEWHERE ELSE, THEN WE WOULD BE ACCUSED OF FORUM SHOPPING.

20     ESSENTIALLY NOW THIS IS REVERSE FORUM SHOPPING.  WATCHWITH

21   HAS KIND OF HID THE BALL ON WHOSE TECHNOLOGY THEY WERE USING

22   AND THEN THEY GOT TRANSFERRED, SO OBVIOUSLY TO HELP KIND OF

23   SET A PRECEDENCE OF THIS COURT AND THE EASTERN DISTRICT OF

24   TEXAS COURT, WE RECOMMEND YOU SEND THE CASE BACK.  STAYING ONE

25   DEFENDANT CREATES ALL KIND OF PROBLEMS.

1        **MR. RAMSEY:**  WE WOULD OPPOSE THAT.  I SHOULD ALSO

2   NOTE THAT BLUE SPIKE KNEW THAT WATCHWITH USED BOTH ZEITERA AND

3   AUDIBLE MAGIC TECHNOLOGY IN TEXAS.  INDEED, ITS INFRINGEMENT

4   CONTENTIONS ACCUSED BOTH.  WE HAVE TWO SEPARATE SETS OF CHARTS

5   IN TEXAS.

6        WE HAD BRIEFED THE MOTION TO TRANSFER ALONG WITH ZEITERA.

7   THE INFRINGEMENT CONTENTIONS ASSERTING BOTH OF THESE

8   TECHNOLOGIES WERE SERVED BY BLUE SPIKE.  IN THE MEANTIME, IN

9   THEIR REPLY BRIEF IN THE TRANSFER, THEY NEVER BOTHERED TO TALK

10  ABOUT AUDIBLE MAGIC AT ALL.  THEY ALREADY KNEW THAT THEY WERE

11  ACCUSING WATCHWITH BASED ON BOTH TECHNOLOGIES.

12       **THE COURT:**  OKAY.

13       **MR. RAMSEY:**  SO I THINK THAT THE -- FROM OUR POINT OF

14  VIEW, THE TAKE-AWAY IS IT DOESN'T MATTER WHERE IT IS.

15  WATCHWITH IS PROPERLY IN THIS VENUE.  THE SUPPLIERS SHOULD

16  LITIGATE THEIR TECHNOLOGIES.

17       **THE COURT:**  ALL RIGHT.  GO AHEAD AND BRIEF IT.  I MAY

18  NOT TAKE ANY ARGUMENT ON IT.  I WILL JUST SEE HOW -- I REALLY

19  NEED TO LOOK AT THE SPECIFICS OF THE ALLEGATIONS THAT ARE

20  BEING MADE, AND MOVE FROM THERE.

21       **MR. GARTEISER:**  THANK YOU, YOUR HONOR.

22       **MR. RAMSEY:**  THANK YOU.

23       **THE COURT:**  OKAY.  ANYTHING ELSE THAT WE SHOULD DO AT

24  THIS JUNCTURE?

25       **MR. FISHER:**  YOUR HONOR, ONE THING.  WE MADE CLEAR IN

1    THE PAPERS WE MAY NEED TO FILE A MOTION TO STRIKE ON THE

2    CONTENTIONS THAT ARE FILED HERE.  DOES THAT GO TO JUDGE CORLEY

3    OR WOULD THAT COME TO YOU?

4         **THE COURT:**  THAT GOES TO JUDGE CORLEY.

5         **MR. GARTEISER:**  YOUR HONOR, WHEN I WAS CLERKING

6    BEFORE, WE DIDN'T SEE MOTIONS TO STRIKE.  IT WAS A MOTION TO

7    COMPEL, MORE DETAIL.  IS THAT PROPER PROCEDURALLY NOW TO GO

8    STRAIGHT PASSED THAT TO A MOTION TO STRIKE?

9         **THE COURT:**  I HAVE SEEN MOTIONS TO STRIKE.

10        **MR. GARTEISER:**  OKAY.  IT'S BEEN A WHILE FOR ME.

11        **THE COURT:**  SO, WE SEE THEM.

12        **MR. GARTEISER:**  OKAY.

13        **THE COURT:**  ALL RIGHT.  ANYTHING ELSE?

14      CAN SOMEONE GET ME A FORM OF ORDER WITH THE CHART THAT YOU

15   ALREADY HAVE TO THE EXTENT THAT YOU CAN FILL IN THE DATES THAT

16   WE HAVE GONE THROUGH?

17      WHO IS THE -- WHO IS IN CHARGE OF THE CHART?

18        **MR. BERTA:**  I DON'T KNOW.  WE ARE, HAVING SPOKEN FOR

19   NO APPARENT REASON.  WE ARE IN CHARGE.

20        **THE COURT:**  I WILL EXPECT IT FROM YOU THEN.

21      MAYBE I WILL MAKE A NOTE AND YOU WON'T HAVE TO DO IT NEXT

22   TIME.  EVERYBODY CAN TAKE TURNS DOING IT.

23      THANK YOU, MR. BERTA.

24        **MS. CORBIN:**  THANK YOU, YOUR HONOR.

25           (PROCEEDINGS CONCLUDED AT 3:16 P.M.)

**CERTIFICATE OF REPORTER**

       I, DIANE E. SKILLMAN, OFFICIAL REPORTER FOR THE

UNITED STATES COURT, NORTHERN DISTRICT OF CALIFORNIA, HEREBY

CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE

RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

DIANE E. SKILLMAN, CSR 4909, RPR, FCRR

TUESDAY, AUGUST 12, 2014

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
### OAKLAND DIVISION

| | | |
|---|---|---|
| **BLUE SPIKE, LLC,** | § | |
| *Plaintiff*, | § § § | **Civil Action No. 14-1650** |
| **v.** | § § § | **JURY TRIAL DEMANDED** |
| **GOOGLE INC.,** | § § § | |
| *Defendant*. | § § § | |

## AMENDED COMPLAINT FOR PATENT INFRINGEMENT

Plaintiff Blue Spike, LLC files this Amended Complaint against Defendant Google Inc. and alleges infringement of U.S. Patent Nos. 7,346,472 (the '472 Patent), 7,660,700 (the '700 Patent), 7,949,494 (the '494 Patent), 8,214,175 (the '175 Patent), and 8,712,728 (the '728 Patent, together with the '472, '700, '494, and '175 Patents, the Patents-in-Suit) as follows:

## NATURE OF THE SUIT

1.      This is a claim for patent infringement arising under the patent laws of the United States, Title 35 of the United States Code.

2.      This lawsuit was originally filed in the Eastern District of Texas, Tyler Division (Civil Action No. 12-CV-499-MHS).  On [Date], Defendant moved to transfer the case to this District, and on [Date] the Texas court granted the motion. [Elaborate?]

## PARTIES

3.      Plaintiff Blue Spike, LLC is a Texas limited liability company and has its headquarters and principal place of business at 1820 Shiloh Road, Suite 1201-C, Tyler, Texas 75703. Blue Spike, LLC is the assignee of the Patents-in-Suit from Blue Spike,

Inc. (a Florida corporation), which was the assignee of the Patents-in-Suit from Scott Moskowitz and Michael Berry. Blue Spike, LLC and Blue Spike, Inc. are collectively referred to as "Blue Spike." Blue Spike CEO Scott Moskowitz is an inventor of more than 66 U.S. Patents related to managing, monitoring, and monetizing digital content and informational assets. Blue Spike has practiced and has continued business plans to practice Moskowitz's patented inventions. Many of Blue Spike's patents are foundational to today's robust markets for content, which grew into their present form only after using Blue Spike's technology to catalogue, manage, monitor, and monetize that content.

4.      On information and belief, Google Inc. ("Google" or "Defendant") is a Delaware corporation having its principal place of business at 600 Amphitheatre Parkway, Mountain View, California 94043. Defendant can be served with process through its registered agent, The Corporation Trust Company, located at 1209 Orange Street, Wilmington, Delaware 19801. Defendant does business in the State of Texas and in the Eastern District of Texas.

## JURISDICTION AND VENUE

5.      This lawsuit is a civil action for patent infringement arising under the patent laws of the United States, 35 U.S.C. §101 *et seq.* The Court has subject-matter jurisdiction pursuant to 28 U.S.C. §§1331, 1332, 1338(a), and 1367.

6.      The Court has personal jurisdiction over Defendant for at least five reasons: (1) Defendant has committed acts of patent infringement and contributed to and induced acts of patent infringement by others in this District and elsewhere in Texas; (2) Defendant regularly does business or solicits business in the District and in Texas; (3) Defendant engages in other persistent courses of conduct and derives substantial

revenue from products and/or services provided to individuals in the District and in Texas; and (4) Defendant has purposefully established substantial, systematic, and continuous contacts with the District and should reasonably expect to be haled into court here. Thus, the Court's exercise of jurisdiction over Defendant will not offend traditional notions of fair play and substantial justice.

7.     Venue is proper in this judicial district under 28 U.S.C. §§1391(b)–(c) and 1400(b) because Defendant does business in the State of Texas, Defendant has committed acts of infringement in Texas and in the District, a substantial part of the events or omissions giving rise to Blue Spike's claims happened in the District, and Defendant is subject to personal jurisdiction in the District.

## FACTUAL BACKGROUND

### A.     Moskowitz's History

8.     The owners of art, music, films, and other creations who want to sell and license their work in digital form over the Internet need an efficient way to manage, monitor, and monetize it. Blue Spike founder Scott Moskowitz pioneered—and continues to invent—technology that makes such management possible, and which has parlayed with equal importance into other industries.

9.     Moskowitz, who earned two degrees *cum laude* from the Wharton School of Finance and Commerce at the University of Pennsylvania, is an inventor of more than 87 U.S. Patents, including each of the Patents-in-Suit.

10.     In 1992, Moskowitz entered the entertainment industry by doing agency work in Japan for a large U.S. wholesaler of music-related products.

11.    In 1993, Moskowitz filed his first U.S. digital-content-management patent application. That year, he also founded the software start-up The Dice Company, which would become widely recognized as a leader in digital watermarking. Since that first patent, Moskowitz has continued to create patented inventions in the field of information management and security at a prodigious pace. His goal from the outset has been to commercialize his patented inventions.

12.    Moskowitz founded Blue Spike, Inc. in November 1997. Just over two years later, he filed his first patent application related to signal recognition technology, which issued as the '472 Patent. In describing this pioneering technology, Moskowitz coined the term "signal abstracting," which enhanced the ability to catalogue, archive, identify, authorize, transact, and monitor the use and/or application of signals, such as images (for example, photographs, paintings, and scanned fingerprints), audio (for example, songs, jingles, commercials, movies soundtracks, and their versions), video (for example, videos, television shows, commercials, and movies), and multimedia works. This revolutionary technology greatly improves the efficiency and speed of monitoring, analyzing, and identifying signals as perceived, as well as enabling the optimal compression of the signals and their associated signal abstracts for memory accommodation.

13.    Moskowitz's status as a pioneer in this new field between cryptography and signal analysis is evident from the United States Patent and Trademark Office's categorization of his patent applications. The USPTO was initially puzzled about how to classify his early inventions, as the then-existing patent categories in cryptography and signal analysis were, by themselves, inadequate. The USPTO therefore created a new

classification for his groundbreaking inventions: classification 713, subclass 176, called "Authentication by digital signature representation or digital watermark."

14.    The National Security Agency (NSA) even took interest in his work after he filed one of his early patent applications. The NSA made the application classified under a "secrecy order" while it investigated his pioneering innovations and their impact on national security.

15.    As an industry trailblazer, Moskowitz has been an active author and public figure on digital-watermarking and signal-recognition technologies since their emergence. A 1995 *New York Times* article—entitled "TECHNOLOGY: DIGITAL COMMERCE; 2 plans for watermarks, which can bind proof of authorship to electronic works"— recognized Moskowitz's The Dice Company as one of two leading software start-ups in this newly created field. *Forbes* also interviewed Moskowitz as an expert for "Cops Versus Robbers in Cyberspace," a September 9, 1996 article about the emergence of digital watermarking and rights-management technology. He has also testified before the Library of Congress regarding the Digital Millennium Copyright Act.

16.    He has spoken to the RSA Data Security Conference, the International Financial Cryptography Association, Digital Distribution of the Music Industry, and many other organizations about the business opportunities that digital watermarking creates. Moskowitz also authored *So This Is Convergence?*, the first book of its kind about secure digital-content management. This book has been downloaded over a million times online and has sold thousands of copies in Japan, where Shogakukan published it under the name *Denshi Skashi*, literally "electronic watermark." Moskowitz was asked to author the introduction to *Multimedia Security Technologies for Digital Rights Management*, a 2006

book explaining digital-rights management. Moskowitz authored a paper for the 2002 International Symposium on Information Technology, titled "What is Acceptable Quality in the Application of Digital Watermarking: Trade-offs of Security, Robustness and Quality." He also wrote an invited 2003 article titled "Bandwidth as Currency" for the *IEEE Journal*, among other publications.

17.    Moskowitz is a senior member of the Institute of Electrical and Electronics Engineers (IEEE), a member of the Association for Computing Machinery, and the International Society for Optics and Photonics (SPIE). As a senior member of the IEEE, Moskowitz has peer-reviewed numerous conference papers and has submitted his own publications.

18.    Moskowitz has been at the forefront of industry-based tests—such as the MUSE Embedded Signaling Tests, Secure Digital Music Initiative ("SDMI"), and various tests by performance-rights organizations including ASCAP and BMI, as well as Japan's Nomura Research Institute.

19.    Moskowitz has negotiated projects to incorporate his technologies with leaders in a gamut of industries. For example, Moskowitz worked with EMI, Warner Brothers, and Universal Music Group on music-release tracking systems; with AIG on insurance and financial services; with IBM on watermarking its software and managing movie scripts; and with Juniper Networks on measuring and provisioning the bandwidth used on its routers. Blue Spike is also registered with the Federal Government's Central Contractor Registry (managed under the System for Award Management, "SAM") and participated in the Department of Defense Small Business Innovative Research (SBIR) program.

20.     Moskowitz and his companies have always practiced or had business plans to practice his patented inventions. He has worked extensively to ensure that his technology's powerful and patented Giovanni® suite of media security technologies can be licensed to all. Before the industry understood where digital management of content was heading, Moskowitz believed that copyright management was an invaluable element for dramatically expanding the business of music, emphasizing that security must not be shrouded in secrecy and that his patented techniques were the strongest to do so.

21.     Moskowitz and Blue Spike continued to produce new versions of its popular digital-watermarking tools. Under Moskowitz's control, Blue Spike also developed its unique Scrambling technologies, which continue to gain currency. Moskowitz and Blue Spike rolled out its "end-to-end" solution for music security. Music encoded with Blue Spike's watermark had both security and CD-quality sound, even when integrated with text, image, and video content. To this day, Moskowitz and Blue Spike are working with artists to help them manage and secure their valuable artistic contributions from its office in Tyler, Texas.

**B.     Patents-in-Suit**

22.     As content becomes increasingly profitable and prevalent in the U.S. and around the globe, pirates will continue to proliferate and use increasingly sophisticated technologies to steal and illegally copy others' work, especially those works that are digitally formatted or stored. The Patents-in-Suit comprise, in part, what Moskowitz has coined "signal abstracting," which encompasses techniques, among others, also known as "signal fingerprinting," "acoustic fingerprinting," or "robust hash functions." These are among the most effective techniques available for combating piracy, which are

7

completely undetectable to the thief, yet still enable content owners to easily search through large amounts of data to identify unauthorized copies of their works.

23.     Broadly speaking, "signal abstracting" identifies digital information and material—including video, audio, graphics, multimedia, and text—based solely on the perceptual characteristics of the material itself.  If desired, however, the abstract need not be static, and other information or heuristics can be used to augment the perceptual characteristics, resulting in a more robust abstract. In contrast, other technologies (such as digital watermarking) embed additional information or messages into the original source material to enable traceability of the subsequently watermarked content, much like an audit trail or the serial number on a dollar bill. When a pirate attempts to remove embedded information or messages, ideally the quality of the content may be degraded, making the tampered copies unusable or of such poor quality that they have little commercial value. Signal abstracting avoids watermarking's vulnerabilities by leaving the source signal unchanged and catalogues the signal's identifying features or perceptual characteristics in a database.

24.     Content owners can also then monitor and analyze distribution channels, such as the Internet, radio broadcasts, television broadcasts, and other media sources, to determine whether any content from those sources has the same abstract as their catalogued works. Unauthorized versions of copies of content may then be successfully identified. With the unauthorized copies identified, the content owner can then restrict access, compel payment for authorized use, and develop better intelligence about content markets and those consumers with a willingness to pay. In some cases, new versions of the content can be observed and analyzed, creating more robust abstracts or new abstracts

entirely, informing owners and content aggregators about new channels or new opportunities for consumption of their content.

25.     Similarly, content recognition applications running on mobile devices, smartphones, and tablets can use abstracts to identify content for users who would like to know what it is they are listening to (such as applications that just identify content) or would like to know more about that content  (such as applications that are now popularly known as "second screen applications," which allow a television audience to identify and interact with the content they are consuming, whether it be, for example, TV shows, movies, music, or video games). Once identified by an abstract, songwriters, for example, can be given lyrics, or budding video producers can be provided related versions or background on a video identified. Thus, value add in markets can be adjusted to meet the specific needs and consumption patterns of users.

26.     This idea of "signal abstracting" applies equally to biometric identification and today's security systems, such as fingerprint, facial, and optic systems that analyze, catalogue, monitor, and identify a person's biometric features. Once an image is created from the features of these biometric identifiers, signal abstracting can be used to optimally compress the signal and its associated abstract, resulting in less memory usage and increased accuracy and speed of signal analysis and identification. Further, signal abstracts of the biometric information can be secured independently; this means that authentication and verification of the identifying abstract do not compromise the original information. This separation of the abstracts from the original source material enables more secure environments, such as those dealing with the security of a person's biometrics. Thus, fingerprint scanners are made more secure, as are systems requiring

physical scans of a person's body. The recent evolution to smaller and cheaper processors and memory storage has led to the proliferation of these biometric-identification systems, which rely on the inventions of the Patents-in-Suit to be implemented.

27.     The four Patents-in-Suit are prime examples of Moskowitz's pioneering contributions to signal recognition technology.

**C.     The Accused Products and Services**

28.     Defendant designs and develops software, applications, websites, systems, and technology so users can find, store, share, manage, and monetize videos, images, music and other digital content. Defendant makes, uses, offers for sale and/or imports into the U.S. products, systems and/or services including, but not limited to, its ContentID and YouTube, applications, websites, systems, and technology ("Accused Products"), which infringe one or more claims of the Patents-in-Suit. The Accused Products have millions of users and Defendant generates millions of dollars in revenue from them..

29.     Defendant has not sought or obtained a license for any of Blue Spike's patented technologies.

30.     Yet Defendant is using methods, devices, and systems taught by Blue Spike's Patents-in-Suit.

31.     Ironically, although Defendant does not have permission to use Blue Spike's Patents-in-Suit, it is using those very same technologies to prevent and track piracy committed by others. Furthermore, without the use of Blue Spike's patented technology, Defendant faces lawsuits seeking billions of dollars from content owners claiming copyright infringement alleging that Defendant has done too little to prevent the uploading of copyrighted content.

## COUNT 1:
## INFRINGEMENT OF U.S. PATENT NO. 8,214,175

32.     Blue Spike incorporates by reference the allegations in paragraphs 1 through 30 of this complaint.

33.     Blue Spike, LLC is assignee of the '175 Patent, titled "Method and Device for Monitoring and Analyzing Signals," and has ownership of all substantial rights in the '175 Patent, including the rights to grant sublicenses, to exclude others from using it, and to sue and obtain damages and other relief for past and future acts of patent infringement.

34.     The '175 Patent is valid, is enforceable, and was duly and legally issued on July 3, 2012. A true and correct copy of the '175 Patent is attached as Exhibit A.

35.     Without a license or permission from Blue Spike, Defendant has infringed and continues to infringe on one or more claims of the '175 Patent—directly, contributorily, or by inducement—by importing, making, using, offering for sale, or selling products and devices that embody the patented invention, including, without limitation, one or more of the Accused Products, in violation of 35 U.S.C. §271.

36.     Defendant has been and now is indirectly infringing by way of inducing infringement by others and/or contributing to the infringement by others of the '175 Patent in the State of Texas, in this judicial district, and elsewhere in the United States, by, among other things, making, using, importing, offering for sale, and/or selling, without license or authority, products for use in systems that fall within the scope of one or more claims of the '175 Patent. Such products include, without limitation, one or more of the Accused Products. Such products have no substantial non-infringing uses and are for use in systems that infringe the '175 Patent. By making, using, importing offering for sale, and/or selling such products, Defendant injured Blue Spike and is thus liable to Blue

Spike for infringement of the '175 Patent under 35 U.S.C. § 271. Those whom Defendant induces to infringe and/or to whose infringement Defendant contributes are the end users of the Accused Products. Defendant had knowledge of the '175 Patent at least as early as the service of this complaint and is thus liable for infringement of one or more claims of the '175 Patent by actively inducing infringement and/or is liable as contributory infringer of one or more claims of the '175 Patent under 35 U.S.C. §271.

37.     Defendant's acts of infringement of the '175 Patent have caused damage to Blue Spike, and Blue Spike is entitled to recover from Defendant the damages sustained as a result of Defendant's wrongful acts in an amount subject to proof at trial pursuant to 35 U.S.C. §271. Defendant's infringement of Blue Spike's exclusive rights under the '175 Patent will continue to damage Blue Spike, causing it irreparable harm, for which there is no adequate remedy at law, warranting an injunction from the Court.

38.     On information and belief, Defendant has continued to infringe the '175 Patent since receiving notice of their infringement, at least by way of their receiving notice of this lawsuit. On information and belief, such continued infringement has been objectively reckless including because Defendant has (1) acted despite an objectively high likelihood that its actions constituted infringement of a valid patent and (2) knew or should have known of that objectively high risk. Accordingly, Blue Spike seeks a willfulness finding against Defendant relative to its infringement of the '175 Patent entitling Blue Spike to increased damages under 35 U.S.C. §284 as well as attorneys' fees and costs under 35 U.S.C. §285.

39.     On information and belief, Defendant has at least had constructive notice of the '175 Patent by operation of law.

## COUNT 2:
## INFRINGEMENT OF U.S. PATENT NO. 7,949,494

40.     Blue Spike incorporates by reference the allegations in paragraphs 1 through 38 of this complaint.

41.     Blue Spike, LLC is assignee of the '494 Patent, titled "Method and Device for Monitoring and Analyzing Signals," and has ownership of all substantial rights in the '494 Patent, including the rights to grant sublicenses, to exclude others from using it, and to sue and obtain damages and other relief for past and future acts of patent infringement.

42.     The '494 Patent is valid, is enforceable, and was duly and legally issued on May 24, 2011. A true and correct copy of the '494 Patent is attached as Exhibit B.

43.     Without a license or permission from Blue Spike, Defendant has infringed and continues to infringe on one or more claims of the '494 Patent—directly, contributorily, or by inducement—by importing, making, using, offering for sale, or selling products and devices that embody the patented invention, including, without limitation, one or more of the Accused Products, in violation of 35 U.S.C. §271.

44.     Defendant has been and now is indirectly infringing by way of inducing infringement by others and/or contributing to the infringement by others of the '494 Patent in the State of Texas, in this judicial district, and elsewhere in the United States, by, among other things, making, using, importing, offering for sale, and/or selling, without license or authority, products for use in systems that fall within the scope of one or more claims of the '494 Patent. Such products include, without limitation, one or more of the Accused Products. Such products have no substantial non-infringing uses and are for use in systems that infringe the '494 Patent. By making, using, importing offering for sale, and/or selling such products, Defendant injured Blue Spike and is thus liable to Blue

Spike for infringement of the '494 Patent under 35 U.S.C. §271. Those whom Defendant induces to infringe and/or to whose infringement Defendant contributes are the end users of the Accused Products. Defendant had knowledge of the '494 Patent at least as early as the service of this complaint and is thus liable for infringement of one or more claims of the '494 Patent by actively inducing infringement and/or is liable as contributory infringer of one or more claims of the '494 Patent under 35 U.S.C. § 271.

45. Defendant's acts of infringement of the '494 Patent have caused damage to Blue Spike, and Blue Spike is entitled to recover from Defendant the damages sustained as a result of Defendant's wrongful acts in an amount subject to proof at trial pursuant to 35 U.S.C. §271. Defendant's infringement of Blue Spike's exclusive rights under the '494 Patent will continue to damage Blue Spike, causing it irreparable harm, for which there is no adequate remedy at law, warranting an injunction from the Court.

46. On information and belief, Defendant has continued to infringe the '494 Patent since receiving notice of their infringement, at least by way of their receiving notice of this lawsuit. On information and belief, such continued infringement has been objectively reckless including because Defendant has (1) acted despite an objectively high likelihood that its actions constituted infringement of a valid patent and (2) knew or should have known of that objectively high risk. Accordingly, Blue Spike seeks a willfulness finding against Defendant relative to its infringement of the '494 Patent entitling Blue Spike to increased damages under 35 U.S.C. §284 as well as attorneys' fees and costs under 35 U.S.C. §285.

47. On information and belief, Defendant has at least had constructive notice of the '494 Patent by operation of law.

**COUNT 3:**
**INFRINGEMENT OF U.S. PATENT NO. 7,660,700**

48.     Blue Spike incorporates by reference the allegations in paragraphs 1 through 46 of this complaint.

49.     Blue Spike, LLC is assignee of the '700 Patent, titled "Method and Device for Monitoring and Analyzing Signals," and has ownership of all substantial rights in the '700 Patent, including the rights to grant sublicenses, to exclude others from using it, and to sue and obtain damages and other relief for past and future acts of patent infringement.

50.     The '700 Patent is valid, is enforceable, and was duly and legally issued on February 9, 2010. A true and correct copy of the '700 Patent is attached as Exhibit C.

51.     Without a license or permission from Blue Spike, Defendant has infringed and continues to infringe on one or more claims of the '700 Patent—directly, contributorily, or by inducement—by importing, making, using, offering for sale, or selling products and devices that embody the patented invention, including, without limitation, one or more of the Accused Products, in violation of 35 U.S.C. §271.

52.     Defendant has been and now is indirectly infringing by way of inducing infringement by others and/or contributing to the infringement by others of the '700 Patent in the State of Texas, in this judicial district, and elsewhere in the United States, by, among other things, making, using, importing, offering for sale, and/or selling, without license or authority, products for use in systems that fall within the scope of one or more claims of the '700 Patent. Such products include, without limitation, one or more of the Accused Products. Such products have no substantial non-infringing uses and are for use in systems that infringe the '700 Patent. By making, using, importing offering for sale, and/or selling such products, Defendant injured Blue Spike and is thus liable to Blue

Spike for infringement of the '700 Patent under 35 U.S.C. §271. Those whom Defendant induces to infringe and/or to whose infringement Defendant contributes are the end users of the Accused Products. Defendant had knowledge of the '700 Patent at least as early as the service of this complaint and is thus liable for infringement of one or more claims of the '700 Patent by actively inducing infringement and/or is liable as contributory infringer of one or more claims of the '700 Patent under 35 U.S.C. §271.

53.     Defendant's acts of infringement of the '700 Patent have caused damage to Blue Spike, and Blue Spike is entitled to recover from Defendant the damages sustained as a result of Defendant's wrongful acts in an amount subject to proof at trial pursuant to 35 U.S.C. §271. Defendant's infringement of Blue Spike's exclusive rights under the '700 Patent will continue to damage Blue Spike, causing it irreparable harm, for which there is no adequate remedy at law, warranting an injunction from the Court.

54.     On information and belief, Defendant has continued to infringe the '700 Patent since receiving notice of their infringement, at least by way of their receiving notice of this lawsuit. On information and belief, such continued infringement has been objectively reckless including because Defendant has (1) acted despite an objectively high likelihood that its actions constituted infringement of a valid patent and (2) knew or should have known of that objectively high risk. Accordingly, Blue Spike seeks a willfulness finding against Defendant relative to its infringement of the '700 Patent entitling Blue Spike to increased damages under 35 U.S.C. §284 as well as attorneys' fees and costs under 35 U.S.C. §285.

55.     On information and belief, Defendant has at least had constructive notice of the '700 Patent by operation of law.

## COUNT 4:
## INFRINGEMENT OF U.S. PATENT NO. 7,346,472

56.     Blue Spike incorporates by reference the allegations in paragraphs 1 through 54 of this complaint.

57.     Blue Spike, LLC is assignee of the '472 Patent, titled "Method and Device for Monitoring and Analyzing Signals," and has ownership of all substantial rights in the '472 Patent, including the rights to grant sublicenses, to exclude others from using it, and to sue and obtain damages and other relief for past and future acts of patent infringement.

58.     The '472 Patent is valid, is enforceable, and was duly and legally issued on March 18, 2008. A true and correct copy of the '472 Patent is attached as Exhibit D.

59.     Without a license or permission from Blue Spike, Defendant has infringed and continues to infringe on one or more claims of the '472 Patent—directly, contributorily, or by inducement—by importing, making, using, offering for sale, or selling products and devices that embody the patented invention, including, without limitation, one or more of the Accused Products, in violation of 35 U.S.C. §271.

60.     Defendant has been and now is indirectly infringing by way of inducing infringement by others and/or contributing to the infringement by others of the '472 Patent in the State of Texas, in this judicial district, and elsewhere in the United States, by, among other things, making, using, importing, offering for sale, and/or selling, without license or authority, products for use in systems that fall within the scope of one or more claims of the '472 Patent. Such products include, without limitation, one or more of the Accused Products. Such products have no substantial non-infringing uses and are for use in systems that infringe the '472 Patent. By making, using, importing offering for sale, and/or selling such products, Defendant injured Blue Spike and is thus liable to Blue

Spike for infringement of the '472 Patent under 35 U.S.C. §271. Those whom Defendant induces to infringe and/or whose infringement to which Defendant contributes are the end users of the Accused Products. Defendant had knowledge of the '472 Patent at least as early as the service of this complaint and is thus liable for infringement of one or more claims of the '472 Patent by actively inducing infringement and/or is liable as contributory infringer of one or more claims of the '472 Patent under 35 U.S.C. § 271.

61.     Defendant's acts of infringement of the '472 Patent have caused damage to Blue Spike, and Blue Spike is entitled to recover from Defendant the damages sustained as a result of Defendant's wrongful acts in an amount subject to proof at trial pursuant to 35 U.S.C. §271. Defendant's infringement of Blue Spike's exclusive rights under the '472 Patent will continue to damage Blue Spike, causing it irreparable harm, for which there is no adequate remedy at law, warranting an injunction from the Court.

62.     On information and belief, Defendant has continued to infringe the '472 Patent since receiving notice of their infringement, at least by way of their receiving notice of this lawsuit. On information and belief, such continued infringement has been objectively reckless including because Defendant has (1) acted despite an objectively high likelihood that its actions constituted infringement of a valid patent and (2) knew or should have known of that objectively high risk. Accordingly, Blue Spike seeks a willfulness finding against Defendant relative to its infringement of the '472 Patent entitling Blue Spike to increased damages under 35 U.S.C. §284 as well as attorneys' fees and costs under 35 U.S.C. §285.

63.     On information and belief, Defendant has at least had constructive notice of the '472 Patent by operation of law.

## COUNT 5:
## INFRINGEMENT OF U.S. PATENT NO. 8,712,728

64.     Blue Spike incorporates by reference the allegations in paragraphs 1 through 63 of this complaint.

65.     Blue Spike, LLC is assignee of the '728 Patent, titled "Method and Device for Monitoring and Analyzing Signals," and has ownership of all substantial rights in the '728 Patent, including the rights to grant sublicenses, to exclude others from using it, and to sue and obtain damages and other relief for past and future acts of patent infringement.

66.     The '728 Patent is valid, is enforceable, and was duly and legally issued on April 29 18, 2014. A true and correct copy of the '728 Patent is attached as Exhibit E.

67.     Without a license or permission from Blue Spike, Defendant has infringed and continues to infringe on one or more claims of the '728 Patent—directly, contributorily, or by inducement—by importing, making, using, offering for sale, or selling products and devices that embody the patented invention, including, without limitation, one or more of the Accused Products, in violation of 35 U.S.C. §271.

68.     Defendant has been and now is indirectly infringing by way of inducing infringement by others and/or contributing to the infringement by others of the '728 Patent in the State of Texas, in this judicial district, and elsewhere in the United States, by, among other things, making, using, importing, offering for sale, and/or selling, without license or authority, products for use in systems that fall within the scope of one or more claims of the '728 Patent. Such products include, without limitation, one or more of the Accused Products. Such products have no substantial non-infringing uses and are for use in systems that infringe the '728 Patent. By making, using, importing offering for sale, and/or selling such products, Defendant injured Blue Spike and is thus liable to Blue

Spike for infringement of the '728 Patent under 35 U.S.C. §271. Those whom Defendant induces to infringe and/or whose infringement to which Defendant contributes are the end users of the Accused Products. Defendant had knowledge of the '728 Patent at least as early as the service of this complaint and is thus liable for infringement of one or more claims of the '728 Patent by actively inducing infringement and/or is liable as contributory infringer of one or more claims of the '728 Patent under 35 U.S.C. § 271.

69.     Defendant's acts of infringement of the '728 Patent have caused damage to Blue Spike, and Blue Spike is entitled to recover from Defendant the damages sustained as a result of Defendant's wrongful acts in an amount subject to proof at trial pursuant to 35 U.S.C. §271. Defendant's infringement of Blue Spike's exclusive rights under the '728 Patent will continue to damage Blue Spike, causing it irreparable harm, for which there is no adequate remedy at law, warranting an injunction from the Court.

70.     On information and belief, Defendant has continued to infringe the '728 Patent since receiving notice of their infringement, at least by way of their receiving notice of this lawsuit. On information and belief, such continued infringement has been objectively reckless including because Defendant has (1) acted despite an objectively high likelihood that its actions constituted infringement of a valid patent and (2) knew or should have known of that objectively high risk. Accordingly, Blue Spike seeks a willfulness finding against Defendant relative to its infringement of the '728 Patent entitling Blue Spike to increased damages under 35 U.S.C. §284 as well as attorneys' fees and costs under 35 U.S.C. §285.

71.     On information and belief, Defendant has at least had constructive notice of the '728 Patent by operation of law.

## REQUEST FOR RELIEF

Blue Spike incorporates each of the allegations in paragraphs 1 through 62 above and respectfully asks the Court to:

(a)     enter a judgment that Defendant has directly infringed, contributorily infringed, and/or induced infringement of one or more claims of each of the Patents-in-Suit;

(b)     enter a judgment awarding Blue Spike all damages adequate to compensate it for Defendant's infringement of, direct or contributory, or inducement to infringe, the Patents-in-Suit, including all pre-judgment and post-judgment interest at the maximum rate permitted by law;

(c)     enter a judgment awarding treble damages pursuant to 35 U.S.C. §284 for Defendant's willful infringement of one or more of the Patents-in-Suit;

(d)     issue a preliminary injunction and thereafter a permanent injunction enjoining and restraining Defendant, its directors, officers, agents, servants, employees, and those acting in privity or in concert with them, and their subsidiaries, divisions, successors, and assigns, from further acts of infringement, contributory infringement, or inducement of infringement of the Patents-in-Suit;

(c)     enter a judgment requiring Defendant to pay the costs of this action, including all disbursements, and attorneys' fees as provided by 35 U.S.C. §285, together with prejudgment interest; and

(d)     award Blue Spike all other relief that the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Blue Spike demands a jury trial on all issues that may be determined by a jury.

Respectfully submitted,

/s/Randall Garteiser

Randall T. Garteiser
California Bar No. 231821
rgarteiser@ghiplaw.com
Christopher A. Honea
California Bar No. 232473
chonea@ghiplaw.com
Peter S. Brasher
California Bar No. 283992
pbrasher@ghiplaw.com
Ian Ramage
California Bar No. 224881
iramage@ghiplaw.com
Kirk J. Anderson
California Bar No. 289043
kanderson@ghiplaw.com
**GARTEISER HONEA, P.C.**
44 North San Pedro Rd
San Rafael, California 94903
Telephone: (415) 785-3762
Facsimile: (415) 785-3805

***Counsel for Blue Spike LLC***

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION**

| | | |
|---|---|---|
| BLUE SPIKE, LLC, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | |
| | § | Civil Action No. 6:12-cv-499-MHS-CMC |
| TEXAS INSTRUMENTS, INC., et al., | § | |
| | § | |
| | § | |
| *Defendants.* | § | |
| | § | |

## <u>MEMORANDUM OPINION AND ORDER</u>

The above-referenced case was referred to the undersigned United States Magistrate Judge for pre-trial purposes in accordance with 28 U.S.C. § 636.  Before the Court are Plaintiff's Opening Claim Construction Brief (Dkt. No. 1700), and Defendants' response (Dkt. No. 1751), Plaintiff's reply (Dkt. No. 1776).[1]  Also before the Court are the parties' Local Patent Rule ("P.R.") 4-3 Joint Claim Construction and Prehearing Statement (Dkt. No. 1674) and P.R. 4-5(d) Joint Claim Construction Chart (Dkt. No. 1791).

A claim construction hearing, in accordance with *Markman v. Westview Instruments, Inc.*, 52 F.3d 967 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996), was held in Tyler on October 1, 2014.  After hearing the arguments of counsel and reviewing the relevant pleadings, presentation materials, other papers, and case law, the Court finds the disputed terms of the patents-in-suit should be construed as set forth herein.

---

[1] The parties also dispute whether a number of the terms are indefinite, and in the alternative, Defendants provided a construction for these terms.  Thus, the Court also considered Defendants' Motion for Summary Judgment of Invalidity Based on Indefiniteness Under 35 U.S.C. § 112(b) and the related briefing (Dkt. Nos. 1752, 1785, 1803) when construing the disputed terms/phrases.

# TABLE OF CONTENTS

MEMORANDUM OPINION AND ORDER ................................................................................. 1

I.      BACKGROUND ............................................................................................................. 3

II.     APPLICABLE LAW ....................................................................................................... 5

III.    LEVEL OF ORDINARY SKILL IN THE ART ............................................................. 7

IV.     CONSTRUCTION OF AGREED TERMS ...................................................................... 9

V.      CONSTRUCTION OF DISPUTED TERMS ................................................................ 17

        A.      "abstract" ............................................................................................................ 17

        B.      "match/matches/matched/matching" .................................................................. 32

        C.      "reference signal" and "query signal" ............................................................... 37

        D.      "a comparing device that compares" and "a device configured to determine if a
                query signal matches any one plurality of reference signals" ............................ 42

        E.      "versions of [a/the/said/"that one of said plurality of"] reference signals" ......... 49

        F.      "similar to" ........................................................................................................ 51

        G.      "creating at least one counter corresponding to one of said at least one reference
                signal & Incrementing the counter … when a match is found / first digital
                reference signal abstract match recorder" ......................................................... 55

        H.      "selectable criteria" .......................................................................................... 57

        I.      "distributing at least one signal based on the comparison step" ........................ 60

        J.      "related to" ........................................................................................................ 61

        K.      "index of relatedness" ........................................................................................ 63

VI.     CONCLUSION ............................................................................................................. 65

## I.       BACKGROUND

Plaintiff brings suit alleging infringement of United States Patents Nos. 7,346,472 ("the

'472 Patent"), 7,660,700 ("the '700 Patent"), 7,949,494 ("the '494 Patent"), and 8,214,175 ("the

'175 Patent") (collectively, the "Asserted Patents").  The Asserted Patents are titled "Method and

Device for Monitoring and Analyzing Signals" and share a common specification.  The Asserted

Patents generally relate to a method and system for monitoring and analyzing at least one

signal.[2]   The Asserted Patents describes a technique for identifying digitally sampled

information, such as images, audio and video. '472 Patent at 4:42–43.  The specification states

that traditional methods of identification and monitoring of signals do not rely on "perceptual

quality," but rather upon a separate and additional signal (i.e., "additive signal"). *Id.* at 4:43–46.

The specification adds that one traditional, text-based additive signal is title and author

information. *Id.* at 4:50–51.  Thus, the specification states that if a book is being duplicated

digitally, the title and author could provide one means of monitoring the number of times the text

is being duplicated. *Id.* at 4:53–55.

The specification contrast the additive signal approach of the prior art to the approach of

the present invention, which "is directed to the identification of a digital signal–whether text,

audio, or video–using only the digital signal itself and then monitoring the number of times the

signal is duplicated." *Id.* at 4:56–59.   The specification states that this identification is

---

[2] The Abstract of the '472 Patent follows:

> A method and system for monitoring and analyzing at least one signal are
> disclosed. An abstract of at least one reference signal is generated and stored in a
> reference database. An abstract of a query signal to be analyzed is then generated
> so that the abstract of the query signal can be compared to the abstracts stored in
> the reference database for a match. The method and system may optionally be
> used to record information about the query signals, the number of matches
> recorded, and other useful information about the query signals. Moreover, the
> method by which abstracts are generated can be programmable based upon
> selectable criteria. The system can also be programmed with error control
> software so as to avoid the re-occurrence of a query signal that matches more than
> one signal stored in the reference database.

accomplished by receiving at least one reference signal to be monitored and creating an abstract of the reference signal. *Id.* at 2:64–66. The specification further describes storing the abstract of the reference signal in a reference database. *Id.* at 3:1–2. The specification then describes receiving at least one query signal to be analyzed and creating an abstract of the query signal. *Id.* at 3:2–3. The abstract of the query signal can then be compared to the abstract of the reference signal to determine if the abstract of the query signal matches the abstract of the reference signal. *Id.* at 3:4–7.

Plaintiff brings suit alleging infringement of claims 3, 4, 8, 11, and 12 of the '472 Patent, claims 1, 6, 7, 8, 10, 11, 40, 49, 50, and 51 of the '700 Patent, claims 1, 4, 5, 11, 17, 18, 20, 21, 22, and 29 of the '494 Patent, and claims 8, 11, 12, 13, 15, 16, and 17 of the '175 Patent. Claim 3 of the '472 Patent is representative of the asserted claims and recites the following elements (disputed terms in italics):

> 3. A method for monitoring and analyzing at least one signal comprising:
> receiving at least one *reference signal* to be monitored;
> creating an *abstract* of said at least one *reference signal*;
> storing the *abstract* of said at least one *reference signal* in a reference database;
> receiving at least one *query signal* to be analyzed;
> creating an *abstract* of said at least one *query signal*;
> comparing the *abstract* of said at least one *query signal* to the *abstract* of said at least one *reference signal* to determine if the *abstract* of said at least one *query signal matches* the *abstract* of said at least one *reference signal*;
> *creating at least one counter corresponding to one of said at least one reference signals*, said at least one counter being representative of the number of times a *match* is found between the *abstract* of said at least one *query signal* and the *abstract* of said at least one *reference signal*; and
> *incrementing the counter* corresponding to a particular *reference signal when a match is found* between an *abstract* of said at least one *query signal* and the *abstract* of the particular *reference signal*.

## II.   APPLICABLE LAW

### A.  Claim Construction

The claims of a patent define the invention to which the patentee is entitled the right to exclude.  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc).  Claim terms are given their ordinary and customary meaning to one of ordinary skill in the art at the time of the invention, unless there is clear evidence in the patent's specification or prosecution history that the patentee intended a different meaning.  *Id.* at 1312-13.  Claim construction is informed by the intrinsic evidence: the patents' specifications and file histories.  *Id.* at 1315-17.  Courts may also consider evidence such as dictionary definitions and treatises to aid in determining the ordinary and customary meaning of claim terms.  *Id.* at 1322.  Further, "[o]ther claims, asserted and unasserted, can provide additional instruction because 'terms are normally used consistently throughout the patent.'"  *SmartPhone Techs. LLC v. Research in Motion Corp.*, No. 6:10-CV-74-LED-JDL, 2012 WL 489112, at *2 (E.D. Tex. Feb. 13, 2012) (citing *Phillips*, 415 F.3d at 1314).  "Differences among claims, such as additional limitations in dependent claims, can provide further guidance."  *SmartPhone*, 2012 WL 489112, at *2.

A court should "avoid the danger of reading limitations from the specification into the claim[s]."  *Phillips*, 415 F.3d at 1323.  For example, "although the specification often describes very specific embodiments of the invention, [the Federal Circuit has] repeatedly warned against confining the claims to those embodiments."  *Id.*  The Federal Circuit has "expressly rejected the contention that if a patent describes only a single embodiment, the claims of the patent must be construed as being limited to that embodiment."  *Id.*  This is not only because of the requirements of Section 112 of the Patent Act, but also because "persons of ordinary skill in the art rarely would confine their definitions of terms to the exact representations depicted in the

embodiments." *Id.* Limitations from the specification should only be read into the claims if the patentee "acted as his own lexicographer and imbued the claim terms with a particular meaning or disavowed or disclaimed scope of coverage, by using words or expressions of manifest exclusion or restriction." *E-Pass Techs., Inc. v. 3Com Corp.*, 343 F.3d 1364, 1369 (Fed. Cir. 2003) (citations omitted); *Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1367 (Fed. Cir. 2012).

Similarly, the prosecution history may not be used to infer the intentional narrowing of a claim absent the applicant's clear disavowal of claim coverage. *SuperGuide Corp. v. DirecTV Enters., Inc.*, 358 F.3d 870, 875 (Fed. Cir. 2004) (citations omitted). "To be given effect, such a disclaimer must be made with reasonable clarity and deliberateness." *Id.*

Guided by these principles of claim construction, this Court directs its attention to the Asserted Patents and the disputed claim terms.

## B. Construction Indefiniteness

Title 35 U.S.C. § 112(b) articulates that patent claims must particularly point out and distinctly claim the invention. "Whether a claim meets this definiteness requirement is a matter of law." *Net Navigation, LLC v. Cisco Systems,* No. 4:11-cv-660, 662, 2012 WL 6161900, at *2 (E.D. Tex. Dec. 11, 2012) (citing *Young v. Lumenis, Inc.,* 492 F.3d 1336, 1344 (Fed. Cir. 2007)). A party challenging the definiteness of a claim must show it is invalid by clear and convincing evidence. *Id.* at 1345.

The ultimate issue is whether someone working in the relevant technical field could understand the bounds of a claim. *Haemonetics Corp. v. Baxter Healthcare Corp.,* 607 F.3d 776, 783 (Fed. Cir. 2010). A claim is not indefinite merely because it poses a difficult issue of claim construction. *Exxon Research & Eng'g Co. v. U.S.,* 265 F.3d 1371, 1375 (Fed. Cir. 2001).

The Supreme Court has recently held that the definiteness requirement of 35 U.S.C. § 112 "require[s] that a patent's claims, viewed in light of the specification and prosecution history, inform those skilled in the art about the scope of the invention with reasonable certainty." *Nautilus,* 134 S. Ct. at 2129. "The definiteness requirement, so understood, mandates clarity, while recognizing that absolute precision is unattainable." *Id.*

"The burden of establishing invalidity of a patent or any claim thereof shall rest on the party asserting such invalidity." 35 U.S.C. § 282. A "determination of claim indefiniteness is a legal conclusion that is drawn from the court's performance of its duty as the construer of patent claims." *Exxon,* 265 F.3d at 1376.

It is with these principles in mind the Court considers whether Defendants have demonstrated that the pleadings, affidavits, and other evidence available to the Court establish there are no genuine issues of material fact, and they are entitled to judgment as a matter of law on these specific issues. Fed. R. Civ. P. 56(c); *see Celotex v. Catrett,* 477 U.S. 317, 332 (1986).

### III.    LEVEL OF ORDINARY SKILL IN THE ART

It is well established that patents are interpreted from the perspective of one of ordinary skill in the art. *See Phillips*, 415 F.3d at 1313 ("[T]he ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application."). The Federal Circuit has advised that the "[f]actors that may be considered in determining the level of skill in the art include: (1) the educational level of the inventors; (2) the type of problems encountered in the art; (3) prior art solutions to those problems; (4) the rapidity with which innovations are made; (5) sophistication of the technology; and (6) education level of active workers in the field." *Env'tl Designs, Ltd. v. Union Oil Co. of California*, 713 F.2d 693, 696

(Fed. Cir. 1983). "These factors are not exhaustive but are merely a guide to determining the level of ordinary skill in the art." *Daiichi Sankyo Co. Ltd. v. Apotex, Inc.*, 501 F.3d 1254, 1256 (Fed. Cir. 2007).

Plaintiff proposes that a person of ordinary skill in the art would have a Master's degree in computer science or computer engineering, or equivalent experience, as well as two years experience in the field of digital fingerprinting and cryptography. (Dkt. No. 1700 at 7.)[3]  In a related motion, Defendants submitted declarations of three experts, each of which opine on the level of ordinary skill in the art.[4]  *See* Dkt. No. 1752-4 (Declaration of Kevin Bowyer, PH.D.); Dkt. No. 1752-6 (Declaration of John Snell); Dkt. No. 1752-8 (Declaration of Dr. Matthew Turk).  Dr. Bowyer opines that a person of ordinary skill in the art would have at least a Bachelor's degree in Electrical Engineering, Computer Science, or an equivalent degree, with a background and at least two years' experience in the fields of signal or image processing, biometric identification, and/or related fields. (Dkt. No. 1752-4 at 7.)  Mr. Snell opines that a person of ordinary skill in the art would have at least a Bachelor's degree in Electrical Engineering, Computer Science or an equivalent degree, with at least two years of signal or image processing experience. (Dkt. No. 1752-6 at 9.)  Finally, Dr. Turk opines that a person of ordinary skill in the art would have at least a bachelor's degree in electrical engineering, computer science, or equivalent degree, with a background and at least two years' experience in signal processing, image processing, biometric identification, or a related field. (Dkt. No. 1752-8 at 8.)

Having considered the parties' proposals and the factors that may be considered in

---

[3] Unless otherwise indicated, all citations to documents filed with the Court are to the ECF page number assigned by the Court's filing system.

[4] The related motion is Defendants' Motion for Summary Judgment of Invalidity Based on Indefiniteness Under 35 U.S.C. § 112(b) (Dkt. No. 1752).

determining the level of skill in the art, the Court finds that a person of ordinary skill in the art would have at least a Bachelor's degree in electrical engineering, computer science, or equivalent degree, with a background and at least two years' experience in signal processing, image processing, biometric identification, or a related field.

### IV.    CONSTRUCTION OF AGREED TERMS

The Court hereby adopts the following agreed-upon constructions:

| Term | Patents / Claims | Agreed Construction |
| --- | --- | --- |
| "hashed abstract" | '700 patent, claims 11, 50; '494 patent, claims 21 | "data that results from performing a Hash on an Abstract" |
| "perceptible characteristic" | '700 patent, claim 8; '494 patent, claims 5, 18 | "characteristic perceived by a person" |
| "cognitive characteristic" | '700 patent, claim 8; '494 patent, claim 18 | "characteristic understood by a person" |
| "subjective characteristic" | '700 patent, claim 8; '494 patent, claim 18 | "characteristic perceived differently by different people" |
| "perceptual quality" | '700 patent, claim 8; '494 patent, claim 18 | "quality perceived by a person" |
| "cognitive feature" | '494 patent, claims 5, 18 | "a feature that is understood by a person" |

Dkt. No. 1674 at 3.

The parties also agreed that the following terms do require construction and should be given their ordinary meaning as understood by a person of ordinary skill in the respective art:

- Digital reference signal abstract
- Query signal abstract
- Digital representation
- First digital reference signal abstract
- Signal
- Identifies
- Identifying
- Recording

- To be identified
- Digital representation of one of a plurality of different versions of a visual work and a multimedia work

Dkt. No. 1674 at 2.

During the claim construction hearing, the Court provided the parties with proposed constructions for the disputed terms/phrases. The parties agreed to the Court's proposed construction for the following terms:

| Claim Term/Phrase | Agreed Construction |
|---|---|
| "digital" | plain and ordinary meaning |
| "cryptographic protocol" | "procedure for transforming data to secure it and enhance its uniqueness and identification" |
| "hash" | "a mathematical transform that maps a bit string of arbitrary length to a fixed length bit string to achieve uniqueness" |
| "reduced in size" | plain and ordinary meaning |
| "perceptual characteristics representative of parameters to differentiate between versions of the reference signal" | plain and ordinary meaning |
| "signal characteristic parameters configured to differentiate between versions of said reference signal" | plain and ordinary meaning |
| "signal characteristic parameters configured to differentiate between a plurality of versions of the reference signal." | plain and ordinary meaning |
| "signal characteristic parameters configured to differentiate between other versions of that one of said plurality of reference signals" | plain and ordinary meaning |
| "signal characteristic parameters that differentiate between said plurality of different versions of said visual work | plain and ordinary meaning |

| and said multimedia work" | |
|---|---|
| "reference database" | "a database containing abstracts of reference signals" |
| "recognizable characteristic" | "characteristic visually or aurally perceived by a person" |
| "a compare result" | plain and ordinary meaning |

Regarding the term **"digital,"** the term appears in claims 11, 23, and 50 of the '700 Patent, claim 21 of the '494 Patent, and claims 1-14 of the '175 Patent.  The Court finds that the term is used consistently in the claims and is intended to have the same meaning in each claim. The Court further finds that the term, as recited in the claims, is not confusing and is easily understandable by a jury.  Moreover, the parties have not articulated a discernable dispute about the scope of this term.  Accordingly, the Court agrees with the parties that the term **"digital"** should be given its **plain and ordinary meaning.**

Regarding the term **"cryptographic protocol,"** the term appears in claims 10, 11, 22, and 23 of the '700 Patent and claims 6, 20, and 21 of the '494 Patent.  The Court finds that the term is used consistently in the claims and is intended to have the same meaning in each claim. The Court further finds that the claim language generally recite applying a cryptographic protocol to the abstract of the reference signal. *See, e.g.*, '700 Patent, claim 22.  The specification states the value of applying a "cryptographic protocol":

> The benefits of massive data reduction, flexibility in constructing appropriate signal recognition protocols and incorporation of cryptographic techniques to further add accuracy and confidence in the system are clearly improvements over the art. For example, where the data reduced abstract needs to have further uniqueness, a hash or signature may be required. And for objects which have further uniqueness requirements, two identical instances of the object could be made unique with cryptographic techniques.

'472 Patent at 10:45–50.  The specification adds that "[i]n applications where the data to be

analyzed has higher value in some predetermined sense, cryptographic protocols, such as a hash or digital signature, can be used to distinguish such close cases." '472 Patent at 14:24–27.  Thus, the claims and the specification are consistent with the arguments made by the patentee during prosecution that the prior art failed to "disclose cryptographic functions to enhance uniqueness and identification." (Dkt. No. 1751-6 at 22) ('700 FH Response to 5/30/2008 OA).  Accordingly, the Court finds that the term should be construed to include this limitation.

Moreover, the IEEE Standard Dictionary of Electrical and Electronics Terms (6th Ed. 1997) defines "cryptography" as "the discipline embodying principles, means, and methods for the transformation of data in order to hide its information content, prevent its undetected modification, and/or prevent its unauthorized use." (Dkt. No. 1751-10 at 4.)  This extrinsic evidence is consistent with the specification's statement that cryptographic techniques "further add accuracy and confidence in the system." '472 Patent at 10:48–50.  For at least these reasons, the Court agrees with the parties that the term **"cryptographic protocol"** should be construed as **"procedure for transforming data to secure it and enhance its uniqueness and identification."**

Regarding the term **"hash,"** the term appears in claims 11, 23, and 50 of the '700 Patent, claim 21 of the '494 Patent, and claim 7 of the '175 Patent.  The Court finds that the term is used consistently in the claims and is intended to have the same meaning in each claim.  The Court further finds that the claim language generally recites "wherein the cryptographic protocol is one of at least a hash." *See, e.g.*, '700 Patent at Claim 11.  Thus, the arguments made by the patentee during prosecution regarding "cryptographic protocol" apply equally here. (Dkt. No. 1751-6 at 22) ('700 FH Response to 5/30/2008 OA).  This is consistent with the specification statement that "[i]n applications where the data to be analyzed has higher value in some predetermined

sense, cryptographic protocols, such as a hash or digital signature, can be used to distinguish such close cases." '472 Patent at 14:24–27.  Furthermore, the Digital Signature Standard, Federal Information Processing Standards Publication defines a "hash function" as "a function that maps a bit string of arbitrary length to a fixed length bit string." (Dkt. No. 1751-11 at 13.)  For at least these reasons, the Court agrees with the parties that the term **"hash"** should be construed as **"a mathematical transform that maps a bit string of arbitrary length to a fixed length bit string to achieve uniqueness."**

Regarding the phrase **"reduced in size,"** the term appears in claims 1, 5, 7-11, and 17-19 of the '175 Patent.  The Court finds that the term is used consistently in the claims and is intended to have the same meaning in each claim.  Defendants' original construction redrafted the claims to replace "reduced in size" with "compressed."  Defendants argued that this was warranted because the specification only mentions compression to reduce the reference signals to abstract.

The Court finds that the specification does use the term compression, but it also refers to simply reducing the digital signal.  For example, the specification states "[w]hile there are many approaches to data reduction that can be utilized, a primary concern is the ability to reduce the digital signal in such a manner as to retain a 'perceptual relationship' between the original signal and its data reduced version." '472 Patent at 3:52–57.  This is very similar to the claim language and indicates that the patentees contemplated different approaches to data reduction.   Indeed, dependent claim 10 of the '472 Patent recites that a "controller includes a means to adjust compression rates."  This indicates that the patentees knew how to claim "compressed," if this was their intention.  Accordingly, the Court agrees with the parties that the phrase **"reduced in size"** should be given its **plain and ordinary meaning.**  To the extent that Defendants contend

that the plain and ordinary meaning limits "reduced in size" to "compressed," the Court rejects this argument.

Regarding the phrase **"perceptual characteristics representative of parameters to differentiate between versions of the reference signal,"** the phrase appears in claim 40 of the '700 Patent and claim 11 of the '494 Patent.  The Court finds that the phrase is used consistently in the claims and is intended to have the same meaning in each claim.  Regarding the phrase **"signal characteristic parameters configured to differentiate between versions of said reference signal,"** the phrase appears in claim 1 of the '494 Patent.  Regarding the phrase **"signal characteristic parameters configured to differentiate between a plurality of versions of the reference signal,"** the phrase appears in claim 1 of the '700 Patent.  Regarding the phrase **"signal characteristic parameters configured to differentiate between other versions of that one of said plurality of reference signals,"** the phrase appears in claim 29 of the '494 Patent.  Regarding the phrase **"signal characteristic parameters configured to differentiate between other versions of that one of said plurality of reference signals,"** the phrase appears in claim 8 of the '175 Patent.

The parties originally disputed whether these phrases should be redrafted to replace "differentiate" with "distinguish," as Defendants proposed.  The Court agrees with Defendants that the intrinsic evidence indicates that the patentee used the words "differentiate" and "distinguish" interchangeably.  This is illustrated in the specification and in the prosecution history. *See, e.g.*, '472 Patent at 10:16–24 ("Each of such representations must have at least a one bit difference with all other members of the database to *differentiate* each such representation from the others in the database … The engine will identify those characteristics (for example, the differences) that can be used to *distinguish* one digital signal from all other digital signals that

are stored in its collection.") (emphasis added).   However, the Court finds that the claim language is clear and is not persuaded that it should redraft the claims to replace "differentiate" with the term "distinguish."

Moreover, for the disputed term "abstract," the majority of the Defendants proposed a construction that included "differentiate," which they contend was taken directly from the portion of the specification that described the invention as a whole. (Dkt. No. 1751 at 9.)   In addition, the Court's construction for the term "abstract" includes the word "differentiate," and is consistent with the wording of these disputed phrases.   It would be confusing to include the term "differentiate" in the construction of "abstract," while at the same time removing the term "differentiate" from the actual claim language.   Accordingly, the Court agrees with the parties that these phrases should be given its **plain and ordinary meaning.**   To the extent that Defendants contend that the plain and ordinary meaning requires replacing "differentiate" with "distinguish," the Court rejects this argument.

Regarding the term **"reference database,"** the term appears in claims 1, 3, 6, 8, 9, 11, and 14 of the '472 Patent, claims 1, 18, 30, 34, and 35 of the '700 Patent, and claims 1, 3, 11, 21, 24, and 27-29 of the '494 Patent.   The Court finds that the term is used consistently in the claims and is intended to have the same meaning in each claim.   The Court further finds that the claim language indicates that the "reference database" is a "database containing abstracts of reference signals."   For example, claim 3 of the '472 Patent recites "storing the abstract of said at least one reference signal in a reference database."   Similarly, claim 1 of the '700 Patent recites "a reference database that stores abstracts of each at least one reference signal."   Likewise, claim 1 of the '494 Patent recites "at least one reference database for storing at least one abstract."   Thus, the claim language indicates how a person of ordinary skill in the art would interpret this term.

Defendants' originally proposed that the construction should include a "predefined set." The Court finds that this language is unnecessary and could be confusing to a jury. The claim language only requires storing abstracts and there is no mention of a predefined set. In fact, "predefined signal set" appears only two times in the entire specification. While Defendants are correct that these two occurrences are in a paragraph that includes "the present invention," Defendants overlook that this paragraph is referring to the signal abstract. The Court has captured the critical features disclosed by this paragraph with its construction for the disputed term "abstracts." Moreover, the specification defines "the predefined signal set" as the object being analyzed, and not a "predefined set of reference signal abstracts," as Defendants contend. '472 Patent at 10:19–20 ("The predefined signal set is the object being analyzed.") Accordingly, the Court agrees with the parties that the term **"reference database,"** should be given its **plain and ordinary meaning.** To the extent that Defendants contend that the plain and ordinary meaning requires a "predefined set," the Court rejects this argument.

Regarding the term **"recognizable characteristic,"** the term appears in claims 8 of the '700 Patent and claims 18 of the '494 Patent. The Court finds that the term is used consistently in the claims and is intended to have the same meaning in each claim. The Court further finds that the disputed term is one characteristic in a list of characteristics recited in the claims. The parties have agreed to the construction of the other terms in this list as generally perceived and understood by people. (Dkt. 1674 at 3.) In addition, the Court agrees with Defendants that the specification indicates that the term should be construed as "characteristic visually or aurally perceived by a person." *See, e.g.*, ('472 Patent at 14:58–61) ("Similar to the goals of a psychoacoustic model, a psychovisual model attempts to represent a visual image with less data, and yet preserve those perceptual qualities that permit a human to recognize the original visual

image."). For at least these reasons, the Court agrees with the parties that the term **"recognizable characteristic"** should be construed as **"characteristic visually or aurally perceived by a person."**

Regarding the phrase **"a compare result,"** the phrase appears in claim 11 of the '175 Patent. The Court finds that the phrase is unambiguous, is easily understandable by a jury, and requires no construction. The Court agrees with Plaintiff that there is no reason to limit the scope of the claim to "a match between two abstracts." The claim recites the comparison may be between a "plurality of digital reference signal abstracts." Accordingly, the Court agrees with the parties that the phrase **"a compare result"** should be given its **plain and ordinary meaning.** To the extent that Defendants contend that the plain and ordinary meaning requires "a match between two abstracts," the Court rejects this argument.

## V. CONSTRUCTION OF DISPUTED TERMS

### A. *"abstract"*

| Disputed Term | Plaintiff's Proposal | Defendants' Proposal |
|---|---|---|
| "abstract" | No construction Required<br><br>In the alternative:<br>"a summary"<br>(Dkt. No. 1776 at 3) | **All Defendants (except Morpho Defendants)**<br>"A data-reduced representation of a reference or query signal that is the smallest amount of data that can represent and differentiate two signals for a given predefined signal set and that retains a perceptual relationship with the original signal"<br><br>**Morpho Defendants**<br>Indefinite<br>To the extent the Court finds this term is definite, Morpho proposes: "a reduction that preserves an aesthetic quality of the original signal" |

### 1. The Parties' Position

The parties dispute whether the term "abstract" is indefinite, and if not indefinite, whether the term requires construction. Plaintiff contends that the term "abstract" is a central

component to each of the patents-in-suit, and as such the inventors went to great lengths to describe it thoroughly in the claim language and specifications. (Dkt. No. 1700 at 8.)  Thus, according to Plaintiff, a separate construction is unnecessary because the term is sufficiently described in the intrinsic record. (Dkt. No. 1700 at 8.)  Plaintiff further contends that "both independent and dependent claims alter the definition of this term, making a single definition impossible to achieve." (Dkt. No. 1700 at 8.)  Plaintiff "urges the Court to let the patent speak for itself and refrain from construing 'abstract.'" (Dkt. No. 1700 at 8.)

Plaintiff further argues that Defendants' construction is inappropriate because it (1) unjustifiably redefines the term to resemble prior art, (2) narrows the term unnecessarily, and (3) is not consistent with all claims.[5] (Dkt. No. 1700 at 8.)  Regarding Defendants' "data-reduced representation" proposal, Plaintiff argues that only the asserted claims in the '175 Patent specifically mention that abstracts are "data reduced." (Dkt. No. 1700 at 8.)  Thus, according to Plaintiff, this would make the term redundant in the '175 claims. (Dkt. No. 1700 at 9.)  Plaintiff also contends that it is conceivable that the abstract may even be larger than the signal from which it derived, and thus would not be a "data-reduced representation." (Dkt. No. 1700 at 9.)

Regarding Defendants' "smallest amount of data" proposal, Plaintiff argues that the phrase is not present in the intrinsic record and is inappropriate in this context. (Dkt. No. 1700 at 9.)  Plaintiff further argues the specification indicates that creating a signal representation of the smallest size possible is not practiced in the current invention, because such representation tends to lose a perceptual relationship common to the abstracts taught in the Asserted Patent. (Dkt. No. 1700 at 9.)

---

[5]  For the term "abstract," "Defendants" refers to the "majority group of Defendants," which is a separate from the other group of Defendants ("the Morpho Defendants.") (Dkt. No. 1751 at 11 n. 9.)

Regarding Defendants' "predefined signal set" proposal, Plaintiff argues that "abstracts" involve more than predefined sets of signals, and can include the ability to add new members to the set and compare signals on the fly. (Dkt. No. 1700 at 10.)  Thus, according to Plaintiff, the abstract's ability to compare beyond a predefined signal set is one of its improvements on the prior art. (Dkt. No. 1700 at 10.)  Regarding Defendants' "retains a perceptual relationship" proposal, Plaintiff argues that the phrase is unnecessarily limiting as indicated by the patentees' reservation of this definition for certain dependent claims. (Dkt. No. 1700 at 10.)

Turning to the Morpho Defendants' construction, Plaintiff argues that it is inadequate because it does not account for the abstract's purpose of comparing and differentiating between signals. (Dkt. No. 1700 at 11.)  Regarding Morpho Defendants' "reduction" proposal, Plaintiff argues that the term is inappropriate for the same reasons it is in Defendants' construction. (Dkt. No. 1700 at 11.)  Regarding Morpho Defendants' "aesthetic" proposal, Plaintiff argues that it is inadequate because the claim language does not indicate "aesthetic," and the term itself would require construction. (Dkt. No. 1700 at 11.)

Defendants respond that the specification never actually describes what constitutes an "abstract." (Dkt. No. 1751 at 9.)   However, Defendants contend that the specification does provide a description that is a starting point. (Dkt. No. 1751 at 9) (citing '472 Patent at 10:9–19). Based on this, Defendants argue that the abstract's creation process starts with a predefined signal set, from which digitized signal representations are created. (Dkt. No. 1751 at 10.) Defendants argue that the goal of the creation process is to create abstracts that both: (1) represent the signals and (2) differentiate between the signals. (Dkt. No. 1751 at 10.)  Defendants argue that to accomplish this goal, the process first determines the smallest set of data that can both represent the signals and differentiate between the signals. (Dkt. No. 1751 at 10.)

Defendants further argue that this description of the abstract creation process is consistent with the rest of the disclosure, which states that the goal of the invention is to reduce the data overhead in the abstract. (Dkt. No. 1751 at 10.)  Defendants contend that the necessity of this data reduction is emphasized repeatedly throughout the specification. (Dkt. No. 1751 at 10–11.) Defendants further argue that the specification and prosecution history repeatedly confirm that the data in abstracts must retain a perceptual relationship to their original signal. (Dkt. No. 1751 at 11.)  Defendants also argue that the patentees consistently argued to the patent examiner that an "abstract" requires a perceptual relationship to a signal from which it is derived. (Dkt. No. 1751 at 12–13.)

Defendants further argue that Plaintiff is wrong to assert that the term does not need to be construed, and in so doing, ignores the entire specification and prosecution history. (Dkt. No. 1751 at 13.)  Regarding Plaintiff's criticism of their "data-reduced representation" proposal, Defendants argue that the same term must be construed consistently across all patents in the same family, and that a patentee cannot change the meaning of a term in a continuation patent. (Dkt. No. 1751 at 14.)  Defendants further argue that no evidence support Plaintiff's assertion that the claimed "abstract" could be large that its representative signal. (Dkt. No. 1751 at 14.) Instead, Defendants argue that the specification and prosecution history stress that the abstract is a compressed/compact representation/data reduced version of an original signal. (Dkt. No. 1751 at 15.)

Regarding Plaintiff's criticism of their "smallest amount of data" proposal, Defendants argue that, contrary to Plaintiff's assertion, the phrase appears in the specification in the paragraph describing the "abstract" of the "present invention," and is defined as the point of novelty "over the art." (Dkt. No. 1751 at 15–16.)  Defendants further argue that Plaintiff

mischaracterizes Defendants' position and the language of the specification defining "abstract." (Dkt. No. 1751 at 16.)  Regarding Plaintiff's criticism of their "retains a perceptual relationship" proposal, Defendants argue that Plaintiff makes contradictory arguments in its brief. (Dkt. No. 1751 at 16.)  Defendants further argue that Plaintiff's claim differentiation argument fails because the dependent claim that Blue Spike relies on for this argument ('494 Patent, Claim 18) does not discuss the definition of abstract at all, but instead relates to the nature of the original signal. (Dkt. No. 1751 at 16.)  Regarding Plaintiff's criticism of their "predefined signal set" proposal, Defendants argue that without a predefined signal set, an abstract cannot be properly created because there is not a minimum data target that it must meet. (Dkt. No. 1751 at 17.)

Turning to the Morpho Defendants' response, this group of defendants argue that the term "abstract" is indefinite. (Dkt. No. 1751 at 18.)  Specifically, the Morpho Defendants contend that the specification does not inform one of ordinary skill in the art with reasonably certainty as to the scope of the term "abstract," and the term has no accepted meaning to one of ordinary skill in the art. (Dkt. No. 1752 at 17.)  The Morpho Defendants further contend that the only clear guidance from the specification pertains to what an "abstract" is not, and does not give any indication about what an "abstract" is. (Dkt. No. 1752 at 17–18)  The Morpho Defendants further argue that the specification contains no explanation of what part of a reference signal or query signal appears in an "abstract," how much of that signal is used, how that "abstract" ultimately relates to its original signal, or how to determine any of these. (Dkt. No. 1752 at 18.)

The Morpho Defendants further argue that the specification confirms that the meaning of "abstract" is a moving target that shifts depending upon the unspecified "markets" or "applications" where the alleged invention might be deployed. (Dkt. No. 1752 at 18–19.)  Thus, according to the Morpho Defendants, the broad range of possible applications, and the vague

descriptions of the relationship between abstracts and their original signals, one of ordinary skill in the art cannot tell with reasonable certainty what is claimed. (Dkt. No. 1752 at 19.)  Finally, the Morpho Defendants argue that the Asserted Patents are indefinite because the scope of the claims is left to the subjective opinion of the person practicing the invention. (Dkt. No. 1752 at 19–20.)

In the alternative, the Morpho Defendants propose that the term means "a reduction that preserves an aesthetic quality of the original signal." (Dkt. No. 1751 at 18.)   The Morpho Defendants agree with the other Defendants that an "abstract" must be less than the original signal, i.e., "a reduction." (Dkt. No. 1751 at 18.)  The Morpho Defendants, however, disagree with the other Defendants that an "abstract" must be the smallest amount of data that can represent and differentiate two signals for a given predefined signal set. (Dkt. No. 1751 at 18.) Instead, the Morpho Defendants contend that an "abstract" "preserves an aesthetic quality of the original signal," based on a sentence from the specification. (Dkt. No. 1751 at 18) (citing '472 Patent at 7:3–14.

The Morpho Defendants further state that they agree with the other Defendants that the "perceptual" features of signals and their "abstracts" pervade the intrinsic record and were the primary feature that the patentee argued to distinguish the prior art. (Dkt. No. 1751 at 19.) However, they contend that some of the dependent claims narrow the abstract to having perceptual, cognitive, subjective, perceptible, and/or recognizable features, qualities, and/or characteristics of the underlying signal. (Dkt. No. 1751 at 19) (citing '700 Patent, column 8; '494 Patent, columns 5, 18).   Thus, according to the Morpho Defendants, the doctrine of claim differentiation requires the term "abstract" to have a broader construction than perceptual, cognitive, subjective, perceptible, and/or recognizable features, qualities, and/or characteristics.

(Dkt. No. 1751 at 19.)   The Morpho Defendants argue that their construction is the only one broad enough to encompass all of the dependent claims while remaining true to the intrinsic evidence. (Dkt. No. 1751 at 20.)

Plaintiff replies that the Asserted Patents describe an "abstract" as a summary of a signal. (Dkt. No. 1776 at 3.)  Plaintiff contends that their there can be more than one summary for an original signal, and in certain dependent claims, additional limitations are added to the term "abstract" or summary to explain what those additional limitations are. (Dkt. No. 1776 at 3.) Plaintiff argues that the term "abstract" is further limited in various ways with additional modifiers such as "digital reference signal," "data-reduced," "perceptual," or countless other ways. (Dkt. No. 1776 at 3–5)  Plaintiff contends that claim 11 of the '472 Patent emphasizes that the abstract, or summary of a signal, is based upon perceptual characteristics, whereas in contrast, claim 19 of the '175 Patent, emphasizes that the abstract is based on being reduced to a smaller size. (Dkt. No. 1776 at 5.)

Regarding Defendants' "data reduced" proposal, Plaintiff states that it agrees that one of the goals of the invention is to produce a data-reduced representation of a media sample. (Dkt. No. 1776 at 5.)   However, Plaintiff argues that an overriding purpose of the invention is to provide the ability to efficiently match, distinguish, and analyze the similarities between two media samples. (Dkt. No. 1776 at 5.)  Plaintiff argues that abstract (or a summary) that lost this comparing functionality would similarly lose its benefit. (Dkt. No. 1776 at 5.)  Thus, according to Plaintiff, although data reduction is certainly a primary focus of an "abstract," it is not necessary and such importation of a limitation from the specification is impermissible. (Dkt. No. 1776 at 5.)  Plaintiff argues that this is evidenced in the claims themselves, as none of the claims include a limitation that an abstract be reduced in size, except for claims 1, 5, 7, 8, 9–11, and 17–

19 of the '175 Patent. (Dkt. No. 1776 at 5.)

Regarding Defendants' "smallest amount of data that can differentiate signals" proposal, Plaintiff argues that Defendants misread the passage they cited to. (Dkt. No. 1776 at 6) (citing '175 Patent at 10:12–16). Plaintiff contends that this passage does not instruct that the abstract itself must be the smallest size possible, and notes that the Morpho Defendants' disagree with this construction as well. (Dkt. No. 1776 at 6.) Regarding Defendants' "predefined signal set" proposal, Plaintiff argues that Defendants once again misconstrue the same passage of the specification by insisting that an abstract must be compared to a predefined set of reference signals. (Dkt. No. 1776 at 7.) Plaintiff contends that "predefined signal set" does not indicate a predefined set of reference signals, but instead is a set of points within a signal that can be compared. (Dkt. No. 1776 at 7.) Plaintiff argues that Defendants' construction would render the "two digitized signal representations" redundant, and the passage nonsensical. (Dkt. No. 1776 at 7.) Plaintiff further argues that an abstract provides comparison capabilities beyond what would be available if it were only comparing against a predefined set of reference signals. (Dkt. No. 1776 at 7.) Finally, Plaintiff contends that the term in not indefinite.

## 2. Analysis

To begin its analysis, the Court first turns to the language of the claims, as it provides "substantial guidance as to the meaning of particular claim terms." *Phillips*, 415 F.3d at 1313 (citing *Vitronics Corp.*, 90 F.3d at 1582). The term "abstract" appears in claims 1-14 of the '472 Patent, claims 1, 5-7, 9-11, 13, 18, 21-22, 24-25, 30-32, 35, 40, 43-46, and 48-50 of the '700 Patent, claims 1, 5-7, 11, 14-17, 19-21, 24, and 27-29 of the '494 Patent, and claims 1-19 of the '175 Patent. The Court finds that the term is used consistently in the claims and is intended to have the same meaning in each claim. The Court further finds that the claim language indicates that the recited "abstract" is a representation of a signal. *See, e.g.*, '472 Patent, claim 3 ("creating

an abstract of said at least one reference signal"); '700 Patent, claim 1 ("a first processor that creates an abstract of each reference signal input"); '494 Patent, claim 1 ("a first processor that creates an abstract of each reference signal"); '175 Patent, claim 8 ("wherein said at least one processor is programmed or structured to generate a digital reference signal abstract from a digital reference signal").

The claim language further indicates that the recited "abstracts" are created to compare and differentiate between different reference signals and query signals. *See, e.g.*, '472 Patent, claim 3 ("comparing the abstract of said at least one query signal to the abstract of said at least one reference signal to determine if the abstract of said at least one query signal matches the abstract of said at least one reference signal"); '700 Patent, claim 40 ("comparing an abstract of said received query signal to the abstracts stored in the database to determine if the abstract of said received query signal is related to any of the stored abstracts"); '494 Patent, claim 29 ("comparing a query signal abstract of said query signal with at least one abstract of said plurality of reference signal abstracts stored in said reference database"); '175 Patent, claim 11 ("wherein said at least one processor is programmed or structured to compare a digital query signal abstract to said plurality of digital reference signal abstracts stored in said database to generate a compare result").  Thus, the claim language indicates that the reference "abstract" is a representation of the reference signal that can be compared to the query "abstract" to differentiate between different query signals and different reference signals.

The specification further indicates that person of ordinary skill in the art would understand that the recited "abstract" is a data-reduced representation of the signal.  The necessity of this data reduction representation is emphasized throughout the specification:

> While psychoacoustic and psychovisual compression has some relevance to the present invention, additional data reduction or massive compression is anticipated

by the present invention. It is anticipated that the original signal may be compressed to create a realistic or self-similar representation of the original signal, so that the compressed signal can be referenced at a subsequent time as unique binary data that has computational relevance to the original signal.
'472 Patent at 7:40-48

As a general improvement over the art, the present invention incorporates what could best be described as "computer-acoustic" and "computer-visual" modeling, where the signal abstracts are created using data reduction techniques to determine the smallest amount of data, at least a single bit, which can represent and differentiate two digitized signal representations for a given predefined signal set. '472 Patent at 10:9-16

The challenge is to maximize the ability to sufficiently compress a signal to both retain its relationship with the original signal while reducing the data overhead to enable more efficient analysis, archiving and monitoring of these signals.
'472 Patent at 9:47-51

The ability to massively compress a signal to its essence … where such compression is designed to preserve some underlying "aesthetic quality" of the signal…
'472 Patent at 7:3-9

While there are many approaches to data reduction that can be utilized, a primary concern is the ability to reduce the digital signal in such a manner as to retain a "perceptual relationship" between the original signal and its data reduced version.
'472 Patent at 3:52-55

The present invention creates a second database from the first database, wherein each of the stored audio signals in the first database is data reduced in a manner that is not likely to reflect the human perceptual quality of the signal, meaning that a significantly data-reduced signal is not likely to be played back and recognized as the original signal. As a result of the data reduction, the size of the second database (as measured in digital terms) is much smaller than the size of the first database, and is determined by the rate of compression.
'472 Patent at 14:3-12

With greater compression rates, it is anticipated that similarity may exist between the data compressed abstractions of different analog signals …
'472 Patent at 14:19-21

The present invention, however, involves the scanning of an image involving a sun, compressing the data to its essential characteristics (i.e., those perceptual characteristics related to the sun)….
'472 Patent at 15:3-8

In addition, the specification and prosecution history indicate that a person of ordinary skill in the art would understand that the recited "abstract" must retain a perceptual relationship with the original signal. The specification states that "[w]hile there are many approaches to data reduction that can be utilized, *a primary concern* is the ability to reduce the digital signal in such a manner as to retain a 'perceptual relationship' between the original signal and its data reduced version." '472 Patent at 3:52–55. Similarly, the specifications adds that "[t]he challenge is to maximize the ability to sufficiently compress a signal to both retain its relationship with the original signal while reducing the data overhead to enable more efficient analysis, archiving and monitoring of these signals." '472 Patent at 9:47–51.

Moreover, the patentees distinguished the claims from the prior art based on the prior art failing to disclose this "perceptual relationship." Specifically, the patentees argued that claim 21 of the '700 Patent (which ultimately issued as claim 1 of the '700 Patent) was distinguishable from the prior art because the "[s]ignal abstracts retain a perceptual relationship with the signal from which it was created or derived." (Dkt. No. 1751-8 at 20) ('700 FH Response to 3/5/09 OA). The patentees made similar arguments in the '472 Patent's file history about pending claims that did not explicitly recite "a perceptual relationship" element. (Dkt. No. 1751-3 at 11) ('472 FH Response to 5/11/07 OA) ("Logan allegedly discloses additive information, the 'informational signal', having no relationship with the perceptual nature of the reference signal. The present invention(s) is not so limited."). Accordingly, the Court finds that the intrinsic evidence informs, with reasonable certainty, those skilled in the art about the scope of the term "abstract." Specifically, the Court finds that a person of ordinary skill in the art would understand that the recited "abstracts" are a data-reduced representation of a signal that retains a perceptual relationship with the signal and differentiates the data-reduced representation from

other data-reduced representations.

Turning to the parties' constructions, the Court disagrees with Plaintiff that the term does not require construction or that a single definition is impossible to achieve.  As indicated above, the intrinsic evidence indicates how a person of ordinary skill in the art would understand the term as it used in the Asserted Patents. *NTP, Inc. v. Research In Motion, Ltd.*, 418 F.3d 1282, 1293 (Fed. Cir.2005) ("Because [Plaintiff's] patents all derive from the same parent application and share many common terms, we must interpret the claims consistently across all asserted patents."); *Laitram Corp. v. Morehouse Indus., Inc.*, 143 F.3d 1456, 1460 & n.2 (Fed. Cir. 1998) (noting that it was proper to consider the prosecution histories of two related re-examination patents originating from the same parent, to determine the meaning of a term used in both patents)

Furthermore, the Court is not persuaded by Plaintiff's argument that the doctrine of claim differentiation forbids construing the term as a "data-reduced representation."  As described above, and as recited in the Detailed Description of the Invention section, the specification states that data reduction was a "primary concern" of the invention's "ability to reduce the digital signal in such a manner as to retain a 'perceptual relationship' between the original signal and its data reduced version." '472 Patent at 3:52-56.  Thus, the specification's emphasis on data reduction overcomes Plaintiff's claim differentiation argument. *Seachange Int'l, Inc. v. C-COR Inc.*, 413 F.3d 1361, 1368-1369 (Fed. Cir. 2005) (stating that claim differentiation is "not a hard and fast rule and will be overcome by a contrary construction dictated by the written description or prosecution history."); *see also Kraft Foods, Inc. v. Int'l Trading Co.*, 203 F.3d 1362, 1368 (Fed. Cir. 2000) (determining that any presumption arising from the doctrine of claim differentiation was overcome by the written description and prosecution history).  Indeed, there

is no disclosure or indication that a person of ordinary skill in the art would understand the scope of the claims include an "abstract" that is "even larger than the signal from which it is derived," as Plaintiff contends. (Dkt. No. 1700 at 9.)

The same is true for Plaintiff's and the Morpho Defendants' claim differentiation argument regarding Defendants' "retaining a perceptual relationship" proposal.  As discussed above, not only does the specification state that "retaining a perceptual relationship" was a "primary concern," but the patentees also argued that the claims was distinguishable from the prior art based on this feature. *See* '472 Patent at 3:52-56 ("a primary concern is the ability to reduce the digital signal in such a manner as to retain a 'perceptual relationship' between the original signal and its data reduced version.")  Thus, the express description in the specification and the repeated affirmation during prosecution that "[s]ignal abstracts retain a perceptual relationship with the signal from which it was created or derived," overcomes the parties' claim differentiation doctrine. (Dkt. No. 1751-8 at 20) ('700 FH Response to 3/5/09 OA); *see Fantasy Sports Props. v. Sportsline.com*, 287 F.3d 1108, 1115-16 (Fed. Cir. 2002) ("Claim differentiation serves best as a guideline, rather than a rule" and can be "overcome by …disclaimer of subject matter in the prosecution history.").

Moreover, the dependent claims that Plaintiff and the Morpho Defendants' rely on for this argument ('494 Patent, claim 18) does not appear to discuss the definition of an abstract at all.  Claim 18 depends from claim 17, which recites "wherein at least one abstract comprises data describing a portion of the characteristics of its associated reference signal."  Claim 18 further recites that "the characteristics of the reference signal being described comprise at least one of a perceptible characteristic, a cognitive characteristic, a subjective characteristic, a perceptual quality, a recognizable characteristic or combinations thereof."  Thus, the claim relied

upon by Plaintiff and the Morpho Defendants does not relate to the definition of abstract, but instead appears to relate to the nature of the original signal. Moreover, the fact that an abstract comprises a "perceptual quality," or other characteristics, would not be inconsistent with that same abstract retaining a perceptual relationship with the original signal. Finally, Plaintiff appears to concede this point by arguing that "a perceptual relationship [is] common to the abstracts taught in the patents-in-suit." (Dkt. No. 1700 at 9.)

Regarding, Defendants' "smallest amount of data that can differentiate signals" proposal, the Court finds that this would potentially limit the claims to a preferred embodiment. The specification does indicate that "massive compression is anticipated by the present invention." '472 Patent at 7:40–43. However, "massive compression" does not necessarily equate to reducing the data to the "smallest amount of data that can differentiate signals." The specification does state that the representations "must have at least a one bit difference with all other members of the database to differentiate each such representation from the others in the database." '472 Patent at 10:16–18. But this is not a requirement for a one bit difference, which could be read as the "smallest amount data that can differentiate signals," instead it provides a minimum amount while at the same time allowing for more.

The specification further discusses that the "success or failure of an accurate detection of any given object may be flexibly implemented or changed to reflect market-based demands of the engine." '472 Patent at 9:27–31. Limiting the claims to the "smallest amount data that can differentiate signals" could exclude the contemplated flexibility. Likewise, the specification states that "[i]t is anticipated that the original signal may be compressed to create a realistic or self-similar representation of the original signal, so that the compressed signal can be referenced at a subsequent time as unique binary data that has computational relevance to the original

signal." '472 Patent at 7:44–48.  This further confirms that an important aspect of the invention is that the original signal can be compressed or data-reduced and then later uniquely identified. Thus, the Court is not persuaded that the claims should be limited to only "smallest amount of data that can differentiate signals."

Regarding, Defendants' "predefined signal set" proposal, the Court finds that this is unnecessary and could be confusing to a jury.  The claim language and the Court's construction captures the requirement of a reference signal being compared to a "predefined set of reference signal abstracts." *See, e.g.*, '472 Patent, claim 3 ("storing the abstract of said at least one reference signal in a reference database.")  Moreover, the specification defines "the predefined set" as the object being analyzed, and not a "predefined set of reference signal abstracts," as Defendants appear to contend.  '472 Patent at 10:19–20 ("The predefined signal set is the object being analyzed.").  The Court's construction captures that the data-reduced representation of an original signal must be able to be differentiated from other data-reduced representations.

Finally, regarding the Morpho Defendants' "aesthetic" proposal, the Court finds that the construction is too broad.  The proposal fails to capture the requirement that the data-reduced representation of an original signal retains a perceptual relationship with the original signal. Instead, it only requires preserving "an aesthetic quality of the original signal."  Moreover, it is very likely that the term "aesthetic" would require construction.  Indeed, the Morpho Defendants contend that the term is broad enough to "encompasses all of the narrower features of the dependent claims, including perceptual, cognitive, subjective, perceptible, and/or recognizable features, qualities, and/or characteristics of the underlying signal." (Dkt. No. 1751 at 20.)  Thus, the Court does not adopt this aspect of the Morpho Defendants' construction.

### 3.  Court's Construction

In light of the intrinsic evidence, the Court construes the term **"abstract"** to mean **"a data-reduced representation of a signal that retains a perceptual relationship with the signal and differentiates the data-reduced representation from other data-reduced representations."**

### B. *"match/matches/matched/matching"*

| Disputed Term | Plaintiff's Proposal | Defendants' Proposal |
|---|---|---|
| "match" "matches" "matched" "matching" | No construction required | "match" - "an indistinguishable copy" "matches" - "is indistinguishable from " "matched" - "was indistinguishable from" "matching" - "indistinguishable" |

### 1. The Parties' Position

The parties dispute whether the terms "match/matches/matched/matching" require construction. Plaintiff argues that the intrinsic record details the matching process, and thus, no construction is required. (Dkt. No. 1700 at 13.) Regarding Defendants' construction, Plaintiff argues that their construction of "match" as an "indistinguishable copy" does not capture the capabilities described in the claims and specifications, but instead is the 1-to-1 matching widely taught in the prior art. (Dkt. No. 1700 at 13.) According to Plaintiff, the 1-to-1 matching does not account for "versions," "index of relatedness," "similarity," etc. (Dkt. No. 1700 at 13.)

Defendants respond that the plain meaning of "match" in the field of computer searching and retrieval is an identical copy, and nothing in the specification departs from that ordinary meaning. (Dkt. No. 1751 at 20.) Defendants further argue that the patentees used "matching" to mean the identification of only those abstracts that have "indistinguishable differences," and that the claims are consistent with the ordinary meaning. (Dkt. No. 1751 at 20.) Defendants further argue that the goal of the invention described in the specification is always to get to the point where there is a 1-to-1 "match" according to the ordinary understanding of that term in the art.

(Dkt. No. 1751 at 21.)   Defendants cite the specifications description of "recalibration" to support its 1-to-1 argument. (Dkt. No. 1751 at 21) (citing '472 Patent at 11:20–23).

Defendants further contend that the prosecution history confirms that the claim term "match" has the ordinary meaning proposed by Defendants. (Dkt. No. 1751 at 21.)   Specifically, Defendants argue that the recalibration process was used during prosecution to overcome a prior art rejection. (Dkt. No. 1751 at 21) (citing 1751-4 at 5) ('175 FH Response to 10/24/11 OA) (discussing claim 107.   Defendants argue that the amendment makes clear "match" means that two abstracts are indistinguishable. (Dkt. No. 1751 at 21.)   Defendants also contend that the specification includes other means of ensuring that all abstracts in the database are distinguishable so that only one match is returned per query. (Dkt. No. 1751 at 22.)

Defendants further argue that Plaintiff provides no support for its position that abstracts "match a version of a signal to an original signal. They even match similar signals and indicated [sic] how and to what degree those signals are related." (Dkt. No. 1751 at 22.)   Defendants argue that abstracts are nothing more than a set of data in which an abstract has different data than all other abstracts. (Dkt. No. 1751 at 22.)   Defendants contend that a "version" is not a "match," and Plaintiff's discussion about "abstracts" and "versions" is irrelevant to the meaning of the term "match." (Dkt. No. 1751 at 22.)

Plaintiff responds that the claim language supports its position that "matching" does not mean "indistinguishable" as Defendants suggest. (Dkt. No. 1776 at 11.)   Plaintiff argues that claim 11 of the '472 Patent demonstrates that two separate "matches" are compared to one another through an index of relatedness. (Dkt. No. 1776 at 11.)   Plaintiff contends that if these two "matches" had to be identical matches as Defendants suggest, then the index would serve no purpose (Dkt. No. 1776 at 11.)   Plaintiff further argues that Defendants' construction would

exclude disclosed embodiment. (Dkt. No. 1776 at 12.)

Plaintiff also argues that Defendants' discussion of recalibration is only one embodiment that applies in situations where identical matches are warranted. (Dkt. No. 1776 at 12.)  Plaintiff contends that "recalibration" isn't a bad thing as Defendants suggest, "it is merely a way to obtain more accurate of time as additional information becomes available." (Dkt. No. 1776 at 12.)  Finally, Plaintiff argues that Defendants' citation to the prosecution history does not support their construction because the patentees explained to the examiner that when two objects are "indistinguishable" that is referred to as a "collision of data" not as a match. (Dkt. No. 1776 at 13) (citing Dkt. 1751-4 at 4).

### 2.  Analysis

The terms "match/matches/matched/matching" appear, in some form, in claims 1, 3-6, 8-9, and 11-14 of the '472 Patent, claims 1, 13, 18, and 30 of the '700 Patent, claims 1, 2, 24, and 27-29 of the '494 Patent, and claims 9, 10, 12, 13, and 15 of the '175 Patent.  The Court finds that the terms are used consistently in the claims and are generally intended to have the same meaning in each claim.  The Court further finds that the claim language indicates that a person of ordinary skill in the art would understand the terms are not limited to being only "indistinguishable," as Defendants propose.  For example, as Plaintiff contends, claim 11 of the '472 Patent recites "wherein the comparing device identifies at least two abstracts in the reference database that match the abstract of said at least one query signal and an index of relatedness to said at least one query signal for each of said at least two matching abstracts." The Court agrees that if these two "matches" had to be identical matches as Defendants suggest, then the recited index would serve no purpose.

Likewise, the Court finds that the specification discloses multiple embodiments.  One of these embodiments is the identical match that includes the recalibration process.  Regarding this

process, the specification states the following:

> For instance, if an artist releases a second performance of a previously recorded song, and the two performances are so similar that their differences are almost imperceptible, then the previously selected criteria may not be able to differentiate the two recordings. Hence, the database must be "recalibrated" to be able to differentiate these two versions. Similarly, if the system identifies not one, but two or more, matches for a particular search, then the database may need "recalibration" to further differentiate the two objects stored in the database.

'472 Patent at 11:13–23.  This is the embodiment discussed during the prosecution history that Defendants quote.  The important aspect here is that the "recalibration" relates to the "selected criteria" in this embodiment.  Here, the "selected criteria" is an identical match.  However, this is not the case for other embodiments.  For example, the specification describes the following additional embodiments:

> One such application for monitoring and analyzing visual images involves a desire to find works of other artists that relate to a particular theme. For example, finding paintings of sunsets or sunrises. A traditional approach might involve a textual search involving a database wherein the works of other artists have been described in writing. The present invention, however, involves the scanning of an image involving a sun, compressing the data to its essential characteristics (i.e., those perceptual characteristics related to the sun) and then finding matches in a database of other visual images (stored as compressed or even uncompressed data). By studying the work of other artists using such techniques, a novice, for example, could learn much by comparing the presentations of a common theme by different artists.
> Another useful application involving this type of monitoring and analyzing is the identification of photographs of potential suspects whose identity matches the sketch of a police artist.

'472 Patent at 14:65–15:15.  In this embodiment, the specification describes that an abstract may be generated of an image of a sun, and then a search may be run to find "matches in a database of other visual images" by other artists. '175 Patent at 14:57.  As indicated above, the specification further describes an embodiment where an abstract of a suspect's photograph may be compared against police sketches in search of "suspects whose identity matches the sketch of the police artist." '175 Patent at 14:62–65.

In both of these examples, the specification indicates that a match is not limited to an "indistinguishable" copy.  Instead, the specification indicates that a match occurs when the abstracts share selected criteria.  Indeed, the claims recite creating abstracts using selectable criteria. *See, e.g.,* '472 Patent, claim 9 ("a processor that creates an abstract of a signal using selectable criteria"), '175 Patent, claim 4 ("wherein said at least one processor is programmed or structured to select criteria to use for generating said digital reference signal abstract from said digital reference signal").  Likewise, the Abstract of the Asserted Patents states that "the method by which abstracts are generated can be programmable based upon selectable criteria."  Moreover, nothing excludes applying the "recalibration" process (*i.e.*, adjusting the selected criteria) to the other disclosed embodiments.

Thus, the Court agrees with Plaintiff that the patentees did not make a clear and unmistakable disclaimer that would limit the scope of the claims to only "indistinguishable" copies.  The Court further finds that based on the intrinsic evidence, a person of ordinary skill would understand that the term "match" means that the abstracts "share selected criteria." Finally, the Court has considered the extrinsic evidence submitted by Defendants and finds that it is consistent with one of the disclosed embodiments, but could potentially exclude other disclosed embodiments.  Therefore, the Court is not persuaded by the extrinsic definition provide by Defendants.

### 3.  Court's Construction

In light of the intrinsic evidence and extrinsic evidence, the Court construes the term **"match"** to mean **"share selected criteria,"** the term **"matches"** to mean **"shares selected criteria with,"** the term **"matched"** to mean **"shared selected criteria with,"** and the term **"matching"** to mean **"sharing selected criteria."**

### C. "reference signal" and "query signal"

| Disputed Term | Plaintiff's Proposal | Defendants' Proposal |
|---|---|---|
| "reference signal" | "a signal that is being referenced" | "an uncompressed signal representing an entire work" |
| "query signal" | "a signal being monitored or analyzed" | "an uncompressed signal representing an entire work to be analyzed" |

### 1. The Parties' Position

The parties dispute whether the terms "reference signal" and "query signal" must be an uncompressed signal representing an entire work, as Defendants propose.  Plaintiff contends that a reference signal is a signal that is being referenced, and that a "query signal" is "a signal being monitored or analyzed." (Dkt. No. 1700 at 20.)  Plaintiff further argues that requiring the signal to be uncompressed is not necessary, and that Defendants' construction would limit the Asserted Patents to uncompressed, raw images only, and nullify many of the embodiments. (Dkt. No. 1700 at 21.)  Plaintiff further argues that Defendants' limitation of "representing an entire work" is too limiting, because there is no reason why a reference signal could not be a notable portion of a public speech, a key subset of a painting, or the chorus of a song. (Dkt. No. 1700 at 21.)

Defendants respond that their construction of "reference signal" reflects two important concepts that are emphasized in the specification of the Asserted Patents: (1) a reference signal represents an entire work and (2) a reference signal has not undergone compression. (Dkt. No. 1751 at 31.)  Defendants argue that the specification defines "reference signal" as the work: "the creator's work itself is used as the monitoring signal." (Dkt. No. 1751 at 32) (citing '472 Patent at 6:50–51).  Thus, according to Defendants, a reference signal cannot be a portion of a work because the patentee expressly defined "reference signal" as the entire work, and defined a portion of an entire work as an "object." (Dkt. No. 1751 at 32) (citing '472 Patent at 8:33–35, 11:47–48).  Defendants further argue that Plaintiff's construction is flawed because it just

rearranges the words of the claims and provides no guidance for the term's meaning. (Dkt. No. 1751 at 33.)  Defendants next argue that the specification also makes it clear that a reference signal has not undergone the compression that an abstract has undergone. (Dkt. No. 1751 at 33) (citing '472 Patent at 5:34–39).

Regarding the term "query signal," Defendants argue that like a "reference signal," a "query signal" is an uncompressed signal that represents an entire work. (Dkt. No. 1751 at 33.) Defendants argue that Plaintiff's construction is incorrect because it does not differentiate between a query signal and a reference signal. (Dkt. No. 1751 at 33.)  Defendants also argue that a query signal differs from a reference signal because it is a signal that the claimed invention receives to be analyzed. (Dkt. No. 1751 at 33.)  Defendants contend that Plaintiff's construction conflicts with the claim language and the specification because it uses monitor or analyze. (Dkt. No. 1751 at 33.)

Plaintiff replies that Defendants' constructions improperly import limitations from the specification. (Dkt. No. 1776 at 14.)  Plaintiff argues that there is no support in the claim language or the specification that limits the signals to only "the entire work." (Dkt. No. 1776 at 14.)  Plaintiff argues that Defendants ignore that an object can be portion of the signal. (Dkt. No. 1776 at 14.)  Plaintiff next argues that Defendants' construction improperly limits the signal to being "uncompressed." (Dkt. No. 1776 at 14.)  Plaintiff claims that uncompressed is a modifier of the term "signal" and the claim language demonstrates that signal appears with and without modifiers. (Dkt. No. 1776 at 14.)  Plaintiff further argues that the word "compression" will very likely confuse the jury or require yet another claim construction of the term "compression" in the future. (Dkt. No. 1776 at 14.)

## 2.  Analysis

The term "reference signal" appears in claims 1-9 and 11-14 of the '472 Patent, claims 1,

5, 10, 12-13, 40, and 43-49 of the '700 Patent, claims 1-5, 11, 14-20, 24, and 27-29 of the '494 Patent, and claims 1-4 and 6-19 of the '175 Patent.  The Court finds that the term is used consistently in the claims and is intended to have the same meaning in each claim.  The term "query signal" appears in claims 1-9 and 11-14 of the '472 Patent, claims 1, 10, 12, 18, 40, 42-43, and 49 of the '700 Patent, claims 1, 11, 13-14, 20, 24, and 27-29 of the '494 Patent, and claims 5 and 11-16 of the '175 Patent.  The Court finds that the term is used consistently in the claims and is intended to have the same meaning in each claim.

The Court further finds that the claim language indicates that the "reference signal" exists separately from the "query signal," although it may be a copy of the "reference signal." *See, e.g.*, '472 Patent, claim 3 ("receiving at least one reference signal to be monitored … receiving at least one query signal to be analyzed.")  Indeed, the specification discusses the problem with counterfeiting and unauthorized use of copies, and how the present invention can be used to identify "matches" between abstracts of signals. *See, e.g.*, '472 Patent at 4:26–32, 8:48–59.  The claims further indicate that the "reference signal" and "query signal" are not the recited "abstract."  *See, e.g.*, '472 Patent, claim 3 ("creating an abstract of said at least one reference signal … creating an abstract of said at least one query signal.")  As discussed, the recited "abstracts" are "data-reduced representations" of the respective signals.

The specification further indicates that the "reference signal" is an "original signal."  For example, the specification states "[w]hile there are many approaches to data reduction that can be utilized, a primary concern is the ability to reduce the digital signal in such a manner as to retain a 'perceptual relationship' between the original signal and its data reduced version." '472 Patent at 3:52–56.  Likewise, the specification states that "[i]t is anticipated that the original signal may be compressed to create a realistic or self-similar representation of the original signal,

so that the compressed signal can be referenced at a subsequent time as unique binary data that has computational relevance to the original signal." '472 Patent at 7:44–48.   Both of these citations describe the claimed relationship between "reference signal," which is the original signal, and the recited "abstract."   Thus, the intrinsic evidence indicates that the "reference signal" is an original signal and the "query signal" is a second signal (*i.e.*, they are different signals).

However, neither the claims nor the specification require the original signal to be "uncompressed" or the "entire work" as Defendants contend.  The Court is not persuaded that the specification explicitly defines "reference signal" as the "entire work."   It is true that the specification states that a segmented portion of a "signal" is also referred to as an "object." '472 Patent at 8:31–39.  But this statement neither "explicitly" defines the recited "reference signal," nor does it require the recited "reference signal" to be an "entire work."   Instead, it notes that a "signal" can be thought of as "comprising a set of objects." "472 Patent at 8:34–35.  And, as Plaintiff contends, the intrinsic evidence does not exclude one "signal" from being an "object" (*i.e.*, a segmented portion) of a larger "signal."

Likewise, the intrinsic evidence does not require the "reference signal" to be an uncompressed signal.  The portion of the specification that Defendants cite to relates to one particular embodiment (*i.e.*, watermarks), and the specification states that this "*an example* of retaining a logical and perceptible relationship with the original uncompressed signal." '472 Patent at 5:37–39.  Thus, the Court is not persuaded that it should limit the claims to one example.  Instead, as discussed above, the intrinsic evidence requires that the "abstract" of the "reference signal" to be a "data-reduced representation of a signal."  This does not mean that the "reference signal" or the "query signal" have to be "uncompressed signals," it only requires that

their respective "abstracts" are "data-reduced representations" of the respective signals.

Furthermore, Defendants' construction that a "query signal" is "to be analyzed" is unhelpful and duplicative of the claim language. For example, claim 3 of the '472 Patent recites "receiving at least one query signal *to be analyzed*." Similarly, Plaintiff's construction that a "query signal" is "a signal being monitored or analyzed," is duplicative of the claim language and unnecessary. Likewise, Plaintiff's construction that a "reference signal" is "a signal that is being referenced" does not provide any useful guidance. As discussed above, the intrinsic evidence identifies the "reference signal" as an "original signal" and the "query signal" as a "second signal."

Finally, the Court's construction is not intended to mean that an "original signal" cannot be a copy of another signal. Instead, it only indicates that the "reference signal" is a separate signal from the "query signal" or second signal, and is "original" to the abstract that is created from it. Thus, the Court's will clarify this point by construing "reference signal" as an "original or first signal."

### 3. Court's Construction

In light of the intrinsic evidence, the Court construes the term **"reference signal"** to mean **"original or first signal,"** and the term **"query signal"** to mean **"second signal."**

**D. "a comparing device that compares" and "a device configured to determine if a query signal matches any one plurality of reference signals"**

| Disputed Term | Plaintiff's Proposal | Defendants' Proposal |
|---|---|---|
| "a comparing device that compares/ a comparing device….that compares/ a comparing device for comparing" | Not governed by §112¶6 | Means plus function.<br>Function: comparing<br>Structure: no structure or algorithm disclosed.<br><br>-To the extent the Court determines this term is not means-plus-function, Defendants propose this term is indefinite.<br><br>-To the extent the Court finds this term is not indefinite, Defendants propose: "A separate hardware component of the computerized system [that compares/for comparing/able to compare]". |
| "a device configured to determine if a query signal matches any one plurality of reference signals" | Not governed by §112¶6 | Means plus function.<br>Function: determine if a Query Signal matches any one plurality of Reference Signals<br>Structure: no structure or algorithm disclosed.<br><br>-To the extent the Court determines this term is not means-plus-function, Defendants propose this term is indefinite.<br><br>-To the extent the Court finds this term is not indefinite, Defendants propose: "A separate hardware component of the computerized system configured to determine if a Query Signal Matches any one plurality of Reference Signals". |

### 1.  The Parties' Position

The parties dispute whether the disputed phrases are means-plus-function limitations governed by 35 U.S.C. §112 ¶ 6 (pre-AIA).  In the alternative, Defendants contend that the phrases are indefinite, and if not indefinite, the phrases should be construed as "a separate hardware component of the computerized system." (Dkt. No. 1751 at 22.)

Plaintiff contends that the phrases are not governed by § 112 ¶ 6 because the terms do not use "means," and Defendants have failed to overcome the rebuttable presumption that § 112 ¶ 6 does not apply. (Dkt. No. 1700 at 15.)  Plaintiff further argues that "where '[t]he record shows

that an ordinary artisan would have recognized the [claim term] as an electronic device with a known structure', there is sufficient disclosure." (Dkt. No. 1700 at 15) (quoting *Telcordia Techs., Inc. v. Cisco Sys., Inc.*, 612 F.3d 1365, 1376 (Fed. Cir. 2010)).  To this end, Plaintiff argues that the specification indicates that the disputed phrases are not implicated by the means-plus-function statute. (Dkt. No. 1700 at 16) (citing '472 Patent at 8:55–9:10).  Plaintiff further argues that these claim terms would have been well understood by one of skill in the art as indicated by multiple technical dictionary definitions. (Dkt. No. 1700 at 17.)

Defendants respond that disputed claim phrases "comparing device that compares," "a comparing device for comparing" and "device configured to determine" are governed by § 112 ¶ 6. (Dkt. No. 1751 at 24.)  Defendants argue that they have overcome the rebuttable presumption that section 112 ¶ 6 does not apply to a claim limitation that does not use the term "means." (Dkt. No. 1751 at 24.)  Specifically, Defendants argue that if the claim uses a generic term, such as "device," that is a substitute for the term "means for" carrying out some function. (Dkt. No. 1751 at 24) (citing *Lighting World, Inc. v. Birchwood Lighting, Inc.*, 382 F.3d 1354, 1360 (Fed. Cir. 2004)).

Defendants further argue that stating the device is for "comparing" or "configured to determine" does not change the analysis, as those words only indicate the function of the device (*i.e.*, the device is either comparing or determining). (Dkt. No. 1751 at 24.)  Defendants also contend that the specification provides no insight into the meaning of "comparing device" or "device configured to determine," nor does it indicate that these terms are understood within the art to connote a known structure. (Dkt. No. 1751 at 24–25.)  Thus, according to Defendants, section 112 ¶ 6 applies because the claims nakedly recites a "device" and the written description fails to place clear structural limitations on that "device." (Dkt. No. 1751 at 25.)

Defendants further contend that the claims are indefinite because the specification of the asserted patents fails to disclose any structure for performing the claimed function of comparing a query signal abstract to the reference signal abstracts in order to determine if a match exists. (Dkt. No. 1751 at 25.)  Defendants argue that the only instance where "a comparing device" is discussed in the specification, the language merely rewords the function recited in the claim and says nothing about the "comparing device" structure that performs this function. (Dkt. No. 1751 at 25) (citing '472 Patent at 8:55–59).

Defendants further argue that Plaintiff's position that that one of ordinary skill in the art would nevertheless understand what a "comparing device" or "device configured to determine" may be fails as a matter of law. (Dkt. No. 1751 at 26.)  Defendants next argue that Plaintiff's dictionary definitions are irrelevant and attenuated because they require one of skill to make the unwarranted leap to know that a "comparator" is the "comparing device" of the patents. (Dkt. No. 1751 at 26.)  Finally, Defendants argue that the definitions provide no clear structure for a "comparator," let alone a comparing device, leaving one to guess whether a comparing device is software, hardware, logic, or a circuit. (Dkt. No. 1751 at 26.)

Plaintiff replies that "a comparing device" or "comparator" is a device that "compares two quantities and determines their equality." (Dkt. No. 1776 at 8)(citing Dkt. No. 1700 at 17–18).  Plaintiff argues that Defendants have glossed over the intrinsic evidence and have failed to rebut Plaintiff's definition. (Dkt. No. 1776 at 8.)  Plaintiff further argues that the specification is consistent with the use of the disputed term "a comparing device" or "comparator." (1776 at 8) (citing '175 Patent 3:32–60, 8:58–9:12, 9:20–40).

Regarding Defendants contention that section 112 ¶ 6 applies, Plaintiff argues that the case law cited by Defendants is not relevant or is readily distinguishable. (Dkt. No. 1776 at 8.)

Plaintiff argues that claim 11 of the '175 Patent illustrates that "a comparing device" does not require construction and is consistent with the use of the term "comparing device" in the specification that describes various setups of the comparator. (Dkt. No. 1776 at 8–9) (citing '175 Patent at 3:32–60, 8:58–9:12, 9:20–40).

Plaintiff further argues that the cited prior art indicates that a person of ordinary skill in the art would understand that a comparing device is also known as a "comparator," and that such devices are described in the Logan reference. (Dkt. No. 1776 at 9) (citing Dkt. No 1778, Logan Patent). Plaintiff further argues that the examiner not only mentioned the Logan reference in allowing claims to be issued, but even stated that the claims were being allowed over Logan because "Logan et al. do[es] not teach . . . a controller coupled to the first input, the processor, the comparing device, the reference database, and the storage medium, …") (Dkt. No. 1776 at 9) (citing Dkt. No.1776-4 at 5).

## 2. Analysis

The phrase "a comparing device that compares" or the phrase "a comparing device … that compares" appear in claims 9, 11, and 14 of the '472 Patent, claims 1 and 30 of the '700 Patent, and claims 1 and 24 of the '494 Patent. The Court finds that the term is used consistently in the claims and is intended to have the same meaning in each claim. The phrase "a comparing device for comparing" appears in claim 11 of the '494 Patent. The phrase "device configured to determine if a query signal matches any one plurality of reference signals" appears in claim 29 of the '494 Patent.

Contrary to Defendants' contention, the Court finds that the claims do not nakedly recite a "device." Instead, the claims recite a "comparing device" that "compares" or a "device configured to compare." Moreover, none of the asserted claims use "means" and Defendants have failed to overcome the rebuttable presumption that § 112 ¶ 6 does not apply. *Lighting*

*World, Inc. v. Birchwood Lighting, Inc.*, 382 F.3d 1354, 1358 (Fed. Cir. 2004) ("'[[A] claim term that does not use 'means' will trigger the rebuttable presumption that § 112 ¶ 6 does not apply.'") (quoting *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1369 (Fed. Cir. 2002)). As the Federal Circuit stated in *Lighting World*, "it is sufficient if the claim term is used in common parlance or by persons of skill in the pertinent art to designate structure, even if the term covers a broad class of structures and even if the term identifies the structures by their function." *Id.* at 1359-60.

Here, the intrinsic and extrinsic evidence indicates that a person of ordinary skill in the art would understand "comparing device" as designating structure even if identifies the structure by its function. *Greenberg v. Ethicon Endo-Surgery*, 91 F.3d 1580, 1583 (Fed. Cir.1996) ("[T]he fact that a particular mechanism … is defined in functional terms is not sufficient to convert a claim element containing that term into a 'means for performing a specified function' within the meaning of section 112(6).").   The specification states that the comparing device is able to compare the selected object using the features selected by the feature selector to the plurality of signals in the reference database to identify which of the signals matches the monitored signal. '472 Patent at 8:55–59.  Likewise, claim 11 of the '472 Patent recites that "a comparing device" is coupled to a reference database and to "said second input."

Moreover, the prior art cited in the prosecution history indicates that a person of ordinary skill in the art would understand that the comparing device, also known as a "comparator," designates sufficient structure.[6]  For example, the prior art states that "[t]he comparator can be

---

[6]  Defendants argue that a person of ordinary skill would have to make an "unwarranted leap to know that a 'comparator' is the 'comparing device' of the patents. (Dkt. No. 1751 at 26.)  The Court disagrees and finds that a person of ordinary skill in the art would understand that a "comparator" is a "comparing device."  For example, the examiner rejected the claims of the '700 Patent based on Logan's disclosure of a comparator. (Dkt. No. 1751-5 at 7–8) (("With

[an] electrical circuit card assembly, a software program, or a combination of both. As will be explained in greater detail hereinafter, the comparator can employ known signal processing techniques that identify a signal by comparing the signal, to a library of known signals or signal characteristics." (Dkt. No. 1778 at 9 at 6:2–9.)  Furthermore, the dictionary definitions cited by Plaintiff indicate how a person of ordinary skill in the art would understand the disputed phrases. For example, The Computer Glossary 72 (8th ed. 1998) defines "comparator" as "a device that compares two quantities and determines their equality." (Dkt. No. 1761-1 at 4.)  Thus, the Court finds that a person of ordinary skill in the art would understand that the recited "comparing device" or a "device configured to compare" provides sufficient structure.  *Greenberg v. Ethicon Endo-Surgery*, 91 F.3d 1580, 1583(Fed. Cir.1996) ("Many devices take their names from the functions they perform. The examples are innumerable ….")

In addition to this evidence, the examiner understood that the recited "comparing device" recited sufficient structure when the claims were allowed over the prior art because "Logan et al. do[es] not teach . . . a controller coupled to the first input, the processor, the comparing device, the reference database, and the storage medium, …") (Dkt. No.  1776-4 at 5) ('472 Patent – Notice of Allowability dated Sept. 19, 2007); *see also id.* at 6–7 ("Logan et al. do[es] not teach the comparing device identifying at least two abstracts in the reference database that match the abstract of said at least one query signal and an index of relatedness to said at least one query signal for each of said at least two matching abstracts.").  Accordingly, Defendants have failed to overcome the presumption that § 112 ¶ 6 does not apply.  Indeed, the presumption "is a strong

respect to claims 21, 28, 30, 33, and 43, Logan et al. disclose an electronic system for monitoring and analyzing at least one signal, comprising: … a comparing device (comparator 50 shown on Fig. 2) that compares an abstract of said at least one query signal to the abstracts stored in the reference database to determine if the abstract of said at least one query signal matches any of the stored abstracts (see Abstract, lines 7-10; col. 2, lines and col. 8, line 39 to col. 9, line 6).").

one that is not readily overcome." *Lighting World, Inc.*, 382 F.3d at 1358.

Moreover, as discussed above, the intrinsic evidence informs, with reasonable certainty, those skilled in the art about the scope of the disputed phrase.  In addition to the intrinsic evidence discussed above, the claim language itself informs those skilled in the art about the scope of the phrase.  For example, claim 11 of the '472 Patent recites "a comparing device, coupled to said reference database and to said second input, that compares an abstract of said at least one query signal to the abstracts stored in the reference database to determine if the abstract of said at least one query signal matches any of the stored abstracts."  Similarly, claim 1 of the '494 Patent recites "a comparing device that compares the created query signal abstract to the reference signal abstracts in the at least one database."  Thus, the claims inform a person of ordinary skill in the art that the recited "comparing device" must at a minimum compare the recited "abstracts."  Therefore, the Court finds that the phrases are not indefinite and should be given their plain and ordinary meaning.[7]

### 3.  Court's Construction

In light of the intrinsic and extrinsic evidence, the Court finds that the phrases **"a comparing device that compares," "a comparing device … that compares," "a comparing device for comparing,"** and **"device configured to determine if a query signal matches any one plurality of reference signals"** are not indefinite.  The Court further finds that the phrases do not require construction and will be given their **plain and ordinary meaning**.

---

[7]  Defendants' brief presented an alternative construction of a "separate hardware component of the computerized system …." (Dkt. No. 1751 at 22.)  Defendants, however, did not provide any arguments on why that construction should be adopted in light of the intrinsic and extrinsic evidence before the Court.  Moreover, the Court finds that the disputed phrases are unambiguous, are easily understandable by a jury, and require no construction.

### E.  *"versions of [a/the/said/"that one of said plurality of"] reference signals"*

| Disputed Term | Plaintiff's Proposal | Defendants' Proposal |
|---|---|---|
| "versions of [a/the/said/"that one of said plurality of"] reference signal[s]" | No construction required. | "multiple variations of a particular Reference Signal" |

### 1.  The Parties' Position

The parties dispute whether the phrase "version of the reference signals," and its various iterations, require construction.  Plaintiff contends that the phrases are best left defined by the claims and specifications. (Dkt. No. 1700 at 18.)  Plaintiff argues that the intrinsic evidence notes that "version" may be a reference signal that is transformed during transport, such as a song transformed once played by CD, AM radio, or over the internet. (Dkt. No. 1700 at 18) (citing '175 Patent at column 13.  Plaintiff also argues that a "version" of a reference signal may also refer to different formatting and/or compression schemes applied to the same song. (Dkt. No. 1700 at 19.)  Plaintiff further contends that a "versions" may relate to a reference signal, such as a song, that is not derived from the signal itself per se. (Dkt. No. 1700 at 19.)  Plaintiff provides the example of separate artists singing the same song. (Dkt. No. 1700 at 19) (citing '175 Patent at column 8.  Thus, Plaintiff concludes that Defendants' construction is unnecessary and will likely confuse these phrases. (Dkt. No. 1700 at 19.)

Defendants respond that the asserted claims of the '494 and '700 Patents require differentiation among "versions" of "[the] reference signal." (Dkt. No. 1751 at 28.)  Defendants argue that the "multiple of the former conjoined with the singular of the latter can only mean: 'multiple variations of a particular Reference Signal.'" (Dkt. No. 1751 at 28.)  Defendants also contend that all of the disputed formulations—"the", "said", and "one of said plurality of"—

share the singularity of the "reference signal." (Dkt. No. 1751 at 28.)  Defendants argue that these formulations recite "versions" in the plural, indicating that there are multiple versions. (Dkt. No. 1751 at 28.)  Defendants argue that the specification itself equates "versions" with "variations." (Dkt. No. 1751 at 28)(citing '472 Patent at 3:63–4:2).  Defendants contend that Plaintiff's "version" arguments are irrelevant because the claims do not merely require "versions," but require "versions of [the] reference signal." (Dkt. No. 1751 at 29.)

Defendants also argue that there is no evidence to support Plaintiff's proposition that a reference signal, as used in the asserted claims, can be a disembodied "original song" with no particular ability to be identified in its own right. (Dkt. No. 1751 at 29.)  Defendants argue that the specification requires the "original song" to be recorded in a medium in order to be abstracted and analyzed. (Dkt. No. 1751 at 29) (citing '472 Patent at 4:56–59).  Thus, according to Defendants, even if a reference signal did comprise an original song performed by an artist, the "versions of [that] reference signal" could only comprise variations of a particular recording—not the attenuated and unsupported example proposed by Plaintiff of the same lyrics sung by different artists. (Dkt. No. 1751 at 30.)  Finally, Defendants argue that if a version need not even be derived from the signal itself, the term is further indefinite as subjective. (Dkt. No. 1751 at 30.)

Plaintiff's reply brief directed the Court to the arguments made in its opening claim construction brief for this term. (Dkt. No. 1776 at 15.)

### 2.  Analysis

The phrase "versions of the reference signal" appears in asserted claims 1 and 40 of the '700 Patent and claim 11 of the '494 Patent.  The phrase "versions of said reference signal" appears in asserted claim 1 of the '494 Patent.  The phrase "versions of at least one reference signal" appears in claim 24 of the '494 Patent.  The phrase "versions of that one of said plurality

of reference signals" appears in claim 29 of the '494 Patent.  The Court finds that these phrases are unambiguous, are easily understandable by a jury, and no construction is needed.

Defendants' constructions redraft "version" to "multiple variations," and further requires the phrase to include a "particular" reference signal.  Defendants' construction is more confusing than helpful.  The claim language is clear and will be given its plain and ordinary meaning.  To be sure, each "reference signal" has a corresponding "abstract," and each abstract provides differentiating between a plurality of versions of *the* reference signal. *See, e.g.*, '700 at claim 1.  This does not mean that differentiating between the same lyrics sung by different artists is automatically excluded from the scope of the claims.  It only means that it is not within the scope of these disputed phrases, as Plaintiff appears to contend.

### 3.  Court's Construction

In light of the intrinsic evidence, the Court finds that the phrases **"versions of the reference signal," "versions of said reference signal,"** and **"versions of that one of said plurality of reference signals,"** are unambiguous, are easily understandable by a jury, and require no construction.  Therefore, the phrases will be given their **plain and ordinary meaning**.

### F.  *"similar to"*

| Disputed Term | Plaintiff's Proposal | Defendants' Proposal |
|---|---|---|
| "similar to" | No construction required | Indefinite<br><br>To the extent the Court believes that this term is not indefinite, then Defendants propose: "looks or sounds the same as" |

### 1.  The Parties' Position

The parties dispute whether the term "similar to" is indefinite.  Plaintiff contends that the meaning of "similar to" is apparent on the face of the specification. (Dkt. No. 1785 at 24.)

Plaintiff argues that signal analysis (*i.e.*, abstract comparisons) "must maintain the ability to distinguish the perceptual quality of the signals being compared." (Dkt. No. 1785 at 24) ('175 Patent at 7:15–17). Thus, according to Plaintiff, distinguishing signals necessarily provides feedback regarding their similarity. (Dkt. No. 1785 at 24.) Plaintiff further argues that the specification explains that "abstracts are created using data reduction techniques to determine the smallest amount of data, at least a single bit, which can represent and differentiate two digitized signal representations." (Dkt. No. 1785 at 24) (quoting '175 Patent at 10:12–16). According to Plaintiff, these "at least a single bit" characteristics are distinguishing aspects of the reference signal, not arbitrary distinctions. (Dkt. No. 1785 at 24.) Thus, Plaintiff argues that an abstract remains similar to the signal from which it is derived and "maintain[s] the ability to distinguish the perceptual quality of the signals being compared." (Dkt. No. 1785 at 24) (quoting '175 Patent at 7:4–17).

Defendants respond that the claim language provides no guidance on the required degree of similarity. (Dkt. No. 1752 at 21.) Defendants further argue that the claims do not indicate what this term means with respect to the relationship between the digital reference signal and its digital reference signal abstract. (Dkt. No. 1752 at 21.) Defendants also argue that neither the specification nor the prosecution history of the '175 Patent provides guidance as to the meaning of this term. (Dkt. No. 1752 at 21.) Defendants further argue that the specification does not use the phrase "similar to" anywhere when describing the relationship between an abstract and a signal. (Dkt. No. 1752 at 21.)

Defendants also argue that the specification suggests the relationship between an original signal and its abstract is a subjective inquiry left to those practicing the invention. (Dkt. No. 1752 at 22) (citing '472 Patent at 9:61–65). Thus, according to Defendants, one skilled in the art

is left struggling to apply their subjective judgment to determine what degree of similarity is required by the claims and what features or aspects in signal processing, their perception, or the physical world might bear on that question. (Dkt. No. 1752 at 22.)  Defendants further argue that it also unclear who or what determines this similarity. (Dkt. No. 1752 at 22) (citing '472 Patent at 9:55–59).  Defendants conclude that because the relative "similarity" between an abstract and signal is subjective and wholly undefined, claims 8, 11 and 17 of the '175 Patent, and the claims that depend therefrom, are necessarily invalid as indefinite. (Dkt. No. 1752 at 23).  In the alternative, Defendants propose that the term means "looks or sounds the same as." (Dkt. No. 1751 at 45.)  Defendants argue that signals can only be perceived visually or aurally. (Dkt. No. 1751 at 45) (citing '472 Patent at 8:21–30, 10:9–11).

Plaintiff's reply brief directed the Court to the arguments made in its opening claim construction brief for this term. (Dkt. No. 1776 at 15.)

### 2.  Analysis

The phrase "similar to" appears in claims 1, 3, 5, 7-11, and 17-19 of the '175 Patent.  The Court finds that the term is used consistently in the claims and is intended to have the same meaning in each claim.  Claim 11 of the '175 Patent recites that "wherein said at least one processor is programmed or structured to generate a digital reference signal abstract from a digital reference signal such that said digital reference signal abstract is similar to said digital reference signal and reduced in size compared to said digital reference signal."  Thus, the claims recite that the abstract is "similar to" the "reference signal," as well as "reduced in size."

Moreover, the specification and prosecution history further informs, with reasonable certainty, those skilled in the art about the scope of the phrase "similar to."  In addition to being "reduced in size," the recited abstract is "similar to" the recited reference signal by retaining a perceptual relationship with the reference signal.  The specification states that "[w]hile there are

many approaches to data reduction that can be utilized, *a primary concern* is the ability to reduce the digital signal in such a manner as to retain a 'perceptual relationship' between the original signal and its data reduced version." '472 Patent at 3:52–55.  Similarly, the specifications adds that "[t]he challenge is to maximize the ability to sufficiently compress a signal to both retain its relationship with the original signal while reducing the data overhead to enable more efficient analysis, archiving and monitoring of these signals." '472 Patent at 9:47–51.

Furthermore, the patentees distinguished the claims from the prior art based on the prior art failing to disclose this "perceptual relationship."  Specifically, the patentees argued that claim 21 of the '700 Patent (which ultimately issued as claim 1 of the '700 patent) was distinguishable from the prior art because the "[s]ignal abstracts retain a perceptual relationship with the signal from which it was created or derived." (Dkt. No. 1751-8 at 20) ('700 FH Response to 3/5/09 OA).  The patentees made similar arguments in the '472 Patent file history about pending claims that did not explicitly recite "a perceptual relationship" element. *See* 1751-3 at 11 ('472 FH Response to 5/11/07 OA) ("Logan allegedly discloses additive information, the 'informational signal', having no relationship with the perceptual nature of the reference signal. The present invention(s) is not so limited.").  Accordingly, the Court finds that the intrinsic evidence informs, with reasonable certainty, those skilled in the art about the scope of the phrase "similar to."  Specifically, the Court finds that a person of ordinary skill in the art would understand that "similar to" means "retaining a perceptual relationship with."[8]

### 3.  Court's Construction

In light of the intrinsic evidence, the Court construes the term **"similar to"** to mean

---

[8]  The Court notes that the parties have agreed to the following constructions: "characteristic perceived by a person," "characteristic understood by a person," "characteristic perceived differently by different people," and "quality perceived by a person." (Dkt. No. 1674 at 3.)  Thus, the parties agree that terms like "perceptual relationship" are not indefinite.

**"retaining a perceptual relationship."**

> ### G. *"creating at least one counter corresponding to one of said at least one reference signal & Incrementing the counter … when a match is found / first digital reference signal abstract match recorder"*

| Disputed Term | Plaintiff's Proposal | Defendants' Proposal |
|---|---|---|
| "creating at least one counter corresponding to one of said at least one reference signal" | No construction required. | "creating an element used for counting, which corresponds to a particular Reference Signal" |
| "incrementing the counter …. when a match is found" | No construction required. | "increasing the value of the element used for counting when a match is found" |
| "first digital reference signal abstract match recorder" | No construction required. | "an element used for counting, which corresponds to a particular Abstract" |

### 1. The Parties' Position

The parties dispute whether the phrases should be clarified to state that each "counter" (or "recorder") corresponds to one (and only one) reference signal and its associated abstract. Plaintiff argues the phrases do not require construction and that Defendants' constructions add the idea that "an element" is created and "used for counting." (Dkt. No. 1700 at 22.)  Plaintiff argues that this is beyond the scope and purpose of the claim. (Dkt. No. 1700 at 22.)  Plaintiff further contends that how the counter is created is not important, nor is it indicated in the specification. (Dkt. No. 1700 at 22.)

Defendants respond that when reading the terms in the context of the entire claim in which it is found, the phrase "one of said at least one reference signals [sic]" recited in claim 3 of the '472 patent (as well as the similar phrase "one of said plurality of reference signals" recited in claim 8 of the '472 patent) refers to only one reference signal, i.e., the particular reference signal. (Dkt. No. 1751 at 35.)  Defendants further argue that the specification indicates that the "counter" is used for counting the number of times a reference signal has been detected as a result of comparing abstracts of query signals with the abstract of the particular reference signal.

(Dkt. No. 1751 at 36.)   Thus, according to Defendants, only matches to the abstract of the particular reference signal are counted, not matches to any other abstract. (Dkt. No. 1751 at 36.)

Regarding claim 15 of the '175 Patents, Defendants make a similar argument and contend that when the phrase "first digital reference signal abstract match recorder . . . [records] a number of times said at least one processor determines a match between a digital query signal abstract and first [sic] digital reference signal abstract of said plurality of digital reference signal abstracts" is read in the entire context of the claim, the phrase "first digital reference signal abstract" indicates that the "match recorder" corresponds to only one particular abstract, i.e., the "first digital reference signal abstract." (Dkt. No. 1751 at 37.)   Thus, according to Defendants, nothing in the intrinsic record, or in any extrinsic record, indicates that the "match recorder" corresponds to multiple abstracts. (Dkt. No. 1751 at 37.)

Plaintiff's reply brief directed the Court to the arguments made in its opening claim construction brief for this term. (Dkt. No. 1776 at 15.)

## 2.  Analysis

The phrases "creating at least one counter corresponding to one of said at least one reference signal" and "incrementing the counter….when a match is found" appear in claims 3 of the '472 Patent.  The phrases "creating at least one counter corresponding to one of said plurality of reference signals" and "incrementing the counter….when a match is found" appears in claim 8 of the '472 Patent.  The phrase "first digital reference signal abstract match recorder" appears in claim 15 of the '175 Patent.

The Court finds that the claim language is unambiguous, is easily understandable by a jury, and the phrases require no construction.   The Court agrees with Defendants that the intrinsic evidence indicates that each counter that is created increments "the counter corresponding to a particular reference signal when a match is found."  This is the plain language

of the claims 3 and 8 of the '472 Patents.  The language is clear and does not require rearrangement or adding an "element" as Defendants contend.  To the extent that Plaintiff contends that a single counter can count matches for multiple references signals, the Court rejects such an argument.  However, the claim language is clear that the scope of the claims are not limited to creating only one counter, but instead indicate that a counter can be created for each reference signal. *See, e.g.*, '472 Patent at claim 3 ("creating at least one counter").

### 3.  Court's Construction

In light of the intrinsic evidence, the Court finds that the phrases "**creating at least one counter corresponding to one of said at least one reference signal," "creating at least one counter corresponding to one of said plurality of reference signals," "incrementing the counter….when a match is found,"** and **"first digital reference signal abstract match recorder"** are unambiguous, are easily understandable by a jury, and require no construction.  Therefore, the phrases will be given their **plain and ordinary meaning**.

### H.  *"selectable criteria"*

| Disputed Term | Plaintiff's Proposal | Defendants' Proposal |
|---|---|---|
| "selectable criteria" | "criteria that is selectable" | "Rules available for selection, which create different Abstracts for a particular reference signal" |

### 1.  The Parties' Position

The parties dispute whether the term "selectable criteria" should be construed as "rules" for "different Abstracts for a particular reference signal."  Plaintiff contends that the term "selectable criteria" can be succinctly construed as "criteria that is selectable." (Dkt. No. 1700 at 19.)  Plaintiff argues that this definition allows for criteria that may affect the abstract, or may not. (Dkt. No. 1700 at 20.)  Plaintiff further argues that the criteria may be complex rules or simple variable, and may be selected by the user. (Dkt. No. 1700 at 20.)  Plaintiff further argues

that Defendants' construction places unnecessary limitations on the term. (Dkt. No. 1700 at 20.) Plaintiff contends that there is no indication in the record that the criteria must be rules rather than variable, or that the criteria must necessarily generate different abstracts. (Dkt. No. 1700 at 20.)

Defendants respond that the claim language explains that the processor uses "selectable criteria" to create an abstract. (Dkt. No. 1751 at 30.) Defendants argue that it necessarily follows that the abstract created by the processor will be different depending on which of the available criteria is selected. (Dkt. No. 1751 at 30.) Thus, according to Defendants, "selectable criteria" can only mean "rules available for selection, which create different abstracts for a particular reference signal." (Dkt. No. 1751 at 30.)

Defendants further argue the Plaintiff's construction does not actually define this term, it only rearranges the claim language. (Dkt. No. 1751 at 30.) Defendants contend that there is no support in the specification or in the prosecution history regarding criteria being selected by a user. (Dkt. No. 1751 at 31.) Defendants further contend that because the processor uses the "selectable criteria" to create the abstract, these criteria are in fact "rules" for the processor to apply, and the processor selects the rules to be applied. (Dkt. No. 1751 at 31) (citing '472 Patent at Abstract, 13:16–22).

Defendants next argue that the specification explains that "if an artist releases a second performance of a previously recorded song, and the two performances are so similar that their differences are almost imperceptible, then the previously selected criteria may not be able to differentiate the two recordings." (Dkt. No. 1751 at 31) (quoting '472 Patent at 11:14–18). Thus, according to Defendants, to make such a differentiation, different criteria must be selected to generate Abstracts that are different from those Abstracts that were created using the previously

selected criteria. (Dkt. No. 1751 at 31.)

Plaintiff replies that Defendants attempt to limit the criteria to "rules" is improper and is not supported by the claim language or the specification. (Dkt. No. 1776 at 13) (citing '472 Patent claims 9, 11, and Abstract). Plaintiff argues that the Abstract recites "[m]oreover, the method by which abstracts are generated can be programmable based upon selectable criteria." (Dkt. No. 1776 at 13.) Plaintiff contends that the patentees did not limit themselves to specific "rules" by the use of "can be programmable" as a modifier. (Dkt. No. 1776 at 13.) Finally, Plaintiff argues that Defendants are incorrect that an abstract will be different based on different criteria. (Dkt. No. 1776 at 13.)

## 2. Analysis

The term "selectable criteria" appears in claims 9 and 11 of the '472 Patent. The Court finds that the term is used consistently in the claims and is intended to have the same meaning in each claim. The Court further finds that the claim language recites that the processor "creates an abstract of a signal using selectable criteria." Thus, it is repetitive and unnecessary to include "which create different Abstracts for a particular reference signal" in the construction. Moreover, as Plaintiff notes, the specification states that "the method by which abstracts are generated can be programmable based upon selectable criteria." (Dkt. No. 1776 at 13) (quoting '472 Patent at Abstract). Likewise, the specification states that "means can be derived (and programmed for selectability) to recognize and distinguish these differences." '472 Patent at 13:20–22. Given that the specification discusses that criteria are "programmable" or "programmed," the Court finds that a person of ordinary skill would understand that the recited "selectable criteria" is "criteria that are programmable." The Court agrees with Plaintiff that the term should not be limited to specific "rules." The only mention of "rules" in the specification is regarding an embodiment that can increase efficiency based on the efficiency of the processing

hardware and/or software. '472 Patent at 10:41–46.

### 3. Court's Construction

In light of the intrinsic evidence, the Court construes the term **"selectable criteria"** to mean **"criteria that are programmable."**

### I. *"distributing at least one signal based on the comparison step"*

| Disputed Term | Plaintiff's Proposal | Defendants' Proposal |
|---|---|---|
| "distributing at least one signal based on the comparison step" | No construction required. | "delivering at least one signal resulting from the comparison to multiple recipients" |

### 1. The Parties' Position

The parties dispute whether the phrase "distributing at least one signal based on the comparison step" requires delivery to "multiple recipients." Plaintiff contends that this is another term that is self-explanatory, and that Defendants' construction adds no clarity. (Dkt. No. 1700 at 23.) Plaintiff further argues that there is no indication that "distribution" should be limited to delivery to "multiple recipients." (Dkt. No. 1700 at 23.)

Defendants contends that the specification envisions "methods for faster and more accurate auditing of signals as they are played, distributed or otherwise shared amongst providers (transmitters) and consumers (receivers)." (Dkt. No. 1751 at 37) (quoting '472 Patent at 6:67–7:3). Thus, according to Defendants, "distributing" means delivering of at least one signal to multiple recipients. Defendants also cite to the definition of "signal distributing" provided by the IEEE Standard Dictionary of Electrical and Electronics Terms (6th Ed. 1997)) (Dkt. 1751-10 at 6) ("signal distributing (telephone switching systems) Delivering of signals from a common control to other circuits.").

Plaintiff's reply brief directed the Court to the arguments made in its opening claim

construction brief for this term. (Dkt. No. 1776 at 15.)

## 2. Analysis

The phrase "distributing at least one signal based on the comparison step" appears in claim 22 of the '494 Patent.  The Court finds that the phrase is unambiguous, is easily understandable by a jury, and requires no construction.  The intrinsic and extrinsic evidence cited by Defendants does not support requiring the signal to be delivered to "multiple recipients."

## 3. Court's Construction

In light of the intrinsic and extrinsic evidence, the phrase **"distributing at least one signal based on the comparison step"** will be given its **plain and ordinary meaning**.

## J. "related to"

| Disputed Term | Plaintiff's Proposal | Defendants' Proposal |
|---|---|---|
| "related to" | No construction required. | "Matches" |

## 1. The Parties' Position

The parties dispute whether the term "related to" requires construction.  Plaintiff contends that "related to" by definition implies similarity, not equality. (Dkt. No. 1700 at 14.) As an example, Plaintiff argues that the specification indicates that an abstract of the sun could be created by identifying essential characteristics of the sun (*i.e.*, those "characteristics related to" it). (1700 at 14) (citing '472 Patent at 15:2–8).  According to Plaintiff, those characteristics are not the sun itself, but they share a connection with it, and other images would then be matched based on those related characteristics. (Dkt. No. 1700 at 14.)  Plaintiff argues that this technique is far from the 1-to-1 matching taught in the prior art. (Dkt. No. 1700 at 14.)

Defendants argue that the Asserted Patents include no description of how one abstract can be "related to" another abstract. (Dkt. No. 1751 at 27.)  Defendants argue that the only disclosure in the specification for comparisons of abstracts is for 1-to-1 matching and a match to

different versions of a reference signal using an "index of relatedness." (Dkt. No. 1751 at 27.) Thus, according to Defendants, the only way to potentially preserve the validity of the claims containing the term "related to" is to construe it to mean "matches." (Dkt. No. 1751 at 27.) Defendants also argue that claim is not enabled unless it is construed as "matches" because there is no support in the specification to identify how close something must be to be "related." (Dkt. No. 1751 at 27.)

Plaintiff replies that Defendants are mistaken that there is no support in the specification to identify something that is "close." (Dkt. No. 1776 at 10.)  Plaintiff argues that Defendants ignore the entire second embodiment (citing '175 Patent at 14:39–15:4) and the description of abstracts of songs performed by different artists (citing '175 Patent at 7:4–34). (Dkt. No. 1776 at 10.)  Plaintiff argues that two matches are further described by an index of relatedness that identifies just how similar they are to the original. (Dkt. No. 1776 at 10.) (citing '472 Patent, claim 11).

### 2.  Analysis

The term "related to" appears in claim 40 of the '700 Patent and claim 11 of the '494 Patent.  The Court finds that the term is used consistently in the claims and is intended to have the same meaning in each claim.  The Court finds that the disputed phrase "related to" should be construed the same at the disputed "match" terms.  A comparison of the claims in the Asserted Patents indicates that it is used interchangeably with "matches."  Indeed, the parties make the same arguments that they made to support the disputed "matches" term.  Accordingly, for the reasons stated above for the disputed "match" terms, the Court finds the term should be construed as "shares selected criteria with."

### 3.  Court's Construction

In light of the intrinsic evidence, the Court construes the term **"related to"** to mean

**"shares selected criteria with."**

### K.  *"index of relatedness"*

| Disputed Term | Plaintiff's Proposal | Defendants' Proposal |
|---|---|---|
| index of relatedness | No construction required. | Indefinite |

### 1.  The Parties' Position

The parties dispute whether the term "index of relatedness" is indefinite.  Defendants contend that the term is indefinite because there is no disclosure of what this term is, what it does, or how "relatedness" is measured. (Dkt. No. 1752 at 23.)  Defendants further argue that the term "index of relatedness" has no specific meaning in the art, and is a subjective and relative term. (Dkt. No. 1752 at 23.)  Defendants contend that "index of relatedness" is used in the patent to describe some type of relationship between a "query signal" and two "abstracts" in a database. (Dkt. No. 1752 at 23.)  Defendants argue that the nature or extent of the "relatedness" between an abstract and a query signal is not described in the specification, nor how to measure it. (Dkt. No. 1752 at 23.)  Defendants also argue that the terms "index" and "index of relatedness" do not appear in the patent beyond the claim, and that there is no specific meaning of the phrase "index of relatedness" in the art. (Dkt. No. 1752 at 23.)  Thus, Defendants contend that one of ordinary skill in the art is left to apply their subjective judgment about what this term may mean. (Dkt. No. 1752 at 24.)

Plaintiff responds that "index of relatedness" describes a relationship between a query signal and two abstracts.  Plaintiff argues that an "index" is an "indicator, sign, or measure of something." (Dkt. No. 1785 at 25) (citing Google Dictionary).   Plaintiff also argues that at the time of the invention, "relatedness" meant "the state or condition of being related." (Dkt. No. 1785 at 25) (quoting Dkt. 1785-8 at 4) (Oxford English Dictionary (1989)).  Plaintiff argues that the term "related" meant "having relation to, or relationship with, something else." (Dkt. No.

1785 at 25) (Dkt. 1785-9 at 4) (Oxford English Dictionary (1989)).  Thus, according to Plaintiff, an "index of relatedness" in the context of the claims meant "a measure of the relationship between the signal and its abstract." (Dkt. No. 1785 at 25.)  Plaintiff further argues that the specification goes to great lengths to describe the relationship between signal and abstract, a relationship that identifies distinguishing characteristics. (Dkt. No. 1785 at 25.)

Defendants reply that it is clear that even Plaintiff is uncertain what "index of relatedness" means. (Dkt. No. 1803 at 10.)  Defendants argue that Plaintiff's entire argument is that "[t]he term is definite despite not appearing in the specification because it is framed by sufficient context." (Dkt. No. 1803 at 10.)  Defendants further argue Plaintiff includes no citations, nor any indication at all, as to what that context is because none exists. (Dkt. No. 1803 at 10.)

### 2.  Analysis

The disputed term "index of relatedness" appears in claim 11 of the '472 Patent.  Claim 11 recites "wherein the comparing device identifies at least two abstracts in the reference database that match the abstract of said at least one query signal and an index of relatedness to said at least one query signal for each of said at least two matching abstracts."  Thus, the claim language indicates that the comparing devices compares the query signal to each of the matching abstracts to determine an index of relatedness.  Moreover, the specification discusses differentiating between two recordings and recalibrating the database to further differentiate between two objects stored in the database. '472 Patent at 11:13–24.

In this context, a person of ordinary skill in the art would understand the term "index of relatedness" to mean "an index that provides a degree of differentiation."  Thus the "claims, viewed in light of the specification . . ., inform those skilled in the art about the scope of the invention with reasonable certainty." *Nautilus*, 134 S. Ct. at 2129.  Accordingly, for the reasons

stated above, the Court finds the term "index of relatedness" should be construed to mean "an index that provides a degree of differentiation."

### 3. Court's Construction

In light of the intrinsic and extrinsic evidence, the Court construes the term **"index of relatedness"** to mean **"an index that provides a degree of differentiation."**

## VI.   CONCLUSION

The Court hereby orders the claim terms addressed herein construed as indicated. Summary charts are attached below as Exhibit A (agreed terms) and Exhibit B (disputed terms).

The parties are further ordered that they may not refer, directly or indirectly, to each other's claim construction positions in the presence of the jury.  Likewise, the parties are ordered to refrain from mentioning any portion of this opinion, other than the actual constructions adopted by the Court, in the presence of the jury.  Any reference to claim construction proceedings is limited to informing the jury of the constructions adopted by the Court.

**SIGNED this 16th day of October, 2014.**

CAROLINE M. CRAVEN
UNITED STATES MAGISTRATE JUDGE

**EXHIBIT A**

| Agreed Claim Term | Construction |
|---|---|
| "hashed abstract" | "data that results from performing a Hash on an Abstract" |
| "perceptible characteristic" | "characteristic perceived by a person" |
| "cognitive characteristic" | "characteristic understood by a person" |
| "subjective characteristic" | "characteristic perceived differently by different people" |
| "perceptual quality" | "quality perceived by a person" |
| "cognitive feature" | "a feature that is understood by a person" |
| "digital" | plain and ordinary meaning |
| "cryptographic protocol" | "procedure for transforming data to secure it and enhance its uniqueness and identification" |
| "hash" | "a mathematical transform that maps a bit string of arbitrary length to a fixed length bit string to achieve uniqueness" |
| "reduced in size" | plain and ordinary meaning |
| "perceptual characteristics representative of parameters to differentiate between versions of the reference signal" | plain and ordinary meaning |
| "signal characteristic parameters configured to differentiate between versions of said reference signal" | plain and ordinary meaning |
| "signal characteristic parameters configured to differentiate between a plurality of versions of the reference signal." | plain and ordinary meaning |

| "signal characteristic parameters configured to differentiate between other versions of that one of said plurality of reference signals" | plain and ordinary meaning |
|---|---|
| "signal characteristic parameters that differentiate between said plurality of different versions of said visual work and said multimedia work" | plain and ordinary meaning |
| "reference database" | "a database containing abstracts of reference signals" |
| "recognizable characteristic" | "characteristic visually or aurally perceived by a person" |
| "a compare result" | plain and ordinary meaning |

**EXHIBIT B**

| Disputed Claim Term | Court's Construction |
|---|---|
| "abstract" | "a data-reduced representation of a signal that retains a perceptual relationship with the signal and differentiates the data-reduced representation from other data-reduced representations" |
| "match"/"matches"/"matched"/"matching" | "match" – "share selected criteria"<br>"matches" – "shares selected criteria with"<br>"matched" – "shared selected criteria with"<br>"matching" – "sharing selected criteria" |
| "reference signal" | "original or first signal" |
| "query signal" | "second signal" |
| "a comparing device that compares/ a comparing device….that compares/ a comparing device for comparing" | plain and ordinary meaning |
| "a device configured to determine if a query signal matches any one plurality of reference signals" | plain and ordinary meaning |
| "versions of [a/the/said/"that one of said plurality of"] reference signal[s]" | plain and ordinary meaning |
| "similar to" | "retaining a perceptual relationship" |
| "creating at least one counter corresponding to one of said at least one reference signal" / "creating at least one counter corresponding to one of said plurality of reference signals" | plain and ordinary meaning |
| "incrementing the counter….when a match is found," | plain and ordinary meaning |
| "first digital reference signal abstract match recorder" | plain and ordinary meaning |
| "selectable criteria" | "criteria that are programmable" |
| "distributing at least one signal based on the comparison step" | plain and ordinary meaning |

| "related to" | "shares selected criteria with" |
|---|---|
| "index of relatedness" | "an index that provides a degree of differentiation" |

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION**

| | | |
|---|---|---|
| BLUE SPIKE, LLC, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | |
| | § | Civil Action No. 6:12-cv-499-MHS-CMC |
| TEXAS INSTRUMENTS, INC., et al., | § | |
| | § | |
| | § | |
| *Defendants.* | § | |
| | § | |

## <u>REPORT AND RECOMMENDATION</u>
## <u>OF THE UNITED STATES MAGISTRATE JUDGE</u>

Before the Court is the following pending motion:[1] Defendants' Motion for Summary Judgment of Invalidity Based on Indefiniteness Under 35 U.S.C. § 112(b) (Docket Entry # 1752). The Court, having reviewed the relevant briefing and hearing arguments on October 1, 2014, recommends Defendants' motion should be **DENIED**.

## I.       BACKGROUND

Plaintiff Blue Spike, LLC ("Plaintiff) brings suit alleging infringement of United States Patents Nos. 7,346,472 ("the '472 Patent"), 7,660,700 ("the '700 Patent"), 7,949,494 ("the '494 Patent"), and 8,214,175 ("the '175 Patent") (collectively, the "Asserted Patents"). Defendants move for summary judgment, asserting claim 11 of the '472 Patent, claims 7, 10, and, 11 of the '700 Patent, claims 1, 11, 17, 21, 22, and 29 of the '494 Patent, and claims 8, 11, 16, and 17 of the '175 Patent are indefinite and therefore invalid under 35 U.S.C. § 112.

---

[1] The above-referenced cases were referred to the undersigned United States Magistrate Judge for pre-trial purposes in accordance with 28 U.S.C. § 636.

## II.      INDEFINITENESS

Title 35 U.S.C. § 112(b) articulates that patent claims must particularly point out and distinctly claim the invention.  "Whether a claim meets this definiteness requirement is a matter of law." *Net Navigation, LLC v. Cisco Systems,* No. 4:11-cv-660, 662, 2012 WL 6161900, at *2 (E.D. Tex. Dec. 11, 2012) (citing *Young v. Lumenis, Inc.,* 492 F.3d 1336, 1344 (Fed. Cir. 2007)). A party challenging the definiteness of a claim must show it is invalid by clear and convincing evidence. *Id.* at 1345.

The ultimate issue is whether someone working in the relevant technical field could understand the bounds of a claim.  *Haemonetics Corp. v. Baxter Healthcare Corp.,* 607 F.3d 776, 783 (Fed. Cir. 2010).  A claim is not indefinite merely because it poses a difficult issue of claim construction. *Exxon Research & Eng'g Co. v. U.S.,* 265 F.3d 1371, 1375 (Fed. Cir. 2001).

The Supreme Court has recently held that the definiteness requirement of 35 U.S.C. § 112 "require[s] that a patent's claims, viewed in light of the specification and prosecution history, inform those skilled in the art about the scope of the invention with reasonable certainty." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2129 (2014). "The definiteness requirement, so understood, mandates clarity, while recognizing that absolute precision is unattainable." *Id.*

"The burden of establishing invalidity of a patent or any claim thereof shall rest on the party asserting such invalidity."  35 U.S.C. § 282.  A "determination of claim indefiniteness is a legal conclusion that is drawn from the court's performance of its duty as the construer of patent claims."  *Exxon,* 265 F.3d at 1376.

It is with these principles in mind the Court considers whether Defendants have demonstrated that the pleadings, affidavits, and other evidence available to the Court establish

there are no genuine issues of material fact, and they are entitled to judgment as a matter of law on these specific issues.  Fed. R. Civ. P. 56(c); *see Celotex v. Catrett,* 477 U.S. 317, 332 (1986).

## III.   LEVEL OF ORDINARY SKILL IN THE ART

It is well established that patents are interpreted from the perspective of one of ordinary skill in the art. *See Phillips*, 415 F.3d at 1313 ("[T]he ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application.").  The Federal Circuit Court of Appeals has advised that the "[f]actors that may be considered in determining the level of skill in the art include: (1) the educational level of the inventors; (2) the type of problems encountered in the art; (3) prior art solutions to those problems; (4) the rapidity with which innovations are made; (5) sophistication of the technology; and (6) education level of active workers in the field." *Env'tl Designs, Ltd. v. Union Oil Co. of California*, 713 F.2d 693, 696 (Fed. Cir. 1983). "These factors are not exhaustive but are merely a guide to determining the level of ordinary skill in the art." *Daiichi Sankyo Co. Ltd. v. Apotex, Inc.*, 501 F.3d 1254, 1256 (Fed. Cir. 2007).

In the claim construction briefing related to Blue Spike's Patents, Plaintiff proposes that a person of ordinary skill in the art would have a Master's degree in computer science or computer engineering, or equivalent experience, as well as two years experience in the field of digital fingerprinting and cryptography. (Dkt. No. 1700 at 7).[2]  Defendants submitted declarations of three experts, each of which opine on the level of ordinary skill in the art. *See* Dkt. No. 1752-4 (Declaration of Kevin Bowyer, PH.D.); Dkt. No. 1752-6 (Declaration of John Snell); Dkt. No. 1752-8 (Declaration of Dr. Matthew Turk).  Dr. Bowyer opines that a person of ordinary skill in

[2] Unless otherwise indicated, all citations to documents filed with the Court are to the ECF page number assigned by the Court's filing system.

the art would have at least a Bachelor's degree in Electrical Engineering, Computer Science, or an equivalent degree, with a background and at least two years' experience in the fields of signal or image processing, biometric identification, and/or related fields. (Dkt. No. 1752-4 at 7). Mr. Snell opines that a person of ordinary skill in the art would have at least a Bachelor's degree in Electrical Engineering, Computer Science or an equivalent degree, with at least two years of signal or image processing experience. (Dkt. No. 1752-6 at 9). Finally, Dr. Turk opines that a person of ordinary skill in the art would have at least a bachelor's degree in electrical engineering, computer science, or equivalent degree, with a background and at least two years' experience in signal processing, image processing, biometric identification, or a related field. (Dkt. No. 1752-8 at 8).

Having considered the parties' proposals and the factors that may be considered in determining the level of skill in the art, the Court finds that a person of ordinary skill in the art would have at least a Bachelor's degree in electrical engineering, computer science, or equivalent degree, with a background and at least two years' experience in signal processing, image processing, biometric identification, or a related field.

## IV.    DISCUSSION

As an initial matter, the Court notes that Defendants rely on the declarations of three experts to support their arguments. (Dkt. No. 1752-4) (Declaration of Kevin Bowyer, PH.D.); (Dkt. No. 1752-6) (Declaration of John Snell); (Dkt. No. 1752-8) (Declaration of Dr. Matthew Turk). To rebut this evidence, Plaintiff relies on the declaration of one expert. (Dkt. No. 1785-10) (Declaration of Ahmed Tewfik, PH.D.). The Court has reviewed the declarations and finds this extrinsic evidence is not more persuasive than the intrinsic evidence discussed below. *Kara Tech. Inc. v. Stamps.com Inc.,* 582 F.3d 1341, 1348 (Fed. Cir.2009) ("While helpful, extrinsic

sources like expert testimony cannot overcome more persuasive intrinsic evidence.").

**A.**      *"abstract"*

The term "abstract" appears in claims 1-14 of the '472 Patent, claims 1, 5-7, 9-11, 13, 18, 21-22, 24-25, 30-32, 35, 40, 43-46, and 48-50 of the '700 Patent, claims 1, 5-7, 11, 14-17, 19-21, 24, and 27-29 of the '494 Patent, and claims 1-19 of the '175 Patent.  The Court has considered the parties' argument and determined the "claims, viewed in light of the specification . . ., inform those skilled in the art about the scope of the invention with reasonable certainty."  *Nautilus*, 134 S. Ct. at 2129.   Specifically, the Court construed the term "abstract" to mean "a data-reduced representation of a signal that retains a perceptual relationship with the signal and differentiates the data-reduced representation from other data-reduced representations."   The reasoning for the Court's construction is provided in the Memorandum Opinion and Order construing the disputed terms of the '472 Patent, the '700 Patent, the '494 Patent, and the '175 Patent.  Accordingly, the Court recommends Defendants' motion for summary judgment be denied as to the term "abstract."

**B.**      *"device that compares," "comparing device," and "device configured to determine"*

The phrase "a comparing device that compares" or the phrase "a comparing device … that compares" appear in claims 9, 11, and 14 of the '472 Patent, claims 1 and 30 of the '700 Patent, and claims 1 and 24 of the '494 Patent.  The phrase "a comparing device for comparing" appears in claim 11 of the '494 Patent.  The phrase "a device configured to determine if a query signal matches any one plurality of reference signals" appears in claim 29 of the '494 Patent. The Court has considered the parties' argument and determined that the "claims, viewed in light of the specification . . ., inform those skilled in the art about the scope of the invention with reasonable certainty."  *Nautilus*, 134 S. Ct. at 2129.   Specifically, the Court finds the phrases are

not indefinite and should be given their plain and ordinary meaning.  The reasoning for the Court's finding is provided in the Memorandum Opinion and Order construing the disputed terms of the '472 Patent, the '700 Patent, the '494 Patent, and the '175 Patent.  Accordingly, the Court recommends Defendants' motion for summary judgment be denied as to the phrases "a comparing device," "a device that compares," and "a device configured to determine."

### C.    *"similar to"*

The phrase "similar to" appears in claims 1, 3, 5, 7-11, and 17-19 of the '175 Patent.  The Court has considered the parties' argument and determined the "claims, viewed in light of the specification . . ., inform those skilled in the art about the scope of the invention with reasonable certainty."  *Nautilus*, 134 S. Ct. at 2129.  Specifically, the Court construed the term "similar to" to mean "retaining a perceptual relationship."  The reasoning for the Court's construction is provided in the Memorandum Opinion and Order construing the disputed terms of the '472 Patent, the '700 Patent, the '494 Patent, and the '175 Patent.  Accordingly, the Court recommends Defendants' motion for summary judgment be denied as to the terms "similar to."

### D.    *"wherein the system applies a cryptographic protocol," "further comprising storing the hashed abstract," and "based on the comparison step"*

### 1.    The Parties' Position

Defendants contend each of the disputed phrases improperly add a method step to a system claim and therefore render the claims indefinite. (Dkt. No. 1752 at 27–32).  Plaintiff responds that apparatus claims are not necessarily indefinite for using functional language. (Dkt. No. 1785 at 28.)  Plaintiff adds that functional language which merely describes the capability of the claimed invention will not render a claim invalid. (Dkt. No. 1785 at 28).  Plaintiff argues the claim language reveals that there is no user involved; rather there is functionality. (Dkt. No. 1785 at 30).

Defendants reply that Plaintiff is incorrect that the claims must include user action to be an impermissible mixed method and apparatus claim. (Dkt. No. 1803 at 13).  Defendants further argue the method steps are not describing the configuration or capabilities of any claimed structural elements; rather, they are unattributed to any structural element and must be performed by the system as a whole in order to infringe (*e.g.*, "wherein the system applies a cryptographic protocol," "further comprising storing the hashed abstract and/or digitally signed abstract," "based on the comparison step"). (Dkt. No. 1803 at 13).

2.    **Analysis**

A claim may be invalid if it combines two separate statutory classes of invention. *See IPXL Holdings, L.L.C. v. Amazon.com, Inc.*, 430 F.3d 1377, 1384 (Fed. Cir. 2005).  The problem with mixing apparatus and method steps is that such mixed claims fail to clarify "whether infringement would occur when one creates a system that allows the user to [perform the step] . . . or . . . when the user actually [performs the step]." *HTC Corp. v. IPCom GmbH & Co., KG*, 667 F.3d 1270, 1277 (Fed. Cir. 2012). "[S]uch a claim 'is not sufficiently precise to provide competitors with an accurate determination of the 'metes and bounds' of protection involved' and is 'ambiguous and properly rejected.'" *Id.* (quoting *Ex parte Lyell*, 17 U.S.P.Q.2d 1548 (1990)).

However, apparatus claims that are limited by functional language are not necessarily indefinite. *Microprocessor Enhancement Corp. v. Texas Instruments Inc.*, 520 F.3d 1367, 1375 (Fed. Cir. 2008) (citing *Halliburton Energy Servs. v. M-I LLC*, 514 F.3d 1244, 1255 (Fed. Cir. 2008)).  If the functional language of the claim merely describes "the structure and capabilities of the claimed apparatus," then the claim is sufficiently definite under 35 U.S.C. § 112 ¶2. *SynQor, Inc. v. Artesyn Techs.*, Inc., 2010 U.S. Dist. LEXIS 74808, at *97 (E.D. Tex. July 26, 2010), *aff'd SynQor v. Artesyn Techs. Inc.*, 709 F.3d 1365 (Fed. Cir. 2013) (citing

*Microprocessor*, 520 F.3d at 1375).

**a)    Claim 10 of the '700 Patent – "wherein the system applies a cryptographic protocol"**

The disputed phrase "wherein the system applies a cryptographic protocol" appears in claim 10 of the '700 Patent.  Claim 10 and the claim from which it depends (claim 1) follow:

> 1. An electronic system for monitoring and analyzing at least one signal, comprising:
> a first input that receives at least one reference signal to be monitored,
> a first processor that creates an abstract of each reference signal input to said first processor through said first input wherein the abstract comprises signal characteristic parameters configured to differentiate between a plurality of versions of the reference signal;
> a second input that receives at least one query signal to be analyzed, a second processor that creates an abstract of each query signal wherein the abstract comprises signal characteristic parameters of the query signal;
> a reference database that stores abstracts of each at least one reference signal;
> a comparing device that compares an abstract of said at least one query signal to the abstracts stored in the reference database to determine if the abstract of said at least one query signal matches any of the stored abstracts wherein a match indicates the query signal is a version of at least one of the reference signals.

> 10. The system of claim 1, **wherein the system applies a cryptographic protocol** to the abstract of said reference signal, said query signal, or both said reference signal and said query signal.

The Court finds the claim language "wherein the system applies a cryptographic protocol" does not describe a method step for using the system.  Rather, this phrase is functional language used to describe the structure and capabilities of the claim components, including the "first processor" and the "second processor."  Such use of functional language is not improper. *See Microprocessor Enhancement Corp. v. Texas Instruments, Inc.*, 520 F.3d 1367, 1375 (Fed. Cir. 2008).  *IPXL* does not apply here because the claim does not recite a method step performed by a user and does not create confusion as to when infringement occurs.  Accordingly, the Court is of the opinion the disputed claims are not hybrid claims under *IPXL* and are not invalid as being indefinite.  Thus the "claims, viewed in light of the specification . . ., inform those skilled in the art about the scope of the invention with reasonable certainty."  *Nautilus*, 134 S. Ct. at

2129.    Accordingly, the Court recommends Defendants' motion for summary judgment be denied as to the phrase "wherein the system applies a cryptographic protocol."

**b)    Claim 11 of the '700 Patent and Claim 21 of the '494 Patent – "further comprising storing the hashed abstract"**

The disputed phrase "further comprising storing the hashed abstract" appears in claim 11 of the '700 Patent and claim 21 of the '494 Patent.  Claim 11 and the claims from which it depends (claims 1 and 10) follow:

> 1. An electronic system for monitoring and analyzing at least one signal, comprising:
> a first input that receives at least one reference signal to be monitored,
> a first processor that creates an abstract of each reference signal input to said first processor through said first input wherein the abstract comprises signal characteristic parameters configured to differentiate between a plurality of versions of the reference signal;
> a second input that receives at least one query signal to be analyzed, a second processor that creates an abstract of each query signal wherein the abstract comprises signal characteristic parameters of the query signal;
> a reference database that stores abstracts of each at least one reference signal;
> a comparing device that compares an abstract of said at least one query signal to the abstracts stored in the reference database to determine if the abstract of said at least one query signal matches any of the stored abstracts wherein a match indicates the query signal is a version of at least one of the reference signals.

> 10. The system of claim 1, wherein the system applies a cryptographic protocol to the abstract of said reference signal, said query signal, or both said reference signal and said query signal.

> 11. The system of claim 10, wherein the cryptographic protocol is one of at least a hash or digital signature and **further comprising storing the hashed abstract** and/or digitally signed abstract.

The Court finds the claim language "further comprising storing the hashed abstract" does not describe a method step for using the system.  Rather, as with the previous phrase, this phrase is functional language used to describe the structure and capabilities of the claim components, including the "reference database."  Again, such use of functional language is not improper, and *IPXL* does not apply here because the claim does not recite a method step performed by a user

and does not create confusion as to when infringement occurs.  Furthermore, claim 21 of the '494 Patent, and the claims from which it depends on, follow a very similar claim structure. Accordingly, the Court is of the opinion the disputed claims are not hybrid claims under *IPXL* and are not invalid as being indefinite.  Thus the "claims, viewed in light of the specification . . ., inform those skilled in the art about the scope of the invention with reasonable certainty." *Nautilus*, 134 S. Ct. at 2129.  Accordingly, the Court recommends Defendants' motion for summary judgment be denied as to the phrase "further comprising storing the hashed abstract."

**c)      Claim 22 of the '494 Patent – "based on the comparison step"**

The disputed phrase "based on the comparison step" appears in claim 22 of the '494 Patent.  Claim 22 and the claim from which it depends (claim 11) follow:

11. A system for analyzing and identifying at least one reference signal, comprising: a first input for receiving at least one reference signal to be identified, a first processor for creating an abstract of each reference signal received based on perceptual characteristics representative of parameters to differentiate between versions of the reference signal; a reference database for storing abstracts of each reference signal received in a database; a second input for receiving at least one query signal to be identified, a second processor for creating an abstract of the received query signal based on the parameters; and a comparing device for comparing an abstract of said received query signal to the abstracts stored in the database to determine if the abstract of said received query signal is related to any of the stored abstracts.

22. The system of claim 11, further comprising a transmitter for distributing at least one signal **based on the comparison step**.

The Court finds the language "based on the comparison step" does not describe a method step for using the system.  Rather, this phrase is functional language used to describe the structure and capabilities of the claim components, including the "comparing device" and the "transmitter." Again, such use of functional language is not improper, and *IPXL* does not apply here because the claim does not recite a method step performed by a user and does not create confusion as to when infringement occurs. Accordingly, the Court is of the opinion the disputed

claims are not hybrid claims under *IPXL* and are not invalid as being indefinite.

Defendants also contend the claim is indefinite because "the comparison step" lacks antecedent basis. (Dkt. No. 1752 at 31).  Claim 11 recites "a comparing device for comparing an abstract of said received query signal to the abstracts stored in the database to determine if the abstract of said received query signal is related to any of the stored abstracts."  A person of ordinary skill in the art would understand that "the comparison step" is functional language used to describe the capabilities of the "comparing device" recited in claim 11.  Therefore, the Court finds the claim is not indefinite for a lack of explicit antecedent basis.  Thus the "claims, viewed in light of the specification . . ., inform those skilled in the art about the scope of the invention with reasonable certainty." *Nautilus*, 134 S. Ct. at 2129.   Accordingly, the Court recommends Defendants' motion for summary judgment be denied as to the phrase "based on the comparison step."

### E.      *"index of relatedness"*

The term "index of relatedness" appears in claim 11 of the '472 Patent.  The Court has considered the parties' argument and determined the "claims, viewed in light of the specification . . ., inform those skilled in the art about the scope of the invention with reasonable certainty." *Nautilus*, 134 S. Ct. at 2129.   Specifically, the Court construed the term the term "index of relatedness" to mean "an index that provides a degree of differentiation."  The reasoning for the Court's construction is provided in the Memorandum Opinion and Order construing the disputed terms of the '472 Patent, the '700 Patent, the '494 Patent, and the '175 Patent.  Accordingly, the Court recommends Defendants' motion for summary judgment be denied as to the terms "similar to."

**F.**   *"programmed or structured to use an/said algorithm"*

**1.**   **The Parties' Position**

The parties dispute whether the phrases "programmed or structured to use an algorithm to generate said digital reference signal abstract from said digital reference signal" and "programmed or structured to use said algorithm to generate said digital query signal abstract from said digital query signal" are indefinite.  Defendants contend that the phrases are indefinite because the specification fails to disclose an "algorithm" that a processor could use to generate a query signal or reference signal. (Dkt. No. 1752 at 24).  Defendants further argue that in the absence of any such disclosure, a person of ordinary skill in the art reading the patent would have to guess whether use of a particular type of algorithm to generate an abstract would infringe. (Dkt. No. 1752 at 24).  Defendants argue that because the specification does not limit the field to a particular technology, the problem is compounded. (Dkt. No. 1752 at 24).  Defendants also contend that when a required structural element is claimed as an algorithm, the specification must disclose the algorithm. (Dkt. No. 1752 at 25).  Defendants argue that the specification fails to disclose any algorithm. (Dkt. No. 1752 at 24).  Finally, Defendants argue that term "digital query signal" lacks antecedent basis, further rendering the claim invalid as indefinite. (Dkt. No. 1752 at 25).

Plaintiff responds that the phrases are definite because the specification and claims cite to numerous algorithms that can be used in the abstract creation process. (Dkt. No. 1785 at 25).  Plaintiff contends that an inventor may disclose an algorithm "in any understandable terms including as a mathematical formula, in prose, or as a flow chart, or in any other manner that provides sufficient structure." (Dkt. No. 1785 at 25) (citing *Finisar Corp. v. DirecTV Group, Inc.*, 523 F.3d 1323, 1340 (Fed. Cir. 2008) (noting that "a patentee [may] express th[e] algorithm in any understandable terms including as a mathematical formula,

in prose, or as a flow chart, or in any other manner that provides sufficient structure"). Plaintiff argues that the specification notes many algorithms by name and lays out in prose a five step algorithm for producing an abstract. (Dkt. No. 1785 at 2) (citing '175 Patent at 7:65–9:28).

Plaintiff also argues that the specification states that "watermarking embedding algorithm" can be used to "yield information about the extent to which a data signal can be compressed while holding steadfast to the design requirement that the compressed signal maintain its perceptual relationship with the original, uncompressed signal." (Dkt. No 1785 at 26) (quoting '175 Patent at 5:33–42). Plaintiff further argues that claim 16 would have survived indefiniteness even if it had failed to list an algorithm because it is not a means-plus-function claim, and would not be subject to the requirement under 35 USC § 112 to disclose a structure. (Dkt. No. 1785 at 26). Plaintiff also contends that even if the means-plus-function restrictions applied to this term, it would still be sufficiently definite because claim 16 is a dependent claim attached to an already clear independent claim. (Dkt. No. 1785 at 26).

Defendants reply that the claim language plainly requires an algorithm to generate an abstract, and neither the claim nor the specification specifies an algorithm. (Dkt. No. 1803 at 10–11). Defendants further argue that the algorithms that Plaintiff point to are irrelevant. (Dkt. No. 1803 at 11). Defendants argue that it cannot be disputed that claim 16 of the '175 Patent is drafted in functional language. (Dkt. No. 1803 at 11). Defendants contend that because patent drafters can resolve the ambiguity of functional claiming "if the specification provided a formula for calculating a property" or a "quantitative metric," courts are reluctant to permit functional limitations to cover that which the inventor did not invent. (Dkt. No. 1803 at 11) (quoting *Halliburton Energy Services, Inc. v. M-I LLC*, 514 F.3d 1244, 1256 (Fed. Cir. 2008)). Thus, Defendants argue that there is no mention of an algorithm in the specification and claim 16

cannot permit the inventors to cover "all future improvements" to the abstract creation process. (Dkt. No. 1803 at 11–12).

**2.      Analysis**

The disputed phrases "programmed or structured to use an algorithm to generate said digital reference signal abstract from said digital reference signal" and "programmed or structured to use said algorithm to generate said digital query signal abstract from said digital query signal" appear in claim 16 of the '175 Patent.  As an initial matter, the Court finds that the claims are not governed by means-plus-function limitations governed by 35 U.S.C. §112 ¶ 6. The phrases do not use "means," and Defendants have failed to overcome the rebuttable presumption that § 112 ¶ 6 does not apply.

Moreover, the intrinsic evidence informs one of skill in the art, with reasonable certainty, the scope of the disputed phrases.  Specifically, the specification states "the present invention incorporates what could best be described as 'computer-acoustic' and 'computer-visual' modeling, where the signal abstracts are created using data reduction techniques to determine the smallest amount of data, at least a single bit, which can represent and differentiate two digitized signal representations for a given predefined signal set."  '175 Patent at 10:10–17.  The specification further states that "the present invention generally contemplates a signal recognition system that has at least five elements," and then proceeds to discuss each of these elements. '175 at 8:3–9:40.  Thus, the specification provides an exemplary algorithm in prose. *Finisar Corp. v. DirecTV Group, Inc.*, 523 F.3d 1323, 1340 (Fed. Cir. 2008) (noting that "a patentee [may] express th[e] algorithm in any understandable terms including as a mathematical formula, in prose, or as a flow chart, or in any other manner that provides sufficient structure").  Thus the "claims, viewed in light of the specification . . ., inform those skilled in the art about the scope of the invention with reasonable certainty." *Nautilus*, 134 S. Ct. at 2129.

Finally, the Court finds the lack of antecedent basis for the term "digital query signal" does not make the claim indefinite because the independent claim refers to digital reference signals, digital reference signal abstracts, and query signal abstracts.  In addition, query signals are mentioned in the patent's abstract and body numerous times.   Accordingly, the Court recommends Defendants' motion for summary judgment be denied as to the phrases "programmed or structured to use an algorithm to generate said digital reference signal abstract from said digital reference signal" and "programmed or structured to use said algorithm to generate said digital query signal abstract from said digital query signal."

**G.      *"data describing a portion of the characteristics of its associated reference signal"*

**1.      The Parties' Position**

The parties dispute whether the phrase "data describing a portion of the characteristics of its associated reference signal" is indefinite.  Defendants contend the phrase is indefinite because there is no disclosure that quantifies how much a "portion of characteristics" must be.  (Dkt. No. 1752 at 25).  Defendant further contend there is no specific meaning of this phrase in the art, and there is no description of what portion or how much of the characteristics, or which characteristics, of an associated reference signal must be described. (Dkt. No. 1752 at 25).

Defendants further argue the specification does not provide any guidance on what "portion" refers to. (Dkt. No. 1752 at 26).  Defendants contend the specification also fails to give guidance on which "portion" of the characteristics of claim 7 of the '700 Patent and claim 17 of the '494 Patent mean.  Defendants argue that both claims depend from independent claims that describe creating an abstract from presumably more than a "portion" of the characteristics of a reference or query signal. (Dkt. No. 1752 at 26).  Defendants contend that the specification states that an "abstract" is created in part by selecting certain characteristics of the reference signal that remain relatively constant. (Dkt. No. 1752 at 26).  Thus, according to Defendants, a person of

ordinary skill practicing the patent would need to know which portion of the characteristics was used to create the abstract, and then which portion of the first portion claims 7 and 17 refer to. (Dkt. No. 1752 at 26).

Defendants also argue that the specification fails to describe what "characteristics" might be relevant to the constitution of an abstract and how one of ordinary skill in the art could separate out a "portion" of those characteristics. (Dkt. No. 1752 at 26). Defendants note that the specification states that a "database engine" will identify "characteristics (for example, the differences) that can be used to distinguish one digital signal from all other digital signals that are stored in its collection." (Dkt. No. 1752 at 26). But, Defendants contend that says nothing about what those characteristics might be. (Dkt. No. 1752 at 27). Defendants further argue that neither "portion" nor "characteristics" has a technical meaning in the field. (Dkt. No. 1752 at 27). Thus, according to Defendants, one of ordinary skill in the art is left to guess what "characteristics" of a signal, and what "portion" of them, are relevant to defining an abstract. (Dkt. No. 1752 at 27).

Plaintiff responds that the phrase "data describing a portion of the characteristics of its associated reference signal" should be construed as "an abstract is generated from a portion of a reference signal rather than the entire signal." (Dkt. No. 1785 at 27). Plaintiff contends that this construction is supported by the specification which provides examples of what constitutes a "portion" in the context of characteristics of a reference signal. (Dkt. No. 1785 at 27) (citing '175 Patent at 11:35–41). Plaintiff further argues that there is no conflict or redundancy between the independent claim and dependent claims at issue. (Dkt. No. 1785 at 27). According to Plaintiff, the dependent claims identify distinguishing characteristics of a fraction of the original signal, while the dependent claims identify those characteristics in the entire signal.

(Dkt. No. 1785 at 27.)

Defendants reply that Plaintiff ignores the plain language of the claim—discussing portions of characteristics—and instead posits that the claim teaches that "an abstract is generated from a portion of a reference signal rather than the entire signal." (Dkt. No. 1803 at 12) (quoting Dkt. No. 1785 at 27).  Defendants contend that the claim language discusses a portion of the characteristics, not a portion of the reference signal.  Thus, according to Defendants, a person of ordinary skill in the art is left to guess what "characteristics" of a signal, and what "portion" of them, are relevant to defining an abstract. (Dkt. No. 1803 at 12).

2.     **Analysis**

The disputed phrase "data describing a portion of the characteristics of its associated reference signal" appears in claim 7 of the '700 Patent and claim 17 of the '494 Patent.  The Court finds that the intrinsic evidence informs one of skill in the art, with reasonable certainty, the scope of the disputed phrases.  Specifically, the claim language itself recites that at least one abstract includes data that describes "a portion" of the "characteristics associated with the reference signal."  A person of ordinary skill in the art would understand the term "portion" in the context of the intrinsic evidence.  Accordingly, although the term may be broad, it is not indefinite and the claims are not required to provide mathematical precision on how big or small a portion must be.

Likewise, a person of ordinary skill in the art would understand the phrase "characteristics associated with the reference signal" in the context of the intrinsic evidence.  For example, the specification provides different examples of "characteristics associated with a reference signal" and how they can be used to find matches in the database. *See, e.g.*, '494 Patent at 14:53–58 ("The present invention, however, involves the scanning of an image involving a sun, compressing the data to its essential characteristics (i.e., those perceptual characteristics

related to the sun) and then finding matches in a database of other visual images (stored as compressed or even uncompressed data).").   Moreover, claim 18 provides a list of "characteristics of the reference signal," which includes a perceptible characteristic, a cognitive characteristic, a subjective characteristic, a perceptual quality, a recognizable characteristic or combinations thereof.

Thus, a person of ordinary skill in the art would understand these different types of "characteristics."   Indeed, the parties have agreed to a construction for a number of these characteristics. *See*, Dkt. No. 1674 at 3 (providing agreed constructions for "perceptible characteristic," "cognitive characteristic," "subjective characteristic," and "perceptual quality"). The specification further states that using these characteristics is more accurate and efficient than a text-based descriptor of the signal. '494 Patent at 7:60–64 ("In this manner, certain media which are commonly known by signal characteristics, a painting, a song, a TV commercial, a dialect, etc., may be analyzed more accurately, and perhaps, more efficiently than a text-based descriptor of the signal.")   Thus, the intrinsic evidence informs one of skill in the art, with reasonable certainty, the scope of the phrases meaning.

Finally, the Court does not adopt Plaintiff's construction because it is not consistent with the claim language.   Claim 7 of the '700 Patent and claim 17 of the '494 Patent each require that "stored abstracts comprise data describing *a portion of the characteristics* of its associated reference signal." (emphasis added).   Plaintiff's construction is "an abstract is generated from *a portion of a reference signal* rather than the entire signal." As indicated, the claim language discusses a portion of the characteristics, not a portion of the reference signal.   Therefore, the Court does not adopt Plaintiff's construction.   Thus the "claims, viewed in light of the specification . . ., inform those skilled in the art about the scope of the invention with reasonable

certainty." *Nautilus*, 134 S. Ct. at 2129.    Accordingly, the Court recommends Defendants' motion for summary judgment be denied as to the phrase "data describing a portion of the characteristics of its associated reference signal."

## V.    CONCLUSION

Based on the foregoing, it is

**RECOMMENDED** that Defendants' Motion for Summary Judgment of Invalidity Based on Indefiniteness Under 35 U.S.C. § 112(b) (Docket Entry # 1752) be **DENIED**.

Within fourteen (14) days after receipt of the magistrate judge's report, any party may serve and file written objections to the findings and recommendations of the magistrate judge. 28 U.S.C.A. 636(b)(1)(C).    Failure to file written objections to the proposed findings and recommendations contained in this report within fourteen days after service shall bar an aggrieved party from *de novo* review by the district court of the proposed findings and recommendations and from appellate review of factual findings accepted or adopted by the district court except on grounds of plain error or manifest injustice.    *Thomas v. Arn*, 474 U.S. 140, 148 (1985); *Rodriguez v. Bowen*, 857 F.2d 275, 276-77 (5th Cir. 1988).

**SIGNED this 16th day of October, 2014.**

CAROLINE M. CRAVEN
UNITED STATES MAGISTRATE JUDGE

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**ARNOLD & PORTER LLP**
Michael A. Berta (SBN 194650)
Three Embarcadero Center, 7th Floor
San Francisco, CA 94111
Phone: (415) 471-3100
Fax: (415) 471-3400
michael.berta@aporter.com

Nicholas H. Lee (SBN 259588)
777 S. Figueroa Street, 44th Floor
Los Angeles, CA 90017
Phone: (213) 243-4000
Fax: (213) 243-4199
nicholas.lee@aporter.com

*Attorneys for Defendant Google Inc.*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**OAKLAND DIVISION**

|  |  |
|---|---|
| BLUE SPIKE, LLC,<br><br>     Plaintiff,<br><br> v.<br><br>GOOGLE INC.,<br><br>     Defendant. | Case No. 14-cv-01650 (YGR)<br><br>**DEFENDANT GOOGLE INC.'S MOTION FOR JUDGMENT ON THE PLEADINGS PURSUANT TO FED. R. CIV. P. 12(c) & MEMORANDUM IN SUPPORT**<br><br>Hearing Date: Tuesday, June 16, 2015<br>Hearing Time: 2:00 p.m.<br>Courtroom: Courtroom 1, 4th Floor<br>Judge: Hon. Yvonne Gonzalez Rogers |

1    In accordance with Local Rule 7-2, Defendant Google Inc. ("Google") hereby provides

2    notice of its Motion for Judgment on the Pleadings Pursuant to Federal Rule of Civil Procedure

3    12(c).  A hearing on this motion is set for Tuesday, June 16, 2015 at 2:00 p.m. in Courtroom 1 on

4    the Fourth Floor of the Oakland Courthouse:  Ronald V. Dellums Federal Building, 1301 Clay

5    Street, Oakland, California 94612.

6    Google respectfully moves the Court to enter judgment in Google's favor based on the

7    Amended Complaint (Dkt. # 47) of Plaintiff Blue Spike, LLC ("Blue Spike").  As set forth more

8    fully in the accompanying Memorandum of Points and Authorities, Blue Spike's claims are

9    precluded because the asserted claims of the Patents-in-Suit are invalid under 35 U.S.C. § 101 for

10   lack of patentable subject matter.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**TABLE OF CONTENTS**

**Page**

I.     PRELIMINARY STATEMENT ....................................................................................1

II.    STATEMENT OF FACTS........................................................................................3

       A.     Blue Spike and Its Litigation Campaign................................................3

       B.     The Patents-in-Suit and Asserted Claims .................................................4

       C.     The Written Description ...........................................................................5

       D.     The Asserted Claims................................................................................8

III.   ARGUMENT...........................................................................................................10

       A.     Legal Standards......................................................................................10

       B.     The Asserted Claims Are Directed to an Abstract Idea..........................12

       C.     The Asserted Claims Are Not Patent-Eligible Applications of the Abstract Idea .....15

IV.    CONCLUSION.......................................................................................................19

**TABLE OF AUTHORITIES**

**Cases**

*Alice Corp. Pty. Ltd. v. CLS Bank Int'l,*
        134 S. Ct. 2347 (2014) ................................................................. passim

*Amdocs (Israel) Ltd. v. Openet Telecom, Inc.,*
        Case No. 1:10cv910, 2014 WL 5430956 (E.D. Va. Oct. 24, 2014) ............................... 17, 18

*Bascom Research, LLC v. LinkedIn, Inc.,*
        Case No. 12-cv-06293-SI, 2015 WL 149480 (N.D. Cal. Jan. 5, 2015) ..............11, 12, 14, 18

*Bilski v. Kappos,*
        561 U.S. 593, 130 S. Ct. 3218 (2010) ......................................................... 11, 13

*BuySafe, Inc. v. Google, Inc.,*
        765 F.3d 1350 (Fed. Cir. 2014) ................................................................. 11

*Cogent Medicine, Inc. v. Elsevier Inc.,*
        Case No. C-13-4479-RMW et al., 2014 WL 4966326 (N.D. Cal. Sept. 30, 2014)... 11, 14, 18

*CyberSource Corp. v. Retail Decisions, Inc.,*
        654 F.3d 1366 (Fed. Cir. 2011) ................................................................. 14

*Diamond v. Diehr,*
        101 S. Ct. 1048 (1981) ......................................................................... 13

*DietGoal Innovations LLC v. Bravo Media LLC,*
        33 F. Supp. 3d 271 (S.D.N.Y. 2014).......................................................... 15

*Eclipse IP LLC. v. McKinley Equip. Corp.,*
        Case No. 14-742, 2014 WL 4407592 (C.D. Cal. Sept. 4, 2014) ........................................ 11

*Enfish, LLC v. Microsoft Corp.,*
        Case No. 2:12-cv-07360, 2014 WL 5661456 (C.D. Cal. Nov. 3, 2014)..............12, 13, 14, 15

*Gametek LLC v. Zynga, Inc.,*
        Case No. CV 13-2546, 2014 WL 1665090 (N.D. Cal. Apr. 25, 2014)................................. 19

*Gottschalk v. Benson,*
        409 U.S. 63, 93 S. Ct. 253 (1972)............................................................ 14

*I/P Engine, Inc. v. AOL Inc.,*
        576 Fed. Appx. 982 (Fed. Cir. 2014).......................................................... 11

*IpLearn, LLC v. K12 Inc.,*
        Case No. 11-1026, 2014 WL 7206380 (D. Del. Dec. 17, 2014) ........................................ 14

*Mayo Collaborative Servs. v. Prometheus Labs., Inc.,*
        132 S. Ct. 1289 (2012) .................................................................. passim

*McRO, Inc. v. Sega of America, Inc.*,
  Case No. 12-10327, 2014 WL 4749601 (C.D. Cal. Sept. 22, 2014) ...................................18

*Morsa v. Facebook, Inc.*,
  Case No. SACV 14-161-JLS, 2014 WL 7641155 (C.D. Cal. Dec. 23, 2014) ............... 11, 15

*Open Text S.A. v. Alfresco Software, Ltd.*,
  Case No. 13-cv-04843 et al., 2014 WL 4684429 (N.D. Cal. Sept. 29, 2014)......10, 11, 14, 18

*Open Text S.A. v. Box, Inc.*,
  Case No. 13-cv-04910-JD, 2015 WL 269036 (N.D. Cal. Jan. 20, 2015) ..................... passim

*OpenTV, Inc. v. Netflix Inc.*,
  Case No. 14-cv-01525-RS, 2014 WL 7185921 (N.D. Cal. Dec. 16, 2014)................... 14, 18

*Parker v. Flook*,
  437 U.S. 584, 98 S. Ct. 2522  (1978)................................................................................ 11

*Planet Bingo v. VKGS LLC*,
  576 Fed. Appx. 1005 (Fed. Cir. 2014) ........................................................................ 10, 14

*The Money Suite Co. v. 21st Century Ins. and Fin. Servs., Inc.*,
  Case No. 13-984 et al., 2015 WL 436160 (D. Del. Jan. 27, 2015).......................................15

*Wolf v. Capstone Photography, Inc.*,
  Case No. 2:13-CV-09573, 2014 WL 7639820 (C.D. Cal. Oct. 28, 2014)............................15

**Statutes**

35 U.S.C. § 101 ........................................................................................................... 10, 13, 16

35 U.S.C. § 102 ...................................................................................................................... 16

**Rules**

Fed. R. Civ. P. 12(c) ............................................................................................................... 11

**MEMORANDUM OF POINTS & AUTHORITIES**

**I.     PRELIMINARY STATEMENT**

"[A]bstract ideas are not patentable."  *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 134 S. Ct. 2347, 2354 (2014) (citations omitted).  Here, Blue Spike's patents claim the idea of comparing two works (*e.g.*, songs, images or videos) by using "qualities" of the work (*i.e.*, features that humans recognize).  But this is an abstract idea, and the patents simply take this "comparison" that humans have performed everyday for as long as images, songs and videos have existed and move it to a generic computer.  As the Supreme Court has confirmed in *Alice* and prior cases, this is ***not*** a patentable invention.  It is merely an attempt to monopolize human activity by implementing an abstract idea in a computer environment.  The patent claims fail under 35 U.S.C. § 101.

Exemplary claim 1 of the '472 patent proves the point.  It claims:

| Claim Language | Abstract Ideas and Non-Inventive Concepts |
|---|---|
| A method for monitoring and analyzing at least one signal comprising: | |
| receiving at least one reference signal to be monitored; | Receiving a signal (purportedly, of anything) |
| creating an abstract of said at least one reference signal wherein the step of creating an abstract of said at least one reference signal comprises: inputting the reference signal to a processor; creating an abstract of the reference signal using perceptual qualities of the reference signal such that the abstract retains a perceptual relationship to the reference signal from which it is derived; | Creating an "abstract" of the signal using "perceptual" qualities with a generic "processor" |
| storing the abstract of said at least one reference signal in a reference database; | Storing the "abstract" in a generic "reference database" |
| receiving at least one query signal to be analyzed; | Receiving another signal |

| | |
|---|---|
| creating an abstract of said at least one query signal wherein the step of creating an abstract of said at least one query signal comprises: <br><br> inputting the at least one query signal to the processor; <br><br> creating an abstract of the at least one query signal using perceptual qualities of the at least one query signal such that the abstract retains a perceptual relationship to the at least one query signal from which it is derived; and | Creating another "abstract" with the generic "processor" |
| comparing the abstract of said at least one query signal to the abstract of said at least one reference signal to determine if the abstract of said at least one query signal matches the abstract of said at feast [sic] one reference signal. | Comparing the two "abstracts" |

As illustrated, claim 1 recites nothing more than the idea of creating some type of "abstract" from "signals" and comparing them, using a generic "processor " and a "database." But, as the Supreme Court has explained, "transformation [of an abstract idea] into a patent-eligible application requires more than simply stating the abstract idea while adding the words 'apply it.'" *Alice*, 134 S. Ct. at 2357. And, "the mere recitation of a generic computer cannot transform a patent-ineligible abstract idea into a patent-eligible invention." *Id.* at 2358. Because the claims of the Patents-in-Suit claim nothing more than a bare idea without sufficient limitations for patent eligibility, the claims at issue are invalid under § 101.

The patents themselves confirm that the claims are directed to patenting an idea, rather than an application of an idea. With respect to the so-called "abstract" referenced in the claims, the specification fails to provide any algorithm or formula or specific method of creating something that would qualify as the claimed "abstract." Instead, the patents describe the claimed "abstract" in terms of its aspirational functional qualities without ever describing how to actually make a claimed "abstract." For example, in its alleged disclosed embodiments, the patents explain that a so-called "abstract" can be used to find "paintings of sunsets or sunrises" by somehow creating an abstract out of "those perceptual characteristics related to the sun." First, this is no different than what a person would do in looking at a picture or hearing a song – they would categorize their impressions

of the work by what it contained.  Blue Spike wants to claim this process, but on a computer.  There is, however, zero discussion of how one would go about creating such an abstract using a "processor" and a "database."  Similarly, the specification states that an "abstract" can be used for comparing songs, but fails to explain how such an abstract would be created, except that it might use some unspecified form of "compression."  The specification suggests that existing "digital signal processing techniques" may be useful for abstracts (Ex. 3 at col. 6:61-7:3); some of the existing "large number of approaches to compressing a signal" could be relevant to abstracts (*id.* at col. 7:35-65); and that existing "hash or signature" techniques may be helpful for abstracts.  (*Id.* at col. 10:50-55).  But, the specification never actually sets forth a process of how to create something that would qualify as an "abstract"; instead, it essentially seeks to claim almost anything that anyone else could come up with later to actually implement the abstract idea of comparing works using a computer – an intent borne out by the fact that Blue Spike has sued over one hundred innovative technology companies in wide ranging fields, asserting that all of them somehow use something that would qualify as the claimed "abstract" of the asserted patents.

Setting aside for now the fatal defects in these patents with respect to lack of written description, lack of enablement and indefiniteness, these claims are exactly what the Supreme Court was cautioning against in *Alice*:  a broad set of claims purporting to cover a normal human function (comparing two things), but using generic computer components, without any "practical assurance that the process is more than a drafting effort designed to monopolize the abstract idea itself."  *Alice*, 134 S. Ct. at 2358.  For this reason, these claims are invalid.

## II.    STATEMENT OF FACTS

### A.    Blue Spike and Its Litigation Campaign

Blue Spike purports to be the current assignee of U.S. Patent Nos. 7,346,472 ("'472 patent"), 7,660,700 ("'700 patent"), 7,949,494 ("'494 patent"), 8,214,175 ("'175 patent") and 8,712,728 ("'728 patent") (collectively, the "Patents-in-Suit"), and to have obtained its ownership interest from Blue Spike, Inc., a related business.  (Dkt. # 47 ¶ 3.)  Blue Spike did not exist until May 11, 2012 when it was organized in Tyler, Texas.  It was not assigned the Patents-in-Suit until August 4, 2012 (*i.e.*, five days before filing its first lawsuit in the Eastern District of Texas).  (*See*

1   Ex. 1; Ex. 2; Lee Decl. ¶ 2.)  Since then, Blue Spike has filed more than one hundred separate patent

2   infringement actions in the Eastern District of Texas against Google and other companies that

3   actually "design and develop software, applications, websites, systems and technology."  (*See, e.g.,*

4   Dkt. # 47 ¶ 28.)  Blue Spike has voluntarily dismissed or settled more than eighty of the cases it

5   filed.  (Lee Decl. ¶ 2.)

6       **B.**      **The Patents-in-Suit and Asserted Claims**

7       The '472 patent, entitled "Method and Device for Monitoring and Analyzing Signals," was

8   filed on September 7, 2000 and issued on March 18, 2008.  (Ex. 3.)  The other four Patents-in-Suit

9   (filed between 2007-2013 and issued between 2010-2014) all claim priority to the '472 patent

10  application, and share the same title and specification as the '472 patent.  (*See* Ex. 4 through Ex. 7.)

11      Blue Spike alleges that Google directly infringes 31 claims of five Patents-in-Suit:  claims 1,

12  2, 3, 4, 8 and 11 of the '472 patent; claims 1, 10, 11, 12, 18, 21, 27, 40 and 51 of the '700 patent;

13  claims 11, 15, 17 and 29 of the '494 patent; claims 1, 8, 11, 12, 16 and 17 of the '175 patent; and

14  claims 1, 4, 5, 16, 25 and 26 of the '728 patent.[1]  (Lee Decl. ¶¶ 6-9.)

15      According to Blue Spike, the supposedly inventive aspect of the Patents-in-Suit is the

16  claimed "abstract," which is recited in every asserted claim:

17      Moskowitz … filed his first patent application related to signal recognition
18      technology, which issued as the '472 Patent.  In describing this pioneering
        technology, ***Moskowitz coined the term "signal abstracting,"*** which enhanced the
19      ability to ***catalogue, archive, identify, authorize, transact, and monitor the use
        and/or application of signals, such as images*** (for example, photographs, paintings,
20      and scanned fingerprints), ***audio*** (for example, songs, jingles, commercials, movies
        soundtracks, and their versions), ***video*** (for example, videos, television shows,
21      commercials, and movies), ***and multimedia works***.  ***This revolutionary technology
        greatly improves the efficiency and speed of monitoring, analyzing, and identifying
22      signals as perceived***, as well as enabling the optimal compression of the signals and
        their associated signal abstracts for memory accommodation.
23

24  _____

    [1] Blue Spike filed its Complaint against Google on August 22, 2012 in the Eastern District of Texas,
25  asserting only four patents (Dkt. #1) but contending that Google infringed every claim (Lee Decl. ¶
    5).  Following transfer to the Northern District of California on March 14, 2014 (Dkt. # 16), Blue
26  Spike amended its complaint to assert a fifth patent, the '728 patent (Dkt. # 47), and pursuant to
    Court order reduced the number of asserted claims to no more than thirty-two.  (Ex. 8, Jul. 28, 2014
27  Hearing Tr. at 26:6-7.)  Blue Spike subsequently abandoned all allegations of willful infringement,
    indirect infringement and infringement under the doctrine of equivalents.  (Lee Decl. ¶ 8.)
28

1   (Dkt. #47 ¶ 12 (emphasis added); *see also id*. ¶ 22 ("The Patents-in-Suit comprise, in part, what

2   Moskowitz has coined 'signal abstracting,' which encompasses techniques, among others, also

3   known as 'signal fingerprinting,' 'acoustic fingerprinting,' or 'robust hash functions.'"); *id*. ¶ 23

4   ("Broadly speaking, 'signal abstracting' identifies digital information and material—including

5   video, audio, graphics, multimedia, and text—based solely on the perceptual characteristics of the

6   material itself."); *id*. ¶ 26 ("This idea of 'signal abstracting' applies equally to biometric

7   identification and today's security systems, such as fingerprint, facial, and optic systems that

8   analyze, catalogue, monitor, and identify a person's biometric features.").  Each asserted claim

9   requires at least one "abstract."  (*See* n. 5 & n. 7, *infra*.)

10      **C.      The Written Description**

11      The Patents-in-Suit purport to cover methods and apparatus for identifying, monitoring and

12   analyzing signals (*e.g.*, images, audio and video) for virtually any conceivable application.  (*See,*

13   *e.g.*, Ex. 3 at col. 1:56-59 ("The invention relates to the monitoring and analysis of digital

14   information...."), 4:42-43 ("The present invention relates to identification of digitally-sampled

15   information, such as images, audio and video."), 4:56-59 (present invention "is directed to the

16   identification of a digital signal—whether text, audio, or video—using only the digital signal

17   itself"), 4:19-20 (leaving it to skilled artisan to "determin[e] particular applications of the present

18   invention"), 6:64-7:9 ("… useful means for signal analysis in a wide variety of applications"),

19   13:31-38 (a "variety of purposes").)  Specifically, the Summary of the Invention describes the

20   methods and systems for "monitoring and analyzing" as requiring a reference signal, creating and

21   storing an "abstract" for the reference signal, receiving a query signal, creating an "abstract" for the

22   query signal, and then comparing the abstract of the query signal to the stored abstract(s) of the

23   reference signal(s) to determine if they match.  (*Id*. at Abstract & col. 2:64-3:47.)

24      The specification acknowledges that the invention accomplishes the same identification,

25   monitoring and analysis of content that humans have been performing since the dawn of time.  For

26   example, the invention may be used to find images of a sunset or sunrise that are stored in a

27   database.  (Ex. 3 at col. 14:56-15:11; *see also id*. at 13:31-38 (draw comparisons between technique,

28   compositions, or color schemes between beginner and great artists).)  While one "traditional

approach might involve a textual search involving a database wherein the works of other artists have been described in writing" (*id.* at 14:56-15:11), another traditional approach might be for a human to simply look through a physical archive that contains various paintings, photos, images, etc. to locate those that include a sunset, sunrise or other desired feature. Similarly, the specification claims that the invention may be used to identify songs or the number of times they are played on a radio station (Ex. 3 at col. 13:54-14:2, 13:31-38), but admits that a "traditional analysis is performed by actual persons who use play lists …." (*Id.* at 13:54-14:2.) An even more conventional approach is to simply listen to the radio and write down the names of songs and the number of times they are played. (*Id.* ("manual (i.e., by persons) monitoring …").)

In fact, the specification requires that the purportedly inventive "abstract" (*see* Dkt. # 47 ¶¶ 12, 23) be a substitute for human observation, *i.e.*, the signal abstracts differentiate what humans would perceive (without the aid of technology) as non-identical content:

- The specification recognizes that humans have a "highly effective ability [ ] to identify and recognize a signal" (Ex. 3 at col. 4:32-41);

- The signal is compressed "to its essence" while still "preserv[ing] some underlying 'aesthetic quality' of the signal" (*id.* at col. 7:3-7);

- The "abstracts" should distinguish between Billy Joel's recording and Barbara Streisand's recordings of "I'm in a New York State of Mind" (*id.* at col. 7:14-20);

- The signal is compressed "to retain what is 'humanly-perceptible'" and "the compression successfully mimics human perception" (*id.* at col. 7:36-38);

- The database should be "recalibrated" if it fails to recognize and differentiate different versions of a song, *e.g.*, an artist's first and second performances of a song that are similar but not identical (*id.* at col. 11:13-23);

- The invention should capture "humanly-perceptible observation" and "experience-based criteria," such as the use or application of a "complete song" versus "a short 3 second segment of a commercially available and recognizable song which is used for commercials … of goods or services being marketed" (*id.* at col. 11:31-45); and

- The invention should recognize and distinguish "perceptual differences" such as those that "exist between a song and its reproduction from a CD, an AM radio, and an Internet broadcast" that are differentiable by either the creator or consumers (*id.* at col. 13:13-22).

1   Signal comparison using signal "abstracts" as described in the specification merely takes the place

2   of manual comparison of signals (*e.g.*, images, audio or video) that humans are more than capable

3   of performing.  (*See id.* at col. 7:57-64 ("abstract" should sufficiently represent  "a painting, a song,

4   a TV commercial, a dialect, etc." so that "no independent cataloging is necessary"), 10:4-5

5   ("benefit" of invention is a more open means to uniformly catalog, analyze, and monitor signals).)

6          However, the specification is devoid of even one example of an actual "abstract."  Instead, it

7   defines an abstract by its aspirational function, stating that an "abstract" is something that "mimics

8   human perception" (*see id*. at col. 7:38).  The specification goes on to recognize all sorts of prior art

9   techniques for manipulating digital signals that existed as of the time of the alleged invention.[2]

10  (*See, e.g.*, Ex. 3 at col. 1:61-64 ("[m]any methods and protocols are known for transmitting data in

11  digital form …"), 2:4-6 (compression and transmission of digitized information is known), 4:23-26

12  (increasingly, information such as music, photos and motion pictures is created and stored in digital

13  format), 4:32-41 (analog signals should be digitized before being "analyzed by perceptually-based

14  or perceptually limited analysis" that "model[s] the processes of the highly effective ability of

15  humans to identify and recognize a signal").)  Then, the specification attempts to sweep in any work

16  that anyone might do to compare digital signals using known digital signal handling techniques by

17  stating that any of these techniques may be useful for creating a so-called "abstract."  For example,

18  the specification identifies data compression and other techniques from the prior art as possibly

19  being "appropriate tools to measure signal characteristics" (*id*. at col. 4:8-11, 4:15-17) or,

20  alternatively, asserts that other undisclosed approaches to data reduction can used to practice the

21  invention.[3]  (*Id*. at col. 3:52-56 ("there are many approaches to data reduction that can be utilized");

---

23  [2] The Patents-in-Suit also recognize that—in addition to humans—other then-existing technology
24  could be used to identify, monitor and analyze signals.  Text-based "additive signals" that included
    information such as the title and author were already in use to identify and monitor digital works
25  (Ex. 3 at col. 4:46-56), as were "digital watermarks" that embedded information into signals to
    identify, monitor, detect tampering and provide security (*id*. at col. 5:5-17, 5:20-55, 6:7-31).

26  [3] These vague disclosures do not provide adequate written support for or fully enable the claimed
27  invention under § 112 (issues that Google reserves the right to address later), let alone transform the
    abstract idea into a patentable invention (*see* Section III).

28

---

GOOGLE RULE 12(C) MOTION
CASE NO. 14-CV-1650                          Appx214

*see also id.* at col. 4:17-18 ("other approaches or combinations of signal characteristic analysis are contemplated"); *id.* at col. 4:20-22 ("a generalized approach to signal recognition is necessary to optimize the deployment and use of the present invention").)  The "abstract"—the alleged invention—is nothing more than an open-ended theoretical concept, waiting for someone else to come along and implement this idea using known (or yet-to-be-developed by others) digital signal handling techniques.  The patents attempt to sweep within their scope (i) comparisons that humans and other existing then-technology admittedly were capable of performing, (ii) using *any* technology that might be used to create the "abstract," (iii) for *any* application.  (*See, e.g.*, Ex. 3 at col. 6:54-7:2 (relying on known and then-unknown "computationally inexpensive ways of identifying an entire signal with some fractional representation or relationship with the original signal, or its perceptually observable representation," and envisioning "a useful means for signal analysis in a wide variety of applications").)

**D.     The Asserted Claims**

Blue Spike asserts fifteen independent claims, which recite nothing more than comparing one signal to another using a signal representation ("abstract") based on qualities that a human can perceive.  Like the generic methods and systems described in the Summary of the Invention (Ex. 3 at col. 2:64-3:47), the independent claims require a reference signal,[4] creating and storing an "abstract" for the reference signal based on "perceptual" qualities,[5] a query signal,[6] creating an "abstract" for the query signal,[7] and then comparing the abstract of the query signal to the stored

---

[4] (*See* Ex. 3 at col. 15:35, 16:5, 17:13-14, 18:12; Ex. 4 at col. 15:11-12, 16:15, 18:1; Ex. 5 at col. 16:11, 18:21-22; Ex. 6 at col. 15:23, 16:31, 17:25, 17:66; Ex. 7 at col. 15:17, 16:51-52.)

[5] (*See* Ex. 3 at col. 15:36-45, 16:6-8, 17:13-15, 18:10-18; Ex. 4 at col. 15:13-17, 15:23-24, 16:15-20, 18:2-7; Ex. 5 at col. 16:11-16, 18:21-28; Ex. 6 at col. 15:18-29, 16:25-46, 17:21-31, 17:61-18:11.)  The '728 claims require a reference signal abstract, but do not recite storing the abstract. (*See* Ex. 7 at col. 15:16-20, 16:50-54.)

[6] (*See* Ex. 3 at col. 15:46, 16:9, 17:16, 18:19; Ex. 4 at col. 15:18-19, 16:21, 18:8; Ex. 5 at col. 16:17, 18:29; Ex. 7 at col. 15:21-22, 16:48.)  Claim 1 of the '175 patent recites a second abstract for the reference signal rather than a "query signal" and query signal abstract.  (Ex. 6 at col. 15:30-45.)  Claims 8 and 17 of the '175 patent recite only one reference signal abstract (*see* n. 5).

[7] (*See* Ex. 3 at col. 15:47-55, 16:10, 17:17-18,18:19-22; Ex. 4 at col. 15:20-22, 16:22-23, 18:9-10; Ex. 5 at col. 16:17-19, 18:31; Ex. 6 at col. 17:33; Ex. 7 at col. 15:23-27, 16:55-59.)

abstract(s) of the reference signal(s) to determine if they match.[8]  Claim 1 of the '472 patent is

representative.  It provides:

> A method for monitoring and analyzing at least one signal comprising:
>
>> receiving at least one reference signal to be monitored;
>>
>> creating an abstract of said at least one reference signal wherein the step of creating an abstract of said at least one reference signal comprises:
>>
>>> inputting the reference signal to a processor;
>>>
>>> creating an abstract of the reference signal using perceptual qualities of the reference signal such that the abstract retains a perceptual relationship to the reference signal from which it is derived;
>>
>> storing the abstract of said at least one reference signal in a reference database;
>>
>> receiving at least one query signal to be analyzed;
>>
>> creating an abstract of said at least one query signal wherein the step of creating an abstract of said at least one query signal comprises:
>>
>>> inputting the at least one query signal to the processor;
>>>
>>> creating an abstract of the at least one query signal using perceptual qualities of the at least one query signal such that the abstract retains a perceptual relationship to the at least one query signal from which it is derived; and
>>
>> comparing the abstract of said at least one query signal to the abstract of said at least one reference signal to determine if the abstract of said at least one query signal matches the abstract of said at feast [sic] one reference signal.

(Ex. 3 at col. 15:33-60.)  For purposes of this motion, the asserted independent claims are not

meaningfully distinguishable from one another, and there is little difference between the method

and system claims.  The latter (like claim 1 above) recite generic computer components (*e.g.*,

processor, input, receiver, database, comparing device, counter) to practice the same idea of

---

[8] (*See* Ex. 3 at col. 15:56-60, 16:11-15, 17:19-20, 18:23-32; Ex. 4 at col. 15:25-30, 16:24-25, 18:11-14; Ex. 5 at col. 16:19-22, 18:29-33; Ex. 6 at col. 17:32-35; Ex. 7 at col. 15:28-31, 16:60-64.) Claims 1, 8 and 17 of the '175 patent are even more generic than the rest in that they recite a reference signal abstract (*see* n. 5), but no compare step.

1  "comparing" using the "abstract" of the method claims.[9]  (*See, e.g.*, Ex. 3 at col. 15:39, 15:45,

2  15:50, 16:8, 16:16, 17:15, 17:24, 18:10, 18:12, 18:17, 18:19, 18:23; *see also* n. 5 through n. 8.)

3         Much like the independent claims, dependent claim 4 of the '728 patent requires creating a

4  second reference signal abstract and comparing it to the query signal abstract to determine if they

5  match.  (Ex. 7 at col. 15:39-49.)  The other dependent claims are directed generally to creating the

6  "abstract" (Ex. 3 at col. 15:61-16:2 ('472 claim 2); Ex. 4 at col. 16:42-44 ('700 claim 21); Ex. 5 at

7  col. 16:30-32 ('494 claim 15), 16:36-38 ('494 claim 17); Ex. 6 at col. 17:54-59 ('175 claim 16); Ex.

8  7 at col. 15:50-52 ('728 claim 5), 16:65-67 ('728 claim 26)); further processing the "abstract" using

9  techniques in the prior art (Ex. 4 at col. 15:56-63 ('700 claims 10 and 11)); "comparing" and

10  "matching" (Ex. 3 at col. 16:26-33 ('472 claim 4); Ex. 6 at col. 17:36-39 ('175 claim 12); Ex. 7 at

11  col. 16:16-18 ('728 claim 16)); embedding information into the signal itself (Ex. 4 at col. 15:64-67

12  ('700 claim 12)); or other activity that is common in computer environment such as authorizing or

13  distributing (Ex. 4 at col. 16:65-67 ('700 claim 27), 18:47-48 ('700 claim 51)).  None of these

14  dependent claims adds anything inventive to the abstract ideas in the independent claims.

15  **III.    ARGUMENT**

16         **A.    Legal Standards**

17         Section 101 of the Patent Act defines patent-eligible subject matter as "any new and useful

18  process, machine, manufacture, or composition of matter, or any new and useful improvement

19  thereof."  35 U.S.C. § 101.  For more than 150 years, courts have recognized an important implicit

20  exception:  laws of nature, natural phenomena and abstract ideas are not patentable.  *Alice*, 134 S.

21  Ct. at 2354 (citation omitted); *Mayo*, 132 S. Ct. at 1293 (2012) (citations omitted); *BuySafe, Inc. v.*

22

23  [9] If Blue Spike contends that the asserted claims are distinct, it should identify the differences and
   explain how those differences are relevant to the § 101 analysis.  *See, e.g., Mayo Collaborative*
24  *Servs. v. Prometheus Labs., Inc.*, 132 S. Ct. 1289, 1295 (2012) (deciding § 101 issue based on
   representative claim where claims did not differ significantly from claim 1); *Planet Bingo v. VKGS*
25  *LLC*, 576 Fed. Appx. 1005, 1007 (Fed. Cir. 2014) (system and method claims recite the same basic
   process, and dependent claims recite only slight variations of the independent claims); *Open Text*
26  *S.A. v. Alfresco Software, Ltd.*, Case No. 13-cv-04843 et al., 2014 WL 4684429, *1 (N.D. Cal. Sept.
   29, 2014) (analyzing representative claim where "patents appear to be largely duplicative in claims
27  and content" and patent owner made no argument that claims are meaningfully distinguishable).

28

1    *Google, Inc.*, 765 F.3d 1350, 1352 (Fed. Cir. 2014); *Bascom Research, LLC v. LinkedIn, Inc.*, Case

2    No. 12-cv-06293-SI, 2015 WL 149480, *5 (N.D. Cal. Jan. 5, 2015); *Cogent Medicine, Inc. v.*

3    *Elsevier Inc.*, Case No. C-13-4479-RMW et al., 2014 WL 4966326, *3 (N.D. Cal. Sept. 30, 2014).

4    These three concepts are "basic tools of scientific and technological work" and "building blocks of

5    human ingenuity" that are "free to all men and reserved exclusively to none." *Alice*, 134 S. Ct. at

6    2354 (citations omitted); *Mayo*, 132 S. Ct. at 1293 (citation omitted).

7        Subject matter eligibility under § 101 is a threshold inquiry that courts determine as a matter

8    of law.  *Bilski v. Kappos*, 561 U.S. 593, 602, 130 S. Ct. 3218, 3225 (2010) ("threshold test");

9    *Parker v. Flook*, 437 U.S. 584, 593, 98 S. Ct. 2522  (1978) ("[t]he obligation to determine what type

10    of discovery is sought to be patented must precede the determination of whether that discovery is, in

11    fact, new or obvious"); *Open Text v. Alfresco*, 2014 WL 4684429 at *3 (citing *Accenture Global*

12    *Servs., GmbH v. Guidewire Software, Inc.*, 728 F.3d 1336, 1340-41 (Fed. Cir. 2013)) (§ 101

13    presents an issue of law).  Courts have "broad discretion concerning the appropriate time to address

14    § 101." *Eclipse IP LLC. v. McKinley Equip. Corp.,* Case No. 14-742, 2014 WL 4407592, *5 (C.D.

15    Cal. Sept. 4, 2014) (broad discretion as to timing).  Early resolution of this issue is appropriate at

16    the pleadings stage,[10] even if claim construction has not yet occurred.  *Open Text v. Alfresco*, 2014

17    WL 4684429 at *3 (citations omitted); *Bascom*, 2015 WL 149480 at *4 (citing *Microsoft Corp. v.*

18    *i4i L.P.*, 131 S. Ct. 2238, 2242 (2011)) (claim construction is not necessary to determining subject

19    matter eligibility); *see also I/P Engine, Inc. v. AOL Inc.*, 576 Fed. Appx. 982, 996 (Fed. Cir. 2014)

20

21    _____

    [10] Challenges to patentability under § 101 may be brought as a motion for judgment on the

22    pleadings.  *Open Text S.A. v. Box, Inc.*, Case No. 13-cv-04910-JD, 2015 WL 269036, *2 (N.D. Cal.
    Jan. 20, 2015) (citations omitted).  Rule 11(c) states, "[a]fter the pleadings are closed—but early

23    enough not to delay trial—a party may move for judgment on the pleadings."  Fed. R. Civ. P. 12(c).
    Judgment is appropriate when the movant clearly establishes on the face of the pleadings that no

24    material issue of fact remains to be resolved and that it is entitled to judgment as a matter of law.
    *Morsa v. Facebook, Inc.*, Case No. SACV 14-161-JLS, 2014 WL 7641155, *2 (C.D. Cal. Dec. 23,

25    2014) (citation omitted).  Courts should accept as true all factual allegations in the complaint, but
    need not accept mere conclusory statements or threadbare recitals of the elements of a cause of

26    action.  *Id.* (citations omitted).  The court may consider exhibits submitted with or alleged in the
    complaint, as well as matters than may be judicially noticed pursuant to Federal Rule of Evidence

27    201.  *Id.* (citations omitted).

28

(Mayer, C., concurring) ("clear advantages to addressing section 101's requirements at the outset of litigation" including eliminating "lengthy claim construction").

To determine whether a claim is patent-ineligible under § 101, the Supreme Court has articulated a two-part test. *First*, courts must determine whether the claims at issue are directed to one of the three patent-ineligible concepts. *Second*, if they are, courts must search the claims for an "inventive concept" that is "sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself." *Alice*, 134 S. Ct. at 2355; *Mayo*, 132 S. Ct. at 1294, 1297. As explained below, the asserted claims of the Patents-in-Suit meet the first part of this test and fail the second, and are thus patent-ineligible.

## B.      The Asserted Claims Are Directed to an Abstract Idea

The first step of the *Mayo/Alice* test requires the Court to evaluate the asserted patent claims "on their face" to determine if the claims are drawn to an abstract idea. *Alice*, 134 S. Ct. at 2355; *Bascom Research*, 2015 WL 149480 at *6. The Court must "identify the purpose of the claim—in other words, determine what the claimed invention is trying to achieve—and ask whether that purpose is abstract." *Enfish, LLC v. Microsoft Corp.*, Case No. 2:12-cv-07360, 2014 WL 5661456, *4 (C.D. Cal. Nov. 3, 2014); *see also Open Text v. Box*, 2015 WL 269036 at *2 (court must "distill[] the gist of the claim"). This inquiry should focus on the claim's purpose "at a reasonably high level of generality." *Enfish*, 2014 WL 5661456 at *4; *see also Open Text v. Box*, 2015 WL 269036 at *1 (for first part of test, distinguishing between the "core concept" of the claim and its "implementation").

The asserted claims of the Patents-in-Suit are drawn to the abstract idea of comparing one signal to another using perceivable qualities of the signal.[11] (*See* Section II.D, *supra*.) Consider

---

[11] The only exceptions are claims 1, 8 and 17 of the '175 patent, which have no "purpose" at all. They require creating and storing a reference signal "abstract" but do not identify any application for the "abstract" (*e.g.*, to compare one signal to another). (Ex. 6 at col. 15:17-45 (claim 1), 16:24-46 (claim 8), 17:60-18:11 (claim 17).) The claims require creating an abstract solely for the sake of creating an abstract. Despite this difference (which, if it is even possible, makes these claims **more** abstract), claims 1, 8 and 17 also should be found to be unpatentable under § 101 for at least the same reasons as discussed for the other asserted claims.

1  claim 1 of the '472 patent, which recites the steps of (i) receiving a reference signal, (ii) creating an

2  abstract of the reference signal, (iii) storing the abstract, (iv) receiving a query signal, (v) creating

3  an abstract for the query signal, and (vi) comparing the abstracts to determine if they match.[12]  (Ex.

4  3 at col. 15:33-60.)  Beyond the basic comparison required in the last limitation, the claim has no

5  "purpose" whatsoever.  It does not recite any practical use or application, *i.e.*, the "comparing" step

6  is performed  solely for the sake of "comparing."  (*Id.*)  Exploiting this, Blue Spike interprets the

7  asserted claims as covering a vast array of technology fields and applications not recited in the

8  claims themselves and never contemplated by the specification.  (*See, e.g.*, Dkt. # 47 ¶¶ 24-26

9  (contending that technology of Patents-in-Suit cover everything from "develop[ing] better

10  intelligence about content markets" to "biometric identification" to "security systems").)  This is the

11  very definition of an "abstract idea" that is patent-ineligible.  *See* 35 U.S.C. § 101 (invention must

12  be "new and ***useful***") (emphasis added); *Bilski*, 561 U.S. at 602 (exceptions to patentability "are

13  consistent with the notion that a patentable process must be 'new and useful'"); *Alice*, 134 S. Ct. at

14  2354 (exclusions to patentability are driven by concern that patent monopoly would pre-empt use of

15  the approach in all fields); *Enfish*, 2014 U.S. Dist. LEXIS 156760 at *5 ("Patents that claim

16  inventions too broadly or prohibit a vast amount of future applications are suspect" because they are

17  "designed to monopolize [the ineligible concept] itself").

18        In addition to having no claimed "usefulness," the purpose of the asserted claims (*i.e.*,

19  comparing one signal to another) is an idea that even the specification recognizes is a computerized

20  substitute for human observation and signal analysis.  (*See* Section II.C, *supra*.)  This is precisely

21  the type of subject matter that the Supreme Court and Federal Circuit have excluded from patent

---

[12] The "abstract" recited in claim 1 is how the "purpose" of the claim (*i.e.*, comparing one signal to another) is implemented.  *Open Text v. Box*, 2015 WL 269036 at *1 ("general idea" of the claim is considered in part 1 of the *Alice/Mayo* test, and "implementation" is considered in part 2).  It is also the alleged point of novelty (Dkt. # 47 ¶ 12), and should not be considered in determining the "purpose" of the claims.  *Diamond v. Diehr*, 101 S. Ct. 1048, 1058-59 (1981) (novelty falls under § 102 and "is of no relevance in determining whether the subject matter of a claim falls within the § 101 categories …"); *Enfish*, 2014 WL 5661456 at *4 (citing *Diamond*) (in first part of test, the "correct approach" is asking what the claim is trying to achieve instead of examining the point of novelty).

Appx2120

1    eligibility under § 101.  *Alice*, 134 S. Ct. at 2356 (claims directed to "organizing human activity"

2    are abstract ideas and not patentable); *Gottschalk v. Benson*, 409 U.S. 63, 67, 93 S. Ct. 253 (1972)

3    (method that can be "done mentally" without a computer is an abstract idea and not patentable);

4    *Planet Bingo*, 576 Fed. Appx. at 1006-7 (method encompassing abstract idea of managing and

5    playing Bingo consists of mental steps that can be carried out by a human using pen and paper);

6    *CyberSource Corp. v. Retail Decisions, Inc.*, 654 F.3d 1366, 1371 (Fed. Cir. 2011) (following the

7    Supreme Court, "we have similarly held that mental processes are not patent-eligible subject matter

8    …").

9          Applying this guidance, recent decisions of this and other district courts have rejected claim

10    after claim on § 101 grounds because they describe patent-ineligible "abstract ideas."  *See Open*

11    *Text v. Box*, 2015 WL 269036 at *1, 3 ("[s]horn of its implementation-specific fleece, the claim is

12    directed at providing a method for people to collaborate and share information"); *Bascom Research*,

13    2015 WL 149480 at *2, 6, 8, 9 (claim reciting "link relationships" between document objects

14    "simply describes the abstract idea of creating, storing and using relationships between objects");

15    *OpenTV, Inc. v. Netflix Inc.*, Case No. 14-cv-01525-RS, 2014 WL 7185921, *5-6 (N.D. Cal. Dec.

16    16, 2014) (claims directed to allowing advertisers to gather data and direct customized ads to

17    individuals are abstract ideas "as old as the saying, 'know your audience'"); *id*. at *7 (claims for

18    delivery of customized advertizing do not describe anything more than the abstract idea of

19    attempting to provide appropriately selected content to users); *Cogent*, 2014 WL 4966326 at *3-4 (a

20    database of information, cataloging the information, and setting aside particular information that

21    may be relevant to a particular user "claims the abstract idea of maintaining and searching a library

22    of information"); *Open Text v. Alfresco*, 2014 WL 4684429 at *1, 4 (claim describes "a very simple

23    computer-driven method to engage in the commonplace and time-honored practice of interacting

24    with customers to promote marketing and sales"); *see also IpLearn, LLC v. K12 Inc.*, Case No. 11-

25    1026, 2014 WL 7206380, *6 (D. Del. Dec. 17, 2014) (claims covering abstract idea of educational

26    instruction, evaluation and review address "fundamental human behavior" and "conventional

27    everyday teaching that happens in schools across the country"); *Enfish*, 2014 WL 5661456 at *6

28    (claims directed to storing, organizing and retrieving memory in a logical table are abstract ideas

GOOGLE RULE 12(C) MOTION
CASE NO. 14-CV-1650

because "humans have used tables to store information" for millennia and continue to use them);

*Wolf v. Capstone Photography, Inc.*, Case No. 2:13-CV-09573, 2014 WL 7639820, *10 (C.D. Cal.

Oct. 28, 2014) (claims "merely implement basic computer technology to perform the same process

[matching photographs to participant and making them available for ordering], with computer

systems automating much of the work previously done manually"); *DietGoal Innovations LLC v.

Bravo Media LLC*, 33 F. Supp. 3d 271, 283-84 (S.D.N.Y. 2014) (claims are drawn to the abstract

concept of meal planning to meet nutritional goals, which is a "long prevalent" practice that humans

have engaged in for millennia).

The asserted claims here should fare no better.  "Comparing" one signal (*e.g.*, images, audio

and video) using the humanly perceivable parts of the signal is, by definition, an activity that

humans can perform manually without a computer.[13]  These claims seek coverage of an abstract

idea.  (*See* Sections II.C & II.D, *supra*.)

**C.     The Asserted Claims Are Not Patent-Eligible Applications of the Abstract Idea**

Once it has been determined that a claim is directed to an abstract idea, the second step of

the *Mayo/Alice* test requires the Court to search for an inventive concept—*i.e.*, an element or

combination of elements that is "sufficient to ensure that the patent in practice amounts to

significantly more than a patent upon the [ineligible concept] itself."  *Alice*, 134 S. Ct. at 2355

(citing *Mayo*, 132 S. Ct. at 1294).  The limitations of the asserted claims, either individually or

collectively, do not contain an inventive step sufficient to transform the claimed abstract idea into

patent-eligible subject matter.

---

[13] The act of "comparing" one thing to another also is a "fundamental, long-standing, well-known concept" with limitless potential uses.  (*See, e.g.*, Ex. 3 at col. 6:64-7:9 (wide variety of applications), 13:31-38 (variety of purposes).)  Recent cases have held claims unpatentable for this reason as well.  *See, e.g., The Money Suite Co. v. 21st Century Ins. and Fin. Servs., Inc.*, Case No. 13-984 et al., 2015 WL 436160, *3 (D. Del. Jan. 27, 2015) (method of "conduct[ing] a search of multiple financial products for efficient quoting" is a fundamental economic or business practice and therefore an abstract idea); *Morsa*, 2014 WL 761155 at *6 (claims directed to targeted advertising on the internet is a patent-ineligible abstract idea because it is a fundamental, long-standing, well-known concept); *Enfish*, 2014 WL 5661456 at *5 ("[l]ongstanding practices are often the building blocks of future research and development").

A fundamental problem with the asserted claims is that they attempt to pre-empt and monopolize every possible field and application in which the abstract idea of comparing one signal to another may be used. (Ex. 3 at col. 15:33-60 (reciting no steps beyond "comparing" and no practical application).) There is no claim limitation that cures this problem. Even the "abstract" elements, which Blue Spike contends are the point of novelty (*see* Section II.B, *supra*; Dkt. # 47 ¶¶ 12, 22, 23, 26), add nothing inventive or limiting to the abstract idea of comparing one signal to another. In claim 1 of the '472 patent, the reference signal "abstract" is created by "inputting the reference signal to a processor" and the query signal "abstract" is created by "inputting the at least one query signal to the processor." The processor creates the abstract "using perceptual qualities of the [] signal such that the abstract retains a perceptual relationship" to the signal from which it is derived.[14] (Ex. 3 at col. 15:26-42, 15:48-55.) The claim provides no detail on how to do this and gives no bounds that would add technical, "inventive" features to the claim.

The specification provides no help either. It confirms that the claimed "abstract" is itself merely an abstract idea. Except for prior art "data reduction technologies" that might (or might not) be useful,[15] there is no disclosure of how to create an "abstract." There are no figures, examples, processes, flowcharts, algorithms, source code, or other procedures. There are only vague

---

[14] Other claims are even barer, reciting "creating an abstract" for the reference signal. (*See, e.g.,* Ex. 3 at col. 16:6, 17:13-14.) Even without the additional language of '472 claim 1 reciting "perceptual qualities," the specification teaches that the "abstract" is a substitute for human perception, as described previously.

[15] For purposes of this motion, it is not necessary to determine one way or the other whether the prior art listed in the specification may be used to create an "abstract." On the one hand, the specification suggests prior art techniques "may be appropriate tools" (Ex. 3 at col. 4:18-16; *see also id.* at col. 7:34-40), but on the other hand downplays the prior art's usefulness in comparing signals as contemplated. (*Id.* at col. 6:64-7:11 (lossy or lossless compression and perceptual coding techniques are "not strictly equivalent to" massively compressing a signal to its essence while still preserving some underlying "aesthetic quality" of the signal), 7:40-43 (psychoacoustic and psychovisual compression "has some relevance to the present invention" but additional data reduction or massive compression is anticipated).) Regardless, the prior art does not supply an "inventive concept" required in part two of the *Alice/Mayo* test. *See* 35 U.S.C. § 101 ("Whoever invents or discovers any ***new*** and useful …") (emphasis added); *see also* 35 U.S.C. § 102 (novelty requirement); *Mayo*, 132 S. Ct. at 1298 ("well-understood, routine, conventional activity" does not transform an unpatentable exception into patent-eligible application).

---

directions to use some unidentified technology, which will depend on the specific application, to ensure that the "abstract" "retain[s] what is 'humanly-perceptible'" and "successfully mimics human perception." (*Id*. at col. 7:29-48; *see also id*. at 4:7-18 ("other approaches or combinations of signal characteristic analysis are contemplated"), 4:20-22 ("a generalized approach to signal recognition is necessary to optimize the deployment and use of the present invention"), 6:64-67 ("[s]o long as there exist computationally inexpensive ways to identifying an entire signal …"), 7:25-27 (the present invention "aims to maintain some level of perceptual quality").)  Creation of the "abstract" depends entirely on the innovation of someone other than the named inventors of the Patents-in-Suit.

The claimed "abstract" cannot provide the "inventive concept" that is necessary under *Alice* and *Mayo*.  At best, the Patents-in-Suit fail to disclose, describe and enable something that the named inventors actually did invent, *i.e.*, technology to create an "abstract."  At worst, the Patents-in-Suit describe an "abstract" only in the most general terms to intentionally pre-empt the creativity and innovation of others who perform research, develop technology and achieve actual solutions.  The exceptions to § 101 exist to foreclose this abuse.  As recently explained:

> In *Alice*, the Supreme Court articulated concerns that claims to abstract ideas would preempt the "building blocks" of research—in essence, that ***people who merely had the idea of how to solve a problem, but did not actually know how to solve the problem, would prevent others from performing research and achieving actual solutions***.

> … [I]f the patent claims sweep too broadly, or only claim the idea that was achieved rather than implementation of the idea, § 101 directs that the patent [claim] is invalid.

*Amdocs (Israel) Ltd. v. Openet Telecom, Inc.*, Case No. 1:10cv910, 2014 WL 5430956, *11 (E.D. Va. Oct. 24, 2014) (emphasis added).  The "abstract" limitations of the asserted claims sweep too broadly by claiming another abstract idea, not an actual implementation.  They do no more than state, "create an abstract" using humanly-perceptible qualities in order to mimic human perception. (Ex. 3 at col. 15:36-44, 15:47-55.)  In other words, they recite an idea and say, "apply it."  This does not transform the asserted claims into a patent-eligible concept.  *Alice*, 134 S. Ct. at 2357 (to transform  an abstract idea into a patent-eligible application, the additional claim elements must do

more than simply state the abstract idea while adding the words "apply it"); *Bascom Research*, 2015 WL 149480 at *10 (claims reciting the creation of "link directories" to store "link relationships" amount to instructions to apply the abstract idea of "establishing relationships between documents and making those relationships accessible to other users"); *Amdocs*, 2014 WL 5430956 at *5, 6 (despite claims reciting "computer code" for receiving and correlating network accounting records, court concluded "it is difficult to conceive of broader terms with which the idea of correlating two records could be described"); *McRO, Inc. v. Sega of America, Inc.*, Case No. 12-10327, 2014 WL 4749601, *11 (C.D. Cal. Sept. 22, 2014) (what claim purports to add to the prior art "is the use of rules" for automatic lip synchronization, but because they broadly cover any such rule, the claim states an abstract idea while adding the words "apply it").

There is nothing inventive about any of the remaining claim limitations. They recite routine computer-implemented activity (*e.g.*, receiving, inputting, creating, storing, counting, comparing, recording, distributing) using standard computer components (*e.g.*, receiver, input, processor, database, memory, counter, index). (*See* Ex. 3 through Ex. Ex. 7 at Claims; *see also* Ex. 3 at col. 7:65-9:39 (the abstract idea is implemented using generic processors or software that runs on the processors).) These recitations are nothing more than a collection of well-known ideas for conducting any computerized function. They cannot transform the patent-ineligible abstract idea into a patent-eligible invention. *Mayo*, 132 S. Ct. at 1294 (well-understood, routine, conventional activity does not transform an abstract idea into an "inventive concept"); *Alice*, 134 S. Ct. at 2358 (same); *Open Text v. Box*, 2015 WL 269036 at *1, 3 (implementation consisting of "standard technology like browsers, servers, and networks, has nothing inventive whatsoever about it"); *OpenTV*, 2014 WL 7185921 at *7 ("use of general purpose computers and/or the internet does not suffice" to transform abstract idea into patent-eligible subject matter); *Cogent*, 2014 WL 4966326 at *6 ("Alice makes clear that … system and computer component claims rise and fall with the method claims" where none of the hardware recited by the system claims offers meaningful limitation beyond generally implementing the use of the method via computers); *Open Text v. Alfresco*, 2014 WL 4684429 at *5 (implementing basic marketing scheme on a generic computer system without any meaningful limitations is not patent-eligible); *Gametek LLC v. Zynga, Inc.*, Case

1   No. CV 13-2546, 2014 WL 1665090, *7 (N.D. Cal. Apr. 25, 2014) (generic network is "merely the

2   environment in which the abstract idea is practiced").

3          The claim elements, taken individually and collectively, do not establish the asserted claims

4   as including any "inventive concept."  Beyond reciting a "comparing" step, the claims are not

5   limited to any practical application but are drafted to cover every conceivable application (as the

6   specification acknowledges).  The "abstract" limitations are claimed so broadly as to cover both the

7   prior art and all innovation by others (as the specification acknowledges).  And, although the

8   "abstract" is described in the specification as a substitute for what humans perceive and it is alleged

9   by Blue Spike to be the inventive aspect of the claims, neither the claims nor the specification recite

10  any actual implementation or disclose how to create the abstract.  In short, the "abstract" is itself an

11  abstract idea that purports to "mimic human perception" and the claims as a whole purport to be a

12  substitute for signal comparisons that humans can perform.  There is nothing in the asserted claims

13  that ensures that the "patent in practice amounts to significantly more than a patent upon the

14  [ineligible concept] itself."  *Alice*, 134 S. Ct. at 2355 (citing *Mayo*, 132 S. Ct. at 1294).

15  **IV.    CONCLUSION**

16         For the foregoing reasons, Google requests that the Court find that the asserted claims are

17  unpatentable under 35 U.S.C. § 101 and enter judgment on the pleadings in Google's favor.

18  Dated:  May 12, 2015                    */s/ Michael A. Berta*

19                                          **ARNOLD & PORTER LLP**
                                            Michael A. Berta (SBN 194650)
20                                          Three Embarcadero Center, 7th Floor
                                            San Francisco, CA 94111
21                                          Phone: (415) 471-3100
                                            Fax: (415) 471-3400
22                                          michael.berta@aporter.com

23                                          Nicholas H. Lee (SBN 259588)
24                                          777 S. Figueroa Street, 44th Floor
                                            Los Angeles, CA 90017
25                                          Phone: (213) 243-4000
                                            Fax: (213) 243-4199
26                                          nicholas.lee@aporter.com

27                                          *Attorneys for Defendant Google Inc.*

28

**PROOF OF SERVICE**

I am over the age of 18 and not a party to the within action.  My business address is 777 S. Figueroa Street, 44th Floor Los Angeles, CA 90017-5844.

On May 12, 2015, I served on the below list of counsel for Plaintiff in said action a copy of the foregoing document:

Randall T. Garteiser (rgarteiser@ghiplaw.com)
Christopher A. Honea (chonea@ghiplaw.com)
Christopher S. Johns (cjohns@ghiplaw.com)
Kirk J. Anderson (kanderson@ghiplaw.com)
Peter S. Brasher (pbrasher@ghiplaw.com)
GARTEISER HONEA, PLLC
119 W. Ferguson St.
Tyler, Texas 75702
Telephone: (903) 705-7420
Facsimile: (888) 908-4400

☐   (BY ELECTRONIC MAIL)  I caused such document(s) to be sent to the persons at the e-mail addresses listed above. I did not receive, within a reasonable time after the submission, any electronic message or other indication that the transmission was unsuccessful.

☒   (BY CM/ECF)  I caused such document(s) to be sent via electronic mail through the Case Management/Electronic File system with the U.S. District Court for the Northern District of California.

☐   (MAIL) I am readily familiar with this firm's practice of collection and processing correspondence for mailing.  Under that practice it would be deposited with the U.S. postal service on that same day in the ordinary course of business.  I am aware that on motion of party served, service is presumed invalid if postal cancellation date or postage meter date is more than 1 day after date of deposit for mailing in affidavit.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on May 12, 2015, at Los Angeles, California.

| Nicholas H. Lee | /s/ Nicholas H. Lee |
|---|---|
| (Type or print name) | (Signature) |

**ARNOLD & PORTER LLP**
Michael A. Berta (SBN 194650)
Three Embarcadero Center, 7th Floor
San Francisco, CA 94111
Phone: (415) 471-3100
Fax: (415) 471-3400
michael.berta@aporter.com

Nicholas H. Lee (SBN 259588)
777 S. Figueroa Street, 44th Floor
Los Angeles, CA 90017
Phone: (213) 243-4000
Fax: (213) 243-4199
nicholas.lee@aporter.com

*Attorneys for Defendant Google Inc.*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## OAKLAND DIVISION

|  |  |
|---|---|
| BLUE SPIKE, LLC,<br><br>                    Plaintiff,<br><br>        v.<br><br>GOOGLE INC.,<br><br>                    Defendant. | Case No. 14-cv-01650 (YGR)<br><br>**DECLARATION OF NICHOLAS H. LEE IN SUPPORT OF DEFENDANT GOOGLE INC.'S MOTION FOR JUDGMENT ON THE PLEADINGS PURSUANT TO FED. R. CIV. P. 12(c)**<br><br>Hearing Date:  Tuesday, June 16, 2015<br>Hearing Time:  2:00 p.m.<br>Courtroom:     Courtroom 1, 4th Floor<br>Judge:         Hon. Yvonne Gonzalez Rogers |

1    I, Nicholas H. Lee, declare as follows:

2        1.      I am over 18 years of age.  I am an associate at Arnold & Porter LLP, counsel for

3    Defendant Google Inc. in this matter.  I have personal knowledge of the facts stated herein, and, if

4    called upon, could and would testify competently to them.  I make this declaration in support of

5    Defendant Google Inc.'s Motion for Judgment on the Pleadings Pursuant to Fed. R. Civ. P. 12(c),

6    filed herewith.

7        2.      Plaintiff Blue Spike, LLC ("Blue Spike") filed its first patent infringement action on

8    August 9, 2012, captioned *Blue Spike, LLC v. Texas Instruments, Inc.*, Case No. 6:12-cv-499 (E.D.

9    Tex.).  Since then, Blue Spike has filed more than one hundred separate patent infringement actions

10   in the Eastern District of Texas (including this case against Google, and others that subsequently

11   have been transferred to other districts) asserting one or more of U.S. Patent No. 7,346,472 ("'472

12   patent"); U.S. Patent No. 7,660,700 ("'700 patent"); U.S. Patent No. 7,949,494 ("'494 patent");

13   U.S. Patent No. 8,214,175 ("'175 patent"); and U.S. Patent No. 8,712,728 ("'728 patent")

14   (collectively, the "Patents-in-Suit").  According to the case dockets, Blue Spike has voluntarily

15   dismissed or settled at least eighty of those cases.

16       3.      Attached hereto as Exhibit 1 is a true and correct copy (as obtained from website of

17   the Secretary of State of Texas) of the Articles of Organization of Blue Spike LLC, which was

18   previously filed by Google in the Eastern District of Texas in Case No. 6:12-cv-00499-RWS-CMC

19   at Dkt. # 678-25.

20       4.      Attached hereto as Exhibit 2 is a true and correct copy of the Patent Assignment

21   Details for the Asserted Patents that was recorded on August 5, 2012 (as the Details appeared on the

22   Patent and Trademark Office's website on February 12, 2013), which Google previously filed in the

23   Eastern District of Texas at Dkt. # 678-26.

24       5.      On February 26, 2014 (while this case was pending in the Eastern District of Texas),

25   Blue Spike served Plaintiff's Disclosure of Asserted Claims and Infringement Contentions.  The

26   claim charts appended thereto identified only one accused instrumentality (YouTube Content ID)

27   and identified 114 asserted claims (*i.e.*, each claim of each asserted patent):  claims 1-14 of U.S.

28   Patent No. 7,346,472 ("'472 patent"); claims 1-52 of U.S. Patent No. 7,660,700 ("'700 patent");

1   claims 1-29 of U.S. Patent No. 7,949,494 ("'494 patent"); and claims 1-19 of U.S. Patent No.

2   8,214,175 ("'175 patent").

3         6.      On September 25, 2014 (after this action was transferred to the Northern District of

4   California and after Blue Spike amended its complaint to assert a fifth patent), Blue Spike served

5   Plaintiff's Disclosures Pursuant to Patent L.R. 3-1 and 3-2.  The claim charts appended thereto

6   identified only one accused instrumentality (YouTube Content ID) and identified thirty-two asserted

7   claims:  claims 1, 2, 3, 4, 8 and 11 of the '472 patent; claims 1, 10, 11, 12, 18, 21, 27, 40 and 51 of

8   the '700 patent; claims 11, 15, 17 and 29 of the '494 patent; claims 1, 8, 11, 12, 16 and 17 of the

9   '175 patent; and claims 1, 4, 5, 16, 25, 26 and 30 of U.S. Patent No. 8,712,728 ("'728 patent").

10  Though Blue Spike charted claim 30 of the '728 patent, it did not chart independent claim 29 (from

11  which claim 30 depends).

12        7.      On November 17, 2014, Blue Spike served "updated" infringement charts, which

13  included the same patent claims included in its September 25, 2014 charts.  Again, Blue Spike

14  charted claim 30 of the '728 patent, but did not chart independent claim 29.

15        8.      On February 11, 2015, Blue Spike again served "updated" infringement charts to

16  clarify—as part of the parties' meet-and-confer process and to avoid Google filing a motion to

17  strike—that it was abandoning all allegations of willful infringement, indirect infringement and

18  infringement under the doctrine of equivalents (*i.e.*, the only infringement theory under which Blue

19  Spike will proceed is literal direct infringement).  The February 11, 2015 claim charts included the

20  same patent claims as in the September 25, 2014 and November 17, 2014 charts.  Again, Blue Spike

21  charted claim 30 of the '728 patent, but did not chart independent claim 29.

22        9.      Because Blue Spike has never asserted or provided a claim chart for independent

23  claim 29 (which is necessarily part of any infringement analysis of dependent claim 30, and which

24  would exceed the number of asserted claims permitted by this Court), Google informed Blue Spike

25  in its invalidity contentions served on January 26, 2015 that claim 30 was deemed unasserted.  As of

26  the date of this declaration, Blue Spike has not objected, responded or moved the Court to (i) show

27  good cause to assert claims 29 and 30, or (ii) show good cause to amend its infringement

28  contentions to comply with Patent L.R. 3-1 as to those claims.

10.     Attached hereto as Exhibit 3 is a true and correct copy of the '472 patent, which is highlighted to identify the asserted claims.  Blue Spike filed a copy of the '472 patent with its original Complaint at Dkt. # 1-5.

11.     Attached hereto as Exhibit 4 is a true and correct copy of the '700 patent, which is highlighted to identify the asserted claims.  Blue Spike filed a copy of the '700 patent with its original Complaint at Dkt. # 1-4.

12.     Attached hereto as Exhibit 5 is a true and correct copy of the '494 patent, which is highlighted to identify the asserted claims.  Blue Spike filed a copy of the '494 patent with its original Complaint at Dkt. # 1-3.

13.     Attached hereto as Exhibit 6 is a true and correct copy of the '175 patent, which is highlighted to identify the asserted claims.  Blue Spike filed a copy of the '175 patent with its original Complaint at Dkt. # 1-2.

14.     Attached hereto as Exhibit 7 is a true and correct copy of the '728 patent, which is highlighted to identify the asserted claims.

15.     Attached hereto as Exhibit 8 is a true and correct copy of the Reporter's Transcript of Proceedings from the Initial Case Management Conference held on July 28, 2014 (as provided by the Court reporter).


I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.


Dated:  May 12, 2015                              By:    _s/ Nicholas H. Lee_____

                                                                Nicholas H. Lee



**United States Patent and Trademark Office**

Home | Site Index | Search | Guides | Contacts | eBusiness | eBiz alerts | News | Help



**Assignments on the Web** > **Patent Query**

# Patent Assignment Details

**NOTE: Results display only for issued patents and published applications. For pending or abandoned applications please consult USPTO staff.**

| | | |
|---|---|---|
| **Reel/Frame:** 028725/0058 | | **Pages:** 8 |
| | **Recorded:** 08/05/2012 | |

**Attorney Dkt #:** SCOT0001

**Conveyance:** ASSIGNMENT OF ASSIGNORS INTEREST (SEE DOCUMENT FOR DETAILS).

**Total properties: 5**

**1**    **Patent #:** 7346472    **Issue Dt:** 03/18/2008    **Application #:** 09657181    **Filing Dt:** 09/07/2000
     **Title:** METHOD AND DEVICE FOR MONITORING AND ANALYZING SIGNALS

**2**    **Patent #:** 7660700    **Issue Dt:** 02/09/2010    **Application #:** 12005229    **Filing Dt:** 12/26/2007
   **Publication #:** US20080109417    **Pub Dt:** 05/08/2008
     **Title:** METHOD AND DEVICE FOR MONITORING AND ANALYZING SIGNALS

**3**    **Patent #:** 7949494    **Issue Dt:** 05/24/2011    **Application #:** 12655357    **Filing Dt:** 12/22/2009
   **Publication #:** US20100106736    **Pub Dt:** 04/29/2010
     **Title:** METHOD AND DEVICE FOR MONITORING AND ANALYZING SIGNALS

**4**    **Patent #:** 8214175    **Issue Dt:** 07/03/2012    **Application #:** 13035964    **Filing Dt:** 02/26/2011
   **Publication #:** US20110179069    **Pub Dt:** 07/21/2011
     **Title:** METHOD AND DEVICE FOR MONITORING AND ANALYZING SIGNALS

**5**    **Patent #:** NONE    **Issue Dt:**    **Application #:** 13487119    **Filing Dt:** 06/01/2012
   **Publication #:** US20120239686    **Pub Dt:** 09/20/2012
     **Title:** Method and device for monitoring and analyzing signals

**Assignor**
**1**   BLUE SPIKE, INC.             **Exec Dt:** 08/04/2012
**Assignee**
**1**   BLUE SPIKE LLC
     1820 SHILOH ROAD, STE 1201C
     TYLER, TEXAS 75703

**Correspondence name and address**
     BRUCE T. MARGULIES
     4813-B EISENHOWER AVE.
     ALEXANDRIA, VA 22304

Search Results as of: 02/12/2013 05:09 PM
If you have any comments or questions concerning the data displayed, contact PRD / Assignments at 571-272-3350. v.2.3.2
Web interface last modified: July 10, 2012 v.2.3.2

| .HOME | INDEX | SEARCH | eBUSINESS | CONTACT US | PRIVACY STATEMENT |

Appx2137

US008214175B2

(12) **United States Patent**   (10) **Patent No.:**   **US 8,214,175 B2**
Moskowitz et al.   (45) **Date of Patent:**   **Jul. 3, 2012**

(54) **METHOD AND DEVICE FOR MONITORING AND ANALYZING SIGNALS**

(75) Inventors: **Scott Moskowitz**, Sunny Isles Beach, FL (US); **Mike W. Berry**, Seattle, WA (US)

(73) Assignee: **Blue Spike, Inc.**, Sunny Isles Beach, FL (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **13/035,964**

(22) Filed: **Feb. 26, 2011**

(65) **Prior Publication Data**

US 2011/0179069 A1   Jul. 21, 2011

**Related U.S. Application Data**

(63) Continuation of application No. 12/655,357, filed on Dec. 22, 2009, now Pat. No. 7,949,494, which is a continuation of application No. 12/005,229, filed on Dec. 26, 2007, now Pat. No. 7,660,700, which is a continuation of application No. 09/657,181, filed on Sep. 7, 2000, now Pat. No. 7,346,472.

(51) **Int. Cl.**
   *G06F 11/30*   (2006.01)
(52) **U.S. Cl.** ........ 702/182; 704/201; 704/219; 341/155; 341/76; 341/61
(58) **Field of Classification Search** .................. 702/182; 704/201, 204, 211, 270, 219, 500, 503, 504; 341/155, 76, 61
   See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,947,825 | A | 3/1976 | Cassada |
| 3,984,624 | A | 10/1976 | Waggener |
| 3,986,624 | A | 10/1976 | Cates, Jr. et al. |
| 4,038,596 | A | 7/1977 | Lee |
| 4,200,770 | A | 4/1980 | Hellman et al. |
| 4,218,582 | A | 8/1980 | Hellman et al. |
| 4,339,134 | A | 7/1982 | Macheel |
| 4,390,898 | A | 6/1983 | Bond et al. |
| 4,405,829 | A | 9/1983 | Rivest et al. |
| 4,424,414 | A | 1/1984 | Hellman et al. |
| 4,528,588 | A | 7/1985 | Lofberg |
| 4,672,605 | A | 6/1987 | Hustig et al. |
| 4,748,668 | A | 5/1988 | Shamir et al. |
| 4,789,928 | A | 12/1988 | Fujisaki |
| 4,827,508 | A | 5/1989 | Shear |
| 4,876,617 | A | 10/1989 | Best et al. |
| 4,896,275 | A | 1/1990 | Jackson |
| 4,908,873 | A | 3/1990 | Philibert et al. |
| 4,939,515 | A | 7/1990 | Adelson |
| 4,969,204 | A | 11/1990 | Jones et al. |
| 4,972,471 | A | 11/1990 | Gross et al. |
| 4,977,594 | A | 12/1990 | Shear |
| 4,979,210 | A | 12/1990 | Nagata et al. |
| 4,980,782 | A | 12/1990 | Ginkel |
| 5,050,213 | A | 9/1991 | Shear |
| 5,073,925 | A | 12/1991 | Nagata et al. |
| 5,077,665 | A | 12/1991 | Silverman et al. |
| 5,111,530 | A * | 5/1992 | Kutaragi et al. .............. 704/270 |
| 5,113,437 | A | 5/1992 | Best et al. |
| 5,136,581 | A | 8/1992 | Muehrcke |
| 5,136,646 | A | 8/1992 | Haber et al. |
| 5,136,647 | A | 8/1992 | Haber et al. |
| 5,142,576 | A | 8/1992 | Nadan |
| 5,161,210 | A | 11/1992 | Druyvesteyn et al. |
| 5,210,820 | A | 5/1993 | Kenyon |
| 5,243,423 | A | 9/1993 | DeJean et al. |
| 5,243,515 | A | 9/1993 | Lee |
| 5,287,407 | A | 2/1994 | Holmes |
| 5,319,735 | A | 6/1994 | Preuss et al. |
| 5,327,520 | A * | 7/1994 | Chen ............................ 704/219 |
| 5,341,429 | A | 8/1994 | Stringer et al. |
| 5,341,477 | A | 8/1994 | Pitkin et al. |
| 5,363,448 | A | 11/1994 | Koopman et al. |
| 5,365,586 | A | 11/1994 | Indeck et al. |
| 5,369,707 | A | 11/1994 | Follendore, III |
| 5,379,345 | A | 1/1995 | Greenberg |
| 5,394,324 | A | 2/1995 | Clearwater |

(Continued)

FOREIGN PATENT DOCUMENTS

EP   0372601   6/1990

(Continued)

OTHER PUBLICATIONS

Jap. App. No. 2000-542907, entitled "Multiple Transform Utilization and Application for Secure Digital Watermarking"; which is a JP national stage of PCT/US1999/007262, published as WO/1999/052271, Oct. 14, 1999.

PCT Application No. PCT/US00/21189, filed Aug. 4, 2000, entitled, "A Secure Personal Content Server", Pub. No. WO/2001/018628 ; Publication Date Mar. 15, 2001.

EPO Application No. 96919405.9, entitled "Steganographic Method and Device"; published as EP0872073 (A2), Oct. 21, 1998.

Schneier, Bruce, Applied Cryptography, 2nd Ed., John Wiley & Sons, pp. 9-10, 1996.

Menezes, Alfred J., Handbook of Applied Cryptography, CRC Press, p. 46, 1997.

1997, Merriam-Webster's Collegiate Dictionary, 10th Ed., Merriam Webster, Inc., p. 207.

(Continued)

*Primary Examiner* — Carol Tsai

(74) *Attorney, Agent, or Firm* — Neifeld IP Law, PC

(57) **ABSTRACT**

A method and system for monitoring and analyzing at least one signal are disclosed. An abstract of at least one reference signal is generated and stored in a reference database. An abstract of a query signal to be analyzed is then generated so that the abstract of the query signal can be compared to the abstracts stored in the reference database for a match. The method and system may optionally be used to record information about the query signals, the number of matches recorded, and other useful information about the query signals. Moreover, the method by which abstracts are generated can be programmable based upon selectable criteria. The system can also be programmed with error control software so as to avoid the re-occurrence of a query signal that matches more than one signal stored in the reference database.

**19 Claims, No Drawings**

**US 8,214,175 B2**

Page 2

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,398,285 | A | 3/1995 | Borgelt et al. |
| 5,406,627 | A | 4/1995 | Thompson et al. |
| 5,408,505 | A | 4/1995 | Indeck et al. |
| 5,410,598 | A | 4/1995 | Shear |
| 5,412,718 | A | 5/1995 | Narasimhalv et al. |
| 5,418,713 | A | 5/1995 | Allen |
| 5,428,606 | A | 6/1995 | Moskowitz |
| 5,450,490 | A | 9/1995 | Jensen et al. |
| 5,469,536 | A | 11/1995 | Blank |
| 5,471,533 | A | 11/1995 | Wang et al. |
| 5,478,990 | A | 12/1995 | Montanari et al. |
| 5,479,210 | A | 12/1995 | Cawley et al. |
| 5,487,168 | A | 1/1996 | Geiner et al. |
| 5,493,677 | A | 2/1996 | Balogh et al. |
| 5,497,419 | A | 3/1996 | Hill |
| 5,506,795 | A | 4/1996 | Yamakawa |
| 5,513,126 | A | 4/1996 | Harkins et al. |
| 5,513,261 | A | 4/1996 | Maher |
| 5,530,739 | A | 6/1996 | Okada |
| 5,530,751 | A | 6/1996 | Morris |
| 5,530,759 | A | 6/1996 | Braudaway et al. |
| 5,539,735 | A | 7/1996 | Moskowitz |
| 5,548,579 | A | 8/1996 | Lebrun et al. |
| 5,568,570 | A | 10/1996 | Rabbani |
| 5,579,124 | A | 11/1996 | Aijala et al. |
| 5,581,703 | A | 12/1996 | Baugher et al. |
| 5,583,488 | A | 12/1996 | Sala et al. |
| 5,598,470 | A | 1/1997 | Cooper et al. |
| 5,606,609 | A | 2/1997 | Houser et al. |
| 5,613,004 | A | 3/1997 | Cooperman et al. |
| 5,617,119 | A | 4/1997 | Briggs et al. |
| 5,617,506 | A * | 4/1997 | Burk et al. .................... 704/201 |
| 5,625,690 | A | 4/1997 | Michel et al. |
| 5,629,980 | A | 5/1997 | Stefik et al. |
| 5,633,932 | A | 5/1997 | Davis et al. |
| 5,634,040 | A | 5/1997 | Her et al. |
| 5,636,276 | A | 6/1997 | Brugger |
| 5,636,292 | A | 6/1997 | Rhoads |
| 5,640,569 | A | 6/1997 | Miller et al. |
| 5,646,997 | A | 7/1997 | Barton |
| 5,657,461 | A | 8/1997 | Harkins et al. |
| 5,659,726 | A | 8/1997 | Sandford, II et al. |
| 5,664,018 | A | 9/1997 | Leighton |
| 5,673,316 | A | 9/1997 | Auerbach et al. |
| 5,677,952 | A | 10/1997 | Blakely et al. |
| 5,680,462 | A | 10/1997 | Miller et al. |
| 5,687,236 | A | 11/1997 | Moskowitz et al. |
| 5,689,587 | A | 11/1997 | Bender et al. |
| 5,696,828 | A | 12/1997 | Koopman, Jr. |
| 5,719,937 | A | 2/1998 | Warren et al. |
| 5,721,788 | A | 2/1998 | Powell et al. |
| 5,734,752 | A | 3/1998 | Knox |
| 5,737,416 | A | 4/1998 | Cooper et al. |
| 5,737,733 | A | 4/1998 | Eller |
| 5,740,244 | A | 4/1998 | Indeck et al. |
| 5,745,569 | A | 4/1998 | Moskowitz et al. |
| 5,748,783 | A | 5/1998 | Rhoads |
| 5,751,811 | A | 5/1998 | Magnotti et al. |
| 5,754,697 | A | 5/1998 | Fu et al. |
| 5,757,923 | A | 5/1998 | Koopman, Jr. |
| 5,765,152 | A | 6/1998 | Erickson |
| 5,768,396 | A | 6/1998 | Sone |
| 5,774,452 | A | 6/1998 | Wolosewicz |
| 5,781,184 | A * | 7/1998 | Wasserman et al. .......... 348/571 |
| 5,790,677 | A | 8/1998 | Fox et al. |
| 5,799,083 | A | 8/1998 | Brothers et al. |
| 5,809,139 | A | 9/1998 | Grirod et al. |
| 5,809,160 | A | 9/1998 | Powell et al. |
| 5,818,818 | A | 10/1998 | Soumiya |
| 5,822,432 | A | 10/1998 | Moskowitz et al. |
| 5,828,325 | A | 10/1998 | Wolosewicz et al. |
| 5,832,119 | A | 11/1998 | Rhoads |
| 5,839,100 | A * | 11/1998 | Wegener ....................... 704/220 |
| 5,842,213 | A | 11/1998 | Odom |
| 5,848,155 | A | 12/1998 | Cox |
| 5,850,481 | A | 12/1998 | Rhoads |
| 5,859,920 | A | 1/1999 | Daly et al. |
| 5,860,099 | A | 1/1999 | Milios et al. |
| 5,862,260 | A | 1/1999 | Rhoads |
| 5,870,474 | A | 2/1999 | Wasilewski et al. |
| 5,884,033 | A | 3/1999 | Duvall et al. |
| 5,889,868 | A | 3/1999 | Moskowitz et al. |
| 5,893,067 | A | 4/1999 | Bender et al. |
| 5,894,521 | A | 4/1999 | Conley |
| 5,901,178 | A * | 5/1999 | Lee et al. ....................... 375/240 |
| 5,903,721 | A | 5/1999 | Sixtus |
| 5,905,800 | A | 5/1999 | Moskowitz et al. |
| 5,905,975 | A | 5/1999 | Ausubel |
| 5,912,972 | A | 6/1999 | Barton |
| 5,915,027 | A | 6/1999 | Cox et al. |
| 5,917,915 | A | 6/1999 | Hirose |
| 5,918,223 | A | 6/1999 | Blum |
| 5,920,900 | A | 7/1999 | Poole et al. |
| 5,923,763 | A | 7/1999 | Walker et al. |
| 5,930,369 | A | 7/1999 | Cox et al. |
| 5,930,377 | A | 7/1999 | Powell et al. |
| 5,940,134 | A | 8/1999 | Wirtz |
| 5,943,422 | A | 8/1999 | Van Wie et al. |
| 5,949,055 | A | 9/1999 | Fleet |
| 5,963,909 | A | 10/1999 | Warren et al. |
| 5,973,731 | A | 10/1999 | Schwab |
| 5,974,141 | A | 10/1999 | Saito |
| 5,991,426 | A | 11/1999 | Cox et al. |
| 5,999,217 | A | 12/1999 | Berners-Lee |
| 6,009,176 | A | 12/1999 | Gennaro et al. |
| 6,029,126 | A | 2/2000 | Malvar |
| 6,041,316 | A | 3/2000 | Allen |
| 6,044,471 | A | 3/2000 | Colvin |
| 6,049,838 | A | 4/2000 | Miller et al. |
| 6,051,029 | A | 4/2000 | Paterson et al. |
| 6,061,793 | A | 5/2000 | Tewfik et al. |
| 6,067,622 | A | 5/2000 | Moore |
| 6,069,914 | A | 5/2000 | Cox |
| 6,078,664 | A | 6/2000 | Moskowitz et al. |
| 6,081,251 | A | 6/2000 | Sakai et al. |
| 6,081,587 | A | 6/2000 | Reyes et al. |
| 6,081,597 | A | 6/2000 | Hoffstein |
| 6,088,455 | A | 7/2000 | Logan et al. |
| 6,131,162 | A | 10/2000 | Yoshiura et al. |
| 6,141,753 | A | 10/2000 | Zhao et al. |
| 6,141,754 | A | 10/2000 | Choy |
| 6,148,333 | A | 11/2000 | Guedalia |
| 6,154,571 | A | 11/2000 | Cox et al. |
| 6,178,405 | B1 * | 1/2001 | Ouyang et al. ................ 704/500 |
| 6,192,138 | B1 | 2/2001 | Yamadaji |
| 6,199,058 | B1 | 3/2001 | Wong et al. |
| 6,205,249 | B1 | 3/2001 | Moskowitz |
| 6,208,745 | B1 | 3/2001 | Florenio et al. |
| 6,226,618 | B1 | 5/2001 | Downs |
| 6,230,268 | B1 | 5/2001 | Miwa et al. |
| 6,233,347 | B1 | 5/2001 | Chen et al. |
| 6,233,684 | B1 | 5/2001 | Stefik et al. |
| 6,240,121 | B1 | 5/2001 | Senoh |
| 6,263,313 | B1 | 7/2001 | Milstead et al. |
| 6,272,634 | B1 | 8/2001 | Tewfik et al. |
| 6,275,988 | B1 | 8/2001 | Nagashima et al. |
| 6,278,780 | B1 | 8/2001 | Shimada |
| 6,278,791 | B1 | 8/2001 | Honsinger et al. |
| 6,282,300 | B1 | 8/2001 | Bloom et al. |
| 6,282,650 | B1 | 8/2001 | Davis |
| 6,285,775 | B1 | 9/2001 | Wu et al. |
| 6,301,663 | B1 | 10/2001 | Kato et al. |
| 6,310,962 | B1 | 10/2001 | Chung et al. |
| 6,330,335 | B1 | 12/2001 | Rhoads |
| 6,330,672 | B1 | 12/2001 | Shur |
| 6,345,100 | B1 | 2/2002 | Levine |
| 6,351,765 | B1 | 2/2002 | Pietropaolo et al. |
| 6,363,483 | B1 | 3/2002 | Keshav |
| 6,373,892 | B1 | 4/2002 | Ichien et al. |
| 6,373,960 | B1 | 4/2002 | Conover et al. |
| 6,374,036 | B1 | 4/2002 | Ryan et al. |
| 6,377,625 | B1 | 4/2002 | Kim |
| 6,381,618 | B1 | 4/2002 | Jones et al. |
| 6,381,747 | B1 | 4/2002 | Wonfor et al. |
| 6,385,324 | B1 | 5/2002 | Koppen |
| 6,385,329 | B1 | 5/2002 | Sharma et al. |
| 6,385,596 | B1 | 5/2002 | Wiser |

**US 8,214,175 B2**

Page 3

| | | | | | | |
|---|---|---|---|---|---|---|
| 6,389,538 | B1 | 5/2002 | Gruse et al. | 7,159,116 | B2 | 1/2007 | Moskowitz |

| Patent | Type | Date | Inventor |
|---|---|---|---|
| 6,389,538 B1 | 5/2002 | Gruse et al. |
| 6,405,203 B1 | 6/2002 | Collart |
| 6,415,041 B1 | 7/2002 | Oami et al. |
| 6,418,421 B1 | 7/2002 | Hurtado |
| 6,425,081 B1 | 7/2002 | Iwamura |
| 6,430,301 B1 | 8/2002 | Petrovic |
| 6,430,302 B2 | 8/2002 | Rhoads |
| 6,442,283 B1 | 8/2002 | Tewfik et al. |
| 6,446,211 B1 | 9/2002 | Colvin |
| 6,453,252 B1 | 9/2002 | Laroche |
| 6,457,058 B1 | 9/2002 | Ullum et al. |
| 6,463,468 B1 | 10/2002 | Buch et al. |
| 6,484,264 B1 | 11/2002 | Colvin |
| 6,493,457 B1 | 12/2002 | Quackenbush |
| 6,502,195 B1 | 12/2002 | Colvin |
| 6,522,767 B1 | 2/2003 | Moskowitz et al. |
| 6,522,769 B1 | 2/2003 | Rhoads et al. |
| 6,523,113 B1 | 2/2003 | Wehrenberg |
| 6,530,021 B1 | 3/2003 | Epstein et al. |
| 6,532,284 B2 | 3/2003 | Walker et al. |
| 6,539,475 B1 | 3/2003 | Cox et al. |
| 6,557,103 B1 | 4/2003 | Boncelet, Jr. et al. |
| 6,584,125 B1 | 6/2003 | Katto |
| 6,587,837 B1 | 7/2003 | Spagna et al. |
| 6,590,996 B1 | 7/2003 | Reed |
| 6,598,162 B1 | 7/2003 | Moskowitz |
| 6,606,393 B1 | 8/2003 | Xie et al. |
| 6,611,599 B2 | 8/2003 | Natarajan |
| 6,647,424 B1 | 11/2003 | Pearson et al. |
| 6,658,010 B1 | 12/2003 | Enns et al. |
| 6,665,489 B2 | 12/2003 | Collart |
| 6,668,246 B1 | 12/2003 | Yeung et al. |
| 6,668,325 B1 | 12/2003 | Collberg et al. |
| 6,674,858 B1 | 1/2004 | Kimura |
| 6,687,683 B1 | 2/2004 | Harada et al. |
| 6,725,372 B1 | 4/2004 | Lewis et al. |
| 6,754,822 B1 | 6/2004 | Zhao |
| 6,775,772 B1 | 8/2004 | Binding et al. |
| 6,784,354 B1 | 8/2004 | Lu et al. |
| 6,785,815 B1 | 8/2004 | Serret-Avila et al. |
| 6,785,825 B2 | 8/2004 | Colvin |
| 6,792,548 B2 | 9/2004 | Colvin |
| 6,792,549 B2 | 9/2004 | Colvin |
| 6,795,925 B2 | 9/2004 | Colvin |
| 6,799,277 B2 | 9/2004 | Colvin |
| 6,804,453 B1 * | 10/2004 | Sasamoto et al. ............ 386/258 |
| 6,813,717 B2 | 11/2004 | Colvin |
| 6,813,718 B2 | 11/2004 | Colvin |
| 6,823,455 B1 | 11/2004 | Macy et al. |
| 6,834,308 B2 | 12/2004 | Ikezoye et al. |
| 6,842,862 B2 | 1/2005 | Chow et al. |
| 6,853,726 B1 | 2/2005 | Moskowitz et al. |
| 6,857,078 B2 | 2/2005 | Colvin |
| 6,865,747 B1 | 3/2005 | Mercier |
| 6,931,534 B1 | 8/2005 | Jandel et al. |
| 6,957,330 B1 | 10/2005 | Hughes |
| 6,966,002 B1 | 11/2005 | Torrubia-Saez |
| 6,977,894 B1 | 12/2005 | Achilles et al. |
| 6,978,370 B1 | 12/2005 | Kocher |
| 6,983,337 B2 | 1/2006 | Diamant |
| 6,986,063 B1 | 1/2006 | Colvin |
| 6,990,453 B2 | 1/2006 | Wang |
| 7,007,166 B1 | 2/2006 | Moskowitz et al. |
| 7,020,285 B1 | 3/2006 | Kirovski et al. |
| 7,035,049 B2 | 4/2006 | Yamamoto |
| 7,035,409 B1 | 4/2006 | Moskowitz |
| 7,043,050 B2 | 5/2006 | Yuval |
| 7,046,808 B1 | 5/2006 | Metois et al. |
| 7,050,396 B1 | 5/2006 | Cohen et al. |
| 7,051,208 B2 | 5/2006 | Venkatesan et al. |
| 7,058,570 B1 | 6/2006 | Yu et al. |
| 7,093,295 B1 | 8/2006 | Saito |
| 7,095,874 B2 | 8/2006 | Moskowitz et al. |
| 7,103,184 B2 | 9/2006 | Jian |
| 7,107,451 B2 | 9/2006 | Moskowitz |
| 7,123,718 B1 | 10/2006 | Moskowitz et al. |
| 7,127,615 B2 | 10/2006 | Moskowitz |
| 7,150,003 B2 | 12/2006 | Naumovich et al. |
| 7,152,162 B2 | 12/2006 | Moskowitz et al. |
| 7,159,116 B2 | 1/2007 | Moskowitz |
| 7,162,642 B2 | 1/2007 | Schumann et al. |
| 7,177,429 B2 | 2/2007 | Moskowitz et al. |
| 7,177,430 B2 | 2/2007 | Kim |
| 7,206,649 B2 | 4/2007 | Kirovski et al. |
| 7,231,524 B2 | 6/2007 | Burns |
| 7,233,669 B2 | 6/2007 | Candelore |
| 7,240,210 B2 | 7/2007 | Michak et al. |
| 7,266,697 B2 | 9/2007 | Kirovski et al. |
| 7,286,451 B2 | 10/2007 | Wirtz |
| 7,287,275 B2 | 10/2007 | Moskowitz |
| 7,289,643 B2 | 10/2007 | Brunk et al. |
| 7,343,492 B2 | 3/2008 | Moskowitz et al. |
| 7,346,472 B1 | 3/2008 | Moskowitz et al. |
| 7,362,775 B1 | 4/2008 | Moskowitz |
| 7,363,278 B2 | 4/2008 | Schmelzer et al. |
| 7,409,073 B2 | 8/2008 | Moskowitz et al. |
| 7,457,962 B2 | 11/2008 | Moskowitz |
| 7,460,994 B2 | 12/2008 | Herre et al. |
| 7,475,246 B1 | 1/2009 | Moskowitz |
| 7,530,102 B2 | 5/2009 | Moskowitz |
| 7,532,725 B2 | 5/2009 | Moskowitz et al. |
| 7,568,100 B1 | 7/2009 | Moskowitz et al. |
| 7,647,502 B2 | 1/2010 | Moskowitz |
| 7,647,503 B2 | 1/2010 | Moskowitz |
| 7,664,263 B2 | 2/2010 | Moskowitz |
| 7,743,001 B1 | 6/2010 | Vermeulen |
| 7,761,712 B2 | 7/2010 | Moskowitz |
| 7,779,261 B2 | 8/2010 | Moskowitz |
| 2001/0010078 A1 | 7/2001 | Moskowitz |
| 2001/0029580 A1 | 10/2001 | Moskowitz |
| 2001/0043594 A1 | 11/2001 | Ogawa et al. |
| 2002/0009208 A1 | 1/2002 | Alattar |
| 2002/0010684 A1 | 1/2002 | Moskowitz |
| 2002/0026343 A1 | 2/2002 | Duenke |
| 2002/0047873 A1 | 4/2002 | Imanaka et al. |
| 2002/0056041 A1 | 5/2002 | Moskowitz |
| 2002/0071556 A1 | 6/2002 | Moskowitz et al. |
| 2002/0073043 A1 | 6/2002 | Herman et al. |
| 2002/0097873 A1 | 7/2002 | Petrovic |
| 2002/0103883 A1 | 8/2002 | Haverstock et al. |
| 2002/0161741 A1 | 10/2002 | Wang et al. |
| 2003/0002862 A1 | 1/2003 | Rodriguez |
| 2003/0126445 A1 | 7/2003 | Wehrenberg |
| 2003/0133702 A1 | 7/2003 | Collart |
| 2003/0200439 A1 | 10/2003 | Moskowitz |
| 2003/0219143 A1 | 11/2003 | Moskowitz et al. |
| 2004/0028222 A1 | 2/2004 | Sewell et al. |
| 2004/0037449 A1 | 2/2004 | Davis et al. |
| 2004/0049695 A1 | 3/2004 | Choi et al. |
| 2004/0059918 A1 | 3/2004 | Xu |
| 2004/0083369 A1 | 4/2004 | Erlingsson et al. |
| 2004/0086119 A1 | 5/2004 | Moskowitz |
| 2004/0093521 A1 | 5/2004 | Hamadeh et al. |
| 2004/0117628 A1 | 6/2004 | Colvin |
| 2004/0117664 A1 | 6/2004 | Colvin |
| 2004/0125983 A1 | 7/2004 | Reed et al. |
| 2004/0128514 A1 | 7/2004 | Rhoads |
| 2004/0225894 A1 | 11/2004 | Colvin |
| 2004/0243540 A1 | 12/2004 | Moskowitz et al. |
| 2005/0135615 A1 | 6/2005 | Moskowitz et al. |
| 2005/0160271 A9 | 7/2005 | Brundage et al. |
| 2005/0177727 A1 | 8/2005 | Moskowitz et al. |
| 2005/0246554 A1 | 11/2005 | Batson |
| 2006/0005029 A1 | 1/2006 | Petrovic et al. |
| 2006/0013395 A1 | 1/2006 | Brundage et al. |
| 2006/0013451 A1 | 1/2006 | Haitsma |
| 2006/0041753 A1 | 2/2006 | Haitsma |
| 2006/0101269 A1 | 5/2006 | Moskowitz et al. |
| 2006/0140403 A1 | 6/2006 | Moskowitz |
| 2006/0251291 A1 | 11/2006 | Rhoads |
| 2006/0285722 A1 | 12/2006 | Moskowitz et al. |
| 2007/0011458 A1 | 1/2007 | Moskowitz |
| 2007/0028113 A1 | 2/2007 | Moskowitz |
| 2007/0064940 A1 | 3/2007 | Moskowitz et al. |
| 2007/0079131 A1 | 4/2007 | Moskowitz et al. |
| 2007/0083467 A1 | 4/2007 | Lindahl et al. |
| 2007/0110240 A1 | 5/2007 | Moskowitz et al. |
| 2007/0113094 A1 | 5/2007 | Moskowitz et al. |

US 8,214,175 B2

Page 4

| 2007/0127717 | A1 | 6/2007 | Herre et al. |
| 2007/0226506 | A1 | 9/2007 | Moskowitz |
| 2007/0253594 | A1 | 11/2007 | Lu et al. |
| 2007/0294536 | A1 | 12/2007 | Moskowitz et al. |
| 2007/0300072 | A1 | 12/2007 | Moskowitz |
| 2007/0300073 | A1 | 12/2007 | Moskowitz |
| 2008/0005571 | A1 | 1/2008 | Moskowitz |
| 2008/0005572 | A1 | 1/2008 | Moskowitz |
| 2008/0016365 | A1 | 1/2008 | Moskowitz |
| 2008/0022113 | A1 | 1/2008 | Moskowitz |
| 2008/0022114 | A1 | 1/2008 | Moskowitz |
| 2008/0028222 | A1 | 1/2008 | Moskowitz |
| 2008/0046742 | A1 | 2/2008 | Moskowitz |
| 2008/0075277 | A1 | 3/2008 | Moskowitz et al. |
| 2008/0109417 | A1 | 5/2008 | Moskowitz |
| 2008/0133927 | A1 | 6/2008 | Moskowitz et al. |
| 2008/0151934 | A1 | 6/2008 | Moskowitz et al. |
| 2009/0037740 | A1 | 2/2009 | Moskowitz |
| 2009/0089427 | A1 | 4/2009 | Moskowitz et al. |
| 2009/0190754 | A1 | 7/2009 | Moskowitz et al. |
| 2009/0210711 | A1 | 8/2009 | Moskowitz |
| 2009/0220074 | A1 | 9/2009 | Moskowitz et al. |
| 2010/0002904 | A1 | 1/2010 | Moskowitz |
| 2010/0005308 | A1 | 1/2010 | Moskowitz |
| 2010/0064140 | A1 | 3/2010 | Moskowitz |
| 2010/0077219 | A1 | 3/2010 | Moskowitz |
| 2010/0077220 | A1 | 3/2010 | Moskowitz |
| 2010/0098251 | A1 | 4/2010 | Moskowitz |
| 2010/0106736 | A1 | 4/2010 | Moskowitz |
| 2010/0153734 | A1 | 6/2010 | Moskowitz |
| 2010/0182570 | A1 | 7/2010 | Chota |
| 2010/0202607 | A1 | 8/2010 | Moskowitz |
| 2010/0220861 | A1 | 9/2010 | Moskowitz |

### FOREIGN PATENT DOCUMENTS

| EP | 0565947 | | 10/1993 |
| EP | 0581317 | | 2/1994 |
| EP | 0581317 | A2 | 2/1994 |
| EP | 0649261 | | 4/1995 |
| EP | 0651554 | | 5/1995 |
| EP | 0872073 | | 7/1996 |
| EP | 1547337 | | 3/2006 |
| EP | 1354276 | | 12/2007 |
| NL | 1005523 | | 9/1998 |
| WO | WO 9514289 | | 5/1995 |
| WO | WO 9629795 | | 9/1996 |
| WO | WO 9642151 | | 12/1996 |
| WO | WO9701892 | | 1/1997 |
| WO | WO9726733 | | 1/1997 |
| WO | WO 9724833 | | 7/1997 |
| WO | WO9726732 | | 7/1997 |
| WO | WO 9744736 | | 11/1997 |
| WO | WO9802864 | | 1/1998 |
| WO | WO9837513 | | 8/1998 |
| WO | WO 9952271 | | 10/1999 |
| WO | WO 9962044 | | 12/1999 |
| WO | WO 9963443 | | 12/1999 |
| WO | WO 0057643 | | 9/2000 |
| WO | WO0118628 | | 3/2001 |
| WO | WO0143026 | | 6/2001 |
| WO | WO0203385 | | 1/2002 |
| WO | WO02003385 | A1 | 10/2002 |

### OTHER PUBLICATIONS

Brealy, et al., Principles of Corporate Finance, "Appendix A—Using Option Valuation Models", 1984, pp. 448-449.

Copeland, et al., Real Options: A Practitioner's Guide, 2001 pp. 106-107, 201-202, 204-208.

Sarkar, M. "An Assessment of Pricing Mechanisms for the Internet—A Regulatory Imperative", presented MIT Workshop on Internet Economics, Mar. 1995 http://www.press.vmich.edu/iep/works/SarkAsses.html on Internet.

Crawford, D.W. "Pricing Network Usage: A Market for Bandwidth of Market Communication?" presented MIT Workshop on Internet Economics, Mar. 1995 http://www.press.vmich.edu/iep/works/CrawMarket.html on March.

Low, S.H., "Equilibrium Allocation and Pricing of Variable Resources Among User-Suppliers", 1988. http://www.citesear.nj.nec.com/366503.html.

Caronni, Germano, "Assuring Ownership Rights for Digital Images", published proceeds of reliable IT systems, v15 '95, H.H. Bruggemann and W. Gerhardt-Hackel (Ed) Viewing Publishing Company Germany 1995.

Zhao, Jian. "A WWW Service to Embed and Prove Digital Copyright Watermarks", Proc. of the European conf. on Multimedia Applications, Services & Techniques Louvain-La-Nevve Belgium May 1996.

Gruhl, Daniel et al., Echo Hiding. In Proceeding of the Workshop on Information Hiding. No. 1174 in Lecture Notes in Computer Science, Cambridge, England (May/Jun. 1996).

Oomen, A.W.J. et al., A Variable Bit Rate Buried Data Channel for Compact Disc, J.AudioEng. Sc., vol. 43, No. 1/2, pp. 23-28 (1995).

Ten Kate, W. et al., A New Surround-Stereo-Surround Coding Techniques, J. Audio Eng.Soc., vol. 40,No. 5,pp. 376-383 (1992).

Gerzon, Michael et al., A High Rate Buried Data Channel for Audio CD, presentation notes, Audio Engineering Soc. 94th Convention (1993).

Sklar, Bernard, Digital Communications, pp. 601-603 (1988).

Jayant, N.S. et al., Digital Coding of Waveforms, Prentice Hall Inc., Englewood Cliffs, NJ, pp. 486-509 (1984).

Bender, Walter R. et al., Techniques for Data Hiding, SPIE Int. Soc. Opt. Eng., vol. 2420, pp. 164-173, 1995.

Zhao, Jian et al., Embedding Robust Labels into Images for Copyright Protection, (xp 000571976), pp. 242-251, 1995.

Menezes, Alfred J., Handbook of Applied Cryptography, CRC Press, p. 175, 1997.

Schneier, Bruce, Applied Cryptography, 1st Ed., pp. 67-68, 1994.

Ten Kate, W. et al., "Digital Audio Carrying Extra Information", IEEE, CH 2847-2/90/0000-1097, (1990).

Van Schyndel, et al., "A digital Watermark," IEEE Int'l Computer Processing Conference, Austin,TX, Nov. 13-16, 1994, pp. 86-90.

Smith, et al. "Modulation and Information Hiding in Images", Springer Verlag, 1st Int'l Workshop, Cambridge, UK, May 30-Jun. 1, 1996, pp. 207-227.

1997, Kutter, Martin et al., "Digital Signature of Color Images Using Amplitude Modulation", SPIE-E197, vol. 3022, pp. 518-527.

Puate, Joan et al., "Using Fractal Compression Scheme to Embed a Digital Signature into an Image", SPIE-96 Proceedings, vol. 2915, Mar. 1997, pp. 108-118.

Swanson, Mitchell D. et al., "Transparent Robust Image Watermarking", Proc. of the 1996 IEEE Int'l Conf. on Image Processing, vol. 111, 1996 , pp. 211-214.

Swanson, Mitchell D., et al. "Robust Data Hiding for Images", 7th IEEE Digital Signal Processing Workshop, Leon, Norway. Sep. 1-4, 1996, pp. 37-40.

Zhao, Jian et al., "Embedding Robust Labels into Images for Copyright Protection", Proceeding of the Know Right '95 Conference, pp. 242-251.

Koch, E., et al., "Towards Robust and Hidden Image Copyright Labeling", 1995 IEEE Workshop on Nonlinear Signal and Image Processing, Jun. 1995 Neos Marmaras pp. 4.

Van Schyandel, et al., "Towards a Robust Digital Watermark", Second Asain Image Processing Conference, Dec. 6-8, 1995, Singapore, vol. 2, pp. 504-508.

Tirkel,A.Z., "A Two-Dimensional Digital Watermark", DICTA '95, Univ. of Queensland, Brisbane, Dec. 5-8, 1995, pp. 7.

Tirkel,A.Z., "Image Watermarking—A Spread Spectrum Application", ISSSTA '96, Sep. 1996, Mainz, German, pp. 6.

O'Ruanaidh, et al. "Watermarking Digital Images for Copyright Protection", IEEE Proceedings, vol. 143, No. 4, Aug. 1996, pp. 250-256.

Cox, et al., Secure Spread Spectrum Watermarking for Multimedia, NEC Research Institute, Techinal Report 95-10, pp. 33.

Kahn, D., "The Code Breakers", The MacMillan Company, 1969, pp. xIII, 81-83, 513, 515, 522-526, 863.

Boney, et al., Digital Watermarks for Audio Signals, EVSIPCO, 96, pp. 473-480 (Mar. 14, 1997).

Dept. of Electrical Engineering, Del Ft University of Technology, Del ft The Netherlands, Cr.C. Langelaar et al.,"Copy Protection for Multimedia Data based on Labeling Techniques", Jul. 1996 9 pp.

F. Hartung, et al., "Digital Watermarking of Raw and Compressed Video", SPIE vol. 2952, pp. 205-213.

Craver, et al., "Can Invisible Watermarks Resolve Rightful Owner-ships?", IBM Research Report, RC 20509 (Jul. 25, 1996) 21 pp.

Press, et al., "Numerical Recipes in C", Cambridge Univ. Press, 1988, pp. 398-417.

Pohlmann, Ken C., "Principles of Digital Audio", 3rd Ed., 1995, pp. 32-37, 40-48:138, 147-149, 332, 333, 364, 499-501, 508-509, 564-571.

Pohlmann, Ken C., "Principles of Digital Audio", 2nd Ed., 1991, pp. 1-9, 19-25, 30-33, 41-48, 54-57, 86-107, 375-387.

Schneier, Bruce, Applied Cryptography, John Wiley & Sons, Inc., New York, 1994, pp. 68, 69, 387-392, 1-57, 273-275, 321-324.

Boney, et al., Digital Watermarks for Audio Signals, Proceedings of the International Conf. on Multimedia Computing and Systems, Jun. 17-23, 1996 Hiroshima, Japan, 0-8186-7436-9196, pp. 473-480.

Johnson, et al., "Transform Permuted Watermarking for Copyright Protection of Digital Video", IEEE Globecom 1998, Nov. 8-12, 1998, New York New York vol. 2 1998 pp. 684-689 (ISBN 0-7803-4985-7).

Rivest, et al., "Pay Word and Micromint: Two Simple Micropayment Schemes," MIT Laboratory for Computer Science, Cambridge, MA, May 7, 1996 pp. 1-18.

Bender, et al., "Techniques for Data Hiding", IBM Systems Journal, (1996) vol. 35, Nos. 3 & 4,1996, pp. 313-336.

Moskowitz, "Bandwith as Currency", IEEE Multimedia, Jan.-Mar. 2003, pp. 14-21.

Moskowitz, Multimedia Security Technologies for Digital Rights Management, 2006, Academic Press, "Introduction—Digital Rights Management" pp. 3-22.

Rivest, et al., "PayWord and Micromint: Two Simple Micropayment Schemes," MIT Laboratory for Computer Science, Cambridge, MA, Apr. 27, 2001, pp. 1-18.

Tomsich, et al., "Towards a secure and de-centralized digital watermarking infrastructure for the protection of Intellectual Prop-erty", in Electronic Commerce and Web Technologies, Proceedings (ECWEB)(2000).

Moskowitz, "What is Acceptable Quality in the Application of Digi-tal Watermarking: Trade-offs of Security; Robustness and Quality", IEEE Computer Society Proceedings of ITCC 2002 Apr. 10, 2002 pp. 80-84.

Lemma, et al. "Secure Watermark Embedding through Partial Encryption", International Workshop on Digital Watermarking ("IWDW" 2006). Springer Lecture Notes in Computer Science 2006 (to appear) 13.

Kocher, et al., "Self Protecting Digital Content", Technical Report from the CRI Content Security Research Initiative, Cryptography Research, Inc. 2002-2003 14 pages.

Sirbu, M. et al., "Net Bill: An Internet Commerce System Optimized for Network Delivered Services", Digest of Papers of the Computer Society Computer Conference (Spring) Mar. 5, 1995 pp. 20-25 vol. CONF40.

Schunter, M. et al., "A Status Report on the SEMPER framework for Secure Electronic Commerce", Computer Networks and ISDN Sys-tems, Sep. 30, 1998, pp. 1501-1510 vol. 30 No. 16-18 NL North Holland.

Konrad, K. et al., "Trust and Electronic Commerce—more than a technical problem," Proceedings of the 18th IEEE Symposium on Reliable Distributed Systems Oct. 19-22, 1999, pp. 360-365 Lausanne.

Kini, et al., "Trust in Electronic Commerce: Definition and Theoreti-cal Considerations", Proceedings of the 31st Hawaii Int'l Conf on System Sciences (Cat. No. 98TB100216). Jan. 6-9, 1998. pp. 51-61. Los.

Steinauer D. D., et al., "Trust and Traceability in Electronic Com-merce", Standard View, Sep. 1997, pp. 118-124, vol. 5 No. 3, ACM, USA.

Hartung, et al. "Multimedia Watermarking Techniques", Proceedings of the IEEE, Special Issue, Identification & Protection of Multimedia Information, pp. 1079-1107 Jul. 1999 vol. 87 No. 7 IEEE.

European Search Report & European Search Opinion in EP07112420.

STAIND (The Singles 1996-2006), Warner Music—Atlantic, Pre-Release CD image, 2006, 1 page.

Radiohead ("Hail to the Thief"), EMI Music Group—Capitol, Pre-Release CD image, 2003, 1 page.

U.S. Appl. No. 60/169,274, filed Dec. 7, 1999, entitled "Systems, Methods and Devices for Trusted Transactions".

U.S. Appl. No. 60/234,199, filed Sep. 20, 2000, "Improved Security Based on Subliminal and Supraliminal Channels for Data Objects".

U.S. Appl. No. 09/671,739, filed Sep. 29, 2000, entitled "Method and Device for Monitoring and Analyzing Signals".

Tirkel, A.Z., "A Two Dimensional Digital Watermark", Scientific Technology, 686, 14, date unknown.

PCT International Search Report in PCT/US95/08159.

PCT International Search Report in PCT/US96/10257.

Supplementary European Search Report in EP 96919405.

PCT International Search Report in PCT/US97/00651.

PCT International Search Report in PCT/US97/00652.

PCT International Search Report in PCT/US97/11455.

PCT International Search Report in PCT/US99/07262.

PCT International Search Report in PCT/US00/06522.

Supplementary European Search Report in EP00919398.

PCT International Search Report in PCT/US00/18411.

PCT International Search Report in PCT/US00/33126.

PCT International Search Report in PCT/US00/21189.

Delaigle, J.-F., et al. "Digital Watermarking," Proceedings of the SPIE, vol. 2659, Feb. 1, 1996, pp. 99-110.

Schneider, M. et al. "A Robust Content Based Digital Signature for Image Authentication," Proceedings of the International Conference on Image Processing (IC. Lausanne) Sep. 16-19, 1996, pp. 227-230, IEEE ISBN.

Cox, I. J., et al. "Secure Spread Spectrum Watermarking for Multi-media," IEEE Transactions on Image Processing, vol. 6 No. 12, Dec. 1, 1997, pp. 1673-1686.

Wong, Ping Wah. "A Public Key Watermark for Image Verification and Authentication," IEEE International Conference on Image Pro-cessing, vol. 1 Oct. 4-7, 1998, pp. 455-459.

Fabien A.P. Petitcolas, Ross J. Anderson and Markkus G. Kuhn, "Attacks on Copyright Marking Systems," LNCS, vol. 1525, Apr. 14-17, 1998, pp. 218-238 ISBN: 3-540-65386-4.

Ross Anderson, "Stretching the Limits of Steganography," LNCS, vol. 1174, May/Jun. 1996, 10 pages, ISBN: 3-540-61996-8.

Joseph J.K. O'Ruanaidh and Thierry Pun, "Rotation, Scale and Translation Invariant Digital Image Watermarking", pre-publication, Summer 1997 4 pages.

Joseph J.K. O'Ruanaidh and Thierry Pun, "Rotation, Scale and Translation Invariant Digital Image Watermarking", Submitted to Signal Processing Aug. 21, 1997, 19 pages.

Oasis (Dig Out Your Soul), Big Brother Recordings Ltd, Promotional CD image, 2008, 1 page.

Rivest, R. "Chaffing and Winnowing: Confidentiality without Encryption", MIT Lab for Computer Science, http://people.csail.mit. edu/rivest/Chaffing.txt Apr. 24, 1998, 9 pp.

PortalPlayer, PP502 digital media management system-on-chip, May 1, 2003, 4 pp.

VeriDisc, "The Search for a Rational Solution to Digital Rights Management (DRM)", http://64.244.235.240/news/whitepaper, /docs/veridisc.sub.--white.sub.--paper.pdf, 2001, 15 pp.

Cayre, et al., "Kerckhoff's-Based Embedding Security Classes for WOA Data Hiding", IEEE Transactions on Information Forensics and Security, vol. 3 No. 1, Mar. 2008, 15 pp.

Wayback Machine, dated Jan. 17, 1999, http://web.archive.org/web/19990117020420/http://www.netzero.com/, accessed on Feb. 19, 2008.

Namgoong, H., "An Integrated Approach to Legacy Data for Multi-media Applications", Proceedings of the 23rd EUROMICRO Con-ference, vol., Issue 1-4, Sep. 1997, pp. 387-391.

Wayback Machine, dated Aug. 26, 2007, http://web.archive.org/web/20070826151732/http://www.screenplaysmag.com/t-abid/96/articleType/ArticleView/articleId/495/Default.aspx/.

"YouTube Copyright Policy: Video Identification tool—YouTube Help", accessed Jun. 4, 2009, http://www.google.com/support/youtube/bin/answer.py?hl=en&answer=83766, 3 pp.

PCT Application No. PCT/US95/08159, filed Jun. 26, 1995, entitled, "Digital Information Commodities Exchange with Virtual Menu-ing", published as WO/1997/001892; Publication Date: Jan. 16, 1997.

US 8,214,175 B2

Page 6

PCT Application No. PCT/US96/10257, filed Jun. 7, 1996, entitled "Steganographic Method and Device"—corresponding to—EPO Application No. 96919405.9, entitled "Steganographic Method and Device", published as WO/1996/042151; Publication Date: Dec. 27, 1996.

PCT Application No. PCT/US97/00651, filed Jan. 16, 1997, entitled, "Method for Stega-Cipher Protection of Computer Code", published as WO/1997/026732; Publication Date: Jul. 24, 1997.

PCT Application No. PCT/US97/00652, filed Jan. 17, 1997, entitled, "Method for an Encrypted Digital Watermark", published as WO/1997/026733; Publication Date: Jul. 24, 1997.

PCT Application No. PCT/US97/11455, filed Jul. 2, 1997, entitled, "Optimization Methods for the Insertion, Protection and Detection of Digital Watermarks in Digitized Data", published as WO/1998/002864; Publication Date: Jan. 22, 1998.

PCT Application No. PCT/US99/07262, filed Apr. 2, 1999, entitled, "Multiple Transform Utilization and Applications for Secure Digital Watermarking", published as WO/1999/052271; Publication Date: Oct. 14, 1999.

PCT Application No. PCT/US00/06522, filed Mar. 14, 2000, entitled, "Utilizing Data Reduction in Steganographic and Cryptographic Systems", published as WO/2000/057643; Publication Date: Sep. 28, 2000.

PCT Application No. PCT/US00/18411, filed Jul. 5, 2000, entitled, "Copy Protection of Digital Data Combining Steganographic and Cryptographic Techniques".

PCT Application No. PCT/US00/33126, filed Dec. 7, 2000, entitled "Systems, Methods and Devices for Trusted Transactions", published as WO/2001/043026; Publication Date: Jun. 14, 2001.

EPO Divisional Patent Application No. 07112420.0, entitled "Steganographic Method and Device" corresponding to PCT Application No. PCT/US96/10257, published as WO/1996/042151, Dec. 27, 1996.

U.S. Appl. No. 60/222,023, filed Jul. 31, 2007 entitled "Method and apparatus for recognizing sound and signals in high noise and distortion".

"Techniques for Data Hiding in Audio Files," by Morimoto, 1995.

Howe, Dennis Jul. 13, 1998 http://foldoc..org//steganography.

CSG, Computer Support Group and CSGNetwork.com 1973 http://www.csgnetwork.com/glossarys.html.

QuinStreet Inc. 2010 What is steganography?—A word definition from the Webopedia Computer Dictionary http://www.webopedia.com/terms/steganography.html.

Graham, Robert Aug. 21, 2000 "Hacking Lexicon" http://robertgraham.com/pubs/hacking-dict.html.

Farkex, Inc 2010 "Steganography definition of steganography in the Free Online Encyclopedia" http://encyclopedia2.Thefreedictionary.com/steganography.

Horowitz, et al., The Art of Eletronics. 2nd Ed., 1989, pp7.

Jimmy eat world ("futures"), Interscope Records, Pre-Release CD image, 2004, 1 page.

Aerosmith ("Just Push Play"), Pre-Release CD image, 2001, 1 page.

Phil Collins(Testify) Atlantic, Pre-Release CD image, 2002, 1 page.

U.S. Appl. No. 11/599,838, filed Nov. 15, 2006.

U.S. Appl. No. 11/899,662, filed Sep. 7, 2007.

U.S. Appl. No. 10/369,344, filed Feb. 18, 2003.

U.S. Appl. No. 11/482,654, filed Jul. 7, 2006.

U.S. Appl. No. 12/215,812, filed Jun. 30, 2008.

U.S. Appl. No. 12/901,568, filed Oct. 10, 2010.

U.S. Appl. No. 11/497,822, filed Aug. 2, 2006.

U.S. Appl. No. 12/217,834, filed Jul. 9, 2008.

U.S. Appl. No. 12/462,799, filed Aug. 10, 2009.

U.S. Appl. No. 11/899,661, filed Sep. 7, 2007.

U.S. Appl. No. 12/590,681, filed Nov. 19, 2009.

U.S. Appl. No. 11/897,791, filed Aug. 31, 2007.

U.S. Appl. No. 12/590,553, filed Nov. 10, 2009.

U.S. Appl. No. 12/592,331, filed Nov. 23, 2009.

U.S. Appl. No. 12/009,914, filed Jan. 23, 2008.

U.S. Appl. No. 12/005,230, filed Dec. 26, 2007.

U.S. Appl. No. 12/803,168, filed Jun. 21, 2010.

U.S. Appl. No. 11/649,026, filed Jan. 3, 2007.

U.S. Appl. No. 12/803,194, filed Jun. 21, 2010.

U.S. Appl. No. 12/892,900, filed Sep. 28, 2010.

U.S. Appl. No. 08/999,766, filed Jul. 23, 1997.

U.S. Appl. No. 11/894,476, filed Aug. 21, 2007.

U.S. Appl. No. 11/050,779, filed Feb. 7, 2005.

U.S. Appl. No. 12/802,519, filed Jun. 8, 2010.

U.S. Appl. No. 12/383,916, filed Mar. 30, 2009.

U.S. Appl. No. 11/894,443, filed Aug. 21, 2007.

U.S. Appl. No. 12/913,751, filed Oct. 27, 2010.

U.S. Appl. No. 11/512,701, filed Aug. 29, 2006.

U.S. Appl. No. 11/895,388, filed Aug. 24, 2007.

U.S. Appl. No. 12/383,879, filed Mar. 30, 2009.

U.S. Appl. No. 12/886,732, filed Sep. 21, 2010.

U.S. Appl. No. 12/287,443, filed Oct. 9, 2008.

U.S. Appl. No. 12/655,357, filed Dec. 22, 2009.

U.S. Appl. No. 13/035,964, filed Feb. 26, 2011.

U.S. Appl. No. 11/900,065, filed Sep. 10, 2007.

U.S. Appl. No. 12/799,894, filed May 4, 2010.

* cited by examiner

US 8,214,175 B2

<table>
<tr><td>1</td><td>2</td></tr>
</table>

## METHOD AND DEVICE FOR MONITORING AND ANALYZING SIGNALS

### CROSS-REFERENCE TO RELATED APPLICATIONS

This application is a continuation of application Ser. No. 12/655,357, filed Dec. 22, 2009 now U.S. Pat. No. 7,949,494, which is a continuation of application Ser. No. 12/005,229, filed Dec. 26, 2007, now U.S. Pat. No. 7,660,700, which is a continuation of application Ser. No. 09/657,181, filed Sep. 7, 2000, now U.S. Pat. No. 7,346,472. The previously identified patents and/or patent applications are hereby incorporated by reference, in their entireties, as if fully stated herein.

This application is related to U.S. patent application Ser. No. 08/999,766, filed Jul. 23, 1997, entitled "Steganographic Method and Device" (issued as U.S. Pat. No. 7,568,100); U.S. patent application Ser. No. 08/772,222, filed Dec. 20, 1996, entitled "Z-Transform Implementation of Digital Watermarks" (issued as U.S. Pat. No. 6,078,664); U.S. patent application Ser. No. 09/456,319, filed Dec. 8, 1999, entitled "Z-Transform Implementation of Digital Watermarks" (issued as U.S. Pat. No. 6,853,726); U.S. patent application Ser. No. 08/674,726, filed Jul. 2, 1996, entitled "Exchange Mechanisms for Digital Information Packages with Bandwidth Securitization, Multichannel Digital Watermarks, and Key Management" (issued as U.S. Pat. No. 7,362,775); U.S. patent application Ser. No. 09/545,589, filed Apr. 7, 2000, entitled "Method and System for Digital Watermarking" (issued as U.S. Pat. No. 7,007,166); U.S. patent application Ser. No. 09/046,627, filed Mar. 24, 1998, entitled "Method for Combining Transfer Function with Predetermined Key Creation" (issued as U.S. Pat. No. 6,598,162); U.S. patent application Ser. No. 09/053,628, filed Apr. 2, 1998, entitled "Multiple Transform Utilization and Application for Secure Digital Watermarking" (issued as U.S. Pat. No. 6,205,249); U.S. patent application Ser. No. 09/281,279, filed Mar. 30, 1999, entitled "Optimization Methods for the Insertion, Protection, and Detection of Digital Watermarks in Digital Data (issued as U.S. Pat. No. 6,522,767)"; U.S. patent application Ser. No. 09,594,719, filed Jun. 16, 2000, entitled "Utilizing Data Reduction in Steganographic and Cryptographic Systems" (which is a continuation-in-part of PCT application No. PCT/US00/06522, filed Mar. 14, 2000, which PCT application claimed priority to U.S. Provisional Application No. 60/125,990, filed Mar. 24, 1999) (issued as U.S. Pat. No. 7,123,718); U.S. Application No. 60/169,274, filed Dec. 7, 1999, entitled "Systems, Methods And Devices For Trusted Transactions" (issued as U.S. Pat. No. 7,159,116); and PCT Application No. PCT/US00/21189, filed Aug. 4, 2000 (which claims priority to U.S. patent application Ser. No. 60/147, 134, filed Aug. 4, 1999, and to U.S. patent application Ser. No. 60/213,489, filed Jun. 23, 2000, both of which are entitled, "A Secure Personal Content Server") (issued as U.S. Pat. No. 7,475,246). The previously identified patents and/or patent applications are hereby incorporated by reference, in their entireties, as if fully stated herein.

In addition, this application hereby incorporates by reference, as if fully stated herein, the total disclosures of U.S. Pat. No. 5,613,004 "Steganographic Method and Device"; U.S. Pat. No. 5,745,569 "Method for Stega-Cipher Protection of Computer Code"; and U.S. Pat. No. 5,889,868 "Optimization Methods for the Insertion, Protection, and Detection of Digital Watermarks in Digitized Data."

### BACKGROUND OF THE INVENTION

1. Field of the Invention

The invention relates to the monitoring and analysis of digital information. A method and device are described which relate to signal recognition to enhance identification and monitoring activities.

2. Description of the Related Art

Many methods and protocols are known for transmitting data in digital form for multimedia applications (including computer applications delivered over public networks such as the internet or World Wide Web ("WWW"). These methods may include protocols for the compression of data, such that it may more readily and quickly be delivered over limited bandwidth data lines. Among standard protocols for data compression of digital files may be mentioned the MPEG compression standards for audio and video digital compression, promulgated by the Moving Picture Experts Group. Numerous standard reference works and patents discuss such compression and transmission standards for digitized information.

Digital watermarks help to authenticate the content of digitized multimedia information, and can also discourage piracy. Because piracy is clearly a disincentive to the digital distribution of copyrighted content, establishment of responsibility for copies and derivative copies of such works is invaluable. In considering the various forms of multimedia content, whether "master," stereo, NTSC video, audio tape or compact disc, tolerance of quality will vary with individuals and affect the underlying commercial and aesthetic value of the content. It is desirable to tie copyrights, ownership rights, purchaser information or some combination of these and related data into the content in such a manner that the content must undergo damage, and therefore reduction of its value, with subsequent, unauthorized distribution, commercial or otherwise. Digital watermarks address many of these concerns. A general discussion of digital watermarking as it has been applied in the art may be found in U.S. Pat. No. 5,687,236 (whose specification is incorporated in whole herein by reference).

Further applications of basic digital watermarking functionality have also been developed. Examples of such applications are shown in U.S. Pat. No. 5,889,868 (whose specification is incorporated in whole herein by reference). Such applications have been drawn, for instance, to implementations of digital watermarks that were deemed most suited to particular transmissions, or particular distribution and storage mediums, given the nature of digitally sampled audio, video, and other multimedia works. There have also been developed techniques for adapting watermark application parameters to the individual characteristics of a given digital sample stream, and for implementation of digital watermarks that are feature-based—i.e., a system in which watermark information is not carried in individual samples, but is carried in the relationships between multiple samples, such as in a waveform shape. For instance, natural extensions may be added to digital watermarks that may also separate frequencies (color or audio), channels in 3D while utilizing discreteness in feature-based encoding only known to those with pseudo-random keys (i.e., cryptographic keys) or possibly tools to access such information, which may one day exist on a quantum level.

A matter of general weakness in digital watermark technology relates directly to the manner of implementation of the watermark. Many approaches to digital watermarking leave detection and decode control with the implementing party of the digital watermark, not the creator of the work to be pro-

US 8,214,175 B2

3

tected. This weakness removes proper economic incentives for improvement of the technology. One specific form of exploitation mostly regards efforts to obscure subsequent watermark detection. Others regard successful over encoding using the same watermarking process at a subsequent time. Yet another way to perform secure digital watermark implementation is through "key-based" approaches.

## SUMMARY OF THE INVENTION

A method for monitoring and analyzing at least one signal is disclosed, which method comprises the steps of: receiving at least one reference signal to be monitored; creating an abstract of the at least one reference signal; storing the abstract of the at least one reference signal in a reference database; receiving at least one query signal to be analyzed; creating an abstract of the at least one query signal; and comparing the abstract of the at least one query signal to the abstract of the at least one reference signal to determine if the abstract of the at least one query signal matches the abstract of the at least one reference signal.

A method for monitoring a plurality of reference signals is also disclosed, which method comprises the steps of: creating an abstract for each one of a plurality of reference signals; storing each of the abstracts in a reference database; receiving at least one query signal to be analyzed; creating an abstract of each at least one query signal; locating an abstract in the reference database that matches the abstract of each at least one query signal; and recording the identify of the reference signal whose abstract matched the abstract of each at least one query signal.

A computerized system for monitoring and analyzing at least one signal is also disclosed, which system comprises: a processor for creating an abstract of a signal using selectable criteria; a first input for receiving at least one reference signal to be monitored, the first input being coupled to the processor such that the processor may generate an abstract for each reference signal input to the processor; a reference database, coupled to the processor, for storing abstracts of each at least one reference signal; a second input for receiving at least one query signal to be analyzed, the second input being coupled to the processor such that the processor may generate an abstract for each query signal; and a comparing device, coupled to the reference database and to the second input, for comparing an abstract of the at least one query signal to the abstracts stored in the reference database to determine if the abstract of the at least one query signal matches any of the stored abstracts.

Further, an electronic system for monitoring and analyzing at least one signal is disclosed, which system comprises: a first input for receiving at least one reference signal to be monitored, a first processor for creating an abstract of each reference signal input to the first processor through the first input; a second input for receiving at least one query signal to be analyzed, a second processor for creating an abstract of each query signal; a reference database for storing abstracts of each at least one reference signal; and a comparing device for comparing an abstract of the at least one query signal to the abstracts stored in the reference database to determine if the abstract of the at least one query signal matches any of the stored abstracts.

## DETAILED DESCRIPTION OF THE INVENTION

While there are many approaches to data reduction that can be utilized, a primary concern is the ability to reduce the digital signal in such a manner as to retain a "perceptual relationship" between the original signal and its data reduced

4

version. This relationship may either be mathematically discernible or a result of market-dictated needs. The purpose is to afford a more consistent means for classifying signals than proprietary, related text-based approaches. A simple analogy is the way in which a forensic investigator uses a sketch artist to assist in determining the identity of a human.

In one embodiment of the invention, the abstract of a signal may be generated by the following steps: 1) analyze the characteristics of each signal in a group of audible/perceptible variations for the same signal (e.g., analyze each of five versions of the same song—which versions may have the same lyrics and music but which are sung by different artists); and 2) select those characteristics which achieve or remain relatively constant (or in other words, which have minimum variation) for each of the signals in the group. Optionally, the null case may be defined using those characteristics which are common to each member of the group of versions.

Lossless and lossy compression schemes are appropriate candidates for data reduction technologies, as are those subset of approaches that are based on perceptual models, such as AAC, MP3, TwinVQ, JPEG, GIF, MPEG, etc. Where spectral transforms fail to assist in greater data reduction of the signal, other signal characteristics can be identified as candidates for further data reduction. Linear predictive coding (LPC), z-transform analysis, root mean square (rms), signal to peak, may be appropriate tools to measure signal characteristics, but other approaches or combinations of signal characteristic analysis are contemplated. While such signal characteristics may assist in determining particular applications of the present invention, a generalized approach to signal recognition is necessary to optimize the deployment and use of the present invention.

Increasingly, valuable information is being created and stored in digital form. For example, music, photographs and motion pictures can all be stored and transmitted as a series of binary digits—1's and 0's. Digital techniques permit the original information to be duplicated repeatedly with perfect or near perfect accuracy, and each copy is perceived by viewers or listeners as indistinguishable from the original signal. Unfortunately, digital techniques also permit the information to be easily copied without the owner's permission. While digital representations of analog waveforms may be analyzed by perceptually-based or perceptually-limited analysis it is usually costly and time-consuming to model the processes of the highly effective ability of humans to identify and recognize a signal. In those applications where analog signals require analysis, the cost of digitizing the analog signal is minimal when compared to the benefits of increased accuracy and speed of signal analysis and monitoring when the processes contemplated by this invention are utilized.

The present invention relates to identification of digitally-sampled information, such as images, audio and video. Traditional methods of identification and monitoring of those signals do not rely on "perceptual quality," but rather upon a separate and additional signal. Within this application, such signals will be called "additive signals" as they provide information about the original images, audio or video, but such information is in addition to the original signal. One traditional, text-based additive signal is title and author information. The title and author, for example, is information about a book, but it is in addition to the text of the book. If a book is being duplicated digitally, the title and author could provide one means of monitoring the number of times the text is being duplicated, for example, through an Internet download. The present invention, however, is directed to the identification of a digital signal—whether text, audio, or video—using only the digital signal itself and then monitoring the number of

US 8,214,175 B2

5

times the signal is duplicated. Reliance on an additive signal has many shortcomings. For example, first, someone must incorporate the additive signal within the digital data being transmitted, for example, by concatenation or through an embedding process. Such an additive signal, however, can be easily identified and removed by one who wants to utilize the original signal without paying for its usage. If the original signal itself is used to identify the content, an unauthorized user could not avoid payment of a royalty simply by removing the additive signal—because there is no additive signal to remove. Hence, the present invention avoids a major disadvantage of the prior art.

One such additive signal that may be utilized is a digital watermark—which ideally cannot be removed without perceptually altering the original signal. A watermark may also be used as a monitoring signal (for example, by encoding an identifier that uniquely identifies the original digital signal into which the identifier is being embedded). A digital watermark used for monitoring is also an additive signal, and such a signal may make it difficult for the user who wants to duplicate a signal without paying a royalty—mainly by degrading the perceptual quality of the original signal if the watermark (and hence the additive monitoring signal) is removed. This is, however, is a different solution to the problem.

The present invention eliminates the need of any additive monitoring signal because the present invention utilizes the underlying content signal as the identifier itself. Nevertheless, the watermark may increase the value of monitoring techniques by increasing the integrity of the embedded data and by indicating tampering of either the original content signal or the monitoring signal. Moreover, the design of a watermarking embedding algorithm is closely related to the perceptibility of noise in any given signal and can represent an ideal subset of the original signal: the watermark bits are an inverse of the signal to the extent that lossy compression schemes, which can be used, for instance, to optimize a watermarking embedding scheme, can yield information about the extent to which a data signal can be compressed while holding steadfast to the design requirement that the compressed signal maintain its perceptual relationship with the original, uncompressed signal. By describing those bits that are candidates for imperceptible embedding of watermark bits, further data reduction may be applied on the candidate watermarks as an example of retaining a logical and perceptible relationship with the original uncompressed signal.

Of course, the present invention may be used in conjunction with watermarking technology (including the use of keys to accomplish secure digital watermarking), but watermarking is not necessary to practice the present invention. Keys for watermarking may have many forms, including: descriptions of the original carrier file formatting, mapping of embedded data (actually imperceptible changes made to the carrier signal and referenced to the predetermined key or key pairs), assisting in establishing the watermark message data integrity (by incorporation of special one way functions in the watermark message data or key), etc. Discussions of these systems in the patents and pending patent applications are incorporated by reference above. The "recognition" of a particular signal or an instance of its transmission, and its monitoring are operations that may be optimized through the use of digital watermark analysis.

A practical difference between the two approaches of using a separate, additive monitoring signal and using the original signal itself as the monitoring signal is control. If a separate signal is used for monitoring, then the originator of the text, audio or video signal being transmitted and the entity doing

6

the monitoring have to agree as to the nature of the separate signal to be used for monitoring—otherwise, the entity doing the monitoring would not know where to look, for what to look, or how to interpret the monitoring signal once it was identified and detected. On the other hand, if the original signal is used itself as a monitoring signal, then no such agreement is necessary. Moreover, a more logical and self-sufficient relationship between the original and its data-reduced abstract enhances the transparency of any resulting monitoring efforts. The entity doing the monitoring is not looking for a separate, additive monitoring system, and further, need not have to interpret the content of the monitoring signal.

Monitoring implementations can be handled by robust watermark techniques (those techniques that are able to survive many signal manipulations but are not inherently "secure" for verification of a carrier signal absent a logically-related watermarking key) and forensic watermark techniques (which enable embedding of watermarks that are not able to survive perceptible alteration of the carrier signal and thus enable detection of tampering with the originally watermarked carrier signal). The techniques have obvious trade-offs between speed, performance and security of the embedded watermark data.

In other disclosures, we suggest improvements and implementations that relate to digital watermarks in particular and embedded signaling in general. A digital watermark may be used to "tag" content in a manner that is not humanly-perceptible, in order to ensure that the human perception of the signal quality is maintained. Watermarking, however, must inherently alter at least one data bit of the original signal to represent a minimal change from the original signal's "unwatermarked state." The changes may affect only a bit, at the very least, or be dependent on information hiding relating to signal characteristics, such as phase information, differences between digitized samples, root mean square (RMS) calculations, z-transform analysis, or similar signal characteristic category.

There are weaknesses in using digital watermark technology for monitoring purposes. One weakness relates directly to the way in which watermarks are implemented. Often, the persons responsible for encoding and decoding the digital watermark are not the creator of the valuable work to be protected. As such, the creator has no input on the placement of the monitoring signal within the valuable work being protected. Hence, if a user wishing to avoid payment of the royalty can find a way to decode or remove the watermark, or at least the monitoring signal embedded in the watermark, then the unauthorized user may successfully duplicate the signal with impunity. This could occur, for example, if either of the persons responsible for encoding or decoding were to have their security compromised such that the encoding or decoding algorithms were discovered by the unauthorized user.

With the present invention, no such disadvantages exist because the creator need not rely on anyone to insert a monitoring signal—as no such signal is necessary. Instead, the creator's work itself is used as the monitoring signal. Accordingly, the value in the signal will have a strong relationship with its recognizability.

By way of improving methods for efficient monitoring as well as effective confirmation of the identity of a digitally-sampled signal, the present invention describes useful methods for using digital signal processing for benchmarking a novel basis for differencing signals with binary data comparisons. These techniques may be complemented with perceptual techniques, but are intended to leverage the generally

US 8,214,175 B2

7

decreasing cost of bandwidth and signal processing power in an age of increasing availability and exchange of digitized binary data.

So long as there exist computationally inexpensive ways of identifying an entire signal with some fractional representation or relationship with the original signal, or its perceptually observable representation, we envision methods for faster and more accurate auditing of signals as they are played, distributed or otherwise shared amongst providers (transmitters) and consumers (receivers). The ability to massively compress a signal to its essence—which is not strictly equivalent to "lossy" or "lossless" compression schemes or perceptual coding techniques, but designed to preserve some underlying "aesthetic quality" of the signal—represents a useful means for signal analysis in a wide variety of applications. The signal analysis, however, must maintain the ability to distinguish the perceptual quality of the signals being compared. For example, a method which analyzed a portion of a song by compressing it to a single line of lyrics fails to maintain the ability to distinguish the perceptual quality of the song being compared. Specifically, for example, if the song "New York State of Mind" were compressed to the lyrics "I'm in a New York State of Mind," such a compression fails to maintain the ability to distinguish between the various recorded versions of the song, say, for example between Billy Joel's recording and Barbara Streisand's recording. Such a method is, therefore, incapable of providing accurate monitoring of the artist's recordings because it could not determine which of the two artists is deserving of a royalty—unless of course, there is a separate monitoring signal to provide the name of the artist or other information sufficient to distinguish the two versions. The present invention, however, aims to maintain some level of perceptual quality of the signals being compared and would deem such a compression to be excessive.

This analogy can be made clearer if it is understood that there are a large number of approaches to compressing a signal to, say, $\frac{1}{10,000}^{th}$ of its original size, not for maintaining its signal quality to ensure computational ease for commercial quality distribution, but to assist in identification, analysis or monitoring of the signal. Most compression is either lossy or lossless and is designed with psychoacoustic or psychovisual parameters. That is to say, the signal is compressed to retain what is "humanly-perceptible." As long as the compression successfully mimics human perception, data space may be saved when the compressed file is compared to the uncompressed or original file. While psychoacoustic and psychovisual compression has some relevance to the present invention, additional data reduction or massive compression is anticipated by the present invention. It is anticipated that the original signal may be compressed to create a realistic or self-similar representation of the original signal, so that the compressed signal can be referenced at a subsequent time as unique binary data that has computational relevance to the original signal. Depending on the application, general data reduction of the original signal can be as simple as massive compression or may relate to the watermark encoding envelope parameter (those bits which a watermarking encoding algorithm deem as candidate bits for mapping independent data or those bits deemed imperceptible to human senses but detectable to a watermark detection algorithm). In this manner, certain media which are commonly known by signal characteristics, a painting, a song, a TV commercial, a dialect, etc., may be analyzed more accurately, and perhaps, more efficiently than a text-based descriptor of the signal. So long as the sender and receiver agree that the data representation is accurate, even insofar as the data-reduction technique has logical relationships with the perceptibility of the original

8

signal, as they must with commonly agreed to text descriptors, no independent cataloging is necessary.

The present invention generally contemplates a signal recognition system that has at least five elements. The actual number of elements may vary depending on the number of domains in which a signal resides (for example, audio is at least one domain while visual carriers are at least two dimensional). The present invention contemplates that the number of elements will be sufficient to effectively and efficiently meet the demands of various classes of signal recognition. The design of the signal recognition that may be used with data reduction is better understood in the context of the general requirements of a pattern or signal recognition system.

The first element is the reference database, which contains information about a plurality of potential signals that will be monitored. In one form, the reference database would contain digital copies of original works of art as they are recorded by the various artists, for example, contain digital copies of all songs that will be played by a particular radio station. In another form, the reference database would contain not perfect digital copies of original works of art, but digital copies of abstracted works of art, for example, contain digital copies of all songs that have been preprocessed such that the copies represent the perceptual characteristics of the original songs. In another form, the reference database would contain digital copies of processed data files, which files represent works of art that have been preprocessed in such a fashion as to identify those perceptual differences that can differentiate one version of a work of art from another version of the same work of art, such as two or more versions of the same song, but by different artists. These examples have obvious application to visually communicated works such as images, trademarks or photographs, and video as well.

The second element is the object locator, which is able to segment a portion of a signal being monitored for analysis (i.e., the "monitored signal"). The segmented portion is also referred to as an "object." As such, the signal being monitored may be thought of comprising a set of objects. A song recording, for example, can be thought of as having a multitude of objects. The objects need not be of uniform length, size, or content, but merely be a sample of the signal being monitored. Visually communicated informational signals have related objects; color and size are examples.

The third element is the feature selector, which is able to analyze a selected object and identify perceptual features of the object that can be used to uniquely describe the selected object. Ideally, the feature selector can identify all, or nearly all, of the perceptual qualities of the object that differentiate it from a similarly selected object of other signals. Simply, a feature selector has a direct relationship with the perceptibility of features commonly observed. Counterfeiting is an activity which specifically seeks out features to misrepresent the authenticity of any given object. Highly granular, and arguably successful, counterfeiting is typically sought for objects that are easily recognizable and valuable, for example, currency, stamps, and trademarked or copyrighted works and objects that have value to a body politic.

The fourth element is the comparing device which is able to compare the selected object using the features selected by the feature selector to the plurality of signals in the reference database to identify which of the signals matches the monitored signal. Depending upon how the information of the plurality of signals is stored in the reference database and depending upon the available computational capacity (e.g., speed and efficiency), the exact nature of the comparison will vary. For example, the comparing device may compare the selected object directly to the signal information stored in the

US 8,214,175 B2

**9**

database. Alternatively, the comparing device may need to process the signal information stored in the database using input from the feature selector and then compare the selected object to the processed signal information. Alternatively, the comparing device may need to process the selected object using input from the feature selector and then compare the processed selected object to the signal information. Alternatively, the comparing device may need to process the signal information stored in the database using input from the feature selector, process the selected object using input from the feature selector, and then compare the processed selected object to the processed signal information.

The fifth element is the recorder which records information about the number of times a given signal is analyzed and detected. The recorder may comprise a database which keeps track of the number of times a song, image, or a movie has been played, or may generate a serial output which can be subsequently processed to determine the total number of times various signals have been detected.

Other elements may be added to the system or incorporated into the five elements identified above. For example, an error handler may be incorporated into the comparing device. If the comparing device identifies multiple signals which appear to contain the object being sought for analysis or monitoring, the error handler may offer further processing in order to identify additional qualities or features in the selected object such that only one of the set of captured signals is found to contain the further analyzed selected object that actually conforms with the object thought to have been transmitted or distributed.

Moreover, one or more of the five identified elements may be implemented with software that runs on the same processor, or which uses multiple processors. In addition, the elements may incorporate dynamic approaches that utilize stochastic, heuristic, or experience-based adjustments to refine the signal analysis being conducted within the system, including, for example, the signal analyses being performed within the feature selector and the comparing device. This additional analyses may be viewed as filters that are designed to meet the expectations of accuracy or speed for any intended application.

Since maintenance of original signal quality is not required by the present invention, increased efficiencies in processing and identification of signals can be achieved. The present invention concerns itself with perceptible relationships only to the extent that efficiencies can be achieved both in accuracy and speed with enabling logical relationships between an original signal and its abstract.

The challenge is to maximize the ability to sufficiently compress a signal to both retain its relationship with the original signal while reducing the data overhead to enable more efficient analysis, archiving and monitoring of these signals. In some cases, data reduction alone will not suffice: the sender and receiver must agree to the accuracy of the recognition. In other cases, agreement will actually depend on a third party who authored or created the signal in question. A digitized signal may have parameters to assist in establishing more accurate identification, for example, a "signal abstract" which naturally, or by agreement with the creator, the copyright owner or other interested parties, can be used to describe the original signal. By utilizing less than the original signal, a computationally inexpensive means of identification can be used. As long as a realistic set of conditions can be arrived at governing the relationship between a signal and its data reduced abstract, increases in effective monitoring and transparency of information data flow across communications channels is likely to result. This feature is significant in that it represents an improvement over how a digitally-

**10**

sampled signal can be cataloged and identified, though the use of a means that is specifically selected based upon the strengths of a general computing device and the economic needs of a particular market for the digitized information data being monitored. The additional benefit is a more open means to uniformly catalog, analyze, and monitor signals. As well, such benefits can exist for third parties, who have a significant interest in the signal but are not the sender or receiver of said information.

As a general improvement over the art, the present invention incorporates what could best be described as "computer-acoustic" and "computer-visual" modeling, where signal abstracts are created using data reduction techniques to determine the smallest amount of data, at least a single bit, which can represent and differentiate two digitized signal representations for a given predefined signal set. Each of such representations must have at least a one bit difference with all other members of the database to differentiate each such representation from the others in the database. The predefined signal set is the object being analyzed. The signal identifier/detector should receive its parameters from a database engine. The engine will identify those characteristics (for example, the differences) that can be used to distinguish one digital signal from all other digital signals that are stored in its collection. For those digital signals or objects which are seemingly identical, except[ing] that the signal may have different performance or utilization in the newly created object, benefits over additive or text-based identifiers are achieved. Additionally, decisions regarding the success or failure of an accurate detection of any given object may be flexibly implemented or changed to reflect market-based demands of the engine. Appropriate examples are songs or works or art which have been sampled or reproduced by others who are not the original creator.

In some cases, the engine will also consider the NULL case for a generalized item not in its database, or perhaps in situations where data objects may have collisions. For some applications, the NULL case is not necessary, thus making the whole system faster. For instance, databases which have fewer repetitions of objects or those systems which are intended to recognize signals with time constraints or capture all data objects. Greater efficiency in processing a relational database can be obtained because the rules for comparison are selected for the maximum efficiency of the processing hardware and/or software, whether or not the processing is based on psychoacoustic or psychovisual models. The benefits of massive data reduction, flexibility in constructing appropriate signal recognition protocols and incorporation of cryptographic techniques to further add accuracy and confidence in the system are clearly improvements over the art. For example, where the data reduced abstract needs to have further uniqueness, a hash or signature may be required. And for objects which have further uniqueness requirements, two identical instances of the object could be made unique with cryptographic techniques.

Accuracy in processing and identification may be increased by using one or more of the following fidelity evaluation functions:

1) RMS (root mean square). For example, a RMS function may be used to assist in determining the distance between data based on mathematically determinable Euclidean distance between the beginning and end data points (bits) of a particular signal carrier.

2) Frequency weighted RMS. For example, different weights may be applied to different frequency components of the carrier signal before using RMS. This selective weighting can assist in further distinguishing the distance between

US 8,214,175 B2

11                                                              12

beginning and end points of the signal carrier (at a given point in time, described as bandwidth, or the number of total bits that can be transmitted per second) and may be considered to be the mathematical equivalent of passing a carrier signal difference through a data filter and figuring the average power in the output carrier.

3) Absolute error criteria, including particularly the NULL set (described above) The NULL may be utilized in two significant cases: First, in instances where the recognized, signal appears to be an identified object which is inaccurately attributed or identified to an object not handled by the database of objects; and second, where a collision of data occurs. For instance, if an artist releases a second performance of a previously recorded song, and the two performances are so similar that their differences are almost imperceptible, then the previously selected criteria may not be able to differentiate the two recordings. Hence, the database must be "recalibrated" to be able to differentiate these two versions. Similarly, if the system identifies not one, but two or more, matches for a particular search, then the database may need "recalibration" to further differentiate the two objects stored in the database.

4) Cognitive Identification. For example, the present invention may use an experience-based analysis within a recognition engine. Once such analysis may involve mathematically determining a spectral transform or its equivalent of the carrier signal. A spectral transform enables signal processing and should maintain, for certain applications, some cognitive or perceptual relationship with the original analog waveform. As a novel feature to the present invention, additional classes may be subject to humanly-perceptible observation. For instance, an experience-based criteria which relates particularly to the envisioned or perceived accuracy of the data information object as it is used or applied in a particular market, product, or implementation. This may include a short 3 second segment of a commercially available and recognizable song which is used for commercials to enable recognition of the good or service being marketed. The complete song is marketed as a separately valued object from the use of a discrete segment of the song (that may be used for promotion or marketing—for the complete song or for an entirely different good or service). To the extent that an owner of the song in question is able to further enable value through the licensing or agreement for use of a segment of the original signal, cognitive identification is a form of filtering to enable differentiations between different and intended uses of the same or subset of the same signal (object). The implementation relating specifically, as disclosed herein, to the predetermined identification or recognition means and/or any specified relationship with subsequent use of the identification means can be used to create a history as to how often a particular signal is misidentified, which history can then be used to optimize identification of that signal in the future. The difference between use of an excerpt of the song to promote a separate and distinct good or service and use of the excerpt to promote recognition of the song itself (for example, by the artist to sell copies of the song) relates informationally to a decision based on recognized and approved use of the song. Both the song and applications of the song in its entirety or as a subset are typically based on agreement by the creator and the sender who seeks to utilize the work. Trust in the means for identification, which can be weighted in the present invention (for example, by adjusting bit-addressable information), is an important factor in adjusting the monitoring or recognition features of the object or carrier signal, and by using any misidentification information, (including any experience-based or heuristic information), additional features of the

monitored signal can be used to improve the performance of the monitoring system envisioned herein. The issue of central concern with cognitive identification is a greater understanding of the parameters by which any given object is to be analyzed. To the extent that a creator chooses varying and separate application of his object, those applications having a cognitive difference in a signal recognition sense (e.g., the whole or an excerpt), the system contemplated herein includes rules for governing the application of bit-addressable information to increase the accuracy of the database.

5) Finally, the predetermined parameters that are associated with a discrete case for any given object will have a significant impact upon the ability to accurately process and identify the signals. For example, if a song is transmitted over a FM carrier, then one skilled in the art will appreciate that the FM signal has a predetermined bandwidth which is different from the bandwidth of the original recording, and different even from song when played on an AM carrier, and different yet from a song played using an 8-bit Internet broadcast. Recognition of these differences, however, will permit the selection of an identification means which can be optimized for monitoring a FM broadcasted signal. In other words, the discreteness intended by the sender is limited and directed by the fidelity of the transmission means. Objects may be cataloged and assessing with the understanding that all monitoring will occur using a specific transmission fidelity. For example, a database may be optimized with the understanding that only AM broadcast signals will be monitored. For maximum efficiency, different data bases may be created for different transmission channels, e.g., AM broadcasts, FM broadcasts, Internet broadcasts, etc.

For more information on increasing efficiencies for information systems, see The Mathematical Theory of Communication (1948), by Shannon.

Because bandwidth (which in the digital domain is equated to the total number of bits that can be transmitted in a fixed period of time) is a limited resource which places limitations upon transmission capacity and information coding schemes, the importance of monitoring for information objects transmitted over any given channel must take into consideration the nature and utilization of a given channel. The supply and demand of bandwidth will have a dramatic impact on the transmission, and ultimately, upon the decision to monitor and recognize signals. A discussion of this is found in a application by the inventor under U.S. patent application Ser. No. 08/674,726 (which issued Apr. 22, 2008 as U.S. Pat. No. 7,362,775) "Exchange Mechanisms for Digital Information Packages with Bandwidth Securitization, Multichannel Digital Watermarks, and Key Management" (which application is incorporated herein by reference as if fully setforth herein).

If a filter is to be used in connection with the recognition or monitoring engine, it may be desirable for the filter to anticipate and take into consideration the following factors, which affect the economics of the transmission as they relate to triggers for payment and/or relate to events requiring audits of the objects which are being transmitted: 1) time of transmission (i.e., the point in time when the transmission occurred), including whether the transmission is of a live performance); 2) location of transmission (e.g., what channel was used for transmission, which usually determines the associated cost for usage of the transmission channel); 3) the point of origination of the transmission (which may be the same for a signal carrier over many distinct channels); and 4) pre-existence of the information carrier signal (pre-recorded or newly created information carrier signal, which may require differentiation in certain markets or instances).

US 8,214,175 B2

13

In the case of predetermined carrier signals (those which have been recorded and stored for subsequent use), "positional information carrier signals" are contemplated by this invention, namely, perceptual differences between the seemingly "same" information carrier that can be recognized as consumers of information seek different versions or quality levels of the same carrier signal. Perceptual differences exist between a song and its reproduction from a CD, an AM radio, and an Internet broadcast. To the extent that the creator or consumer of the signal can define a difference in any of the four criteria above, means can be derived (and programmed for selectability) to recognize and distinguish these differences. It is, however, quite possible that the ability to monitor carrier signal transmission with these factors will increase the variety and richness of available carrier signals to existing communications channels. The differentiation between an absolute case for transmission of an object, which is a time dependent event, for instance a live or real time broadcast, versus the relative case, which is prerecorded or stored for transmission at a later point in time, creates recognizable differences for signal monitoring.

The monitoring and analysis contemplated by this invention may have a variety of purposes, including, for example, the following: to determine the number of times a song is broadcast on a particular radio broadcast or Internet site; to control security though a voice-activated security system; and to identify associations between a beginner's drawing and those of great artists (for example to draw comparisons between technique, compositions, or color schemes). None of these examples could be achieved with any significant degree of accuracy using a text-based analysis. Additionally, strictly text-based systems fail to fully capture the inherent value of the data recognition or monitoring information itself.

### SAMPLE EMBODIMENTS

#### Sample Embodiment 1

A database of audio signals (e.g., songs) is stored or maintained by a radio station or

Internet streaming company, who may select a subset of the songs are stored so that the subset may be later broadcast to listeners. The subset, for example, may comprise a sufficient number of songs to fill 24 hours of music programming (between 300 or 500 songs). Traditionally, monitoring is accomplished by embedding some identifier into the signal, or affixing the identifier to the signal, for later analysis and determination of royalty payments. Most of the traditional analysis is performed by actual persons who use play lists and other statistical approximations of audio play, including for example, data obtained through the manual (i.e., by persons) monitoring of a statistically significant sample of stations and transmission times so that an extrapolation may be made to a larger number of comparable markets.

The present invention creates a second database from the first database, wherein each of the stored audio signals in the first database is data reduced in a manner that is not likely to reflect the human perceptual quality of the signal, meaning that a significantly data-reduced signal is not likely to be played back and recognized as the original signal. As a result of the data reduction, the size of the second database (as measured in digital terms) is much smaller than the size of the first database, and is determined by the rate of compression. If, for example, if 24 hours worth of audio signals are compressed at a 10,000:1 compression rate, the reduced data could occupy a little more than 1 megabyte of data. With such a large compression rate, the data to be compared and/or

14

analyzed may become computationally small such that computational speed and efficiency are significantly improved.

With greater compression rates, it is anticipated that similarity may exist between the data compressed abstractions of different analog signals (e.g., recordings by two different artists of the same song). The present invention contemplates the use of bit-addressable differences to distinguish between such cases. In applications where the data to be analyzed has higher value in some predetermined sense, cryptographic protocols, such as a hash or digital signature, can be used to distinguish such close cases.

In a preferred embodiment, the present invention may utilize a centralized database where copies of new recordings may be deposited to ensure that copyright owners, who authorize transmission or use of their recordings by others, can independently verify that the object is correctly monitored. The rules for the creator himself to enter his work would differ from a universally recognized number assigned by an independent authority (say, ISRC, ISBN for recordings and books respectively). Those skilled in the art of algorithmic information theory (AIT) can recognize that it is now possible to describe optimized use of binary data for content and functionality. The differences between objects must relate to decisions made by the user of the data, introducing subjective or cognitive decisions to the design of the contemplated invention as described above. To the extent that objects can have an optimized data size when compared with other objects for any given set of objects, the algorithms for data reduction would have predetermined flexibility directly related to computational efficiency and the set of objects to be monitored. The flexibility in having transparent determination of unique signal abstracts, as opposed to independent third party assignment, is likely to increase confidence in the monitoring effort by the owners of the original signals themselves. The prior art allows for no such transparency to the copyright creators.

#### Sample Embodiment 2

Another embodiment of the invention relates to visual images, which of course, involve at least two dimensions.

Similar to the goals of a psychoacoustic model, a psychovisual model attempts to represent a visual image with less data, and yet preserve those perceptual qualities that permit a human to recognize the original visual image. Using the very same techniques described above in connection with an audio signal, signal monitoring of visual images may be implemented.

One such application for monitoring and analyzing visual images involves a desire to find works of other artists that relate to a particular theme. For example, finding paintings of sunsets or sunrises. A traditional approach might involve a textual search involving a database wherein the works of other artists have been described in writing. The present invention, however, involves the scanning of an image involving a sun, compressing the data to its essential characteristics (i.e., those perceptual characteristics related to the sun) and then finding matches in a database of other visual images (stored as compressed or even uncompressed data). By studying the work of other artists using such techniques, a novice, for example, could learn much by comparing the presentations of a common theme by different artists.

Another useful application involving this type of monitoring and analyzing is the identification of photographs of potential suspects whose identity matches the sketch of a police artist.

Note that combinations of the monitoring techniques discussed above can be used for audio-visual monitoring, such

15

as video-transmission by a television station or cable station. The techniques would have to compensate, for example, for a cable station that is broadcasting a audio channel unaccompanied by video.

Other embodiments and uses of the invention will be apparent to those skilled in the art from consideration of the specification and practice of the invention disclosed herein. The specification and examples should be considered exemplary only with the true scope and spirit of the invention indicated by the following claims. As will be easily understood by those of ordinary skill in the art, variations and modifications of each of the disclosed embodiments can be easily made within the scope of this invention as defined by the following claims.

The invention claimed is:

1. A system, comprising:
non transitory memory comprising a database for storing a plurality of digital reference signal abstracts;
at least one processor;
wherein said at least one processor is programmed or structured to generate a digital reference signal abstract from a digital reference signal such that said digital reference signal abstract is similar to said digital reference signal and reduced in size compared to said digital reference signal; and
wherein said at least one processor is programmed to store said digital reference signal abstract in said database as one of said plurality of digital reference signal abstracts;
wherein said non transitory memory further comprises a second database for storing a plurality of second database digital reference signal abstracts;
wherein said at least one processor is programmed or structured to generate a second database digital reference signal abstract from said digital reference signal such that said second database digital reference signal abstract is similar to said digital reference signal and reduced in size compared to said digital reference signal, and wherein said second database digital reference signal abstract is distinct from said digital reference signal abstract; and
wherein said at least one processor is programmed to store said second database digital reference signal abstract in said second database as one of said plurality of second database digital reference signal abstracts.

2. The system of claim 1, wherein said at least one processor is programmed or structured to generate said digital reference signal abstract from said digital reference signal by using perceptual qualities of said digital reference signal in generating said digital reference signal abstract such that the abstract retains a perceptual relationship to said digital reference signal.

3. The system of claim 1 wherein said at least one processor is programmed or structured to generate a digital reference signal abstract from a digital reference signal such that said digital reference signal abstract is self similar to said digital reference signal.

4. The system of claim 1, wherein said at least one processor is programmed or structured to select criteria to use for generating said digital reference signal abstract from said digital reference signal.

5. The system of claim 1, wherein said at least one processor is programmed or structured to generate said digital query signal abstract from a digital query signal such that said digital query signal abstract is similar to said digital query signal and reduced in size compared to said digital query signal.

16

6. The system of claim 1, wherein said at least one processor is programmed to generate said digital reference signal abstract.

7. A system, comprising:
non transitory memory comprising a database for storing a plurality of digital reference signal abstracts;
at least one processor;
wherein said at least one processor is programmed or structured to generate a digital reference signal abstract from a digital reference signal such that said digital reference signal abstract is similar to said digital reference signal and reduced in size compared to said digital reference signal; and
wherein said at least one processor is programmed to store said digital reference signal abstract in said database as one of said plurality of digital reference signal abstracts;
wherein said at least one processor is programmed or structured to generate said digital reference signal abstract from said digital reference signal and at least one of a hash and a signature, so that each one of said plurality of digital reference signal abstracts in said database is distinct from one another.

8. A system, comprising:
non transitory memory comprising a database for storing a plurality of digital reference signal abstracts;
at least one processor;
wherein said at least one processor is programmed or structured to generate a digital reference signal abstract from a digital reference signal such that said digital reference signal abstract is similar to said digital reference signal and reduced in size compared to said digital reference signal; and
wherein said at least one processor is programmed to store said digital reference signal abstract in said database as one of said plurality of digital reference signal abstracts;
wherein said digital reference signal is a digital representation of one of a plurality of different versions of a visual work and a multimedia work, and wherein said at least one processor is programmed or structured to generate said digital reference signal abstract from said digital reference signal so that said digital reference signal comprises signal characteristic parameters that differentiate between said plurality of different versions of said visual work and said multimedia work.

9. A system, comprising:
non transitory memory comprising a database for storing a plurality of digital reference signal abstracts;
at least one processor;
wherein said at least one processor is programmed or structured to generate a digital reference signal abstract from a digital reference signal such that said digital reference signal abstract is similar to said digital reference signal and reduced in size compared to said digital reference signal; and
wherein said at least one processor is programmed to store said digital reference signal abstract in said database as one of said plurality of digital reference signal abstracts;
wherein said at least one processor is programmed or structured to determine if said digital reference signal abstract matches one of said plurality of digital reference signal abstracts stored in said database; and
wherein said processor is programmed to recalibrate said database in response to a determination that said digital reference signal abstract matches one of said plurality of digital reference signal abstracts stored in said database.

US 8,214,175 B2

17

10. A system, comprising:

non transitory memory comprising a database for storing a plurality of digital reference signal abstracts;

at least one processor;

wherein said at least one processor is programmed or structured to generate a digital reference signal abstract from a digital reference signal such that said digital reference signal abstract is similar to said digital reference signal and reduced in size compared to said digital reference signal; and

wherein said at least one processor is programmed to store said digital reference signal abstract in said database as one of said plurality of digital reference signal abstracts;

wherein said processor is programmed or structured to change selected criteria to use for generating said digital reference signal abstract from said digital reference signal when said at least one processor determines that said digital reference signal abstract matches one of said plurality of digital reference signal abstracts stored in said database.

11. A system, comprising:

non transitory memory comprising a database for storing a plurality of digital reference signal abstracts;

at least one processor;

wherein said at least one processor is programmed or structured to generate a digital reference signal abstract from a digital reference signal such that said digital reference signal abstract is similar to said digital reference signal and reduced in size compared to said digital reference signal; and

wherein said at least one processor is programmed to store said digital reference signal abstract in said database as one of said plurality of digital reference signal abstracts;

wherein said at least one processor is programmed or structured to compare a digital query signal abstract to said plurality of digital reference signal abstracts stored in said database to generate a compare result.

12. The system of claim 11, wherein said compare result indicates no match between said digital query signal abstract to said plurality of digital reference signal abstracts stored in said database.

13. The system of claim 11, wherein said compare result indicates a match between said digital query signal abstract and a first digital reference signal abstracts of said plurality of digital reference signal abstracts stored in said database.

14. The system of claim 11, wherein said memory further defines a digital query signal abstract receipt recorder recording a number times said at least one processor receives said digital query signal abstract for comparison with said plurality of digital reference signal abstracts stored in said database.

15. The system of claim 11, wherein said memory further defines a first digital reference signal abstract match recorder recording a number of times said at least one processor determines a match between a digital query signal abstract and first digital reference signal abstract of said plurality of digital reference signal abstracts stored in said database.

16. The system of claim 12, wherein said at least one processor is programmed or structured to use an algorithm to generate said digital reference signal abstract from said digital reference signal; and wherein said at least one processor is programmed or structured to use said algorithm to generate said digital query signal abstract from said digital query signal.

17. A system, comprising:

non transitory memory comprising a database for storing a plurality of digital reference signal abstracts;

at least one processor;

wherein said at least one processor is programmed or structured to generate a digital reference signal abstract from a digital reference signal such that said digital reference

18

signal abstract is similar to said digital reference signal and reduced in size compared to said digital reference signal; and

wherein said at least one processor is programmed to store said digital reference signal abstract in said database as one of said plurality of digital reference signal abstracts;

wherein said wherein said at least one processor is programmed or structured to apply at least one of psycho-acoustic model and a psycho-visual model to generate said digital reference signal abstract from said digital reference signal.

18. A method, comprising:

storing in non transitory memory a database for storing a plurality of digital reference signal abstracts;

generating with said at least one processor a digital reference signal abstract from a digital reference signal such that said digital reference signal abstract is similar to said digital reference signal and reduced in size compared to said digital reference signal; and

storing with said at least one processor said digital reference signal abstract in said database as one of said plurality of digital reference signal abstracts;

wherein said non transitory memory further comprises a second database for storing a plurality of second database digital reference signal abstracts;

wherein said at least one processor is programmed or structured to generate a second database digital reference signal abstract from said digital reference signal such that said second database digital reference signal abstract is similar to said digital reference signal and reduced in size compared to said digital reference signal, and wherein said second database digital reference signal abstract is distinct from said digital reference signal abstract; and

wherein said at least one processor is programmed to store said second database digital reference signal abstract in said second database as one of said plurality of second database digital reference signal abstracts.

19. A computer program product stored on non transitory memory media, which, when installed on a computer system having at least one processor and non transitory memory, causes said computer system to perform the steps comprising:

storing in said non transitory memory a database for storing a plurality of digital reference signal abstracts;

generating with said at least one processor a digital reference signal abstract from a digital reference signal such that said digital reference signal abstract is similar to said digital reference signal and reduced in size compared to said digital reference signal; and

storing with said at least one processor said digital reference signal abstract in said database as one of said plurality of digital reference signal abstracts;

wherein said non transitory memory further comprises a second database for storing a plurality of second database digital reference signal abstracts;

wherein said at least one processor is programmed or structured to generate a second database digital reference signal abstract from said digital reference signal such that said second database digital reference signal abstract is similar to said digital reference signal and reduced in size compared to said digital reference signal, and wherein said second database digital reference signal abstract is distinct from said digital reference signal abstract; and

wherein said at least one processor is programmed to store said second database digital reference signal abstract in said second database as one of said plurality of second database digital reference signal abstracts.

\*   \*   \*   \*   \*

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.          : 8,214,175 B2                                        Page 1 of 1
APPLICATION NO.     : 13/035964
DATED               : July 3, 2012
INVENTOR(S)         : Moskowitz et al.

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

Column 18 lines 7-11 change "wherein said wherein said at least one processor is programmed or structured to apply at least one of psycho-acoustic model and a psycho-visual model to generate said digital reference signal abstract from said digital reference signal." to

-- wherein said at least one processor is programmed or structured to apply at least one of psycho-acoustic model and a psycho-visual model to generate said digital reference signal abstract from said digital reference signal. --

Signed and Sealed this
Fourth Day of December, 2012

David J. Kappos
*Director of the United States Patent and Trademark Office*

PAGES 1 - 46

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

AOPTIX TECHNOLOGIES,     )
                              )
         PLAINTIFF,    )    NO. C-13-1105 YGR
                              )      (RELATED CASE)
  VS.                  )
                              )    MONDAY, JULY 28, 2014
BLUE SPIKE, LLC,         )
                              )    OAKLAND, CALIFORNIA
                              )
         DEFENDANT.    )    INITIAL CASE MANAGEMENT
——————————————————————————————)       CONFERENCE
                              )
BLUE SPIKE, LLC,         )
                              )
         PLAINTIFF,    )    NO. C-14-1647 YGR
                              )      (RELATED CASE)
  VS.                  )
                              )
ADOBE SYSTEMS, INC.,    )
                              )
         DEFENDANT.    )
——————————————————————————————)

CAPTION CONTINUED ON NEXT PAGE

BEFORE THE HONORABLE YVONNE GONZALEZ ROGERS, JUDGE

**REPORTER'S TRANSCRIPT OF PROCEEDINGS**

(APPEARANCES ON NEXT PAGE)

REPORTED BY:          DIANE E. SKILLMAN, CSR 4909, RPR, FCRR
                    OFFICIAL COURT REPORTER

TRANSCRIPT PRODUCED BY COMPUTER-AIDED TRANSCRIPTION

```
 1              THE COURT:  '700.

 2              MR. BERTA:  AND '472.

 3              THE COURT:  '472.

 4        ALL RIGHT.  THE '175 PATENT, WHAT IS THE KIND OF PATENT

 5   ARE WE DEALING WITH?

 6              MR. GARTEISER:  WE'RE DEALING WITH A PATENT THAT

 7   HANDLES --

 8              THE COURT:  IS IT A METHOD'S PATENT?  WHAT KIND OF

 9   PATENT --

10              MR. GARTEISER:  THERE'S NO MEANS-PLUS-FUNCTION, IT'S

11   METHOD AND APPARATUS.  AND THAT'S TRUE FOR ALL FIVE.

12              THE COURT:  ARE THE PATENTS ATTACHED TO THE

13   COMPLAINT?

14              MR. GARTEISER:  NOT IN THIS CASE, YOUR HONOR, BUT WE

15   CAN TRANSFER -- WE CAN LODGE THE FIVE WITH THE COURT.

16              THE COURT:  OKAY.  PLEASE LODGE THEM.

17        ALL RIGHT.  SO HE'S CREATED A METHOD FOR DOING THIS; IS

18   THAT WHAT YOU ARE SAYING TO ME?

19              MR. GARTEISER:  THAT'S CORRECT.  FROM THAT, YOU CAN

20   ACTUALLY BUILD A SYSTEM TO DO IT AS WELL.

21              THE COURT:  WHAT IS HIS BACKGROUND?

22              MR. GARTEISER:  HIS BACKGROUND -- AND THERE'S TWO

23   INVENTORS HERE.  ONE IS SCOTT MOSKOWITZ, SO I WILL START WITH

24   HIM.  HE IS THE CEO OF BLUE SPIKE, INCORPORATED WHICH

25   TRANSFERRED THESE PATENTS TO BLUE SPIKE, LLC.
```

1    THE OTHER INVENTOR IS MIKE BARRY WHO LATER ENDED UP

2    WORKING FOR ADOBE SYSTEMS WHO IS ALSO INVOLVED IN THIS

3    LITIGATION --

4         **THE COURT:**  HE IS NOT SUED INDIVIDUALLY, THOUGH?

5         **MR. GARTEISER:**  NO, NOT AT ALL.  AND WE DON'T HAVE

6    ANY -- IT'S JUST RUN-OF-THE-MILL PATENT CASE WITH ADOBE.

7    THERE'S NOTHING EXCITING ABOUT IT.

8         **THE COURT:**  SO WHAT IS MR. MOSKOWITZ'S BACKGROUND?

9         **MR. GARTEISER:**  HE HOLDS TWO DEGREES FROM WHARTON,

10   AND HE STUDIED ALSO AT --

11        **THE COURT:**  WHARTON IS A MBA -- THAT IS A BUSINESS --

12        **MR. GARTEISER:**  IT'S A BUSINESS SCHOOL.

13        **THE COURT:**  DOESN'T HE HAVE A TECHNICAL BACKGROUND?

14        **MR. GARTEISER:**  HE DOESN'T.  IT'S KIND OF LIKE THE

15   GUY THAT WE'VE HAD -- THAT WE HIRED, HAS AN ENGLISH DEGREE,

16   BUT HE KNOWS COMPUTERS.  SO WHEN HE WANTED TO GO BACK TO UVA,

17   HE STUDIED ENGLISH AND THEN WENT TO LAW SCHOOL.

18        **THE COURT:**  HE'S TEACHING ENGINEERS HOW TO DO

19   SOMETHING?

20        **MR. GARTEISER:**  HE'S TEACHING HIMSELF -- HE TAUGHT

21   HIMSELF HOW TO DO THESE THINGS AND HAD MIKE BARRY HELP HIM

22   WITH THE IMPLEMENTATION SIDE AS WELL.

23        **THE COURT:**  SO WHAT IS MIKE BARRY'S BACKGROUND?

24        **MR. GARTEISER:**  HE'S A COMPUTER PROGRAMMER.

25        **THE COURT:**  SO WHEN I LOOK AT THESE PATENTS, WHAT'S

1    Randall T. Garteiser (CBN 231821)
2    rgarteiser@ghiplaw.com
     Christopher A. Honea (CBN 232473)
3    chonea@ghiplaw.com
     Ian N. Ramage (CBN 224881)
4    iramage@ghiplaw.com
5    Kirk J. Anderson (CBN 289043)
     kanderson@ghiplaw.com
6    Molly A. Jones (CBN 301419)
     mjones@ghiplaw.com
7    GARTEISER HONEA, P.C.
8    119 W Ferguson St.
     Tyler, Texas 75702
9    Telephone:  (903) 705-7420
     Facsimile:  (888) 908-4400
10

11   Attorneys for Plaintiff
     BLUE SPIKE, LLC
12

13

14              IN THE UNITED STATES DISTRICT COURT

15          FOR THE NORTHERN DISTRICT OF CALIFORNIA

16                    OAKLAND DIVISION

17

18   BLUE SPIKE, LLC                    Civil Case No.: 4:14-cv-01650-YGR

19             Plaintiff,

20                                      **BLUE SPIKE, LLC'S OPPOSITION TO
     v.                                 GOOGLE INC.'S MOTION FOR
21                                      JUDGMENT ON THE PLEADINGS**

22   GOOGLE INC.

23             Defendant.

24                                      Hon. Yvonne Gonzalez Rogers

25

26

27

28

GARTEISER HONEA – TRIAL ATTORNEYS

1   monetization and protection efforts.  *Id.* at 7:9-25. However, signal abstracting extends beyond

2   digital music signals to image, video, and other multimedia works that are expressed as digital

3   signals. *Id.* at 4:42-43, 8:28-30.

4          The Patents-in-Suit are directed to Moskowitz's concept of "signal abstracting".  (FAC, ¶

5   22).  Through use of the patented "signal abstracting" technology, content owners are able to

6   monitor distribution channels such as the Internet, radio broadcasts, television broadcasts, and other

7   media sources, to determine whether any of the monitored source content has the same abstract as

8   their copyrighted catalogued works.  (FAC, ¶ 23).  Content protection and monetization similarly

9   extends to mobile devices, smartphones, and tablets.  (FAC ¶ 25).  As discussed in detail in the

10  patent specification and below, the Patents-in-Suit provide significant advantages over the prior art,

11  including watermarking technology.  Details of particular claim limitations are similarly provided

12  below.

13         The Patents-in-Suit have been rigorously examined by the USPTO, having been found

14  patentable over literally hundreds of prior art patents and publications.  The '472 Patent cites more

15  than 100 references; the '700 Patent cites more than 350 references; the '494 and '175 Patents each

16  cite almost 600 references; and the '728 Patent cites more than 700 references.

17  **III.    NATURE AND STAGE OF THE PROCEEDINGS**

18         On August 22, 2012, Blue Spike filed its original complaint against Google in the Eastern

19  District of Texas, alleging infringement of the '472, '700, '494, and '175 Patents. On March 13,

20  2014, the Court granted Google's motion for transfer to the Northern District of California and

21  ordered the case transferred. Dkt. No. 16. On July 28, 2014, the Court held its initial Case

22  Management Conference.  Blue Spike filed its First Amended Complaint ("FAC") on September 15,

23  2015, alleging infringement of the same four patents asserted in its original complaint along with

24  U.S. Patent No. 8,712,728 ("the '728 Patent") (collectively with the '472, '700, '494 and '175

25  Patents, "the Patents-in-Suit").[2]  Dkt. No. 47.  Google answered Blue Spike's FAC on October 2,

26  _____

27  [2] Blue Spike contends that '728 Patent claim 30 remains an asserted claim despite Google's
    characterization to the contrary. *See* Dkt. No. 60. Although not before the Court, Blue Spike believes

28  its charting of this claim in its February 11, 2015 P.L.R. 3-1 Disclosures is more than sufficient to
    provide notice to Google. Even were the Court to accept Google's position that one representative

1   2015. Dkt. No. 48.  Recently, the Court granted the parties' joint stipulation to extend case deadlines

2   through claim construction by roughly four months in order to facilitate the completed transfer of

3   other cases from the Eastern District of Texas as well as in anticipation of the likely relation of

4   several transferred cases the involving the same Patents-in-Suit.  Dkt. No. 55.

5        The Eastern District of Texas has previously issued a number of substantive rulings in a

6   related case relevant to Google's motion.  On October 16, 2014, that Court, with the assistance of a

7   Court-appointed Technical Advisor, issued a 69-page *Markman* opinion construing more than 30

8   terms and phrases in the Patents-in-Suit. *See* Declaration of Randall T. Garteiser ("Garteiser Decl."),

9   Exhibits ("Exhs.") 1, 2, and 3. On that same date, Magistrate Judge Craven issued a 19-page Report

10  and Recommendation recommending that a motion for summary judgment based on indefiniteness

11  be denied.  Garteiser Decl., Exh. 4.  In an 11-page Memorandum Order on January 6, 2015, Judge

12  Schneider adopted the Magistrate Judge's findings, affirming the denial of summary judgment of

13  indefiniteness.  Garteiser Decl., Exh. 5.

14       On May 12, 2015, during what Blue Spike understood to be a stand-down period on motion

15  practice, Google filed the present Rule 12(c) Motion for Judgment on the Pleadings seeking

16  adjudication that the Patents-in-Suit are invalid under 35 U.S.C. § 101.  Dkt. No. 59. Blue Spike

17  opposes Google's Rule 12(c) Motion.

18  **IV.**    **LEGAL STANDARDS**

19      **A.**    **Federal Rule of Civil Procedure 12(c)**

20       Federal Rule of Civil Procedure 12(c) provides that "[a]fter the pleadings are closed – but

21  early enough not to delay trial – a party may move for judgment on the pleadings." A district court

22  must view the facts and inferences to be drawn from the pleadings in the light most favorable to the

23  non-moving party, and "the allegations of the moving party which have been denied are assumed to

24  be false."  *Hal Roach Studios, Inc. v. Richard Feiner and Co., Inc.*, 896 F.2d 1542, 1550 (9th Cir.

25  1990).  "Judgment on the pleadings is proper when the moving party clearly establishes on the face

26

27  claim can govern the section 101 analysis, '728 Patent claim 30 must survive this motion as Google

28  failed to raise it in its opening brief and may not raise new arguments in its reply. At a minimum, the
    sufficiency of Blue Spike's contentions must be construed in Blue Spike's favor at this stage.

GARTEISER HONEA – TRIAL ATTORNEYS

1   Google has made no motion for an adjudication under 35 U.S.C. § 112, and those issues are not ripe

2   for adjudication at this early stage, let alone under Rule 12(c).  "Compliance with the written

3   description inquiry is essentially a *fact-based* inquiry."  *Enzo Biochem, Inc. v. Gen-Probe, Inc.*, 323

4   F.3d 956, 963 (Fed. Cir. 2002) (emphasis added).  "Enablement is a question of law with *factual*

5   *underpinnings*."  *CFMT Inc. v. Yieldup Intern. Corp.*, 349 F.3d 1333, 1337-40 (Fed. Cir. 2003)

6   (emphasis added).  Indefiniteness requires an inquiry into whether the claims "inform those skilled

7   in the art about the scope of the invention with *reasonable* certainty."  *Nautilus v. BioSig*, 134 S. Ct.

8   2120, 2129 (2014) (emphasis added).  To the extent the Court were to address § 112 issues (even in

9   an overlapping capacity in the § 101 analysis), they would have to be resolved *against* Google under

10  Rule 12(c).  For example, the Eastern District of Texas has already *denied* a motion for summary

11  judgment that the patents are indefinite based on the term "abstract."  That ruling was supported by,

12  among other things, a declaration submitted by Blue Spike's expert.  *See* Case 6:12-cv-00499-MHS-

13  CMC, Dkt. No. 1832 (E.D. Tex. Oct. 16, 2014), Garteiser Decl., Exh. 4.  Google's arguments to the

14  contrary run afoul of the requirement that facts and inferences be drawn in Blue Spike's favor, and

15  instead improperly invite the Court to weigh and construe facts only in Google's favor.

16          For the foregoing reasons, Google's 12(c) motion on the pleadings should be summarily

17  denied.  In the alternative, Google's 12(c) motion should be converted to a motion for summary

18  judgment to provide Blue Spike with a full opportunity to present its claim construction positions

19  and expert testimony relevant to the intertwined Section 112/101 issues that Google prematurely

20  raises at this stage of the case.  If the Court grants Google's 12(c) motion on the pleadings, Blue

21  Spike requests leave to amend its complaint.

22          **B.      THE ASSERTED CLAIMS ARE PATENT ELIGIBLE UNDER 35 U.S.C. §**

23                  **101.**

24          Even assuming, *arguendo*, that Google's motion is not premature, it should nonetheless be

25  denied on the merits.  The claims of the Patents-in-Suit satisfy both prongs of the *Alice* test, and

26  Google has failed to carry its burden to show otherwise.

27          **1.      The Patents-in-Suit Are Not Directed to "Abstract Ideas."**

28

GARTEISER HONEA – TRIAL ATTORNEYS

9

1    *First*, the Eastern District of Texas with the assistance of a Court-appointed Technical

2    Advisor has already construed the term "abstract," as just discussed.  *Blue Spike, LLC v. Texas*

3    *Instruments, Inc. et al.*, Case No. 6:12-cv-499-MHS-CMC, Dkt. No. 1831, at *32; Garteiser Decl.,

4    Exh. 1.  That construction results from 15 pages of exhaustive analysis of the parties' positions and

5    evidence, the patent specification, and the prosecution history.  The Eastern District of Texas would

6    not have been able to reach such a detailed construction if the intrinsic evidence were as Google

7    characterizes.

8    *Second*, if the specification were so lacking, the claims would have fallen when the Eastern

9    District of Texas defendants challenged them under 35 U.S.C. § 112.  They did not.  Instead, in light

10   of all the evidence, the Magistrate Judge recommended denying summary judgment that "abstract"

11   was indefinite because the "Court has … determined the 'claims, viewed in light of the specification

12   …, inform those skilled in the art about the scope of the invention with reasonable certainty.'"  *Blue*

13   *Spike, LLC v. Texas Instruments, et al.*, Case 6:12-cv-00499-MHS-CMC, Dkt. No. 1832, at *5;

14   Garteiser Decl., Exh. 4.  The Judge reviewed challenges to the Magistrate Judge's recommendation,

15   and affirmed. *Blue Spike, LLC v. Texas Instruments, et al.*, Case 6:12-cv-00499-MHS-CMC, Dkt.

16   No. 1892, at *4; Garteiser Decl., Exh. 5 ("the claim language, the specification, and prosecution

17   history informs, with reasonable certainty, those skilled in the art about the scope of each of the

18   disputed terms/phrase").  Google cannot carry its burden under Rule 12(c) by simply ignoring these

19   rulings and the evidence on which they were based.

                    **b.       The Claims Contain an Inventive Concept.**

21         As an initial matter, Blue Spike does not agree with Google's assertion (at 9) that claim 1 of

22   the '472 Patent is representative of the asserted claims.  Each asserted claim carries its own statutory

23   presumption of validity, 35 U.S.C. § 282, and by attempting to shoehorn its analysis of all the claims

24   into one, Google has failed to meet its burden.  Exemplary differences among the claims are

25   discussed in more detail below.

26         On the merits, Google's generic analysis fails.  Google contends (at 17-18) that the neither

27   the "abstract" limitation nor "any of the remaining claim limitations" reflect anything inventive.  As

28   to "abstract," that limitation is a key inventive concept of the asserted claims.  The specification

**GARTEISER HONEA – TRIAL ATTORNEYS**

1    Here, the asserted claims do not recite a mere manipulation of a public or private legal

2  obligation or business risk, but rather are directed to manipulation of data representing tangible

3  objects, including actual objects (such as an iris in the biometrics context), visual arts, video, and

4  audio samples.  More specifically, the patents claim a method for creating signal abstracts, which are

5  manipulations of the data signal in question, for the useful purpose of being able to compare one

6  abstract with another.  Contrary to Google's reading of the claims at issue, the signal abstract is

7  more than a copy of the underlying object – rather, it requires the data be transformed (e.g., "data

8  reduced," as construed by the Eastern District of Texas) in order to be a useful tool in signal

9  differentiation and identification.  That data reduction transformation imposes a meaningful limit on

10  the claims' scope, strongly supporting eligibility.

11  **VI.    CONCLUSION**

12    Because Google's motion is prematurely based on disputed claim construction issues and

13  underlying Section 112 questions of fact, Blue Spike requests the Court to deny the present 12(c)

14  motion.  In the alternative, Blue Spike requests the Court to convert Google's 12(c) motion to one of

15  summary judgment under FRCP 12(d) where the record may be more fully developed, including

16  claim construction proceedings and expert testimony.

17    Google's motion should be denied on the merits as well.  Blue Spike respectfully urges the

18  Court to follow governing Federal Circuit precedent where the claims at issue here are both 1)

19  securely anchored to a computer technology under *DDR Holdings*, and 2) provide an "inventive

20  concept".  In the alternative, Blue Spike seeks leave to amend its First Amended Complaint.

21

22

23  Dated:   June 9, 2015                              Respectfully submitted,

24                                                              /s/ Randall T. Garteiser
                                                              Randall T. Garteiser

25                                                                California Bar No. 231821
                                                                rgarteiser@ghiplaw.com

26                                                              Christopher A. Honea
                                                                California Bar No. 232473

27                                                                chonea@ghiplaw.com
                                                              Ian N. Ramage

28                                                                California Bar No. 224881

GARTEISER HONEA – TRIAL ATTORNEYS

1

Randall T. Garteiser (CBN 231821)
2
rgarteiser@ghiplaw.com
3
Christopher A. Honea (CBN 232473)
chonea@ghiplaw.com
4
Ian N. Ramage (CBN 224881)
iramage@ghiplaw.com
5
Kirk J. Anderson (CBN 289043)
kanderson@ghiplaw.com
6
Molly A. Jones (CBN 301419)
7
GARTEISER HONEA, P.C.
119 W Ferguson St.
8
Tyler, Texas 75702
Telephone:  (903) 705-7420
9
Facsimile:  (888) 908-4400

10

Attorneys for Plaintiff
11
BLUE SPIKE, LLC

12

13     **IN THE UNITED STATES DISTRICT COURT**

14     **FOR THE NORTHERN DISTRICT OF CALIFORNIA**

15     **OAKLAND DIVISION**

16

17
BLUE SPIKE, LLC                    | Civil Case No.: 4:14-cv-01650-YGR
18
          Plaintiff,
19                                     | **DECLARATION OF YANNIS**
20    v.                               | **PAPAKONSTANTINOU, PH.D. IN**
                                       | **SUPPORT OF BLUE SPIKE, LLC'S**
                                       | **OPPOSITION TO GOOGLE INC.'S**
21    GOOGLE INC.                      | **MOTION FOR JUDGMENT ON THE**
                                       | **PLEADINGS**
22           Defendant.
23

24
                                       | Hon. Yvonne Gonzalez Rogers
25

26     **I.     INTRODUCTION**

27     1.      In this litigation, Plaintiff Blue Spike, LLC ("Blue Spike") has asserted that Defendant

28     Google Inc. ("Google") has infringed U.S. Patent Nos. 7,346,472 ("the '472 Patent"), 7,660,700

GARTEISER HONEA – TRIAL ATTORNEYS

1   ("the '700 Patent"), 7,949,494 ("the '494 Patent"), 8,214,175 ("the '175 Patent"), and 8,712,728

2   ("the '728 Patent") (collectively with the '472, '700, '494, '175, and '728 Patents, "the Patents-in-

3   Suit"), assigned to Blue Spike. I have been retained by counsel for Blue Spike to offer my opinion

4   on matters relating to the scope and content of the asserted claims of the Patents-in-Suit.

5   2.      I am being paid for my work in this litigation at the rate of $450 per hour. My compensation

6   does not depend on the outcome of this litigation. I have no personal interest in the outcome.

7   3.      I received a Diploma of Electrical and Computer Engineering from the National Technical

8   University of Athens in Athens, Greece in 1990. In 1994, I received a M.S. in Computer Science

9   from Stanford University, and in 1997, I received a Ph.D. in Computer Science from Stanford

10  University. The title of my thesis was "Query Processing in Heterogeneous Information Systems."

11  4.      Since the Fall of 1996 I have been in the faculty of the Computer Science and Engineering

12  Department of the University of California, San Diego. From July 1997 to June 2003, I was an

13  Assistant Professor in the Department of Computer Science and Engineering at the University of

14  California, San Diego. From July 2003 to June 2007 was a tenured Associate Professor. In July

15  2007, I became a Full Professor. During these years I have taught multiple courses, including

16  Discrete Mathematics and Probability for Computer Science, Database Application Development,

17  Web Application Development and Principles of Database Systems.

18  5.      In June 1997 and July 1999, I worked as a visiting research associate in the Computer

19  Science Departments of Stanford University and as Assistant Professor in the Department of

20  Computer Science at the University of California, San Diego. Additionally, from 1998 to 1999, I

21  consulted for Indicast Inc. and HelixTech Inc.

22  6.      Beginning in June 2003 through the present, I have consulted with various technology

23  companies and law firms regarding intellectual property and technology issues. My consulting

24  activities are outlined in my curriculum vitae.

25  7.      My research spans database (recently including the storage and querying of sensor data) and

26  Internet-related technologies. I have published over eighty-five research articles in scientific

27  conferences and journals, given tutorials at major conferences, and served on journal editorial boards

28  and program committees for numerous international conferences and symposiums. I was the co-

GARTEISER HONEA – TRIAL ATTORNEYS

GARTEISER HONEA – TRIAL ATTORNEYS

1  Chair of WebDB 2002, the General Chair of ACM SIGMOD 2003, the co-Chair of XIME-P 2004

2  and the Vice PC Chair for the "XML, Metadata and Semistructured Data" track of IEEE ICDE 2004.

3  I will be the Program Chair of the 2017 IEEE International Conference of Data Engineering. In

4  1998, I received the NSF CAREER award for my work on integrating heterogeneous data. In 2000, I

5  founded Enosys Software, which built the first generally available distributed XQuery processor for

6  information integration (EII), was subsequently acquired by BEA in 2003, and its product is now

7  sold under the BEA Liquid Data brand name.

8  8.      Attached hereto as Exhibit A is a true and correct copy of my curriculum vitae ("CV"). My

9  CV includes a listing of publications I have authored over the last ten (10) years.

10 9.      I have testified once in a legal proceeding regarding a legal matter in which I was involved as

11 an expert. That matter is unrelated to the present lawsuit.

12 10.     In connection with my retention in this matter, I have reviewed the Patents-in-Suit and

13 relevant excerpts of their file histories.

14 11.     This declaration is based on my education, professional career and relevant experiences, as

15 well as the materials reviewed. All of the opinions stated in this declaration are based on my own

16 personal knowledge and professional judgment; if called as a witness in this matter, I am prepared to

17 testify competently about them.

18

19 **II.      PERSONS OF ORDINARY SKILL IN THE ART**

20 12.     I am informed that the Court in the Eastern District of Texas found "that a person of ordinary

21 skill in the art would have at least a Bachelor's degree in electrical engineering, computer science, or

22 equivalent degree, with a background and at least two years' experience in signal processing, image

23 processing, biometric identification, or a related field."  Docket No. 1831, *Affirmed*, Docket No.

24 1894.

25

26 **III.     PRACTICING THE ASSERTED METHODS OF THE PATENTS-IN-SUIT**
   **REQUIRES MACHINERY AND CANNOT BE PERFORMED SOLELY BY THE**
27 **HUMAN MIND.**

28 13.     The Patents-in-Suit require the creation of an abstract.  I refer to the following two excerpts

1   from the '472 Patent:

2       • While psychoacoustic and psychovisual compression has
3         some relevance to the present invention, additional data
          reduction or massive compression is anticipated by the
4         present invention. It is anticipated that the original signal
          may be compressed to create a realistic or self-similar
5         representation of the original signal, so that the compressed
          signal can be referenced at a subsequent time as unique
6         binary data that has computational relevance to the original
          signal. Depending on the application, general data reduction
7         of the original signal can be as simple as massive
          compression or may relate to the watermark encoding
8         envelope parameter (those bits which a watermarking
          encoding algorithm deem as candidate bits for mapping
9         independent data or those bits deemed imperceptible to
          human senses but detectable to a watermark detection
10        algorithm).
11

12        Col. 7, lines 46-60.

13      • Linear predictive coding (LPC), z-transform analysis, root
14        mean square (rms), signal to peak, may be appropriate tools
          to measure signal characteristics, but other approaches or
15        combinations of signal characteristic analysis are
          contemplated. While such signal characteristics may assist in
16        determining particular applications of the present invention,
17        a generalized approach to signal recognition is necessary to
          optimize the deployment and use of the present invention.
18

19        Col. 4, lines 24-32.

20      As one of skill in the art, I declare that abstract creation requires use of a computing device

21   configured to utilize data-reduction techniques, examples of which are psychoacoustic and

22   psychovisual models as well as related signal processing techniques (such as LPC, z-transforms, and

23   rms, and signal to peak).  Such techniques would not be capable of being performed mentally by a

24   human.

25   14.    Specifically, it is my opinion that one of ordinary skill in the art would have understood that

26   a data processor and related hardware (e.g., a storage medium) are required to perform functions

27   necessary to create signal abstracts.  A person having ordinary skill in the art reading the entire

28   patent would not have understood the terms data processor and storage medium to include humans.

GARTEISER HONEA – TRIAL ATTORNEYS

I declare that it would be impossible for the invention of the asserted claims of the Patents-in-Suit to be performed entirely by humans, and that practicing the invention of the asserted claims of the Patents-in-Suit requires use of the machinery disclosed in the patent, configured in light of the specification.

15.     For example, claim 8 of the '175 Patent specifically refers to the processor being "programmed or structured to generate a digital reference signal abstract from a digital reference signal such that said digital reference signal abstract is similar to said digital reference signal and reduced in size compared to said digital reference signal." 16:28-34. Humans do not possess the ability to "process" digital signals in the manner specified in the Patents In Suit, nor can they achieve data-reduction through a mental process alone. Similarly, claim 8 of the '175 Patent requires the processor to be "programmed or structured to generate said digital reference signal abstract from said digital reference signal so that said digital reference signal comprises signal characteristic parameters that differentiate between said plurality of different versions of said visual work and said multimedia work." 16:41-46. Although humans may be able to differentiate the real-world versions of digital signals, they lack the ability to differentiate between the digital signals themselves. Even if humans somehow could monitor a plurality of digital signals, differentiate between versions, and ultimately accurately identify a "match," I am certain that they could not achieve differentiation of signal abstracts separated by a single bit. *See* '175 Patent, 10:12-20 (clarifying that "signal abstracts are created using data reduction techniques to determine the smallest amount of data, *at least a single bit*, which can represent and differentiate two digitized signal representations for a given predefined signal set" and that "[abstracts] must have *at least a one bit difference with all other members* of the database to differentiate") (emphasis added). Nor could a human adequately assess the threshold between identifying a small amount of data (potentially a single bit) that differentiates two signals while ensuring that a perceptual relationship to the signals is not lost. Therefore, in my opinion, the Patents-in-Suit address a specific problem of how to differentiate between digital signals, a problem that does not exist outside of the digital realm and which cannot be accomplished by human thought or ability alone.

17.     My opinion regarding the context and scope of the problem to be solved is informed by the

GARTEISER HONEA – TRIAL ATTORNEYS

specification of the Patents-in-Suit.

First, the inventors discuss other prior art technologies, such as digital watermarking, and the weaknesses of those technologies for the purpose of accurately differentiating and identifying digital content. Discussion of these precursor and alternative technologies that are rooted in a digital framework indicates that the invention taught is intended also to address similar problems within that same digital framework.

Second, the specification explicitly describes the invention as "relat[ing] to identification of digitally sampled information, such as images, audio and video," and that the invention is "directed to the identification of a digital signal – whether text, audio, or video – using only the digital signal itself and then monitoring the number of times the signal is duplicated." '175 Patent, 4:51-52, 4:65-5:1.

Third, the specification refers to the problem with the digital sharing of copyrighted content and the necessity for accurate reporting for royalty payment purposes. This suggests that reliance on human thought process alone would be insufficient to achieve the goals of the invention. Rather, the accuracy (down to even a single bit) that is imparted by using the claimed technology (a data-reduced digital signal abstract based on perceptual qualities) is essential. Based on the teachings of the Patents-In-Suit, including the specific specification and claim citations above, in my opinion the invention teaches more than what the human mind can do, and use of computers is critical to solving an issue that ultimately stems from that technological environment.

I declare under penalty of perjury under the laws of the United States that the statements in this declaration are true and correct.

Executed on June _8_, 2015, in Athens, Greece.

/s/ Yannis Papakonstantinou, Ph.D.
Yannis Papakonstantinou, Ph.D.

Civil Case No. 4:14-cv-01650-YGR
Papakonstantinou Declaration In Support of Blue Spike Opposition to Google's Rule 12(c) Motion
Appx2307

GARTEISER HONEA – TRIAL ATTORNEYS

1

## SIGNATURE ATTESTATION

2        Pursuant to L.R. 5-1(i)(3), I hereby attest that I have on file all holographic signatures

3  corresponding to any signatures indicated by a conformed signature (/s/) within this e-filed

   document.

4

                                            /s/ Randall T. Garteiser
5                                           Randall T. Garteiser

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

GARTEISER HONEA – TRIAL ATTORNEYS

Civil Case No. 4:14-cv-01650-YGR
Papakonstantinou Declaration In Support of Blue Spike Opposition to Google's Rule 12(c) Motion

Appx2308

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## TYLER DIVISION

| | | |
|---|---|---|
| BLUE SPIKE, LLC, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | |
| | § | Civil Action No. 6:12-cv-499-MHS-CMC |
| TEXAS INSTRUMENTS, INC., et al., | § | |
| | § | |
| | § | |
| *Defendants.* | § | |
| | § | |

## MEMORANDUM OPINION AND ORDER

The above-referenced case was referred to the undersigned United States Magistrate Judge for pre-trial purposes in accordance with 28 U.S.C. § 636. Before the Court are Plaintiff's Opening Claim Construction Brief (Dkt. No. 1700), and Defendants' response (Dkt. No. 1751), Plaintiff's reply (Dkt. No. 1776).[1] Also before the Court are the parties' Local Patent Rule ("P.R.") 4-3 Joint Claim Construction and Prehearing Statement (Dkt. No. 1674) and P.R. 4-5(d) Joint Claim Construction Chart (Dkt. No. 1791).

A claim construction hearing, in accordance with *Markman v. Westview Instruments, Inc.*, 52 F.3d 967 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996), was held in Tyler on October 1, 2014. After hearing the arguments of counsel and reviewing the relevant pleadings, presentation materials, other papers, and case law, the Court finds the disputed terms of the patents-in-suit should be construed as set forth herein.

---

[1] The parties also dispute whether a number of the terms are indefinite, and in the alternative, Defendants provided a construction for these terms. Thus, the Court also considered Defendants' Motion for Summary Judgment of Invalidity Based on Indefiniteness Under 35 U.S.C. § 112(b) and the related briefing (Dkt. Nos. 1752, 1785, 1803) when construing the disputed terms/phrases.

determining the level of skill in the art, the Court finds that a person of ordinary skill in the art would have at least a Bachelor's degree in electrical engineering, computer science, or equivalent degree, with a background and at least two years' experience in signal processing, image processing, biometric identification, or a related field.

## IV.    CONSTRUCTION OF AGREED TERMS

The Court hereby adopts the following agreed-upon constructions:

| Term | Patents / Claims | Agreed Construction |
|------|------------------|---------------------|
| "hashed abstract" | '700 patent, claims 11, 50; '494 patent, claims 21 | "data that results from performing a Hash on an Abstract" |
| "perceptible characteristic" | '700 patent, claim 8; '494 patent, claims 5, 18 | "characteristic perceived by a person" |
| "cognitive characteristic" | '700 patent, claim 8; '494 patent, claim 18 | "characteristic understood by a person" |
| "subjective characteristic" | '700 patent, claim 8; '494 patent, claim 18 | "characteristic perceived differently by different people" |
| "perceptual quality" | '700 patent, claim 8; '494 patent, claim 18 | "quality perceived by a person" |
| "cognitive feature" | '494 patent, claims 5, 18 | "a feature that is understood by a person" |

Dkt. No. 1674 at 3.

The parties also agreed that the following terms do require construction and should be given their ordinary meaning as understood by a person of ordinary skill in the respective art:

- Digital reference signal abstract
- Query signal abstract
- Digital representation
- First digital reference signal abstract
- Signal
- Identifies
- Identifying
- Recording

- To be identified
- Digital representation of one of a plurality of different versions of a visual work and a multimedia work

Dkt. No. 1674 at 2.

During the claim construction hearing, the Court provided the parties with proposed constructions for the disputed terms/phrases. The parties agreed to the Court's proposed construction for the following terms:

| Claim Term/Phrase | Agreed Construction |
|---|---|
| "digital" | plain and ordinary meaning |
| "cryptographic protocol" | "procedure for transforming data to secure it and enhance its uniqueness and identification" |
| "hash" | "a mathematical transform that maps a bit string of arbitrary length to a fixed length bit string to achieve uniqueness" |
| "reduced in size" | plain and ordinary meaning |
| "perceptual characteristics representative of parameters to differentiate between versions of the reference signal" | plain and ordinary meaning |
| "signal characteristic parameters configured to differentiate between versions of said reference signal" | plain and ordinary meaning |
| "signal characteristic parameters configured to differentiate between a plurality of versions of the reference signal." | plain and ordinary meaning |
| "signal characteristic parameters configured to differentiate between other versions of that one of said plurality of reference signals" | plain and ordinary meaning |
| "signal characteristic parameters that differentiate between said plurality of different versions of said visual work | plain and ordinary meaning |

| and said multimedia work" | |
|---|---|
| "reference database" | "a database containing abstracts of reference signals" |
| "recognizable characteristic" | "characteristic visually or aurally perceived by a person" |
| "a compare result" | plain and ordinary meaning |

Regarding the term **"digital,"** the term appears in claims 11, 23, and 50 of the '700 Patent, claim 21 of the '494 Patent, and claims 1-14 of the '175 Patent. The Court finds that the term is used consistently in the claims and is intended to have the same meaning in each claim. The Court further finds that the term, as recited in the claims, is not confusing and is easily understandable by a jury. Moreover, the parties have not articulated a discernable dispute about the scope of this term. Accordingly, the Court agrees with the parties that the term **"digital"** should be given its **plain and ordinary meaning.**

Regarding the term **"cryptographic protocol,"** the term appears in claims 10, 11, 22, and 23 of the '700 Patent and claims 6, 20, and 21 of the '494 Patent. The Court finds that the term is used consistently in the claims and is intended to have the same meaning in each claim. The Court further finds that the claim language generally recite applying a cryptographic protocol to the abstract of the reference signal. *See, e.g.*, '700 Patent, claim 22. The specification states the value of applying a "cryptographic protocol":

> The benefits of massive data reduction, flexibility in constructing appropriate signal recognition protocols and incorporation of cryptographic techniques to further add accuracy and confidence in the system are clearly improvements over the art. For example, where the data reduced abstract needs to have further uniqueness, a hash or signature may be required. And for objects which have further uniqueness requirements, two identical instances of the object could be made unique with cryptographic techniques.

'472 Patent at 10:45–50. The specification adds that "[i]n applications where the data to be

stated above, the Court finds the term "index of relatedness" should be construed to mean "an index that provides a degree of differentiation."

### 3. Court's Construction

In light of the intrinsic and extrinsic evidence, the Court construes the term **"index of relatedness"** to mean **"an index that provides a degree of differentiation."**

## VI.    CONCLUSION

The Court hereby orders the claim terms addressed herein construed as indicated. Summary charts are attached below as Exhibit A (agreed terms) and Exhibit B (disputed terms).

The parties are further ordered that they may not refer, directly or indirectly, to each other's claim construction positions in the presence of the jury.  Likewise, the parties are ordered to refrain from mentioning any portion of this opinion, other than the actual constructions adopted by the Court, in the presence of the jury.  Any reference to claim construction proceedings is limited to informing the jury of the constructions adopted by the Court.

**SIGNED this 16th day of October, 2014.**

CAROLINE M. CRAVEN
UNITED STATES MAGISTRATE JUDGE

**EXHIBIT A**

| Agreed Claim Term | Construction |
|---|---|
| "hashed abstract" | "data that results from performing a Hash on an Abstract" |
| "perceptible characteristic" | "characteristic perceived by a person" |
| "cognitive characteristic" | "characteristic understood by a person" |
| "subjective characteristic" | "characteristic perceived differently by different people" |
| "perceptual quality" | "quality perceived by a person" |
| "cognitive feature" | "a feature that is understood by a person" |
| "digital" | plain and ordinary meaning |
| "cryptographic protocol" | "procedure for transforming data to secure it and enhance its uniqueness and identification" |
| "hash" | "a mathematical transform that maps a bit string of arbitrary length to a fixed length bit string to achieve uniqueness" |
| "reduced in size" | plain and ordinary meaning |
| "perceptual characteristics representative of parameters to differentiate between versions of the reference signal" | plain and ordinary meaning |
| "signal characteristic parameters configured to differentiate between versions of said reference signal" | plain and ordinary meaning |
| "signal characteristic parameters configured to differentiate between a plurality of versions of the reference signal." | plain and ordinary meaning |

| "signal characteristic parameters configured to differentiate between other versions of that one of said plurality of reference signals" | plain and ordinary meaning |
|---|---|
| "signal characteristic parameters that differentiate between said plurality of different versions of said visual work and said multimedia work" | plain and ordinary meaning |
| "reference database" | "a database containing abstracts of reference signals" |
| "recognizable characteristic" | "characteristic visually or aurally perceived by a person" |
| "a compare result" | plain and ordinary meaning |

**EXHIBIT B**

| Disputed Claim Term | Court's Construction |
|---|---|
| "abstract" | "a data-reduced representation of a signal that retains a perceptual relationship with the signal and differentiates the data-reduced representation from other data-reduced representations" |
| "match"/"matches"/"matched"/"matching" | "match" – "share selected criteria" <br> "matches" – "shares selected criteria with" <br> "matched" – "shared selected criteria with" <br> "matching" – "sharing selected criteria" |
| "reference signal" | "original or first signal" |
| "query signal" | "second signal" |
| "a comparing device that compares/ a comparing device....that compares/ a comparing device for comparing" | plain and ordinary meaning |
| "a device configured to determine if a query signal matches any one plurality of reference signals" | plain and ordinary meaning |
| "versions of [a/the/said/"that one of said plurality of"] reference signal[s]" | plain and ordinary meaning |
| "similar to" | "retaining a perceptual relationship" |
| "creating at least one counter corresponding to one of said at least one reference signal" / "creating at least one counter corresponding to one of said plurality of reference signals" | plain and ordinary meaning |
| "incrementing the counter....when a match is found," | plain and ordinary meaning |
| "first digital reference signal abstract match recorder" | plain and ordinary meaning |
| "selectable criteria" | "criteria that are programmable" |
| "distributing at least one signal based on the comparison step" | plain and ordinary meaning |

| "related to" | "shares selected criteria with" |
| "index of relatedness" | "an index that provides a degree of differentiation" |

**ARNOLD & PORTER LLP**
Michael A. Berta (SBN 194650)
Three Embarcadero Center, 7th Floor
San Francisco, CA 94111
Phone: (415) 471-3100
Fax: (415) 471-3400
michael.berta@aporter.com

Nicholas H. Lee (SBN 259588)
777 S. Figueroa Street, 44th Floor
Los Angeles, CA 90017
Phone: (213) 243-4000
Fax: (213) 243-4199
nicholas.lee@aporter.com

*Attorneys for Defendant Google Inc.*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**OAKLAND DIVISION**

| | |
|---|---|
| BLUE SPIKE, LLC,<br><br>                    Plaintiff,<br><br>        v.<br><br>GOOGLE INC.,<br><br>                    Defendant. | Case No. 14-cv-01650 (YGR)<br><br>**DEFENDANT GOOGLE INC.'S REPLY BRIEF IN SUPPORT OF MOTION FOR JUDGMENT ON THE PLEADINGS PURSUANT TO FED. R. CIV. P. 12(c) (DKT. # 59)**<br><br>Hearing Date:  Tuesday, June 30, 2015<br>Hearing Time:  9:00 a.m.<br>Courtroom:       Courtroom 1, 4th Floor<br>Judge:              Hon. Yvonne Gonzalez Rogers |

# TABLE OF CONTENTS

Page

I.   INTRODUCTION ............................................................................................ 1

II.  BLUE SPIKE'S OPPOSITION CONFIRMS THAT THE ASSERTED
     CLAIMS ARE DIRECTED TO AN ABSTRACT IDEA ...................................... 3

III. BLUE SPIKE FAILS TO POINT TO ANY MEANINGFUL LIMITATIONS
     ON THE CREATION OR USE OF AN ABSTRACT THAT SAVE IT
     FROM BEING AN UNPATENTABLE ABSTRACT IDEA .................................. 5

IV.  THE ASSERTED CLAIMS FAIL TO ADD ANYTHING INVENTIVE TO
     THE ABSTRACT IDEA OF USING AN "ABSTRACT" ON A
     COMPUTER ................................................................................................... 9

     A.   Blue Spike's Arguments About the Alleged Inventiveness of Using An
          "Abstract" Cannot Confer Patentability Because They Fail To Provide
          Any Meaningful Limitations On The Idea of Using An "Abstract," As
          Required ................................................................................................. 9

     B.   Prior Art And Well-Known Techniques Do Not Provide An Inventive
          Concept ................................................................................................. 11

V.   CONCLUSION .............................................................................................. 15

# TABLE OF AUTHORITIES

Page(s)

**CASES**

*Alice Corp. Pty. Ltd. v. CLS Bank Int'l.,*
134 S. Ct. 2347 (2014) ("*Alice*")..............................................................................passim

*Almeranth, Inc. v. Genesis Gaming Solutions, Inc.,*
No. 11-cv-189, 2014 WL 7012391 (C.D. Cal. Nov. 14, 2014)....................................8

*Amdocs (Israel) Ltd. v. Openet Telecom, Inc.,*
No. 10-cv-910, 2014 WL 5430956 (E.D. Va. Oct. 24, 2014)......................................15

*Bascom Research, LLC v. LinkedIn, Inc.,*
No. 12-cv-062893, 2015 WL 149480 (N.D. Cal. Jan. 5, 2015).....................................4

*Content Extraction and Transmission, LLC v. Wells Fargo Bank, Nat. Ass'n.,*
776 F.3d 1343 (Fed. Cir. 2014)..............................................................................9, 14

*CyberSource Corp. v. Retail Decisions, Inc.,*
654 F.3d 1366 (Fed. Cir. 2011)..............................................................................5, 7

*DDR Holdings, LLC v. Hotels.com, L.P.,*
773 F.3d 1245 (Fed. Cir. 2014)..........................................................................6, 7, 8

*Digitech Image Techs., LLC v. Electronics for Imaging, Inc.,*
758 F.3d 1344 (Fed. Cir. 2014)....................................................................11, 12, 13

*Enfish, LLC v. Microsoft Corp.,*
56 F. Supp. 3d 1167 (C.D. Cal. 2014)..........................................................3, 4, 11

*Gametek LLC v. Zynga, Inc.,*
No. 13-cv-2546, 2014 WL 1665090 (N.D. Cal. Apr. 25, 2014)..................................15

*Gottschalk v. Benson,*
409 U.S. 63, 93 S. Ct. 253 (1972)................................................................................7

*I/P Engine, Inc. v. AOL Inc.,*
576 Fed. Appx. 982 (Fed. Cir. 2014)...........................................................................4

*Intellectual Ventures II LLC v. JP Morgan Chase & Co.,*
No. 13-cv-3777, 2015 WL 1941331 (S.D.N.Y. Apr. 28, 2015)...............................2, 11, 12

*IpLearn, LLC v. K12 Inc.,*
No. 11-cv-1026, 2014 WL 7206380 (D. Del. Dec. 17, 2014).................................5, 8

*Kroy IP Holdings, LLC v. Safeway, Inc.,*
No. 12-cv-800, 2015 WL 3452469 (E.D. Tex. May 29, 2015)..............................9, 14

*Mayo Collaborative Servs. v. Prometheus Labs., Inc.,*
132 S. Ct. 1289 (2012)............................................................................................2, 3

*McRO, Inc. v. Codemasters Inc.*,
No. 14-cv-439, 2014 WL 4762989 (C.D. Cal. Sept. 22, 2014) ................................11, 13, 15

*Messaging Gateway Solutions, LLC v. Amdocs, Inc. et al.*,
No. 14-cv-732, 2015 WL 1744343 (D. Del. Apr. 15, 2015)......................................................8

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
134 S. Ct. 2120 (2014) ...........................................................................................................15

*Open Text S.A. v. Box, Inc.*,
No. 13-cv-4910, 2015 WL 269036 (N.D. Cal. Jan. 20, 2015)......................................3, 4, 14

*OpenTV, Inc. v. Netflix Inc.*,
No. 14-cv-01525-RS, 2014 WL 7185921 (N.D. Cal. Dec. 16, 2014) ...................................15

*Planet Bingo v. VKGS LLC*,
576 Fed. Appx. 1005 ........................................................................................................3, 5, 7

*Smart Flash, LLC et al. v. Apple Inc. et al.*,
No. 13-cv-447, 2015 WL 661174 (E.D. Tex. Feb. 13, 2015) ..................................................8

*TPQ Development, LLC v. Intuit Inc.*,
No. 12-cv-180, 2014 WL 651935 (E.D. Tex. Feb. 19, 2014).................................................8

**DOCKETED CASES**

*Fidelity Nat'l. Information Svcs., Inc. v. Datatreasury Corp.*,
CBM2014-00020, Doc. No. 34 (Apr. 29, 2015), attached as Appendix A......................3, 12

*OIP Technologies, Inc. v. Amazon.com, Inc.*,
No. 2012-1696, Dkt. # 59 (Fed. Cir. June 11, 2015), attached as Appendix B ....................12

**STATUTES, RULES AND REGULATIONS**

35 U.S.C. § 101 ..............................................................................................................passim

35 U.S.C. § 112 ...............................................................................................................10, 15

I.     **INTRODUCTION**

Blue Spike's Opposition (Dkt. # 63) confirms that the claims at issue should be rejected under 35 U.S.C. § 101.

As discussed in Google's opening papers, a § 101 analysis proceeds by first identifying the purpose of the alleged invention, and then asking if that purpose is an abstract idea. *See Alice Corp. Pty. Ltd. v. CLS Bank Int'l.*, 134 S. Ct. 2347, 2355 (2014) ("*Alice*"). Then, the analysis proceeds to a second step of examining whether the claims of the patents place some limits on the implementation of the abstract idea to take it out of the realm of unpatentability. *Id*. Here, there is no real factual dispute between the parties as to the purpose of, or limits to, the claims; instead, Blue Spike's Opposition either creates the appearance of disputes that actually support Google's position, relies on claim limitations that cannot confer patentability as a matter of law, or simply conflates the analytic steps of the § 101 analysis in an attempt to confuse away the issue of unpatentability.

For example, as to the first prong of the *Alice* inquiry, Blue Spike asserts that the idea of the patents is the use of an "abstract," and that, because the term "abstract" was construed in Texas, its claims are not invalid under § 101. This argument fails. Even assuming that the idea of the patents is the use of an "abstract" for comparing or otherwise analyzing works, the Texas claim construction expressly confirms that the "abstract" of an original work is merely a smaller ("data-reduced") version of the work that "retains a perceptual relationship with the original." And, the Texas court confirmed that the "perceptual relationship" required for the "abstract" is a quality of the original work that is "perceived by a person." Thus, according to the Texas court, an "abstract" is, definitionally, no more or less than a smaller version of an original work that retains human-perceived qualities of the original. But, this is the very idea discussed in Google's opening papers – *i.e.*, that an "abstract" matches what humans otherwise do. Blue Spike's reliance on the Texas claim construction only confirms that the use of an "abstract" is an abstract idea under the first prong of the § 101 analysis.

Blue Spike then argues that because its claims require a computer, this saves them from being an abstract idea under § 101. But, this argument has been expressly rejected by the Supreme Court. Blue Spike's claims are no different than all of the other unpatentable claims that have been

held invalid under § 101, where they claim an abstract idea and then say "do it on a computer." Similarly, Blue Spike argues that, because its patents were found to be patentable over prior art containing other ways to compare works, this also saves the claims under § 101. This is likewise incorrect as a matter of law. Because there are other ways to compare digitized versions of works does not mean that the way in which Blue Spike is claiming to compare digitized works is patentable. The one is irrelevant to the other. That others have come up with different ways to compare works does not change what the abstract idea of these patents is. The question is not whether there are other ideas out there, rather once the abstract idea of a claimed invention is identified, the question under a § 101 analysis (*i.e.*, the second prong of the analysis) is whether the abstract idea *that Blue Spike is claiming* is meaningfully limited to confer patentability on that idea. And here, as discussed in Google's opening papers, there are no meaningful limitations on Blue Spike's claim to the idea of using an "abstract": the asserted claims merely state use a human-perceptible portion of an original work (as the "abstract" of that work) and "do that on a computer." Indeed, in defending its patents, Blue Spike indirectly confirms that it is claiming all ways of using an "abstract" by asserting that "pioneering" inventions are entitled to a broad scope and thus a broad application. But, Blue Spike is wrong. If the idea of an "abstract" is an abstract idea (which it is, as confirmed by at least the Texas construction upon which Blue Spike relies), then claiming all ways of using the "abstract" exactly fails prong two of the § 101 analysis.

Finally, Blue Spike fails to rebut the showing in Google's opening papers that the other limitations of its claims confer patent eligibility on the otherwise unpatentable idea of using an "abstract" (the showing also required by the second part of the § 101 analysis). The law is clear that combining generic computer implementations or prior art methods with an abstract idea are insufficient to meaningfully limit that idea to a particular implementation. Because the remaining claim limitations at issue here are all either generic computer functions or expressly acknowledged in the specification as known prior art techniques, Blue Spike cannot show patentability under § 101. *See Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 132 S. Ct. 1289, 1298 (2012) (rejecting "well-understood, routine, conventional activity" as a basis to confer patentability on an otherwise unpatentable abstract idea); *Intellectual Ventures II LLC v. JP Morgan Chase & Co.*, No.

13-cv-3777, 2015 WL 1941331, at *14 (S.D.N.Y. Apr. 28, 2015) (finding encryption/decryption "well-understood, routine, conventional activity" implementing mathematical formulas); *Fidelity Nat'l. Information Svcs., Inc. v. Datatreasury Corp.*, CBM2014-00020, Doc. No. 34 (Apr. 29, 2015) at 13 (finding generic use of longstanding mathematical techniques poses a risk of unacceptable preemption); *Alice Corp.*, 134 S. Ct. at 2356 (rejecting claims direct to "organizing human activity"); *Planet Bingo v. VKGS LLC*, 576 Fed. Appx. 1005 at 1006-07 (finding invalid as an abstract idea claims directed to mental steps that a human can perform); *see also* Dkt. # 60-3 at cols. 1:64-2:6, 4:8-11 (admitting data reduction is done using well-known and standard compression techniques, e.g., MPEG). Simply put, the asserted claims are "designed to monopolize [the ineligible concept] itself" and the Court should find them invalid. *See Enfish, LLC v. Microsoft Corp.*, 56 F. Supp. 3d 1167, 1175 (C.D. Cal. 2014) (citing *Mayo*, 132 S. Ct. at 1297).[1]

## II.   BLUE SPIKE'S OPPOSITION CONFIRMS THAT THE ASSERTED CLAIMS ARE DIRECTED TO AN ABSTRACT IDEA

It is undisputed that under the first prong of *Alice*, the Court must – at some level of generality – "identify the purpose of the claim," *i.e.*, "determine what the claimed invention is trying to achieve," and then assess whether that purpose is abstract. *See Enfish*, 56 F. Supp. 3d at 1173; *Open Text S.A. v. Box, Inc.*, No. 13-cv-4910, 2015 WL 269036, at *1, 2 (N.D. Cal. Jan. 20, 2015). Blue Spike does not dispute that the general purpose of the asserted claims is to compare one signal to another using perceptible qualities of the signals, as Google set forth. (*Compare* Dkt. # 59 at 12-13 *with* Dkt. # 63 at 11-12.) In an attempt to make the claims appear more complex than they actually are, it disputes only whether the claimed "abstract" should be considered part of the claims' purpose under the first prong of *Alice*. (*See* Dkt. # 63 at 11; *id.* at 19 (arguing that the claims "specify ***a particular method of comparison***, namely, creation of signal abstracts, a specific technological construct" that has been construed in Texas) (emphasis added).) As Google explained in its opening brief, the claimed "abstract" is the way in which the claims allegedly carry out their

---

[1] Blue Spike's alternative request to amend its First Amended Complaint (Dkt. # 63 at 1, 20) should be denied as no pleading allegations implicating the asserted patents will impact the Court's determination that the asserted claims are invalid under § 101. Indeed, Blue Spike makes no effort to indicate what such an amendment would accomplish or how it then affects the Court's decision.

purpose of comparing two or more signals, *i.e.*, the "abstract" is the purported **implementation** that is properly considered under prong two of *Alice*. *Enfish*, 2014 WL 5661456 at *4 (under the first prong of *Alice*, the court must – at a high level – "identify the purpose of the claim" by "determin[ing] what the claimed invention is trying to achieve"); *Open Text v. Box*, 2015 WL 269036 at *1 (distinguishing between the "core concept" for first part of *Alice* test as compared to its "implementation" for second part of test). Blue Spike cannot save its claims by arguing in circular fashion that the purpose of the claims is to use an "abstract" to compare signals. The claims are clear that their purpose is to compare one thing to another (a "reference signal" and a "query signal") and the "abstract" is the way in which the comparison occurs (creating and storing an "abstract" for each signal, and then comparing the "abstracts"). (*See* Dkt. # 59 at 8-10.)

Nevertheless, even if the idea of the claims under the first prong of the *Alice* analysis is the use of an "abstract," as Blue Spike contends, this only proves that the asserted claims are directed to an abstract idea. As discussed in Google's opening papers, because the common specification explains that an "abstract" is simply a portion of the original work that retains a human-perceptible relationship to the original, this is definitionally an abstract idea that otherwise comports with human behavior. (*See* Dkt. # 59 at 12-15.) Blue Spike's only response to this argument is to point to the Texas Court's construction for the term "abstract." (*Id.* at 6-7 ("Google makes no attempt to demonstrate that the claims are ineligible under [the Texas court's] construction [for the term 'abstract'].").)[2]

But, this cannot save Blue Spike, because the Texas construction only affirms Google's position. Specifically, the Texas court construed "abstract" to mean "a data-reduced representation

---

[2] Blue Spike seeks to procedurally attack Google's motion because the Court "has not yet construed the disputed term 'abstract.'" (*See* Dkt. # 63 at 6.) This is a strawman. First, it ignores the myriad cases that have decided § 101 issues on the pleadings before claim construction. *See, e.g.*, *Open Text*, 2015 WL 269036, at *2 (granting judgment on the pleadings on the issue of patentability); *Bascom Research, LLC v. LinkedIn, Inc.*, No. 12-cv-062893, 2015 WL 149480, at *4 (N.D. Cal. Jan. 5, 2015); *I/P Engine, Inc. v. AOL Inc.*, 576 Fed. Appx. 982, 996 (Fed. Cir. 2014) (noting that it is advantageous to address § 101 at the outset of litigation without lengthy claim construction). Second, where, as here, because the Texas claim construction to which Blue Spike points confirms that the patents are directed to an abstract idea, Blue Spike's reliance on the Texas construction cannot create a dispute as a matter of law.

1   of a signal that retains a perceptual relationship with the original and differentiates the data-reduced

2   representation from other data-reduced representations." (*See* Dkt. # 63 at 6-7 (citing Dkt. # 63-3

3   (Exhibit 1)).) And, the Texas court expressly confirmed, consistent with the specification of the

4   asserted patents, that the "abstract's" "perceptual relationship" is predicated on a quality "*perceived*

5   *by a person*." (*See* Dkt. # 63-3 at 66 (acknowledging that a "perceptual" quality is one that is

6   "perceived by a person"); *see also, e.g.*, Dkt # 60-3 at col. 14:58-61 (noting that the invention must

7   "preserve those perceptual qualities that permit a human to recognize the original visual image"); *id.*

8   at col. 4:32-41 (noting "humans" have a "highly effective ability [] to identify and recognize a

9   signal"); *id.* at col. 7:3-7 (noting that the signal compression must "preserve some underlying

10  'aesthetic quality' of the signal"); *id.* at 11:31-45 (explaining that the invention should capture

11  "humanly-perceptible observation"); *id.* at 7:34-40 ("compression successfully mimics human

12  perception" / "compressed to retain what is humanly-perceptible").)

13         Thus, under the Texas construction as well, the use of an "abstract" to analyze works is

14  expressly directed to (on a computer) performing steps that a human could take in analyzing a work.

15  This is precisely the type of subject matter that is abstract under § 101. *See Alice*, 134 S. Ct. at 2356

16  (rejecting claims directed to "organizing human activity"); *Planet Bingo*, 576 Fed. Appx. at 1006-

17  07 (finding invalid as an abstract idea claims for managing and playing Bingo through mental steps

18  that a human can perform); *CyberSource Corp. v. Retail Decisions, Inc.*, 654 F.3d 1366, 1371 (Fed.

19  Cir. 2011) (finding "mental processes" are not patentable subject matter); *IpLearn, LLC v. K12 Inc.*,

20  No. 11-cv-1026, 2014 WL 7206380, at *6 (D. Del. Dec. 17, 2014) (rejecting claims covering the

21  abstract idea directed at "fundamental human behavior")

22         Because the Texas construction only confirms that the idea of the claimed "abstract" is

23  directed to an abstract idea, Blue Spike's arguments regarding the identification of the idea of the

24  patents under the first prong of *Alice* do not provide a substantive basis to deny Google's motion.

**III.   BLUE SPIKE FAILS TO POINT TO ANY MEANINGFUL LIMITATIONS ON THE
25        CREATION OR USE OF AN ABSTRACT THAT SAVE IT FROM BEING AN
26        UNPATENTABLE ABSTRACT IDEA**

27         Blue Spike also argues that an "abstract" is not an abstract idea because it is done on a

28  computer. Indeed, Blue Spike goes on to assert that, because computers may be better at creating

1    and using "abstracts," this saves the claimed "abstract" from being an abstract idea.  Blue Spike is

2    incorrect.

3              For example, Blue Spike asserts that the claims at issue are "rooted in computer technology"

4    and "directed to a technological solution to technological problems of monitoring and analyzing

5    signals" such that they "represent a tangible and concrete technological advancement."  (Dkt. # 63

6    at 10-11.)  However, it is beyond dispute that performing an abstract idea on a computer – indeed,

7    even requiring that the abstract idea must be done on a computer – cannot confer patent eligibility

8    on an abstract idea.  *See Alice*, 134 S. Ct. at 2358-59 ("mere recitation of a generic computer cannot

9    transform a patent-eligible abstract idea into a patent-eligible invention").  Here, just because the

10   asserted claims require that the "abstract" be generated by a computer, does not mean that it is not

11   an abstract idea, especially when the claimed "abstract" is nothing other than a portion of a signal

12   that a human can perceive, as discussed above.

13             Blue Spike's argument is a somewhat ham-handed attempt to assert that the claims at issue

14   here are the same type of claims as those at issue in *DDR Holdings, LLC v. Hotels.com, L.P.*, 773

15   F.3d 1245 (Fed. Cir. 2014), which were found to be patent-eligible.  (*See* Dkt. # 63 at 10.)  These

16   claims are not at all similar to the *DDR Holdings* claims.  The claims at issue in *DDR Holdings*

17   were directed to on-click Internet redirection to an automatically generated hybrid webpage that

18   combined the look and feel of a host-site layout with product information from a third-party

19   merchant.  *See id*. at 1257.  The court held that the claims specified how certain Internet-based

20   interactions can be manipulated to yield a desired result that is different than other Internet-based

21   interactions, *i.e.*, "the routine and conventional sequence of events ordinarily triggered by the click

22   of a [Internet] hyperlink."  *Id.* at 1258.  In other words, the claims were directed to an issue that can

23   only arise on the Internet that is specific to manipulating hyperlink redirections and webpage

24   layouts.  *Id.* at 1257 ("it is a challenge particular to the Internet," *i.e.*, "retaining website visitors").[3]

25             In seeking to compare itself to *DDR Holdings*, Blue Spike argues that the asserted patents

26

27   _____

     [3] As a technical matter, the court's reasoning in *DDR Holdings* appears to rest on the second prong
28   of the *Alice* test.  *See* 773 F.3d at 1257 ("the '399 patent's claim satisfy *Mayo/Alice* step two").

1   address the "problem" of "monitoring and analyzing signals." (*See* Dkt. # 63 at 10.) Blue Spike

2   asserts that, because "signals" are computer representations of works, the claims are thus

3   specifically directed to only computer-based activity and thus only arise in the context of a

4   computer. First, this is nothing more than arguing that "requiring a computer" is sufficient to confer

5   patent eligibility. As discussed above, the Supreme Court has held otherwise – just because a claim

6   is limited to a computer environment does not make it patent-eligible. *See Alice*, 134 S. Ct. at 2358-

7   59. Here, just because Blue Spike's claims are limited to comparing digital forms of works (a form

8   in which they would have to be in order to exist on a computer), does not mean that the idea of

9   comparing two works by using an "abstract" is not an abstract idea.

10          Second, unlike in *DDR Holdings*, the specification here ***expressly*** confirms that the alleged

11  invention is not limited to only things a computer could do:

12              While digital representations of analog waveforms may be analyzed by
               perceptually-based or perceptually-limited analysis[,] it is usually costly and time-
13              consuming to model the processes of *the highly effective ability of humans to
               identify and recognize signals*.
14

15  (*See* Dkt. # 60-3 at col. 4:32-36 (emphasis added).) And, unlike the claimed solution in *DDR*

16  *Holdings* (which was limited solely to Internet-based operations), Blue Spike's alleged solution –

17  *i.e.*, "the generation of a data-reduced abstract signals [sic] based on *perceptual characteristics*"

18  (Dkt. # 63 at 11) – definitionally relies on human perceptibility that exists outside any digital realm.

19  (*See* Dkt. # 59 at 6, 12-15 (explaining that the asserted patents are directed to a substitute for human

20  recognition of non-identical content).) In other words, the asserted claims are not a tangible and

21  concrete technological advancement that is patentable; rather, they are defined in the specification

22  (and in the Texas claim construction Blue Spike relies upon) to be no more and no less than a

23  computer substitute for a human activity. This is a non-patentable abstract idea. *See Alice*, 134 S.

24  Ct. at 2356 (claims directed to "organizing human activity" are abstract ideas and not patentable);

25  *Gottschalk v. Benson*, 409 U.S. 63, 67, 93 S. Ct. 253 (1972) (method that can be "done mentally"

26  without a computer is an abstract idea and not patentable); *Planet Bingo*, 576 Fed. Appx. at 1006-7

27  (method encompassing abstract idea of managing and playing Bingo consists of mental steps that

28  can be carried out by a human using pen and paper); *CyberSource*, 654 F.3d at 1371 (following the

Supreme Court, "we have similarly held that mental processes are not patent-eligible subject matter …"); *IpLearn*, 2014 WL 7206380, at *6 (claims covering abstract idea of educational instruction, evaluation and review address "fundamental human behavior").[4]

  In pressing its argument that there is something special about these "do it on a computer" claims, Blue Spike declares that an "abstract" of an original signal is "more helpful than the signal itself" and "does more than a human is capable of performing" (*see* Dkt. # 63 at 12), relying on the declaration of a hired expert. There are two fundamental problems with this assertion. First, of course, the expert fails to point to any language in the claims that **requires** that the "abstract" be more helpful than the signal, or that the "abstract" provide for more than what a human is capable of doing. (*See generally* Dkt. # 63-11.) Thus, his statement is irrelevant as to whether the <u>claims</u> are meaningfully limited in any way, which would be required to save them from patent-ineligibility. Second, the expert's statement contradicts the specification and the Texas claim construction on which Blue Spike relies. As discussed above, an "abstract" is a portion of a signal that retains a **human-perceived** relationship with the original signal. An argument that this is something beyond what humans can do is nonsensical. (*Compare* Dkt. # 63-11, ¶ 15 (expert arguing that humans "lack the ability to differentiate between the digital signals themselves"), *with* Dkt. # 63 at 6-7

---

[4] The other cases Blue Spike relies upon are also inapposite. *Messaging Gateway Solutions, LLC v. Amdocs, Inc. et al.*, No. 14-cv-732, 2015 WL 1744343, at *5 (D. Del. Apr. 15, 2015), addressed a problem that existed only in SMS text message telecommunications between mobile devices and computers that were not present in any conventional practice outside that arena. In *Smart Flash, LLC et al. v. Apple Inc. et al.*, No. 13-cv-447, 2015 WL 661174, at *8-9 (E.D. Tex. Feb. 13, 2015), the claims were directed to a unique problem of *controlling user access to data already in the user's possession* through use data and access restriction rules that could not exist outside the Internet. Here, similar to why *DDR Holdings* is distinguishable, the asserted claims (and specification disclosures) are expressly dependent on a conventional practice – *i.e.*, human recognition – for comparing content. (*See, e.g.*, Dkt. # 60-3 at col. 7:34-40 ("mimics human perception").) Moreover, the very issue the asserted claims are designed to address are acknowledged to exist in either the analog or digital realm. (*Id.* at 4:32-36 ("While digital representations of analog waveforms may be analyzed by perceptually-based or perceptually-limited analysis it is usually costly and time-consuming to model the processes of the highly effective ability of humans to identify and recognize signals.").) In *TPQ Development, LLC v. Intuit Inc.*, No. 12-cv-180, 2014 WL 651935 (E.D. Tex. Feb. 19, 2014), the court failed to even address the relevant two prong inquiry as it was decided before *Alice*, and the defendant in *Almeranth, Inc. v. Genesis Gaming Solutions, Inc.*, No. 11-cv-189, 2014 WL 7012391, at *14 (C.D. Cal. Nov. 14, 2014), failed to identify an abstract idea covered by the asserted claim and made no showing that the other limitations did not add something inventive. That is not the situation here, as set forth in Google's opening papers.

(citing Texas claim construction) *and* Dkt. # 63-3 at 66, 68 (requiring signal abstracts to retain a humanly-perceptible relationship to the signal for comparison purposes).)  And, to the extent Blue Spike's expert is contending that humans cannot process or recognize streams of bits (Dkt. # 63-11, ¶ 15), that argument has been rejected by the Supreme Court and Federal Circuit.  *See Content Extraction and Transmission, LLC v. Wells Fargo Bank, Nat. Ass'n.*, 776 F.3d 1343, 1347 (Fed. Cir. 2014) (rejecting notion that humans cannot process streams of bits output by scanner); *Alice*, 134 S. Ct. at 2358-59.  Finally, as a matter of law, just because computers may be better than humans at some things does not confer patent-eligibility on abstract ideas that are performed on computers. *See Kroy IP Holdings, LLC v. Safeway, Inc.*, No. 12-cv-800, 2015 WL 3452469, at *13 (E.D. Tex. May 29, 2015) ("*The greater efficiency with which the computer can perform tasks that a human could perform does not render the inventions patentable.  See Bancorp*, 687 F.3d at 1278-79 . . . *Adding a computer to perform those mental steps 'does not transform a patent-ineligible claim into a patent-eligible one.*") (emphasis added).

## IV.   THE ASSERTED CLAIMS FAIL TO ADD ANYTHING INVENTIVE TO THE ABSTRACT IDEA OF USING AN "ABSTRACT" ON A COMPUTER

Once the idea of the asserted claims is identified (and identified as an abstract idea, as here), the parties agree that, in the second prong of a § 101 analysis, the Court must then determine whether the claims at issue confer anything inventive to transform that idea into a patent-eligible application.  *See Alice*, 134 S. Ct. at 2355.  Blue Spike's arguments, however, fail to demonstrate the asserted claims are "significantly more than a patent upon the [ineligible concept] itself."  *Id.*

### A.   Blue Spike's Arguments About the Alleged Inventiveness of Using An "Abstract" Cannot Confer Patentability Because They Fail To Provide Any Meaningful Limitations On The Idea of Using An "Abstract," As Required

Blue Spike argues that its claims are saved because the idea of using an "abstract" was allegedly held patentable over prior art.  (*See* Dkt. # 63 at 15 (arguing that the idea of the claimed "abstract" is "the key inventive concept of the asserted claims," so therefore it must be patent-eligible).)  In support, Blue Spike asserts that the patents "cite[] more than 700 prior art patents and publications" (Dkt. # 63 at 13-14) and also relies upon specification passages that "specifically identif[y] the shortcomings of prior art methods and systems of digital signal differentiation and

content recognition." (Dkt. # 63 at 16.)  <u>But, this is an irrelevancy</u>.  Whether or not others have

invented different systems says nothing about whether the claimed "abstract" here is an abstract

idea.  One can look in vain in *Alice* for any idea that being different from the prior art saves a claim

from patent-ineligibility.  The question is not whether the claimed "abstract" is different than prior

art methods, but whether it is an abstract idea (prong one) that is limited in some way to only

inventive applications of that idea (prong two).  Here, as discussed above and in more detail below,

the use of an "abstract" is an abstract idea.  And, the claims contain no inventive limitations on the

use of this idea – *i.e.*, each limitation in each of the claims is either generic computer functionality

or functionality that is expressly admitted to be in the prior art.  In arguing that an "abstract" is

inventive, Blue Spike is merely arguing against the test as outlined by the Supreme Court in *Alice*.

In other words, if it were true that a patent being granted over the prior art saved it from a § 101

challenge, then there would be no § 101 case law, including *Alice*.

      This is confirmed by looking at all of the passages and art that Blue Spike cites to show that

its idea of an "abstract" is inventive.  Each of these passages merely indicates what the claimed

"abstract" is not – *e.g.*, prior art digital watermarking – or generally describes supposed advantages

of the patent at a high level.  (*See id.* at 16-17 (bullet point list of specification cites).)  None of

these citations affirmatively define the scope or implementation of the claimed "abstract."  Indeed,

as explained in Google's opening brief, the specification is devoid of any meaningful disclosures,

such as figures, examples, processes, flowcharts, diagrams, algorithms, or source code, that impose

any consequential limitation on the composition of the claimed "abstract."  (*See* Dkt. # 59 at 16-

17.)[5]  Here, Blue Spike does not dispute that its claim to the idea of an "abstract" is not

---

[5]  Blue Spike takes issue with the question of whether or not its claims are indefinite under § 112.
Google agrees that the question of § 112 is not at issue in this motion, and does not need to be
decided to find these patents invalid under § 101.  The only relevance of the § 112 discussion in
Google's opening papers was to make the point, which Blue Spike essentially concedes in its
Opposition, that Blue Spike is seeking to claim all ways of using an "abstract," even though the
patent specification never actually sets forth even one specific example of how to create one.
Indeed, Blue Spike expressly adopts the view that its claims to the use of an abstract are unbounded
where it says that its inventions are allegedly "pioneering" and entitled to extraordinary scope.
(*See, e.g.*, Dkt. # 63 at 13.)  Whatever the import of these statements with respect to validity under
§ 112, this issue confirms that Blue Spike is claiming the entirety of the abstract idea of using an
"abstract," which is what makes these claims invalid under the second prong of *Alice*.

meaningfully limited – indeed, Blue Spike asserts that it should be essentially limitless by touting

that it is a "pioneering" invention.  (*See, e.g.*, Dkt. # 63 at 13.)  That assertion, however, only

confirms that Blue Spike's claims are not patent-eligible.  Where the idea of an "abstract" is an

abstract idea, as Blue Spike must admit under its own theory, the lack of any other meaningful

limitations on its use make it patent-ineligible to avoid preempting all uses of the idea.  *See Enfish*,

56 F. Supp. 3d at 1175 (rejecting claims "designed to monopolize [the ineligible concept] itself").[6]

### B.  Prior Art And Well-Known Techniques Do Not Provide An Inventive Concept

Blue Spike does make a half-hearted attempt to argue that some of the other limitations in

some of the claims at issue are sufficient to confer patent-eligibility on the use of an "abstract."

(*See* Dkt. # 63 at 17.)  As a matter of law, however, the limitations to which Blue Spike points are

insufficient because they are admitted by the specification as being well-known or in the prior art.

*See McRO, Inc. v. Codemasters Inc.*, No. 14-cv-439, 2014 WL 4762989, at *12 (C.D. Cal. Sept. 22,

2014) (finding additional claim limitations "used in the prior art" did not impact § 101 analysis).

For example, the idea that "authorized transmission" of data can confer patent-eligibility on

an otherwise ineligible abstract idea is simply wrong.  (*See* claim 18 of the '700 patent; Dkt. # 63 at

17).  Not only is data transmission admittedly well-known by the inventors, as stated in the

specification, but data transmission has also expressly been recognized by courts as a conventional,

routine activity.  *See* Dkt. # 60-3 at col. 1:61-64 ("Many methods and protocols are known for

*transmitting data* in digital form . . .") *Id.* at col. 2:4-6 ("Compression and *transmission [] for*

---

[6]  Blue Spike also argues that its claims can allow for data to be 'transformed' or 'reduced' by
compression, thus it meets the "machine or transformation" test of *Bilski*.  (*See* Dkt. # 63 at 20
("[the claimed abstract] requires the data be transformed (e.g., 'data reduced,' as construed by the
Eastern District of Texas) . . . [t]hat data reduction transformation imposes a meaningful limit on the
claims' scope, strongly supporting eligibility.").)  Blue Spike's reliance on *Bilski*'s machine or
transformation test cannot sustain the patentability of the asserted claims here.  Since *Bilski*, courts
have made clear that "well-understood, routine, conventional activity" does not confer patentability
to an otherwise abstract idea.  *See Intellectual Ventures II*, 2015 WL 1941331, at *14; *see also
Digitech Image Techs., LLC v. Electronics for Imaging, Inc.*, 758 F.3d 1344, 1351 (Fed. Cir. 2014).
Here, the inventors admit that the "data reduction" techniques contemplated in the patent are all
prior art techniques, making Blue Spike's reliance on *Bilski* misplaced.  (*See* Dkt. # 60-3 at cols.
1:64-2:3 ("Among *standard protocols for data compression* of digital files [that] may be mentioned
[is] the MPEG compression standard for audio and video digital compression . . ."); *id.* at col. 4:8-
11 ("Lossless and lossy compression schemes are appropriate candidates for data reduction
technologies . . . such as [] MPEG, etc.").)

---

Appx2493

*digitized information"* is a known standard); *see also OIP Technologies, Inc. v. Amazon.com, Inc.*, No. 2012-1696, Dkt. # 59 at 7 (Fed. Cir. June 11, 2015) (finding "sending" electronic data to be a "well-understood, routine, conventional activit[y] previously known in the industry").

The same is true for the general application of a "cryptographic protocol" (claim 10 of the '700 patent; Dkt. # 63 at 18), which has been recognized as a ubiquitous and longstanding concept in computing.  *See Intellectual Ventures II*, 2015 WL 1941331, at *14 ("The additional features described in the claims consist of the following:  encryption and decryption . . . These additional features fail to describe anything beyond 'well-understood, routine, conventional activity.'"); *Fidelity Nat'l. Information Svcs.*, CBM2014-00020, Doc. No. 34 (Apr. 29, 2015) at 13 (acknowledging that the general recitation of cryptographic protocols is ubiquitous and poses a risk of unacceptable preemption); *see also* Dkt. # 60-3 at 10:46-54 (making general reference to the "incorporation of cryptographic techniques," such as a "hash or signature").

Similarly, Blue Spike's reliance on the application of "spectral transforms" and "psycho-acoustic" or "psycho-visual" models (claim 26 of the '728 patent and claim 17 of the '175 patent; Dkt. # 63 at 18) cannot provide the inventive concept to create patent-eligibility.  First, the patent expressly confirms that such models are known prior art techniques.   (*See* Dkt. # 60-3 at cols. 1:64-2:4 ("Among standard protocols for data compression of digital files [that] may be mentioned [is] the MPEG compression standard for audio and video digital compression . . ."); *id.* at col. 4:8-11 ("Lossless and lossy compression schemes are appropriate candidates for data reduction technologies . . . such as [] MPEG, etc."); *id.* at col. 7:34-40 ("Most compression is either lossy or lossless and is designed with psychoacoustic or psychovisual parameters.").  Second, the specification goes on to explain that even psycho-acoustic and psycho-visual compression modeling must "mimic[] human perception" and "retain what is 'humanly-perceptible.'"  (*Id.* at 7:34-40.) Again, by definition, that is not a patent-eligible or inventive concept.  And finally, the general application of mathematical algorithms (such as transforms and compression schemes) has already been determined unpatentable.  *See Digitech Image Techs.*, 758 F.3d at 1351 ("without additional limitations a process that employs mathematical algorithms to manipulate existing information to generate additional information is not patent-eligible.  'If a claim is directed essentially to a method

of calculating, using a mathematical formula, even if the solution is for a specific purpose.'").[7]

Likewise, the "embedder" recited in dependent claim 12 of the '700 patent (Dkt. # 63 at 17) also fails to add anything inventive to the asserted claims. The specification makes clear that the embedder is used to include "additive signals," like in digital watermarking, which is a traditional prior art technique of which the patents attempt to distinguish:

> The present invention relates to identification of digitally-sampled information, such as images, audio and video. *Traditional methods of identification and monitoring of those signals do not rely on "perceptual quality," but rather upon a separate and additional signal. Within this application, such signals will be called "additive signals"* as they provide information about the original images, audio or video, but such information is in addition to the original signal. . . . Reliance on an additive signal has many shortcomings. For example, first, *someone must incorporate the additive signal within the digital data being transmitted, for example, by concatenation or through an embedding process.* Such an additive signal, however, can be easily identified and removed by one who wants to utilize the original signal without paying for its usage.

(*See* Dkt. # 60-3 at col. 4:42-66 (emphasis added); *see also id.* at cols. 13:60-14:2 ("*Traditionally, monitoring is accomplished by embedding some identifier into the signal*, or affixing the identifier to the signal, for later analysis and determination of royalty payments. *Most of the traditional analysis is performed by actual persons who use play lists and other statistical approximations of audio play, including for example, data obtained through the manual (i.e., by persons)* monitoring of a statistically significant sample of stations and transmission times so that an extrapolation may be made to a larger number of comparable markets."); *id.* at col. 5:40-6:17 ("The [watermark] techniques have obvious trade-offs between speed, performance and security of the *embedded watermark data*.").) Relying on prior art techniques to prove inventiveness of an otherwise abstract idea under § 101 should be rejected. *See McRO*, 2014 WL 4762989, at *12 (finding that patentability cannot be conferred on an abstract idea by additional limitations directed at prior art).

Indeed, many of Blue Spike's own arguments about the additional claim limitations at issue do nothing more than confirm that Blue Spike's claims are not patent-eligible. For example, Blue

---

[7] The claim deemed unpatentable in *Digitech Image Technologies* is similar to the spectral transforms here as they were directed to spatial and color transformations in a digital image reproduction system. *See* 776 F.3d at 1349-51.

1  Spike argues that the claim limitation of "characteristic parameters that differentiate between

2  versions of the signal" (claim 1 of the '700 patent; Dkt. # 63 at 18) is relevant to patentability

3  because "*[a human] listener* would not necessarily be able to pinpoint what it is about a song that

4  *sounds familiar*."  (Dkt. # 63 at 18 (emphasis added).)  First, as discussed above, this is nothing

5  other than an assertion that a computer may be better than a human at what humans ordinarily do.

6  But, that does not equate to patent eligibility.  *See Kroy IP Holdings*, 2015 WL 3452469, at *13

7  ("The greater efficiency with which the computer can perform tasks that a human could perform

8  does not render the inventions patentable."); *Content Extraction and Transmission*, 776 F.3d at

9  1347 (finding that humans have always been able to recognize certain data and that the concept of

10  "data collection, recognition, and storage is indisputably well-known").  Second, and more

11  importantly, Blue Spike's argument here is an express admission that the claims are directed to

12  reproducing human behavior on a computer.  (*See* Dkt. # 63 at 18 (equating "*perceptual*

13  characteristics" in claim 18 and 40 of the '700 patent, claim 8 of the '175 patent, and claims 11 and

14  29 of the '494 patent with "characteristic parameters"); *see also* Dkt. # 66-3 at 66 (agreeing that

15  "perceptual" calls for perception by a person).)  And, where the patenting of an abstract idea on a

16  computer is impermissible under § 101, this is an admission that these claims fail.

17       Similarly, as to the "selectable criteria" claim element (claim 5 of the '728 patent; Dkt. # 63

18  at 17), Blue Spike argues that the limitation takes into account "the strengths of the general

19  computing device" and "economic needs of a particular market."  (Dkt. # 63 at 17.)  First, the act of

20  choosing or selecting certain criteria of a work is something humans have always performed, and

21  the specification admits as much.  (*See, e.g.*, Dkt. # 60-3 at cols. 14:65-15:11 (expressly analogizing

22  the idea of an "abstract" to the human behavior of analyzing a set of pictures by selecting the

23  criteria of the sun that is in common among the pictures).)  Second, reciting general computing

24  components to automate the evaluation of economic demands by making selections that any person

25  is capable of doing is not a patent-eligible application.  *See Alice*, 134 S. Ct. at 2355-56 (finding

26  claims drawn to a "fundamental economic practice" and "human activity" to violate § 101); *Content*

27  *Extraction and Transmission*, 776 F.3d 1343 at 1347-48 (finding claims directed to performing

28  tasks that humans can do using generic computer components is not patentable); *Open Text*, 2015

---

Appx2496

WL 269036, at *1, 3 (finding the implementation of the abstract idea using standard computer hardware is not inventive); *OpenTV, Inc. v. Netflix Inc.*, No. 14-cv-01525-RS, 2014 WL 7185921, at *7 (N.D. Cal. Dec. 16, 2014) (rejecting use of "general purpose computers" to transform an abstract idea into patent-eligible subject matter); *Gametek LLC v. Zynga, Inc.*, No. 13-cv-2546, 2014 WL 1665090, at *7 (N.D. Cal. Apr. 25, 2014) (finding the recited general computer components to "merely be the environment in which the abstract idea is practiced").

Because each of the claim limitations to which Blue Spike points is either generic computer functionality or prior art, none of the additional claim elements put any meaningful limitations on Blue Spike's claim to the abstract idea of using an "abstract."[8] *See Amdocs (Israel) Ltd. v. Openet Telecom, Inc.*, No. 10-cv-910, 2014 WL 5430956, at *5, 6, 11 (E.D. Va. Oct. 24, 2014) (finding the claim does not integrate the abstract idea into something more, meaning it effectively is a patent on the idea itself); *McRO*, 2014 WL 4749601, at *11 (finding the claims covered all rules if it "merely states 'an abstract idea while adding the words 'apply it'"); *Alice*, 134 S.Ct. at 2358.

## V.    CONCLUSION

In view of the foregoing and Google's opening brief (Dkt. # 59), Google respectfully requests that the Court find that the asserted claims are unpatentable under 35 U.S.C. § 101 and enter judgment on the pleadings in Google's favor.[9]

---

[8]  Blue Spike also asserts that, because the Texas Court did not find the term "abstract" to be indefinite under 35 U.S.C. § 112, this somehow establishes patent-eligibility.  Whether or not the Texas Court's ruling is correct, it certainly does not help Blue Spike.  The Texas court's decision on indefiniteness of the term "abstract" was expressly predicated only on the fact that the Court issued a construction for that claim.  (*See* Dkt. # 63-6 at 5 (reciting the "reasonably certain" standard under *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2129 (2014), and finding that because the term was construed it was not indefinite); Dkt. # 63-7 at 4-5 (affirming on the same essential reasoning).)  Here, because, as discussed above, the Texas Court's construction of the term "abstract" only confirms that it is directed to an abstract idea, the Texas Court's indefiniteness ruling that relies on the construction of "abstract" cannot save Blue Spike.

[9]  Blue Spike argues that claim 30 of the '728 patent is properly asserted in this case and should survive Google's motion, as a technical matter.  (Dkt. # 63 at 3-4, n.2.)  Blue Spike, however, omits its failure to comply with Patent Local Rule ("PLR") 3-1 and provide Google with an infringement chart for the limitations of that claim.  Google raised this deficiency in its Invalidity Contentions served on January 16, 2015 and again in its opening motion filed on May 12, 2015 (Dkt. # 63).  Blue Spike has not sought leave to amend its infringement contentions, and has failed to address this issue in any of the three version of its infringement charts, the latest of which was served on February 11, 2015.  Mere "notice" (as Blue Spike would contend) cannot qualify as compliance with the requirements of PLR 3-1(c) and the Court should dismiss at least that claim from this case.

---

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Dated:  June 16, 2015

/s/ Michael A. Berta

**ARNOLD & PORTER LLP**
Michael A. Berta (SBN 194650)
Three Embarcadero Center, 7th Floor
San Francisco, CA 94111
Phone: (415) 471-3100
Fax: (415) 471-3400
michael.berta@aporter.com

Nicholas H. Lee (SBN 259588)
777 S. Figueroa Street, 44th Floor
Los Angeles, CA 90017
Phone: (213) 243-4000
Fax: (213) 243-4199
nicholas.lee@aporter.com

*Attorneys for Defendant Google Inc.*

Appx2498

**PROOF OF SERVICE**

I am over the age of 18 and not a party to the within action.  My business address is 777 S. Figueroa Street, 44th Floor Los Angeles, CA 90017-5844.

On June 16, 2015, I served on the below list of counsel for Plaintiff in said action a copy of the foregoing document:

Randall T. Garteiser (rgarteiser@ghiplaw.com)
Christopher A. Honea (chonea@ghiplaw.com)
Christopher S. Johns (cjohns@ghiplaw.com)
Kirk J. Anderson (kanderson@ghiplaw.com)
Peter S. Brasher (pbrasher@ghiplaw.com)
GARTEISER HONEA, PLLC
119 W. Ferguson St.
Tyler, Texas 75702
Telephone: (903) 705-7420
Facsimile: (888) 908-4400

☐   (BY ELECTRONIC MAIL)  I caused such document(s) to be sent to the persons at the e-mail addresses listed above. I did not receive, within a reasonable time after the submission, any electronic message or other indication that the transmission was unsuccessful.

☒   (BY CM/ECF)  I caused such document(s) to be sent via electronic mail through the Case Management/Electronic File system with the U.S. District Court for the Northern District of California.

☐   (MAIL) I am readily familiar with this firm's practice of collection and processing correspondence for mailing.  Under that practice it would be deposited with the U.S. postal service on that same day in the ordinary course of business.  I am aware that on motion of party served, service is presumed invalid if postal cancellation date or postage meter date is more than 1 day after date of deposit for mailing in affidavit.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on June 16, 2015, at Los Angeles, California.

| Michael A. Berta | /s/ Michael A. Berta |
|---|---|
| (Type or print name) | (Signature) |

1   Randall T. Garteiser (SBN 231821)
    rgarteiser@ghiplaw.com
2   Christopher A. Honea (SBN 232473)
    chonea@ghiplaw.com
3   Ian N. Ramage (SBN 224881)
    iramage@ghiplaw.com
4   Kirk J. Anderson (SBN 289043)
    kanderson@ghiplaw.com
5   Molly A. Jones (SBN 301419)
    mjones@ghiplaw.com
6   GARTEISER HONEA, P.C.
7   119 W Ferguson Street
    Tyler, Texas 75702
8   Telephone:  (903) 705-7420
    Facsimile:  (888) 908-4400
9

Michael A. Berta (SBN 194650)
ARNOLD & PORTER LLP
Three Embarcadero Center, 7th Floor
San Francisco, CA 94111
Phone: (415) 471-3100
Fax: (415) 471-3400
michael.berta@aporter.com

Nicholas H. Lee (SBN 259588)
ARNOLD & PORTER LLP
777 S. Figueroa Street, 44th Floor
Los Angeles, CA 90017
Phone: (213) 243-4000
Fax: (213) 243-4199
nicholas.lee@aporter.com

Attorneys for Defendant
GOOGLE INC.

10  Attorneys for Plaintiff
    BLUE SPIKE, LLC

11

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## OAKLAND DIVISION

12

13

14

BLUE SPIKE, LLC,

15

                    Plaintiff,

16

17      v.

GOOGLE INC.,

18

                    Defendant.

19

Case No. 14-cv-01650 (YGR)

**JOINT CLAIM CONSTRUCTION AND
PREHEARING STATEMENT
PURSUANT TO PATENT LOCAL RULE
4-3**

20

21

22

23

24

25

26

27

28

1  Pursuant to Patent Local Rule ("PLR") 4-3, the schedule provided by this Court (Dkt. # 57),

2  and Paragraph 3 of this Court's Standing Order For Patent Cases, Plaintiff Blue Spike, LLC ("Blue

3  Spike") and Defendant Google Inc. ("Google") (collectively, "the parties") hereby submit this Joint

4  Claim Construction and Prehearing Statement for U.S. Patent No. 7,346,472 ("'472 patent"); U.S.

5  Patent No. 7,660,700 ("'700 patent"); U.S. Patent No. 7,949,494 ("'494 patent"); U.S. Patent No.

6  8,214,175 ("'175 patent"); and U.S. Patent No. 8,712,728 ("'728 patent") (collectively, the

7  "Patents-in-Suit").

8  **I.    AGREED UPON CLAIM CONSTRUCTIONS -- PLR 4-3(A)**

9  The parties have met and conferred pursuant to PLR 4-2(c), and agree to the following

10  construction(s) for the listed claim term(s) recited in the Patents-In-Suit:

| Term | Patent / Claim(s) | Construction |
|------|-------------------|--------------|
| "abstract" | '472 patent / claims 1-4, 8, 11<br>'700 patent / claims 1, 10, 18, 40<br>'494 patent / claims 11, 15, 17, 29<br>'175 patent / claims 1, 8, 11, 12, 16, 17<br>'728 patent / claims 1, 4, 5, 16, 25, 26 | A data-reduced representation of a signal that retains a perceptual relationship with the signal and differentiates the data-reduced representation from other data-reduced representations |
| "perceptual qualities" | '472 patent / claim 1 | Qualities perceived by a person |
| "perceptible characteristic" | '700 patent / claim 21 | Characteristic perceived by a person |
| "perceptual characteristics" | '494 patent / claim 11<br>'700 patent / claim 40 | Characteristics perceived by a person |
| "cognitive feature" | '700 patent / claim 21 | A feature that is understood by a person |
| "similar to" | '175 patent / claims 1, 8, 11, 17 | Retaining a perceptual relationship |

11
12
13
14
15
16
17
18
19
20
21
22
23
24

25  **II.   IDENTIFICATION AND PROPOSED CONSTRUCTIONS OF DISPUTED CLAIM TERMS -- PLR 4-3(B) & (C)**

26  Pursuant to PLR 4-3(b) and (c), and Paragraph 3 of this Court's Standing Order For Patent

27  Cases, the parties have identified the following disputed claim terms -- not exceeding ten total --

28  along with each party's proposed construction for the same.  Blue Spike's identification of intrinsic

*CERTIFIED COPY*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE YVONNE GONZALEZ ROGERS, JUDGE

| | |
|---|---|
| BLUE SPIKE, LLC, ) | **MOTION TO DISMISS** |
| ) | |
| PLAINTIFF, ) | |
| ) | |
| VS. ) | NO. C 14-01650YGR |
| ) | |
| GOOGLE INC., ) | PAGES 1 - 55 |
| ) | |
| DEFENDANT ) | OAKLAND, CALIFORNIA |
| _____) | TUESDAY, JUNE 30, 2015 |

## REPORTER'S TRANSCRIPT OF PROCEEDINGS

APPEARANCES:

| | | |
|---|---|---|
| FOR PLAINTIFF: | | GARTEISER HONEA, P.C. |
| | | 119 W. FERGUSON STREET |
| | | TYLER, TEXAS 75702 |
| | BY: | HELEN E. DUTTON, |
| | | RANDALL T. GARTEISER, |
| | | MOLLY A. JONES, ATTORNEYS AT LAW |
| | | |
| FOR DEFENDANT: | | ARNOLD & PORTER LLP |
| | | THREE EMBARCADERO CENTER, 7TH FLOOR |
| | | SAN FRANCISCO, CALIFORNIA 94111 |
| | BY: | MICHAEL A. BERTA, ATTORNEY AT LAW |
| | | |
| | | ARNOLD & PORTER |
| | | 777 SOUTH FIGUEROA STREET |
| | | 44TH FLOOR |
| | | LOS ANGELES, CALIFORNIA 90017-2513 |
| | BY: | NICHOLAS H. LEE, ATTORNEY AT LAW |

REPORTED BY:        RAYNEE H. MERCADO, CSR NO. 8258

    PROCEEDINGS REPORTED BY ELECTRONIC/MECHANICAL STENOGRAPHY;
TRANSCRIPT PRODUCED BY COMPUTER-AIDED TRANSCRIPTION.

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530*

| | |
|---|---|
| 1 | TUESDAY, JUNE 30, 2015                                    8:59 A.M. |

2                    P R O C E E D I N G S

3          **THE CLERK:**  CALLING CIVIL ACTION 14-1650, BLUE SPIKE

4    VERSUS GOOGLE.

5       COUNSEL, PLEASE COME FORWARD AND STATE YOUR APPEARANCES.

6          **MR. GARTEISER:**  GOOD MORNING, YOUR HONOR.  RANDALL

7    GARTEISER FOR PLAINTIFF BLUE SPIKE.  WITH ME TODAY IS HELEN

8    DUTTON AND MOLLY JONES.

9       WHICH IS MS. DUTTON?

10         **MS. DUTTON:**  (INDICATING.)

11         **THE COURT:**  OKAY.

12                   (OFF-THE-RECORD DISCUSSION.)

13         **MR. BERTA:**  YOUR HONOR, MIKE BERTA AND -- FROM ARNOLD

14   AND PORTER ON BEHALF OF GOOGLE.  WITH ME IS NICHOLAS LEE.  AND

15   WITH US ARE MOLLY --

16         **THE COURT:**  I CAN'T HEAR YOU WHEN YOU TURN --

17         **MR. BERTA:**  SORRY.  I'M SORRY.

18      MOLLY PECK AND TREMAINE KIRKMAN FROM GOOGLE.

19         **THE COURT:**  OKAY.

20         **MR. BERTA:**  THANK YOU.

21         **THE COURT:**  ALL RIGHT.  WELCOME, EVERYONE.

22      I HAVE A NUMBER OF QUESTIONS, BUT I'LL LET YOU GET

23   STARTED.  IT'S YOUR MOTION.

24         **MR. BERTA:**  THANK YOU.

25         **THE COURT:**  WHO'S ARGUING ON THE PLAINTIFF'S SIDE?

1        **MR. GARTEISER:**  YOUR HONOR, HELEN DUTTON WILL BE

2   ARGUING FOR PLAINTIFF.

3        **THE COURT:**  OKAY.

4            (PAUSE IN THE PROCEEDINGS.)

5        **THE COURT:**  YOU MAY PROCEED.

6        **MR. BERTA:**  THANK YOU, YOUR HONOR.  I APPRECIATE IT.

7    WE PUT TOGETHER SOME MATERIALS THAT ARE ESSENTIALLY WHAT

8   WE WERE TALKING ABOUT IN THE BRIEF.  AND I DON'T WANT TO

9   REPEAT WHAT WE ARGUED IN THE PAPERS, BUT I DO WANT TO GO

10  THROUGH SOME OF THE THINGS THAT WE HAVE TALKED ABOUT HERE IN

11  LIGHT OF THE OPPOSITION JUST TO THE EXTENT THE COURT HAS

12  QUESTIONS ABOUT PARTICULAR ISSUES THAT WE COULD POTENTIALLY

13  COVER THROUGH HERE.

14   AS AN INITIAL MATTER, TEN -- SORRY.  I APOLOGIZE.

15         (OFF-THE-RECORD DISCUSSION.)

16         (DEMONSTRATIVE PUBLISHED.)

17       **MR. BERTA:**  THE QUESTION OF WHETHER CLAIMS OF A

18  PATENT ARE VALID OR INVALID UNDER QUESTION 101 IS A

19  STRAIGHTFORWARD TEST, STRAIGHTFORWARD AT LEAST IN WHAT YOU'RE

20  SUPPOSED TO DO UNDER THE TEST IF NOT ALWAYS WHAT THE EXACT

21  PARAMETERS ARE ON THE OUTSIDE OF THE TEST.

22       **THE COURT:**  WELL, I DON'T THINK THAT THAT'S A

23  CONTROVERSIAL PROPOSITION.  IS IT MS. HUTTON (PHONETIC)?

24       **MS. DUTTON:**  YOUR HONOR, WE DON'T CONTEST --

25       **THE COURT:**  CAN YOU USE THE MIC OR COME UP FORWARD.

1             **MS. DUTTON:** THANK YOU, YOUR HONOR.

2      WE DON'T CONTEST THE TWO STEPS. THAT'S PRETTY WELL

3 ESTABLISHED. WE WOULD SAY THAT THERE'S BEEN A LOT OF

4 COMPLEXITY INTRODUCED BY THE LANDSCAPE OF THE LAW AND HOW

5 THAT'S APPLIED.

6             **THE COURT:** OKAY. SO LET'S MOVE THROUGH THE --

7             **MR. BERTA:** OKAY.

8             **THE COURT:** WE -- THERE'S NO -- I DON'T KNOW WHAT SHE

9 MEANS BY THAT, BUT GO AHEAD.

10             **MR. BERTA:** SO THE WAY THE TEST IS LAID OUT, THE

11 FIRST QUESTION IS TO IDENTIFY WHAT THE IDEA OF THE PATENT

12 CLAIMS ARE. AND THEN AFTER THAT, DETERMINE WHETHER THAT IS OR

13 IS NOT AN ABSTRACT IDEA. I THINK WITH RESPECT TO THAT

14 QUESTION AS TO WHAT THAT STEP OF THAT TEST IS, THERE PROBABLY

15 IS NO DISPUTE.

16      WHERE I THINK THERE HAVE BEEN ISSUES IS WHAT PLAINTIFF

17 CONTENDS SHOULD BE RELEVANT FOR THE QUESTION OF WHAT THE IDEA

18 OF THE PATENT IS. AND SO I DO WANT TO GO THROUGH THOSE

19 ISSUES.

20      SO AS COURTS HAVE EXPLAINED -- AND, OBVIOUSLY, SOME OF

21 THESE ARE SISTER COURTS AND NOT BINDING ON THIS COURT, BUT

22 THERE'S BEEN A LOT OF COURTS THAT HAVE SPOKEN ON THE ISSUE OF

23 WHAT IT MEANS TO IDENTIFY THE IDEA OF THE PATENT AS A -- AS AN

24 IDEA FOR PURPOSES OF DETERMINING WHETHER OR NOT IT'S ABSTRACT.

25      ONE OF THOSE THAT'S FAIRLY INTERESTING -- IS IT GOES

1    THROUGH A LONG DISCUSSION THIS INTEREST -- THIS ISSUE IS

2    THE -- THE *ENFISH* CASE IN THE CENTRAL DISTRICT OF CALIFORNIA.

3    AND ONE --

4              (OFF-THE-RECORD DISCUSSION.)

5         **MR. BERTA:**  ONE OF THE THINGS THAT THAT CASE SAYS IS

6    THAT YOU JUST HAVE TO LOOK AT WHAT IT IS THE CLAIM IS TRYING

7    TO ACCOMPLISH.  AND SO THE ISSUE OF WHAT IS THE IDEA AND THEN

8    THE QUESTION OF WHETHER IT'S ABSTRACT IS A QUESTION THAT'S

9    ANSWERED BY LOOKING AT THE CLAIMS IN LIGHT OF THE

10   SPECIFICATION FOR THEIR ESSENTIAL PURPOSE.

11     NOW, WHAT PLAINTIFFS HAVE DONE SOMETIMES IN SOME OF THE

12   ARGUMENTS THAT THEY'VE MADE IS THEY SAY YOU NEED TO LOOK AT

13   STEP ONE IN LIGHT OF THE PRIOR ART --

14        **THE COURT:**  PLAINTIFFS -- THE PLAINTIFF HERE?  OR

15   PLAINTIFFS GENERICALLY?

16        **MR. BERTA:**  BOTH.  BUT THE PLAINTIFF -- SO THIS

17   ARGUMENT HAS BEEN MADE BEFORE AND REJECTED BEFORE.

18     SO FOR EXAMPLE, THE IDEA THAT LOOKING AT THE PRIOR ART IS

19   A RELEVANT QUESTION WITH RESPECT TO WHAT THE IDEA OF THE

20   PATENT CLAIMS IS AND WHETHER IT IS ABSTRACT HAS BEEN ARGUED

21   BEFORE, IS BEING ARGUED HERE, HAS BEEN REJECTED BY OTHER

22   COURTS WHO LOOK TO *MAYO* WHO SAYS THAT YOU NEED TO LOOK AT THE

23   IDEA OF THE PATENT AS WHAT IT IS --

24        **THE COURT:**  AGAIN, I THINK THAT'S A PRETTY BASIC

25   PROPOSITION.

1     IS THERE AUTHORITY TO THE CONTRARY SPECIFICALLY?  IF SO,

2  WHAT ARE THE CASES?

3         **MS. DUTTON:**  YOUR HONOR, WE WOULD NOT SUBMIT THAT --

4  BLUE SPIKE DOES NOT SUBMIT THAT THERE IS ANY AUTHORITY TO THE

5  CONTRARY.  THE ISSUE THAT WE WOULD -- WE'D LIKE TO ADDRESS

6  FURTHER IS THE LENS THROUGH WHICH ONE CHARACTERIZES THE -- THE

7  OVERALL PATENT AND WHETHER ONE DIVORCES ONE OF THE CONTEXT IN

8  TERMS OF TECHNOLOGICAL ENVIRONMENT IN WHICH ITS SET FORTH OR

9  DOES ONE TAKE IT TO THE EXTREME AND -- AND SIMPLY SAY THIS

10  IS -- IN THIS CASE, AS GOOGLE HAS DONE IN ITS OPENING BRIEF,

11  IS THEY'RE SIMPLY COMPARING.

12         **THE COURT:**  WELL, CLEARLY, THE COURT NEEDS TO LOOK AT

13  THE CLAIMS ASSERTED IN THE PATENT.  THE NOTION THAT THE FACT

14  OF PRIOR -- THAT THE FACT A PRIOR ART EXISTS SOMEHOW IMPACTS

15  THAT ANALYSIS I FIND HARD TO FATHOM, WHICH IS WHY I ASKED IF

16  THERE WAS ANY AUTHORITY FOR THAT PROPOSITION.

17     ALL RIGHT.  YOU CAN BE SEATED, AND -- AND NO WORRIES,

18  MS. HUTTON (SIC), YOU WILL BE GIVEN AN OPPORTUNITY NOT JUST TO

19  REBUT AS WE GO ALONG BUT IF THIS CASE PROCEEDS BEYOND THIS

20  STAGE, JUST KNOW THIS IS HOW I DO CLAIM CONSTRUCTION.  I LIKE

21  TO TAKE IT ISSUE BY ISSUE AND HEAR FROM BOTH OF YOU PRETTY

22  MUCH AT THE SAME TIME, SO THAT -- AND I'VE GOT YOUR NAME

23  WRONG.  DUTTON.

24         **MS. DUTTON:**  NO PROBLEM, YOUR HONOR.

25         **THE COURT:**  SO I -- I DON'T WAIT UNTIL THE END TO GET

1    RESPONSES.

2            **MS. DUTTON:** THANK YOU.

3            **THE COURT:** ALL RIGHT.

4            **MR. BERTA:** WITH THAT IN MIND, THEN, WHEN YOU LOOK

5    AT -- AND I WANT TO ADDRESS, I THINK, WHAT IS THE DISPUTE

6    HERE.

7        WE HAVE TALKED ABOUT AN EXEMPLARY CLAIM WHICH IS CLAIM ONE

8    OF THE '472 PATENT AND JUST WALKED THROUGH IT, BOTH IN THE

9    BRIEFING AND HERE AND --

10           **THE COURT:** LET ME -- I'M GOING TO INTERRUPT YOU AT

11   THIS POINT.

12           **MR. BERTA:** YES.

13           **THE COURT:** FIRST OF ALL, WHAT IS THE BURDEN OF

14   PROOF?  THAT IS, IS IT CLEAR AND CONVINCING EVIDENCE?

15       IS THERE -- IS THERE A STANDARD?

16           **MR. BERTA:** IT'S -- IT IS A -- IT IS A QUESTION OF

17   LAW, NOT A QUESTION OF FACT.  AND IT IS A QUESTION OF LAW

18   WHETHER OR NOT IT IS PATENTABLE SUBJECT MATTER.  I DO NOT --

19           **THE COURT:** SO IS IT --

20           **MR. BERTA:** -- AWARE OF THE SPECIFIC HOLDING AS TO

21   THE BURDEN OF PROOF, BUT IT IS I BELIEVE --

22           **THE COURT:** SO THERE ARE NO -- THIS ISN'T A

23   QUESTION -- A MIXED QUESTION OF LAW AND FACT.

24           **MR. BERTA:** CORRECT.

25           **THE COURT:** UNDER YOUR VIEW, THERE ARE NO FACTS TO BE

1    RESOLVED.

2            **MR. BERTA:**  CORRECT.

3            **THE COURT:**  IN TERMS OF THE REPRESENTATIVE CLAIMS, IS

4    THERE -- IS IT, IN FACT, REPRESENTATIVE?  MS. DUTTON?

5            **MS. DUTTON:**  NO, YOUR HONOR, IT IS NOT.  IN

6    PARTICULAR, WE IDENTIFY SPECIFIC LIMITATIONS THROUGHOUT THE

7    REMAINING CLAIMS UNDER PRONG TWO OF *ALICE* THAT IDENTIFY

8    DIFFERENCES WITH RESPECT TO CLAIM ONE OF THE '472.

9            **THE COURT:**  ALL RIGHT.  SO I'M GOING TO HAVE YOU

10   PROCEED, MS. BERTA -- MR. BERTA, BUT THAT ISSUE HAS TO BE

11   RESOLVED.

12           **MR. BERTA:**  YES.

13           **THE COURT:**  BECAUSE THE QUESTION IS WHETHER IN PART,

14   GOOGLE'S MOTION RISES AND FALLS WITH -- WITH OR WITHOUT ANY

15   ABILITY TO IDENTIFY THIS AS A REPRESENTATIVE CLAIM.

16           **MR. BERTA:**  AND -- AND I AGREE WITH YOU, YOUR HONOR.

17   AND WHAT WE HAVE DONE IN THE PAPERS AND WHAT WE ARE PREPARED

18   TO DO HERE IS GO THROUGH -- AND THIS WAS ADDRESSED IN THE

19   FEDERAL CIRCUIT DECISION OF -- SORRY.  I APOLOGIZE, YOUR

20   HONOR.

21       -- THE *CONTENT EXTRACTION* DECISION THAT THE ISSUE IS TO

22   THE EXTENT THAT THEY RAISE PARTICULAR LIMITATIONS WITH RESPECT

23   TO PARTICULAR CLAIMS, YOU CAN GO THROUGH THOSE LIMITATIONS ON

24   THOSE CLAIMS AND THEN YOU ASKED THE QUESTION, DOES THIS ADD

25   SOMETHING PATENTABLE TO THE ABSTRACT IDEA.

1    AND SO WHEN YOU GO THROUGH THE LIMITATIONS THAT THEY'VE

2    IDENTIFIED ON THE CLAIMS THAT THEY HAVE IDENTIFIED AND IF THE

3    COURT WERE TO DETERMINE THAT THE THINGS THAT THEY ARE ADDING

4    ARE NO MORE THAN CONVENTIONAL ACTIVITIES THAT ARE RECOGNIZED

5    AS PRIOR ART, THEN THEY ARE NOT SUFFICIENT LIMITATIONS ON THE

6    ABSTRACT IDEA TO CONVERT IT INTO A PATENTABLE INVENTION, AND

7    THAT'S BECAUSE -- AND THIS IS EXPLAINED IN MANY CASES -- THAT

8    THAT --

9    AND ONE THOSE THAT'S SOMEWHAT INTERESTING IS THE *COGENT*

10   DECISION OUT OF THIS DISTRICT THAT YOU CAN JUST HAVE HUNDREDS

11   OF CLAIMS, EACH WITH A DIFFERENT LIMITATION THAT IS OTHERWISE

12   WHAT SOME PEOPLE DO AND BY THAT DRAFTSMAN ART, STILL TAKE UP

13   AN ENTIRE FIELD OF THE USE OF THE ABSTRACT IDEA.

14   SO WHATEVER THE ADDITIONAL LIMITATIONS ARE HAVE TO BE

15   SOMETHING MORE THAN -- IN AND OF THEMSELVES MORE THAN WHAT'S

16   IN THE PRIOR ART.  OTHERWISE, YOU'RE JUST SLICING OFF PIECES

17   OF THE ABSTRACT IDEA IN PARTICULAR FIELDS FOR PARTICULAR

18   CLAIMS.

19   SO WE WILL GO THROUGH THE PARTICULAR LIMITATIONS THAT

20   THEY'VE IDENTIFIED AND SHOW THAT THEY CONCEDE IN THE

21   SPECIFICATION THAT THESE ARE JUST THINGS THAT OTHERWISE PEOPLE

22   DO.

23          **THE COURT:**  ALL RIGHT.  PROCEED.

24          **MR. BERTA:**  OKAY.  SO WITH RESPECT TO WHAT THE IDEA

25   IS, WE HAVE SAID, IN ESSENCE, YOU -- GOING THROUGH THE CLAIM

1   OF THE EXEMPLARY CLAIM LANGUAGE THAT WHAT THE CLAIM CALLS FOR

2   IS JUST USING A PART OF A -- WE'LL SAY SIGNAL TO COMPARE WITH

3   IT OTHER SIGNALS AND THAT THE RULE IS HERE THE PART OF THE

4   SIGNAL HAS TO BE SOMETHING THAT'S BASED ON HUMAN PERCEPTION.

5       AND I DON'T THINK THAT THERE IS A TRUE DISPUTE THAT THIS

6   IS A ABSTRACT IDEA CLAIM BY CLAIM, FOR EXAMPLE -- SORRY.  I

7   DON'T KNOW -- HOW DO YOU GO BACK?

8               (OFF-THE-RECORD DISCUSSION.)

9          **MR. LEE:**  RIGHT CLICK "PREVIOUS."

10        **MR. BERTA:**  I ACTUALLY CAN'T SEE THAT FAR.

11    OKAY.  IF I SNEAK OVER TO YOUR SIDE JUST FOR A SEC.

12   SORRY.

13    SO WHEN YOU GO THROUGH EXEMPLARY CLAIM, THE ISSUE IS --

14          **THE COURT:**  THAT CAN BE PUSHED UP.  THAT IS --

15          **THE CLERK:**  THERE YOU GO.  YOU DON'T HAVE TO LEAN.

16          **THE COURT:**  THE MIC -- THE NECK --

17        **MR. BERTA:**  THANK YOU.

18          **THE COURT:**  -- IS MOVABLE.

19        **MR. BERTA:**  THANK YOU.

20    WHEN YOU GO THROUGH THIS CLAIM FOR WHATEVER CLAIMS THAT WE

21   AGREE THAT IT'S EXEMPLARY OF, SETTING ASIDE THE INDIVIDUAL

22   LIMITATIONS THAT THEY IDENTIFY, ALL IT SAYS IS YOU RECEIVE A

23   SIGNAL, AND THEN IT HAS THIS DISCUSSION OF WHAT THE ABSTRACT

24   IS.  YOU CREATE THIS ABSTRACT, AND IT EXPRESSLY SAYS THAT THE

25   ABSTRACT HAS TO BE BASED ON PERCEPTUAL QUALITIES.

1    AFTER THAT, THERE'S NOTHING MORE TO THE CLAIM BESIDES

2    STORING THE ABSTRACT, CREATING ANOTHER ABSTRACT, AND COMPARING

3    THE ABSTRACTS.

4    AND THERE'S NO COMPUTER -- SPECIFIC COMPUTER

5    IMPLEMENTATIONS THAT ARE REQUIRED TO DO THIS.  THEY JUST SAY

6    THINGS LIKE A PROCESSOR, THINGS LIKE A REFERENCE DATABASE.  SO

7    TAKING THIS CLAIM AS AN EXAMPLE, IT IS ALL ABOUT THE IDEA OF

8    CREATING SOMETHING FROM A SIGNAL THAT'S SMALLER THAN THE

9    SIGNAL USING HUMAN PERCEPTUAL QUALITIES.

10    NOW, THERE IS A ARGUMENT THAT WAS MADE IN THE BRIEF THAT

11    YOU WOULD HAVE TO TAKE INTO ACCOUNT CLAIM CONSTRUCTION

12    GENERALLY AND ESPECIALLY CLAIM CONSTRUCTION IN TEXAS.

13    BUT THAT -- WHETHER WE AGREE WITH THAT OR NOT DOESN'T

14    REALLY MATTER BECAUSE THE CLAIM CONSTRUCTION TO WHICH THEY

15    POINT IS THE CLAIM CONSTRUCTION OF THE TERM "ABSTRACT."  AND

16    THEY SAY YOU'VE GOT TO LOOK AT THE TERM "ABSTRACT" FOR THE

17    IDEA OF THIS PATENT IN LIGHT OF WHAT THE CLAIM CONSTRUCTION

18    SAID ABOUT IT.

19    BUT WHEN YOU GO TO WHAT THE TEXAS CLAIM CONSTRUCTION IS,

20    IT SAYS ESSENTIALLY THE EXACT SAME THING THAT WE'RE SAYING,

21    THE SPECIFIC LANGUAGE OF THE --

22    (PAUSE IN THE PROCEEDINGS.)

23    **MR. BERTA:**  -- CONSTRUCTION IS "A DATA REDUCED

24    REPRESENTATION OF A SIGNAL THAT RETAINS A PERCEPTUAL

25    RELATIONSHIP WITH THE SIGNAL."  AND GOES ON TO SAY

1   "DIFFERENTIATES ONE FROM ANOTHER."

2       BUT THE COURT IN TEXAS CONSTRUED "PERCEPTUAL QUALITY" AS A

3   QUALITY PERCEIVED BY A PERSON.  AND THE COURT IN TEXAS

4   CONSTRUED "DATA REDUCED" -- NOT "DATA REDUCED" EXACTLY, BUT IT

5   CONSTRUED THE TERM BY AGREEMENT "REDUCED IN SIZE" TO BE ITS

6   PLAIN-AND-ORDINARY MEANING.

7       SO WHEN YOU PUT THOSE CONSTRUCTIONS INTO "ABSTRACT," IT'S

8   A SMALLER REPRESENTATION OF A SIGNAL THAT DEPENDS ON HUMAN

9   PERCEPTIBILITY.  AND SO THAT IS THE IDEA HERE UNDER THE

10  CONSTRUCTION FOR WHICH THEY ARE -- ON WHICH THEY ARE RELYING.

11      AND SO THEN THE QUESTION BECOMES IS THAT ABSTRACT.

12          **THE COURT:**  OKAY.  SO JUST TO BE CLEAR, THEN, IS

13  GOOGLE CONCEDING THAT THAT'S THE CONSTRUCTION?  TO THE

14  EXTENT -- AND I HAVEN'T COMPLETED THE ANALYSIS.  SO TO THE

15  EXTENT I FOUND THAT I MIGHT NEED TO CONSTRUE A TERM, ARE YOU

16  CONCEDING THAT'S WHAT IT SHOULD BE FOR PURPOSES OF THIS

17  MOTION?

18          **MR. BERTA:**  NOT TO BE DIFFICULT, BUT WHAT I BELIEVE

19  OUR ARGUMENT TRULY IS IS THAT EVEN IF YOU TOOK THEIR ARGUMENT

20  ABOUT THIS CLAIM CONSTRUCTION WAS TRUE, IT DOESN'T CHANGE THE

21  ANALYSIS.

22          **THE COURT:**  IF I NEED TO CONSTRUE A TERM -- 'CAUSE

23  ONE OF THE THINGS WE'LL TALK ABOUT IN CASE YOU DON'T GET HERE

24  IS WHETHER THIS IS APPROPRIATE FOR JUDGMENT ON THE PLEADINGS

25  OR WHETHER I HAVE TO CONVERT IT TO A MOTION FOR SUMMARY

1  JUDGMENT.

2  SO I NEED TO KNOW WHETHER OR NOT FOR PURPOSES OF THIS

3  MOTION, YOU WOULD AGREE THAT THE COURT COULD USE A

4  CONSTRUCTION THAT IS PROFFERED BY THE PLAINTIFFS, NAMELY THE

5  ONE OUT OF TEXAS.

6  **MR. BERTA:**  YES, WE AGREE.

7  **THE COURT:**  ALL RIGHT.  KEEP GOING.

8  **MR. BERTA:**  SO I DO WANT TO BRIEFLY COVER THIS ISSUE

9  OF 112 'CAUSE THIS IS WHY I'M -- NOT BEING CAUTIOUS BUT WANT

10 TO BE CAREFUL.  WE DID TALK ABOUT 112 IN OUR PAPERS, AND WE

11 SAID, WELL, YOU -- 112 IS A MIXED QUESTION OF LAW AND FACT,

12 AND THIS IS PLEADINGS, AND YOU CAN'T DETERMINE 112 ON THE

13 PLEADINGS --

14 **THE COURT:**  BEFORE YOU GO THERE --

15 **MR. BERTA:**  YEAH.

16 **THE COURT:**  -- I WANT TO GO BACK.

17 IS THERE A DIFFERENCE AND ARE YOU CLAIMING THERE'S A

18 DIFFERENCE BETWEEN THE CONCEPT IN THE PATENT THAT IS BEING

19 PROFFERED BETWEEN MATCHING AND COMPARISON?

20 IS THAT A DISTINCTION WITH A DIFFERENCE?

21 **MR. BERTA:**  NO, YOUR HONOR.  THERE IS NO DISTINCTION

22 IN THAT.  IT IS -- THE -- THE ISSUE OF WHAT THE ABSTRACT IDEA

23 IS THE -- THE IDEA OF THE PATENTS THAT WE CONTEND TO BE

24 ABSTRACT IS THAT YOU ARE CREATING SOMETHING FROM A SIGNAL

25 USING A SMALLER PIECE OF SIGNAL THAT RELIES ON WHAT HUMANS CAN

1    OTHERWISE PERCEIVE.

2        TO WHATEVER PURPOSE.  BECAUSE THERE ARE DIFFERENT PURPOSES

3    ENUMERATED IN THERE.  SOMETIMES IT'S TO COMPARE.  SOMETIMES

4    IT'S TO MAKE SIMILAR.  SOMETIMES IT'S NOT.  BUT ALL OF THAT

5    FUNCTIONALITY OF WHAT YOU'RE USING THIS ABSTRACT FOR IS

6    CONVENTIONAL COMPUTER ACTIVITY.  AND THEY DON'T SAY OTHERWISE

7    BECAUSE IT JUST SAYS PUT IT ON A DATABASE OR USE A PROCESSOR.

8              **THE COURT:**  OKAY.

9              **MR. BERTA:**  SO THE REASON, AND I -- I -- I -- WANT TO

10   JUST BRIEFLY ADDRESS THE 112 ISSUE AND EXPLAIN WHY WE THINK

11   IT'S RELEVANT IN A SENSE.  WE AGREE THERE'S NO QUESTION THAT

12   THAT IS NOT A 112 MOTION AND THE COURT DOES NOT NEED TO DECIDE

13   ONE WAY OR THE OTHER WHETHER THE PATENT MEETS THE WRITTEN

14   DESCRIPTION OR ANY OF THE OTHER -- ENABLEMENT OR ANY OF THE

15   OTHER REQUIREMENTS OF 112.

16       THE REASON -- WE THINK IT DOESN'T MEET THOSE BUT SET THAT

17   ASIDE.  THE REASON THE 112 DISCUSSION IS HERE IS BECAUSE THE

18   PATENT IS REQUIRED TO SET FORTH HOW IT DOES ITS INVENTION.

19       AND THE ISSUE THAT WE HAVE WITH THE SPECIFICATION, WHICH I

20   THINK WE TALKED ABOUT LONG TIME AGO WHEN WE HAD OUR CASE

21   STATUSES CONFERENCES, THERE IS NO PARTICULAR DISCLOSURE OF ANY

22   PARTICULAR ABSTRACT WITH ANY PARTICULAR ALGORITHM OF ANY SORT

23   OR ANY REQUIREMENTS ON WHAT THE ABSTRACT CAN BE.

24       NOW, DO I THINK THAT'S A 112 PROBLEM?  SURE.  BUT IT IS

25   ALSO A PROBLEM HERE BECAUSE THE SPECIFICATION AND THE CLAIMS

1    ARE COMPLETELY UNBOUNDED AS TO WHAT AN ABSTRACT -- I.E., THE

2    WORD "ABSTRACT" IN THE PATENT CLAIMS -- CAN BE.  IT CAN TAKE

3    ANY FORM THAT YOU WANT AS LONG AS IT'S SMALLER THAN THE

4    ORIGINAL AND USES HUMAN PERCEPTIBLE QUALITIES.

5        AND THE PROBLEM WITH THAT IS THAT'S EXACTLY THE ISSUE OF

6    PREEMPTION, THAT THERE'S NO -- THEY CAN'T POINT TO THE IDEA OF

7    AN ABSTRACT USING AN ABSTRACT AND SAY THAT THAT IS SOMEHOW

8    CONSTRAINED BECAUSE THEY ARE TRYING TO CLAIM ALL WAYS OF USING

9    AN ABSTRACT BECAUSE THE PATENT SPECIFICATION NEVER SAYS

10   ANYTHING ABOUT AN ABSTRACT OTHER THAN HOW USEFUL IT IS IN ALL

11   SORTS OF DIFFERENT CIRCUMSTANCES.

12       SO IT'S REALLY A QUESTION OF IS THERE ANYTHING IN THIS

13   SPECIFICATION THAT LIMITS AN ABSTRACT.  AND THE ANSWER IS

14   ACCORDING TO THE TEXAS CLAIM CONSTRUCTION, NOPE.  IT JUST HAS

15   TO BE SMALLER THAN THE ORIGINAL AND RELY ON HUMAN PERCEPTION,

16   SO THAT UNBOUNDEDNESS OF THE CONSTRUCTION ON WHICH THEY ARE

17   RELYING AND THAT THERE ARE NO LIMITATIONS ON IT, THAT'S WHAT

18   MAKES THIS AN ABSTRACT IDEA.

19       BECAUSE BY ITS VERY DEFINITION, THE IDEA OF LOOKING AT A

20   SIGNAL, LIKE A PICTURE, AND DETERMINING A PIECE OF THAT, LIKE

21   THE SUN, AND THEN COMPARING THE TWO PIECES THAT ARE SMALLER

22   THAN THE ORIGINAL USING WHAT IS HUMANLY PERCEPTIBLE IS BY

23   DEFINITION SOMETHING THAT HUMANS DO.

24       AND ALL THIS CLAIM DOES IS -- ALL THESE CLAIMS DO IS SAY

25   DO THAT ON A COMPUTER.

1    **THE COURT:** IS THERE A DIFFERENCE BETWEEN "PERCEPTUAL

2    RELATIONSHIP" AND "PERCEPTUAL QUALITY"?

3    **MR. BERTA:** NOT ACCORDING TO THE CONSTRUCTION ON

4    WHICH THEY RELY BECAUSE ALL OF THAT RELIES ON WHAT HUMANS CAN

5    PERCEIVE, AND SO IT IS A LIMITATION THAT MEANS WHATEVER YOU'RE

6    DOING ON THE COMPUTER, IT'S GOT TO BE WHAT HUMANS COULD

7    OTHERWISE DO.

8    AND IT'S IN THE -- WE SAY THIS IN THE BRIEF, BUT IT --

9    IT'S -- IT'S IN THE SPECIFICATION. THIS IS JUST ONE EXAMPLE

10   WHERE IT'S TALKING ABOUT THESE PSYCHO-ACOUSTIC MODELS AND

11   PSYCHO-VISUAL MODELS, AND IT SAYS THAT THE POINT IS PRESERVE

12   THOSE PERCEPTUAL QUALITIES THAT PERMIT A HUMAN TO RECOGNIZE

13   THE ORIGINAL VISUAL IMAGE USING THE VERY SAME TECHNIQUES

14   DESCRIBED ABOVE IN CONNECTION WITH THE AUDIO SIGNAL, SIGNAL

15   MONITORING OF VISUAL IMAGES CAN BE IMPLEMENTED.

16   AND THEN IT GOES ON. THIS IS THE EMBODIMENT THAT IS

17   DISCLOSED IN THE PATENT. AND IT SAYS, FOR ONCE ITS

18   APPLICATION FOR MONITORING AND ANALYZING VISUAL IMAGES

19   INVOLVES A DESIRE TO FIND WORKS OF OTHER ARTISTS THAT RELATED

20   TO A PARTICULAR THEME.

21   FOR EXAMPLE, FINDING PAINTINGS OF SUNRISES -- SUNSETS OR

22   SUNRISES. THEN IT GOES ON TO SAY THE PRESENT INVENTION

23   INVOLVES THE SCANNING OF AN IMAGE INVOLVING A SUN.

24   **THE COURT:** CAN I STOP YOU FOR A SECOND WHILE YOU'RE

25   READING?

1          MR. BERTA:  YES.

2          THE COURT:  DOES MY COURT REPORTER HAVE A COPY OF

3    THIS?

4          MR. BERTA:  SHE DOES.

5          THE CLERK:  YEAH.

6          MR. BERTA:  OKAY.

7          THE COURT:  JUST A NOTE, A PRACTICE NOTE, AND MANY,

8    MANY LAWYERS DO IT.  WHEN YOU READ, YOU START TALKING VERY

9    QUICKLY.  AND AS A CONSEQUENCE, MY TRANSCRIPT'S NOT AS GOOD AS

10   IT NEEDS TO BE.

11         MR. BERTA:  THANK YOU.

12         THE COURT:  GO AHEAD.  SO YOU WERE READING.

13         MR. BERTA:  I WAS.  BUT LET ME CUT TO THE CHASE.  THE

14   EMBODIMENT THAT IS DESCRIBED HERE IS ESSENTIALLY DESCRIBED IN

15   TERMS OF WHAT A HUMAN WOULD DO.  IT SAYS YOU DO WHAT HUMANS

16   DO.  YOU SAY "SUNSETS," "SUNRISES," AND THEN IT SAYS SOMEHOW

17   DO THAT BY WAY OF DOING IT ON A COMPUTER.  AND THAT IS THE

18   ESSENCE OF AN ABSTRACT IDEA MOVED TO A COMPUTER ENVIRONMENT.

19       AND CASES ARE LEGION THAT THE FACT THAT YOU DO THIS ON A

20   COMPUTER ALONE DOESN'T MEAN ANYTHING.  IT DOESN'T CONFER

21   PATENTABILITY ON WHAT IS OTHERWISE AN ABSTRACT IDEA.  IT'S

22   JUST A LIMITATION ON THE FORUM IN WHICH YOU ARE DOING THAT

23   ABSTRACT IDEA.

24         THE COURT:  MS. DUTTON, WHY DON'T YOU RESPOND TO

25   THAT?  THAT IS A CRITICAL PIECE OF THIS.  WHAT DOES THIS

1  PATENT TEACH OTHER THAN TO OUTLINE EXACTLY THAT?

2        **MS. DUTTON:**  YOUR HONOR, I THINK THE FIRST QUESTION

3  THAT HAS TO BE ANSWERED BEFORE -- AND I'M NOT IN THE POSITION

4  THAT -- BLUE SPIKE IS NOT IN A POSITION TO ANSWER THAT -- IS

5  WHAT IS ONE OF ORDINARY SKILL OF THE ART.  THAT IS THE LENS

6  THROUGH --

7        **THE COURT:**  WHAT DO YOU MEAN BLUE SPIKE IS NOT IN A

8  POSITION TO ANSWER THAT QUESTION.  IT'S THEIR PATENT.

9        **MS. DUTTON:**  CORRECT, YOUR HONOR.  AND IN TEXAS WE

10  HAVE SAID THAT -- BLUE SPIKE HAS ARGUED THAT ONE OF SKILL IN

11  THE ART WOULD HAVE A MASTER'S DEGREE, WITH SEVERAL YEARS OF

12  EXPERIENCE IN SIGNAL PROCESSING.

13        **THE COURT:**  AND THEY DO NOT.

14        **MS. DUTTON:**  IN THIS CASE, THE -- THE INVENTOR -- ONE

15  OF THE INVENTORS, AS YOU'VE NOTED IN THE CMC HEARING, IS --

16  HAS A BACHELOR IN -- BACHELOR'S IN ECONOMICS.  THE OTHER

17  COINVENTOR HAS A BACHELOR'S IN -- IS A SOFTWARE ENGINEER.  I

18  DON'T KNOW HIS EXACT --

19        **THE COURT:**  CAN YOU NOT EXPLAIN THIS PATENT TO ME?

20        **MS. DUTTON:**  YES, YOUR HONOR.

21        **THE COURT:**  IS THAT YES, YOU CAN?  OR THAT'S A YES, I

22  CANNOT?

23        **MS. DUTTON:**  I CAN EXPLAIN -- BLUE SPIKE CAN EXPLAIN

24  THE PATENTS.  HOWEVER, THE LENS THROUGH WHICH THE COURT AND

25  BLUE SPIKE NEEDS TO ANALYZE THE -- THE LEGITIMATE QUESTIONS

1  THAT ARE ANSWERED ARE THROUGH -- IS FROM ONE OF SKILL IN THE

2  ART.

3         **THE COURT:**  SO WHAT?  SO ANSWER THE QUESTION.  WE DO

4  THIS ALL THE TIME.  THAT'S OUR JOB.

5         **MS. DUTTON:**  YES, YOUR HONOR.  SO UNDER PRONG ONE OF

6  THE -- THE *ALICE* TEST, THE CORRECT CONSTRUCT OF REVIEWING THIS

7  IS REVIEWING NOT JUST A COMPARISON BUT --

8         **THE COURT:**  I'M ASKING YOU TO EXPLAIN THE PATENT.

9  DOES IT DO ANYTHING OTHER THAN TELL THE READER TO IDENTIFY

10  SOMETHING THAT A HUMAN PERCEIVES AND COMPARE IT TO SOMETHING

11  ELSE THROUGH THE USE OF A COMPUTER?

12     DOES IT DO ANYTHING OTHER THAN THAT?

13         **MS. DUTTON:**  YES, YOUR HONOR.

14         **THE COURT:**  THEN WHAT DOES IT DO?

15         **MS. DUTTON:**  IT PROVIDES FOR COMPUTATIONS THAT --

16  PART OF THE ERROR HERE IS IN SAYING THAT PERCEPTUAL

17  CHARACTERISTICS EQUATES TO HUMAN ACTIVITY.  THAT'S THE --

18  THAT'S THE INITIAL PROBLEM THAT'S -- THAT'S FACING BLUE SPIKE

19  AND THE COURT TODAY.

20         **THE COURT:**  I'M NOT TRYING TO PUT WORDS IN YOUR

21  MOUTH.  I'M ASKING A VERY OPEN-ENDED QUESTION FOR YOU TO

22  EXPLAIN TO -- IF THIS -- THIS IS BEING ATTACKED AS JUST

23  OUTLINING AN ABSTRACT IDEA.

24     I AM ASKING YOU TO THEN TELL ME IF IT DOES NOT, WHAT DOES

25  IT DO?

1    **MS. DUTTON:** YOUR HONOR, WHAT IT DOES WITH RESPECT TO

2    THE ABSTRACT -- TOO MANY USES OF THE WORD "ABSTRACT" -- IS

3    IT'S COMPLEX ALGORITHMS THAT HAVE -- THAT WHILE TAKING INTO

4    ACCOUNT WHAT A HUMAN PERCEPTION IS, IS NOT SOMETHING THAT IN

5    TURN A HUMAN CAN DO.

6       THESE ARE COMPLEX MATHEMATICAL ALGORITHMS THAT EFFECT

7    (SIC) AND MODEL AND MIMIC WHAT HUMAN ACTIVITY IS, BUT THE --

8    THE OTHER DIRECTION IS NOT TRUE.

9       A HUMAN --

10       **THE COURT:** -- TEACH THE ALGORITHMS. IT DOESN'T DO

11   ANY OF THAT; IS THAT RIGHT?

12       **MS. DUTTON:** NO, YOUR HONOR, IT'S NOT RIGHT. THE

13   TEST IS -- WHICH HAS BEEN FULLY BRIEFED IN TEXAS AND IS --

14       **THE COURT:** WELL, WE'RE NOT IN TEXAS RIGHT NOW.

15       **MS. DUTTON:** CORRECT, YOUR HONOR.

16       **THE COURT:** SO TELL ME WHERE IT IS THAT IT TEACHES

17   IT. WHAT CLAIM -- LET'S TAKE A LOOK AT THE '740, WHICH IS THE

18   FIRST -- OR '728?

19       **MS. DUTTON:** '472, YOUR HONOR?

20            (SIMULTANEOUS COLLOQUY.)

21       **MS. DUTTON:** -- '472.

22       **THE COURT:** SO WHERE ARE YOU SAYING IT TEACHES THIS?

23            (PAUSE IN THE PROCEEDINGS.)

24       **MS. DUTTON:** ONE MOMENT, YOUR HONOR.

25            (PAUSE IN THE PROCEEDINGS.)

1           **MS. DUTTON:**  YOUR HONOR, AT COLUMN 7, LINES 46

2    THROUGH 60, WHICH IS DIRECTLY ON POINT WITH GOOGLE'S COUNSEL

3    POINTING OUT "PSYCHO-ACOUSTIC" AND "PSYCHO-VISUAL

4    COMPRESSION."

5       IN ADDITION, YOUR HONOR, AT COLUMN 4, LINES 24 THROUGH 32,

6    SPECIFICALLY -- AND THESE ARE IDENTIFIED IN THE EXPERT

7    DECLARATION SUBMITTED BY -- BY BLUE SPIKE.

8          **THE COURT:**  SO THERE'S NOTHING IN THE CLAIMS ITSELF.

9          **MS. DUTTON:**  NO, YOUR HONOR.

10         **THE COURT:**  OKAY.

11    ANYTHING ELSE?

12         **MS. DUTTON:**  THOSE ARE THE TWO PRIMARY COLUMNS, YOUR

13    HONOR, THAT THE EXPERT HAS RELIED UPON AND -- AND IS NOT --

14    ADMITTEDLY IS NOT BEFORE THIS COURT BECAUSE THE -- AS WE'LL

15    EXPLAIN SHORTLY, WE BELIEVE THIS ISSUE TO BE PREMATURE.

16       ONE OF SKILL IN THE ART IS ALLOWED TO WORK WITH THE -- THE

17    KNOWLEDGE OF WHAT HAS COME BEFORE.  THE -- IN FACT, THE NPEP

18    CITES TO NUMEROUS FEDERAL CIRCUIT OPINIONS WHICH IDENTIFY THAT

19    THE PATENT --

20         **THE COURT:**  CAN YOU TELL ME --

21         **MS. DUTTON:**  SORRY, YOUR HONOR.

22         **THE COURT:**  YOU SAID LINE 46?  THAT DOESN'T START A

23    SENTENCE.  LINE -- COLUMN 7 --

24             (PAUSE IN THE PROCEEDINGS.)

25         **MR. GARTEISER:**  JUST WANT TO CONFIRM WE'RE LOOKING AT

1    THE SAME PATENT, '472.

2            **MS. DUTTON:**  RIGHT.  NO, YOUR HONOR'S CORRECT.  THAT

3    IS -- THAT IS NOT THE RIGHT CITATION.

4                    (PAUSE IN THE PROCEEDINGS.)

5            **THE COURT:**  WELL, I'LL LET YOU GET BACK TO ME ON THAT

6    ONE.

7            **MS. DUTTON:**  THANK YOU, YOUR HONOR.

8            **THE COURT:**  THE -- THE SECOND ONE YOU CITED WAS

9    COLUMN FOUR, AT WHAT LINE?

10           **MS. DUTTON:**  LINES 24 THROUGH 32, YOUR HONOR.

11           **THE COURT:**  WITH -- STARTING WITH WORD "FOR EXAMPLE"?

12                   (PAUSE IN THE PROCEEDINGS.)

13           **MS. DUTTON:**  YOUR HONOR, IT APPEARS THAT INSTEAD OF

14    THE '472, THIS SHOULD HAVE BEEN CITED TO A DIFFERENT PATENT.

15    LET ME LOCATE BOTH OF THOSE SECTIONS SO THAT WE CAN BE

16    LITERALLY ON THE SAME PAGE.

17           **MR. GARTEISER:**  PROBABLY THE 7 --

18           **THE COURT:**  OKAY.  WHY DON'T YOU GO LOOK AT IT.

19    LET'S KEEP GOING.

20           **MS. DUTTON:**  THANK YOU, YOUR HONOR.

21           **THE COURT:**  MR. BERTA.

22           **MR. BERTA:**  YOUR HONOR, THANK YOU.

23       BRIEFLY ON THIS ISSUE THAT WAS BEING DISCUSSED, THE -- THE

24    ISSUE THAT WE HAVE WITH THE EXPERT'S DECLARATION IS THAT WHAT

25    HE SAYS IS THAT THERE ARE THINGS THAT COMPUTERS CAN DO THAT

1    PEOPLE CAN'T DO.  AND THAT MAY BE TRUE.

2        AND THEN HE SAYS THAT THERE ARE TRUE PARTICULAR

3    COMPARISONS THAT HE THINKS A COMPUTER CAN DO OF ONE ABSTRACT

4    TO ANOTHER THAT PEOPLE CAN'T DO BASED ON PARTICULAR SINGLE-BIT

5    DIFFERENCES BETWEEN TWO DIFFERENT ABSTRACTS.

6        WE WILL GET TO THIS LATER, BUT THE ISSUE IS TWO FOLD.

7    NUMBER ONE, CASE LAW HAS SAID THAT'S NOT TRUE.  ACTUALLY,

8    HUMANS CAN GO BIT BY BIT THROUGH THINGS, SO THAT'S NOT A

9    CORRECT STATEMENT OF HUMAN CAPACITY.

10        TWO, HERE, OBVIOUSLY BECAUSE THESE PATENTS ARE EXPRESSLY,

11    EVEN UNDER THEIR CONSTRUCTION, DRAWN TO MIMICKING WHAT HUMANS

12    CAN OTHERWISE PERCEIVE.  IT IS NOTHING MORE THAN WHAT HUMANS

13    CAN PERCEIVE ON A COMPUTER, WHICH IS THE PARADIGM OF AN

14    ABSTRACT IDEA.

15        BUT THREE, THE LIMITATION -- THE IDEAS THAT HE SAYS THAT

16    COMPUTERS CAN DO THAT PEOPLE CAN'T DO, THOSE AREN'T

17    LIMITATIONS OF THE CLAIM.  THERE MAY BE A CORNER CASE

18    SOMEWHERE OF A CLAIM THAT COVERS WHAT HE'S SAYING, BUT UNLESS

19    THE CLAIM IS LIMITED TO THAT, IT DOESN'T MATTER.  THE CLAIM IS

20    BROADER THAN THE THING HE'S SAYING THAT A COMPUTER CAN DO AND

21    THAT PERSON CAN'T DO.  AND THAT'S THE ISSUE HERE.  THAT'S WHY

22    THESE ARE PREEMPTIVE, BECAUSE THESE PATENTS ARE BEING ASSERTED

23    OBVIOUSLY AGAINST EVERYTHING EVERYWHERE AND DON'T HAVE A LIMIT

24    TO ONLY AN ABSTRACT THAT IS ONE-BIT DIFFERENCE BETWEEN ANOTHER

25    ABSTRACT OR ONLY AN ABSTRACT THAT A COMPUTER CAN TELL THE

1  DIFFERENCE BETWEEN BUT A HUMAN CAN'T DO.

2  I WOULD SUBMIT YOU COULDN'T HAVE THAT AS A LIMITATION OF

3  THESE CLAIMS 'CAUSE THAT'S DIRECTLY CONTRARY TO THE

4  CONSTRUCTION THAT THEY ARE SAYING.  BUT REGARDLESS, UNLESS

5  IT'S A LIMITATION OF THE CLAIM, IT HAS NO BEARING ON THE 101

6  ANALYSIS.

7  I WANT TO, I THINK, JUST MOVE TO STEP 22, IF APPROPRIATE,

8  TO TALK ABOUT WHETHER THERE ARE ANY LIMITATIONS HERE THAT

9  MATTER.  AND AS A PREFACE, WHAT I WOULD SAY IS THAT CASES ARE,

10  I THINK, UNIFORM IN THE IDEA THAT ADDING IN CONVENTIONAL

11  ACTIVITY IS NOT A MEANINGFUL LIMITATION ON AN ABSTRACT IDEA.

12  I JUST WANT TO BRIEFLY TALK ABOUT WHY THAT HAS TO BE TRUE.

13  I THINK WE TALKED ABOUT IT A LITTLE EARLIER, THAT -- AND THIS

14  IS CONSISTENT WITH THE REASONING OF THE *COGENT* CASE, WHICH IS

15  OUT OF THIS DISTRICT, THAT YOU CAN BASICALLY PREEMPT

16  EVERYTHING BY JUST ADDING IN WHAT OTHER PEOPLE DO.

17  AND IN TERMS OF THESE SETS OF PATENTS AND THESE SETS OF

18  CLAIMS, THERE ARE HUNDREDS OF THE CLAIMS.  AND THAT'S

19  ESSENTIALLY EXACTLY WHAT'S HAPPENED HERE.  THEY CAME UP

20  WITH -- THEY SAY WE CAME UP WITH A REVOLUTIONARY IDEA.  FINE.

21  LET'S ACCEPT THAT AS TRUE.  THE REVOLUTIONARY IDEA OF TAKING A

22  SMALLER PIECE OF A SIGNAL AND COMPARING IT USING HUMAN

23  PERCEPTION.

24  THAT'S THE ABSTRACT IDEA.  AND IF THEY SAY, THEN, DO IT

25  WITH A COMPUTER, THAT DOES -- THAT ONLY LIMITS IT TO COMPUTER

1    FIELD.

2        IF THEY SAY DO IT WITH COMPRESSION, THERE'S NO CONTENTION

3    HERE THAT THEY INVENTED COMPRESSION CERTAINLY AND IN THE

4    SPECIFICATION THEY ADMIT THAT THEY DON'T, NOR ANY PARTICULAR

5    FORM OF COMPRESSION.  THEY JUST SAY -- THEY, IN FACT, CITE

6    COMPRESSION, WHICH I THINK IS ONE OF THE EXAMPLES THAT WE'RE

7    PROBABLY GOING TO GET FROM THE EXPERT DECLARATION AS A THING

8    THAT PEOPLE OTHERWISE DO.  AND THEY SAY THIS THING THAT OTHER

9    PEOPLE HAVE INVENTED IS USEFUL IN COMBINATION WITH OUR

10   ABSTRACT IDEA.

11       AND THAT'S EXACTLY WHAT ISN'T A LIMIT ON AN ABSTRACT IDEA

12   BECAUSE IT DOESN'T -- YOU ADD COMPRESSION HERE, YOU ADD

13   ENCRYPTION THERE, YOU ARE THEN SLICING OFF PIECES OF THE

14   ABSTRACT IDEA AND THEN PREEMPTING THE ENTIRE ABSTRACT IDEA.

15       AND SO WHEN THEY POINT TO PARTICULAR LIMITATIONS OF

16   PARTICULAR CLAIMS THAT HAVE SOMETHING THAT'S ACKNOWLEDGED BY

17   THE SPECIFICATION TO BE IN THE PRIOR ART, THOSE ARE JUST

18   SLICES OF CLAIMING THE ABSTRACT IDEA IN A PARTICULAR FIELD.

19       OBVIOUSLY WITH THE BROADER CLAIMS THAT HAVE NONE OF THESE

20   LIMITATIONS AT ALL, JUST GENERIC COMPUTER IMPLEMENTATION,

21   THOSE ARE COMPLETELY UNLIMITED.  BUT THE FACT YOU HAVE A

22   DEPENDENT CLAIM THAT SAYS DO IT IN A FIELD YOU'RE USING

23   COMPRESSION, DO IT IN FIELD WHERE YOU'RE USING ENCRYPTION,

24   BOTH OF WHICH ARE ACKNOWLEDGED TO BE THINGS THAT OTHER PEOPLE

25   HAVE COME UP WITH ACCORDING TO THE SPECIFICATION, THAT'S JUST

1    SLICING UP YOUR PREEMPTION OF THE FIELD.

2         THE PARTICULAR THINGS TO WHICH THEY POINT -- WELL, FIRST,

3    WE HAVE A -- THIS IS IN THE SLIDES, AND IT'S IN THE PAPERS,

4    BUT IT'S, I THINK, A LITTLE NOT CLEAR.  THE CLAIMS THAT DON'T

5    HAVE THE LIMITATIONS THAT THEY ARE POINTING TO IN THE BRIEFS

6    ARE, ON THE '472 PATENT, CLAIMS 1, 2, 3, AND 8; ON THE '700

7    PATENT, CLAIMS 1 AND 21; ON THE '494 PATENT, CLAIMS 15 AND 17.

8    ON THE '175 PATENT, IT'S CLAIMS 1, 8, AND 11; AND ON THE '728

9    PATENT, IT'S CLAIMS 1, 4 AND 25.

10        SO THOSE ARE THE CLAIMS THAT DON'T HAVE THE LIMITATIONS

11   THAT THEY EXPRESSLY WERE DISCUSSING IN THEIR PAPERS, SETTING

12   ASIDE OUR DISPUTE OVER WHETHER AN ABSTRACT ITSELF TAKES IT OUT

13   OF THE REALM OF AN ABSTRACT IDEA.

14        SO I WANT TO GO THROUGH THE PARTICULAR LIMITATIONS THAT

15   ARE RAISED AND SHOW WHERE THOSE THINGS EITHER HAVE BEEN HELD

16   TO BE OR ARE ADMITTED TO BE ESSENTIALLY WELL UNDERSTOOD

17   ROUTINE AND CONVENTIONAL -- I.E., PRACTICED BY OTHERS AND NOT

18   INVENTED BY THE PATENT -- THE INVENTORS.

19        SO JUST GETTING TO IT.  STARTING WITH CERTAIN CLAIMS THAT

20   THEY POINT TO IN THE '700 PATENT, CLAIMS 10 AND 11, AND THEN

21   IN THE '175 PATENT, CLAIM 16, THESE ARE EXAMPLES OF HOW

22   THOSE -- WHAT THOSE CLAIMS LOOK LIKE.

23        SAYS "THE SYSTEM OF CLAIM 1, WHEREIN THE SYSTEM APPLIES A

24   CRYPTOGRAPHIC PROTOCOL TO THE ABSTRACT."  SO THAT'S WHAT

25   THEY'VE ADDED.  "CRYPTOGRAPHIC PROTOCOL" IN CLAIM 11 IS "ONE

1   OF AT LEAST A HASH OR DIGITAL SIGNATURE."  I BELIEVE THERE'S

2   NO DISPUTE HERE THAT THE INVENTORS HERE DID NOT COME UP WITH

3   CRYPTOGRAPHIC PROTOCOLS, DID NOT COME UP WITH HASHES OR

4   DIGITAL SIGNALS.  AND, IN FACT, THE SPECIFICATION ADMITS AS

5   MUCH, WHERE IT BASICALLY TALKS ABOUT A -- IN, FOR EXAMPLE, THE

6   '700 PATENT, COLUMNS -- COLUMN 10, LINES 39 TO 48, THAT YOU

7   CAN JUST ADD IN CRYPTOGRAPHIC TECHNIQUES.  THERE'S NO

8   DESCRIPTION OF WHAT IT MEANS TO BE A CRYPTOGRAPHIC TECHNIQUE

9   BECAUSE IT IS A WELL-UNDERSTOOD PRACTICE IN THE ART.

10       AND, IN FACT, THAT'S WHAT'S BEEN HELD BY OTHER COURTS WHEN

11  LOOKING AT THIS ISSUE.  CRYPTOGRAPHY IS KNOWN.  YOU'RE NOT --

12  FIRST OF ALL, IDENTIFYING -- INVENTING CRYPTOGRAPHY.  SECOND,

13  A PARTICULAR FORM OF CRYPTOGRAPHY --

14       **THE COURT:**  THE POINT'S MADE.  YOU'RE NOT GOING TO

15  HAVE ALL MORNING.

16       **MR. BERTA:**  SORRY.

17       DATA TRANSMISSION IS THE NEXT LIMITATION.  CLAIMS 18 AND

18  27 OF THE '700 PATENT, AND THERE'S AN ADDITIONAL LIMIT AT THE

19  BOTTOM OF THAT CLAIM THAT SAYS, "DETERMINING WHETHER THE QUERY

20  SIGNAL ABSTRACT MATCHES ANY OF THE STORED DATA SIGNAL

21  ABSTRACTS IN THE AT LEAST ONE DATABASE."  AND HERE IT GIVES

22  THE PURPOSE, "TO ENABLE AUTHORIZED TRANSMISSION."

23       AGAIN, PATENT EXPRESSLY ACKNOWLEDGES THAT TRANSMISSION OF

24  DATA IS NOTHING NEW.

25       AND IT GOES THROUGH MULTIPLE PROTOCOLS INCLUDING MPEG THAT

1    ARE COMPRESSION AND TRANSMISSION STANDARDS FOR DIGITIZED

2    INFORMATION.  IT'S JUST ANOTHER INSTANCE OF ADDING WHAT IS

3    ALREADY KNOWN TO THE ABSTRACT IDEA, WHICH IS NOT A VALID STEP

4    2 LIMITATION.

5        SIMILARLY, THEY TALK ABOUT A LIMITATION CALLED THIS USE OF

6    PSYCHO-ACOUSTIC AND PSYCHO-VISUAL MODELS.  IT'S A MOUTHFUL.

7    IT SHOWS UP, FOR EXAMPLE, IN '175 PATENT, CLAIM 17.

8        HOWEVER, WHAT THE SPECIFICATION EXPLAINS IS -- AND THIS

9    IS, I BELIEVE, IN THE SAME SET OF CITATIONS POINTED TO BY

10   PLAINTIFF'S COUNSEL.  IT SAYS, LOSSY AND LOSSLESS -- "LOSSLESS

11   AND LOSSY COMPRESSION SCHEMES ARE APPROPRIATE CANDIDATES FOR

12   DATA REDUCTION TECHNOLOGIES, AS ARE THOSE SUBSET OF APPROACHES

13   THAT ARE BASED ON PERCEPTUAL MODELS SUCH AS" -- AND IT LISTS A

14   WHOLE SLEW OF PREEXISTING COMPRESSION SCHEMES.

15       AND THEN IT GOES ON TO EXPLAIN, MOST COMPRESSION IS EITHER

16   LOSSY OR LOSSLESS AND IS DESIGNED WITH PSYCHO-ACOUSTIC OR

17   PSYCHO-VISUAL PARAMETERS.  THAT IS TO SAY THE SIGNAL IS

18   COMPRESSED TO RETAIN WHAT IS HUMANLY PERCEPTIBLE.  THAT IS A

19   STATEMENT THAT THEY ARE REFERRING TO PREEXISTING COMPRESSION

20   SCHEMES THAT ARE DOING THE THING THAT THEY ARE CLAIMING.

21       SO THEY'RE JUST SAYING, USE THESE EXISTING COMPRESSION

22   SCHEMES THAT HAVE THESE ATTRIBUTES TO PRACTICE OUR INVENTION.

23       THAT IS NOT A STEP 2 LIMITATION -- THAT IS NOT A STEP 2 OF

24   *ALICE* VALID LIMITATION.

25       SPECTRAL TRANSFORMS SHOWS UP IN '728 PATENT, CLAIM 26,

1   SAME ISSUE.  SAME ISSUE ON BOTH FRONTS.  FIRST --

2          **THE COURT:**  IF IT'S THE SAME ISSUE, DON'T REPEAT

3   YOURSELF.

4          **MR. BERTA:**  OKAY.

5          **THE COURT:**  IF YOU HAVE SOMETHING NEW TO ADD, THEN

6   YOU CAN ADD IT.

7          **MR. BERTA:**  I WILL ADD THE PARTICULARS OF WHERE IN

8   THE SPECIFICATION THEY CONCEDE THAT A SPECTRAL TRANSFORM IS

9   NOTHING OTHER THAN -- THEY CERTAINLY DON'T SAY THAT THEY'RE

10  INVENTING SPECTRAL TRANSFORMS.  THEY JUST DESCRIBE THEM AS

11  SOMETHING THAT EXISTS AS A MATHEMATICALLY DETERMINING A

12  SPECTRAL TRANSFORM.  AND A MATHEMATICAL CALCULATION IS NOT A

13  PATENTABLE IDEA.  THEY ADMIT IT IS.  THE SPECTRAL TRANSFORM IS

14  A MATHEMATICAL CALCULATION.

15      THE REST OF THE LIMITATIONS ARE IN THEIR PARTICULARS

16  DIFFERENT BUT SUBSTANTIVELY NO DIFFERENT OF THE LIMITATION

17  THAT THEY POINT TO OF CHANGING SELECTED CRITERIA WHICH SHOWS

18  UP IN THE '728 PATENT, CLAIM 5.  THE IDEA OF -- THIS IS FROM

19  THE FEDERAL CIRCUIT DATA -- COLLECTION AND RECOGNITION IS

20  UNDISPUTABLY (PHONETIC) WELL KNOWN.  THE ISSUE IN *CONTENT*

21  *EXTRACTION*, THE PARTICULARS HAD TO DO WITH FEEDING A CHECK

22  INTO A OPTICAL RECOGNITION SYSTEM AND PULLING OUT CERTAIN

23  FIELDS.

24      THE COURT CHARACTERIZED THERE THAT THE ABSTRACT IDEA WAS

25  COLLECTING THE DATA, RECOGNIZING CERTAIN DATA WITHIN THE

1  COLLECTED DATA, AND THEN STORING THE DATA.  COURT SAID THAT'S

2  ABSTRACT.  THAT'S NOT -- THERE'S NOTHING ABOUT THAT THAT'S

3  ANYTHING OTHER THAN WHAT PEOPLE WOULD OTHERWISE DO.

4      SAME HERE, IT'S BASICALLY SELECTING A PORTION OF A SIGNAL

5  TO USE AS YOUR ABSTRACT OF THE SIGNAL.

6      THE -- THEY GO ON, I THINK, WITH RESPECT TO THE '728

7  PATENT CLAIM 5 AND SAY THAT SOMEHOW THIS LIMITATION OF

8  SELECTION RAISES THE IDEA OF THE STRENGTHS OF A COMPUTING

9  DEVICE AND THE ECONOMIC NEEDS OF A PARTICULAR MARKET.  THAT'S

10 THE ARGUMENT THAT'S MADE IN THEIR PAPERS.

11     THE ISSUE IS, THOUGH, OF COURSE THOSE ARE NOT CLAIM

12 LIMITATIONS, SO WHAT ONE WOULD DO WITH SELECTING AND WHY IT'S

13 GREAT TO SELECT DOESN'T CONVERT THE IDEA OF SELECTING INTO

14 ANYTHING OTHER THAN A COMMON, CONVENTIONAL, WELL-UNDERSTOOD

15 PRACTICE DONE BY OTHERS.

16     THIS -- IT IS ESSENTIALLY THE SAME ARGUMENT WITH RESPECT

17 TO THE LAST ISSUE HERE, WHICH IS WHERE THEY POINT TO AN

18 ABSTRACT COMPRISES SIGNAL CHARACTERISTIC PARAMETERS CONFIGURED

19 TO DIFFERENTIATE BETWEEN A PLURALITY OF VERSIONS OF THE

20 REFERENCE SIGNAL.

21     IN ACTUAL WORDS, THAT'S NOTHING OTHER THAN PICKING WHICH

22 CHARACTERISTIC PARAMETERS THAT YOU'RE GOING TO MAKE YOUR

23 ABSTRACT FROM, AND THAT'S IN THE REST OF CLAIMS THAT THEY

24 CHALLENGE.

25     AND IN PARTICULAR HERE, IT'S INTERESTING BECAUSE A

1    SPECIFICATION JUST CONFIRMS THAT WE'RE -- THAT WE'RE RIGHT

2    ABOUT THIS, BECAUSE THERE'S THIS WHOLE DISCUSSION OF HOW TO

3    PRACTICE THE -- THE INVENTION.  AND, AGAIN, THEY DO THIS BY

4    WAY OF EXAMPLE RATHER THAN A DISCLOSURE.  AND IT SAYS,

5    "PERCEPTUAL DIFFERENCES EXIST BETWEEN A SONG AND ITS

6    REPRODUCTION FROM A CD, AN A.M. RADIO, AND AN INTERNET

7    BROADCAST."  SO HERE WE'RE TALKING ABOUT WHAT KINDS OF SIGNALS

8    THE PATENT CAN POTENTIALLY APPLY TO.

9        AND THEN IT SAYS, "TO THE EXTENT THAT THE CREATOR OR

10   CONSUMER OF THE SIGNAL CAN DEFINE A DIFFERENCE IN ANY OF THE

11   FOUR CRITERIA ABOVE, MEANS CAN BE DERIVED (AND PROGRAMMED FOR

12   SELECTABILITY) TO RECOGNIZE AND DISTINGUISH THESE

13   DIFFERENCES."

14           **THE COURT:**  SO I TAKE IT THAT GOOGLE'S ENTIRE

15   ARGUMENT ESSENTIALLY RESTS ON THE BASIC PREMISE THAT THE

16   PATENT AND/OR THE CLAIMS ARE REALLY -- I GUESS YOU'RE NOT

17   ATTACKING THE PATENT AS A WHOLE, JUST VERY SPECIFIC CLAIMS --

18   THAT ALL OF THOSE ARE FUNDAMENTALLY BASED ON THE NOTION THAT A

19   HUMAN NEEDS TO PERCEIVE SOMETHING.

20           **MR. BERTA:**  THAT -- YES, YOUR HONOR.  THAT IS -- THAT

21   IS WHY WE THINK IT'S ABSTRACT.  AND WE THINK THAT THESE OTHER

22   LIMITATIONS THAT ARE BEING THROWN IN EITHER COLLAPSE TO THIS

23   EXACT SAME ISSUE, THAT IT'S JUST SOMETHING HUMANS ARE

24   OTHERWISE DOING AND IT'S ON A COMPUTER OR THEY JUST ADD IN

25   CONVENTIONAL, OTHERWISE WELL-KNOWN COMPUTER STEPS OF SOMETHING

1    LIKE SELECTING.

2         **THE COURT:**  ALL RIGHT.

3         **MR. BERTA:**  WITH THAT, WITHOUT QUESTIONS OBVIOUSLY IF

4    THERE'S SOMETHING TO RESPOND TO, I CAN ADDRESS THAT BUT THAT

5    IS OUR PRESENTATION.

6         **THE COURT:**  WELL, LET'S START THERE WITH THE

7    PLAINTIFF AGAIN.  DOES IT DO ANYTHING OTHER THAN THAT?  AND IF

8    SO, WHAT?

9         **MS. DUTTON:**  YOUR HONOR, MAY WE REFRAME AND TAKE A

10   LOOK AT THE FOREST FOR THE TREES.

11        **THE COURT:**  NO, I'D LIKE YOU TO ANSWER THAT QUESTION,

12   AND THEN YOU CAN REFRAME.

13        **MS. DUTTON:**  THANK YOU, YOUR HONOR.

14     WILL YOU READ THE QUESTION BACK, PLEASE, TO MAKE SURE I'M

15   ON THE SAME PAGE.

16        **THE COURT:**  LET ME DO IT.

17             (PAUSE IN THE PROCEEDINGS.)

18        **THE COURT:**  MR. BERTA FINISHED BY SAYING THAT GOOGLE

19   THINKS THAT THESE -- WELL, WHEN I ASKED THE QUESTION ABOUT

20   WHETHER GOOGLE'S ARGUMENT REST ON THE PREMISE THAT THE CLAIMS

21   ASSERTED WERE BASED ON A NOTION THAT A HUMAN NEEDS TO JUST

22   PERCEIVE SOMETHING.

23     HIS RESPONSE WAS THAT YES, BUT THAT THEY THINK THAT THESE

24   OTHER LIMITATIONS THAT ARE BEING THROWN IN EITHER COLLAPSE TO

25   THIS EXACT SAME ISSUE OR IT'S JUST SOMETHING THAT --

1    (RECORD READ AS FOLLOWS:  "-- HUMANS ARE OTHERWISE DOING

2    AND IT'S ON A COMPUTER.")

3         **MS. DUTTON:**  THANK YOU, YOUR HONOR.

4    SO THAT REALLY PRESENTS THE TWO-PRONG APPROACH.  FIRST OF

5    ALL, WE DO NOT AGREE THAT -- THAT HUMAN PERCEPTION ABSTRACT.

6    THE PROBLEM WITH EQUATING RETAINING PERCEPTUAL

7    RELATIONSHIPS TO HUMAN ACTIVITY IS THAT THIS WOULD ENCOMPASS

8    ARTIFICIAL INTELLIGENCE.  MIMICKING OR MODELING PERCEPTUAL

9    RELATIONSHIPS BASED ON WHAT HUMANS DO, SUCH AS COMPARING,

10   COMMUNICATING, MAY GO IN ONE DIRECTION, BUT IT DOESN'T

11   NECESSARILY MEAN THAT THE HUMANS CAN PERFORM THE FUNCTIONS

12   THAT THE COMPUTERS DO.

13   AND WE'D LIKE TO EXPLORE THAT LATER WITH SOME -- WITH SOME

14   EXAMPLES, BUT LET ME GET DIRECTLY TO YOUR SECOND QUESTION.

15        **THE COURT:**  SO ARE YOU SAYING THAT THIS PATENT COVERS

16   ARTIFICIAL INTELLIGENCE?

17        **MS. DUTTON:**  NO, YOUR HONOR.  BUT USING THE FRAMEWORK

18   AND THE TEST THAT GOOGLE SETS FORTH IN ATTACKING OUR -- THE

19   PATENT'S MODELING AFTER HUMAN PERCEPTION IS ONE THAT WOULD

20   HAVE GRAVE CONSEQUENCES FOR AI; INCLUDING, FOR EXAMPLE

21   GOOGLE'S OWN DRIVERLESS CAR.

22        **THE COURT:**  OKAY.

23        **MS. DUTTON:**  SECOND, WITH RESPECT TO THE ADDITIONAL

24   LIMITATIONS, THE ERROR THAT GOOGLE INVITES THIS COURT TO

25   CREATE IN LOOKING AT A POINT OF NOVELTY OF INDIVIDUAL CLAIM

1    LIMITATIONS, THIS IS CONTRARY TO SUPREME COURT LAW AS WELL AS

2    FEDERAL CIRCUIT PRECEDENT -- WE COVER THIS IN OUR OPPOSITION

3    AT FOOTNOTE 9 -- IN WHICH OBVIOUSNESS, THE SECTION 103

4    ANALYSIS, CAN BE LOOKED -- IS REQUIRED TO BE LOOKED AT ALL --

5    AS ALL OF THE CLAIM ELEMENTS AS A WHOLE.

6        SO THE ANALYSIS, THE LENS THROUGH WHICH GOOGLE IS LOOKING

7    AT AND FOCUSING ON ONE LIMITATION AT A TIME IS ERRONEOUS, YOUR

8    HONOR.  IT'S PROBLEMATIC.

9        **THE COURT:**  ARE YOU SAYING THAT I'M NOT SUPPOSED TO

10   LOOK AT THE PATENT AND -- THAT EACH CLAIM OF THE PATENT

11   INDEPENDENTLY?

12       **MS. DUTTON:**  YOUR HONOR, YOU'RE -- THE -- THE

13   FRAMEWORK AND THE LENS IS ONE OF LOOKING BOTH AT THE CLAIM AS

14   A WHOLE AS WELL AS LOOKING AT THE LIMITATIONS INDIVIDUALLY.

15   BUT IN TERMS OF AN OBVIOUSNESS ANALYSIS, AS THE SUPREME COURT

16   RECOGNIZED IN -- IN *KSR*, "INVENTION" -- AND I QUOTE SLOWLY,

17   "INVENTIONS IN MOST, IF NOT ALL, INSTANCES RELY UPON BUILDING

18   BLOCKS LONG SINCE UNCOVERED, AND CLAIMED DISCOVERIES ALMOST OF

19   NECESSITY WILL BE COMBINATIONS OF WHAT IN SOME SENSES SENSE IS

20   ALREADY KNOWN."

21       YOUR HONOR, THIS ISSUE HAS BEEN -- AND GOOGLE RELIES ON A

22   CASE IN A SISTER COURT IN CENTRAL DISTRICT OF CALIFORNIA

23   CALLED *MCRO*.  THIS CASE IS CURRENTLY PENDING ON APPEAL FOR THE

24   VERY SAME ISSUES THAT I RAISE HERE IN THAT -- AND THIS IS

25   RELEVANT -- IT'S RESPONDING TO GOOGLE'S REPLY BRIEF.

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530*

```
 1        EXCUSE ME.  WITH THE COURT'S INDULGENCE.
 2                  (PAUSE IN THE PROCEEDINGS.)
 3           MS. DUTTON:  THESE ISSUES HAVE BEEN TEED UP AND WILL
 4    BE ARGUED LATER THIS YEAR.  IN PARTICULAR, THE -- THIS DREW
 5    THE ATTENTION OF THE SOFTWARE ALLIANCE INCLUDING NUMEROUS
 6    ENTITIES THAT RAISE THE VERY SAME ISSUES THAT RESPECTFULLY,
 7    YOUR HONOR, WE WOULD LIKE TO ADDRESS THE FACT THAT GOOGLE DOES
 8    SEEK TO CREATE A SUPER ONE -- SECTION 101 INCORPORATING FACT
 9    QUESTIONS OF -- WITH FACTUAL UNDERPINNINGS UNDER BOTH SECTIONS
10    112 AND 103.
11           THE COURT:  I'M LISTENING.
12           MS. DUTTON:  THANK YOU, YOUR HONOR.
13        IF I MAY GO BACK TO LOOKING AT THE FRAMEWORK, YOUR HONOR.
14    IN ADDITION TO CREATING A SUPER SECTION 101, THE CONTEXT THAT
15    I REFERRED TO WITH RESPECT TO ARTIFICIAL INTELLIGENCE -- AND
16    HERE I RELY ON THE TEXAS CONSTRUCTION THAT GOOGLE HAS CONCEDED
17    WILL -- WILL GOVERN THIS PARTICULAR ARGUMENT.  AND THAT IS A
18    THREE-PART CONSTRUCTION.
19        HOWEVER, WHAT'S CRITICAL HERE IS THE ANALYSIS OF -- AND
20    GOOGLE'S EQUATION THAT -- THAT IN EFFECT RETAINING PERCEPTUAL
21    RELATIONSHIPS AS REQUIRED UNDER THE ABSTRACTS THAT ARE CLAIMED
22    IN EACH AND EVERY CLAIM LIMITATION IS EFFECTIVELY EQUAL TO
23    HUMAN ACTIVITY.
24        AND THIS IS WHERE WE DRAW ISSUE -- IF THIS IS THE TEST
25    THAT IS CARRIED FORWARD THAT WOULD BE APPLIED TO ARTIFICIAL
```

1    INTELLIGENCE, YOUR HONOR, THE PROBLEM IS THAT IN THAT

2    CONTEXT --

3         **THE COURT:** WELL, IN THAT CONTEXT, HAVEN'T -- HAVEN'T

4    SCIENTISTS ACTUALLY GENERATED THE METHOD BY WHICH THE

5    PERCEPTIONS YOU'RE SEEKING TO COMPARE COULD ACTUALLY BE

6    DIGITIZED, WHICH YOU IN THIS PATENT CERTAINLY DO NOT DO.

7      I MEAN, I DON'T -- I DON'T UNDERSTAND HOW YOU CAN COMPARE

8    WHAT THIS PATENT SEEKS TO ACHIEVE WITH SOMETHING AS

9    COMPLICATED AS THIS GIVEN THAT ALL YOU'RE SAYING IS TAKE WHAT

10   EVERYBODY ELSE HAS DONE AND COMPARE THEM.

11        **MS. DUTTON:** YOUR HONOR, THAT'S -- THAT'S NOT WHAT

12   THE PATENTS CLAIM.

13        **THE COURT:** OKAY. WELL, THEN WHAT DOES IT CLAIM?

14   YOU STILL HAVEN'T CLEARLY ARTICULATED IT FOR ME.

15        **MS. DUTTON:** THANK YOU, YOUR HONOR, FOR ALLOWING ME

16   TO GO BACK TO -- THE CORRECTED COLUMNS OF THE '472 ARE COLUMNS

17   4, LINES 15 THROUGH 22, AND COLUMN 7, LINES 40 THROUGH 55,

18   WHICH CONTAIN THE SECTIONS THAT IDENTIFY COMPRESSION

19   TECHNIQUES THAT WOULD BE UNDERSTOOD BY ONE OF SKILL IN THE

20   ART.

21        **THE COURT:** RIGHT, BUT YOU DIDN'T -- THIS PATENT

22   DOESN'T DISCLOSE OR TEACH THOSE COMPRESSION TECHNIQUES.

23        **MS. DUTTON:** YOUR HONOR, THESE ARE --

24        **THE COURT:** NOT IN THE CLAIMS, RIGHT? SO THEY TAKE

25   THAT INVENTION, THEY TAKE THAT PATENT, AND THEN WHAT DO THEY

1     DO WITH IT? THAT'S -- THAT'S WHAT GOOGLE HAS ISSUES WITH IN

2     THIS CASE.

3              **MS. DUTTON:** AND, YOUR HONOR --

4              **THE COURT:** -- TAKEN ALL OF THIS TECHNOLOGY, YOU'VE

5     TAKEN ALL THESE OTHER INVENTIONS, AND YOU SAY TAKE THAT

6     INTELLECTUAL PROPERTY, REDUCE IT TO AN ABSTRACT, POP IT INTO A

7     COMPUTER, AND CORRECT IT. THAT -- THAT DOESN'T -- THAT'S THE

8     ESSENCE OF WHAT THEY'RE ARGUING. AND I'M TRYING TO SEE -- I'M

9     GIVING YOU AN OPPORTUNITY TO CONVINCE ME THAT THEY'RE WRONG,

10     THAT THAT'S ALL -- THAT THERE'S SOMETHING MORE HERE.

11              **MS. DUTTON:** YOUR HONOR, THESE ARE LEGITIMATE

12     QUESTIONS. THE CRUX OF THE MATTER HERE IS THAT IT'S PREMATURE

13     TO BE ANSWERING THESE QUESTIONS --

14              **THE COURT:** WELL, NO, IT'S NOT.

15              **MS. DUTTON:** -- 101 CONTEXT.

16              **THE COURT:** NO, IT'S NOT. IF I CANNOT -- WHY WOULD I

17     HAVE AN ENTIRE CASE BE LITIGATED WHERE ON THE FACE OF THE

18     PATENT, THERE'S NOTHING THERE?

19              **MS. DUTTON:** AND THAT'S WHERE --

20              **THE COURT:** I MEAN, THAT'S -- THAT IS -- AND PERHAPS

21     THERE IS SOMETHING, BUT I CAN TELL YOU, I HAVE LOT OF PATENT

22     CASES, AND I DON'T ALWAYS GET THESE MOTIONS. AND I'M GETTING

23     THIS ONE HERE BECAUSE THE ARGUMENT'S BEING MADE THAT THERE'S

24     NOTHING THERE THERE (SIC).

25              **MS. DUTTON:** AND, YOUR HONOR, BOTH -- ORIGINALLY BOTH

1  BLUE SPIKE AND GOOGLE CONTENDED THAT -- THAT BOTH FACT AND

2  EXPERT DISCOVERY ARE REQUIRED TO ANSWER THOSE QUESTIONS.

3       IF I MAY REFER BACK TO -- AND ASK THE COURT TO TAKE

4  JUDICIAL NOTICE -- IN JANUARY OF THIS YEAR, GOOGLE SERVED

5  INVALIDITY CONTENTIONS UPON BLUE SPIKE IN WHICH IT ORIGINALLY

6  ASKED FOR BOTH FACT AND EXPERT DISCOVERY TO EXPLORE THESE

7  ISSUES.

8       GOOGLE IN EFFECT IS ASKING YOU, YOUR HONOR, TO ACT AS A

9  EXPERT AS THE ONE OF SKILL IN THE ART TO ANALYZE AND TAKE A

10  LOOK AT WHAT'S BEING TAUGHT.  IS IT ENABLED?  IS THERE

11  SUFFICIENCY?  IS IT TOO BROAD?  THAT'S -- WITH ALL DUE

12  RESPECT, YOUR HONOR, THAT'S NOT THE COURT'S ROLE.

13       SO ONE QUESTION BLUE SPIKE IS LEFT WITH IS BETWEEN JANUARY

14  AND MAY OF THIS YEAR WHEN GOOGLE FILED ITS MOTION, WHY DID IT

15  CHANGE ITS MIND?  WHY IS FACT DISCOVERY AND EXPERT DISCOVERY

16  NO LONGER REQUIRED?  WHY IS EVERYTHING SUFFICIENT ON JUST THE

17  FACE OF THE PATENT ALONE?  THESE ARE THE ISSUES THAT -- THAT

18  BLUE SPIKE WOULD REQUEST THE COURT'S LEAVE TO PRESENT IN A

19  FULL CAPACITY WITH FURTHER PRIMARILY EXPERT DISCLOSURE THAT

20  HAS BEEN LARGELY DEVELOPED IN THE TEXAS CASE AND BE ABLE TO

21  BRING IT HERE TO THE -- TO THE NORTHERN DISTRICT OF CALIFORNIA

22  SO THAT YOUR HONOR CAN CONSIDER THESE ISSUES.

23       IN SHORT, THE RECORD IS -- IS NOT FULLY DEVELOPED IN ORDER

24  TO ADDRESS THESE ISSUES.

25            **THE COURT:**  ON THIS MOTION, THERE IS NO RECORD OTHER

1    THAN THE PATENT, SO IT IS FULLY DEVELOPED.  I MAY DENY THE

2    MOTION, BUT THERE IS NOTHING ELSE TO BE CONSIDERED IN THIS

3    TYPE OF MOTION.

4        WHAT ELSE DOES ONE CONSIDER IN THIS TYPE OF MOTION OTHER

5    THAN THE PATENT?

6            **MS. DUTTON:**  THAT IS THE CRUX OF THE ISSUE, YOUR

7    HONOR.

8        UNDER A 101 STANDARD, WHICH IS A MORE FAVORABLE STANDARD

9    OF REVIEW, AS YOU'RE AWARE, MATTER OF THE LAW, IT WOULD ONLY

10   REQUIRE THE PLEADINGS, THE PATENT.  AND THAT'S THE INHERENT

11   PROBLEM HERE.

12       WHAT'S REQUIRED TO ANSWER THESE QUESTIONS IS SOMETHING

13   MORE.  EXPERT DISCOVERY IS REQUIRED, YOUR HONOR.  AND THAT IS

14   WHY IN INCORPORATING THE SECTION 112 QUESTIONS INTO SECTION

15   101, THAT'S, IN ESSENCE, ASKING THE COURT TO COMBINE THE TWO

16   WITHOUT GIVING 112 FULL EFFECT.

17       112, AS WE'VE POINTED OUT IN THE OPPOSITION BRIEF, ARE,

18   FOR THE MOST PART, QUESTIONS OF LAW WITH FACTUAL

19   UNDERPINNINGS, AS IS CLAIM CONSTRUCTION, YOUR HONOR.  THE --

20   AS IS OBVIOUSNESS.

21           **THE COURT:**  ALL RIGHT.  SO WHAT'S CHANGED, GOOGLE,

22   SINCE JANUARY?  IF THIS WAS SUCH A GOOD MOTION, WHY DIDN'T I

23   SEE IT SIX MONTHS AGO?

24           **MR. BERTA:**  IN ALL HONESTY, I BELIEVE THAT WE'VE

25   GOTTEN A LOT MORE CLARITY ON THE LAW, LIKE *ALICE* CAME OUT

1    LAST -- SORRY.  *ALICE* WAS ISSUED LAST SUMMER.  I THINK THAT

2    THE LAW HAS BEEN DEVELOPED VERY MORE SIGNIFICANTLY IN THE PAST

3    12 MONTHS ON THE ISSUE.

4        THERE IS NO -- THE -- OF COURSE, WE SOUGHT FACT AND EXPERT

5    DISCOVERY WITH RESPECT TO INVALIDITY ISSUES IN GENERAL.  NO

6    QUESTION ABOUT THAT, BUT THAT DOESN'T CHANGE THAT THE ANALYSIS

7    UNDER THIS PARTICULAR PRONG OF INVALIDITY IS STILL AN ISSUE AS

8    A MATTER OF LAW THAT DEPENDS ON WHAT'S CLAIMED AND WHAT'S

9    CONCEDED IN THE SPECIFICATION IN LIGHT OF COURTS SUCH AS OTHER

10   COURTS HERE, OTHER COURTS IN OTHER DISTRICTS, AND WHAT THE

11   FEDERAL CIRCUIT AND THE SUPREME COURT HAVE SAID ON NO MORE

12   THAN CONVENTIONAL ACTIVITY.

13       THOSE ARE ALL DECISIONS THAT HAVE BEEN MADE AS A MATTER OF

14   LAW, WHAT CONVENTIONAL ACTIVITY IS.  AND IT'S IN LIGHT OF

15   THOSE PRECEDENTS THAT THIS -- THESE CLAIMS, THE CLAIMS

16   THEMSELVES, DO NOT ADD ANYTHING -- ANY LIMITATIONS THAT ARE

17   ANYTHING OTHER THAN CONVENTIONAL ACTIVITY.

18       THE -- THIS IS AN ISSUE THAT -- I DON'T KNOW -- I DON'T

19   WANT TO SPEAK MORE THAN I HAVE LICENSE TO, BUT THIS WAS AN

20   ISSUE THAT CAME UP IN *PLANET BINGO*, WHICH WAS DECIDED AT THE

21   FEDERAL CIRCUIT, WHICH I HAVE THE CITE FOR.

22       THAT WAS ADMITTEDLY IN A SUMMARY JUDGMENT CONTEXT, BUT

23   WHAT THE COURT SAID THERE WAS THE -- THE PLAINTIFF HAS RAISED

24   THIS CORNER CASE OF -- IT WAS A PATENT ABOUT ORGANIZING BINGO

25   GAMES USING COMPUTERS.

1  AND THE PLAINTIFF SAID, LOOK, OUR -- OUR COMPUTERS THAT
2  ORGANIZE BINGO GAMES CAN ORGANIZE MILLIONS OF BINGO GAMES.
3  AND WHAT THE COURT POINTED OUT AT THE FEDERAL CIRCUIT IS MAYBE
4  BUT THE CLAIMS SAY "TWO OR MORE BINGO CARDS," SO YOUR CLAIMS
5  AREN'T LIMITED TO THE THINGS THAT YOU'RE SAYING IS SPECIAL;
6  THEREFORE IT'S IRRELEVANT TO THE 101 ANALYSIS.

7  IT'S EXACTLY THE SAME THING THAT HAPPENED IN THE *COGENT*
8  CASE IN THIS COURT.  BUT IT WAS AN EXPERT DECLARATION THAT WAS
9  SUBMITTED.  BUT IF THE EXPERT DECLARATION CAN'T TIE WHATEVER
10  THEY'RE SAYING TO THE PARTICULAR CLAIMS AT ISSUE, IT IS NOT
11  RELEVANT BECAUSE THE CLAIMS HAVE TO BE LIMITED UNDER A 101
12  ANALYSIS TO SOMETHING THAT IS OTHER THAN CONVENTIONAL
13  ACTIVITY, AND THAT IS OUR ARGUMENT.

14  **THE COURT:**  THE PLAINTIFF HAS ASKED FOR LEAVE TO
15  AMEND IF THE MOTION IS GRANTED.  I DON'T UNDERSTAND THE
16  QUESTION.

17  THAT IS, AGAIN, I UNDERSTAND THAT YOU THINK THE MOTION
18  SHOULDN'T BE GRANTED, AND PERHAPS IT SHOULD NOT, BUT HOW CAN
19  AN AMENDMENT CHANGE ANY OF THE ANALYSIS?

20  **MS. DUTTON:**  YOUR HONOR, IT -- WHAT BLUE SPIKE WOULD
21  SEEK TO DO IS TO INCLUDE THE -- THE DECLARATIONS AND MORE
22  FULLY DEVELOPED ITS EXPERT TESTIMONY THAT WOULD FLESH OUT AND
23  ANSWER THE QUESTIONS THAT THIS -- THAT BOTH GOOGLE AND THIS
24  COURT IS ASKING IN ORDER TO COMPLETE THAT FACT RECORD.

25  IT -- WOULD IT ACHIEVE THE SAME RESULT?  IS IT A DIFFERENT

1    FORM -- PROCEDURAL FORUM TO -- AS CONVERTING TO AN MSJ?

2    ABSOLUTELY, YOUR HONOR, BUT WE'RE -- WE'RE SEEKING EVERY

3    POTENTIAL TO -- TO HAVE OUR DAY IN COURT.

4         **THE COURT:**  BUT YOU'RE NOT SEEKING TO AMEND TO

5    CHANGE -- I MEAN, THE PATENT'S THE PATENT.

6         **MS. DUTTON:**  CORRECT, YOUR HONOR.

7         **THE COURT:**  AND YOU'RE NOT SEEKING TO AMEND TO CHANGE

8    THE PATENTS ASSERTED IN THIS CASE OR AT ISSUE IN THIS CASE,

9    ARE YOU?

10        **MS. DUTTON:**  NO, YOUR HONOR.

11        **THE COURT:**  I TAKE IT THAT NONE OF THESE QUESTIONS

12   HAVE BEEN RAISED OR LITIGATED IN TEXAS IN TERMS OF THIS KIND

13   OF MOTION?  IS THAT ACCURATE?

14        **MS. DUTTON:**  THIS PROCEDURAL MOTION HAS NOT BEEN

15   RAISED.  HOWEVER, THE VERY SAME UNDERLYING ISSUES THAT GOOGLE

16   AND THIS COURT IS ASKING ARE INDEED IN FRONT OF -- IN FRONT OF

17   TEXAS AND WILL BE RAISED TO THE JURY IN NOVEMBER.

18        **MR. BERTA:**  WE'RE NOT FAMILIAR WITH THE STATUS OF

19   TEXAS, BUT YOU CAN'T DO A 101 IN FRONT OF JURY.

20        **THE CLERK:**  YOU NEED TO BE IN FRONT OF THE MIC.

21        **MR. BERTA:**  I APOLOGIZE.  101 IS NOT FOR THE JURY.

22        **THE COURT:**  NO, I UNDERSTAND.

23   I AGREE THE -- THE LAW IN THIS AREA IS DEVELOPING MORE AND

24   HAS BEEN DEVELOPING MORE SINCE *ALICE*.  I THINK THAT IT'S ONLY

25   BEEN RECENTLY THAT A COURT IN THIS DISTRICT ISSUED A

1    POST-*ALICE* RULING.  AND I THINK THERE HAVE BEEN A NUMBER THAT

2    HAVE COME DOWN, BUT IT'S BEEN RELATIVELY RECENT.

3        WHAT, IF ANY, RELEVANCE ANYMORE IS THERE TO THE MACHINE OR

4    TRANSFORMATION TEST THAT HAD BEEN USED IN THE PAST IN TERMS OF

5    THESE KINDS OF ISSUES?

6        WE'LL START WITH THE PLAINTIFF AND THEN MOVE TO THE

7    DEFENDANTS.

8            **MS. DUTTON:**  YOUR HONOR, THE MACHINE OR

9    TRANSFORMATION TESTS THAT WE'VE ADDRESSED IN OUR OPPOSITION

10   PAPERS DEALS SPECIFICALLY WITH -- IT'S AN INDICATOR.  I DON'T

11   HAVE A PARTICULAR -- AN -- A DIRECT ANSWER WITH RESPECT TO HOW

12   IT'S CONTINUED TO DEVELOP.  IT IS CERTAINLY A -- IT IS STILL A

13   FACTOR.

14           **THE COURT:**  ALL RIGHT.  ANY RESPONSE?

15           **MR. BERTA:**  YEAH.  YES, YOUR HONOR.

16       THE TWO RECENT CASES OUT OF THE FEDERAL -- IT DEPENDS, I

17   GUESS, ON WHAT IT IS.  BUT WHAT IS CLEAR HERE IS THAT DOING

18   SOMETHING ON A COMPUTER IS NOT SUFFICIENT TO MEET THE

19   TRANSFORMATION TEST.

20       AND THAT IS -- CAN ONLY BE THE OUTCOME OF CASES SUCH AS

21   *ALICE* THAT SAYS PUTTING IT ON A COMPUTER, WHICH IS A MACHINE,

22   AND DOES TRANSFORMATIONS OF DATA DOES NOT SAVE A CLAIM THAT'S

23   OTHERWISE ABSTRACT FROM PATENTABILITY.

24       I WOULD OFFER THE *DIGITECH IMAGE* CASE FROM THE FEDERAL

25   CIRCUIT, WHICH CITE IS IN OUR PAPERS, AND I APOLOGIZE.  I

1    DON'T HAVE IT ON MY FINGERTIPS. BUT THAT CASE SAYS WITHOUT

2    ADDITIONAL LIMITATIONS, A PROCESS THAT EMPLOYS MATHEMATICAL

3    ALGORITHMS TO MANIPULATE EXISTING INFORMATION TO GENERATE

4    ADDITIONAL INFORMATION IS NOT PATENT ELIGIBLE.

5        AND SO THE TRANSFORMATION OF INFORMATION CANNOT MAKE

6    SOMETHING -- CONVERT SOMETHING TO PATENT ELIGIBILITY. WE KNOW

7    THAT.

8        WE KNOW DO DOING IT ON A COMPUTER ALSO CANNOT BECAUSE

9    THAT -- THOSE ARE THE LIMITATIONS THAT ARE AT ISSUE WITH

10   RESPECT TO THIS PATENT. THAT TEST HAS NO RELEVANCE HERE UNDER

11   A CONTROLLING PRECEDENT.

12       **THE COURT:** LET ME REFER YOU, MS. DUTTON, TO PAGE 4

13   OF THE DEFENDANT'S MOVING PAPERS. THEY LIST THERE THE

14   ASSERTED CLAIMS WHICH THEY ARE MOVING ON. I JUST WANT TO

15   CONFIRM THAT I UNDERSTAND THE TOTALITY OF THE MOTION AND THAT

16   YOU AGREE THAT THAT'S THE LIST OF ASSERTED CLAIMS THAT BLUE

17   SPIKE HAS OTHER THAN I UNDERSTAND THERE'S A SEPARATE DISPUTE

18   WITH CLAIM 30.

19       **MS. DUTTON:** CORRECT, YOUR HONOR. WITH THAT

20   EXCEPTION, WE'RE ON THE SAME PAGE.

21       **THE COURT:** OKAY.

22       ALL RIGHT. IN TERMS OF CLAIM 30, WE HAVE VERY STRICT

23   RULES HERE IN THE NORTHERN DISTRICT.

24       RESPONSES ON THOSE ISSUES? WE'LL BEGIN WITH YOU,

25   MS. DUTTON.

1      **MS. DUTTON:** YES, YOUR HONOR. IT'S -- IT'S SIMPLY A

2  MATTER OF -- FORGIVE ME. IT'S A MATTER OF WHO BEARS THE

3  BURDEN. DOES GOOGLE -- DOES GOOGLE BEAR THE BURDEN TO MOVE TO

4  STRIKE BUT CLAIM 30 WAS NOT PROPERLY -- WAS NOT PROPERLY

5  CHARTED? OR IS IT BLUE SPIKE'S BURDEN TO -- TO MOVE TO AMEND?

6      IT'S BLUE SPIKE'S POSITION THAT -- THAT SUFFICIENT NOTICE

7  HAS BEEN PROVIDED AND, THEREFORE, THE BURDEN SHOULD BE SHIFTED

8  PROPERLY TO GOOGLE TO MOVE TO STRIKE, WHICH IT HAS NOT DONE.

9      **THE COURT:** RESPONSE.

10      **MR. BERTA:** IF I UNDERSTAND IT CORRECTLY, IT'S THAT

11  THE -- I DON'T THINK THAT THERE'S A DISPUTE THAT IT WASN'T

12  DISCLOSED CORRECTLY UNDER THE LOCAL RULES AND THAT IT'S A

13  QUESTION OF WHETHER WE HAVE OR HAVEN'T MOVED TO STRIKE IT YET.

14      I CONCEDE WE HAVE NOT. I DON'T -- I DON'T THINK IT'S

15  INCORRECT THAT ONE SHOULD MOVE TO STRIKE THINGS, BUT I DON'T

16  THINK THAT CHANGES THE OUTCOME HERE, THAT THERE'S NO QUESTION

17  THAT IT WASN'T DISCLOSED ADEQUATELY IN THE INITIAL

18  INFRINGEMENT CONTENTIONS AND ON THAT BASIS, IT'S NOT AT ISSUE.

19      THE FACT THAT WE HAVE IT -- I MEAN, NOT TO BE FLIP, AND I

20  DON'T MEAN THAT AT ALL, BUT WE HAVE THE FACTUAL PREDICATE

21  AVAILABLE TO US HERE. THEY DO NOT -- THEY DO NOT CONTEST IT.

22  IN FACT, THEY DIDN'T CHART THAT CLAIM, THEREFORE, IT SHOULDN'T

23  BE THERE; THEREFORE, THE OUTCOME IS THE SAME WITH RESPECT TO

24  WHO MOVED AND WHO DIDN'T MOVE.

25      **THE COURT:** MS. DUTTON.

1          **MS. DUTTON:** YOUR HONOR, GOOGLE'S POSITIONS HERE ARE

2     AT ODDS. IT WOULD HAVE THIS COURT BELIEVE THAT ONE CLAIM IS

3     REPRESENTATIVE AND CAN RULE THEM ALL. AND YET IN THE FLIP

4     SIDE, IT SAYS IT DOESN'T -- SUFFICIENT CHARTING HAS TO BE

5     ELEMENT BY ELEMENT. WHICH -- WHICH IS IT, YOUR HONOR?

6          **THE COURT:** WELL, DO YOU CONCEDE THAT YOU DIDN'T

7     COMPLY WITH THE RULES?

8          **MS. DUTTON:** YES, YOUR HONOR.

9          **THE COURT:** AND IF A MOTION TO STRIKE WAS BROUGHT,

10    WHAT WOULD BE THE BASIS FOR OPPOSING THE MOTION?

11         **MR. GARTEISER:** ONE MOMENT.

12              (PAUSE IN THE PROCEEDINGS.)

13         **MS. DUTTON:** MY UNDERSTANDING FROM LEAD COUNSEL IS

14    THAT DURING MEET-AND-CONFERS, THE ISSUE WAS NOT BROUGHT UP. I

15    WAS NOT A PARTY TO THOSE -- THOSE MEET-AND-CONFERS; HOWEVER,

16    THAT'S MY INFORMATION.

17      BUT I WOULD ADD, YOUR HONOR, THAT -- THAT IN THE

18    OPPOSITION, I WOULD FRAME UP THAT IT WOULD SURELY ELEVATE FORM

19    OVER SUBSTANCE TO NOT PERMIT BLUE SPIKE WITH THE OPPORTUNITY

20    TO CHART THE CLAIM IN FULL TO COMPLY WITH THE INTENT OF THE

21    RULE.

22         **THE COURT:** WHY WASN'T IT CHARTED?

23         **MS. DUTTON:** I DON'T KNOW, YOUR HONOR.

24         **THE COURT:** DOES LEAD COUNSEL KNOW?

25         **MR. GARTEISER:** YOUR HONOR, RANDALL GARTEISER FOR

1    BLUE SPIKE.

2        IT'S MY UNDERSTANDING AFTER WE MET AND CONFERRED SEVERAL

3    TIMES WITH GOOGLE TO AVOID ACTUALLY A MOTION TO STRIKE

4    PREVIOUSLY, WE -- WE REDUCED OR -- WE ELIMINATED D.O.E.  WE

5    ELIMINATED INDIRECT.  WE TRIED TO -- WE AGREED ON A PRIOR --

6    I'M SORRY -- THE EARLIEST DATE OF CONCEPTION AND REDUCTION TO

7    PRACTICE.

8        SO WE -- WE HAD A REAL PRODUCTIVE MEET-AND-CONFER.  TO THE

9    EXTENT THAT THAT WAS NOT CHARTED PROPERLY, IT'S -- IT'S A

10   RESPONSIBILITY THAT FALLS ON ME AND IS MOST LIKELY JUST A --

11   AN OVERSIGHT DUE TO IT BEING CLAIM 30 OF THE -- OR LAST PATENT

12   OR LAST DEPENDENT CLAIM ASSERTED IN A PARTICULAR PATENT.

13       **THE COURT:**  I'M JUST CHECKING THE DOCKET IN THIS

14   CASE.  LOOKS LIKE I ISSUED A SCHEDULING ORDER ABOUT TEN MONTHS

15   AGO.

16       **MR. GARTEISER:**  THAT'S CORRECT YOUR HONOR.  THERE WAS

17   A DEADLINE TO -- THE MOVE TO STRIKE, AND THE FOUR OR FIVE --

18   OF THE FOUR DEFENDANTS THAT WERE -- WERE CONSOLIDATED -- NOT

19   CONSOLIDATED BUT RELATED, ONLY ADOBE FILED A MOTION TO STRIKE.

20       **THE COURT:**  A MOTION TO STRIKE -- A MOTION TO STRIKE

21   CLAIM 30?

22       **MR. GARTEISER:**  NO, MA'AM.  A MOTION TO STRIKE

23   INFRINGEMENT CONTENTIONS.  THE CLAIMS WERE DIFFERENT FOR EACH

24   DEFENDANT.

25       **THE COURT:**  SO HAS THE -- WHAT'S THE STATUS OF THE

1    BRIEFING ON CLAIM CONSTRUCTION?

2         **MR. GARTEISER:** YOUR HONOR, THE PARTIES -- AND

3    CORRECT ME IF I'M WRONG, COUNSEL FOR GOOGLE, BUT THE PARTIES

4    WERE IN THE PROCESS OF GETTING TOGETHER ON CLAIM CONSTRUCTION.

5    AND BLUE SPIKE WAS TRYING TO -- TRY TO LIMIT THE NUMBER OF

6    DISPUTES 'CAUSE WE UNDERSTAND THE COURT WANTS TO LIMIT THE

7    NUMBER OF TERMS THAT THE COURT CONSTRUES.

8         AND SO WE WERE ASKING FOR THEM TO EXPLAIN TO US WHAT

9    CONSTRUCTIONS THEY DID NOT AGREE WITH IN E.D. TEXAS, AND THEY

10   DIDN'T WANT TO DO THAT.  AND THAT ORDER WE THOUGHT WAS MOST

11   EFFICIENT.

12        THEN ALONG -- AT THE SAME TIME, A NEW DEFENDANT GOT

13   TRANSFERRED TO N.D. CAL, GRACENOTE, AND THE PARTIES MET AND

14   CONFERRED, AND WE AGREED TO KIND OF A WAIT -- POSTPONE THE

15   DEADLINES UNTIL WE SEE WHETHER THE COURT AGREED WHETHER IT WAS

16   PROPER TO RELATE THE GRACENOTE CASE OR NOT.  AND IN THAT -- SO

17   THAT'S THE STATUS.

18        **THE COURT:** WELL, THE MOTION TO RELATE GRACENOTE JUST

19   CAME ACROSS MY DESK LATE LAST WEEK.  IS THERE AN OBJECTION?  I

20   DON'T KNOW THAT THE FIVE DAYS HAS PASSED.

21        **MR. GARTEISER:** I DON'T THINK THERE IS AN OBJECTION

22   FROM US.  AND GOOGLE -- CORRECT ME IF I'M WRONG -- DIDN'T WANT

23   TO TAKE A POSITION ONE WAY OR THE OTHER.

24        **MR. BERTA:** YEAH, WE DON'T OBJECT.  WE JUST DON'T

25   KNOW THAT THIS MEETS THE STANDARDS.  AND THAT'S FOR THE COURT

1   TO DETERMINE AND —— NOT THAT WE'RE SAYING THAT WE WANT TO

2   ADVOCATE RESPONSIBILITY FOR THE ISSUE, SO IT'S JUST ——

3           **THE COURT:**  I DON'T WANT HAVE TO WAIT, SO I WANT

4   TO ——

5           **MR. BERTA:**  WE'RE DEFINITELY NOT FILING AN OBJECTION,

6   IF THAT'S THE QUESTION.

7           **THE COURT:**  THAT'S —— THAT'S THE QUESTION.

8           **MR. BERTA:**  YEAH.

9           **THE COURT:**  SO YOU'RE NOT —— YOU'RE SUBMITTING ON THE

10  ISSUE.

11          **MR. BERTA:**  ABSOLUTELY.

12          **THE COURT:**  SO I DON'T HAVE TO WAIT THE FIVE DAYS.

13          **MR. BERTA:**  CORRECT.

14          **THE COURT:**  ALL RIGHT.

15          **MR. BERTA:**  SORRY, YOUR HONOR.

16          **THE COURT:**  UNDER THE CURRENT DEADLINE, YOUR CLAIM

17  CONSTRUCTION AND PREHEARING AT THE SAME TIME IS DUE AUGUST

18  1ST.

19          **MR. BERTA:**  THAT'S CORRECT.

20          **THE COURT:**  ARE YOU SUGGESTING THAT THAT WOULD CHANGE

21  IF I GRANT THAT MOTION TO RELATE?

22          **MR. GARTEISER:**  IT DOESN'T NEED TO, YOUR HONOR.  IT'S

23  UP TO THE COURT.

24      WE —— WE SPOKE WITH COUNSEL FOR GRACENOTE.  THEY HAD A

25  CHANGE.  SOMEONE AT THEIR —— THAT WAS TAKING LEAD FOR THAT

1　CASE, DAVID LEE KASTERS, HE WENT IN-HOUSE APPARENTLY NOW AT

2　APPLE, AND SO THERE WAS A LITTLE BIT OF A -- A DELAY THERE IN

3　TALKING TO WHO WAS GOING TO TAKE IT OVER.

4　　　NOW THAT WE'VE SPOKEN WITH THEM, THEIR POSITION IS THAT

5　THEY -- THEY WANT TO RELY ON THE LICENSING DEFENSE, AND THEY

6　DON'T THINK CLAIM CONSTRUCTION IS -- IS RELEVANT.

7　　　WE DISAGREE, AND WE THINK CLAIM CONSTRUCTION IS RELEVANT,

8　AND WE'VE ASKED THEM IF THEY'LL STIPULATE FOR THE PURPOSES

9　OF -- OF, YOU KNOW, THIS PROCEEDING WITH THE CONSTRUCTIONS IN

10　THE FORMER CASE, AND THEY'VE DECLINED TO DO SO.

11　　　BUT THEY DIDN'T WANT TO SLOW DOWN THIS CASE EITHER, SO

12　THEY'RE -- THEY'RE KIND OF --

13　　　**THE COURT:**  SO HAVE THERE -- HAS THERE BEEN THE

14　EXCHANGE OF CLAIM CONSTRUCTIONS THAT WERE DUE LAST, I GUESS,

15　THE -- FEBRUARY AND MARCH?

16　　　**MR. GARTEISER:**  YOUR HONOR, THE PARTIES DID EXCHANGE

17　TERMS.  AND IN -- IT GOT A LITTLE CONFUSING BECAUSE IN SOME

18　CASES, GOOGLE WOULD HAVE, LIKE, ONE MODIFIER ADDED TO A

19　PREVIOUS CONSTRUCTION FROM THE COURT.

20　　　**THE COURT:**  IS THAT THE EASTERN DISTRICT COURT?

21　　　**MR. GARTEISER:**  CORRECT, YOUR HONOR.  AND THAT WAS

22　VERY -- WE -- IT WAS A LOT OF WORK THAT WENT INTO THAT OPINION

23　AT 69 PAGES.  IT HAD A SPECIAL TECHNICAL ADVISOR THAT WENT AND

24　HELPED OUT WITH THAT.  AND IT INVOLVED A LOT OF BRIEFING.  AND

25　THEN IT WAS CHALLENGED BECAUSE SOME OF THE TERMS WERE SAID TO

1    HAVE BEEN INDEFINITE.  AND THAT WAS A WHOLE MSJ THAT WAS

2    BROUGHT THERE.

3         THERE WERE EIGHT MSJ'S BROUGHT IN THAT CASE, AND NONE OF

4    THEM HAVE BEEN GRANTED, AND NONE OF THEM RELATED TO SECTION

5    101.

6         BUT -- SO SOME OF THESE UNDERLYING THINGS ABOUT SECTION

7    112, WE'VE DEALT WITH WITH OUR PROFESSOR, AHMED TEWFIK, WHO IS

8    THE HEAD OF THE DEPARTMENT OF COMPUTER SCIENCE AND ELECTRICAL

9    ENGINEERING AT UNIVERSITY OF TEXAS.  HE WAS GRACIOUS ENOUGH TO

10   GIVE US HIS TIME TO -- TO PARTICIPATE IN THE CLAIM

11   CONSTRUCTION PROCESS BY SUBMITTING A DECLARATION.

12        AND THEN ALSO HE WAS JUST DEPOSED LAST WEEK IN PREPARATION

13   FOR TRIAL ON OUR INFRINGEMENT ANALYSIS FOR A DIFFERENT

14   DEFENDANT AUDIBLE MAGIC.

15        SO TO ANSWER YOUR QUESTION, WE TRIED TO EXCHANGE THE

16   TERMS, AND WE'RE IN THE PROCESS OF MEETING AND CONFERRING ON

17   THAT BECAUSE IN SOME CASES, IT SEEMS LIKE -- IT WOULD SEEM TO

18   BLUE SPIKE LIKE WE WERE BEING REDUNDANT.  AND TO GOOGLE'S

19   COUNSEL, THEY WANTED TO MEET AND CONFER MORE, AND THAT'S WHY

20   WE DECIDED TO PUSH BACK THE DATES.  AND WE'RE NOT INCLINED --

21   WE'RE -- WE'RE INCLINED TO AGREE TO PUSH IT BACK MORE IF WE

22   NEED TO.

23        I BELIEVE NOW, WE'RE -- WE MAY EVEN HAVE A CONFLICT IN

24   OCTOBER.

25             **THE COURT:**  WELL, I'M NOT INCLINED.  I GO INTO A

1  THREE-MONTH MURDER TRIAL, EXTENUATING CIRCUMSTANCES AND A

2  VIOLENT RICO PRISON GANG CASE IN JANUARY, SO I HAVE NO

3  INCLINATION TO LADEN MY CALENDAR WITH THINGS THAT NEED TO BE

4  DONE THIS FALL THAT WAS SCHEDULED TO BE DONE THIS FALL, IN

5  PART BECAUSE I KNOW WHAT I'M GOING INTO IN 2016.  THAT'S WHY

6  I'M ASKING THE QUESTIONS.

7          **MR. GARTEISER:**  YOUR HONOR, I THINK THAT THE PARTIES

8  COULD GET TOGETHER WITH COUNSEL FOR GRACENOTE AND COME UP

9  WITH, YOU KNOW, THE -- A WORKABLE OUTLINE AND PRESENT IT TO

10  THE COURT.  WE'RE SUPPOSED TO HAVE A CMC TOMORROW IN THAT CASE

11  AND --

12          **THE COURT:**  IN FRONT OF WHOM?

13          **MR. GARTEISER:**  THE -- DENOTO (PHONETIC).  JUDGE

14  DONATO.

15          **THE COURT:**  WELL, I'LL MAKE SURE TO DEAL WITH IT ONE

16  WAY OR THE OTHER BEFORE TOMORROW, AND I'LL LET HIM KNOW.

17     OKAY.

18              (PAUSE IN THE PROCEEDINGS.)

19          **THE COURT:**  ALL RIGHT.  I THINK I HAVE EVERYTHING I

20  NEED.

21          **MS. DUTTON:**  YOUR HONOR --

22          **THE COURT:**  YES, MA'AM.

23          **MS. DUTTON:**  WITH THE COURT'S INDULGENCE, I HAD

24  EARLIER REQUESTED IF WE COULD RE-FRAME (SIC) TO TAKE A LOOK

25  BRIEFLY AT THE FOREST FOR THE TREES.

1    I ONLY REQUEST LEAVE TO ANALYZE PRONG ONE BECAUSE THE

2    INFERENCES I READ FROM WHAT THE COURT'S ADDRESSED TODAY SEEMS

3    TO FOCUS SOLELY ON PRONG TWO.  AND IF I MAY TAKE ONE MINUTE

4    TO -- TO ADDRESS THAT.

5         **THE COURT:**  GO AHEAD.

6         **MS. DUTTON:**  THANK YOU, YOUR HONOR.

7    UNDERSTANDING THAT THE -- THE COURT DRAWS ISSUE WITH THE

8    CONTEXT OF ARTIFICIAL INTELLIGENCE, THERE STILL REMAINS AN

9    ISSUE --

10        **THE COURT:**  I DON'T TAKE ISSUE WITH THE CONCEPT OF

11   ARTIFICIAL INTELLIGENCE.  I DO THINK THAT THIS PATENT IS A FAR

12   CRY FROM THAT.

13        **MS. DUTTON:**  UNDERSTAND, YOUR HONOR.

14   AND THAT'S NOT -- WE'RE NOT CERTAINLY TRYING TO UMBRELLA

15   UNDER THAT.  HOWEVER, THE EQUATING OF RETAINING PERCEPTUAL

16   RELATIONSHIP TO HUMAN ACTIVITY WOULD CREATE HUGE POLICY

17   IMPLICATIONS FOR THAT TECHNOLOGY.  THAT CAN'T BE THE TEST.  IF

18   IT'S NOT THE TEST THERE, IT SHOULDN'T BE THE TEST HERE.

19   ONE FORM WOULD BE AUTOMATED PHONE TECHNOLOGY, VOICE

20   RECOGNITION.

21        **THE COURT:**  YOU KNOW, WHAT YOU'VE JUST SAID CONCERNS

22   ME.  BECAUSE THE POINT OF A PATENT IS TO ELUCIDATE, TO

23   IDENTIFY THE BOUNDS OF AN INVENTION, TO THEN MOVE TECHNOLOGY

24   FORWARD.

25   IT IS NOT THE POINT OF THE PATENT LAWS TO HAVE SOMEONE

1    EXPOUND WITHOUT INVENTION ON A CONCEPT WHICH IMPACTS HUGE

2    ISSUES AND AREAS OF TECHNOLOGY.

3        SO JUST BECAUSE THERE IS A PATENT FOR ONE DOES NOT MEAN

4    THAT THERE IS -- THAT -- THAT THAT CONCEPT GETS IMPORTANT --

5    IMPORTED INTO EVERY SINGLE PATENT.  THAT'S NOT THE POINT.

6        THE POINT IS, IS THAT EVERY PATENT STANDS ON ITS OWN.  IT

7    MUST STAND ON ITS OWN.

8        SO IF YOU CANNOT DEFEND THIS PATENT IN THIS CASE AT THE

9    TIME IT WAS ISSUED, WELL, THEN YOU CAN'T.

10       BUT -- BUT DON'T -- DON'T SEEM TO SUGGEST THAT BECAUSE

11   THERE ARE PATENTABLE IDEAS IN THE FORM OF -- OF ARTIFICIAL

12   INTELLIGENCE AND OTHERS, THAT SOMEHOW, YOU -- YOU GET THE

13   BENEFIT OF THAT IF YOU HAVEN'T DONE ANYTHING.

14       **MS. DUTTON:**  BLUE SPIKE RECOGNIZES THE LEGITIMACY OF

15   THE QUESTIONS THAT YOU HAVE.  WE WOULD CONTEND, HOWEVER, THAT

16   THE SUFFICIENCY OF THE PATENT IS ABLE TO STAND ON THE -- ON

17   THE PATENTS OF OTHERS.

18       THE -- THE PATENT RULES AND THE CASE LAW STATE THAT IT

19   DOES NOT ENCOURAGE EVERY PATENT TO INCLUDE EVERY KNOWN PRIOR

20   ART.  IT'S -- IN FACT, THE LAW --

21       **THE COURT:**  IT DOESN'T.  OF COURSE, IT DOESN'T.  BUT

22   YOU DO HAVE TO DEFINE SOMETHING.

23       **MS. DUTTON:**  AND YOUR HONOR IS ACTUALLY MAKING THE

24   ARGUMENT THAT WE WANT YOU TO SEE.  YOU'RE -- WE'RE SEEING THE

25   TWO SIDES OF THE SAME COIN.  THAT IS 112 ARGUMENT, YOUR HONOR.

1    AND THAT IS FOR ONE OF SKILL IN THE ART TO PROVIDE TESTIMONY

2    FOR THIS COURT TO CONSIDER.

3         **THE COURT:**  OKAY.  ANYTHING ELSE?

4         **MS. DUTTON:**  NO, YOUR HONOR.

5      ON THE BASIS OF THE -- THE PAPERS AND THE ARGUMENTS HERE

6    TODAY, BLUE SPIKE REQUESTS THAT THE COURT TO DENY THIS

7    MOTION -- THE PRESENT MOTION.

8         **THE COURT:**  I MEAN, AS I UNDERSTAND THIS LAST

9    ARGUMENT, YOU ARE CLAIMING THAT ANY TIME THERE IS

10   SOPHISTICATED TECHNOLOGY, THAT A COURT COULD NEVER ISSUE AN

11   ORDER UNDER 112.  THAT'S WHAT I HEAR YOU SAYING.

12     AND THAT'S -- I DON'T THINK THERE'S ANY LAW TO SUPPORT IT.

13   BUT -- THAT'S WHAT I HEAR YOU SAYING.

14        **MS. DUTTON:**  YOUR HONOR, ON THE FACTS OF THIS CASE,

15   WITH THE -- THE GOOGLE ARGUMENTS THAT HAVE BEEN RAISED, THIS

16   WOULD CONFLATE SECTIONS 101 AND 112, AND THAT'S CONTRARY TO

17   STATUTORY INTERPRETATION.

18        **THE COURT:**  OKAY.

19        **MS. DUTTON:**  THANK YOU, YOUR HONOR.

20        **THE COURT:**  THANK YOU.  SUBMITTED?

21        **MR. BERTA:**  YES, YOUR HONOR.  THANK YOU.

22        (PROCEEDINGS WERE CONCLUDED AT 10:25 A.M.)

23                    --OOO--

24

25

1
2
3          **CERTIFICATE OF REPORTER**
4
5          I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT
6     FROM THE RECORD OF PROCEEDINGS IN THE ABOVE—ENTITLED MATTER.
7     I FURTHER CERTIFY THAT I AM NEITHER COUNSEL FOR, RELATED TO,
8     NOR EMPLOYED BY ANY OF THE PARTIES TO THE ACTION IN WHICH THIS
9     HEARING WAS TAKEN, AND FURTHER THAT I AM NOT FINANCIALLY NOR
10    OTHERWISE INTERESTED IN THE OUTCOME OF THE ACTION.
11
12    _____
13         RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR
14              FRIDAY, SEPTEMBER 11, 2015
15
16
17
18
19
20
21
22
23
24
25

# U.S. District Court
# California Northern District (Oakland)
# CIVIL DOCKET FOR CASE #: 4:13-cv-01105-YGR

AOptix Technologies v. Blue Spike, LLC
Assigned to: Hon. Yvonne Gonzalez Rogers
Referred to: Magistrate Judge Jacqueline Scott Corley
Relate Case Cases:     4:14-cv-01647-YGR
                       4:14-cv-01648-YGR
                       4:14-cv-01650-YGR
                       4:14-cv-01649-YGR
Cause: 28:2201 Declaratory Judgement

Date Filed: 03/11/2013
Date Terminated: 01/27/2015
Jury Demand: Both
Nature of Suit: 830 Patent
Jurisdiction: Federal Question

**Plaintiff**

**AOptix Technologies**
*a Delaware corporation*

represented by **Teresa M. Corbin**
Fenwick & West LLP
555 California Street, 12th Floor
San Francisco, CA 94104
415-875-2300
Fax: 415-281-1350
Email: tcorbin@fenwick.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Bryan A. Kohm**
Fenwick & West LLP
555 California Street, 12th Floor
San Francisco, CA 94104
415-875-2300
Fax: 415-281-1350
Email: bkohm@fenwick.com
*ATTORNEY TO BE NOTICED*

**Darren E. Donnelly**
Fenwick & West LLP
Silicon Valley Center
801 California Street
Mountain View, CA 94041
650-988-8500
Fax: 650-938-5200
Email: ddonnelly@fenwick.com
*ATTORNEY TO BE NOTICED*

**David M. Lacy Kusters**
Fenwick & West LLP
555 California Street, 12th Floor

San Francisco, CA 94104
415-875-2300
Fax: 415-281-1350
Email: dlacykusters@fenwick.com
*ATTORNEY TO BE NOTICED*

**Jeffrey Allen Ware**
Fenwick and West
1191 Second Ave.
10th Floor
Seattle, WA 98101
206-389-4531
Email: jware@fenwick.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Blue Spike, LLC**
*a Texas limited liability company*

represented by

**Randall Garteiser**
Garteiser Honea, P.C.
44 N. San Pedro Road
San Rafael, CA 94903
(415) 568-0553
Fax: (415) 785-3805
Email:
randall.garteiser@sftrialattorneys.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Christopher Alan Honea**
Garteiser Honea, P.C.
44 N. San Pedro Road
San Rafael, CA 94903
(415) 785-3762
Fax: (415) 785-3805
Email: chris.honea@sftrialattorneys.com
*ATTORNEY TO BE NOTICED*

**Kirk J Anderson**
Garteiser Honea
44 N San Pedro Rd.
San Rafael, CA 94903
415-785-3762
Email: kanderson@ghiplaw.com
*ATTORNEY TO BE NOTICED*

**Peter Stuart Brasher**
Garteiser Honea
44 N San Pedro Rd.
San Rafael, CA 94903

415-785-3762
Email: pbrasher@ghiplaw.com
*ATTORNEY TO BE NOTICED*

<u>**Counter-claimant**</u>

**Blue Spike, LLC**
*a Texas limited liability company*

represented by **Randall Garteiser**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Christopher Alan Honea**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kirk J Anderson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Peter Stuart Brasher**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

<u>**Counter-defendant**</u>

**AOptix Technologies**
*a Delaware corporation*

represented by **Teresa M. Corbin**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Bryan A. Kohm**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Darren E. Donnelly**
(See above for address)
*ATTORNEY TO BE NOTICED*

**David M. Lacy Kusters**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jeffrey Allen Ware**
(See above for address)
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|------------|---|-------------|
| 03/11/2013 | 1 | COMPLAINT against Blue Spike, LLC ( Filing fee $ 350, receipt number |

| | | |
|---|---|---|
| | | 34611084043.) SUMMONS ISSUED. Filed byAOptix Technologies. (mclS, COURT STAFF) (Filed on 3/11/2013) (Additional attachment(s) added on 3/13/2013: # 1 Civil cover sheet, # 2 Summons) (mclS, COURT STAFF). (Entered: 03/12/2013) |
| 03/11/2013 | 2 | ADR SCHEDULING ORDER: Case Management Statement due by 6/4/2013. Case Management Conference set for 6/11/2013 10:00 AM. (Attachments: # 1 Standing Order)(mclS, COURT STAFF) (Filed on 3/11/2013) (Entered: 03/12/2013) |
| 03/13/2013 | 3 | REPORT on the filing of an action regarding Patent Infringement (cc: form mailed to register). (mclS, COURT STAFF) (Entered: 03/13/2013) |
| 05/10/2013 | 4 | CLERKS NOTICE REQEUESTING PLAINTIFF FILE CONSENT OR DECLINATION BY NO LATER THAN 5/24/2013. (knm, COURT STAFF) (Filed on 5/10/2013) (Entered: 05/10/2013) |
| 05/24/2013 | 5 | CONSENT/DECLINATION to Proceed Before a US Magistrate Judge by AOptix Technologies.. (Kohm, Bryan) (Filed on 5/24/2013) (Entered: 05/24/2013) |
| 05/24/2013 | 6 | Ex Parte Application re 2 ADR Scheduling Order *for Continuance of Case Management Conference* filed by AOptix Technologies. (Attachments: # 1 Proposed Order Granting Ex Parte Application for Continuance of Case Management Conference)(Kohm, Bryan) (Filed on 5/24/2013) (Entered: 05/24/2013) |
| 05/28/2013 | 7 | CLERK'S NOTICE of Impending Reassignment to U.S. District Judge (knm, COURT STAFF) (Filed on 5/28/2013) (Entered: 05/28/2013) |
| 05/29/2013 | 8 | **ORDER REASSIGNING CASE. Case reassigned to Judge Hon. Yvonne Gonzalez Rogers for all further proceedings. Magistrate Judge Elizabeth D. Laporte no longer assigned to the case.. Signed by Executive Committee on 5/29/13. (as, COURT STAFF) (Filed on 5/29/2013) (Entered: 05/29/2013)** |
| 06/04/2013 | 9 | CLERKS NOTICE SETTING CASE MANAGEMENT CONFERENCE. Case Management Statement due by 9/23/2013. Initial Case Management Conference set for Monday, 9/30/2013 02:00 PM before Judge Yvonne Gonzalez Rogers in Courtroom 5, 2nd Floor, Oakland. (Attachments: # 1 Standing Order) (fs, COURT STAFF) (Filed on 6/4/2013) (Entered: 06/04/2013) |
| 09/23/2013 | 10 | CASE MANAGEMENT STATEMENT filed by AOptix Technologies. (Kohm, Bryan) (Filed on 9/23/2013) (Entered: 09/23/2013) |
| 09/23/2013 | 11 | SUMMONS Returned Executed by AOptix Technologies. Blue Spike, LLC served on 9/20/2013, answer due 10/11/2013. (Kohm, Bryan) (Filed on 9/23/2013) (Entered: 09/23/2013) |
| 09/25/2013 | 12 | **ORDER CONTINUING CASE MANAGEMENT CONFERENCE. Initial Case Management Conference set for 9/30/2013 is CONTINUED to Monday, 11/18/2013 02:00 PM in Courtroom 5, 2nd Floor, Oakland. Signed by Judge Yvonne Gonzalez Rogers on 9/25/13. (fs, COURT STAFF) (Filed on 9/25/2013) (Entered: 09/25/2013)** |
| 10/11/2013 | 13 | MOTION to Dismiss pursuant to First-to-File Rule, MOTION to Dismiss for Lack of Jurisdiction, or in the alternative, MOTION to Transfer action to the Eastern |

| | | |
|---|---|---|
| | | District of Texas pursuant to Title 28 U.S.C. Section 1404(a) where the first to file action originated, filed by Blue Spike, LLC. Motion Hearing set for 11/19/2013 02:00 PM in Courtroom 5, 2nd Floor, Oakland before Hon. Yvonne Gonzalez Rogers. Responses due by 10/25/2013. Replies due by 11/1/2013. (Attachments: # 1 Declaration of Scott Moskowitz, # 2 Request for Judicial Notice, # 3 Ex. A, # 4 Ex. B, # 5 Ex. C, # 6 [Proposed] Order)(Garteiser, Randall) (Filed on 10/11/2013) Modified on 10/15/2013 (jlmS, COURT STAFF). (Entered: 10/11/2013) |
| 10/14/2013 | 14 | Corporate Statement of Corporate Disclosure, filed by Blue Spike, LLC. (Honea, Christopher) (Filed on 10/14/2013) Modified on 10/15/2013 (jlmS, COURT STAFF). (Entered: 10/14/2013) |
| 10/14/2013 | 15 | NOTICE of Appearance of Christopher Alan Honea as Counsel, filed by Blue Spike, LLC (Honea, Christopher) (Filed on 10/14/2013) Modified on 10/15/2013 (jlmS, COURT STAFF). Modified on 10/15/2013 (jlmS, COURT STAFF). (Entered: 10/14/2013) |
| 10/14/2013 | 16 | NOTICE of Appearance of Peter Stuart Brasher as Counsel, filed by Blue Spike, LLC (Brasher, Peter) (Filed on 10/14/2013) Modified on 10/15/2013 (jlmS, COURT STAFF). (Entered: 10/14/2013) |
| 10/14/2013 | 17 | NOTICE of Appearance of Kirk J Anderson as Counsel, filed by Blue Spike, LLC (Anderson, Kirk) (Filed on 10/14/2013) Modified on 10/15/2013 (jlmS, COURT STAFF). (Entered: 10/14/2013) |
| 10/25/2013 | 18 | AMENDED COMPLAINT for Declaratory Judgment of Patent Noninfringement and Patent Invalidity with Jury Demand, against Blue Spike, LLC. Filed by AOptix Technologies. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G)(Corbin, Teresa) (Filed on 10/25/2013) Modified on 10/28/2013 (jlmS, COURT STAFF). (Entered: 10/25/2013) |
| 11/08/2013 | 19 | MOTION to Dismiss *[AOptix's First Amended Complaint]* filed by Blue Spike, LLC. Motion Hearing set for 12/18/2013 02:00 PM in Courtroom 5, 2nd Floor, Oakland before Hon. Yvonne Gonzalez Rogers. Responses due by 1/2/2014. Replies due by 1/9/2014. (Attachments: # 1 Proposed Order, # 2 Declaration, # 3 Exhibit A, # 4 Exhibit B, # 5 Exhibit C, # 6 Supplement Request for Judicial Notice)(Garteiser, Randall) (Filed on 11/8/2013) (Entered: 11/08/2013) |
| 11/12/2013 | 20 | **ORDER by Judge Yvonne Gonzalez Rogers Denying as moot 13 Motion to Dismiss; Denying as moot 13 Motion to Dismiss for Lack of Jurisdiction; Resetting Hearing on Motion to Dismiss Amended Complaint; Continuing Case Management Conference. (fs, COURT STAFF) (Filed on 11/12/2013) (Entered: 11/12/2013)** |
| 11/22/2013 | 21 | Memorandum in Opposition re 19 *Motion to Dismiss Amended Complaint,* filed by AOptix Technologies. (Attachments: # 1 Declaration Bryan A. Kohm In Support of Plaintiff AOptix Technologies, Inc.'s Opposition to Defendant Blue Spike, LLC's Motion to Dismiss the Amended Complaint, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C, # 5 Exhibit D, # 6 Exhibit E, # 7 Exhibit F, # 8 Exhibit G, # 9 Exhibit H, # 10 Exhibit I, # 11 Exhibit J, # 12 Exhibit K, # 13 Exhibit L, # 14 Exhibit M, # 15 Exhibit N, # 16 Exhibit O, # 17 Exhibit P)(Kohm, Bryan) (Filed on 11/22/2013) Modified on 11/25/2013 (jlmS, COURT STAFF). (Entered: 11/22/2013) |

| 12/02/2013 | 22 | Reply Memorandum re 19 *Motion to Dismiss Amended Complaint,* filed by Blue Spike, LLC. (Attachments: # 1 Proposed Order (updated to conform to standing order rule no. 7))(Garteiser, Randall) (Filed on 12/2/2013) Modified on 12/3/2013 (jlmS, COURT STAFF). (Entered: 12/02/2013) |
|---|---|---|
| 12/10/2013 | 23 | **ORDER RE: MOTION TO DISMISS; STAYING CASE; VACATING HEARING AND CASE MANAGEMENT CONFERENCE., Case stayed., ***Deadlines terminated. 19 MOTION to Dismiss *[AOptix's First Amended Complaint]* filed by Blue Spike, LLC is submitted on the papers and the 12/17/2013 hearing date is vacated; 1/27/14 Case Management Conference is vacated. Signed by Judge Yvonne Gonzalez Rogers on 12/10/13. (fs, COURT STAFF) (Filed on 12/10/2013) (Entered: 12/10/2013)** |
| 03/20/2014 | 24 | Joint NOTICE of Resolution of Texas Action re 23 *Order Staying Case,* filed by Blue Spike, LLC, AOptix Technologies (Garteiser, Randall) (Filed on 3/20/2014) Modified on 3/21/2014 (jlmS, COURT STAFF). (Entered: 03/20/2014) |
| 04/01/2014 | 25 | Joint NOTICE of Resolution of Texas Action re 23 *Order,* filed by Blue Spike, LLC, AOptix Technologies (Attachments: # 1 Exhibit 1)(Garteiser, Randall) (Filed on 4/1/2014) Modified on 4/2/2014 (jlmS, COURT STAFF). (Entered: 04/01/2014) |
| 05/16/2014 | 26 | MOTION to Relate Case *Pursuant to L.R. 3-12* filed by AOptix Technologies. (Kohm, Bryan) (Filed on 5/16/2014) (Entered: 05/16/2014) |
| 06/11/2014 | 27 | **ORDER by Judge Yvonne Gonzalez Rogers denying 19 Motion to Dismiss (fs, COURT STAFF) (Filed on 6/11/2014) (Entered: 06/11/2014)** |
| 06/11/2014 | 28 | **ORDER by Judge Yvonne Gonzalez Rogers granting 26 Motion to Relate Cases and ORDER RELATING CASES C-13-1105-YGR; C-14-1647-BLF; C-14-1648-RS; C-14-1649-KAW and C-14-1650-JD. (fs, COURT STAFF) (Filed on 6/11/2014) (Entered: 06/11/2014)** |
| 06/19/2014 | 29 | CLERKS NOTICE SETTING CASE MANAGEMENT CONFERENCE IN RELATED CASES. Case Management Statement due by 7/21/2014. Initial Case Management Conference set for 7/28/2014 02:00 PM before Judge Yvonne Gonzalez Rogers in Courtroom 1, 4th Floor, Oakland. (Attachments: # 1 Standing Order) (fs, COURT STAFF) (Filed on 6/19/2014) (Entered: 06/19/2014) |
| 06/19/2014 | 30 | AMENDED CLERKS NOTICE [amended to reflect the correct year of the case as to: 4:13-CV-1105-YGR] (fs, COURT STAFF) (Filed on 6/19/2014) (Entered: 06/24/2014) |
| 07/07/2014 | 31 | ADR Certification (ADR L.R. 3-5 b) of discussion of ADR options (Kohm, Bryan) (Filed on 7/7/2014) (Entered: 07/07/2014) |
| 07/07/2014 | 32 | NOTICE of need for ADR Phone Conference (ADR L.R. 3-5 d) (Kohm, Bryan) (Filed on 7/7/2014) (Entered: 07/07/2014) |
| 07/07/2014 | 33 | *Defendant Blue Spike, LLC's* ANSWER to Amended Complaint , *Affirmative Defenses*, COUNTERCLAIM against AOptix Technologies byBlue Spike, LLC. (Garteiser, Randall) (Filed on 7/7/2014) (Entered: 07/07/2014) |
| 07/08/2014 | 34 | ADR Clerks Notice Setting ADR Phone Conference on Monday, July 21, 2014 at 2:30 PM Pacific time. Please note that you must be logged into an ECF account of counsel of record in order to view this document. (af, COURT STAFF) (Filed on |

| | | |
|---|---|---|
| | | 7/8/2014) (Entered: 07/08/2014) |
| 07/21/2014 | 35 | JOINT CASE MANAGEMENT STATEMENT *ON BEHALF OF ALL PARTIES* filed by AOptix Technologies. (Kohm, Bryan) (Filed on 7/21/2014) (Entered: 07/21/2014) |
| 07/22/2014 | | ADR Remark: ADR Phone Conference held by Howard A. Herman Director, ADR Program on 7/21/2014. (af, COURT STAFF) (Filed on 7/22/2014) (Entered: 07/22/2014) |
| 07/22/2014 | | NOTICE TO COUNSEL: Document # 35 Joint Case Management Statement also listed the related case(s). If it is intended to be applied to the related case(s), please e-file in the related case(s) also. If the document is not applicable to the related case(s), please DO NOT include that case number(s) on the document. (cp, COURT STAFF) (Filed on 7/22/2014) (Entered: 07/22/2014) |
| 07/28/2014 | 37 | Minute Entry: Initial Case Management Conference held on 7/28/2014 before Yvonne Gonzalez Rogers (Date Filed: 7/28/2014). Case referred to Magistrate Judge Corley for Discovery. Tutorial Hearing set for Friday 5/1/2015 10:00 AM in Courtroom 1, 4th Floor, Oakland. (Court Reporter Diane Skillman.) (fs, COURT STAFF) (Date Filed: 7/28/2014) (Entered: 07/30/2014) |
| 07/30/2014 | 36 | ADR Certification (ADR L.R. 3-5 b) of discussion of ADR options (Garteiser, Randall) (Filed on 7/30/2014) (Entered: 07/30/2014) |
| 07/31/2014 | 38 | ANSWER TO COUNTERCLAIM 33 Answer to Amended Complaint, Counterclaim *Plaintiff AOptix Technologies, Inc.'s Answer and Defenses to Blue Spike, LLC's Counterclaims to First Amended Complaint for Declaratory Judgment of Patent Noninfringement and Patent Invalidity* byAOptix Technologies. (Kohm, Bryan) (Filed on 7/31/2014) (Entered: 07/31/2014) |
| 07/31/2014 | 39 | STIPULATION WITH PROPOSED ORDER *re proposed schedule* filed by AOptix Technologies, Blue Spike LLC. (Lee, Nicholas) (Filed on 7/31/2014) Modified on 8/1/2014 (cpS, COURT STAFF). (Entered: 07/31/2014) |
| 08/04/2014 | 40 | **ORDER by Judge Yvonne Gonzalez Rogers granting (39) Stipulation re Joint Schedule in case 4:13-cv-01105-YGR; granting (58) Stipulation re Joint Schedule in case 4:14-cv-01648-YGR; granting (40) Stipulation re Joint Schedule in case 4:14-cv-01647-YGR; granting (39) Stipulation re Joint Schedule in case 4:14-cv-01650-YGR; granting (35) Stipulation re Joint Schedule in case 4:14-cv-01649-YGR (fs, COURT STAFF) (Filed on 8/4/2014) (Entered: 08/04/2014)** |
| 08/04/2014 | | Set Deadlines/Hearings: Claim Construction Discovery completed by 5/2/2015. Opening Claim Construction Brief by Blue Spike filed 6/2/15; Responsive Claim Construction Brief by AOptix and Defendants filed by 6/23/2015; Reply Claim Construction Brief by Blue Spike filed by 7/7/15. Status Conference set for 5/1/2015 10:00 AM in Courtroom 1, 4th Floor, Oakland before Hon. Yvonne Gonzalez Rogers. (fs, COURT STAFF) (Filed on 8/4/2014) (Entered: 08/04/2014) |
| 08/13/2014 | 41 | Transcript of Proceedings held on July 28, 2014, before Judge Yvonne Gonzalez Rogers. Court Reporter Diane E. Skillman, Telephone number 510-451-2930, Diane_Skillman@cand.uscourts.gov, diane.transcripts@aol.com. Per General Order |

| | | No. 59 and Judicial Conference policy, this transcript may be viewed only at the Clerks Office public terminal or may be purchased through the Court Reporter until the deadline for the Release of Transcript Restriction.After that date it may be obtained through PACER. Any Notice of Intent to Request Redaction, if required, is due no later than 5 business days from date of this filing. (Re (39 in 4:14-cv-01647-YGR) Transcript Order ) Release of Transcript Restriction set for 11/12/2014. (Skillman, Diane) (Filed on 8/13/2014) (Entered: 08/13/2014) |
|---|---|---|
| 10/02/2014 | 42 | STIPULATION WITH PROPOSED ORDER *Regarding Discovery of Electronically Stored Information (Joint ESI Order)* filed by AOptix Technologies, Blue Spike, LLC. (Lee, Nicholas) (Filed on 10/2/2014) Modified on 10/3/2014 (cpS, COURT STAFF). (Entered: 10/02/2014) |
| 10/02/2014 | 43 | NOTICE of Appearance by Jeffrey Allen Ware (Ware, Jeffrey) (Filed on 10/2/2014) (Entered: 10/02/2014) |
| 10/03/2014 | 44 | STIPULATION WITH PROPOSED ORDER *Regarding Joint Protective Order* filed by AOptix Technologies, Blue Spike LLC. (Lee, Nicholas) (Filed on 10/3/2014) Modified on 10/6/2014 (cpS, COURT STAFF). (Entered: 10/03/2014) |
| 10/06/2014 | 45 | **ORDER by Magistrate Judge Jacqueline Scott Corley granting (42) Stipulation Regarding Discovery of Electronically Stored Information (Joint ESI Order) in case 4:13-cv-01105-YGR; granting (68) Stipulation Regarding Discovery of Electronically Stored Information (Joint ESI Order) in case 4:14-cv-01648-YGR; granting (49) Stipulation Regarding Discovery of Electronically Stored Information (Joint ESI Order) in case 4:14-cv-01650-YGR; granting (40) Stipulation Regarding Discovery of Electronically Stored Information (Joint ESI Order) in case 4:14-cv-01649-YGR (ahm, COURT STAFF) (Filed on 10/6/2014) (Entered: 10/06/2014)** |
| 10/06/2014 | 46 | **ORDER by Magistrate Judge Jacqueline Scott Corley granting (44) Stipulation Regarding Joint Protective Order in case 4:13-cv-01105-YGR; granting (70) Stipulation Regarding Joint Protective Order in case 4:14-cv-01648-YGR; granting (44) Stipulation Regarding Joint Protective Order in case 4:14-cv-01647-YGR; granting (50) Stipulation Regarding Joint Protective Order in case 4:14-cv-01650-YGR; granting (42) Stipulation Regarding Joint Protective Order in case 4:14-cv-01649-YGR (ahm, COURT STAFF) (Filed on 10/6/2014) (Entered: 10/06/2014)** |
| 12/12/2014 | 47 | STIPULATION and Proposed Order selecting Mediation by Blue Spike, LLC filed by Blue Spike, LLC, AOptix Technologies. (Garteiser, Randall) (Filed on 12/12/2014) Modified on 12/15/2014 (cpS, COURT STAFF). (Entered: 12/12/2014) |
| 12/16/2014 | 48 | **ORDER by Judge Yvonne Gonzalez Rogers granting 47 Stipulation selecting ADR Process:Mediation (fs, COURT STAFF) (Filed on 12/16/2014) (Entered: 12/16/2014)** |
| 01/23/2015 | 49 | ADR Clerk's Notice Appointing Karen Boyd as Mediator. (af, COURT STAFF) (Filed on 1/23/2015) (Entered: 01/23/2015) |
| 01/23/2015 | 50 | Joint MOTION to Dismiss *ALL claims and counterclaims between AOptix Technologies, Inc. and Blue Spike, LLC with prejudice* filed by Blue Spike, LLC, AOptix Technologies. Responses due by 2/6/2015. Replies due by 2/13/2015. |

| | | |
|---|---|---|
| | | (Attachments: # 1 Proposed Order)(Garteiser, Randall) (Filed on 1/23/2015) Modified on 1/26/2015 (cpS, COURT STAFF). (Entered: 01/23/2015) |
| 01/27/2015 | 51 | **ORDER by Judge Yvonne Gonzalez Rogers granting 50 Joint Motion to Dismiss Claims and Counterclaims between Plaintiff and Defendant; Order of Dismissal with Prejudice. (fs, COURT STAFF) (Filed on 1/27/2015) (Entered: 01/27/2015)** |
| 01/28/2015 | 52 | REPORT on the determination of an action regarding patents (cc: form mailed to register). (cpS, COURT STAFF) (Filed on 1/28/2015) (Entered: 01/28/2015) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 03/23/2016 11:39:04 | | | |
| **PACER Login:** | arnoldporterwest:2506668:0 | **Client Code:** | 0026064.00006 6791 |
| **Description:** | Docket Report | **Search Criteria:** | 4:13-cv-01105-YGR |
| **Billable Pages:** | 8 | **Cost:** | 0.80 |

# U.S. District Court
# California Northern District (Oakland)
# CIVIL DOCKET FOR CASE #: 4:14-cv-01649-YGR

Blue Spike, LLC v. SoundHound, Inc.
Assigned to: Hon. Yvonne Gonzalez Rogers
Referred to: Magistrate Judge Jacqueline Scott Corley
Relate Case Case: 4:13-cv-01105-YGR
Case in other court: Texas Eastern, 6:12-cv-00537
Cause: 35:271 Patent Infringement

Date Filed: 04/10/2014
Date Terminated: 03/23/2015
Jury Demand: Both
Nature of Suit: 830 Patent
Jurisdiction: Federal Question

**Plaintiff**

**Blue Spike, LLC**

represented by **Christopher A Honea**
Garteiser Honea PLLC
218 N. College Ave
Tyler, TX 75702
903-705-7420
Fax: 888-908-4400
Email: chonea@ghiplaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Randall Garteiser**
Garteiser Honea, P.C.
44 N. San Pedro Road
San Rafael, CA 94903
(415) 568-0553
Fax: (415) 785-3805
Email:
randall.garteiser@sftrialattorneys.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Randall T Garteiser**
Garteiser Honea PLLC
218 N. College Ave
Tyler, TX 75702
903-705-7420
Fax: 888-908-4400
Email: rgarteiser@ghiplaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Christopher Alan Honea**
Garteiser Honea, P.C.
44 N. San Pedro Road

San Rafael, CA 94903
(415) 785-3762
Fax: (415) 785-3805
Email: chris.honea@sftrialattorneys.com
*ATTORNEY TO BE NOTICED*

**Christopher S Johns**
Johns Marrs Ellis & Hodge LLP
300 West Sixth Street
Suite 1950
Austin, TX 78701
512-215-4078
Fax: 512-628-7169
Email: cjohns@jmehlaw.com
*ATTORNEY TO BE NOTICED*

**Eric Miller Albritton**
Albritton Law Firm
P.O. Box 2649
Longview, Tx 75606
903-757-8449
Email: ema@emafirm.com
*TERMINATED: 05/03/2013*

**Ian Nicholas Ramage**
Garteiser Honea PC
218 N. College Ave.
Tyler, TX 75702
903-705-7420
Fax: 888-908-4400
Email: iramage@ramagelaw.net
*ATTORNEY TO BE NOTICED*

**Michael A Benefield**
Williams Morgan & Amerson PC
10333 Richmond Ave
Suite 1100
Houston, TX 77042
(713) 934-7000 ext 4091
Fax: (713) 934-7011
Email: mbenefield@wmalaw.com
*TERMINATED: 05/03/2013*

**Peter Stuart Brasher**
Garteiser Honea
44 N San Pedro Rd.
San Rafael, CA 94903
415-785-3762
Email: pbrasher@ghiplaw.com
*ATTORNEY TO BE NOTICED*

**Stephen Eugene Edwards**
Blank Rome LLP
717 Texas Avenue
Suite 1400
Houston, Tx 77002
713,228,6601
Fax: 713.228.6605
Email: sedwards@blankrome.com
*TERMINATED: 03/08/2013*

V.

**Defendant**

SoundHound, Inc.                    represented by

**Jennifer A. Kash**
Quinn Emanuel Urquhart & Sullivan ,
LLP
50 California Street, 22nd Floor
San Francisco, CA 94111
415-875-6600
Fax: 415-875-6700
Email: jenniferkash@quinnemanuel.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Sean Sang-Chul Pak**
Quinn Emanuel Urquhart & Sullivan,
LLP
50 California, Floor 22
San Francisco, CA 94111
415-875-6320
Fax: 415-875-6700
Email: seanpak@quinnemanuel.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Bryan A. Kohm**
Fenwick & West LLP
555 California Street, 12th Floor
San Francisco, CA 94104
415-875-2300
Fax: 415-281-1350
Email: bkohm@fenwick.com
*TERMINATED: 12/17/2014*

**Bryan Alexander Kohm**
Fenwick & West - San Francisco
555 California Street
12th Floor
San Francisco, CA 94104

415-875-2300
Fax: 415-281-1350
Email: bkohm@fenwick.com
*TERMINATED: 12/17/2014*

**Catherine Rose Lacey**
Quinn Emanuel Urquhart Sullivan LLP
50 California Street
Floor 22
San Francisco, CA 94111
415-875-6343
Email: catylacey@quinnemanuel.com
*ATTORNEY TO BE NOTICED*

**Darren E. Donnelly**
Fenwick & West LLP
Silicon Valley Center
801 California Street
Mountain View, CA 94041
650-988-8500
Fax: 650-938-5200
Email: ddonnelly@fenwick.com
*TERMINATED: 12/17/2014*

**David M Lacy Kusters**
Fenwick & West - San Francisco
555 California Street
12th Floor
San Francisco, CA 94104
415-875-2300
Fax: 415-281-1350
Email: dlacykusters@fenwick.com
*TERMINATED: 12/17/2014*

**Jason L Liu**
Quinn Emanuel Urquhart and Sullivan,
LLP
50 California St. 22nd Floor
San Francisco, CA 94111
415-875-6434
Email: jasonliu@quinnemanuel.com
*ATTORNEY TO BE NOTICED*

**Jeffrey Allen Ware**
Fenwick and West
1191 Second Ave.
10th Floor
Seattle, WA 98101
206-389-4531
Email: jware@fenwick.com

*TERMINATED: 12/17/2014*

**Michelle Ann Clark**
Quinn Emanuel Urquhart Sullivan LLP
50 California St.
22nd Floor
San Francisco, CA 94111
415-875-6340
Email:
michelleclark@quinnemanuel.com
*ATTORNEY TO BE NOTICED*

**Teresa Marie Corbin**
Fenwick & West - San Francisco
555 California Street
12th Floor
San Francisco, CA 94104
415-875-2303
Fax: 415-281-1350
Email: tcorbin@fenwick.com
*TERMINATED: 12/17/2014*

**Counter-claimant**

**SoundHound, Inc.**          represented by   **Bryan A. Kohm**
(See above for address)
*TERMINATED: 12/17/2014*

**Bryan Alexander Kohm**
(See above for address)
*TERMINATED: 12/17/2014*

**Darren E. Donnelly**
(See above for address)
*TERMINATED: 12/17/2014*

**David M Lacy Kusters**
(See above for address)
*TERMINATED: 12/17/2014*

**Jason L Liu**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jeffrey Allen Ware**
(See above for address)
*TERMINATED: 12/17/2014*

**Teresa Marie Corbin**
(See above for address)
*TERMINATED: 12/17/2014*

V.

**Counter-defendant**

**Blue Spike, LLC**                    represented by    **Christopher A Honea**
                                                        (See above for address)
                                                        *LEAD ATTORNEY*
                                                        *ATTORNEY TO BE NOTICED*

                                                        **Randall T Garteiser**
                                                        (See above for address)
                                                        *LEAD ATTORNEY*
                                                        *ATTORNEY TO BE NOTICED*

                                                        **Christopher S Johns**
                                                        (See above for address)
                                                        *ATTORNEY TO BE NOTICED*

                                                        **Eric Miller Albritton**
                                                        (See above for address)
                                                        *TERMINATED: 05/03/2013*

                                                        **Michael A Benefield**
                                                        (See above for address)
                                                        *TERMINATED: 05/03/2013*

                                                        **Stephen Eugene Edwards**
                                                        (See above for address)
                                                        *TERMINATED: 03/08/2013*

**Counter-claimant**

**SoundHound, Inc.**                   represented by    **Bryan A. Kohm**
                                                        (See above for address)
                                                        *TERMINATED: 12/17/2014*

                                                        **Bryan Alexander Kohm**
                                                        (See above for address)
                                                        *TERMINATED: 12/17/2014*

                                                        **Darren E. Donnelly**
                                                        (See above for address)
                                                        *TERMINATED: 12/17/2014*

                                                        **David M Lacy Kusters**
                                                        (See above for address)
                                                        *TERMINATED: 12/17/2014*

                                                        **Jeffrey Allen Ware**
                                                        (See above for address)

*TERMINATED: 12/17/2014*

**Teresa Marie Corbin**
(See above for address)
*TERMINATED: 12/17/2014*

V.

**<u>Counter-defendant</u>**

**Blue Spike, LLC**                    represented by    **Christopher A Honea**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Randall Garteiser**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Randall T Garteiser**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Christopher Alan Honea**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Christopher S Johns**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Eric Miller Albritton**
(See above for address)
*TERMINATED: 05/03/2013*

**Ian Nicholas Ramage**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Michael A Benefield**
(See above for address)
*TERMINATED: 05/03/2013*

**Peter Stuart Brasher**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Stephen Eugene Edwards**
(See above for address)

| Date Filed | # | Docket Text |
|---|---|---|
| 08/16/2012 | 1 | COMPLAINT against SoundHound, Inc. ( Filing fee $ 350 receipt number 0540-3731378.), filed by Blue Spike, LLC. (Attachments: # 1 Exhibit A - Patent 8214175, # 2 Exhibit B - Patent 7949494, # 3 Exhibit C - Patent 7660700, # 4 Exhibit D - Patent 7346472, # 5 Civil Cover Sheet)(Albritton, Eric) (Entered: 08/16/2012) |
| 08/16/2012 | 2 | Notice of Filing of Patent/Trademark Form (AO 120). AO 120 mailed to the Director of the U.S. Patent and Trademark Office. (Albritton, Eric) (Entered: 08/16/2012) |
| 08/16/2012 | 3 | CORPORATE DISCLOSURE STATEMENT filed by Blue Spike, LLC (Albritton, Eric) (Entered: 08/16/2012) |
| 08/16/2012 | 4 | NOTICE of Attorney Appearance by Stephen E Edwards on behalf of Blue Spike, LLC (Edwards, Stephen) (Entered: 08/16/2012) |
| 08/16/2012 | 5 | NOTICE of Attorney Appearance by Michael A. Benefield on behalf of Blue Spike, LLC (Benefield, Michael) (Entered: 08/16/2012) |
| 08/16/2012 | 6 | SUMMONS Issued as to SoundHound, Inc.. and emailed to pltf for service. (klb, ) (Entered: 08/16/2012) |
| 08/16/2012 | 7 | NOTICE of Attorney Appearance by Christopher A Honea on behalf of Blue Spike, LLC (Honea, Christopher) (Entered: 08/16/2012) |
| 08/16/2012 | 8 | NOTICE of Attorney Appearance by Randall T Garteiser on behalf of Blue Spike, LLC (Garteiser, Randall) (Entered: 08/16/2012) |
| 08/16/2012 | | Judge Leonard Davis added. (mll, ) (Entered: 08/16/2012) |
| 08/22/2012 | 9 | NOTICE of Attorney Appearance by Christopher S Johns on behalf of Blue Spike, LLC (Johns, Christopher) (Entered: 08/22/2012) |
| 08/28/2012 | 10 | Return of Service Executed as to SoundHound, Inc. on 8/20/2012, by cert mail; answer due: 9/10/2012. (mll, ) (Entered: 08/28/2012) |
| 09/07/2012 | 11 | Defendant's Unopposed First Application for Extension of Time to Answer Complaint re SoundHound, Inc..( Donnelly, Darren) (Entered: 09/07/2012) |
| 09/10/2012 | | Defendant's Unopposed First Application for Extension of Time to Answer Complaint 11 is granted pursuant to Local Rule CV-12 for SoundHound, Inc. to 10/10/2012. 30 Days Granted for Deadline Extension.( mll, ) (Entered: 09/10/2012) |
| 10/09/2012 | 12 | ORDER that this civil action is CONSOLIDATED for pretrial issues only, with the exception of venue. **The earliest filed civil action 6:12cv499 shall serve as the Lead Case for consolidated issues.** The individual cases will remain active for venue motions and trial. All motions, other than venue motions, shall be filed in the consolidated lead case. Parties shall submit a single Docket Control, Discovery, ESI, and Protective Order, and each of the respective orders shall be filed in the Lead Case. Signed by Judge Leonard Davis on 10/09/12. cc:attys 10-10-12(mll, ) (Entered: 10/10/2012) |

| 10/09/2012 | | **This Civil Action is CONSOLIDATED with cause 6:12cv499, which is designated as the Lead Case. All future pleadings, except for venue motions, should be filed in the Lead Case.** (mll, ) (Entered: 10/10/2012) |
|---|---|---|
| 10/10/2012 | 13 | NOTICE of Attorney Appearance by Teresa Marie Corbin on behalf of SoundHound, Inc. (Corbin, Teresa) (Entered: 10/10/2012) |
| 10/10/2012 | 14 | ANSWER to 1 Complaint,, COUNTERCLAIM *(TO ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT)* against Blue Spike, LLC by SoundHound, Inc.. (Corbin, Teresa) (Entered: 10/10/2012) |
| 10/10/2012 | 15 | NOTICE of Attorney Appearance by Darren E Donnelly on behalf of SoundHound, Inc. (Donnelly, Darren) (Entered: 10/10/2012) |
| 10/10/2012 | 16 | NOTICE of Attorney Appearance by Bryan Alexander Kohm on behalf of SoundHound, Inc. (Kohm, Bryan) (Entered: 10/10/2012) |
| 10/10/2012 | 17 | NOTICE of Attorney Appearance by David M Lacy Kusters on behalf of SoundHound, Inc. (Lacy Kusters, David) (Entered: 10/10/2012) |
| 01/15/2013 | 18 | Order reassigning this case to United States District Judge Michael H. Schneider per General Order 13-3. Please see Appendix D: Addendum Regarding Cases Assigned to Judge Schneider. Judge Leonard Davis no longer assigned to the case. (gsg) (Entered: 01/15/2013) |
| 03/26/2013 | 19 | ORDER OF CONSOLIDATION. The above listed cases are hereby consolidated into cause number 6:12cv499, Blue Spike, LLC v. Texas Instruments, Inc., for all pretrial purposes, including discovery and claim construction. The Clerk of the Court shall add the consolidated defendants to the lead case, as well as lead counsel only. Any other counsel who wishes to appear in the lead case shall file a notice of appearance in that case. The Clerk shall close all cases listed above other than the lead case. **Any motions including motions challenging venue or jurisdiction filed prior to consolidation in all cases must be refiled in the consolidated case 6:12cv499 to be considered by the Court.** The Court ORDERS Plaintiff to file a notice of readiness for scheduling conference when all Defendants in the consolidated case have either answered or filed a motion to transfer or dismiss. The notice must be filed within five days of the last remaining Defendants answer or motion. The notice must include a list of any pending motions to dismiss or transfer and a list of any other related cases filed in the Eastern District of Texas involving the same patents. If the consolidated case is not ready for scheduling conference within 90 days of this order, Plaintiff must file a detailed status report explaining the reason for the delay. Furthermore, attorney Stephen E. Edwards has moved to withdraw from several of the cases listed above. The Court GRANTS the motions in all cases in which it is pending. Signed by Judge Michael H. Schneider on 03/25/13. cc:attys 3-26-13(mll, ) (Entered: 03/26/2013) |
| 03/13/2014 | 20 | ORDER granting Motion to Change Venue filed in the consolidated lead case 6:12cv499 by Defendant SoundHound, Inc. Plaintiff's claims against SoundHound, Inc. are SEVERED from the lead case back into the original cause number, 6:12-cv-537, and the clerk of the court is directed to TRANSFER the severed action to the Northern District of California for further consideration. Signed by Judge Michael H. Schneider on 3/13/14. (mjc, ) (Entered: 03/14/2014) |

| 04/07/2014 | | Interdistrict transfer to the Northern District of California. (mjc, ) (Entered: 04/07/2014) |
|---|---|---|
| 04/10/2014 | 21 | Case transferred in from District of Texas Eastern; Case Number 6:12-cv-00537. Case file electronically transfered, copy of transfer order and docket sheet received. Modified on 4/14/2014 (cjlS, COURT STAFF). (Entered: 04/14/2014) |
| 04/10/2014 | 22 | **Initial Case Management Scheduling Order with ADR Deadlines: Case Management Statement due by 7/8/2014. Case Management Conference set for 7/15/2014 01:30 PM in Courtroom 4, 3rd Floor, Oakland. (cjlS, COURT STAFF) (Filed on 4/10/2014) (Entered: 04/14/2014)** |
| 04/14/2014 | 23 | CLERKS NOTICE Acknowledging Receipt of Case Transferred in from the Eastern District of Texas, Case No. 6:12-cv-537-MHS. (cjlS, COURT STAFF) (Filed on 4/14/2014) (Entered: 04/14/2014) |
| 05/09/2014 | 24 | NOTICE of Appearance by Ian Nicholas Ramage (Ramage, Ian) (Filed on 5/9/2014) (Entered: 05/09/2014) |
| 05/19/2014 | 25 | NOTICE of Appearance by Peter Stuart Brasher *on behalf of Blue Spike, LLC* (Brasher, Peter) (Filed on 5/19/2014) (Entered: 05/19/2014) |
| 05/19/2014 | 26 | NOTICE of Appearance by Randall Garteiser *on behalf of Blue Spike, LLC* (Garteiser, Randall) (Filed on 5/19/2014) (Entered: 05/19/2014) |
| 05/19/2014 | 27 | NOTICE of Appearance by Christopher Alan Honea *on behalf of Blue Spike, LLC* (Honea, Christopher) (Filed on 5/19/2014) (Entered: 05/19/2014) |
| 06/11/2014 | 28 | **ORDER RELATING CASES C-13-1105-YGR and C-14-1647-BLF and C-14-1648-RS and C-14-1649-KAW and C-14-1650-JD. Signed by Judge Yvonne Gonzalez Rogers on 6/11/14. (fs, COURT STAFF) (Filed on 6/11/2014) (Entered: 06/11/2014)** |
| 06/11/2014 | | **Case reassigned to Judge Hon. Yvonne Gonzalez Rogers. Judge Magistrate Judge Kandis A. Westmore no longer assigned to the case. (cpS, COURT STAFF) (Filed on 6/11/2014) (Entered: 06/12/2014)** |
| 06/19/2014 | 29 | CLERKS NOTICE SETTING CASE MANAGEMENT CONFERENCE IN RELATED CASES. Case Management Statement due by 7/21/2014. Initial Case Management Conference set for 7/28/2014 02:00 PM before Judge Yvonne Gonzalez Rogers in Courtroom 1, 4th Floor, Oakland. (Attachments: # 1 Standing Order) (fs, COURT STAFF) (Filed on 6/19/2014) (Entered: 06/19/2014) |
| 06/19/2014 | 30 | AMENDED CLERKS NOTICE [amended to reflect the correct year of the case as to: 4:13-CV-1105-YGR] (fs, COURT STAFF) (Filed on 6/19/2014) (Entered: 06/24/2014) |
| 07/22/2014 | 31 | JOINT CASE MANAGEMENT STATEMENT *ON BEHALF OF ALL PARTIES* filed by SoundHound, Inc.. (Kohm, Bryan) (Filed on 7/22/2014) (Entered: 07/22/2014) |
| 07/25/2014 | 32 | ADR Certification (ADR L.R. 3-5 b) of discussion of ADR options (Kohm, Bryan) (Filed on 7/25/2014) (Entered: 07/25/2014) |
| 07/28/2014 | 34 | Minute Entry: Initial Case Management Conference held on 7/28/2014 before |

| | | |
|---|---|---|
| | | Yvonne Gonzalez Rogers (Date Filed: 7/28/2014). Case REFERRED to Magistrate Judge Corley for Discovery. Tutorial Hearing set for Friday, 5/1/2015 10:00 AM in Courtroom 1, 4th Floor, Oakland. (Court Reporter Diane Skillman.) (fs, COURT STAFF) (Date Filed: 7/28/2014) (Entered: 07/30/2014) |
| 07/30/2014 | 33 | ADR Certification (ADR L.R. 3-5 b) of discussion of ADR options (Garteiser, Randall) (Filed on 7/30/2014) (Entered: 07/30/2014) |
| 07/31/2014 | 35 | STIPULATION WITH PROPOSED ORDER re proposed schedule filed by SoundHound, Inc., Blue Spike LLC. (Lee, Nicholas) (Filed on 7/31/2014) Modified on 8/1/2014 (cpS, COURT STAFF). (Entered: 07/31/2014) |
| 08/04/2014 | 36 | **ORDER by Judge Yvonne Gonzalez Rogers granting (39) Stipulation re Joint Schedule in case 4:13-cv-01105-YGR; granting (58) Stipulation re Joint Schedule in case 4:14-cv-01648-YGR; granting (40) Stipulation re Joint Schedule in case 4:14-cv-01647-YGR; granting (39) Stipulation re Joint Schedule in case 4:14-cv-01650-YGR; granting (35) Stipulation re Joint Schedule in case 4:14-cv-01649-YGR (fs, COURT STAFF) (Filed on 8/4/2014) (Entered: 08/04/2014)** |
| 08/04/2014 | | Set Deadlines/Hearings: Claim Construction Discovery completed by 5/2/2015. Opening Claim Construction Brief by Blue Spike filed 6/2/15; Responsive Claim Construction Brief by AOptix and Defendants filed by 6/23/2015; Reply Claim Construction Brief by Blue Spike filed by 7/7/15. Status Conference set for 5/1/2015 10:00 AM in Courtroom 1, 4th Floor, Oakland before Hon. Yvonne Gonzalez Rogers. (fs, COURT STAFF) (Filed on 8/4/2014) (Entered: 08/04/2014) |
| 08/13/2014 | 37 | Transcript of Proceedings held on July 28, 2014, before Judge Yvonne Gonzalez Rogers. Court Reporter Diane E. Skillman, Telephone number 510-451-2930, Diane_Skillman@cand.uscourts.gov, diane.transcripts@aol.com. Per General Order No. 59 and Judicial Conference policy, this transcript may be viewed only at the Clerks Office public terminal or may be purchased through the Court Reporter until the deadline for the Release of Transcript Restriction.After that date it may be obtained through PACER. Any Notice of Intent to Request Redaction, if required, is due no later than 5 business days from date of this filing. (Re (39 in 4:14-cv-01647-YGR) Transcript Order ) Release of Transcript Restriction set for 11/12/2014. (Skillman, Diane) (Filed on 8/13/2014) (Entered: 08/13/2014) |
| 09/15/2014 | 38 | AMENDED COMPLAINT against SoundHound, Inc.. Filed byBlue Spike, LLC. (Garteiser, Randall) (Filed on 9/15/2014) (Entered: 09/15/2014) |
| 10/02/2014 | 39 | *SOUNDHOUND'S* ANSWER to Amended Complaint *for Patent Infringement*, COUNTERCLAIM against Blue Spike, LLC; Jury Demand bySoundHound, Inc.. (Kohm, Bryan) (Filed on 10/2/2014) Modified on 10/3/2014 (cpS, COURT STAFF). (Entered: 10/02/2014) |
| 10/02/2014 | 40 | STIPULATION WITH PROPOSED ORDER *Regarding Discovery of Electronically Stored Information (Joint ESI Order)* filed by SoundHound, Inc., Blue Spike LLC. (Lee, Nicholas) (Filed on 10/2/2014) Modified on 10/3/2014 (cpS, COURT STAFF). (Entered: 10/02/2014) |
| 10/02/2014 | 41 | NOTICE of Appearance by Jeffrey Allen Ware (Ware, Jeffrey) (Filed on 10/2/2014) |

| | | (Entered: 10/02/2014) |
|---|---|---|
| 10/03/2014 | 42 | STIPULATION WITH PROPOSED ORDER *Regarding Joint Protective Order* filed by SoundHound, Inc., Blue Spike LLC. (Lee, Nicholas) (Filed on 10/3/2014) Modified on 10/6/2014 (cpS, COURT STAFF). (Entered: 10/03/2014) |
| 10/06/2014 | 43 | **ORDER by Magistrate Judge Jacqueline Scott Corley granting (42) Stipulation Regarding Discovery of Electronically Stored Information (Joint ESI Order) in case 4:13-cv-01105-YGR; granting (68) Stipulation Regarding Discovery of Electronically Stored Information (Joint ESI Order) in case 4:14-cv-01648-YGR; granting (49) Stipulation Regarding Discovery of Electronically Stored Information (Joint ESI Order) in case 4:14-cv-01650-YGR; granting (40) Stipulation Regarding Discovery of Electronically Stored Information (Joint ESI Order) in case 4:14-cv-01649-YGR (ahm, COURT STAFF) (Filed on 10/6/2014) (Entered: 10/06/2014)** |
| 10/06/2014 | 44 | **ORDER by Magistrate Judge Jacqueline Scott Corley granting (44) Stipulation Regarding Joint Protective Order in case 4:13-cv-01105-YGR; granting (70) Stipulation Regarding Joint Protective Order in case 4:14-cv-01648-YGR; granting (44) Stipulation Regarding Joint Protective Order in case 4:14-cv-01647-YGR; granting (50) Stipulation Regarding Joint Protective Order in case 4:14-cv-01650-YGR; granting (42) Stipulation Regarding Joint Protective Order in case 4:14-cv-01649-YGR (ahm, COURT STAFF) (Filed on 10/6/2014) (Entered: 10/06/2014)** |
| 10/20/2014 | 45 | ANSWER TO COUNTERCLAIM 39 Answer to Amended Complaint, Counterclaim byBlue Spike, LLC. (Garteiser, Randall) (Filed on 10/20/2014) (Entered: 10/20/2014) |
| 12/02/2014 | 46 | ADR Clerk's Notice Setting ADR Phone Conference on Thursday, December 4, 2014 at 11:00 AM Pacific time. Please note that you must be logged into an ECF account of counsel of record in order to view this document. (cmf, COURT STAFF) (Filed on 12/2/2014) (Entered: 12/02/2014) |
| 12/04/2014 | | ADR Remark: Plaintiff's counsel failed to appear for the ADR Phone Conference scheduled on 12/4/2014 at 11:00 AM. ADR Phone Conference is rescheduled to 12/10/2014 at 3:00 PM. Call-in information remains the same. (cmf, COURT STAFF) (Filed on 12/4/2014) Modified on 12/4/2014 (cmf, COURT STAFF). (Entered: 12/04/2014) |
| 12/12/2014 | 47 | NOTICE of Appearance by Michelle Ann Clark *as Counsel for Defendant SoundHound, Inc.* (Clark, Michelle) (Filed on 12/12/2014) (Entered: 12/12/2014) |
| 12/12/2014 | 48 | NOTICE of Appearance by Jennifer A. Kash *as Counsel for Defendant SoundHound, Inc.* (Kash, Jennifer) (Filed on 12/12/2014) (Entered: 12/12/2014) |
| 12/12/2014 | 49 | NOTICE of Appearance by Sean Sang-Chul Pak *as Counsel for Defendant SoundHound, Inc.* (Pak, Sean) (Filed on 12/12/2014) (Entered: 12/12/2014) |
| 12/15/2014 | 50 | NOTICE of Appearance by Catherine Rose Lacey *as Counsel for Defendant SoundHound, Inc.* (Lacey, Catherine) (Filed on 12/15/2014) (Entered: 12/15/2014) |
| 12/17/2014 | 51 | NOTICE of Change In Counsel by Michelle Ann Clark (Clark, Michelle) (Filed on 12/17/2014) (Entered: 12/17/2014) |

| 12/18/2014 | [52](#) | NOTICE of Appearance by Jason L Liu *as Counsel for Defendant SoundHound, Inc.* (Liu, Jason) (Filed on 12/18/2014) (Entered: 12/18/2014) |
|---|---|---|
| 12/22/2014 | | ADR Remark: ADR Phone Conference held 12/10/2014 with Daniel Bowling. (cmf, COURT STAFF) (Filed on 12/22/2014) (Entered: 12/22/2014) |
| 02/27/2015 | [53](#) | STIPULATION WITH PROPOSED ORDER *Re Time to Exchange Preliminary Claim Construction and Extrinsic Evidence* filed by Blue Spike, LLC, SoundHound Inc. (Garteiser, Randall) (Filed on 2/27/2015) Modified on 3/2/2015 (cpS, COURT STAFF). (Entered: 02/27/2015) |
| 03/04/2015 | [54](#) | **ORDER by Judge Yvonne Gonzalez Rogers granting [53](#) Stipulation re Time to Exchange Preliminary Claim Construction and Extrinsic Evidence. (fs, COURT STAFF) (Filed on 3/4/2015) (Entered: 03/04/2015)** |
| 03/06/2015 | [55](#) | STIPULATION WITH PROPOSED ORDER *re Time to Exchange Preliminary Claim Construction and Extrinsic Evidence* filed by SoundHound, Inc., Blue Spike LLC. (Liu, Jason) (Filed on 3/6/2015) Modified on 3/9/2015 (cpS, COURT STAFF). (Entered: 03/06/2015) |
| 03/10/2015 | [56](#) | **ORDER by Judge Yvonne Gonzalez Rogers granting [55](#) Stipulation re Time to Exchange (fs, COURT STAFF) (Filed on 3/10/2015) (Entered: 03/10/2015)** |
| 03/19/2015 | [57](#) | Joint MOTION to Dismiss filed by SoundHound, Inc.. Responses due by 4/2/2015. Replies due by 4/9/2015. (Attachments: # [1](#) Proposed Order Granting Motion to Dismiss)(Liu, Jason) (Filed on 3/19/2015) (Entered: 03/19/2015) |
| 03/23/2015 | [58](#) | **ORDER [AS MODIFIED BY THE COURT] by Judge Yvonne Gonzalez Rogers granting [57](#) Joint Motion to Dismiss (fs, COURT STAFF) (Filed on 3/23/2015) (Entered: 03/23/2015)** |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 03/23/2016 11:43:34 | | | |
| **PACER Login:** | arnoldporterwest:2506668:0 | **Client Code:** | 0026064.0000666791 |
| **Description:** | Docket Report | **Search Criteria:** | 4:14-cv-01649-YGR |
| **Billable Pages:** | 11 | **Cost:** | 1.10 |

# U.S. District Court
## California Northern District (Oakland)
## CIVIL DOCKET FOR CASE #: 4:14-cv-01648-YGR

Blue Spike, LLC v. Zeitera, LLC et al
Assigned to: Hon. Yvonne Gonzalez Rogers
Referred to: Magistrate Judge Jacqueline Scott Corley
Relate Case Case: 4:13-cv-01105-YGR
Case in other court: Texas Eastern, 6:12-cv-00568
Cause: 35:271 Patent Infringement

Date Filed: 04/10/2014
Date Terminated: 04/27/2015
Jury Demand: Both
Nature of Suit: 830 Patent
Jurisdiction: Federal Question

### Plaintiff

**Blue Spike, LLC**

represented by **Christopher A Honea**
Garteiser Honea PLLC
218 N. College Avenue
Tyler, TX 75702
903-705-7420
Fax: 888-908-4400
Email: chonea@ghiplaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Christopher S Johns**
Johns Marrs Ellis & Hodge LLP
300 West Sixth Street
Suite 1950
Austin, TX 78701
512-215-4078
Fax: 512-628-7169
Email: cjohns@jmehlaw.com
*ATTORNEY TO BE NOTICED*

**Eric Miller Albritton**
Albritton Law Firm
P.O. Box 2649
Longview, Tx 75606
903-757-8449
Email: ema@emafirm.com
*TERMINATED: 05/03/2013*

**Michael A Benefield**
Williams Morgan & Amerson PC
10333 Richmond Ave
Suite 1100
Houston, TX 77042
(713) 934-7000 ext 4091

Fax: (713) 934-7011
Email: mbenefield@wmalaw.com
*TERMINATED: 05/03/2013*

**Peter Stuart Brasher**
Garteiser Honea
44 N San Pedro Rd.
San Rafael, CA 94903
415-785-3762
Email: pbrasher@ghiplaw.com
*ATTORNEY TO BE NOTICED*

**Randall Garteiser**
Garteiser Honea, P.C.
44 N. San Pedro Road
San Rafael, CA 94903
(415) 568-0553
Fax: (415) 785-3805
Email:
randall.garteiser@sftrialattorneys.com
*ATTORNEY TO BE NOTICED*

**Randall T Garteiser**
Garteiser Honea PLLC
218 N. College Avenue
Tyler, TX 75702
903-705-7420
Fax: 888-908-4400
Email: rgarteiser@ghiplaw.com
*ATTORNEY TO BE NOTICED*

**Stephen Eugene Edwards**
Blank Rome LLP
717 Texas Avenue
Suite 1400
Houston, Tx 77002
713,228,6601
Fax: 713.228.6605
Email: sedwards@blankrome.com
*TERMINATED: 03/08/2013*

V.

**Defendant**

**Zeitera, LLC**                   represented by **Teresa Marie Corbin**
Fenwick & West - San Francisco
555 California Street
12th Floor
San Francisco, CA 94104
415-875-2303

Fax: 415-281-1350
Email: tcorbin@fenwick.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Bryan A. Kohm**
Fenwick & West LLP
555 California Street, 12th Floor
San Francisco, CA 94104
415-875-2300
Fax: 415-281-1350
Email: bkohm@fenwick.com
*ATTORNEY TO BE NOTICED*

**Bryan Alexander Kohm**
Fenwick & West - San Francisco
555 California Street
12th Floor
San Francisco, CA 94104
415-875-2300
Fax: 415-281-1350
Email: bkohm@fenwick.com
*ATTORNEY TO BE NOTICED*

**Darren E. Donnelly**
Fenwick & West LLP
Silicon Valley Center
801 California Street
Mountain View, CA 94041
650-988-8500
Fax: 650-938-5200
Email: ddonnelly@fenwick.com
*ATTORNEY TO BE NOTICED*

**David M Lacy Kusters**
Fenwick & West - San Francisco
555 California Street
12th Floor
San Francisco, CA 94104
415-875-2300
Fax: 415-281-1350
Email: dlacykusters@fenwick.com
*ATTORNEY TO BE NOTICED*

**Jeffrey Allen Ware**
Fenwick and West
1191 Second Ave.
10th Floor
Seattle, WA 98101
206-389-4531

Email: jware@fenwick.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**Ensequence, Inc.**
*TERMINATED: 04/16/2014*

represented by **Julia Elizabeth Markley**
Perkins Coie, LLP
1120 NW Couch Street
10th Floor
Portland, OR 97209-4128
503-727-2259
Email: jmarkley@perkinscoie.com
*LEAD ATTORNEY*

**Douglas L Sawyer**
Perkins Coie LLP - Denver
1900 Sixteenth Street
Suite 1400
Denver, TX 80202
303-291-2378
Fax: 303-291-2478
Email: dsawyer@perkinscoie.com

**Scott D. Eads**
Perkins Coie LLP
1120 N.W. Couch Street
Tenth Floor
Portland, OR 97209-4128
(503) 727-2192
Fax: 503-346-2192
Email: seads@perkinscoie.com

**Defendant**

**Related Content Database, Inc.**
*doing business as*
Watchwith

represented by **Alyssa M. Caridis**
Orrick, Herrington & Sutcliffe LLP
777 South Figueroa Street
Suite 3200
Los Angeles, CA 90017
213-612-2372
Fax: 213-612-2499
Email: acaridis@orrick.com
*ATTORNEY TO BE NOTICED*

**Christopher James Higgins**
Orrick, Herrington & Sutcliffe LLP
Columbia Center
1152 15th Street, NW
Washington, DC 20005-1706
202-339-8400
Fax: 202-339-8500
Email: chiggins@orrick.com

*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Eric Hugh Findlay**
Findlay Craft PC
102 N College Avenue
Suite 900
Tyler, TX 75702
903/534-1100
Fax: 903/534-1137
Email: efindlay@findlaycraft.com
*ATTORNEY TO BE NOTICED*

**Gabriel M. Ramsey**
Orrick Herrington & Sutcliffe LLP
1000 Marsh Road
Menlo Park, CA 94025
650-614-7400
Email: gramsey@orrick.com
*ATTORNEY TO BE NOTICED*

**Indra Neel Chatterjee**
Orrick Herrington & Sutcliffe LLP
1000 Marsh Road
Menlo Park, CA 94025
650-614-7400
Fax: 650-614-7401
Email: nchatterjee@orrick.com
*ATTORNEY TO BE NOTICED*

**Walter Wayne Lackey , Jr.**
Findlay Craft PC
102 N College Avenue
Suite 900
Tyler, TX 75702
903/534-1100
Fax: 903/534-1137
Email: wlackey@findlaycraft.com
*ATTORNEY TO BE NOTICED*

**Counter-claimant**

Zeitera, LLC          represented by **Teresa Marie Corbin**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Bryan A. Kohm**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Bryan Alexander Kohm**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Darren E. Donnelly**
(See above for address)
*ATTORNEY TO BE NOTICED*

**David M Lacy Kusters**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jeffrey Allen Ware**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Counter-defendant**

**Blue Spike, LLC**                    represented by    **Christopher A Honea**
Garteiser Honea PLLC
218 N. College Ave
Tyler, TX 75702
903-705-7420
Fax: 888-908-4400
Email: chonea@ghiplaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Christopher S Johns**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Eric Miller Albritton**
(See above for address)
*TERMINATED: 05/03/2013*

**Michael A Benefield**
(See above for address)
*TERMINATED: 05/03/2013*

**Randall T Garteiser**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Stephen Eugene Edwards**
(See above for address)
*TERMINATED: 03/08/2013*

**Counter-claimant**

**Zeitera, LLC**                    represented by   **Teresa Marie Corbin**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Bryan A. Kohm**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Bryan Alexander Kohm**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Darren E. Donnelly**
(See above for address)
*ATTORNEY TO BE NOTICED*

**David M Lacy Kusters**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jeffrey Allen Ware**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**<u>Counter-defendant</u>**

**Blue Spike, LLC**                    represented by   **Christopher A Honea**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Christopher S Johns**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Eric Miller Albritton**
(See above for address)
*TERMINATED: 05/03/2013*

**Michael A Benefield**
(See above for address)
*TERMINATED: 05/03/2013*

**Peter Stuart Brasher**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Randall Garteiser**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Randall T Garteiser**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Stephen Eugene Edwards**
(See above for address)
*TERMINATED: 03/08/2013*

| Date Filed | # | Docket Text |
|---|---|---|
| 08/23/2012 | 1 | COMPLAINT against Ensequence, Inc., Related Content Database, Inc., Zeitera, LLC ( Filing fee $ 350 receipt number 0540-3744954.), filed by Blue Spike, LLC. (Attachments: # 1 Civil Cover Sheet, # 2 Exhibit A - Patent 8214175, # 3 Exhibit B - Patent 7949494, # 4 Exhibit C - Patent 7660700, # 5 Exhibit D - Patent 7346472) (Albritton, Eric) (Entered: 08/23/2012) |
| 08/23/2012 | 2 | Notice of Filing of Patent/Trademark Form (AO 120). AO 120 mailed to the Director of the U.S. Patent and Trademark Office. (Albritton, Eric) (Entered: 08/23/2012) |
| 08/23/2012 | 3 | CORPORATE DISCLOSURE STATEMENT filed by Blue Spike, LLC (Albritton, Eric) (Entered: 08/23/2012) |
| 08/23/2012 | 4 | NOTICE of Attorney Appearance by Stephen Edwards on behalf of Blue Spike, LLC (Edwards, Stephen) (Entered: 08/23/2012) |
| 08/23/2012 | 5 | NOTICE of Attorney Appearance by Michael A. Benefield on behalf of Blue Spike, LLC (Benefield, Michael) (Entered: 08/23/2012) |
| 08/23/2012 | | Judge Leonard Davis added. (mll, ) (Entered: 08/23/2012) |
| 08/24/2012 | 6 | NOTICE of Attorney Appearance by Christopher A Honea on behalf of Blue Spike, LLC (Honea, Christopher) (Entered: 08/24/2012) |
| 08/24/2012 | 7 | NOTICE of Attorney Appearance by Christopher S Johns on behalf of Blue Spike, LLC (Johns, Christopher) (Entered: 08/24/2012) |
| 08/24/2012 | 8 | NOTICE of Attorney Appearance by Randall T Garteiser on behalf of Blue Spike, LLC (Garteiser, Randall) (Entered: 08/24/2012) |
| 09/24/2012 | 9 | SUMMONS Issued as to Ensequence, Inc., Related Content Database, Inc., Zeitera, LLC and emailed to pltf for service. (Attachments: # 1 Summons(es), # 2 Summons(es))(klb) (Entered: 09/24/2012) |
| 10/09/2012 | 10 | ORDER that this civil action is CONSOLIDATED for pretrial issues only, with the exception of venue. **The earliest filed civil action 6:12cv499 shall serve as the Lead Case for consolidated issues.** The individual cases will remain active for venue motions and trial. All motions, other than venue motions, shall be filed in the consolidated lead case. Parties shall submit a single Docket Control, Discovery, |

| | | |
|---|---|---|
| | | ESI, and Protective Order, and each of the respective orders shall be filed in the Lead Case. Signed by Judge Leonard Davis on 10/09/12. cc:attys 10-10-12(mll, ) (Entered: 10/10/2012) |
| 10/09/2012 | | **This Civil Action is CONSOLIDATED with cause 6:12cv499, which is designated as the Lead Case. All future pleadings, except for venue motions, should be filed in the Lead Case.** (mll, ) (Entered: 10/10/2012) |
| 10/10/2012 | 11 | NOTICE of Attorney Appearance by Teresa Marie Corbin on behalf of Zeitera, LLC (Corbin, Teresa) (Entered: 10/10/2012) |
| 10/10/2012 | 12 | Defendant's Unopposed First Application for Extension of Time to Answer Complaint re Zeitera, LLC.( Corbin, Teresa) (Entered: 10/10/2012) |
| 10/10/2012 | 13 | NOTICE of Attorney Appearance by Darren E Donnelly on behalf of Zeitera, LLC (Donnelly, Darren) (Entered: 10/10/2012) |
| 10/10/2012 | 14 | NOTICE of Attorney Appearance by Bryan Alexander Kohm on behalf of Zeitera, LLC (Kohm, Bryan) (Entered: 10/10/2012) |
| 10/10/2012 | 15 | NOTICE of Attorney Appearance by David M Lacy Kusters on behalf of Zeitera, LLC (Lacy Kusters, David) (Entered: 10/10/2012) |
| 10/12/2012 | | Defendant's Unopposed First Application for Extension of Time to Answer Complaint 12 is granted pursuant to Local Rule CV-12 for Zeitera, LLC to 11/21/2012. 30 Days Granted for Deadline Extension. **Answer to be filed in Lead Case 6:12cv499.**( mll, ) (Entered: 10/12/2012) |
| 10/19/2012 | 16 | NOTICE of Attorney Appearance by Douglas L Sawyer on behalf of Ensequence, Inc. (Sawyer, Douglas) (Entered: 10/19/2012) |
| 10/19/2012 | 17 | NOTICE of Attorney Appearance by Scott D Eads on behalf of Ensequence, Inc. (Eads, Scott) (Entered: 10/19/2012) |
| 10/22/2012 | 18 | MOTION to Dismiss for Lack of Jurisdiction *and Improper Venue* by Ensequence, Inc.. (Attachments: # 1 Declaration of Aslam Khader, # 2 Exhibit A to Khader Declaration, # 3 Exhibit B to Khader Declaration)(Sawyer, Douglas) (Additional attachment(s) added on 10/22/2012: # 4 Text of Proposed Order) (sm, ). (Entered: 10/22/2012) |
| 10/22/2012 | 19 | CORPORATE DISCLOSURE STATEMENT filed by Ensequence, Inc. (Sawyer, Douglas) (Entered: 10/22/2012) |
| 10/22/2012 | 20 | NOTICE of Attorney Appearance - Pro Hac Vice by Julia Elizabeth Markley on behalf of Ensequence, Inc.. Filing fee $ 100, receipt number 0540-3840009. (Markley, Julia) (Entered: 10/22/2012) |
| 11/08/2012 | 21 | RESPONSE in Opposition re 18 MOTION to Dismiss for Lack of Jurisdiction *and Improper Venue filed by Blue Spike, LLC* . (Garteiser, Randall) (Additional attachment(s) added on 11/9/2012: # 1 Text of Proposed Order) (gsg, ). (Entered: 11/09/2012) |
| 11/09/2012 | 22 | Additional Attachments to Main Document: 21 Response in Opposition to Motion.. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13)(Garteiser, Randall) (Entered: |

| | | |
|---|---|---|
| | | 11/09/2012) |
| 11/19/2012 | 23 | REPLY to Response to Motion re 18 MOTION to Dismiss for Lack of Jurisdiction *and Improper Venue filed by Ensequence, Inc.* . (Attachments: # 1 Supplemental Declaration)(Sawyer, Douglas) (Entered: 11/19/2012) |
| 11/21/2012 | 24 | ANSWER to 1 Complaint, *by Zeitera, LLC,* COUNTERCLAIM against Blue Spike, LLC by Zeitera, LLC.(Corbin, Teresa) (Entered: 11/21/2012) |
| 11/29/2012 | 25 | SUR-REPLY to Reply to Response to Motion re 18 MOTION to Dismiss for Lack of Jurisdiction *and Improper Venue filed by Blue Spike, LLC* . (Garteiser, Randall) (Entered: 11/29/2012) |
| 12/06/2012 | 26 | NOTICE of Attorney Appearance by Gabriel M Ramsey on behalf of Related Content Database, Inc. (Ramsey, Gabriel) (Entered: 12/06/2012) |
| 12/06/2012 | 27 | NOTICE of Attorney Appearance by Indra Neel Chatterjee on behalf of Related Content Database, Inc. (Chatterjee, Indra) (Entered: 12/06/2012) |
| 12/07/2012 | 28 | NOTICE of Attorney Appearance by Christopher James Higgins on behalf of Related Content Database, Inc. (Higgins, Christopher) (Entered: 12/07/2012) |
| 12/21/2012 | 29 | NOTICE of Attorney Appearance by Eric Hugh Findlay on behalf of Related Content Database, Inc. (Findlay, Eric) (Entered: 12/21/2012) |
| 12/21/2012 | 30 | NOTICE of Attorney Appearance by Walter Wayne Lackey, Jr on behalf of Related Content Database, Inc. (Lackey, Walter) (Entered: 12/21/2012) |
| 01/15/2013 | 31 | Order reassigning this case to United States District Judge Michael H. Schneider per General Order 13-3. Please see Appendix D: Addendum Regarding Cases Assigned to Judge Schneider. Judge Leonard Davis no longer assigned to the case. (gsg) (Entered: 01/15/2013) |
| 03/26/2013 | 32 | ORDER OF CONSOLIDATION. The above listed cases are hereby consolidated into cause number 6:12cv499, Blue Spike, LLC v. Texas Instruments, Inc., for all pretrial purposes, including discovery and claim construction. The Clerk of the Court shall add the consolidated defendants to the lead case, as well as lead counsel only. Any other counsel who wishes to appear in the lead case shall file a notice of appearance in that case. The Clerk shall close all cases listed above other than the lead case. **Any motions including motions challenging venue or jurisdiction filed prior to consolidation in all cases must be refiled in the consolidated case 6:12cv499 to be considered by the Court.** The Court ORDERS Plaintiff to file a notice of readiness for scheduling conference when all Defendants in the consolidated case have either answered or filed a motion to transfer or dismiss. The notice must be filed within five days of the last remaining Defendants answer or motion. The notice must include a list of any pending motions to dismiss or transfer and a list of any other related cases filed in the Eastern District of Texas involving the same patents. If the consolidated case is not ready for scheduling conference within 90 days of this order, Plaintiff must file a detailed status report explaining the reason for the delay. Furthermore, attorney Stephen E. Edwards has moved to withdraw from several of the cases listed above. The Court GRANTS the motions in all cases in which it is pending. Signed by Judge Michael H. Schneider on 03/25/13. cc:attys 3-26-13(mll, ) (Entered: 03/26/2013) |
| 09/27/2013 | 33 | ORDER OF DISMISSAL. Plaintiff's claims against Defendant Ensequence, Inc. |

| | | are DISMISSED WITHOUT PREJUDICE. Signed by Judge Michael H. Schneider on 09/27/13. (mll, ) (Entered: 09/27/2013) |
|---|---|---|
| 03/13/2014 | 34 | ORDER granting Motion to Change Venue filed in the lead consolidated case, 6:12cv499, by Defendant Zietera, LLC. Plaintiff's claims against Zietera, LLC and Related Content Database, Inc. are SEVERED from the lead case back into the original cause number, 6:12-cv-568, and the clerk of the court is directed to TRANSFER the severed action to the Northern District of California for further consideration. Signed by Judge Michael H. Schneider on 3/13/14. (mjc, ) (Entered: 03/14/2014) |
| 04/07/2014 | | Interdistrict transfer to the Northern District of California. (mjc, ) (Entered: 04/07/2014) |
| 04/10/2014 | 35 | Case transferred in from District of Texas Eastern; Case Number 6:12-cv-00568. Original file certified copy of transfer order and docket sheet received. (Entered: 04/10/2014) |
| 04/10/2014 | 36 | CLERKS NOTICE : Informing all Parties that this case is now with the United States District Court for the Northern District of California. Re 35 Order of Transfer (aaa, COURT STAFF) (Filed on 4/10/2014) (Entered: 04/10/2014) |
| 04/10/2014 | 37 | **Initial Case Management Scheduling Order with ADR Deadlines:** Case Management Statement due by 7/8/2014. Case Management Conference set for 7/15/2014 10:00 AM. Signed by Magistrate Judge Elizabeth D. Laporte on 4/10/14. (Attachments: # 1 EDL Standing Order, # 2 Standing Order)(aaa, COURT STAFF) (Filed on 4/10/2014) (Entered: 04/10/2014) |
| 04/15/2014 | 38 | FIRST CLERK'S NOTICE Re: Consent or Declination: Plaintiffs/Defendants shall file a consent or declination to proceed before a magistrate judge within 14 days of this notice. The forms are located on the court's website: www.cand.uscourts.gov. *This is a text only docket entry, there is no document associated with this notice.* (knm, COURT STAFF) (Filed on 4/15/2014) (Entered: 04/15/2014) |
| 04/18/2014 | 39 | MOTION for leave to appear in Pro Hac Vice *Christopher Higgins* ( Filing fee $ 305, receipt number 0971-8545786.) filed by Related Content Database, Inc.. (Higgins, Christopher) (Filed on 4/18/2014) (Entered: 04/18/2014) |
| 04/18/2014 | 40 | NOTICE of Appearance by Gabriel M. Ramsey (Ramsey, Gabriel) (Filed on 4/18/2014) (Entered: 04/18/2014) |
| 04/18/2014 | 41 | NOTICE of Appearance by Alyssa M. Caridis (Caridis, Alyssa) (Filed on 4/18/2014) (Entered: 04/18/2014) |
| 04/18/2014 | 42 | NOTICE of Appearance by Indra Neel Chatterjee (Chatterjee, Indra) (Filed on 4/18/2014) (Entered: 04/18/2014) |
| 04/18/2014 | 43 | **ORDER GRANTING APPLICATION FOR ADMISSION OF ATTORNEY PRO HAC VICE, Christopher J. Higgins by Chief Magistrate Judge Elizabeth D. Laporte: Granting 39 Motion for Pro Hac Vice. (ls, COURT STAFF) (Filed on 4/18/2014) (Entered: 04/18/2014)** |
| 04/28/2014 | 44 | CONSENT/DECLINATION to Proceed Before a US Magistrate Judge by Related Content Database, Inc... (Ramsey, Gabriel) (Filed on 4/28/2014) (Entered: 04/28/2014) |

| | | |
|---|---|---|
| 04/28/2014 | 45 | CLERK'S NOTICE of Impending Reassignment to U.S. District Judge (rmm2S, COURT STAFF) (Filed on 4/28/2014) (Entered: 04/28/2014) |
| 04/28/2014 | 46 | **ORDER REASSIGNING CASE. Case reassigned to Judge Hon. Richard Seeborg for all further proceedings. Magistrate Judge Elizabeth D. Laporte no longer assigned to the case. Signed by Executive Committee on 4/28/14. (sv, COURT STAFF) (Filed on 4/28/2014) (Entered: 04/28/2014)** |
| 04/28/2014 | 47 | CLERKS NOTICE SCHEDULING CASE MANAGEMENT CONFERENCE. Case Management Statement due by 7/10/2014. Case Management Conference set for 7/17/2014 10:00 AM in Courtroom 3, 17th Floor, San Francisco. (cl, COURT STAFF) (Filed on 4/28/2014) (Entered: 04/28/2014) |
| 05/19/2014 | 48 | NOTICE of Appearance by Peter Stuart Brasher *on behalf of Blue Spike, LLC* (Brasher, Peter) (Filed on 5/19/2014) (Entered: 05/19/2014) |
| 05/19/2014 | 49 | NOTICE of Appearance by Randall Garteiser *on behalf of Blue Spike, LLC* (Garteiser, Randall) (Filed on 5/19/2014) (Entered: 05/19/2014) |
| 05/19/2014 | 50 | NOTICE of Appearance by Christopher Alan Honea *on behalf of Blue Spike, LLC* (Honea, Christopher) (Filed on 5/19/2014) (Entered: 05/19/2014) |
| 06/11/2014 | 51 | **ORDER RELATING CASES C-13-1105-YGR and C-14-1647-BLF, C-14-1648-RS, C-14-1649-KAW and C-14-1650-JD. Signed by Judge Yvonne Gonzalez Rogers on 6/11/14. (fs, COURT STAFF) (Filed on 6/11/2014) (Entered: 06/11/2014)** |
| 06/11/2014 | | **Case reassigned to Judge Hon. Yvonne Gonzalez Rogers. Judge Hon. Richard Seeborg no longer assigned to the case. (cpS, COURT STAFF) (Filed on 6/11/2014) (Entered: 06/12/2014)** |
| 06/19/2014 | 52 | CLERKS NOTICE SETTING CASE MANAGEMENT CONFERENCE IN RELATED CASES. Case Management Statement due by 7/21/2014. Initial Case Management Conference set for 7/28/2014 02:00 PM before Judge Yvonne Gonzalez Rogers in Courtroom 1, 4th Floor, Oakland. (Attachments: # 1 Standing Order) (fs, COURT STAFF) (Filed on 6/19/2014) (Entered: 06/19/2014) |
| 06/19/2014 | 53 | AMENDED CLERKS NOTICE [amended to reflect the correct year of the case as to: 4:13-CV-1105-YGR] (fs, COURT STAFF) (Filed on 6/19/2014) (Entered: 06/24/2014) |
| 07/22/2014 | 54 | JOINT CASE MANAGEMENT STATEMENT *ON BEHALF OF ALL PARTIES* filed by Zeitera, LLC. Related Content Database, Inc.. (Kohm, Bryan) (Filed on 7/22/2014) Modified on 7/23/2014 (cpS, COURT STAFF). (Entered: 07/22/2014) |
| 07/25/2014 | 55 | MOTION to Stay *Action Against Downstream Customer of Accused Manufacturer* filed by Related Content Database, Inc.. Motion Hearing set for 9/2/2014 02:00 PM in Courtroom 1, 4th Floor, Oakland before Hon. Yvonne Gonzalez Rogers. Responses due by 8/8/2014. Replies due by 8/15/2014. (Attachments: # 1 Proposed Order, # 2 Declaration Zane Vella, # 3 Declaration Gabe Ramsey, # 4 Exhibit 1, # 5 Exhibit 2, # 6 Exhibit 3, # 7 Exhibit 4, # 8 Exhibit 5, # 9 Exhibit 6, # 10 Exhibit 7, # 11 Exhibit 8, # 12 Exhibit 9, # 13 Exhibit 10, # 14 Exhibit 11)(Ramsey, Gabriel) (Filed on 7/25/2014) (Entered: 07/25/2014) |
| 07/28/2014 | 57 | Minute Entry: Initial Case Management Conference held on 7/28/2014 before |

| | | |
|---|---|---|
| | | Yvonne Gonzalez Rogers (Date Filed: 7/28/2014). Case REFERRED to Magistrate Judge Corley for Discovery. Tutorial Hearing set for Friday, 5/1/2015 10:00 AM in Courtroom 1, 4th Floor, Oakland. (Court Reporter Diane Skillman.) (fs, COURT STAFF) (Date Filed: 7/28/2014) (Entered: 07/30/2014) |
| 07/30/2014 | 56 | ADR Certification (ADR L.R. 3-5 b) of discussion of ADR options (Garteiser, Randall) (Filed on 7/30/2014) (Entered: 07/30/2014) |
| 07/31/2014 | 58 | STIPULATION WITH PROPOSED ORDER re proposed schedule filed by Ensequence, Inc., Related Content Database, Inc., Zeitera, LLC., Blue Spike LLC (Lee, Nicholas) (Filed on 7/31/2014) Modified on 8/1/2014 (cpS, COURT STAFF). (Entered: 07/31/2014) |
| 08/04/2014 | 59 | **ORDER by Judge Yvonne Gonzalez Rogers granting (39) Stipulation re Joint Schedule in case 4:13-cv-01105-YGR; granting (58) Stipulation re Joint Schedule in case 4:14-cv-01648-YGR; granting (40) Stipulation re Joint Schedule in case 4:14-cv-01647-YGR; granting (39) Stipulation re Joint Schedule in case 4:14-cv-01650-YGR; granting (35) Stipulation re Joint Schedule in case 4:14-cv-01649-YGR (fs, COURT STAFF) (Filed on 8/4/2014) (Entered: 08/04/2014)** |
| 08/04/2014 | | Set Deadlines/Hearings: Claim Construction Discovery completed by 5/2/2015. Opening Claim Construction Brief by Blue Spike filed 6/2/15; Responsive Claim Construction Brief by AOptix and Defendants filed by 6/23/15; Reply Claim Construction Brief by Blue Spike filed by 7/7/15. Status Conference set for 5/1/2015 10:00 AM in Courtroom 1, 4th Floor, Oakland before Hon. Yvonne Gonzalez Rogers. (fs, COURT STAFF) (Filed on 8/4/2014) (Entered: 08/04/2014) |
| 08/08/2014 | 60 | RESPONSE (re 55 MOTION to Stay *Action Against Downstream Customer of Accused Manufacturer* )and MOTION to Transfer Case filed byBlue Spike, LLC. (Attachments: # 1 Proposed Order, # 2 Exhibit 1)(Garteiser, Randall) (Filed on 8/8/2014) Modified on 8/11/2014 (cpS, COURT STAFF). (Entered: 08/08/2014) |
| 08/13/2014 | 61 | Transcript of Proceedings held on July 28, 2014, before Judge Yvonne Gonzalez Rogers. Court Reporter Diane E. Skillman, Telephone number 510-451-2930, Diane_Skillman@cand.uscourts.gov, diane.transcripts@aol.com. Per General Order No. 59 and Judicial Conference policy, this transcript may be viewed only at the Clerks Office public terminal or may be purchased through the Court Reporter until the deadline for the Release of Transcript Restriction.After that date it may be obtained through PACER. Any Notice of Intent to Request Redaction, if required, is due no later than 5 business days from date of this filing. (Re (39 in 4:14-cv-01647-YGR) Transcript Order ) Release of Transcript Restriction set for 11/12/2014. (Skillman, Diane) (Filed on 8/13/2014) (Entered: 08/13/2014) |
| 08/14/2014 | 62 | TRANSCRIPT ORDER by Related Content Database, Inc. for Court Reporter Diane Skillman. (Ramsey, Gabriel) (Filed on 8/14/2014) (Entered: 08/14/2014) |
| 08/14/2014 | 63 | TRANSCRIPT ORDER by Zeitera, LLC for Court Reporter Diane Skillman. (Kohm, Bryan) (Filed on 8/14/2014) (Entered: 08/14/2014) |
| 08/15/2014 | 64 | REPLY (re 55 MOTION to Stay *Action Against Downstream Customer of Accused Manufacturer* ) filed byRelated Content Database, Inc.. (Attachments: # 1 Declaration, # 2 Exhibit 12)(Ramsey, Gabriel) (Filed on 8/15/2014) (Entered: |

| | | |
|---|---|---|
| | | 08/15/2014) |
| 08/28/2014 | 65 | **ORDER by Judge Yvonne Gonzalez Rogers granting 55 Motion to Stay as to Defendant Related Content Database, Inc. dba Watchwith. This order does not affect defendant Zeitera, LLC. (fs, COURT STAFF) (Filed on 8/28/2014) (Entered: 08/28/2014)** |
| 09/15/2014 | 66 | AMENDED COMPLAINT against Zeitera, LLC. Filed byBlue Spike, LLC. (Garteiser, Randall) (Filed on 9/15/2014) (Entered: 09/15/2014) |
| 10/02/2014 | 67 | *ZEITERA, LLC'S* ANSWER to Amended Complaint *for Patent Infringement*, COUNTERCLAIM against Blue Spike, LLC byZeitera, LLC.; Jury Demand (Kohm, Bryan) (Filed on 10/2/2014) Modified on 10/3/2014 (cpS, COURT STAFF). (Entered: 10/02/2014) |
| 10/02/2014 | 68 | STIPULATION WITH PROPOSED ORDER *Regarding Discovery of Electronically Stored Information (Joint ESI Order)* filed by Zeitera, LLC., Blue Spike LLC (Lee, Nicholas) (Filed on 10/2/2014) Modified on 10/3/2014 (cpS, COURT STAFF). (Entered: 10/02/2014) |
| 10/02/2014 | 69 | NOTICE of Appearance by Jeffrey Allen Ware (Ware, Jeffrey) (Filed on 10/2/2014) (Entered: 10/02/2014) |
| 10/03/2014 | 70 | STIPULATION WITH PROPOSED ORDER *Regarding Joint Protective Order* filed by Zeitera, LLC., Blue Spike LLC (Lee, Nicholas) (Filed on 10/3/2014) Modified on 10/6/2014 (cpS, COURT STAFF). (Entered: 10/03/2014) |
| 10/06/2014 | 71 | **ORDER by Magistrate Judge Jacqueline Scott Corley granting (42) Stipulation Regarding Discovery of Electronically Stored Information (Joint ESI Order) in case 4:13-cv-01105-YGR; granting (68) Stipulation Regarding Discovery of Electronically Stored Information (Joint ESI Order) in case 4:14-cv-01648-YGR; granting (49) Stipulation Regarding Discovery of Electronically Stored Information (Joint ESI Order) in case 4:14-cv-01650-YGR; granting (40) Stipulation Regarding Discovery of Electronically Stored Information (Joint ESI Order) in case 4:14-cv-01649-YGR (ahm, COURT STAFF) (Filed on 10/6/2014) (Entered: 10/06/2014)** |
| 10/06/2014 | 72 | **ORDER by Magistrate Judge Jacqueline Scott Corley granting (44) Stipulation Regarding Joint Protective Order in case 4:13-cv-01105-YGR; granting (70) Stipulation Regarding Joint Protective Order in case 4:14-cv-01648-YGR; granting (44) Stipulation Regarding Joint Protective Order in case 4:14-cv-01647-YGR; granting (50) Stipulation Regarding Joint Protective Order in case 4:14-cv-01650-YGR; granting (42) Stipulation Regarding Joint Protective Order in case 4:14-cv-01649-YGR (ahm, COURT STAFF) (Filed on 10/6/2014) (Entered: 10/06/2014)** |
| 10/20/2014 | 73 | ANSWER TO COUNTERCLAIM 67 Answer to Amended Complaint, Counterclaim byBlue Spike, LLC. (Garteiser, Randall) (Filed on 10/20/2014) (Entered: 10/20/2014) |
| 12/02/2014 | 74 | ADR Clerk's Notice Setting ADR Phone Conference on Thursday, December 4, 2014 at 11:00 AM Pacific time. Please note that you must be logged into an ECF account of counsel of record in order to view this document. (cmf, COURT STAFF) |

| | | |
|---|---|---|
| | | (Filed on 12/2/2014) (Entered: 12/02/2014) |
| 12/04/2014 | | ADR Remark: Plaintiff's counsel failed to appear for the ADR Phone Conference scheduled on 12/4/2014 at 11:00 AM. ADR Phone Conference is rescheduled to 12/10/2014 at 3:00 PM. Call-in information remains the same. (cmf, COURT STAFF) (Filed on 12/4/2014) Modified on 12/4/2014 (cmf, COURT STAFF). (Entered: 12/04/2014) |
| 12/22/2014 | | ADR Remark: ADR Phone Conference held 12/10/2014 with Daniel Bowling. (cmf, COURT STAFF) (Filed on 12/22/2014) (Entered: 12/22/2014) |
| 02/27/2015 | 75 | STIPULATION WITH PROPOSED ORDER *Re Time to Exchange Preliminary Claim Construction and Extrinsic Evidence* filed by Zeitera, LLC., Blue Spike LLC (Ware, Jeffrey) (Filed on 2/27/2015) Modified on 3/2/2015 (cpS, COURT STAFF). (Entered: 02/27/2015) |
| 03/04/2015 | 76 | **ORDER by Judge Yvonne Gonzalez Rogers granting 75 Stipulation re Time to Exchange Preliminary Claim Construction and Extrinsic Evidence. (fs, COURT STAFF) (Filed on 3/4/2015) (Entered: 03/04/2015)** |
| 03/06/2015 | 77 | Second STIPULATION WITH PROPOSED ORDER *Re Time to Exchange Preliminary Claim Construction and Extrinsic Evidence* filed by Zeitera, LLC., Blue Spike LLC (Kohm, Bryan) (Filed on 3/6/2015) Modified on 3/9/2015 (cpS, COURT STAFF). (Entered: 03/06/2015) |
| 03/06/2015 | 78 | Corrected Second STIPULATION WITH PROPOSED ORDER *Re Time to Exchange Preliminary Claim Construction and Extrinsic Evidence* filed by Zeitera, LLC., Blue Spike LLC (Kohm, Bryan) (Filed on 3/6/2015) Modified on 3/9/2015 (cpS, COURT STAFF). (Entered: 03/06/2015) |
| 03/10/2015 | 79 | **ORDER by Judge Yvonne Gonzalez Rogers granting 78 Corrected Second Stipulation (fs, COURT STAFF) (Filed on 3/10/2015) (Entered: 03/10/2015)** |
| 03/23/2015 | 80 | THIRD STIPULATION WITH PROPOSED ORDER RE TIME TO EXCHANGE PRELIMINARY CLAIM CONSTRUCTION AND EXTRINSIC EVIDENCE filed by Zeitera, LLC., Blue Spike LLC (Kohm, Bryan) (Filed on 3/23/2015) Modified on 3/24/2015 (cpS, COURT STAFF). (Entered: 03/23/2015) |
| 03/25/2015 | 81 | **ORDER by Judge Yvonne Gonzalez Rogers granting 80 Third Stipulation (fs, COURT STAFF) (Filed on 3/25/2015) (Entered: 03/26/2015)** |
| 03/30/2015 | 82 | STIPULATION WITH PROPOSED ORDER *Extending Deadlines Re: Claim Construction Disclosures* filed by Zeitera, LLC, Blue Spike LLC. (Ware, Jeffrey) (Filed on 3/30/2015) Modified on 3/31/2015 (cpS, COURT STAFF). (Entered: 03/30/2015) |
| 04/01/2015 | 83 | **ORDER by Judge Yvonne Gonzalez Rogers granting 82 Stipulation Extending Deadlines Re: Disclosures (fs, COURT STAFF) (Filed on 4/1/2015) (Entered: 04/01/2015)** |
| 04/13/2015 | 84 | STIPULATION WITH PROPOSED ORDER *EXTENDING DEADLINES RE CLAIM CONSTRUCTION DISCLOSURES* filed by Zeitera, LLC, Blue Spike LLC (Kohm, Bryan) (Filed on 4/13/2015) Modified on 4/14/2015 (cpS, COURT STAFF). (Entered: 04/13/2015) |

| 04/15/2015 | 85 | **ORDER[AS MODIFIED BY THE COURT] by Judge Yvonne Gonzalez Rogers granting 84 Stipulation Extending Deadlines re: Claim Construction Disclosures. (fs, COURT STAFF) (Filed on 4/15/2015) (Entered: 04/15/2015)** |
|---|---|---|
| 04/23/2015 | 86 | STIPULATION WITH PROPOSED ORDER *OF DISMISSAL WITH PREJUDICE* filed by Zeitera, LLC., Blue Spike LLC (Attachments: # 1 Proposed Order of Dismissal with Prejudice)(Kohm, Bryan) (Filed on 4/23/2015) Modified on 4/24/2015 (cpS, COURT STAFF). (Entered: 04/23/2015) |
| 04/27/2015 | 87 | **ORDER by Judge Yvonne Gonzalez Rogers granting 86 Stipulation for Dismissal of Action with prejudice (fs, COURT STAFF) (Filed on 4/27/2015) (Entered: 04/27/2015)** |

| **PACER Service Center** | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 03/23/2016 11:37:04 | | | |
| **PACER Login:** | arnoldporterwest:2506668:0 | **Client Code:** | 0026064.00006 6791 |
| **Description:** | Docket Report | **Search Criteria:** | 4:14-cv-01648-YGR |
| **Billable Pages:** | 13 | **Cost:** | 1.30 |

# United States Court of Appeals
# For the Federal Circuit

———————

BLUE SPIKE, LLC
*Plaintiff-Appellant,*

v.

GOOGLE INC.
*Defendant-Appellee,*

Appeal from The United States District Court
For The Northern District of California
In Case No. 14-CV-1650, Judge Yvonne Gonzalez Rogers

## CERTIFICATE OF SERVICE

I certify that I served a copy of the foregoing on counsel of record this 28th day of April, 2016 via e-mail and/or CM/ECF.

Dated: April 28, 2016          /s/ Randall T. Garteiser
                               Randall T. Garteiser